ORIGINAL

MORGAN, LEWIS & BOCKIUS LLP
JAMI WINTZ MCKEON, State Bar No. 237923
jmckeon@morganlewis.com
One Market, Spear Street Tower
San Francisco, CA 94105
Tel: 415.442.1405
Fax: 415.442.1001

DAVID L. SCHRADER, State Bar No. 149638
dschrader@morganlewis.com
300 South Grand Avenue
Twenty-Second Floor
Los Angeles, CA 90071-3132
Tel: 213.612.2500
Fax: 213.612.2501

Attorneys for Plaintiff
Deutsche Bank National Trust Company, as Trustee for
certain residential mortgage-backed securitization trusts
sponsored by IndyMac Bank, F.S.B

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| **Deutsche Bank National Trust Company**, as Trustee for certain residential mortgage-backed securitization trusts sponsored by IndyMac Bank, F.S.B., <br><br> Plaintiff, <br><br> vs. <br><br> **Federal Deposit Insurance Corporation**, as Receiver of IndyMac Bank, F.S.B.; Federal Deposit Insurance Corporation, as Conservator and Receiver of IndyMac Federal Bank F.S.B.; Federal Deposit Insurance Corporation, in its corporate capacity; and Federal Deposit Insurance Corporation, as Government Entity, <br><br> Defendants. | Case No. 2:09-cv-03852 GAF-FFMx <br><br><br> **FIRST AMENDED COMPLAINT FOR BREACH OF CONTRACT; REPUDIATION; BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING; BREACH OF FIDUCIARY DUTY; UNCONSTITUTIONAL TAKING; AND DUE PROCESS** <br><br> **DEMAND FOR JURY TRIAL** |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# I.

## **INTRODUCTION**

1.      This is an action by Deutsche Bank National Trust Company ("DBNTC") as trustee of more than 240 mortgage securitization trusts (each one a "Trust," and collectively the "Trusts") created by IndyMac Bank, F.S.B. ("IndyMac").[1]  As more fully set forth herein, IndyMac breached its promises to the Trusts before it failed and was placed in receivership with the Federal Deposit Insurance Corporation (the "FDIC") in July of 2008.  DBNTC brings this action against the FDIC as a successor to IndyMac in several capacities as described below.  This Court has subject matter jurisdiction over this action pursuant to, inter alia, the Constitution of the United States, 28 U.S.C. § 1331, 12 U.S.C. §§ 1819(a), 1819(b)(2)(A) and 1821(d)(6), 28 U.S.C. § 1367, and 28 U.S.C. § 1349.

2.      This action follows the FDIC's disallowance of an administrative proof of claim filed with the FDIC in the receivership by DBNTC as Trustee on behalf of Trust investors seeking essentially the same relief requested herein.

3.      IndyMac created substantially all of the Trusts at issue in this action and did so in a manner designed to make itself the dominant actor in the creation and ongoing management of the Trusts' assets.  IndyMac originated or acquired the mortgage loans that became the principal assets of the Trusts, caused the Trusts to be formed, made promises about the quality and servicing of the mortgage loans, serviced the mortgage loans before and after their sale into the Trusts, promised to handle the defective mortgage loans, and performed duties for the Trusts.  In doing so, IndyMac promoted the benefits of having a single entity handle all of these functions.

---

[1] On January 7, 2011, this Court dismissed the breach of fiduciary duty, takings and due process claims in the Trustee's May 29, 2009 Complaint with prejudice and granted DBNTC leave to replead against the FDIC in its corporate capacity. DBNTC has included the dismissed counts in the Amended Complaint solely to preserve potential appellate rights.

4.      IndyMac breached its promises before it failed.  The FDIC is now IndyMac's successor in several capacities and is liable for IndyMac's pre-failure breaches.

5.      The breaches continued after IndyMac's failure, during the period in which the FDIC operated the business of IndyMac and obtained the benefits of that operation, and the FDIC is liable for its failure to fulfill the obligations it assumed, expressly or by operation of law, after IndyMac failed.  In addition, the FDIC, a government agency, violated the United States Constitution because it took the property of the Trusts without just compensation and without due process of law.

6.      After assuming IndyMac's rights and obligations related to the Trusts, the FDIC purported to split the rights and obligations into pieces and to sell the rights, while making no provision for many of the obligations.  This purported partial transfer extracts the benefits of IndyMac's contracts related to the Trusts, while attempting to avoid the obligations central to IndyMac's promises to the Trusts and their investors.  It also destroys the promised value of having a single entity operate at the center of the Trusts.  These actions therefore violated contractual and fiduciary duties the FDIC owed to the Trusts.

7.      The failures, contractual violations, and breaches of duty described herein caused losses to the investors in the Trusts and to the Plaintiff of at least $6 billion to $8 billion.

## II.

## THE PARTIES

8.      Plaintiff DBNTC is a national banking association organized under the laws of the United States of America to carry on the business of a limited purpose trust company, and is a member of the Federal Reserve System.  DBNTC's main office and principal place of business is located at 300 South Grand Avenue, Suite 3950, Los Angeles, California, 90071-3175, and a site of its trust administration is located at 1761 East St. Andrew Place, Santa Ana, California, 92705.

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FIRST AMENDED COMPLAINT

9.      DBNTC serves as trustee, supplemental interest trustee, document custodian, and in certain other trust-related capacities (collectively, sometimes referred to hereinafter as the "Trustee") under the governing agreements and any subsidiary or related fiduciary arrangements (collectively, the "Governing Agreements") for over 240 Trusts created by IndyMac between 2001 and 2007, and identified on Exhibit 1 hereto.

10.     At the time IndyMac was placed in receivership, the Trusts held, as Trust assets or collateral, more than 150,000 mortgage loans that IndyMac originated or acquired, serviced, and sold into the Trusts.  Additionally, as of the date that IndyMac was placed in receivership, the loans had an aggregate outstanding principal balance of over $81 billion.

11.     The Trustee brings this action for and on behalf of the Trusts, the investors in the Trusts, and itself as Trustee.

12.     The Trusts at issue are "express trusts" created by written instruments manifesting the express intention to create a trust and setting forth the subject, purpose, and beneficiaries of the Trusts.  The Trustee therefore brings this action pursuant to Federal Rule of Civil Procedure 17(a)(1)(E) as the trustee of an express trust for the benefit of the Trusts and the Trusts' investors.

13.     On information and belief, the Trusts' investors include state and local governments, federal government-sponsored entities, retirement plans (such as the Police & Fire Retirement System of the City of Detroit and the Orange County Public Employees Union Fund), mutual funds, insurance companies, and other investors residing throughout the United States and the world.

14.     Defendant FDIC is an agency of the United States created by the Federal Deposit Insurance Act, 12 U.S.C. § 1811 et seq. and related laws and regulations.  The FDIC acts, from time to time, as a receiver and/or conservator of banking institutions, as an insurer of bank deposits, and as a banking regulator.

15.     On information and belief, the FDIC in both its capacity as the receiver of IndyMac and its corporate capacity, share a common office and staff, are run by common officers and/or directors, and do not deal at arms length with each other. Further, the FDIC in its corporate capacity has exercised de facto control over the FDIC in its receiver capacity to pursue the policy and financial interests of the FDIC in its corporate capacity.  More specific information regarding these relationships lies within the FDIC's control and/or is exclusively in the FDIC's possession.

16.     The FDIC is an independent agency of the United States government. It receives no Congressional appropriations and is funded by premiums that banks and thrift institutions pay for deposit insurance coverage and from earnings on investments in U.S. Treasury securities.  It has an insurance fund totaling more than $45 billion and insures more than $5 trillion of deposits in U.S. banks and thrifts.

17.     This Complaint asserts claims against the FDIC in its capacities as receiver of IndyMac; as receiver of IndyMac Federal Bank, F.S.B. ("IndyMac Federal")[2]; as an independent agency (sometimes referred to as its "corporate capacity"); and as an entity of the United States government subject to the Constitutional restrictions on the exercise of the federal government's power.  The term "FDIC" refers to the FDIC in all or any of its capacities.

---

[2] The Trustee's Complaint filed on May 29, 2009 also asserted claims against the FDIC as conservator for IndyMac Federal.  By stipulation of the parties filed on September 14, 2009, IndyMac Federal Receiver was "substituted in the place and stead of the Conservator in this action" because IndyMac Federal Receiver is "the successor in interest to the Conservator for all purposes, including the litigation of this action and assumed all rights and obligations of the Conservator and IndyMac Federal Bank, F.S.B." *See* Stipulation to Substitute the FDIC as Receiver for IndyMac Federal Bank, F.S.B. in Place of the FDIC as Conservator for IndyMac Federal Bank, F.S.B., Docket No. 10, at 2-3.  Accordingly, any actions of the FDIC as conservator for IndyMac are deemed attributable to the FDIC as receiver of IndyMac Federal.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

5                          FIRST AMENDED COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### III.

### **JURISDICTION AND VENUE**

18.   This action arises under the Constitution and laws of the United States and is a suit on a claim submitted to the FDIC pursuant to 12 U.S.C. § 1821(d) related to a depository institution with a main office and principal place of business located within this district.  This Court has subject matter jurisdiction over this action pursuant to, <u>inter alia</u>, the United States Constitution, 28 U.S.C. § 1331, 12 U.S.C. §§ 1819(a), 1819(b)(2)(A) and 1821(d)(6), and 28 U.S.C. § 1367. Jurisdiction also exists in this Court pursuant to 28 U.S.C. § 1349 because the FDIC is a corporation incorporated by an Act of Congress and the United States owns more than one half of its capital stock.

19.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (e), and 12 U.S.C. § 1821(d)(6), because: (a) a substantial part of the events or omissions giving rise to the claim occurred, and a substantial part of the property that is the subject of the action is situated, in this judicial district; (b) the Plaintiff resides in this judicial district; and/or (c) this action is a suit on a claim submitted to the FDIC related to a depository institution with a main place of business located within this judicial district.

20.   This Court has personal jurisdiction over the FDIC in its various capacities because it is an agency of the United States, and because many of the actions and omissions described herein occurred within this judicial district and caused foreseeable harm within this judicial district.

### IV.

### **FACTUAL BACKGROUND**

**A.    IndyMac and Its Successors**

21.   Until July 11, 2008, IndyMac was an FDIC-insured federal savings bank chartered and regulated by the Office of Thrift Supervision (the "OTS").

22.    On July 11, 2008, the Director of the OTS, by Order Number 2008-24, closed IndyMac and appointed the FDIC as IndyMac's receiver.

23.    In the same Order, the OTS authorized the creation of a new federally-chartered savings bank, IndyMac Federal, for which the FDIC was appointed as conservator.

24.    On information and belief, on July 11, 2008, a purchase and assumption agreement was entered into by and among: the FDIC as receiver of IndyMac; the FDIC in its corporate capacity; and the FDIC as conservator of IndyMac Federal.  Pursuant to that purchase and assumption agreement, substantially all of IndyMac's assets and liabilities, including its operational platform, its personnel and many of its ongoing operations, were purportedly transferred to and assumed by IndyMac Federal.  The purportedly transferred assets and liabilities included all of IndyMac's interests, rights and obligations with respect to the securitization Trusts evidenced by the Governing Agreements.

25.    For more than 8 months thereafter, the FDIC operated the business of IndyMac, specifically purporting to perform the obligations and to be entitled to take (and taking) the rights and benefits associated with the Governing Agreements and related to the Trusts.

26.    On March 18, 2009, OneWest Bank, F.S.B., a Pasadena, California-based federal savings bank, was formed by IMB HoldCo LLC ("IMB HoldCo"), a thrift holding company controlled by IMB Management Holding LP, for the primary purpose of purchasing the assets and liabilities of IndyMac Federal.  *See* Master Purchase Agreement by and among the Federal Deposit Insurance Corporation as Conservator for IndyMac Federal Bank, F.S.B., IMB HoldCo LLC, and OneWest Bank Group LLC dated as of March 18, 2009, at 17 (hereinafter the "Master Purchase Agreement"), attached hereto as Exhibit 2.

27.    On March 18, 2009, the Master Purchase Agreement and certain related agreements were entered into by and among: the FDIC as conservator of

1    IndyMac Federal; IMB HoldCo LLC; and OneWest Bank F.S.B. or one or more of

2    its affiliates (collectively "OneWest").  Pursuant to the Master Purchase Agreement

3    and the related agreements, substantially all of IndyMac Federal's assets and

4    liabilities, including its operational platform, its personnel, and some, but not all, of

5    the assets relating to all but three of the Trusts were purportedly transferred to and

6    assumed by OneWest.

7        28.    In addition, simultaneously a Guaranty Agreement dated as of March

8    18, 2009 was entered into by and among the FDIC in its corporate capacity on the

9    one hand, and on the other, IMB HoldCo LLC and OneWest Bank Group LLC,

10   OneWest Bank F.S.B., and any subsidiary of IMB HoldCo LLC or OneWest Bank

11   as Beneficiaries (the "Guaranty Agreement").  *See* Guaranty Agreement by the

12   FDIC in its corporate capacity, attached hereto as Exhibit 3.  Pursuant to the

13   Guaranty Agreement, the FDIC in its corporate capacity "unconditionally and

14   irrevocably" guaranteed "the payment, reimbursement and related obligations of the

15   FDIC, as Conservator for IndyMac Federal or as Receiver for IndyMac Federal . . .

16   under the Definitive Agreements."  *See id.* at 1.  The Master Purchase Agreement is

17   included in the definition of "Definitive Agreements" as used in the Guaranty

18   Agreement.  *See* Master Purchase Agreement, Exhibit 2 at 5 (defining "Definitive

19   Agreements" to include "this Agreement . . . .").  The Guaranty Agreement,

20   therefore, adopts the terms of the Master Purchase Agreement, including the

21   representations and warranties, signed by the FDIC as receiver of IndyMac.  The

22   Guaranty Agreement was required as "a condition and an inducement to the

23   obligation of" OneWest Bank "to consummate the transactions contemplated by the

24   Master Purchase Agreement."  *See* Guaranty Agreement at 1, Exhibit 3.  Moreover,

25   the satisfaction of the terms set forth in the Master Purchase Agreement was

26   expressly incorporated as a pre-condition to the closing of the sale of "servicing

27   rights" to OneWest.  *See* Servicing Business Asset Purchase Agreement by and

28   between the Federal Deposit Insurance Corporation as Receiver for IndyMac

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

8                    FIRST AMENDED COMPLAINT

Federal Bank, F.S.B. and OneWest Bank, F.S.B. dated as of March 19, 2009,
attached hereto as Exhibit 4, §§ 9.01, 9.02.  Accordingly, without the Guaranty
Agreement signed by the FDIC in its corporate capacity, OneWest would not have
entered into the Master Purchase Agreement to purchase the assets and certain
liabilities of IndyMac Federal, including the "servicing rights" under the Governing
Agreements.  Similarly, the Assignment and Assumption of Interests and
Obligations by and between the FDIC as receiver for IndyMac Federal Bank, F.S.B.
as assignor and OneWest Bank, F.S.B. as assignee, attached as Exhibit C to the
Loan Sale Agreement, which evidences the assignment of certain loan assets by the
FDIC as receiver of IndyMac Federal Bank, F.S.B., expressly declares that "the
Federal Deposit Insurance Corporation in its corporate capacity shall be a third-
party beneficiary with respect hereto."  *See* Loan Sale Agreement by and between
the Federal Deposit Insurance Corporation as Receiver for IndyMac Federal Bank,
F.S.B. and OneWest Bank, F.S.B. dated as of March 19, 2009 at C-2, attached
hereto as Exhibit 5.

29.    On March 19, 2009, the Director of the OTS, by Order Number 2009-
17, removed the FDIC as conservator for IndyMac Federal and made the FDIC the
receiver for IndyMac Federal.

**B.    The Securitization Trusts**

30.    Prior to its failure in July 2008, IndyMac operated as a mortgage
securitizer.  This means that it originated and otherwise acquired mortgage loans
and then sold the mortgage loans to the Trusts through one of several limited
purpose intermediate entities (e.g., IndyMac ABS, Inc. and IndyMac MBS, Inc.)
that were formed and controlled exclusively by IndyMac for the sole purpose of
acting as the settlor of the Trusts.  On rare occasions, IndyMac also sold loans to,
and serviced loans for, Trusts sponsored by third parties.  All allegations about the
Trusts in this Complaint include the Trusts sponsored by third parties.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

9                    FIRST AMENDED COMPLAINT

31.     IndyMac caused the settlor of the Trusts to issue and sell to investors certain residential mortgage-backed securities that were supported by the cash flows on the underlying mortgage loans.

32.     The proceeds from the sale of the mortgage-backed securities (which included the issuance to IndyMac of certain securities representing residual interests in the mortgage loans) were then used to pay IndyMac for the mortgage loans that were transferred to the Trusts, and to compensate IndyMac for performing its obligations to the Trusts.  The payments to IndyMac provided further funds for IndyMac to originate and acquire more mortgage loans that were, in turn, used to create and sell more securities.

33.     IndyMac produced and sold into the Trusts an extensive array of non-traditional mortgage loan products.  Central to IndyMac's success in attracting investors to purchase the mortgage-backed securities sponsored by IndyMac were IndyMac's representations and promises that a single entity (i.e., IndyMac) would perform the full range of interrelated functions necessary to protect, preserve and service these complex Trust assets.

34.     Because of the large number and variety of non-traditional mortgage loans sold into the IndyMac Trusts, it was and is important to the Trustee and investors in the Trusts that the same entity that originated or originally acquired the loans also be involved in servicing the loans for a number of reasons, including the assurance that material defects in the mortgage loans could be promptly identified and resolved by being cured or by having the loans substituted or repurchased by IndyMac, which possessed information and expertise necessary to perform these duties efficiently and effectively.

35.     To promote the sale of its mortgage-backed securities, and to induce investors to purchase those securities, IndyMac issued a Prospectus about the benefits of investing in one of its Trusts generally, and a Prospectus Supplement about each Trust.

36.     In the typical Prospectus or Prospectus Supplement, IndyMac promised potential investors that a single entity, "IndyMac Bank," would act as sponsor, seller and servicer of the Trusts and its underlying mortgage loan assets.

37.     In the typical Prospectus or Prospectus Supplement, IndyMac also induced investment in the Trusts by:

a.     promising to deposit into the Trusts a pool of mortgage loans with the particular attributes and characteristics described therein;

b.     promising that the mortgage loans that would be sold into the Trusts had been underwritten in accordance with IndyMac's underwriting guidelines and making numerous representations regarding IndyMac's underwriting process;

c.     promising that the Trusts and the mortgage loans that would be sold into the Trusts would be serviced by IndyMac, before and after the sale, employing the same degree of skill and care that IndyMac employs in servicing comparable mortgage loans for itself or others;

d.     making numerous representations regarding IndyMac's servicing process and the manner in which IndyMac would protect, preserve and administer the Trusts and the underlying mortgage loans;

e.     acknowledging its ongoing duty to notify other parties-in-interest to the Trusts, including the Trustee, of breaches of IndyMac's representations or warranties with respect to the underlying mortgage loans;

f.     acknowledging its ongoing duty to notify other parties-in-interest to the Trusts, including the Trustee, of defective documents with respect to the mortgage loans in the Trusts;

g.     acknowledging its obligations to repurchase or substitute a similar mortgage loan for any mortgage loan with document deficiencies or an uncured breach of any representation, warranty or covenant that materially and

adversely affects the interests of the Trusts' investors or insurers in that mortgage loan;

> h.    specifying the limited circumstances and manner in which modifications to the mortgage loans in the Trusts would be permitted;

> i.    confirming that it would perform default management services, and make certain property preservation advances and advances of principal and interest, on delinquent loans in the Trusts;

> j.    prominently featuring the credit ratings issued on the mortgage-backed securities issued by the Trusts; and

> k.    emphasizing the control and minimization of risks to investors through IndyMac's integrated process of underwriting, originating and servicing loans and the Trusts.

## C.    IndyMac's Duties under the Governing Agreements

38.    The Trusts were created, the mortgage-backed securities were issued, and the mortgage loans were sold, transferred and assigned to the Trusts pursuant to one or more Governing Agreements by and among IndyMac, the settlor entity controlled by IndyMac, the Trustee, and certain other parties, such as mortgage loan insurers and bond insurers.  The Governing Agreements establish and regulate the Trusts and the relationships among the parties-in-interest to the Trusts.  The Governing Agreements include Pooling and Servicing Agreements, Sale and Servicing Agreements, Indentures, Trust Agreements, and related ancillary agreements.

39.    Under the Governing Agreements, IndyMac's duties to protect, preserve, service and administer the Trusts and assets in those Trusts include, but are not limited to:

> a.    enforcing the borrowers' obligations to make monthly principal and interest payments on the underlying mortgage loans;

b.      collecting payments from borrowers on the mortgage loans in the Trusts, posting and processing payments properly, and pursuing borrowers who fail to timely make required payments;

c.      administering and preserving the documents and files necessary to enforce the borrowers' obligations on underlying mortgage loans;

d.      notifying other parties to the Governing Agreements when IndyMac knew of the existence of missing or defective mortgage loan documents;

e.      notifying other parties to the Governing Agreements of mortgage loans that did not comply with the representations or warranties IndyMac made with respect to such mortgage loans;

f.      curing all breaches of any representation or warranty which materially and adversely affect the interests of the Trust beneficiaries, including any breach of representation or warranty for any loan for which coverage was rescinded or a claim was denied by the mortgage pool insurer;

g.      repurchasing or substituting a similar mortgage loan for any mortgage loan as to which an uncured material and adverse breach of a representation or warranty exists, including mortgage loans for which coverage was rescinded or a claim denied by the mortgage pool insurer, at the price and in the manner specified in the Governing Agreements;

h.      making certain property preservation advances and cash advances with respect to delinquent payments of principal and interest on the mortgage loans;

i.      managing claims and proceedings to enforce the obligations of borrowers to make timely payments of principal and interest on the mortgage loans, including foreclosures, evictions, quiet title and bankruptcy filings, and the administration of properties purchased at foreclosures or otherwise acquired from the borrowers;

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

13                    FIRST AMENDED COMPLAINT

1            j.     modifying mortgage loans only when those loans were seriously

2    delinquent and when each proposed modification would benefit Trust investors by

3    minimizing losses on the modified loan;

4            k.     providing accurate and timely reports to the Trustee regarding

5    the status of the Trusts and the underlying mortgage loans; and

6            l.     indemnifying the Trustee for certain fees, costs and expenses

7    incurred by the Trustee in administering, protecting and defending the Trusts and

8    the underlying mortgage loan assets.

9        40.    As compensation for the performance of its duties, IndyMac received

10   the purchase price of the loans (which included, in some instances, residual

11   interests in the Trusts) and also received monthly fees and income from the Trusts

12   based on the aggregate outstanding principal balance of the mortgage loans in each

13   Trust.  IndyMac also retained certain additional fees and income from late payment

14   charges on the mortgage loans, as well as interest or other proceeds earned on assets

15   held in collection accounts.

16       41.    The Trustee and the Trust investors had the right to, and did, rely on

17   IndyMac's representations that a single entity, IndyMac, would sponsor the

18   transactions, sell mortgage loans into the Trusts, and thereafter service the Trusts

19   and the underlying mortgage loan assets unless either (a) IndyMac's rights and

20   obligations were terminated by them for cause or (b) the Trustee (and, in some

21   cases, other parties-in-interest to the Trusts) consented to IndyMac's transfer of its

22   rights and obligations.

23       42.    Neither the Trustee nor Trust investors terminated any of IndyMac's

24   rights and obligations relating to the Trusts or consented to any transfer of such

25   rights and obligations.

26       43.    The Governing Agreement for each Trust provides that the Trustee

27   shall not be required to expend, advance or risk its own funds or otherwise incur

28

financial liability in the performance of any of its duties thereunder or in the exercise of any of its rights or powers.

44.     The Trustee and the Trusts' investors had the right to, and did, rely on IndyMac's promises to indemnify the Trustee for the fees, costs and expenses incurred by the Trustee in administering, protecting and defending the Trusts.

45.     The Governing Agreements represent an integrated set of contractual undertakings on behalf of IndyMac with respect to the formation and servicing of the Trusts.

46.     Each Governing Agreement is a unitary contract that is not divisible.

47.     IndyMac entered into each of the Governing Agreements as a single contracting party, making the representations and warranties both with respect to the due execution and enforceability of the Governing Agreements and with respect to the underlying mortgage loans.

48.     The Governing Agreements are executory contracts that involve obligations that are ongoing, mutual, and interrelated.

49.     The Governing Agreements:

      a.     are all in writing;

      b.     were all executed by IndyMac and DBNTC, as Trustee, at the time the associated property interests transferred;

      c.     were executed on behalf of IndyMac by individuals duly authorized by the IndyMac Board of Directors; and

      d.     have been continuously in existence, since the time of execution, and constitute official records of IndyMac.

## D.     IndyMac's Representations and Warranties

50.     Under the Governing Agreements, IndyMac made numerous representations, warranties and covenants regarding the due execution and enforceability of those agreements and regarding the characteristics of the

underlying mortgage loans. These representations, warranties and covenants generally include, among other things, that:

a. IndyMac is duly organized as a federally insured savings bank, is validly existing and in good standing, and is qualified to transact any business contemplated by the Governing Agreements;

b. IndyMac has the full corporate power and authority to sell and service each mortgage loan, to execute, deliver and perform the Governing Agreements, and to enter into and consummate the transactions contemplated thereunder;

c. the execution, delivery, and fulfillment of it duties and obligations under the Governing Agreements by IndyMac would not: (i) result in a material breach of any term or provision of the charter or by-laws of IndyMac, (ii) materially conflict with, or result in a material breach, violation or default under any other material agreement to which IndyMac was bound, or (iii) constitute a material violation of any statute, order or regulation applicable to IndyMac of any court, regulatory body, administrative agency or governmental body having jurisdiction over IndyMac (including without limitation the OTS and the FDIC);

d. IndyMac was not in breach or violation of any material indenture or other material agreement or instrument, or in violation of any statute, order or regulation of any court, regulatory body, administrative agency or governmental body having jurisdiction over it (including without limitation the OTS and the FDIC) materially impairing IndyMac's ability to perform or meet any of its obligations under the Governing Agreement; and,

e. IndyMac is an approved servicer of mortgage loans by Federal National Mortgage Association ("Fannie Mae") or other applicable authorities.

51. Under the Governing Agreements, IndyMac also made numerous representations, warranties and covenants with respect to the mortgage loans it sold

into the Trusts.  Those representations, warranties and covenants generally provide, among other things, that:

a.      a lender's policy of title insurance (or in the case of mortgaged properties located in areas where title insurance policies are generally not available, an attorney's certificate of title) or a commitment to issue the policy was effective on the date of origination of each loan, other than cooperative loans, and that each policy (or certificate of title as applicable) remained in effect on the date of transfer by IndyMac into the Trust;

b.      IndyMac had good title to each mortgage loan and the mortgage loan was subject to no valid offsets, defenses, counterclaims or rights of rescission subject to certain exceptions;

c.      each mortgage loan was secured by a valid first lien on, or a first perfected security interest with respect to, the mortgaged property (subject only to permissible title insurance exceptions, if applicable, and certain other exceptions described in the Governing Agreement) and the property was free of material damage;

d.      the information provided on one or more schedules to the Governing Agreements regarding the mortgage loans was true and correct in all material respects at the time of execution;

e.      at the time of origination, there were no delinquent tax or assessment liens against the mortgaged property;

f.      all regularly scheduled monthly payments due with respect to each of the mortgage loans, up to and including their transfer into the Trusts, had been made, and, as of the Trust cut-off date, no mortgage loan had a regularly scheduled monthly payment that was seriously delinquent during the twelve months before the cut-off date;

g.      to the best of IndyMac's knowledge, there was no fraud involved in the origination of any mortgage loan by the mortgagee or by the mortgagor, any appraiser or any other party involved in the origination of the mortgage loan;

h.      each mortgage loan was underwritten and serviced substantially in accordance with IndyMac's guidelines, subject only to such variances as are reflected on schedules accompanying the Governing Agreements;

i.      the mortgage loan files contained the documents specified in the Governing Agreements and necessary to enforce the mortgage loans; and

j.      each loan at the time it was originated and on the date of transfer into the Trusts complied in all material respects with all applicable local, state and federal laws.

52.     The representations, warranties and covenants referenced in paragraphs 50 and 51 hereof, together with all of IndyMac's representations, warranties and covenants under the Governing Agreements, are referred to collectively hereinafter as the "Representations and Warranties" or the "Representations or Warranties."

53.     In the event of a breach of certain Representations or Warranties with respect to any mortgage loan, the Governing Agreements impose on IndyMac and/or its successors the obligation to:

a.      notify certain other parties to the Governing Agreements, including the Trustee;

b.      make certain cure payments; and/or

c.      repurchase the mortgage loan at a price specified in the Governing Agreements (typically equal to the unpaid principal balance of the related mortgage loan(s) plus accrued interest through the date of repurchase).

54.     IndyMac's Representations and Warranties are an integral part of the same Governing Agreements describing and establishing IndyMac's obligations to

1   service the mortgage loans that it sold into the Trust and the corresponding right of

2   IndyMac and its successors to receive servicing fees and income.

3        55.    The Governing Agreement for each Trust confers upon the Trustee the

4   right to demand compliance with, and seek remedies for any breach of, IndyMac's

5   Representations and Warranties from IndyMac and/or any of its successors.

6        56.    The Governing Agreements require IndyMac and its successors to

7   indemnify the Trusts and the Trustee for any expenses incurred in enforcing any of

8   the Representations and Warranties or seeking remedies for any breaches thereof.

9   **E.     Assignment, Resignation and Other Contractual Matters**

10       57.    The Governing Agreements do not permit IndyMac to assign or resign

11  from its obligations under the Governing Agreements without the consent of the

12  Trustee.

13       58.    Under the Governing Agreements, succession is permitted only by a

14  person or entity assuming all of IndyMac's business with no carve-out or

15  exceptions, as is typical for other provisions of the Governing Agreements. *See*

16  Pooling and Servicing Agreement by and between IndyMac MBS, Inc. as

17  Depositor, IndyMac Bank, F.S.B. as Seller and Master Servicer, and Deutsche

18  Bank National Trust Company as Trustee dated as of May 1, 2005, Residential

19  Asset Securitization Trust Series 2005-A7, Mortgage Pass-Through Certificates

20  Series 2005-G, at § 6.02 (hereinafter the "PSA"), attached hereto as Exhibit 6.

21       59.    Only the Trustee has the power under Governing Agreements to act as

22  or hire another qualified successor servicer to service the mortgage loans in the

23  event of a default by IndyMac under the Governing Agreements or any inability by

24  IndyMac to perform its continuing obligations under the Governing Agreements.

25  In that event, the Trustee or its designated replacement successor servicer would

26  have the right to receive the appropriate servicing fee.

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

19                                    FIRST AMENDED COMPLAINT

**F.**     **The Role Of IndyMac's Successors**

60.     Pursuant to 12 U.S.C. § 1821(d)(2), by operation of law, the FDIC as receiver of IndyMac succeeded to all rights, titles, powers, and privileges of IndyMac, including those arising under the Governing Agreements or otherwise related to the Trusts.

61.     Pursuant to 12 U.S.C. § 1821(d)(2), by operation of law, the FDIC as conservator of IndyMac Federal succeeded to all rights, titles, powers, and privileges of IndyMac Federal, including those arising under the Governing Agreements or otherwise related to the Trusts.

62.     From July 11, 2008 to approximately March 18, 2009, the FDIC as conservator of IndyMac Federal administered the Trusts and serviced the mortgage loans in the Trusts on the purported basis that it possessed the "servicing rights" to those loans under the Governing Agreements.

63.     In order to exercise such "servicing rights," IndyMac Federal was obligated to, and by operation of law did, assume all of IndyMac's obligations under the Governing Agreements.

64.     On information and belief, on March 18, 2009, the FDIC as conservator of IndyMac Federal purportedly sold certain assets and rights of IndyMac Federal to OneWest for approximately $13.9 billion.

65.     On information and belief, the FDIC, as conservator (and subsequently as receiver) of IndyMac Federal transferred all or substantially all of the proceeds it received from the sale to OneWest to the FDIC, as receiver of IndyMac Federal, which, in turn, transferred all or substantially all of such amounts to FDIC in its corporate capacity.

66.     The sale to OneWest included many valuable rights that IndyMac held under the Governing Agreements or that were otherwise related to the Trusts, but improperly excluded certain of IndyMac's obligations to the Trusts and the Trustee under those same Governing Agreements without making alternate arrangements to

assure the performance of those excluded obligations.  Specifically, the sale to OneWest included what the FDIC characterized as the "servicing rights" under the Governing Agreements, including IndyMac's right to service the mortgage loans in the Trusts and the corresponding right to receive the servicing fees and income provided in the Governing Agreements.  The sale, however, excluded certain obligations imposed on IndyMac under the same Governing Agreements, including on information and belief, "any repurchase obligations for breaches of loan level representations, any indemnities relating to origination activities or securities laws or any seller indemnity. . . ."  *See* Notice Regarding IndyMac Bank, F.S.B. dated February 18, 2009, attached hereto as Exhibit 7.

67.     The sale to OneWest had the effect of treating the obligations of IndyMac and its successors to the Trusts and the Trustee differently than the obligations of IndyMac and its successors contained in similar contracts between IndyMac and certain government-sponsored entities, such as Fannie Mae, the Government National Mortgage Association (known as "Ginnie Mae") and the Federal Home Loan Mortgage Corporation (known as "Freddie Mac"), were treated.  Specifically, the FDIC expressly assumed and assigned to OneWest all of IndyMac's obligations and rights under its loan sale and servicing  contracts with government-sponsored entities, while cherry picking selected  rights and obligations under the Governing Agreements for the Trusts and making no provision for the performance of IndyMac's other obligations to the Trusts and the Trustee under the Governing Agreements.

68.     In attempting to sell, and thereby reap the benefits of, the Governing Agreements without assuming and assigning (or otherwise performing) the related obligations, the FDIC acted outside the scope of its statutorily defined authority.

69.     In the sale to OneWest, the FDIC purported to split unitary contracts and divide rights and obligations that are not severable.

70.    The FDIC failed to follow the procedures provided in the Governing Agreements for transferring servicing rights and obligations.

71.    The FDIC's effort to sell the benefits of the Governing Agreements without transferring the corresponding obligations deprived the Trusts and the Trustee of property without due process of law and took private property of the Trusts and the Trustee without just compensation.

72.    The FDIC's actions described herein discriminated against the Trusts and the Trustee as private parties, while benefiting other similarly situated entities that are affiliated with the United States government.

73.    The Trustee has attempted to obtain more detail from the FDIC in its corporate capacity about the sale to OneWest, including by making two requests to the FDIC pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, et seq. for information and documents regarding the sale to OneWest.

74.    To date, the FDIC in its corporate capacity has provided certain documents to the Trustee in response to the FOIA requests.  The FDIC in its corporate capacity has refused to provide other documents, however, and the Trustee still has not received all of the information it has requested, including copies of the exhibits and schedules to the Master Purchase Agreement and all related correspondence and agreements.

75.    As a result of the FDIC in its corporate capacity's failure to provide all of the relevant documents and information, many of the details of the sale to OneWest, while known to and in control of the FDIC in both its IndyMac receiver and corporate capacities, remain unclear to the Trustee, notwithstanding that the sale affects significant and valuable rights of the Trusts and the Trustee.

**G.    Radian and Repudiation**

76.    The sale to OneWest also purported to exclude rights and obligations under the Governing Agreements with respect to three Trusts for which Radian Insurance, Inc. ("Radian") provides mortgage pool insurance (collectively, the

"Radian Trusts").  Mortgage pool insurance is a guarantee against certain losses on the individual mortgage loans in the Radian Trusts.

77.     The Radian Trusts are: (1) IndyMac INDS Home Equity Mortgage Loan Trust Series 2006-2B; (2) IndyMac INDS Home Equity Mortgage Loan Trust Series 2006-3; and (3) IndyMac INDS Home Equity Mortgage Loan Trust Series 2007-1.

78.     Radian's obligations to the Radian Trusts, the Trustee and other parties are currently the subject of pending litigation and arbitration proceedings.

79.     On March 19, 2009, the FDIC as receiver of IndyMac notified the Trustee that it was formally repudiating certain of the Governing Agreements for the Radian Trusts pursuant to 12 U.S.C. § 1821(e), claiming that those Governing Agreements are "burdensome" and that repudiation would "promote the orderly administration of the institution's [IndyMac's] affairs."

80.     The FDIC has not notified the Trustee or, on information and belief, any other party in interest to any Trust, that it has repudiated any of the Governing Agreements other than those associated with the Radian Trusts.  To the contrary, the FDIC, acting under the control and for the benefit of officers and employees of the FDIC in its corporate capacity, assumed the remaining Governing Agreements and breached them.

**H.     Proofs of Claim**

81.     On October 14, 2008, the Trustee timely filed with the FDIC as receiver for IndyMac a Proof of Claim on behalf of the Trusts and the Trustee pursuant to 12 U.S.C. § 1821(d) (together with all exhibits thereto, the "Proof of Claim"), outlining various claims against the FDIC under or related to the Governing Agreements.

82.     The Trustee hereby incorporates by reference as if set forth here in full the entirety of its Proof of Claim, along with the exhibits thereto and materials referenced therein.  Accordingly, a copy of the Proof of Claim without exhibits is

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

23                          FIRST AMENDED COMPLAINT

1    attached as Exhibit 8 hereto.  The exhibits to the Proof of Claim are incorporated

2    herein by reference as if set forth in full, but because they include confidential and

3    sensitive information, the Trustee would submit the exhibits to the Proof of Claim

4    under seal if they must be filed.

5            83.     On information and belief, other parties with interests in or obligations

6    to the Trusts filed proofs of claim with the FDIC, including insurers, monoline

7    credit enhancement providers, underwriters, depositors, loan servicers, and

8    investors.  The claims asserted in these other proofs of claim may be related or

9    supplemental to the claims asserted by the Trustee and the Trusts in this action.

10   The Trustee hereby incorporates by reference any such proofs of claims, along with

11   the exhibits thereto and any materials referenced therein to the extent appropriate

12   and/or necessary.

13           84.     In its Proof of Claim, the Trustee identified the failure of IndyMac and

14   its successors (including the FDIC in multiple capacities), in contravention of the

15   Governing Agreements, to provide access to books and records, and to properly

16   notify the Trustee of the ongoing multiple breaches of Representations and

17   Warranties that were concealed from the Trustee.

18           85.     In its Proof of Claim and otherwise, the Trustee also requested that it

19   be given reasonable access and time to investigate its claims (the "Requested

20   Access"), so that, among other things, the Trustee could provide more information

21   to the FDIC in support of its claims.

22           86.     In its Proof of Claim, the Trustee further reserved its rights to amend

23   or supplement its Proof of Claim and made clear that its Proof of Claim was in no

24   way intended to waive or release any claim it or the Trusts may have.

25           87.     On March 31, 2009, without providing or addressing the Trustee's

26   Requested Access, the FDIC issued a Notice of Disallowance, rejecting the

27   Trustee's Proof of Claim.  A copy of the Notice of Disallowance is attached as

28   Exhibit 9 hereto.  Pursuant to 12 U.S.C. § 1821(d)(5)(A)(iv), the FDIC was

required in the Notice of Disallowance to state "each reason for the disallowance." The sole stated basis for the FDIC's denial was that the claim was not "fixed and certain as of bank failure on July 11, 2008."

88.     Pursuant to 12 U.S.C. § 1821(d)(6)(A)(ii), the disallowance of the Trustee's Proof of Claim triggered the right to "file suit on such claim in the district or territorial court of the United States for the district within which the depository institution's principal place of business is located or the United States District Court for the District of Columbia (and such court shall have jurisdiction to hear such claim)" within 60 days.  This action is therefore timely and appropriately brought in this Court.[3]

<div align="center">

**V.**

**BREACHES AND DAMAGES**

</div>

**A.     IndyMac's Breaches of Its Representations and Warranties**

89.     IndyMac breached numerous provisions of the Governing Agreements.

90.     Without limiting the generality of the foregoing, and by way of example only, IndyMac committed the following breaches of the Representations and Warranties:

a.     Numerous mortgage loans IndyMac sold into the Trusts did not comply with IndyMac's credit underwriting standards and origination process. There was "little, if any review of borrower qualifications, including income, assets and employment," as well as a failure to obtain proper property appraisals (see Office of the Inspector General, Department of the Treasury, Audit Report,

---

[3]     Although the Trustee believes that the Proof of Claim filed on October 14, 2008 and the denial thereof fully exhausted the administrative process, to the extent the Trustee even needed to do so, in an abundance of caution the Trustee filed additional proofs of claim on June 16, 2009 and August 14, 2009 relating to the repudiation of the Radian loans and the failure of IndyMac Federal, F.S.B., respectively.  A copy of the Complaint filed in this action on May 29, 2009 was attached as an exhibit to both of these additional proofs of claim and incorporated by reference therein.  The FDIC subsequently disallowed both of these additional proofs of claim.  This action was then continued in accordance with 12 U.S.C. § 1821(d)(6)(A)(ii).

"SAFETY AND SOUNDNESS: Material Loss Review of IndyMac Bank, F.S.B.,"
Feb. 26, 2009, at 11-12);

       b.     Many mortgage loans sold into the Trusts did not comply with
the applicable requirements even before they were sold into the Trusts;

       c.     Many mortgage loan origination files did not contain required
documentation;

       d.     The origination of many mortgage loans did not comply with
applicable laws; and

       e.     Many mortgage loans did not comply with the characteristics set
forth in the schedules to the Governing Agreements.

91.     IndyMac breached the Representations and Warranties as more fully
described herein before it was placed in receivership, and the breaches continued
during the period that the FDIC acted as receiver for IndyMac and as conservator
and receiver for IndyMac Federal acting under the control of and for the benefit of
the FDIC in its corporate capacity.

92.     These breaches were concealed by IndyMac, including by its refusal to
provide the access to its books and records required by the Governing Agreements.

93.     The FDIC also failed to permit the Requested Access by the Trustee
and thus concealed the continuing breaches.

94.     IndyMac failed to comply fully with and breached certain of its
contractual obligations in the Governing Agreements to:

       a.     notify the Trustee and other parties-in-interest to the Trusts of
the breaches of the Representations and Warranties;

       b.     make cure payments as required by the Governing Agreements;

       c.     repurchase the mortgage loans that did not conform with or
otherwise breached the Representations and Warranties; and/or

       d.     indemnify the Trusts and the Trustee for the liabilities, expenses
and losses associated with the breaches of the Representations and Warranties.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FIRST AMENDED COMPLAINT

95.     The breaches of Representations and Warranties continued through the receivership period, acting under the control of and for the benefit of the FDIC in its corporate capacity, and continue to the present date.

96.     IndyMac Federal, as successor to IndyMac, also breached numerous Representations and Warranties in the Governing Agreements during the period in which the FDIC was managing its affairs, acting under the control of and for the benefit of the FDIC its corporate capacity.

97.     IndyMac's successors, including the FDIC as receiver of IndyMac, and as conservator and receiver of IndyMac Federal, also breached and have continued to breach, acting under the control of and for the benefit of the FDIC in its corporate capacity, the foregoing Representations and Warranties, and have failed to comply fully with their obligations pursuant to the Governing Agreements to:

a.     notify the Trustee and other parties-in-interest to the Trusts of the breaches of Representations and Warranties;

b.     make cure payments as required by the Governing Agreements;

c.     repurchase the mortgage loans that do not conform with or otherwise breach the Representations and Warranties; and/or

d.     indemnify the Trusts and the Trustee for the liabilities, expenses and losses associated with the breaches of the Representations and Warranties.

98.     In addition, despite provisions of the Governing Agreements permitting the Trustee and certain other parties-in-interest to the Trusts to have access to IndyMac's books and records concerning mortgage loans in the Trusts, IndyMac and its successors, both before and after IndyMac's failure, have consistently refused to allow the Trustee and, on information and belief, such other parties-in-interest to the Trusts, access to those books and records.  As a result, although the Trustee believes that there are other breaches of Representations and Warranties that occurred before IndyMac's failure and have continued through the present, that information has been concealed from the Trustee.

99.    Moreover, because IndyMac and its successors have failed to comply with their obligations to notify the Trustee of breaches of Representations and Warranties, the Trustee is not aware of all of the breaches that have occurred.

100.    On information and belief, the breaches of Representations and Warranties more fully described herein have damaged the Trusts and the Trustee in the approximate amount of $6 billion to $8 billion or more.

**B.    Servicing Deficiencies**

101.    IndyMac failed to comply with its obligations to service the mortgage loans in the Trusts in accordance with applicable standards, the Representations and Warranties, and the other provisions of the Governing Agreements.

102.    IndyMac's successors, including the FDIC as receiver of IndyMac and as conservator and receiver of IndyMac Federal, acting under the control of and for the benefit of the FDIC in its corporate capacity, also have failed to comply with applicable obligations to service the mortgage loans in the Trusts in accordance with applicable standards, the Representations and Warranties, and the other provisions of the Governing Agreements.

103.    Without limiting the generality of the foregoing, and by way of example only, IndyMac and its successors have failed to appropriately service the mortgage loans in the Trusts by:

a.    failing to notify the Trustee and others, and take appropriate steps, relating to mortgage loans failing to conform with the Representations and Warranties;

b.    failing to adequately staff, or improperly staffing, key functions involved in collections on mortgage loans, particularly with respect to delinquent mortgage loans, resulting in collection delays and losses;

c.    conducting loss mitigation activities, including loan modifications, that fall below the servicing standard set forth in the Governing Agreements or otherwise violate the Governing Agreements, including but not

1    limited to: (i) failing to fully or consistently consider borrower assets, recent credit

2    activity or prior loan purpose; (ii) imposing substantive and procedural biases

3    against effective remedial activity and in favor of loan modifications, even when

4    such modifications were not reasonably expected to minimize investors' losses on

5    the mortgage loans; (iii) delaying the initiation of foreclosure proceedings; (iv)

6    failing to properly preserve property; and (v) conducting loss mitigation activities

7    with inadequate or improper controls over such activities;

8            d.      allowing the policy objectives of the FDIC in its corporate

9    capacity to override the servicing obligations under the Governing Agreements and

10   applicable law;

11           e.      knowingly and intentionally deviating from required and

12   appropriate standards with respect to the individual servicing of numerous

13   mortgage loans; and

14           f.      failing to pursue recoveries and reimburse the Trusts in cases of

15   first payment default or early payment default.

16   **C.    Indemnification for Expenses**

17           104.   As a result of the breaches of Representations and Warranties set forth

18   herein and other breaches by IndyMac and its successors, the Trustee and the Trusts

19   have incurred, and will continue to incur, significant costs and legal expenses,

20   including attorneys' fees and costs, and face substantial liability for third-party

21   claims.  These third-party claims include, but are not limited to, claims made in

22   civil litigation proceedings against the Trustee and/or the Trusts, including but not

23   limited to the pending litigation and arbitration proceedings relating to the Radian

24   Trusts and other lawsuits filed against the Trustee and/or the Trusts relating to

25   IndyMac and its origination and/or servicing of mortgage loans.

26           105.   Such third-party claims involve or relate to the acts and omissions of

27   IndyMac and its successors in connection with the origination and servicing of

28   mortgage loans in the Trusts.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FIRST AMENDED COMPLAINT

106.   The expenses, costs and liabilities (including claims asserted by third parties against the Trusts and the Trustee) incurred or suffered to date exceed $77 million, and will increase over time.

107.   Pursuant to the Governing Agreements, IndyMac and its successors were and are obligated to indemnify the Trustee and the Trusts for these amounts.

108.   Such indemnification constitutes core consideration both for the Trustee's initial and ongoing obligation and agreement to act as Trustee and for the investors' purchase of securities issued by the Trusts.

109.   IndyMac failed, and its successors have continued to fail, to comply fully with their indemnification obligations to the Trustee.

**D.    Damages From Sale to OneWest**

110.   Because of the breaches by IndyMac and its successors, the Trustee and the Trusts are entitled under the Governing Agreements and applicable law to exercise remedies of setoff and recoupment against any rights which IndyMac or its successors have to receive payments or reimbursements from the Trustee and/or the Trusts.

111.   Under terms of the Governing Agreements, IndyMac and its successors have the right to recover from Trust assets certain unpaid servicing fees and certain advances previously made by them for the benefit of the Trusts.

112.   On information and belief, as more fully set forth above, the sale to OneWest attempted to transfer to OneWest many of the benefits of the Governing Agreements, including the rights to recover amounts from the Trusts as described in the paragraph above, without transferring or otherwise assuring the performance of all of the related and/or necessary obligations and without expressly transferring the right of setoff or recoupment that the Trusts and the Trustee would have against those amounts.

113.   The failure of IndyMac, the FDIC and/or OneWest as IndyMac's successor-in-interest to perform these obligations inflicts economic harm on the

Trusts and the Trustee, principally in the form of losses on loans that the Governing Agreements require IndyMac and/or its successors to repurchase any losses from liabilities and costs that the Governing Agreements required IndyMac and/or the FDIC to bear as indemnitors.

114.   In addition, on information and belief, the FDIC purported to sell and assign to OneWest all of IndyMac's and the FDIC's rights to recover the amounts described in paragraph 110 above free and clear of the Trusts' and the Trustee's rights of setoff and recoupment.

115.   OneWest therefore may contend that the Trusts and the Trustee do not have the setoff and recoupment rights that the Trusts and the Trustee would have if IndyMac or the FDIC still owned all of the assets transferred to OneWest.

116.   The Trustee notified the FDIC of its rights to setoff and recoupment both in its Proof of Claim and in communications preceding the closing of the OneWest sale transaction.

117.   The Trusts and the Trustee are directly damaged by the FDIC's actions in the OneWest sale transaction to the extent that the sale transaction deprives them of the benefits of such setoff and recoupment rights.

**E.     Damages from Repudiation**

118.   The Trustee and the Trusts have been damaged as a direct and proximate result of the repudiation of certain of the Governing Agreements related to the Radian Trusts.

119.   The repudiation of certain of the Governing Agreements related to the Radian Trusts constitutes an anticipatory breach of the related Governing Agreements in their entirety.

# VI.

## CAUSES OF ACTION

## COUNT ONE

## PRE-FAILURE BREACH OF CONTRACT

## (AGAINST FDIC AS RECEIVER OF INDYMAC AND FDIC AS RECEIVER OF INDYMAC FEDERAL)

120. The Trustee incorporates by reference the previous and succeeding paragraphs of this Complaint as if they were set forth here in full.

121. The conduct alleged above constitutes multiple breaches of contract by IndyMac, including breaches of the Governing Agreements.

122. Without limiting the generality of the foregoing, IndyMac breached the Governing Agreements by:

      a.    selling materially defective mortgage loans into the Trusts that did not comply with IndyMac's express Representations and Warranties;

      b.    failing to repurchase the mortgage loans that did not comply with IndyMac's Representations and Warranties; and

      c.    failing to notify the Trustee of the existence of these breaches of Representations and Warranties.

123. As a direct and proximate cause of IndyMac's breaches of contract, the Trusts and the Trustee have suffered significant damages.

124. The Trustee is fully performing and has not breached its obligations under the Governing Agreements or excused the performance by IndyMac and its successors of their obligations thereunder.

125. The FDIC as the receiver of IndyMac is the successor in interest to IndyMac.

126. In addition, IndyMac Federal, and the FDIC as receiver of IndyMac Federal, is the successor in interest to IndyMac.

127.   As successor in interest to IndyMac in both capacities, the FDIC was required by law either to assume in their entirety IndyMac's obligations under the Governing Agreements, if it wished to obtain the benefits of the Governing Agreements, or to repudiate the Governing Agreements in their entirety.

128.   Having elected to assume IndyMac's obligations under the Governing Agreements in order to gain the benefits of the Governing Agreements, the FDIC was bound by those obligations in their entirety and was required to perform them, including the obligations to notify the Trustee of breaches and to cure them and/or repurchase any affected mortgage loans as a condition to transferring IndyMac's obligations and assets to IndyMac Federal.

129.   The FDIC failed to cure IndyMac's breaches of the Governing Agreements.

130.   As receiver of IndyMac, the FDIC is liable for IndyMac's breaches of contract arising before the failure of IndyMac.

131.   In addition, the FDIC's breaches of the Governing Agreements, and its failure to cure IndyMac's breaches, constitute breach of contract and wrongful conduct in its administration of the IndyMac receivership.

132.   The FDIC's conduct gives rise to a priority right of payment that is superior or equivalent to an administrative claim under the preference scheme outlined in 12 U.S.C. § 1821(d)(11).

133.   The Trusts and the Trustee are entitled to an award of damages caused by IndyMac's pre-failure breaches of contract, which are currently estimated at $6 billion to $8 billion or more.

134.   The Trusts and the Trustee are entitled to recover these damages either in full or as an administrative priority claim in light of the FDIC's failure to cure IndyMac's pre-failure breaches of contract.

WHEREFORE, the Trusts and the Trustee demand judgment in their favor against the FDIC as receiver of IndyMac, and as receiver of IndyMac Federal to the

extent of any IndyMac assets transferred to IndyMac Federal, in an amount to be determined, plus pre- and post-judgment interest, costs of suit, attorneys' fees, and such other relief to which they may be entitled.

## COUNT TWO

### POST-FAILURE BREACH OF CONTRACT

### (AGAINST FDIC AS RECEIVER OF INDYMAC FEDERAL)

135.   The Trustee incorporates by reference the previous and succeeding paragraphs of this Complaint as if they were set forth here in full.

136.   The FDIC, as receiver of IndyMac Federal, assumed IndyMac's obligations under the Governing Agreements as of approximately July 11, 2008, including the obligations to service and administer the Trusts and the mortgage loans included in the Trusts.

137.   Upon assuming IndyMac's obligations, the FDIC was required to cure IndyMac's breaches of the Governing Agreements.

138.   In addition, the FDIC was required to abide by the Governing Agreements it assumed.  In fact, the FDIC acknowledged its obligation and represented to the Trustee that it would abide by those agreements by letter dated September 8, 2008.

139.   The FDIC failed to cure IndyMac's breaches of the Governing Agreements.

140.   The FDIC's failure to cure IndyMac's breaches constitutes wrongful conduct in its administration of IndyMac Federal as conservator and receiver of IndyMac Federal that gives rise to a priority right of payment that is superior or equivalent to an administrative claim under the preference scheme outlined in 12 U.S.C. § 1821(d)(11).

141.   In addition, the FDIC as conservator and receiver of IndyMac Federal committed several breaches of the Governing Agreements it had assumed.

142.   Without limiting the generality of the foregoing, the FDIC breached and continues to breach the Representations and Warranties in the Governing Agreements and also failed to:

a.   repurchase loans that the FDIC knew were subject to material breaches of Representations and Warranties;

b.   notify the other parties to the Governing Agreements of the existence of material breaches of the Representations and Warranties;

c.   service the loans in accordance with and pursuant to the Governing Agreements as more fully set forth above; and

d.   provide for the due performance of all of IndyMac's indemnification obligations to the Trusts and the Trustee under the Governing Agreements.

143.   The FDIC's conduct of the conservatorship and receivership of IndyMac Federal, specifically including its breaches of the Governing Agreements, exceeds the FDIC's lawful authority as conservator and receiver of IndyMac Federal and renders the FDIC liable for full repayment of any damages arising as a result of the breaches.

144.   At a minimum, the FDIC's post-receivership breaches of the Governing Agreements give rise to an administrative priority right of payment under 12 U.S.C. § 1821(d)(20).

145.   As a direct and proximate cause of the FDIC's wrongful conduct and breaches of contract, the Trusts and the Trustee have suffered significant damages.

146.   The FDIC is liable for breaching the Governing Agreements during its conservatorship and receivership of IndyMac Federal.

147.   The Trusts and the Trustee are entitled to an award of damages caused by the FDIC's failure to cure IndyMac's pre-failure breaches of contract and the FDIC's post-failure breaches of contract, which are currently estimated at $6 billion to $8 billion or more.

148.   The Trusts and the Trustee are entitled to recover these damages either in full or as an administrative priority claim in light of the FDIC's willful conduct in failing to cure the pre-failure breaches of contract by IndyMac and in light of the FDIC's further breaches of the Governing Agreements during the conservatorship and receivership periods.

WHEREFORE, the Trusts and the Trustee demand judgment in their favor against the FDIC as receiver of IndyMac Federal for damages in an amount to be determined, plus pre- and post-judgment interest, costs of suit, attorneys' fees, and such other relief as they may be entitled to receive.

## COUNT THREE

## BREACH OF CONTRACT FOR SALE TO ONEWEST

## (AGAINST FDIC AS RECEIVER OF INDYMAC AND FDIC AS RECEIVER OF INDYMAC FEDERAL)

149.   The Trustee incorporates by reference the previous and succeeding paragraphs of this Complaint as if they were set forth here in full.

150.   The Governing Agreements are fully integrated "Qualified Financial Contracts" under 12 U.S.C. § 1821(e)(8)(E) and, as such, they must be transferred or retained in whole.  12 U.S.C. § 1821(e)(9)(i), (ii).

151.   IndyMac, as servicer, could not assign its rights and obligations under the Governing Agreements without the prior written consent of the Trustee, and, if IndyMac was no longer the servicer for any reason, the Governing Agreements provided that the Trustee would become the successor servicer with the right to appoint a replacement successor servicer.

152.   The FDIC, in its capacities as receiver of IndyMac and conservator and receiver of IndyMac Federal, breached the Governing Agreements by purporting to transfer to OneWest all of IndyMac's servicing rights and obligations under the Governing Agreements without transferring  IndyMac's liabilities and

1  obligations to honor all of the Representations and Warranties and other key

2  provisions of the Governing Agreements.

3       153.   The FDIC, in each of its capacities, violated 12 U.S.C. § 1821(e)(9)

4  when it purported to transfer only a portion of the Governing Agreements to

5  OneWest.

6       154.   As a direct and proximate cause of the breaches of contract and

7  violation of 12 U.S.C. § 1821(e)(9), the Trusts and the Trustee have suffered

8  significant damages.

9       155.   The breaches of the Governing Agreements exceed the lawful

10  authority of the FDIC as receiver of IndyMac and as conservator and receiver of

11  IndyMac Federal, and render the FDIC, in each capacity, jointly and severally,

12  liable for full repayment of any damages arising therefrom.

13       156.   At a minimum, the aforesaid conduct by the FDIC in all capacities

14  gives rise to a priority right of payment that is superior or equivalent to an

15  administrative claim under the preference scheme outlined in 12 U.S.C. §

16  1821(d)(11).

17       157.   In addition, the purported transfer of rights to OneWest has deprived

18  the IndyMac Federal conservatorship or receivership estate of substantial assets to

19  the disadvantage of the Trusts and the Trustee.

20       WHEREFORE, the Trusts and the Trustee demand judgment in their favor

21  against FDIC in its capacities as receiver of IndyMac and as receiver of IndyMac

22  Federal for damages in an amount to be determined, plus pre- and post-judgment

23  interest, costs of suit, attorneys' fees, and such other relief as they may be entitled

24  to receive.

25

26

27

28

## COUNT FOUR

## BREACH OF CONTRACT FOR SALE TO ONEWEST

## (AGAINST FDIC IN ITS CORPORATE CAPACITY)

158.   The Trustee incorporates by reference the previous and succeeding paragraphs of this Complaint as if they were set forth here in full.

159.   On information and belief, on July 11, 2008, the FDIC in its corporate capacity was a party to a purchase and assumption agreement whereby substantially all of IndyMac's assets and liabilities, including its operational platform, its personnel and many of its ongoing operations, were purportedly transferred to and assumed by IndyMac Federal.  The purportedly transferred assets and liabilities included all of IndyMac's interests, rights and obligations with respect to the securitization Trusts evidenced by the Governing Agreements.

160.   IndyMac, as servicer, could not assign its rights and obligations under the Governing Agreements without the prior written consent of the Trustee, and the Governing Agreements provided that, if IndyMac was no longer the servicer for any reason, the Trustee would become the successor servicer with the right to appoint a replacement successor servicer.  *See* PSA, Exhibit 6 at § 3.05.

161.   The FDIC in its corporate capacity benefited from the purported transfer and sale of IndyMac's servicing rights to OneWest because it caused the FDIC, as receiver of IndyMac Federal and IndyMac F.S.B., to pay the proceeds of the purported transfer and sale to the FDIC in its corporate capacity.  The details of the precise distribution of such funds, however, is in the hands of the FDIC and has not been disclosed to the Trusts, the Trustee, and the investors in the Trusts.

162.   By entering into the Guaranty Agreement, the FDIC in its corporate capacity used its financial strength to induce OneWest to enter into the Master Purchase Agreement to purchase the assets and certain liabilities of IndyMac Federal.  Pursuant to the Guaranty Agreement, the FDIC in its corporate capacity guaranteed "the payment, reimbursement and related obligations of the FDIC, as

Conservator for IndyMac Federal or as Receiver for IndyMac Federal . . . under the Definitive Agreements." *See* Guaranty Agreement at 1, Exhibit 3. The Guaranty Agreement, therefore, adopts the terms of the Master Purchase Agreement, including the representations and warranties, signed by the FDIC as receiver of IndyMac. Without the Guaranty Agreement signed by the FDIC in its corporate capacity, OneWest would not have entered into the Master Purchase Agreement and related agreements. *See id.*

163. The Trustee's consent for such transfer and the transaction with OneWest was neither sought nor given.

164. The transfer of the servicing rights without the Trustee's consent constituted a breach of the Governing Agreements. *See* PSA, Exhibit 6 at § 3.05.

165. As a direct and proximate cause of the breaches of contract, described herein and otherwise, the Trusts and the Trustee have suffered significant damages.

166. The breaches of the Governing Agreements exceeded the lawful authority of the FDIC in its corporate capacity, and render the FDIC in is corporate capacity liable for full repayment of any damages arising therefrom.

167. At a minimum, the aforesaid conduct by the FDIC in its corporate capacity gives rise to a priority right of payment that is superior or equivalent to an administrative claim under the preference scheme outlined in 12 U.S.C. § 1821(d)(11).

168. In addition, the purported transfer and sale of the servicing rights to OneWest, and the remittance of the proceeds of the sale to the FDIC as receiver of IndyMac F.S.B., and then subsequently to the FDIC in its corporate capacity, has deprived the IndyMac Federal receivership estate of substantial assets that otherwise would have been available to satisfy the claims of the Trusts and the Trustee against the IndyMac Federal receivership estate.

WHEREFORE, the Trusts and the Trustee demand judgment in their favor against the FDIC in its corporate capacity for damages in an amount to be

determined, plus pre- and post-judgment interest, costs of suit, attorneys' fees, and such other relief as they may be entitled to receive.

## COUNT FIVE

## BREACH OF CONTRACT FOR SALE TO ONEWEST

## (AGAINST FDIC IN ITS CORPORATE CAPACITY -- PIERCING THE CORPORATE VEIL)

169.   The Trustee incorporates by reference the previous and succeeding paragraphs of this Complaint as if they were set forth here in full.

170.   The FDIC in its corporate capacity played a considerable role in the management and performance of the Governing Agreements and exercised control over the FDIC as receiver of IndyMac and the FDIC as conservator and receiver of IndyMac Federal in their operation of the IndyMac receivership estate.

171.    On information and belief, the FDIC in both its capacity as receiver of IndyMac Federal and in its corporate capacity, share a common office and staff, are run by common officers and/or directors, and do not deal at arms length with each other.

172.   The officers and employees of the FDIC in its corporate capacity directed the activities of the FDIC as receiver of IndyMac and the FDIC as conservator and receiver of IndyMac Federal and failed to recognize and/or maintain a distinction between the two capacities in their dealings with the IndyMac failure and receivership estate.  The FDIC in its corporate capacity so dominated the FDIC in its receivership capacity as to render them the same entity.

173.    On information and belief, the FDIC in its corporate capacity used its policy role to dominate and control the operation of IndyMac Federal by, inter alia, (1) encouraging the assumption and breach of the Governing Agreements, instead of lawfully repudiating them; and (2) causing IndyMac Federal to service loans in breach of the Governing Agreements and against standard industry practice,

1    including by modifying certain mortgages in contravention of the terms and

2    conditions of the Governing Agreements.

3        174.   The FDIC in its corporate capacity breached the Governing

4    Agreements by causing the FDIC in its capacity as receiver of IndyMac and as

5    conservator of IndyMac Federal to assume the Governing Agreements and breach

6    them by purporting to transfer to OneWest all of IndyMac's servicing rights and

7    obligations under the Governing Agreements without transferring IndyMac's

8    liabilities and obligations to honor all of the Representations and Warranties and

9    other key provisions of the Governing Agreements.

10       175.   As a direct and proximate cause of the breaches of contract, described

11   herein and otherwise, the Trusts and the Trustee have suffered significant damages.

12       176.   The breaches of the Governing Agreements exceed the lawful

13   authority of the FDIC in its corporate capacity, and render the FDIC in its corporate

14   capacity liable for full repayment of any damages arising therefrom.

15       177.   At a minimum, the aforesaid conduct by the FDIC in its corporate

16   capacity gives rise to a priority right of payment that is superior or equivalent to an

17   administrative claim under the preference scheme outlined in 12 U.S.C. §

18   1821(d)(11).

19       178.   In addition, the purported transfer of the servicing rights to OneWest

20   has deprived the IndyMac Federal receivership estate of substantial assets to the

21   disadvantage of the Trusts and the Trustee.

22       WHEREFORE, the Trusts and the Trustee demand judgment in their favor

23   against the FDIC in its corporate capacity for damages in an amount to be

24   determined, plus pre- and post-judgment interest, costs of suit, attorneys' fees, and

25   such other relief as they may be entitled to receive.

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FIRST AMENDED COMPLAINT

## COUNT SIX

### REPUDIATION RELATED TO RADIAN TRUSTS

### (AGAINST FDIC AS RECEIVER OF INDYMAC)

179.   The Trustee incorporates by reference the previous and succeeding paragraphs of this Complaint as if they were set forth here in full.

180.   Pursuant to 12 U.S.C. § 1821(e), the FDIC as receiver has the power to disaffirm or repudiate a contract entered into by the failed institution that it deems burdensome where the repudiation "will promote the orderly administration of the institution's affairs."  12 U.S.C. § 1821(e)(1).

181.   As more fully set forth above, the FDIC as receiver of IndyMac repudiated certain Governing Agreements pertaining to the three Radian Trusts.

182.   Pursuant to 12 U.S.C. § 1821(e)(3), the FDIC's repudiation of these certain Governing Agreements pertaining to the three Radian Trusts gives rise to a claim by the Radian Trusts and the Trustee for resulting damages.

183.   As a direct and proximate cause of the repudiation by the FDIC, the Radian Trusts and the Trustee have suffered significant damages and will continue to suffer such damages.

WHEREFORE, the Radian Trusts and the Trustee demand judgment in their favor against FDIC as receiver of IndyMac for damages in an amount to be determined, plus pre- and post-judgment interest, costs of suit, attorneys' fees, and such other relief as they may be entitled to receive.

## COUNT SEVEN

### BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

### (AGAINST FDIC AS RECEIVER OF INDYMAC AND FDIC AS RECEIVER OF INDYMAC FEDERAL)

184.   The Trustee incorporates by reference the previous and succeeding paragraphs of this Complaint as if they were set forth here in full.

185.   Applicable law implies a duty of good faith and fair dealing in the contracts at issue in this case, including the Governing Agreements.

186.   A party breaches its duty of good faith and fair dealing when it deprives another party to the contract of the essential or material benefits of the contract.

187.   The FDIC as receiver of IndyMac and as conservator and receiver of IndyMac Federal have such a duty of good faith and fair dealing to the Trustee and to the Trusts.

188.   The conduct of the FDIC as described herein breached that duty, by among other things:

      a.   purporting to transfer to OneWest the rights and benefits of the Governing Agreements, while not transferring the associated obligations;

      b.   structuring transactions so as to deprive the Trustee and the investors in the Trusts of the essential consideration provided to them under the Governing Agreements; and

      c.   attempting to deprive the Trustee and the Trusts of setoff or recoupment rights that they have against servicing fees or advance reimbursement under the Governing Agreements, which OneWest and/or the FDIC may now contend not to exist.

WHEREFORE, the Trusts and the Trustee seek judgment in their favor and against the FDIC as receiver of IndyMac and as receiver of IndyMac Federal for damages in an amount to be determined, plus pre- and post-judgment interest, costs of suit, attorneys' fees, and such other relief as they may be entitled to receive.

## COUNT EIGHT

## BREACH OF FIDUCIARY DUTY

## (AGAINST FDIC AS RECEIVER OF INDYMAC AND AS RECEIVER OF INDYMAC FEDERAL)

189.    The Trustee incorporates by reference the previous and succeeding paragraphs of this Complaint as if they were set forth here in full.

190.    The FDIC as the receiver of IndyMac and as conservator and receiver of IndyMac Federal has a fiduciary obligation to manage the assets of the receivership in a manner that "maximizes the net present value return from the sale or disposition" and "minimizes the amount of any loss realized." 12 U.S.C. §§ 1821(d)(3) and 1821(d)(13).

191.    As a receiver and a fiduciary, the FDIC must act for the benefit of all parties who may establish rights during the administration of the receivership.

192.    As receiver, the FDIC further has a fiduciary obligation to claimants to act in good faith, to act in accordance with the laws that establish its authority, to preserve the property in its possession, and to act in a manner that maximizes potential recovery by those claimants and to allocate the proceeds of such assets impartially and in accordance with rights established by claimants, and statutory priorities.

193.    The FDIC has failed to comply with its fiduciary duties as receiver, including but not limited to, its duties with respect to the management and disposition of IndyMac and IndyMac Federal assets, and its treatment of the Trustee and the investors in the Trusts. The FDIC further breached its fiduciary duties as receiver by furthering its interests in its other capacities, including in its corporate capacity and as the insurer of bank deposits, at the expense of the Trusts, the Trustee, and the receivership estate.

194.    The conduct by the FDIC described herein in its administration of the IndyMac and IndyMac Federal receiverships gives rise to the personal and

1  individual liability of the receiver (as opposed to just the assets of the receivership),

2  and a priority right of payment that is superior or equivalent to an administrative

3  claim under the preference scheme outlined in 12 U.S.C. § 1821(d)(11).

4      195.   As conservator and receiver of IndyMac Federal, the FDIC had an

5  obligation either to honor in their entirety the Governing Agreements to which

6  IndyMac Federal succeeded, and to lawfully and properly assign the rights and

7  obligations transferred from IndyMac, or to repudiate these agreements in their

8  entirety.  The FDIC breached this duty.

9      196.   The Trusts and the Trustee have suffered damages as a result of the

10  FDIC's breaches of fiduciary duty.

11      197.   The Trusts and the Trustee are entitled to recovery of these damages

12  either in full from the funds of the FDIC or as an administrative priority claim in

13  light of the FDIC's wrongful conduct in failing to properly manage the assets of the

14  IndyMac receivership and transfer the assets of the IndyMac Federal

15  conservatorship and receivership.

16      WHEREFORE, the Trusts and the Trustee demand judgment in their favor

17  against the FDIC as receiver of IndyMac and as receiver of IndyMac Federal,

18  jointly and severally, for damages in an amount to be determined, plus pre- and

19  post-judgment interest, costs of suit, attorneys' fees, and such other relief as they

20  may be entitled to receive.

21  <u>**COUNT NINE**</u>

22  <u>**UNCONSTITUTIONAL TAKINGS FOR SALE TO ONEWEST AND**</u>

23  <u>**SPLITTING OBLIGATIONS**</u>

24  <u>**(AGAINST FDIC IN ALL CAPACITIES)**</u>

25      198.   The Trustee incorporates by reference the previous and succeeding

26  paragraphs of this Complaint as if they were set forth here in full.

27      199.   The Fifth Amendment to the Constitution prohibits the taking of

28  property for public use without just compensation.

200.   The FDIC's actions described herein violate the Fifth Amendment of the Constitution.

201.   The contractual rights of the Trusts and the Trustee under the Governing Agreements constitute property rights.

202.   The FDIC exercised government authority under the Financial Institutions Reform, Recovery Enforcement Act ("FIRREA"), 12 U.S.C. § 1821, to sell certain rights under the Governing Agreements to OneWest.

203.   By selling rights under the Governing Agreements without also transferring the associated obligations, the FDIC has: (a) prohibited beneficial uses and taken, destroyed and deprived the Trustee and the Trusts of economically viable use of fixed and certain rights under the Governing Agreements; and (b) frustrated, taken and deprived the Trustee and the Trusts of reasonable investment-backed expectations of their property.

204.   The FDIC's actions caused the Trustee and the Trusts to be unable to profit or obtain a reasonable return on their investments.

205.   These actions further harmed the economic interest of the Trustee and the Trusts to benefit the economic interest of the United States Government.  The Trustee and the Trusts should not be forced to bear these burdens for the benefit of others.

206.   By these actions, the FDIC has taken the property of the Trusts and the Trustee without just compensation in violation of the Fifth Amendment to the Constitution.

207.   The Trusts and the Trustee are entitled to an award of just compensation for the taking of their property rights pursuant to FIRREA.

208.   Such wrongful conduct by the FDIC in its administration of the IndyMac receivership gives rise to a priority right of payment that is superior or equivalent to an administrative claim under the preference scheme outlined in 12 U.S.C. § 1821(d)(11).

209.   The Trusts and the Trustee are therefore entitled to recovery of damages either in full or as an administrative priority claim in light of the FDIC's wrongful conduct.

WHEREFORE, the Trusts and the Trustee demand judgment in their favor against the FDIC in all capacities in an amount to be determined representing just compensation, as well as pre- and post-judgment interest, costs of suit, attorneys' fees, and such other relief as they may be entitled to receive.

## COUNT TEN

## UNCONSTITUTIONAL TAKINGS FOR RIGHT TO APPOINT SUCCESSOR SERVICER

## (AGAINST FDIC IN ALL CAPACITIES)

210.   The Trustee incorporates by reference the previous and succeeding paragraphs of this Complaint as if they were set forth here in full.

211.   The Trustee's and the Trusts' contractual rights under the Governing Agreements constitute property rights.

212.   The FDIC exercised its authority under 12 U.S.C. § 1821, to sell certain rights under the Governing Agreements to OneWest.

213.   Pursuant to the Governing Agreements, the Trustee  is the party who has the right to replace IndyMac as a servicer.  This is a valuable right that would ordinarily bring substantial revenue to the Trustee and the Trusts.

214.   By purporting to sell the "servicing rights" under the Governing Agreements without allowing the Trustee to replace and/or appoint the successor servicer, the FDIC has: (a) prohibited beneficial uses and taken, destroyed and deprived the Trustee and the Trusts of economically viable uses of its rights under the Governing Agreements; and (b) frustrated, taken and deprived the Trustee and the Trusts of reasonable investment-backed expectations of their property.

215.   The FDIC's actions caused the Trustee and the Trusts to be unable to profit or obtain a reasonable return on their investments.

216.   The FDIC harmed the economic interests of the Trustee and the Trusts to benefit the United States government and the depositors and other creditors of IndyMac.  The Trustee and the Trusts should not be forced to bear these burdens for the benefit of others.

217.   By these actions, the FDIC has taken the property of the Trusts and the Trustee without just compensation in violation of the Fifth Amendment to the Constitution.

218.   The Trusts and the Trustee are entitled to an award of just compensation for the taking of their property rights under the Governing Agreements pursuant to FIRREA.

219.   Such wrongful conduct by the FDIC in its administration of the IndyMac receivership gives rise to a priority right of payment that is superior or equivalent to an administrative claim under the preference scheme outlined in 12 U.S.C. § 1821(d)(11).

220.   The Trusts and the Trustee are therefore entitled to recovery of damages either in full or as an administrative priority claim in light of the FDIC's wrongful conduct.

WHEREFORE, the Trusts and the Trustee demand judgment in their favor against the FDIC in all capacities in an amount to be determined representing just compensation, as well as pre- and post-judgment interest, costs of suit, attorneys' fees, and such other relief as they may be entitled to receive.

## COUNT ELEVEN

## DUE PROCESS VIOLATION FOR SALE TO ONEWEST AND SPLITTING OBLIGATIONS

## (AGAINST FDIC IN ALL CAPACITIES)

221.   The Trustee incorporates by reference the previous and succeeding paragraphs of this Complaint as if they were set forth here in full.

1  222.   The Fifth Amendment to the Constitution prohibits the taking of

2  property without due process of law.

3  223.   As more fully set forth above, the FDIC's conduct in all capacities

4  described herein constitutes a taking of property.

5  224.   The FDIC in all capacities failed to provide the Trustee or the Trusts

6  with due process of law in connection with the takings described herein.

7  WHEREFORE, the Trusts and the Trustee demands judgment in their favor

8  against the FDIC in all capacities in an amount to be determined representing just

9  compensation, as well as pre- and post-judgment interest, costs of suit, attorneys'

10  fees, and such other relief as they may be entitled to receive.

11  <u>**COUNT TWELVE**</u>

12  <u>**DUE PROCESS VIOLATIONS FOR RIGHT TO APPOINT SUCCESSOR**</u>

13  <u>**SERVICER**</u>

14  <u>**(AGAINST FDIC IN ALL CAPACITIES)**</u>

15  225.   The Trustee incorporates by reference the previous and succeeding

16  paragraphs of this Complaint as if they were set forth here in full.

17  226.   The Fifth Amendment to the Constitution prohibits the taking of

18  property without due process of law.

19  227.   As more fully set forth above, the conduct described herein constitutes

20  a taking of property.

21  228.   The FDIC failed to provide the Trustee or the Trusts with due process

22  of law in connection with the takings described herein.

23  WHEREFORE, the Trusts and the Trustee demand judgment in their favor

24  against the FDIC in all capacities in an amount to be determined representing just

25  compensation, as well as pre- and post-judgment interest, costs of suit, attorneys'

26  fees, and such other relief as they may be entitled to receive.

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FIRST AMENDED COMPLAINT

1

2

3

# COUNT THIRTEEN

# CONSTRUCTIVE TRUST

# (AGAINST THE FDIC IN ALL CAPACITIES)

4   229.   The Trustee incorporates by reference the previous and succeeding

5   paragraphs of this Complaint as if they were set forth here in full.

6   230.   As more fully set forth above, the sale to OneWest purported to

7   include assets that rightfully belong to the Trusts or the Trustee, including setoff

8   and recoupment rights, and the rights to replace the servicer.

9   231.   In addition, on information and belief, the FDIC made the sale to

10   OneWest in a manner that purported to eliminate the setoff and recoupment rights

11   of the Trusts of the Trustee.

12   232.   The Trusts and the Trustee have a superior right to some of the assets

13   that the FDIC purported to sell to OneWest.

14   233.   The Court should therefore impose a constructive trust on the proceeds

15   from the OneWest sale.

16   234.   For all the foregoing reasons, the Trustee and the Trusts respectfully

17   request that this Court impose a constructive trust on the proceeds of the sale of

18   valuable rights to OneWest.

19   WHEREFORE, the Trusts and the Trustee request that judgment be entered

20   in their favor and against the FDIC in each of its capacities imposing a constructive

21   trust on the proceeds of the sale to OneWest.

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FIRST AMENDED COMPLAINT

1

Dated:    May 2, 2011                           MORGAN, LEWIS & BOCKIUS LLP
2                                               JAMI WINTZ MCKEON
                                                DAVID L. SCHRADER
3

4

5                                               By:  /s/ Jami Wintz McKeon
                                                    Attorneys for Plaintiff
6                                                   Deutsche Bank National Trust
                                                    Company, as Trustee for certain
7                                                   residential mortgage-backed
                                                    securitization trusts sponsored by
8                                                   IndyMac Bank, F.S.B.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FIRST AMENDED COMPLAINT

## **JURY TRIAL DEMAND**

Plaintiff DBNTC hereby demands a jury trial to the fullest extent allowed by the Constitution or other applicable law.


Dated:    May 2, 2011                        MORGAN, LEWIS & BOCKIUS LLP
                                             JAMI WINTZ MCKEON
                                             DAVID L. SCHRADER



                                             By: ___/s/ Jami Wintz McKeon_____
                                             Attorneys for Plaintiff
                                             Deutsche Bank National Trust
                                             Company, as Trustee for certain
                                             residential mortgage-backed
                                             securitization trusts sponsored by
                                             IndyMac Bank, F.S.B.

# EXHIBIT 1

## EXHIBIT 1

1.   IndyMac Residential Asset Securitization Trust Series 2002-A12

2.   IndyMac Residential Asset Securitization Trust Series 2002-A13

3.   IndyMac Residential Asset Securitization Trust Series 2002-A14J

4.   IndyMac Residential Asset Securitization Trust Series 2002-A15

5.   IndyMac Residential Asset Securitization Trust Series 2002-A16

6.   IndyMac Residential Asset Securitization Trust Series 2003-A1

7.   IndyMac Residential Asset Securitization Trust Series 2003-A2

8.   IndyMac Residential Asset Securitization Trust Series 2003-A4

9.   IndyMac Residential Asset Securitization Trust Series 2003-A5

10.   IndyMac Residential Asset Securitization Trust Series 2003-A6

11.   IndyMac Residential Asset Securitization Trust Series 2003-A7

12.   IndyMac Residential Asset Securitization Trust Series 2003-A8

13.   IndyMac Residential Asset Securitization Trust Series 2003-A9

14.   IndyMac Residential Asset Securitization Trust Series 2003-A10

15.   IndyMac Residential Asset Securitization Trust Series 2003-A11

16.   IndyMac Residential Asset Securitization Trust Series 2003-A12

17.   IndyMac Residential Asset Securitization Trust Series 2003-A13

18.   IndyMac Residential Asset Securitization Trust Series 2003-A14

19.   IndyMac Residential Asset Securitization Trust Series 2003-A15

20.   IndyMac Residential Asset Securitization Trust Series 2004-A1

21.   IndyMac Residential Asset Securitization Trust Series 2004-A2

22.   IndyMac Residential Asset Securitization Trust Series 2004-A3

23.   IndyMac Residential Asset Securitization Trust Series 2004-A4

24.   IndyMac Residential Asset Securitization Trust Series 2004-A5

25.   IndyMac Residential Asset Securitization Trust Series 2004-A6

26.   IndyMac Residential Asset Securitization Trust Series 2004-A7

27.   IndyMac Residential Asset Securitization Trust Series 2004-A8

28.   IndyMac Residential Asset Securitization Trust Series 2004-A9

29.   IndyMac Residential Asset Securitization Trust Series 2004-A10

30.   IndyMac INDX Mortgage Loan Trust Series 2004-AR1

EXHIBIT 1
Page 45

Exhibit 1, Page 53

31. IndyMac INDX Mortgage Loan Trust Series 2004-AR2

32. IndyMac INDX Mortgage Loan Trust Series 2004-AR3

33. IndyMac INDX Mortgage Loan Trust Series 2004-AR4

34. IndyMac INDX Mortgage Loan Trust Series 2004-AR5

35. IndyMac INDX Mortgage Loan Trust Series 2004-AR6

36. IndyMac INDX Mortgage Loan Trust Series 2004-AR7

37. IndyMac INDX Mortgage Loan Trust Series 2004-AR8

38. IndyMac INDX Mortgage Loan Trust Series 2004-AR9

39. IndyMac INDX Mortgage Loan Trust Series 2004-AR10

40. IndyMac INDX Mortgage Loan Trust Series 2004-AR11

41. IndyMac INDX Mortgage Loan Trust Series 2004-AR12

42. IndyMac INDX Mortgage Loan Trust Series 2004-AR13

43. IndyMac INDX Mortgage Loan Trust Series 2004-AR14

44. IndyMac INDX Mortgage Loan Trust Series 2004-AR15

45. IndyMac Residential Asset Securitization Trust Series 2004-IP1

46. IndyMac Residential Asset Securitization Trust Series 2004-IP2

47. IndyMac Residential Asset Securitization Trust Series 2005-A1

48. IndyMac Residential Asset Securitization Trust Series 2005-A2

49. IndyMac Residential Asset Securitization Trust Series 2005-A3

50. IndyMac Residential Asset Securitization Trust Series 2005-A4

51. IndyMac Residential Asset Securitization Trust Series 2005-A5

52. IndyMac Residential Asset Securitization Trust Series 2005-A6CB

53. IndyMac Residential Asset Securitization Trust Series 2005-A7

54. IndyMac Residential Asset Securitization Trust Series 2005-A8CB

55. IndyMac Residential Asset Securitization Trust Series 2005-A9

56. IndyMac Residential Asset Securitization Trust Series 2005-A10

57. IndyMac Residential Asset Securitization Trust Series 2005-A11CB

58. IndyMac Residential Asset Securitization Trust Series 2005-A12

59. IndyMac Residential Asset Securitization Trust Series 2005-A13

60. IndyMac Residential Asset Securitization Trust Series 2005-A14

61. IndyMac Residential Asset Securitization Trust Series 2005-A15

**EXHIBIT 1**
**Page 46**

Exhibit 1, Page 54

62.   IndyMac Residential Asset Securitization Trust Series 2005-A16

63.   IndyMac INDX Mortgage Loan Trust Series 2005-AR1

64.   IndyMac INDX Mortgage Loan Trust Series 2005-AR2

65.   IndyMac INDX Mortgage Loan Trust Series 2005-AR3

66.   IndyMac INDX Mortgage Loan Trust Series 2005-AR4

67.   IndyMac INDX Mortgage Loan Trust Series 2005-AR5

68.   IndyMac INDX Mortgage Loan Trust Series 2005-AR6

69.   IndyMac INDX Mortgage Loan Trust Series 2005-AR7

70.   IndyMac INDX Mortgage Loan Trust Series 2005-AR8

71.   IndyMac INDX Mortgage Loan Trust Series 2005-AR9

72.   IndyMac INDX Mortgage Loan Trust Series 2005-AR10

73.   IndyMac INDX Mortgage Loan Trust Series 2005-AR11

74.   IndyMac INDX Mortgage Loan Trust Series 2005-AR12

75.   IndyMac INDX Mortgage Loan Trust Series 2005-AR13

76.   IndyMac INDX Mortgage Loan Trust Series 2005-AR14

77.   IndyMac INDX Mortgage Loan Trust Series 2005-AR15

78.   IndyMac INDX Mortgage Loan Trust Series 2005-AR16IP

79.   IndyMac INDX Mortgage Loan Trust Series 2005-AR17

80.   IndyMac INDX Mortgage Loan Trust Series 2005-AR18

81.   IndyMac INDX Mortgage Loan Trust Series 2005-AR19

82.   IndyMac INDX Mortgage Loan Trust Series 2005-AR21

83.   IndyMac INDX Mortgage Loan Trust Series 2005-AR23

84.   IndyMac INDA Mortgage Loan Trust Series 2005-AR1

85.   IndyMac INDX Mortgage Loan Trust Series 2005-AR25

86.   IndyMac INDX Mortgage Loan Trust Series 2005-AR27

87.   IndyMac INDA Mortgage Loan Trust Series 2005-AR2

88.   IndyMac INDX Mortgage Loan Trust Series 2005-AR29

89.   IndyMac INDX Mortgage Loan Trust Series 2005-AR31

90.   IndyMac INDX Mortgage Loan Trust Series 2005-AR33

91.   IndyMac INDX Mortgage Loan Trust Series 2005-AR35

92.   IndyMac INDB Mortgage Loan Trust Series 2005-1

**EXHIBIT 1**
Page 47

Exhibit 1, Page 55

93.    IndyMac Residential Asset Securitization Trust Series 2006-A1

94.    IndyMac Residential Asset Securitization Trust Series 2006-A2

95.    IndyMac Residential Asset Securitization Trust Series 2006-A3CB

96.    IndyMac Residential Asset Securitization Trust Series 2006-A5CB

97.    IndyMac Residential Asset Securitization Trust Series 2006-A6

98.    IndyMac Residential Asset Securitization Trust Series 2006-A7CB

99.    IndyMac Residential Asset Securitization Trust Series 2006-A8

100.   IndyMac Residential Asset Securitization Trust Series 2006-A9CB

101.   IndyMac INDS Home Equity Mortgage Loan Trust Series 2006-A

102.   IndyMac Residential Asset Securitization Trust Series 2006-A10

103.   IndyMac Residential Asset Securitization Trust Series 2006-A11

104.   IndyMac Residential Asset Securitization Trust Series 2006-A12

105.   IndyMac Residential Asset Securitization Trust Series 2006-A13

106.   IndyMac Residential Asset Securitization Trust Series 2006-A14CB

107.   IndyMac Residential Asset Securitization Trust Series 2006-A15

108.   IndyMac Residential Asset Securitization Trust Series 2006-A16

109.   IndyMac INDX Mortgage Loan Trust Series 2006-AR2

110.   IndyMac INDX Mortgage Loan Trust Series 2006-AR3

111.   IndyMac INDX Mortgage Loan Trust Series 2006-AR4

112.   IndyMac INDX Mortgage Loan Trust Series 2006-AR5

113.   IndyMac INDX Mortgage Loan Trust Series 2006-AR6

114.   IndyMac INDX Mortgage Loan Trust Series 2006-AR7

115.   IndyMac INDX Mortgage Loan Trust Series 2006-AR8

116.   IndyMac INDX Mortgage Loan Trust Series 2006-AR9

117.   IndyMac INDX Mortgage Loan Trust Series 2006-AR11

118.   IndyMac INDX Mortgage Loan Trust Series 2006-AR12

119.   IndyMac INDX Mortgage Loan Trust Series 2006-AR13

120.   IndyMac INDX Mortgage Loan Trust Series 2006-AR14

121.   IndyMac INDX Mortgage Loan Trust Series 2006-AR15

122.   IndyMac INDX Mortgage Loan Trust Series 2006-AR19

123.   IndyMac INDX Mortgage Loan Trust Series 2006-AR21

EXHIBIT 1
Page 48

Exhibit 1, Page 56

124.   IndyMac INDX Mortgage Loan Trust Series 2006-AR23

125.   IndyMac INDX Mortgage Loan Trust Series 2006-AR25

126.   IndyMac INDX Mortgage Loan Trust Series 2006-AR27

127.   IndyMac INDX Mortgage Loan Trust Series 2006-AR29

128.   IndyMac INDX Mortgage Loan Trust Series 2006-AR31

129.   IndyMac INDX Mortgage Loan Trust Series 2006-AR33

130.   IndyMac INDX Mortgage Loan Trust Series 2006-AR35

131.   IndyMac INDB Mortgage Loan Trust Series 2006-1

132.   IndyMac INDA Mortgage Loan Trust Series 2006-AR1

133.   IndyMac INDA Mortgage Loan Trust Series 2006-AR2

134.   IndyMac INDA Mortgage Loan Trust Series 2006-AR3

135.   IndyMac INDX Mortgage Loan Trust Series 2006-FLX1

136.   IndyMac INDS Home Equity Mortgage Loan Trust Series 2006-1

137.   IndyMac INDS Home Equity Mortgage Loan Trust Series 2006-2B

138.   IndyMac INDS Home Equity Mortgage Loan Trust Series 2006-3

139.   IndyMac Home Equity Loan Trust Series 2006-H2

140.   IndyMac Home Equity Loan Trust Series 2006-H3

141.   IndyMac Residential Mortgage-Backed Trust Series 2006-L2

142.   IndyMac Residential Mortgage-Backed Trust Series 2006-L3

143.   IndyMac Residential Asset Securitization Trust Series 2006-A4IP

144.   IndyMac INABS Trust Series 2006-C

145.   IndyMac INABS Trust Series 2006-D

146.   IndyMac INDX Mortgage Loan Trust Series 2006-AR37

147.   IndyMac INDX Mortgage Loan Trust Series 2006-AR39

148.   IndyMac INDX Mortgage Loan Trust Series 2006-AR41

149.   IndyMac Residential Asset Securitization Trust Series 2007-A1

150.   IndyMac Residential Asset Securitization Trust Series 2007-A2

151.   IndyMac Residential Asset Securitization Trust Series 2007-A3

152.   IndyMac Residential Asset Securitization Trust Series 2007-A5

153.   IndyMac Residential Asset Securitization Trust Series 2007-A6

154.   IndyMac Residential Asset Securitization Trust Series 2007-A7

**EXHIBIT 1**
Page 49

Exhibit 1, Page 57

155. IndyMac Residential Asset Securitization Trust Series 2007-A8

156. IndyMac Residential Asset Securitization Trust Series 2007-A9

157. IndyMac INDX Mortgage Loan Trust Series 2007-AR1

158. IndyMac INDX Mortgage Loan Trust Series 2007-AR5

159. IndyMac INDX Mortgage Loan Trust Series 2007-AR7

160. IndyMac INDX Mortgage Loan Trust Series 2007-AR9

161. IndyMac INDX Mortgage Loan Trust Series 2007-AR11

162. IndyMac INDX Mortgage Loan Trust Series 2007-AR13

163. IndyMac INDX Mortgage Loan Trust Series 2007-AR15

164. IndyMac INDX Mortgage Loan Trust Series 2007-AR17

165. IndyMac INDX Mortgage Loan Trust Series 2007-AR19

166. IndyMac INDX Mortgage Loan Trust Series 2007-AR21IP

167. IndyMac IMSC Mortgage Loan Trust Series 2007-AR1

168. IndyMac INDA Mortgage Loan Trust Series 2007-AR1

169. IndyMac INDA Mortgage Loan Trust Series 2007-AR2

170. IndyMac INDA Mortgage Loan Trust Series 2007-AR3

171. IndyMac INDA Mortgage Loan Trust Series 2007-AR4

172. IndyMac INDA Mortgage Loan Trust Series 2007-AR5

173. IndyMac INDA Mortgage Loan Trust Series 2007-AR6

174. IndyMac INDA Mortgage Loan Trust Series 2007-AR7

175. IndyMac INDA Mortgage Loan Trust Series 2007-AR8

176. IndyMac INDA Mortgage Loan Trust Series 2007-AR9

177. IndyMac INDS Home Equity Mortgage Loan Trust Series 2007-1

178. IndyMac INDX Mortgage Loan Trust Series 2007-FLX1

179. IndyMac INDX Mortgage Loan Trust Series 2007-FLX2

180. IndyMac INDX Mortgage Loan Trust Series 2007-FLX3

181. IndyMac INDX Mortgage Loan Trust Series 2007-FLX4

182. IndyMac INDX Mortgage Loan Trust Series 2007-FLX5

183. IndyMac INDX Mortgage Loan Trust Series 2007-FLX6

184. IndyMac IMJA Mortgage Loan Trust Series 2007-A1

185. IndyMac IMJA Mortgage Loan Trust Series 2007-A2

EXHIBIT 1
Page 50

Exhibit 1, Page 58

186.   IndyMac IMJA Mortgage Loan Trust Series 2007-A3

187.   IndyMac IMJA Mortgage Loan Trust Series 2007-A4

188.   IndyMac IMSC Mortgage Loan Trust Series 2007-F1

189.   IndyMac IMSC Mortgage Loan Trust Series 2007-F2

190.   IndyMac IMSC Mortgage Loan Trust Series 2007-AR2

191.   IndyMac IMSC Mortgage Loan Trust Series 2007-F3

192.   IndyMac IMSC Mortgage Loan Trust Series 2007-HOA-1

193.   IndyMac SPMD Trust Series 2000-C

194.   IndyMac SPMD Trust Series 2001-A

195.   IndyMac SPMD Trust Series 2001-B

196.   IndyMac SPMD Trust Series 2001-C

197.   IndyMac SPMD Trust Series 2002-A

198.   IndyMac SPMD Trust Series 2002-B

199.   IndyMac SPMD Trust Series 2003-A

200.   IndyMac Certificate Trust Series 2004-2

201.   IndyMac Residential Mortgage-Backed Trust Series 2004-LH1

202.   IndyMac SPMD Trust Series 2004-A

203.   IndyMac SPMD Trust Series 2004-B

204.   IndyMac SPMD Trust Series 2004-C

205.   IndyMac Residential Mortgage-Backed Trust Series 2005-L1

206.   IndyMac Residential Mortgage-Backed Trust Series 2005-L2

207.   IndyMac Residential Mortgage-Backed Trust Series 2005-L3

208.   IndyMac INABS Trust Series 2005-A

209.   IndyMac INABS Trust Series 2005-B

210.   IndyMac INABS Trust Series 2005-C

211.   IndyMac INABS Trust Series 2005-D

212.   IndyMac Home Equity Loan Trust Series 2006-H1

213.   IndyMac Home Equity Loan Trust Series 2006-H4

214.   IndyMac Residential Mortgage-Backed Trust Series 2006-L1

215.   IndyMac Residential Mortgage-Backed Trust Series 2006-L4

216.   IndyMac INABS Trust Series 2006-A

**EXHIBIT 1**
**Page 51**

Exhibit 1, Page 59

217.  IndyMac INABS Trust Series 2006-B

218.  IndyMac INABS Trust Series 2006-E

219.  IndyMac INDS Home Equity Mortgage Loan Trust Series 2007-2

220.  IndyMac Home Equity Loan Trust Series 2007-H1

221.  IndyMac Residential Mortgage-Backed Trust Series 2007-L1

222.  IndyMac INABS Trust Series 2007-A

223.  IndyMac INABS Trust Series 2007-B

224.  Soundview Home Loan Trust Asset-Backed Certificates, Series 2007-2

225.  Structured Asset Investment Loan Trust 2004-1

226.  Harborview Mortgage Loan Trust Series 2006-8

227.  Harborview Mortgage Loan Trust Series 2006-14

228.  Harborview Mortgage Loan Trust Series 2007-7

229.  Harborview Mortgage Loan Trust Series 2006-2

230.  Harborview Mortgage Loan Trust Series 2004-7

231.  GSAA Home Equity Trust Series 2005-4

232.  BCAP Trust LLC Series 2007-AA1

233.  GSR Mortgage Loan Trust Series 2006-OA1

234.  GSAA Home Equity Trust Series 2006-17

235.  GSAA Home Equity Trust Series 2007-4

236.  GSAA Home Equity Trust Series 2004-8

237.  GSR Mortgage Loan Trust Series 2007-AR2

238.  GSR Mortgage Loan Trust Series 2007-OA2

239.  Alliance Bancorp Bancorp Trust 2007-OA1

240.  Deutsche ALT-A Securities Mortgage Loan Trust Series 2006-AR5

241.  GSAMP Trust Series 2006-S4

242.  Harborview Mortgage Loan Trust Series 2005-5

243.  Harborview Mortgage Loan Trust Series 2006-6

244.  Morgan Stanley Dean Witter Capital I Inc. Trust 2002-HE2

245.  Morgan Stanley Mortgage Loan Trust 2004-1

246.  IndyMac Loan Trust Series 2004-L1

**EXHIBIT 1**
**Page 52**

Exhibit 1, Page 60

# EXHIBIT 2

Execution Copy

MASTER PURCHASE AGREEMENT

BY AND AMONG

THE FEDERAL DEPOSIT INSURANCE CORPORATION
AS CONSERVATOR FOR INDYMAC FEDERAL BANK, FSB,

IMB HOLDCO LLC, and

ONEWEST BANK GROUP LLC

Dated as of March 18, 2009

10070175 v63

## TABLE OF CONTENTS

ARTICLE I DEFINITIONS ........................................................................................ 2

    Section 1.01   Definitions.................................................................................2
    Section 1.02   Construction.............................................................................16

ARTICLE II DESCRIPTION OF TRANSACTION .................................................... 17

    Section 2.01   Formation of Purchaser...........................................................17
    Section 2.02   Capitalization..........................................................................17
    Section 2.03   Transactions Prior to Closing..................................................17
    Section 2.04   Closing Date Transactions......................................................17
    Section 2.05   The Closing.............................................................................18

ARTICLE III PURCHASE PRICE FOR THE PURCHASE AND ASSUMPTION
    TRANSACTIONS ................................................................................... 18

    Section 3.01   Final Purchase Price................................................................18
    Section 3.02   Aggregate Closing Payment ...................................................18
    Section 3.03   Post-Closing Settlement..........................................................19

ARTICLE IV ASSUMPTION OF GROUP 1 LIABILITIES ....................................... 21

    Section 4.01   Group 1 Liabilities Assumed by the Purchaser.......................21
    Section 4.02   Liabilities Not Assumed by the Purchaser...............................22
    Section 4.03   Interest on Thrift Deposit Liabilities.......................................23
    Section 4.04   Unclaimed Deposits................................................................23
    Section 4.05   Employee Benefit Plans..........................................................23

ARTICLE V PURCHASE OF GROUP 1 ASSETS ..................................................... 24

    Section 5.01   Group 1 Assets Purchased by the Purchaser...........................24
    Section 5.02   Assets Not Purchased by the Purchaser...................................25
    Section 5.03   Purchase Price; Closing Payment.............................................25
    Section 5.04   Prorations...............................................................................26
    Section 5.05   Closing Procedure...................................................................26
    Section 5.06   Closing Adjustment Documents..............................................27
    Section 5.07   Calculation of Adjustments.....................................................27
    Section 5.08   Final Settlement......................................................................27
    Section 5.09   FHLB Advances Make Whole Payment...................................27
    Section 5.10   Disclaimer..............................................................................28

ARTICLE VI ASSUMPTION OF CERTAIN GROUP 1 DUTIES AND OBLIGATIONS ....... 28

    Section 6.01   Continuation of Banking Business...........................................28
    Section 6.02   Agreement with Respect to Debit Card Business.....................28
    Section 6.03   Agreement with Respect to Safe Deposit Business ..................29

Exhibit 2, Page 62

Section 6.04   Agreement with Respect to Safekeeping Business ....................................29
Section 6.05   Agreement with Respect to Custody Business ...........................................29
Section 6.06   Agreement with Respect to Assumed Contracts.........................................30
Section 6.07   Informational Tax Reporting .....................................................................30
Section 6.08   Insurance ...................................................................................................30
Section 6.09   Flow Subservicing .....................................................................................30
Section 6.10   Transitional Services Agreement ...............................................................30
Section 6.11   Agreement with Respect to Leased Bank Premises....................................31

ARTICLE VII DUTIES WITH RESPECT TO DEPOSITORS OF INDYMAC FEDERAL...... 32

Section 7.01   Payment of Checks, Drafts and Orders.....................................................32
Section 7.02   Notice to Depositors .................................................................................33

ARTICLE VIII RECORDS ........................................................................................................ 33

Section 8.01   Transfer of Records...................................................................................33
Section 8.02   Delivery of Records ...................................................................................34
Section 8.03   Unassigned Records...................................................................................34
Section 8.04   Confidentiality ..........................................................................................36
Section 8.05   No Waiver of Privilege ..............................................................................38
Section 8.06   System Security ........................................................................................38
Section 8.07   Privacy And Data Protection ....................................................................38

ARTICLE IX GROUP 1 TRANSACTION COVENANTS .......................................................... 39

Section 9.01   Additional Title Documents.......................................................................39
Section 9.02   Thrift Deposits ..........................................................................................39
Section 9.03   Payment of Thrift Deposits........................................................................39
Section 9.04   Withheld Payments ...................................................................................40

ARTICLE X TRANSACTION COVENANTS ............................................................................. 40

Section 10.01  Pre-Closing Covenants..............................................................................40
Section 10.02  Post-Closing Covenants Relating to Records and Accounting Records....42
Section 10.03  FHLB Excess Stock ...................................................................................43
Section 10.04  Reformation and Amendment of Definitive Agreements in Certain
               Circumstances ...........................................................................................44

ARTICLE XI EMPLOYMENT MATTERS ................................................................................. 45

Section 11.01  Employees..................................................................................................45
Section 11.02  Welfare and Retirement Benefits for Transferred Employees...................45
Section 11.03  WARN Act.................................................................................................47
Section 11.04  Transition Employees ...............................................................................47

- ii-

ARTICLE XII TAX MATTERS ............................................................................ 48

    Section 12.01  Tax Characterization and Net Operating Losses .......................48

ARTICLE XIII CLOSING DELIVERIES FOR GROUP 1 TRANSACTION ............ 49

    Section 13.01  Seller's Deliverables ................................................................49
    Section 13.02  Purchaser's Deliverables ..........................................................49

ARTICLE XIV CONDITIONS PRECEDENT TO TRANSACTION ....................... 50

    Section 14.01  Conditions to Each of HoldCo's, Intermediate HoldCo's and the
                Purchaser's Obligation ...........................................................50
    Section 14.02  Conditions to the Seller's Obligation ........................................52

ARTICLE XV REPRESENTATIONS AND WARRANTIES ................................ 54

    Section 15.01  Seller's Representations and Warranties ...................................54
    Section 15.02  Representations and Warranties Regarding the Purchaser .....................55
    Section 15.03  HoldCo and Intermediate HoldCo's Representations and Warranties ......56

ARTICLE XVI TERMINATION............................................................................. 60

    Section 16.01  Termination of Agreement.......................................................60
    Section 16.02  Effect of Termination..............................................................61
    Section 16.03  Survival.....................................................................................61
    Section 16.04  Deposit Refund .........................................................................61
    Section 16.05  Backstop Purchase ....................................................................62
    Section 16.06  Failure to Close ........................................................................62
    Section 16.07  Investor Liability......................................................................63

ARTICLE XVII REIMBURSEMENT FOR LOSSES............................................... 63

    Section 17.01  Reimbursement Related to the Seller's Assets, Acts or Omissions...........63
    Section 17.02  Tax Reimbursement ..................................................................65
    Section 17.03  Failure to Obtain Third-Party Consents Reimbursement; GSE
                Reimbursement .......................................................................66
    Section 17.04  Conditions Precedent to Reimbursement....................................67
    Section 17.05  No Additional Warranty ..........................................................68
    Section 17.06  Indemnification of the Seller ....................................................68
    Section 17.07  Obligations Supplemental ........................................................70
    Section 17.08  Criminal Claims ......................................................................70
    Section 17.09  Subrogation .............................................................................71
    Section 17.10  Further Cooperation .................................................................71

Exhibit 2, Page 64

ARTICLE XVIII NOTICES ................................................................................................ 71

ARTICLE XIX MISCELLANEOUS PROVISIONS .......................................................... 72

    Section 19.01  Severability ........................................................................................ 72
    Section 19.02  Governing Law .................................................................................. 73
    Section 19.03  Cost, Fees and Expenses ................................................................... 73
    Section 19.04  Waivers; Amendment and Assignment ............................................. 73
    Section 19.05  No Presumption ................................................................................. 73
    Section 19.06  Entire Agreement .............................................................................. 74
    Section 19.07  Jurisdiction; Venue and Service ......................................................... 74
    Section 19.08  Waiver of Jury Trial ........................................................................... 74
    Section 19.09  Counterparts; Facsimile Signatures .................................................... 75
    Section 19.10  Headings ............................................................................................ 75
    Section 19.11  Compliance with Law ........................................................................ 75
    Section 19.12  Use of the FDIC's Name and Reservation of Statutory Powers ......... 75
    Section 19.13  Right to Specific Performance ............................................................ 75
    Section 19.14  No Third Party Beneficiaries ............................................................. 76
    Section 19.15  Confidentiality; Disclosures ............................................................... 76
    Section 19.16  Manner of Payment ............................................................................ 76
    Section 19.17  Survival of Covenants, Etc ................................................................. 77

Schedules:

| | |
|---|---|
| Schedule 1.01 | List of Investors |
| Schedule 3.02(a) | Aggregate Closing Payment Calculation |
| Schedule 3.02(b) | Wire Transfer Instructions (Seller and Purchaser) |
| Schedule 4.01(a) | Thrift Deposits |
| Schedule 4.01(c)(i) | FHLB Advances |
| Schedule 4.01(c)(ii) | FHLB Contracts |
| Schedule 4.01(f) | Assumed Contracts |
| Schedule 4.01(g) | Assumed Real Property Leases |
| Schedule 4.01(h) | Other Liabilities |
| Schedule 4.02(a) | Excluded Contracts |
| Schedule 5.01(a) | Cash on Hand |
| Schedule 5.01(b)(i) | Owned Bank Premises |
| Schedule 5.01(b)(ii) | Servicing Business Premises |
| Schedule 5.01(c)(i) | Fixtures and Owned Furniture and Equipment |
| Schedule 5.01(c)(ii) | Additional Furniture and Equipment |
| Schedule 5.01(d) | Overdraft Loans |
| Schedule 5.01(e) | Seller's Intellectual Property |
| Schedule 5.01(f) | Accounts and Accounts Receivable |
| Schedule 5.01(j) | Artwork |
| Schedule 5.01(k) | Pre-Paid Expenses |
| Schedule 5.01(l) | Other Assets |
| Schedule 5.02 | Excluded Assets |
| Schedule 6.11(a) | Real Property Leases with Option to Assign |

- iv-

| Schedule 10.01(e) | Contracts Subject to Put |
| Schedule 13.01(i) | Additional Seller's Deliverables |
| Schedule 14.01(g) | Required Approvals |
| Schedule 15.01(c) | Litigation Pending (Seller) |
| Schedule 15.03(d) | Litigation Pending (HoldCo and Intermediate HoldCo) |
| Schedule 16.05 | Backstop Purchasers |

Exhibits:

| Exhibit A-1 | Assignment and Assumption Agreement |
| Exhibit A-2 | Assignment and Assumption of Leases |
| Exhibit B | Bill of Sale |
| Exhibit C-1 | Closing Escrow Agreement |
| Exhibit C-2 | Consent and Collateral Assignment |
| Exhibit D | Term Sheet for Flow Subservicing Agreement |
| Exhibit E-1 | Form of Trademark Assignment |
| Exhibit E-2 | Form of Patent Assignment |
| Exhibit E-3 | Form of Domain Name Assignment |
| Exhibit E-4 | Form of Copyright Assignment |
| Exhibit F | Loan Sale Agreement |
| Exhibit G | Participation and Servicing Agreement |
| Exhibit H | Asset Contribution and Assignment Agreement |
| Exhibit I | LLC Operating Agreement |
| Exhibit J | LLC Interest Sale and Assignment Agreement |
| Exhibit K | Reverse Mortgage Business Asset Purchase Agreement |
| Exhibit L | Securities Sale Agreement |
| Exhibit M | Mortgage Loan Master Repurchase Agreement |
| Exhibit N | Securities Master Repurchase Agreement |
| Exhibit O-1 | Collection Account Control Agreement (Securities) |
| Exhibit O-2 | Collection Account Control Agreement (Mortgage Loans) |
| Exhibit P | Master Netting Agreement |
| Exhibit Q | Financing Electronic Tracking Agreement |
| Exhibit R-1 | Collateral Account Control Agreement (Securities) |
| Exhibit R-2 | Limited Guaranty Agreement (Securities) |
| Exhibit S | Financing Custodial Agreement |
| Exhibit T | Indenture |
| Exhibit U | Pricing Side Letter |
| Exhibit V | Receivables Purchase Agreement |
| Exhibit W | Note Purchase Agreement |
| Exhibit X | Financing Guaranty |
| Exhibit Y | Trust Agreement |
| Exhibit Z | Administration Agreement |
| Exhibit AA | Financing Note |
| Exhibit BB | Trust Certificate |
| Exhibit CC | Servicing Business Asset Purchase Agreement |
| Exhibit DD | [RESERVED] |

Exhibit 2, Page 66

| Exhibit EE | Intellectual Property, Data and Information Technology Assets License Agreement |
| Exhibit FF | Seller Closing Certifications and Other Documents to be Delivered to HoldCo |
| Exhibit GG | Purchaser Closing Certifications, Opinions and Other Documents to be Delivered to the Seller |
| Exhibit HH | HoldCo Closing Certifications, Opinions and Other Documents to be Delivered to Seller |
| Exhibit II | Intermediate HoldCo Closing Certifications, Opinions and Other Documents to be Delivered to Seller |
| Exhibit JJ | Legal Opinions of Cleary Gottlieb Steen & Hamilton LLP |

Exhibit 2, Page 67

## MASTER PURCHASE AGREEMENT

THIS MASTER PURCHASE AGREEMENT (as the same shall be amended or supplemented, this "**Agreement**") is made and entered into as of the 18th day of March, 2009 (the "**Effective Date**") by and among THE FEDERAL DEPOSIT INSURANCE CORPORATION AS CONSERVATOR FOR INDYMAC FEDERAL BANK, FSB (including its successors and assigns, the "**Seller**"), IMB HOLDCO LLC ("**HoldCo**") and ONEWEST BANK GROUP LLC ("**Intermediate HoldCo**").

### RECITALS

WHEREAS, on July 11, 2008, the FDIC (as defined below) was appointed receiver for IndyMac Bank, FSB (the "**Failed Thrift**") and certain assets and obligations of the Failed Thrift were transferred to a newly-formed thrift, IndyMac Federal Bank, FSB ("**IndyMac Federal**"), for which the FDIC was appointed conservator;

WHEREAS, under the Federal Deposit Insurance Act, as amended, the FDIC is authorized to sell or otherwise dispose of the assets of thrift institutions for which it serves as conservator or receiver;

WHEREAS, HoldCo desires to purchase certain specified assets and assume certain specified liabilities of IndyMac Federal on the terms and subject to the conditions set forth herein and in the other Definitive Agreements (as defined below);

WHEREAS, in order to facilitate the purchase of the assets and assumption of the liabilities by HoldCo, Intermediate HoldCo, a newly formed direct wholly owned subsidiary of HoldCo, will form a new federally chartered, FDIC insured, stock form savings association or savings bank to be known as OneWest Bank, FSB (the "**Purchaser**");

WHEREAS, in order to facilitate the transactions provided for herein and in the other Definitive Agreements, on the Closing Date (as defined below), the FDIC shall be appointed receiver of IndyMac Federal;

WHEREAS, on the Closing Date, each of the Purchaser and the FDIC, as receiver for IndyMac Federal, shall become a party to this Agreement by executing a joinder hereto, and shall thereafter be subject to and bound by all of the terms and conditions applicable to it hereunder, respectively, and each of the Purchaser (or a subsidiary of the Purchaser) and the FDIC, as receiver for IndyMac Federal, shall also enter into the other Definitive Agreements to which it is named as a party;

WHEREAS, pursuant to this Agreement and the other Definitive Agreements, the Seller shall sell, assign, convey and transfer to the Purchaser or a subsidiary of the Purchaser and, in connection with Group 3 and Group 4, as defined below, cause certain subsidiaries of IndyMac Federal to sell, assign, convey and transfer to the Purchaser or a subsidiary of the Purchaser, the following:

- certain assets and liabilities of IndyMac Federal's retail bank business (referred to herein as "**Group 1**");

- IndyMac Federal's servicing advances and servicing rights with respect to certain mortgage loans and the related platform (referred to herein as "**Group 2**");

- certain assets and liabilities of IndyMac Federal's reverse mortgage business (referred to herein as "**Group 3**");

- substantially all of IndyMac Federal's securities portfolio (referred to herein as "**Group 4**");

- substantially all of IndyMac Federal's residential mortgage loan portfolio (referred to herein as "**Group 5**"); and

- substantially all of IndyMac Federal's consumer construction loan portfolio, homebuilder loan portfolio and lot loan portfolio (referred to herein as "**Groups 6-8**");

WHEREAS, concurrently with the execution and delivery of this Agreement, as an inducement to HoldCo to enter into this Agreement and incur the obligations set forth herein, the FDIC is executing and delivering to HoldCo the FDIC Guaranty (as defined below); and

WHEREAS, the parties desire to memorialize their agreements relating to the transactions described above and certain other matters as set forth in this Agreement and the other Definitive Agreements.

NOW, THEREFORE, in consideration of the foregoing and the mutual promises and agreements hereinafter contained, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows.

## ARTICLE I

## DEFINITIONS

Section 1.01   Definitions.   For purposes of this Agreement, the following terms shall have the meanings and definitions hereinafter respectively set forth:

"**Accounting Records**" means the general ledger and subsidiary ledgers and supporting schedules which support the general ledger balances.

"**Accrual Period**" means the period beginning on the day immediately following a Measurement Date and ending on the immediately succeeding Measurement Date, except the first Accrual Period shall begin on the day immediately following the Closing Date and end on the second Measurement Date following the Closing Date and the last Accrual Period shall end on the Termination Date.

"**Acquired Subsidiary**" means IndyMac Financial Services, a California corporation and a wholly owned subsidiary of IndyMac Federal.

- 2 -

"**Adjusted FHLB Advances**" means the FHLB Advances identified on Schedule 4.01(c)(i), adjusted down for any maturities, payments or prepayments and shall exclude any FHLB Advances that have been extended, renewed or rolled over.

"**Affiliate**" means, with respect to any specified Person, any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with such specified Person. For purposes of this definition, the term "**control**" (including the phrases "**controlled by**" and "**under common control with**") when used with respect to any specified Person means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or interests, by contract or otherwise.

"**Aggregate Closing Payment**" means an amount equal to the sum of (i) the Group 1 Closing Payment, *plus* (ii) the Group 2 Closing Payment, *plus* (iii) the Group 3 Closing Payment, *plus* (iv) the Group 4 Closing Payment, *plus* (v) the Group 5 Closing Payment, *plus* (vi) the Groups 6-8 Closing Payment.

"**Aggregate Final Payment**" means an amount equal to the sum of (i) the Group 1 Final Payment, *plus* (ii) the Group 2 Final Payment, *plus* (iii) the Group 3 Final Payment, *plus* (iv) the Group 4 Final Payment, *plus* (v) the Group 5 Final Payment, *plus* (vi) the Groups 6-8 Final Payment.

"**Aggregate Final Purchase Price**" has the meaning given in Section 3.01.

"**Agreement**" has the meaning given in the preamble, and shall include all exhibits, schedules and attachments hereto.

"**Amortizing Prepayment Penalty Schedule Amount**" means, for any Accrual Period, the differential between (a) the Initial Maximum Prepayment Penalty and (b) the sum of (i) all previous Differential Payment Calculations and (ii) the Differential Payment Calculation during such Accrual Period.

"**Assets**" means the aggregate of all of the Group 1 Assets and the assets included in Group 2, Group 3, Group 4, Group 5 and Groups 6-8, as more specifically identified in the applicable Definitive Agreement.

"**Assignment and Assumption Agreement**" means the Assignment and Assumption Agreement in the form attached hereto as Exhibit A-1.

"**Assignment and Assumption of Leases**" means the Assignment and Assumption of Leases in the form attached hereto as Exhibit A-2.

"**Assumed Contracts**" has the meaning given in Section 4.01(f).

"**Assumed Group 1 Liabilities**" has the meaning given in Section 4.01.

"**Assumed Real Property Leases**" has the meaning given in Section 4.01(g).

- 3 -

Exhibit 2, Page 70

"**Backstop Purchase**" has the meaning given in <u>Section 16.05</u>.

"**Backstop Purchasers**" has the meaning given in <u>Section 16.05</u>.

"**Bank Premises**" means the banking branch offices, drive-in banking facilities and teller facilities (staffed or automated), together with appurtenant parking, storage and service facilities and structures connecting remote facilities to banking branches, and land on which the foregoing are located, that are owned or leased by the Seller and that are occupied by IndyMac Federal (and, with respect to <u>Section 6.11</u>, real property leased by Financial Freedom) as of the Closing Date.

"**Bill of Sale**" means a Bill of Sale in the form attached hereto as <u>Exhibit B</u>.

"**Book Value**" means, with respect to any asset purchased or liability assumed by the Purchaser pursuant to this Agreement or the other Definitive Agreements, the Dollar amount thereof stated on the Accounting Records of IndyMac Federal, as of the applicable date, determined after adjustments made by the Seller for differences in accounts, suspense items, unposted debits and credits, and other similar adjustments or corrections and for setoffs, whether voluntary or involuntary. Without limiting the generality of the foregoing, the Book Value of an assumed liability shall include all accrued and unpaid interest thereon. The Book Value of an Asset shall not include any adjustment for loan premiums, discounts or any related deferred income or fees, or general or specific reserves on the Accounting Records of IndyMac Federal.

"**Business Day**" means any day except a Saturday, Sunday or other day on which federal savings banks in California, New York or Washington, D.C. or United States federal government offices are required or authorized by Law to close.

"**Capital Contribution**" means the capital contribution in the amount of ONE BILLION FIVE HUNDRED FIFTY MILLION Dollars ($1,550,000,000), inclusive of the Deposit, to be contributed by HoldCo to Intermediate HoldCo and thereafter by Intermediate HoldCo to the Purchaser.

"**Cash on Hand**" means any and all cash maintained at the Bank Premises in connection with the operation of the retail banking business and any cash maintained in the Seller's operating accounts (other than custodial accounts) as reflected on the Accounting Records.

"**Closing**" has the meaning given in <u>Section 2.05</u>.

"**Closing Adjustment Documents**" has the meaning given in <u>Section 3.03(a)</u>.

"**Closing Date**" has the meaning given in <u>Section 2.05</u>.

"**Closing Escrow Account**" means the escrow account for the Closing Escrow Funds pursuant to the Closing Escrow Agreement.

"**Closing Escrow Agreement**" means the Closing Escrow Agreement in the form attached hereto as <u>Exhibit C-1</u> to be entered into prior to the Closing Date by and among the escrow agent named therein, HoldCo and the FDIC as conservator for IndyMac Federal.

Exhibit 2, Page 71

"**Closing Escrow Funds**" has the meaning given in Section 2.03.

"**Confidential Information**" has the meaning given in Section 8.04(e).

"**Confidentiality Agreement**" means the Confidentiality Agreement executed by HoldCo on December 31, 2008.

"**Consent and Collateral Assignment**" means the Consent and Collateral Assignment in the form attached hereto as Exhibit C-2 to be entered into as of the Closing Date by and among the Purchaser, the Seller and the FHLB.

"**Contract**" means any written agreement, lease (other than for real property), license or sublicense, evidence of indebtedness, or other written contract, commitment, arrangement or obligation.

"**Current Period Prepayment Penalty Amount**" means, for any Accrual Period, the sum of all prepayment penalties paid to the FHLB by the Purchaser or any of its Affiliates on the Adjusted FHLB Advances during such Accrual Period. For the avoidance of doubt, the prepayment penalties will not include any accrued interest calculable from the previous interest payment date on the Adjusted FHLB Advances. All prepayment penalties associated with the prepayment of an Adjusted FHLB Advance with a new FHLB advance will be excluded from any Prepayment Penalty Reimbursement Amount.

"**Data Processing Equipment**" means data processing equipment and related hardware and software, and shall include all equipment related thereto, including remote terminals, networked personal computers, cabling, writing and related installation equipment and materials.

"**Data Protection Laws**" has the meaning given in Section 8.07(a).

"**Day Count**" means 30/360 for each Accrual Period, except for: (x) the first Accrual Period which will equal the fraction of (a) the actual number of days between the Closing Date and the second Measurement Date following the Closing Date and (b) 360; and (y) the last Accrual Period, if the Termination Date is the three (3) year anniversary of the Closing Date, which will equal the fraction of (i) the actual number of days between the previous Measurement Date and the Termination Date and (ii) 360.

"**Definitive Agreements**" means this Agreement, the Servicing Business Asset Purchase Agreement, the Reverse Mortgage Business Asset Purchase Agreement, the Securities Sale Agreement, the Loan Sale Agreement, the Shared-Loss Agreement, the Reverse Mortgage Shared-Loss Agreement, the Intellectual Property Assignments, the Intellectual Property, Data and Information Technology Assets License, the Participation Structure Documents, the Transitional Services Agreement, the Seller Financing Agreements, the FDIC Guaranty, and, upon execution of each such agreement, the Unfunded Commitment Definitive Agreements and the Flow Subservicing Definitive Agreement.

"**Deposit**" means the ONE HUNDRED THIRTY NINE MILLION Dollars ($139,000,000) being held in escrow pursuant to the Initial Escrow Agreement and released to the Seller on the date hereof in accordance with the terms of the Initial Escrow Agreement.

Exhibit 2, Page 72

"**Differential Payment Calculation**" means, for any Accrual Period, the product of (a) the product of (i) the Differential Rate and (ii) the Day Count and (b) the average outstanding principal balance of the Adjusted FHLB Advances for such Accrual Period.

"**Differential Rate**" equals 1.25%.

"**Disagreement**" has the meaning given in Section 3.03(b).

"**Dollar**" or "**$**" means the lawful currency of the United States of America.

"**Effective Date**" has the meaning given in the preamble.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" means any entity that, together with the Seller, the Failed Thrift or IndyMac Federal, would be treated as a single employer under Section 414 of the Internal Revenue Code of 1986, as amended.

"**Excess Stock**" has the meaning set forth in the Capital Plan of the FHLB.

"**Excess Stock Payment**" has the meaning given in Section 10.03(a).

"**Excluded Assets**" has the meaning given in Section 5.02.

"**Excluded Contracts**" has the meaning given in Section 4.02(a).

"**Excluded Liabilities**" has the meaning given in Section 4.02(b).

"**Excluded Losses**" means any consequential, special or indirect damages, lost profits, lost investment or business opportunity, interest, damages to reputation, punitive damages, exemplary damages, treble damages, nominal damages and operating losses.

"**Failed Thrift**" has the meaning given in the recitals.

"**Fair Market Value**" means the fair market value of an asset or a group of assets as set forth in an appraisal prepared prior to the Closing Date by Industrial Appraisal Company.

"**Fannie Mae**" means the Federal National Mortgage Association, or any successor thereto.

"**FDIA**" means the Federal Deposit Insurance Act, as amended.

"**FDIC**" means the Federal Deposit Insurance Corporation in any capacity.

"**FDIC Guaranty**" means the Guaranty Agreement dated as of the date hereof, by and among the FDIC, in its corporate capacity, HoldCo and each other Beneficiary (as defined therein) that executes a joinder thereto.

"**FHLB**" has the meaning given in Section 4.01(c).

- 6-

"**FHLB Advance Make Whole Payment**" has the meaning given in Section 5.09(a).

"**FHLB Advances**" has the meaning given in Section 4.01(c).

"**FHLB Interest Rates**" means the interest rates so identified on Schedule 5.09(a).

"**FHLB Stock**" means the capital stock of the Federal Home Loan Bank of San Francisco owned by IndyMac Federal.

"**Financed Security**" has the meaning given in the Securities Sale Agreement.

"**Financed Group 4 Closing Payment**" has the meaning given in the Securities Sale Agreement.

"**Financed Group 4 Purchase Price**" has the meaning given in the Securities Sale Agreement.

"**Financial Freedom**" means Financial Freedom Senior Funding Corporation, a Delaware corporation and wholly owned subsidiary of IndyMac Federal.

"**Fixtures**" means those leasehold improvements, additions, alterations and installations constituting all or a part of the leased or owned Bank Premises and which were acquired, added, built, installed or purchased at the expense of the Failed Thrift, IndyMac Federal or the Seller.

"**Flow Subservicing Definitive Agreement**" means the definitive agreement executed pursuant to the terms set forth in the Term Sheet for Flow Subservicing Agreement attached hereto as Exhibit D.

"**Freddie Mac**" means the Federal Home Loan Mortgage Corporation, or any successor thereto.

"**Furniture and Equipment**" means the furniture, equipment and software owned by or licensed or leased to the Seller, IndyMac Federal or any Subsidiary thereof, and reflected on the Accounting Records of IndyMac Federal as of the Closing Date, or located on (or, for software, including accessed from) the leased or owned Bank Premises, including Safe Deposit Boxes, Data Processing Equipment, carpeting, furniture, artwork, office machinery, shelving, office supplies, information technology systems and equipment, telecommunications systems and equipment and surveillance and security systems.

"**GAAP**" means United States generally accepted accounting principles as in effect from time to time.

"**Ginnie Mae**" means the Government National Mortgage Association, or any successor thereto.

"**Governmental Authority**" means any United States or non-United States national, federal, state, local, municipal or provincial or international government or any political

Exhibit 2, Page 74

subdivision of any governmental, regulatory or administrative authority, agency or commission, or judicial or arbitral body.

"**Group 1**" has the meaning given in the recitals.

"**Group 1 Assets**" has the meaning given in Section 5.01.

"**Group 1 Closing Adjustment Documents**" has the meaning given in Section 5.06.

"**Group 1 Closing Payment**" has the meaning given in Section 5.03(b).

"**Group 1 Final Payment**" has the meaning given in Section 5.07.

"**Group 1 Final Purchase Price**" has the meaning given in Section 5.03(a).

"**Group 2**" has the meaning given in the recitals.

"**Group 2 Closing Payment**" has the meaning given in the Servicing Business Asset Purchase Agreement.

"**Group 2 Final Payment**" has the meaning given in the Servicing Business Asset Purchase Agreement.

"**Group 2 Final Purchase Price**" has the meaning given in the Servicing Business Asset Purchase Agreement.

"**Group 3**" has the meaning given in the recitals.

"**Group 3 Closing Payment**" has the meaning given in the Reverse Mortgage Business Asset Purchase Agreement.

"**Group 3 Final Payment**" has the meaning given in the Reverse Mortgage Business Asset Purchase Agreement.

"**Group 3 Final Purchase Price**" has the meaning given in the Reverse Mortgage Business Asset Purchase Agreement.

"**Group 4**" has the meaning given in the recitals.

"**Group 4 Closing Payment**" has the meaning given in the Securities Sale Agreement.

"**Group 4 Final Payment**" has the meaning given in the Securities Sale Agreement.

"**Group 4 Final Purchase Price**" has the meaning given in the Securities Sale Agreement.

"**Group 5**" has the meaning given in the recitals.

"**Group 5 Closing Payment**" has the meaning given in the Loan Sale Agreement.

- 8-

"**Group 5 Final Payment**" has the meaning given in the Loan Sale Agreement.

"**Group 5 Final Purchase Price**" has the meaning given in the Loan Sale Agreement.

"**Groups 6-8**" has the meaning given in the recitals.

"**Groups 6-8 Closing Payment**" has the meaning given in the LLC Interest Sale and Assignment Agreement.

"**Groups 6-8 Final Payment**" has the meaning given in the LLC Interest Sale and Assignment Agreement.

"**Groups 6-8 Final Purchase Price**" has the meaning given in the LLC Interest Sale and Assignment Agreement.

"**GSE Loans**" has the meaning given in Section 17.10.

"**HoldCo**" has the meaning given in the preamble.

"**Holdings**" has the meaning given in Section 15.03(n).

"**Independent Accounting Firm**" means a nationally recognized certified public accounting firm selected by the Purchaser and approved by the Seller (including approval by the Seller of the engagement terms of such firm), which approval shall not be unreasonably withheld.

"**IndyMac Federal**" has the meaning given in the recitals.

"**Initial Calculation Date**" means the close of business on January 31, 2009.

"**Initial Escrow Agreement**" means the Escrow Agreement, dated January 2, 2009, by and among the Seller, HoldCo and the escrow agent named therein.

"**Initial Maximum Prepayment Penalty**" means $288,236,052.71; however, if the Closing Date is after March 17, 2009, the Initial Maximum Prepayment Penalty will be reduced by $397,000 per day.

"**Intellectual Property Assignment**" means an Assignment in the forms attached hereto as Exhibit E-1, Exhibit E-2, Exhibit E-3 and Exhibit E-4.

"**Intellectual Property, Data and Information Technology Assets License**" means the Intellectual Property, Data and Information Technology Assets License Agreement in the form attached hereto as Exhibit EE.

"**Intermediate HoldCo**" has the meaning given in the preamble.

"**Investors**" means the Persons identified on Schedule 1.01.

Exhibit 2, Page 76

"**Law**" means any applicable statute, law, ordinance, regulation, rule, code, injunction, judgment, decree or order (including any executive order) of any Governmental Authority.

"**Lien**" means any mortgage, pledge, security interest, equity interest, participation interest, lien or other charge or encumbrance, including the lien or retained security title of a conditional vendor, upon or with respect to any property or assets.

"**LLC Interest Sale and Assignment Agreement**" means the LLC Interest Sale and Assignment Agreement in the form attached hereto as Exhibit J to be entered into as of the Closing Date by and among OneWest Ventures Holdings LLC, the Seller and IndyMac Venture, LLC, in connection with the sale of the Groups 6-8 assets.

"**Loan Sale Agreement**" means the Loan Sale Agreement in the form attached hereto as Exhibit F to be entered into as of the Closing Date by and between the Seller and the Purchaser in connection with the sale of the Group 5 assets.

"**Losses**" means actual losses, damages, liabilities, costs and expenses (including reasonable attorneys' fees and litigation and similar costs, and other out-of-pocket expenses incurred in investigating, defending, asserting or preparing the defense or assertion of any of the foregoing), deficiencies, claims, interest, awards, judgments, penalties and fines.

"**Measurement Date**" means the 15th calendar day of each month.

"**Minimum Equity Capital**" means equity capital paid by the Investors to HoldCo prior to the execution of this Agreement in the amount of ONE BILLION FIVE HUNDRED FIFTY MILLION Dollars ($1,550,000,000).

"**Monthly Prepayment Penalty Cap**" means, for any Accrual Period, the greater of (a) 0 and (b) the differential between (i) the Amortizing Prepayment Penalty Schedule Amount for such Accrual Period and (ii) the sum of (x) all previous FHLB Advance Make Whole Payments and (y) the current Rate Differential Payment for such Accrual Period.

"**MSR Mortgage Loan**" means a reverse mortgage loan with respect to which the Seller owns only the related servicing rights and not the reverse mortgage loan itself as provided for in the Reverse Mortgage Business Asset Purchase Agreement.

"**Non-Financed Group 4 Closing Payment**" has the meaning given in the Securities Sale Agreement.

"**Non-Financed Group 4 Purchase Price**" has the meaning given in the Securities Sale Agreement.

"**Non-Transferred Employee**" means any current or former employee or contractor of the Seller or its respective Affiliates who is not and does not become a Transferred Employee pursuant to the terms of Section 11.01.

"**Notice of Disagreement**" has the meaning given in Section 3.03(b).

Exhibit 2, Page 77

"**Offeree Employee**" has the meaning given in Section 11.01(a).

"**OTS**" means the Office of Thrift Supervision.

"**Overdraft Loans**" means all overdraft balances on Thrift Deposits made pursuant to a written credit agreement between the Seller and the account party.

"**Participation Structure Documents**" means the Participation and Servicing Agreement (including the Servicing Agreement, the Electronic Tracking Agreement, the Account Control Agreement and the Custodial Agreement attached as exhibits thereto), the Asset Contribution and Assignment Agreement, the LLC Operating Agreement and the LLC Interest Sale and Assignment Agreement (and the guaranty required to be delivered thereby), all of which documents are to be entered into as of the Closing Date in connection with the sale of the Groups 6-8 assets in the form attached hereto as Exhibit G, Exhibit H, Exhibit I and Exhibit J.

"**Person**" means any individual, corporation, partnership (general or limited), limited liability company, limited liability partnership, firm, joint venture, association, joint-stock company, trust, estate, unincorporated organization, governmental or regulatory body or other entity.

"**Personally Identifiable Information**" means any information that, alone or in combination with other information, can serve to identify or trace a specific, identifiable individual person. Personally Identifiable Information includes individual names, social security numbers or other national identity numbers, passport or visa numbers, telephone numbers, home addresses, driver's license numbers, account numbers, credit card numbers, personal profiles, personnel records or files, email addresses, and vehicle registration numbers.

"**Prepayment Penalty Reimbursement Amount**" means, for any Accrual Period, the greater of (a) 0 and (b) the lesser of (x) the product of (i) 75% and (ii) the Current Period Prepayment Penalty Amount for such Accrual Period and (y) the Monthly Prepayment Penalty Cap for such Accrual Period.

"**Primary Indemnitor**" means any Person (other than the Purchaser or any of its Affiliates) who is obligated to indemnify or insure, or otherwise make payments (including payments on account of claims made against) to or on behalf of any Person in connection with the claims covered under Article XVII, including any insurer issuing any directors and officers liability policy or any Person issuing a financial institution bond or banker's blanket bond.

"**Privacy Laws**" has the meaning given in Section 8.07(a).

"**Privileged Information**" has the meaning given in Section 8.03(b)(ii).

"**Purchase and Assumption Transactions**" means the sale, transfer, conveyance and assignment of the assets and liabilities included in Group 1, Group 2, Group 3, Group 4, Group 5, and Groups 6-8.

"**Purchaser**" has the meaning given in the recitals.

- 11-

"**Purchaser Employee Plans**" has the meaning given in Section 11.02(a).

"**Purchaser Indemnitor**" has the meaning given in Section 17.06(a).

"**Purchaser Notice**" has the meaning given in Section 3.03(c).

"**Rate Differential Payment**" means, for any Accrual Period, the product of (a) the product of (i) the differential between (x) the Weighted Average FHLB Interest Rate for such Accrual Period and (y) the Synthetic Rate and (ii) the Day Count and (b) the average daily outstanding principal balance of the Adjusted FHLB Advances for such Accrual Period.

"**Reassigned Contracts**" means the Contracts assigned back to the Seller pursuant to Section 10.01(e).

"**Records**" means copies and originals of all records and documents, whether in hard copy, microfiche, microfilm or electronic format (including but not limited to magnetic tape, disc storage, card forms, printed copy, and electronic stored information (as defined in Rule 34(a) of the Federal Rules of Civil Procedure) which (i) pertain to, and are utilized to administer, reflect, monitor, evidence or record information respecting the assets purchased and the liabilities assumed by the Purchaser or any of its Subsidiaries pursuant to this Agreement or the other Definitive Agreements and (ii) are owned by the Seller or any Subsidiary of IndyMac Federal and in the possession of the Seller or any such Subsidiary as of the Closing Date.  For the avoidance of doubt, the definition of "**Records**" does not include "**Unassigned Records**".

"**Reimbursed Parties**" means HoldCo, Intermediate HoldCo, the Purchaser and their Affiliates.

"**Reformed Agreements**" has the meaning given in Section 10.04.

"**Reverse Mortgage Business Asset Purchase Agreement**" means the Reverse Mortgage Business Asset Purchase Agreement in the form attached hereto as Exhibit K to be entered into as of the Closing Date by and among the Seller, Financial Freedom, the Purchaser and a subsidiary of the Purchaser in connection with the sale of the Group 3 assets.

"**Reverse Mortgage Shared-Loss Agreement**" means the Reverse Mortgage Shared-Loss Agreement to be entered into as of the Closing Date by and among the Seller, Financial Freedom Acquisition LLC and the Purchaser.

"**Safe Deposit Boxes**" means the safe deposit boxes of the Seller, if any, including the removable safe deposit boxes and safe deposit stacks in the Seller's vault(s), all rights and benefits (other than fees collected prior to the Closing Date) under rental agreements with respect to such safe deposit boxes, and all keys and combinations thereto.

"**Securities Sale Agreement**" means the Sale Agreement in the form attached hereto as Exhibit L to be entered into as of the Closing Date by and between the Seller, the Purchaser and a subsidiary of the Purchaser in connection with the sale of the Group 4 assets.

"**Seller**" has the meaning given in the preamble.

- 12-

Exhibit 2, Page 79

"**Seller Employees**" has the meaning given in <u>Section 11.01</u>.

"**Seller Employee Plan**" means any employee benefit plan within the meaning of Section 3(3) of ERISA, including multiemployer plans within the meaning of Section 3(37) of ERISA, and each other employment, severance, consulting, deferred compensation, incentive compensation, fringe benefit, change in control, retention, employee loan, stock option or other equity or equity-based or other compensatory or benefit plan, policy, agreement or arrangement (including any collective bargaining agreement, multiemployer, multiple employer or post retirement benefit plan), in all cases whether or not subject to ERISA, whether formal or informal, oral or written, legally binding or not, that is or was (i) maintained, sponsored, administered, contributed to or required to be contributed to by the Seller, the Failed Thrift, IndyMac Federal or any of their respective ERISA Affiliates, or to which the Seller, the Failed Thrift, IndyMac Federal or any of their respective ERISA Affiliates is or was a party or had or has any present or future liability thereunder (except as custodian, trustee, fiduciary or service provider to a customer plan), and (ii) is or was for the benefit of current or former employees, directors or consultants who have a present or future right to benefits in respect of services performed for the Seller, the Failed Thrift, IndyMac Federal or any of their respective Affiliates.

"**Seller Financing**" means the portion of the Aggregate Final Purchase Price that the Seller has agreed to finance on the Purchaser's behalf in accordance with the Seller Financing Agreements.

"**Seller Financing Agreements**" means the Mortgage Loan Master Repurchase Agreement, the Securities Master Repurchase Agreement, the Collection Account Control Agreement (Securities), the Collection Account Control Agreement (Mortgage Loan), the Master Netting Agreement, the Electronic Tracking Agreement (Mortgage Loan), Collateral Account Control Agreement (Securities), the Limited Guaranty Agreement (Securities), the Custodial Agreement (Mortgage Loan), the Indenture, the Pricing Side Letter, the Receivables Purchase Agreement, the Note Purchase Agreement, the Financing Guaranty, the Trust Agreement, the Administration Agreement, the Financing Note and the Trust Certificate, to be entered into on the Closing Date, in the form attached hereto as <u>Exhibit M</u>, <u>Exhibit N</u>, <u>Exhibit O-1</u>, <u>Exhibit O-2</u>, <u>Exhibit P</u>, <u>Exhibit Q</u>, <u>Exhibit R-1</u>, <u>Exhibit R-2</u>, <u>Exhibit S</u>, <u>Exhibit T</u>, <u>Exhibit U</u>, <u>Exhibit V</u>, <u>Exhibit W</u>, <u>Exhibit X</u>, <u>Exhibit Y</u>, <u>Exhibit Z</u>, <u>Exhibit AA</u>, and <u>Exhibit BB</u>, respectively, with such changes thereto as may be agreed upon by all parties thereto.

"**Seller Indemnitees**" means the Seller, the Failed Thrift and its predecessors-in-interest, and their respective officers, directors, employees, partners, principals, agents and contractors (other than the Transferred Employees).

"**Seller's Intellectual Property**" means all worldwide trade secrets and confidential information, excluding Unassigned Records; patents, inventions, know-how, tools, indices, analytics, designs, models; copyrights and copyrightable works; trademarks, trade names, corporate names, brand names, trade dress, slogans, logos and service marks, together with the goodwill of the business connected with the use of, or symbolized by, the foregoing; and Internet domain names and rights to use the IP addresses associated with such domain names (to the extent such IP addresses are static and within the contract rights of the Seller); in each case of the foregoing, whether registered or unregistered (and including any registrations or applications for

- 13-

registration of any of the foregoing, including those patent rights, trademarks, domain names and copyrights set forth in Schedule 5.01(e)), owned by the Seller and related to or used in the business of IndyMac Federal or the Assets, to the extent such business or Assets are being acquired by the Purchaser pursuant to this Agreement.  The foregoing does not include any intellectual property used exclusively in connection with the Excluded Assets, Excluded Contracts or Excluded Liabilities.

"**Servicing Business Asset Purchase Agreement**" means the Servicing Business Asset Purchase Agreement in the form attached hereto as Exhibit CC to be entered into as of the Closing Date by and between the Seller and the Purchaser in connection with the sale of the Group 2 assets.

"**Servicing Business Premises**" means the real property owned by the Seller set forth on Schedule 5.01(b)(ii).

"**Settlement Date**" has the meaning given in Section 3.03(d).

"**Settlement Interest Rate**" means, for the first calendar quarter or portion thereof during which interest accrues, the rate determined by the Seller to be equal to the equivalent coupon issue yield on twenty-six (26) week United States Treasury Bills in effect as of the Closing Date as published in The Wall Street Journal; provided that if no such equivalent coupon issue yield is available as of the Closing Date, the equivalent coupon issue yield for such Treasury Bills most recently published in The Wall Street Journal prior to the Closing Date shall be used.  Thereafter, the rate shall be adjusted to the rate determined by the Seller to be equal to the equivalent coupon issue yield on such Treasury Bills in effect as of the first day of each succeeding calendar quarter during which interest accrues as published in The Wall Street Journal.

"**Settlement Payment**" has the meaning given in Section 3.03(d).

"**Shared-Loss Agreement**" means the Shared-Loss Agreement in the form attached as Attachment G to the Loan Sale Agreement, to be entered into as of the Closing Date by and between the Seller and the Purchaser.

"**Swapped Fixed Rate**" means 1.628%.

"**Synthetic Rate**" means the Swapped Fixed Rate plus 1.25%.

"**Subsidiary**" has the meaning set forth in Section 3(w)(4) of the FDIA (12 U.S.C. Section 1813(w)(4)).

"**Tax**" or "**Taxes**" means all income, excise, gross receipts, ad valorem, sales, use, employment, franchise, profits, gains, property, transfer, payroll, withholding, severance, occupation, social security, unemployment compensation, alternative minimum, value added, intangibles or other taxes, fees, stamp taxes, duties, charges, levies or assessments of any kind whatsoever (whether payable directly or by withholding), together with any interest and any penalties, fines, additions to tax or additional amounts imposed by any Governmental Authority with respect thereto.

Exhibit 2, Page 81

"**Tax Authority**" means any branch, office, department, agency, instrumentality, court, tribunal, officer, employee, designee, representative, or other Person that is acting for, on behalf of, or as a part of any foreign or domestic government (or any state, local or other political subdivision thereof) that is engaged in or has any power, duty, responsibility or obligation relating to the legislation, promulgation, interpretation, enforcement, regulation, monitoring, supervision or collection of or any other activity relating to any Tax or Tax Return.

"**Tax Return**" means any return, election, declaration, report, schedule, information return, document, information, opinion, statement, or any amendment to any of the foregoing (including any consolidated, combined or unitary return) submitted or required to be submitted to any Tax Authority.

"**Termination Date**" has the meaning given in Section 5.09(a).

"**Third Party Claim**" means, with respect to any Reimbursed Party, a claim, counterclaim or demand made by any Person (other than the Purchaser or any of its directors, officers, partners, employees, agents, creditors, stockholders or other equityholders, whether beneficial or of record) against such Reimbursed Party; and, with respect to any Seller Indemnitee, a claim, counterclaim or demand made by any Person (other than the Seller or any of its Affiliates) against such Seller Indemnitee.

"**Thrift Deposit**" means a deposit as defined in 12 U.S.C. Section 1813(l), including outstanding cashier's checks and other official checks and all uncollected items included in the depositors' balances (including the balance in custodial accounts) and credited on the books and records of the Seller, including accrued interest thereon; provided that the term "Thrift Deposit" shall not include all or any portion of those deposit balances which, in the discretion of the Seller, (i) may be required to satisfy the Seller for any liquidated or contingent liability of any depositor arising from an unauthorized or unlawful transaction, or (ii) may be needed to provide payment of any liability of any depositor to the Seller, including the liability of any depositor as a director or officer of IndyMac Federal or the Seller, whether or not the amount of the liability is or can be determined as of the Closing Date.

"**Transaction**" means the aggregate of all of the transactions contemplated in this Agreement and the other Definitive Agreements.

"**Transferred Employee**" has the meaning given in Section 11.01.

"**Transferred Employees/Contractors**" has the meaning given in Section 8.03(b)(i).

"**Transferred Employee Data**" has the meaning given in Section 8.03(b)(i).

"**Transition Employees**" has the meaning given in Section 11.04.

"**Transition Employee Costs**" has the meaning given in Section 11.04.

"**Transition Period**" has the meaning given in Section 11.04.

- 15-

Exhibit 2, Page 82

"**Transitional Services Agreement**" means the Transitional Services Agreement to be entered into as of the Closing Date by and between the Seller and the Purchaser.

"**Unassigned Records**" has the meaning given in Section 8.03(b).

"**Unfunded Commitment Definitive Agreements**" means the definitive agreements executed after the Closing Date pursuant to the terms set forth in (i) the Term Sheet for Assignment of Funding Obligations to Servicer in HELOC Securitizations and Reimbursement for Draws attached to the Servicing Business Asset Purchase Agreement as Exhibit C, (ii) the Term Sheet for Shared-Loss and Participation Interest in Unfunded Commitments of Reverse Mortgage Loans attached to the Reverse Mortgage Business Asset Purchase Agreement as Exhibit F, and (iii) the Term Sheet for Participation Interests in Unfunded HELOC Commitments attached to the Loan Sale Agreement as Attachment H.

"**WARN Act**" has the meaning given in Section 11.03.

"**Weighted Average FHLB Interest Rate**" means, for any Accrual Period, the face weighted average FHLB advance rate as of the given period for all then outstanding FHLB Advances.

Section 1.02   Construction.   This Agreement shall be construed and interpreted in accordance with the following:

(a)   References to "Affiliates" include only other Persons which from time to time constitute "Affiliates" of such specified Person, and do not include, at any particular time, other Persons that may have been, but at such time have ceased to be, "Affiliates" of such specified Person, except to the extent that any such reference specifically provides otherwise.

(b)   The term "or" is not exclusive.

(c)   A reference to a law includes any amendment, modification or replacement to such law.

(d)   Accounting terms shall have the meanings assigned to them by GAAP applied on a consistent basis by the accounting entity to which they refer.

(e)   References to any document, instrument or agreement (i) shall be deemed to include all appendices, exhibits, schedules and other attachments thereto and all documents, instruments or agreements issued or executed in replacement thereof, and (ii) shall mean such document, instrument or agreement, or replacement thereto, as amended, modified and supplemented from time to time in accordance with its terms and as the same is in effect at any given time.

(f)   Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

- 16 -

(g)    The words "include" and "including" and words of similar import are not limiting, and shall be construed to be followed by the words "without limitation," whether or not they are in fact followed by such words.

(h)    The word "during" when used with respect to a period of time shall be construed to mean commencing at the beginning of such period and continuing until the end of such period.

(i)    Unless the context otherwise requires, singular nouns and pronouns when used herein shall be deemed to include the plural and vice versa and impersonal pronouns shall be deemed to include the personal pronoun of the appropriate gender.

## ARTICLE II

## DESCRIPTION OF TRANSACTION

Section 2.01    Formation of Purchaser.  On or prior to the Closing Date, HoldCo shall cause Intermediate HoldCo to, and Intermediate HoldCo shall, organize the Purchaser as a federally chartered, FDIC insured, stock form savings association or savings bank and direct wholly owned subsidiary of Intermediate HoldCo.

Section 2.02    Capitalization.  On or prior to the Closing Date, HoldCo and Intermediate HoldCo shall make the Capital Contribution, which shall be deemed to have been made upon the occurrence of both of the following:

(a)    the application of the Deposit by the Seller on the Closing Date to the Aggregate Closing Payment, and

(b)    the release of the Closing Escrow Funds (as defined below) on the Closing Date from the Closing Escrow Account by the Seller and HoldCo in accordance with terms of the Closing Escrow Agreement and the application thereof to the Aggregate Closing Payment in accordance with Section 3.02 hereof.

Section 2.03    Transactions Prior to Closing.    On the Business Day immediately preceding the Closing Date, HoldCo shall pay by wire transfer of immediately available funds an amount equal to ONE BILLION FOUR HUNDRED ELEVEN MILLION Dollars ($1,411,000,000) to the Closing Escrow Account (the "**Closing Escrow Funds**").

Section 2.04    Closing Date Transactions.    The following transactions shall occur substantially simultaneously on the Closing Date but shall be deemed to occur in the following order:

(a)    the FDIC shall be appointed receiver for IndyMac Federal;

(b)    the Purchaser shall be formed as a federally chartered, stock form savings association or savings bank and direct wholly owned subsidiary of Intermediate HoldCo, subject to the supervision of the OTS;

Exhibit 2, Page 84

(c)     the Purchaser shall be approved as an FDIC insured depository institution; and

(d)     the Purchase and Assumption Transactions shall occur in accordance with the terms hereof and the other applicable Definitive Agreements.

Section 2.05   The Closing.  The closing for the Transaction (the "**Closing**") shall take place at the offices of Sonnenschein Nath & Rosenthal LLP, Two World Financial Center, New York, New York, on March 19, 2009, or such other date as HoldCo and the Seller may mutually determine upon satisfaction or waiver of all conditions set forth in this Agreement and the other Definitive Agreements to the obligations of the parties to consummate the Transaction (other than conditions with respect to actions the respective parties will take at the Closing itself) (the "**Closing Date**").  Except as otherwise expressly provided with respect to Group 3 in the Reverse Mortgage Business Asset Purchase Agreement and in Article XIV below, the parties hereto acknowledge that if any Definitive Agreement is not performed, then none of the Definitive Agreements shall be deemed performed.

## ARTICLE III

## PURCHASE PRICE FOR THE PURCHASE AND ASSUMPTION TRANSACTIONS

Section 3.01   Final Purchase Price.  The aggregate purchase price for the Purchase and Assumption Transactions shall be determined as of the Closing Date pursuant to Section 3.03 below and shall be equal to the sum of (i) the Group 1 Final Purchase Price *plus* (ii) the Group 2 Final Purchase Price, *plus* (iii) to the extent the acquisition of Group 3 is completed, the Group 3 Final Purchase Price, *plus* (iv) the Group 4 Final Purchase Price, *plus* (v) the Group 5 Final Purchase Price, *plus* (vi) the Groups 6-8 Final Purchase Price (the "**Aggregate Final Purchase Price**").

Section 3.02   Aggregate Closing Payment.

(a)     Calculation.  The Aggregate Closing Payment shall be calculated by the Seller in accordance with Schedule 3.02(a), and such calculation shall be provided to the Purchaser at least two (2) Business Days prior to the Closing Date along with reasonable supporting information and documentation that was relied upon by the Seller in connection with such calculation.  Notwithstanding the prior sentence or the closing payment calculation provisions in Section 5.03(b) of this Agreement and in the other Definitive Agreements, for purposes of calculating the Aggregate Closing Payment only, if the appraisals necessary to determine Fair Market Value are not received by the Seller at least two (2) Business Days prior to the Closing Date, then any portion of the Aggregate Closing Payment that is to be calculated using Fair Market Value under the Definitive Agreements shall be calculated using the Book Value of the relevant Assets as of the Initial Calculation Date.

(b)     Payment.  At the Closing, assuming the Deposit has been released to the Seller in accordance with the Initial Escrow Agreement, the Aggregate Closing Payment shall be paid by HoldCo or one or more of its Subsidiaries as follows:

Exhibit 2, Page 85

(i)     the Closing Escrow Funds shall be released from the Closing Escrow Account to the Seller in accordance with the terms of the Closing Escrow Agreement;

(ii)    subject to the provisions of paragraph (iii) below, the Purchaser shall pay to the Seller, by wire transfer of immediately available funds, in accordance with the wire transfer instructions set forth in Schedule 3.02(b), an amount equal to the positive difference, if any, obtained by subtracting (x) the sum of (1) the Deposit, (2) the Closing Escrow Funds and (3) the Seller Financing from (y) the Aggregate Closing Payment; and

(iii)   if the amount obtained by subtracting the amount in clause (x) from the amount in clause (y) in paragraph (ii) above results in a negative amount, then the release to the Seller of the Closing Escrow Funds pursuant to Section 3.02(b)(i) shall be reduced by such amount with the remainder of the Closing Escrow Funds released to the Purchaser in accordance with the terms of the Closing Escrow Agreement.

Section 3.03    Post-Closing Settlement.

(a)     Closing Adjustment Documents.  Within forty-five (45) calendar days following the Closing Date, the Purchaser shall prepare and deliver to the Seller the Group 1 Closing Adjustment Documents (as defined below) and the closing adjustment documents required under the other Definitive Agreements, along with the Purchaser's calculation of the Aggregate Final Purchase Price, the Aggregate Final Payment and the Settlement Payment (as defined below) (collectively, the "**Closing Adjustment Documents**"), all of which such documents shall be delivered on the same day.

(b)     Disagreements.  Within thirty (30) calendar days after delivery of the Closing Adjustment Documents, the Seller may dispute all or any portion of such Closing Adjustment Documents by giving written notice (a "**Notice of Disagreement**") to the Purchaser setting forth in reasonable detail the basis for any such dispute and the Seller's calculation of any amounts set forth in the Closing Adjustment Documents that are the subject of such dispute (any such dispute being hereinafter called a "**Disagreement**").  Promptly following the delivery of a Notice of Disagreement, the parties shall commence good faith negotiations with a view to resolving all such Disagreements.  If the Seller does not give a Notice of a Disagreement within thirty (30) calendar days after delivery of the Closing Adjustment Documents, the Seller will be deemed to have irrevocably accepted all of the Closing Adjustment Documents in the form delivered to the Seller by the Purchaser and to have agreed to all amounts set forth therein.  If the Seller gives a Notice of Disagreement with respect to one or more but not all of the Closing Adjustment Documents, the Seller will be deemed to have irrevocably accepted all of the Closing Adjustment Documents with respect to which no Notice of Disagreement was provided, in the form delivered to the Seller by the Purchaser and to have agreed to all amounts set forth therein.

(c)     Resolution of Disagreement.  If the Seller delivers a Notice of Disagreement and the Purchaser does not dispute all or any portion of such Notice of Disagreement by giving written notice (a "**Purchaser Notice**") to the Seller setting forth in

- 19-

Exhibit 2, Page 86

reasonable detail the basis for such dispute within ten (10) calendar days following the receipt of such Notice of Disagreement, the Purchaser will be deemed to have irrevocably accepted the Closing Adjustment Documents as modified in the manner described in the Notice of Disagreement. If the Purchaser gives a Purchaser Notice within the ten (10)-day period described in the previous sentence, and the Purchaser and the Seller do not resolve the Disagreement within ten (10) calendar days after the delivery of the Purchaser Notice to the Seller (with such resolution evidenced by a written agreement signed by the Purchaser and the Seller), such Disagreement or portion thereof that is not resolved by an agreement signed by the Purchaser and the Seller shall be referred by the Purchaser to the Independent Accounting Firm for resolution. The Purchaser shall provide the Independent Accounting Firm with a copy of this Agreement and the other Definitive Agreements, copies of all schedules and other documents delivered at the Closing, the Closing Adjustment Documents and any supporting documentation that has been exchanged by the parties, the Notice of Disagreement, and any partial settlements agreed to by the Purchaser and the Seller in connection with the Closing Adjustment Documents that relate to the Notice of Disagreement (any such matters that have been agreed to by the parties are not considered part of the Disagreement and are not subject to a determination by the Independent Accounting Firm). The Independent Accounting Firm shall resolve the Disagreement as follows (and only as follows): it is to determine, solely based on the terms of this Agreement and the other documents made available to it in accordance with this Section 3.03(c), whether the amount due to or from the Purchaser pursuant to the Closing Adjustment Documents is (i) the amount the Seller claims to be due to or from the Purchaser, (ii) the amount the Purchaser claims to be due to or from the Purchaser or (iii) an amount in between the amount claimed by the Seller in clause (i) and the amount claimed by the Purchaser in clause (ii). For the avoidance of any doubt and in furtherance of the previous sentence, even if the Independent Accounting Firm determines that the correct amount due to or from the Purchaser is an amount greater than the higher of or less than the lower of the amounts set forth in clauses (i) and (ii) of the previous sentence, the Independent Accounting Firm nevertheless must resolve the Disagreement in accordance with the parameters set forth in the previous sentence. The Independent Accounting Firm shall issue a written decision setting forth the resolution of the Disagreement and provide the same to each party. Such resolution by the Independent Accounting Firm shall be final and binding upon the parties and the parties expressly acknowledge the foregoing. The Purchaser and the Seller shall use their best efforts to cause the Independent Accounting Firm to render its determination as soon as practicable after the referral to it of the Disagreement but in any event shall direct the Independent Accounting Firm to render its decision no later than thirty (30) calendar days after the date on which the Independent Accounting Firm receives all of the information to be provided to it in accordance with this Section 3.03(c). The Purchaser and the Seller each shall cooperate with the Independent Accounting Firm and provide such firm with reasonable access to such Accounting Records and personnel as the Independent Accounting Firm reasonably requests in order to render its determination. Either the Purchaser or the Seller may enforce the decision of the Independent Accounting Firm in a court of competent jurisdiction, but neither the Purchaser nor the Seller shall challenge or seek to appeal the decision of the Independent Accounting Firm, and each expressly waives any right it may otherwise have to so challenge such decision. The allocation of the fees and expenses of the Independent Accounting Firm shall be made in accordance with Section 19.03.

Exhibit 2, Page 87

(d)  Settlement Payment.  On the fifth (5th) Business Day following the acceptance or deemed acceptance of the Closing Adjustment Documents or, if later, the fifth (5th) Business Day following the final resolution of any Disagreements relating to such Closing Adjustment Documents (the "**Settlement Date**"), there shall be a post-closing settlement payment for the Purchase and Assumption Transactions (the "**Settlement Payment**") as follows: (i) with respect to Group 4, (A) the Seller Financing with respect to the Financed Securities in Group 4 shall be adjusted in accordance with the Securities Master Repurchase Agreement, to wit, the Outstanding Purchase Price shall be increased or decreased to equal the Recalculated Purchase Price (as such terms are defined in the Securities Master Repurchase Agreement) and (B) an amount equal to (x) the Financed Group 4 Purchase Price minus the Financed Group 4 Closing Payment multiplied by (y) 0.25 shall be paid to the Seller (if positive) or the Purchaser (if negative); and (ii) with respect to all other Groups, an amount equal to (A) the sum of the Group 1 Final Payment, the Group 2 Final Payment, the Group 3 Final Payment, the Non-Financed Group 4 Purchase Price, the Group 5 Final Payment and the Groups 6-8 Final Payment, minus (B) the sum of the Group 1 Closing Payment, the Group 2 Closing Payment, the Group 3 Closing Payment, the Non-Financed Group 4 Closing Payment, the Group 5 Closing Payment and the Groups 6-8 Closing Payment shall be paid to the Seller (if positive) or the Purchaser (if negative).  The payments due under clause (i)(B) and clause (ii) shall be netted and the resulting payment due under this section shall be paid to the party entitled to receive such payment by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth in Schedule 3.02(b), which instructions may be updated on or prior to the Settlement Date.

(e)  Interest.  Any amounts paid under Section 3.03(d) shall bear interest for the period from and including the day following the Closing Date to and including the day preceding the payment at the Settlement Interest Rate, and such interest shall be paid by the Purchaser or the Seller, as applicable, in connection with the Settlement Payment.

(f)  Adjustment to Purchase Price.  The Purchaser and the Seller agree to treat all payments and adjustments provided in this Agreement (including any interest described in Section 3.03(e)), other than any payments pursuant to Section 5.09, as adjustments to the Aggregate Final Purchase Price, and as having been made prior to the Closing Date, for all Tax purposes.

## ARTICLE IV

## ASSUMPTION OF GROUP 1 LIABILITIES

Section 4.01  Group 1 Liabilities Assumed by the Purchaser.  Subject to the terms and provisions of this Agreement (including the retention of all rights and remedies under Article XVII), and effective as of the Closing Date, the Purchaser shall assume and agree to pay, perform, and discharge all of the following liabilities and obligations of IndyMac Federal (such liabilities referred to as the "**Assumed Group 1 Liabilities**"):

(a)  subject to the provisions of Section 4.03, liabilities related to the Thrift Deposits as of the Closing Date, including the obligations under the deposit agreements with respect to Thrift Deposits opened after July 11, 2008 (the Thrift Deposits as of the Initial Calculation Date are set forth on Schedule 4.01(a));

- 21-

(b)     all liabilities for indebtedness secured by mortgages, deeds of trust, chattel mortgages, security interests or other Liens on or affecting any Group 1 Assets (as defined below);

(c)     all liabilities for borrowings from the Federal Home Loan Bank of San Francisco (the "**FHLB**") listed on Schedule 4.01(c)(i) (the "**FHLB Advances**") and all liabilities under the related FHLB contracts listed on Schedule 4.01(c)(ii);

(d)     all liabilities for federal funds purchased, repurchase agreements and overdrafts in accounts maintained with other depository institutions (including any accrued and unpaid interest thereon computed to and including the Closing Date);

(e)     all liabilities related to United States Treasury tax and loan note option accounts, if any;

(f)     subject to Section 10.01(e), all duties, obligations and liabilities relating to the Contracts listed on Schedule 4.01(f) (the "**Assumed Contracts**") and the Contracts with IndyMac Federal customers governing Seller's debit card business (including any extensions of credit with respect thereto), overdraft protection plans, safe deposit business, safekeeping business and custody business, in each case from and after the Closing Date;

(g)     all duties, obligations and liabilities as a tenant under the leases for real property listed on Schedule 4.01(g) (the "**Assumed Real Property Leases**") from and after the Closing Date; and

(h)     all obligations of the Seller with respect to the other liabilities listed on Schedule 4.01(h).

Section 4.02    Liabilities Not Assumed by the Purchaser.

(a)     Except for the Assumed Group 1 Liabilities and the liabilities expressly assumed by the Purchaser pursuant to the other Definitive Agreements, the Seller shall not assign and the Purchaser shall not assume any claims, debts, obligations or liabilities (whether known or unknown, contingent or unasserted, matured or unmatured), however they may be characterized, that the Failed Thrift, IndyMac Federal or the Seller has or may have now or in the future, including, (i) the claims, debts, obligations or liabilities of the Seller relating to the Contracts listed on Schedule 4.02(a) (the "**Excluded Contracts**"); and (ii) any direct or indirect Tax liabilities or obligations of the Failed Thrift, IndyMac Federal or the Seller that are attributable to any taxable period (or portion thereof) ending on or before the Closing Date;

(b)     Notwithstanding anything to the contrary set forth herein, the Seller shall not assign and the Purchaser shall not assume: (i) any claim against or liability of the FDIC in its capacity as receiver for the Failed Thrift or the FDIC as receiver for IndyMac Federal that, under and in accordance with applicable Law, was, is or will be subject to the receivership administrative claims processes administered by the FDIC in its capacity as receiver for the Failed Thrift or the FDIC as receiver for IndyMac Federal pursuant to 12 U.S.C. §1821(d)(3) through (13), including claims and liabilities that are affirmative or defensive, now existing or arising in the future, contingent or fixed, monetary or non-monetary, equitable or legal, or

- 22 -

declarative or injunctive; or (ii) any claim against or liability based on any alleged act or omission of the Failed Thrift or IndyMac Federal which is not provable or allowable, or is otherwise barred against the FDIC as receiver for the Failed Thrift or the FDIC as receiver for IndyMac Federal under applicable Law, including claims and liabilities that are barred under 12 U.S.C. §§1821(c), (d), (e) (including §1821(e)(3)), (i), or (j); 12 U.S.C. §1822; 12 U.S.C. §1823; or 12 U.S.C. §1825.  The claims, debts, obligations and liabilities referred to in Sections 4.02(a) and 4.02(b) are collectively referred to as the "**Excluded Liabilities**".

Section 4.03  Interest on Thrift Deposit Liabilities.  With respect to the Thrift Deposits opened after July 11, 2008, from and after the Closing Date the Purchaser shall accrue and pay interest on such Thrift Deposits under the deposit agreements assumed with respect to such Thrift Deposits in accordance with such assumed agreements.  With respect to the Thrift Deposits opened on or prior to July 11, 2008, from and after the Closing Date the Purchaser shall (i) accrue and pay interest on such Thrift Deposits at such rates as it shall determine and (ii) permit each depositor, to withdraw, without penalty for early withdrawal, all or any portion of such depositor's Thrift Deposit, whether or not the Purchaser elects to pay interest in accordance with any deposit agreement formerly existing between the Failed Thrift, IndyMac Federal or the Seller, on the one hand, and such depositor, on the other hand; provided that if such Thrift Deposit has been pledged to secure an obligation of the depositor or other party, any withdrawal thereof shall be subject to the terms of the agreement governing such pledge.

Section 4.04  Unclaimed Deposits.  If, within eighteen (18) months after the Closing Date, any depositor of the Seller does not claim or arrange to continue such depositor's Thrift Deposit assumed by the Purchaser pursuant to Section 4.01, the Purchaser shall, within fifteen (15) Business Days after the end of such eighteen (18)-month period, (i) refund to the Seller the full amount of each such Thrift Deposit (without reduction for service charges), (ii) provide to the Seller a schedule of all such refunded Thrift Deposits in such form as may be prescribed by the Seller, and (iii) assign, transfer, convey and deliver to the Seller all right, title and interest of the Purchaser in and to Records previously transferred to the Purchaser and other records generated or maintained by the Purchaser pertaining to such Thrift Deposits and the Seller shall assume all liabilities with respect to such refunded Thrift Deposits.  During such eighteen (18)-month period, at the request of the Seller, the Purchaser promptly shall provide to the Seller schedules of unclaimed deposits in such form as may be reasonably prescribed by the Seller.

Section 4.05  Employee Benefit Plans.  None of HoldCo, Intermediate HoldCo, the Purchaser or any of their Affiliates shall have any liabilities, obligations or responsibilities under any Seller Employee Plan or with respect to any Seller Employee who is not a Transferred Employee, unless HoldCo, Intermediate HoldCo, the Purchaser or any of their Affiliates, as applicable, and the Seller agree otherwise in writing subsequent to the Effective Date of this Agreement.

- 23-

## ARTICLE V

## PURCHASE OF GROUP 1 ASSETS

Section 5.01   Group 1 Assets Purchased by the Purchaser.  On the Closing Date, the Purchaser shall purchase from the Seller, and the Seller shall sell, assign, transfer, convey, and deliver to the Purchaser, all right, title, and interest of the Seller in and to the following assets (whether personal or mixed, wherever located and however acquired) (collectively, the "**Group 1 Assets**") (it being understood that, as set forth below, the Schedules described in this Section 5.01 shall be updated as of the Closing Date and assets included in such updated Schedules shall constitute Group 1 Assets):

(a)      the Cash on Hand listed on Schedule 5.01(a);

(b)      the owned Bank Premises listed on Schedule 5.01(b)(i) and the owned Servicing Business Premises listed on Schedule 5.01(b)(ii);

(c)      the Fixtures and owned Furniture and Equipment listed on Schedule 5.01(c)(i), and the additional Furniture and Equipment listed on Schedule 5.01(c)(ii);

(d)      the Overdraft Loans listed on Schedule 5.01(d);

(e)      all rights in and to the Seller's Intellectual Property, including the Seller's Intellectual Property listed on Schedule 5.01(e);

(f)      the accounts and accounts receivable (other than any intercompany accounts receivable) listed on Schedule 5.01(f);

(g)      all rights of and benefits accruing to the Seller under the Assumed Contracts listed on Schedule 4.01(f) and the Contracts governing the Seller's debit card business, overdraft protection plans, safe deposit business, safekeeping business and custody business, and the Assumed Real Property Leases listed on Schedule 4.01(g), including rights to assert claims and take other rightful actions in respect of breaches, defaults and other violations of such Contracts or leases;

(h)      the FHLB Stock having an aggregate par value of $317,833,700;

(i)      all permits relating to the retail banking business of IndyMac Federal, to the extent transferable;

(j)      the artwork listed on Schedule 5.01(j);

(k)      pre-paid expenses listed on Schedule 5.01(k); and

(l)      the other assets listed on Schedule 5.01(l).

Each Schedule referenced above shall be updated as of the Closing Date and delivered to the Purchaser in accordance with Section 5.06.

Exhibit 2, Page 91

To the extent that any party discovers within 180 days following the Closing that there were assets of the Seller used primarily in IndyMac Federal's retail banking business or of the type listed in this Section 5.01, which assets all parties hereto intended to have transferred in connection with the transactions contemplated in this Agreement but were omitted from the Schedules to this Agreement, such party shall promptly provide written notice of such discovery to the other parties. Promptly following its discovery of such asset or its receipt of such written notice, as applicable, the Seller shall or shall cause its Affiliates to assign and transfer to the Purchaser all right, title and interest in such asset.

Section 5.02   Assets Not Purchased by the Purchaser. The Assets shall not include, and the Purchaser shall not purchase or otherwise acquire, any assets not specifically being acquired pursuant to the Definitive Agreements (collectively, the "**Excluded Assets**"), including the excluded assets listed on Schedule 5.02.

Section 5.03   Purchase Price; Closing Payment.

(a)   Purchase Price. Subject to the terms and conditions of this Agreement, the Purchaser shall pay to the Seller an aggregate purchase price for the Group 1 Assets in an amount equal to the sum of (such sum, the "**Group 1 Final Purchase Price**"):

(i)   with respect to the Cash on Hand, an amount equal to the aggregate Book Value thereof as of the Closing Date; *plus*

(ii)   with respect to the owned Bank Premises, an amount equal to the aggregate Book Value thereof as of the Closing Date; *plus*

(iii)   with respect to the Servicing Business Premises, an amount equal to the Fair Market Value thereof; *plus*

(iv)   with respect to the Fixtures and the owned Furniture and Equipment listed on Schedule 5.01(c)(i), an amount equal to the Fair Market Value thereof; *plus*

(v)   with respect to the additional Furniture and Equipment listed on Schedule 5.01(c)(ii), an aggregate amount equal to ONE HUNDRED TWENTY-TWO THOUSAND THREE HUNDRED SIXTY-FIVE Dollars ($122,365); *plus*

(vi)   with respect to the Overdraft Loans, an amount equal to the aggregate Book Value thereof less the amount of any reserves related thereto as of the Closing Date, plus accrued interest from the paid-to date to but not including the Closing Date; *plus*

(vii)   with respect to the accounts and accounts receivable listed on Schedule 5.01(f) (other than any intercompany accounts receivable), an amount equal to the aggregate Book Value thereof less the amount of any reserves related thereto as of the Closing Date; *plus*

Exhibit 2, Page 92

(viii)   with respect to the FHLB Stock, an amount equal to the par value thereof; *plus*

(ix)   with respect to the artwork listed on Schedule 5.01(j), an aggregate amount equal to FIFTY-SIX THOUSAND Dollars ($56,000); *plus*

(x)   with respect to the prepaid expenses listed on Schedule 5.01(k), an amount equal to the aggregate Book Value thereof as of the Closing Date, prorated in accordance with Section 5.04; *plus*

(xi)   with respect to the other assets listed on Schedule 5.01(l), an amount equal to the aggregate Book Value of such other assets as of the Closing Date; *less*

(xii)   an amount equal to the aggregate Book Value of the Thrift Deposits as of the Closing Date; *less*

(xiii)   an amount equal to the aggregate Book Value of the liabilities for borrowings from the FHLB as of the Closing Date; *less*

(xiv)   an amount equal to the aggregate Book Value of the other liabilities listed on Schedule 4.01(h) as of the Closing Date.

(b)   Closing Payment.  On the Closing Date, the Purchaser shall pay to the Seller, in accordance with Article III, an amount equal to the balance of (i) the Group 1 Final Purchase Price, calculated using balances, as applicable, as of the Initial Calculation Date rather than the Closing Date, *less* (ii) prorated amounts owed by the Seller through and including the Closing Date which are calculable as of the Closing Date, as determined pursuant to Section 5.04 (collectively, the "**Group 1 Closing Payment**").

Section 5.04   Prorations.  Except to the extent otherwise specifically provided for herein, all payments under or pursuant to any Contract (including document custodial arrangements and applicable insurance policies) or any Assumed Real Property Lease assigned to the Purchaser under this Agreement, and real and personal property taxes related to the Group 1 Assets, whether or not payable after the Closing Date, shall be prorated between the Purchaser and the Seller, as the case may be, on the basis of a 365 day year and the number of days elapsed and days remaining in the applicable period through the end of the Closing Date.  With respect to any products sold (or services rendered) pursuant to any Contracts assigned to the Purchaser under this Agreement, the Seller and the Purchaser shall use commercially reasonable efforts to arrange for vendors to bill the Seller directly, through and including the Closing Date, and the Purchaser directly after the Closing Date.  All amounts prorated pursuant to this Section 5.04 will be taken into account in connection with the adjustments provided in Section 5.07.

Section 5.05   Closing Procedure.  At the Closing, subject to and upon the terms and conditions of this Agreement:

(a)   the Seller shall deliver to the Purchaser the certificates, instruments and documents referred to in Section 13.01;

- 26 -

(b)     the Purchaser shall deliver to the Seller the certificates, instruments and documents referred to in Section 13.02;

(c)     the Seller shall, as herein provided, sell, assign, transfer, convey, and deliver to the Purchaser all right, title and interest in and to the Group 1 Assets, and the Group 1 Assets shall be transferred from the Seller to the Purchaser;

(d)     the Purchaser shall deliver the Group 1 Closing Payment in accordance with the provisions of Article III; and

(e)     the Seller shall, as herein provided, assign, transfer, convey, and deliver to the Purchaser the Assumed Group 1 Liabilities, and the Purchaser shall assume and agree to pay, perform and discharge in accordance with their terms all of the Assumed Group 1 Liabilities.

Section 5.06   Closing Adjustment Documents.   Within sixty (60) calendar days following the Closing Date, the Purchaser shall prepare and deliver to the Seller (i) a schedule of the Group 1 Assets as of the Closing Date, (ii) a schedule of the Assumed Group 1 Liabilities, including the Thrift Deposits, as of the Closing Date, (iii) Schedule 4.01(a), Schedule 4.01(c)(i), Schedule 4.01(h), Schedule 5.01(a), Schedule 5.01(b)(i), Schedule 5.01(d), Schedule 5.01(f), Schedule 5.01(k) and Schedule 5.01(l), each updated as of the Closing Date and prepared in accordance with the Accounting Records of IndyMac Federal and consistent with past practice (including the preparation of the Schedules attached hereto) and (iv) a schedule setting forth in reasonable detail the calculations contemplated by Section 5.07 below (collectively, the "**Group 1 Closing Adjustment Documents**").  The parties shall cooperate in the preparation of the Group 1 Closing Adjustment Documents and such additional documents as may be necessary to calculate the Group 1 Final Purchase Price.  Without limiting the generality of the foregoing, to the extent necessary, the Purchaser shall provide the Seller and its designees with reasonable access to the books, Records, work papers, personnel and representatives which relate to the Group 1 Assets and the Assumed Group 1 Liabilities.

Section 5.07   Calculation of Adjustments.  The Group 1 Closing Adjustment Documents shall set forth the Purchaser's calculation of (i) the Group 1 Final Purchase Price in accordance with Section 5.03(a) and (ii) a payment amount (such amount, the "**Group 1 Final Payment**") which shall be the sum of the following:  (i) the Group 1 Final Purchase Price, *less* (ii) prorated amounts, as determined pursuant to Section 5.04, owed by the Seller through and including the Closing Date. The Group 1 Closing Adjustment Documents shall be reviewed, and any Disagreements related thereto resolved, in accordance with Article III.

Section 5.08   Final Settlement.  Upon the earlier of (x) the acceptance of the Closing Adjustment Documents by the Seller and (y) the final and binding resolution of any Disagreements, in each case in accordance with Article III, any amounts shall be paid in accordance with Section 3.03(d).

Section 5.09   FHLB Advances Make Whole Payment.

(a)     In respect of the Purchaser's assumption of the FHLB Advances, the Seller agrees to pay to the Purchaser on a monthly basis during the period beginning on the

Exhibit 2, Page 94

date immediately following the Closing Date and ending on the earlier of the date that is the
three (3) year anniversary of the Closing Date and the first Measurement Date as of which
there are no longer any Adjusted FHLB Advances outstanding (in each case, the "**Termination
Date**"), in accordance with Section 5.09(b), the sum of (a) the Rate Differential Payment and
(b) the Prepayment Penalty Reimbursement Amount for the Accrual Period (such sum referred
to herein as the "**FHLB Advance Make Whole Payment**").

      (b)    Within five (5) Business Days after the end of each Accrual Period, the
Purchaser shall provide to the Seller the calculation of the FHLB Advance Make Whole
Payment, together with all reasonable supporting documentation therefor. On or prior to the
day that is five (5) Business Days following the receipt of the calculation and supporting
documentation referenced in the preceding sentence the Seller shall pay to the Purchaser by
wire transfer in immediately available funds in accordance with the wire transfer instructions
provided by the Purchaser the FHLB Advance Make Whole Payment.

      Section 5.10   Disclaimer. EACH OF HOLDCO, INTERMEDIATE HOLDCO AND
THE PURCHASER ACKNOWLEDGE THAT THE GROUP 1 ASSETS WILL BE
CONVEYED "AS IS" AND "WITH ALL FAULTS," WITHOUT ANY REPRESENTATION,
WARRANTY OR GUARANTY WHATSOEVER WITH RESPECT TO THE GROUP 1
ASSETS, INCLUDING AS TO THE COLLECTABILITY, ENFORCEABILITY, VALUE OF
COLLATERAL, ABILITY OF ANY OBLIGOR TO REPAY, CONDITION, FITNESS FOR
ANY PARTICULAR PURPOSE, MERCHANTABILITY OR ANY OTHER WARRANTY,
WHETHER EXPRESS OR IMPLIED OR BY OPERATION OF LAW, BY ANY PERSON,
INCLUDING THE SELLER, THE FAILED THRIFT OR THE FDIC, OR ANY
PREDECESSOR OR AFFILIATE OF THE SELLER, THE FAILED THRIFT OR THE FDIC,
OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR
CONTRACTORS.

**ARTICLE VI**

**ASSUMPTION OF CERTAIN GROUP 1 DUTIES AND OBLIGATIONS**

      Section 6.01   Continuation of Banking Business. The Purchaser shall provide full
service retail banking in the retail branches of IndyMac Federal commencing on the first banking
business day (including a Saturday) after the Closing Date. For the avoidance of any doubt, the
foregoing shall not restrict or otherwise affect the ability of the Purchaser to make changes to the
retail banking business that it conducts at any time from and after the Closing, including opening
or closing retail branches.

      Section 6.02   Agreement with Respect to Debit Card Business. The Purchaser shall
honor and perform, from and after the Closing Date, all duties and obligations with respect to
IndyMac Federal's debit card business, and processing related to debit cards, if any. Fees related
to the debit card business, if any, collected prior to the Closing Date shall be for the benefit of
the Seller and fees collected after the Closing Date, if any, shall be for the benefit of the
Purchaser.

Exhibit 2, Page 95

Section 6.03    Agreement with Respect to Safe Deposit Business.  The Purchaser shall perform and discharge, from and after the Closing Date, in the usual course of conducting a retail banking business, the duties and obligations of IndyMac Federal with respect to all Safe Deposit Boxes, if any, of IndyMac Federal and maintain all of the necessary facilities for the use of such Safe Deposit Boxes by the renters thereof during the period for which such Safe Deposit Boxes have been rented and the rent therefor paid to IndyMac Federal, subject to the provisions of the rental agreements between IndyMac Federal and the respective renters of such Safe Deposit Boxes.  Fees related to the safe deposit business collected prior to the Closing Date shall be for the benefit of the Seller and fees collected after the Closing Date shall be for the benefit of the Purchaser.

Section 6.04    Agreement with Respect to Safekeeping Business.  The Seller hereby transfers, conveys and delivers to the Purchaser and the Purchaser accepts all securities and other items, if any, held by IndyMac Federal in safekeeping for the customers of IndyMac Federal as of the Closing Date.  The Purchaser shall perform and discharge, from and after the Closing Date, the duties and obligations of IndyMac Federal with respect to such securities and items held in safekeeping.  The Purchaser shall be entitled to all rights and benefits heretofore accrued or hereafter accruing with respect thereto; provided that fees related to the safe keeping business collected prior to the Closing Date shall be for the benefit of the Seller and fees collected after the Closing Date shall be for the benefit of the Purchaser.  Within sixty (60) days after the Closing Date, the Purchaser shall provide to the Seller written verification of all assets held for safekeeping as of the Closing Date by IndyMac Federal.

Section 6.05    Agreement with Respect to Custody Business.

(a)    From and after the Closing Date, the Purchaser shall, without further transfer, substitution, act or deed, to the fullest extent permitted by Law, succeed to the rights, obligations, properties, assets, investments, deposits, agreements and custodies under custodianships and other fiduciary or representative capacities of IndyMac Federal, all to the same extent as though the Purchaser had assumed the same from IndyMac Federal prior to the Closing Date; provided that any liability based on the misfeasance, malfeasance or nonfeasance of the Failed Thrift, IndyMac Federal or the Seller or their respective directors, officers, employees or agents with respect to the custody business is not assumed hereunder. Fees related to the custody business collected prior to the Closing Date shall be for the benefit of the Seller and fees collected after the Closing Date shall be for the benefit of the Purchaser.

(b)    The Purchaser shall, to the fullest extent permitted by Law, succeed to, and be entitled to take and execute, the appointment to all custodianships and other fiduciary or representative capacities to which IndyMac Federal is or may be named or appointed by any instrument.

(c)    In the event additional proceedings of any kind are necessary to accomplish the transfer of such custody business, the Purchaser shall take whatever action is necessary to accomplish such transfer.  The Seller shall use reasonable efforts to assist the Purchaser in accomplishing such transfer.  The allocation of the costs and expenses incurred in connection with such transfer shall be made in accordance with Section 19.03.

Exhibit 2, Page 96

(d)     Within sixty (60) days after the Closing Date, the Purchaser shall provide to the Seller written verification of all assets held as of the Closing Date by IndyMac Federal in connection with IndyMac Federal's custody business.

Section 6.06   Agreement with Respect to Assumed Contracts.  Subject to Section 4.01 and Section 10.01(e), the Purchaser shall assume, perform and discharge IndyMac Federal's obligations under each Assumed Contract listed on Schedule 4.01(f), and each Assumed Real Property Lease listed on Schedule 4.01(g) and each other Contract assumed pursuant to Section 4.01, and shall comply with the terms and conditions of each such Contract or lease, in each case from and after the Closing Date.

Section 6.07   Informational Tax Reporting.  The Purchaser shall perform all obligations of IndyMac Federal with respect to federal and state income tax informational reporting related to (i) the Group 1 Assets and the Assumed Group 1 Liabilities, (ii) deposit accounts that were closed and loans that were paid off or collateral obtained with respect thereto prior to the Closing Date, (iii) miscellaneous payments made to vendors of IndyMac Federal, and (iv) any other asset or liability of IndyMac Federal, including loans not purchased and Thrift Deposits not assumed by the Purchaser, as may reasonably be required by the Seller.  The Seller shall provide the Purchaser with any information that is required to comply with any of the Purchaser's Tax reporting responsibilities, including the responsibilities described herein; provided that, such information is in the possession of the Seller, IndyMac Federal or the Failed Thrift and not in the possession of the Purchaser, Intermediate HoldCo or HoldCo.

Section 6.08   Insurance.  The Purchaser shall obtain insurance coverage effective from and after the Closing Date, including public liability, fire and extended coverage insurance reasonably acceptable to the Seller with respect to the owned or leased Bank Premises that the Purchaser occupies, and all owned or leased Furniture and Equipment and Fixtures (including leased Data Processing Equipment) located thereon, in the event such insurance coverage is not already in force and effect with respect to the Purchaser as the insured as of the Closing Date.  All such insurance shall, where appropriate (as reasonably determined by the Seller), name the Seller as an additional insured.

Section 6.09   Flow Subservicing.  The Seller and the Purchaser hereby acknowledge and agree that the Seller is retaining certain assets of IndyMac Federal and the Purchaser will service such assets after the Closing on the terms set forth in the term sheet attached hereto as Exhibit D.  The Seller and the Purchaser shall negotiate in good faith and use their best efforts, and the Purchaser shall cause Financial Freedom Acquisition LLC to negotiate in good faith and use its best efforts, to finalize the Flow Subservicing Definitive Agreement in accordance with such term sheet no later than thirty (30) calendar days after the Closing Date.

Section 6.10   Transitional Services Agreement.  The Seller and the Purchaser hereby acknowledge and agree that the Purchaser is to provide certain transitional services after the Closing pursuant to, and subject to the terms of, the Transitional Services Agreement.

Exhibit 2, Page 97

Section 6.11    Agreement with Respect to Leased Bank Premises.

(a)    Option to Lease.  The Seller hereby grants to the Purchaser an exclusive option for the period of ninety (90) days commencing the day after the Closing to cause the Seller to assign, or to cause the Seller's Subsidiaries to assign (as applicable), to the Purchaser any or all leases for leased Bank Premises set forth on Schedule 6.11(a) which have been continuously occupied by the Purchaser from the Closing Date to the date it elects to accept an assignment of the leases with respect thereto to the extent such leases can be assigned; provided that, the exercise of this option with respect to any lease must be as to all premises or other property subject to the lease.  If an assignment cannot be made of any such lease, the Seller may, in its discretion, enter into subleases, or cause its Subsidiaries to enter into subleases (as applicable), with the Purchaser containing the same terms and conditions provided under such existing leases for such leased Bank Premises or other property.  The Purchaser shall give notice to the Seller within the option period of its election to accept or not to accept an assignment of any or all such leases (or enter into subleases or new leases in lieu thereof).  The Purchaser agrees to assume all leases assigned (or enter into subleases or new leases in lieu thereof) pursuant to this Section 6.11.

(c)    Facilitation.  The Seller agrees to facilitate, or to cause its Subsidiaries to facilitate (as applicable), the assumption, assignment or sublease of leases or the negotiation of new leases by the Purchaser with respect to the leased Bank Premises set forth on Schedule 6.11(a); provided that, none of the FDIC, the Seller nor any of the Seller's Subsidiaries shall be obligated to engage in litigation, make payments to the Purchaser or to any third party in connection with facilitating any such assumption, assignment, sublease or negotiation or commit to any other obligations to third parties.

(d)    Occupancy.  The Purchaser shall give the Seller thirty (30) days' prior written notice of its intention to vacate prior to vacating any leased Bank Premises set forth on Schedule 6.11(a) with respect to which the Purchaser has not exercised the option provided in Section 6.11(a).  Any such notice shall be deemed to terminate the Purchaser's option with respect to such leased Bank Premises.

(e)    Occupancy Costs.

(i)    The Purchaser agrees to pay to the Seller, or to appropriate third parties including Subsidiaries of the Seller at the direction of the Seller, during and for the period of any occupancy by it of any of the leased Bank Premises set forth on Schedule 6.11(a), all operating costs with respect thereto and to comply with all relevant terms of applicable leases entered into by the Failed Thrift, the Seller or any Subsidiary of the Seller, including without limitation the timely payment of all rent.  Operating costs include, without limitation all taxes, fees, charges, utilities, insurance and assessments, to the extent not included in the rental value or rent.

(ii)    The Purchaser agrees during the period of occupancy by it of any of the leased Bank Premises set forth on Schedule 6.11(a), to pay to the Seller or to the appropriate Subsidiary of the Seller rent for the use of all owned or leased Furniture and Equipment and all owned or leased Fixtures located on such Bank Premises for the period

- 31 -

Exhibit 2, Page 98

of such occupancy (provided that the Purchaser shall not be required to pay rent for any Furniture and Equipment or Fixtures that the Purchaser has purchased, or that is the subject of an Assumed Contract assumed by the Purchaser, pursuant to this Agreement or the other Definitive Agreements). Rent for such leased property shall be an amount equal to any and all rent and other amounts which the Seller or any Subsidiary of the Seller incurs or accrues as an obligation or is obligated to pay for such period of occupancy pursuant to all leases and contracts with respect to such property. If the Purchaser purchases any owned Furniture and Equipment or owned Fixtures in accordance with Section 5.01(c), the amount of any rents paid by the Purchaser with respect thereto shall be applied as an offset against the purchase price thereof.

(f)     Vacating Premises.  If the Purchaser elects not to exercise the option provided in Section 6.11(a), the notice of such election in accordance with Section 6.11(a) shall specify the date upon which the Purchaser's occupancy of such leased Bank Premises shall terminate, which date shall not be later than the date which is one hundred seventy (170) calendar days after the Closing Date. Upon vacating such premises, the Purchaser shall relinquish and release to the Seller, or to the Seller's Subsidiaries (as applicable), such premises and the Fixtures and the Furniture and Equipment located thereon (other than any Furniture and Equipment purchased, or that is the subject of an Assumed Contract assumed by the Purchaser, pursuant to this Agreement or the other Definitive Agreements) in the same condition as at Closing, normal wear and tear excepted.  By failing to provide notice of its intention to vacate such premises prior to the expiration of the option period specified in Section 6.11(a), or by occupying such premises after the one hundred seventy (170)-day period specified above in this paragraph, the Purchaser shall, at the Seller's option, (x) be deemed to have assumed all leases, obligations and liabilities with respect to such premises (including any ground lease with respect to the land on which premises are located), and leased Furniture and Equipment and leased Fixtures located thereon in accordance with this Section 6.11 (unless the Seller or any Subsidiary of the Seller previously repudiated any such lease), and (y) be required to purchase all Furniture and Equipment and Fixtures owned by the Seller or any of the Seller's Subsidiaries and located on such premises as of the Closing Date.

## ARTICLE VII

## DUTIES WITH RESPECT TO DEPOSITORS OF INDYMAC FEDERAL

Section 7.01   Payment of Checks, Drafts and Orders.   Subject to Section 9.04, the Purchaser shall pay all properly drawn checks, drafts and withdrawal orders of depositors of IndyMac Federal presented for payment, whether drawn on the check or draft forms provided by the Failed Thrift or IndyMac Federal or by the Purchaser, to the extent that the Thrift Deposit balances to the credit of the respective makers or drawers assumed by the Purchaser under this Agreement are sufficient to permit the payment thereof, and in all other respects to discharge, in the usual course of conducting a retail banking business, the duties and obligations of IndyMac Federal with respect to the Thrift Deposit balances due and owing to depositors and assumed by the Purchaser under this Agreement.

- 32 -

Section 7.02    Notice to Depositors.

(a)    Within seven (7) calendar days after the Closing Date, the Purchaser shall give notice to depositors of IndyMac Federal of its assumption of the Thrift Deposit liabilities of IndyMac Federal, by mailing to each such depositor a notice with respect to such assumption and by advertising in a newspaper of general circulation in the county or counties in which the retail branches of IndyMac Federal are located as of the Closing. The Purchaser agrees that such notice shall be in the form provided by the Seller to the Purchaser prior to the date hereof, with such additional changes as may be agreed to by the Seller.

(b)    The Purchaser shall give notice by mail to depositors of IndyMac Federal concerning the procedures to claim their deposits, which notice shall be in the form provided by the Seller to the Purchaser prior to the date hereof, with such additional changes as may be agreed to by the Seller. Such notice shall be included with the notice to depositors to be mailed by the Purchaser pursuant to Section 7.02(a).

(c)    If the Purchaser proposes to charge fees different from those charged by IndyMac Federal immediately prior to the Closing before the Purchaser establishes new deposit account relationships with the existing depositors of IndyMac Federal as of the Closing Date, the Purchaser shall give notice by mail of such changed fees to such depositors.

## ARTICLE VIII

## RECORDS

Section 8.01    Transfer of Records.

(a)    The Seller, for itself and on behalf of IndyMac Federal and any Subsidiary thereof, assigns, transfers, conveys and delivers to the Purchaser the following Records pertaining to the Group 1 Assets and the Assumed Group 1 Liabilities, except as provided in Section 10.02(a):

(i)    signature cards, orders, contracts between IndyMac Federal and its depositors (to the extent the same are being assumed by the Purchaser) and Records of similar character;

(ii)    passbooks of deposits held by IndyMac Federal, deposit slips, cancelled checks and withdrawal orders representing charges to accounts of depositors;

(iii)    records of deposit balances carried with other banks, bankers or trust companies;

(iv)    deeds, mortgages, abstracts, surveys, and other instruments or records of title pertaining to the owned Bank Premises;

(v)    signature cards, agreements and records pertaining to Safe Deposit Boxes, if any; and

Exhibit 2, Page 100

(vi)     records pertaining to the debit card business, overdraft protection plans, custody business or safekeeping business of IndyMac Federal, if any.

(b)     Subject to Section 8.03, the Seller shall assign and transfer to the Purchaser by a single blanket assignment or otherwise, as soon as practicable after the Closing Date, any other Records not assigned and transferred to the Purchaser as provided in this Agreement, including loan disbursement checks, general ledger tickets, official bank checks, proof transactions (including proof tapes) and paid out loan files.

Section 8.02   Delivery of Records.  The Seller shall deliver to the Purchaser all Records described above on the Closing Date by delivery of possession of the Bank Premises.

Section 8.03   Unassigned Records.

(a)     The Seller, IndyMac Federal or any of their respective Subsidiaries will deliver and make accessible the Transferred Employee Data (as defined in Section 8.03(b)(i)) to the Purchaser by delivery of possession of the Bank Premises on the Closing Date and may further disclose Transferred Employee Data through the period during which such Transferred Employee/Contractor (as defined below) remains an employee or contractor (as applicable) of the Seller, Indy Mac Federal or any of their Subsidiaries.

(b)     "**Unassigned Records**" means any of the following that the Seller, IndyMac Federal or any of their Subsidiaries, delivers, discloses or provides access to the Purchaser or its Subsidiaries (but, in any event, will not assign any rights, title or interest in or to):

(i)     any data, documents, records and information (including without limitation Personally Identifiable Information) relating to or in connection with (A) the Non-Transferred Employees, provided at any time, and (B) the Transferred Employees and individuals classified as contractors of Seller, IndyMac Federal or its Subsidiaries that are engaged to perform services as independent contractors of Purchaser or its Affiliates (collectively, the "**Transferred Employees/Contractors**"), in the Seller's, Indy Mac Federal's or any of their Subsidiary's possession or delivered to the Purchaser as of the Closing Date or through the period during which such Transferred Employee/Contractor remains an employee or contractor (as applicable) of the Seller, Indy Mac Federal or any of their Subsidiaries (the aforesaid data is referred to herein as "**Transferred Employee Data**");

(ii)     any data, documents, records and information (including without limitation Personally Identifiable Information) subject to a claim of protection from discovery or disclosure by the attorney client privilege, the attorney work product doctrine, or any other applicable privilege or doctrine held or asserted by the Seller, IndyMac Federal or any of their Subsidiaries or their respective counsel related to or in connection with (A) the Transferred Employees/Contractors, in the Seller's, IndyMac Federal's or any of their Subsidiary's possession or delivered to the Purchaser as of the Closing Date or through the period during which such Transferred Employee/Contractor remains an employee or contractor of the Seller, IndyMac Federal or any of their

- 34 -

Subsidiaries, (B) Non-Transferred Employees, provided at any time, and (C) the Excluded Assets, Excluded Liabilities (or any facts related thereto or asserted therein) and Excluded Contracts (collectively, the "**Privileged Information**"); or

(iii)    any data, documents, records and information (including without limitation Personally Identifiable Information) to the extent relating to or connected with the Excluded Assets, Excluded Liabilities and Excluded Contracts.

(c)    For purposes of clarification, Unassigned Records do not include any data, documents, records and information (including without limitation Personally Identifiable Information) relating to or in connection with a Transferred Employee/Contractor created from and after the date on which such Transferred Employee/Contractor becomes an employee or contractor of the Purchaser or any of its Affiliates (except with respect to Transferred Employee Data). The data, documents, records and information (including without limitation Personally Identifiable Information) identified in the preceding sentence (except with respect to Transferred Employee Data) shall be owned by the Purchaser and its Affiliates.

(d)    The Seller, IndyMac Federal and any Subsidiary thereof, and their respective representatives, will have the same right and the Purchaser and its Affiliates will have the same obligations with respect to the Unassigned Records as to the Records in Section 10.02 of this Agreement. Unassigned Records are, or shall be, and shall remain the property of, the Seller, IndyMac Federal or any Subsidiary thereof, with the Purchaser and its Affiliates holding such Unassigned Records for the benefit of the Seller, IndyMac Federal and any Subsidiary thereof. The Seller for itself and on behalf IndyMac Federal and any Subsidiary thereof shall have and retain all right, title and interest, including without limitation worldwide ownership of trade secret and confidentiality rights and copyright, in and to the Unassigned Records and all copies made from it. The Purchaser, its Affiliates, licensees, vendors or contractors shall not have, nor in any circumstances gain, any ownership interest in the Unassigned Records.

(e)    Without the Seller's prior written approval (in its sole discretion) or except as set forth in Section 8.03(f), the Unassigned Records shall not be (i) used by the Purchaser, its Affiliates, licensees, vendors or contractors in any manner other than in connection with providing the services to the Seller, IndyMac Federal or any Subsidiary thereof under the Transitional Services Agreement, (ii) disclosed, sold, assigned, leased, published, disseminated or otherwise provided to third parties by the Purchaser, its Affiliates, licensees, vendors or contractors, including without limitation in any anonymized or aggregated formats, (iii) commercially exploited by or on behalf of the Purchaser, its Affiliates, licensees, vendors or contractors, including without limitation in any anonymized or aggregated formats or (iv) used by the Purchaser, its Affiliates, licensees, vendors or contractors against the Seller, IndyMac Federal and its Subsidiaries. The Purchaser on behalf of itself and its Affiliates hereby irrevocably assigns, transfers and conveys to the Seller for itself or on behalf of IndyMac Federal or any Subsidiary thereof without further consideration, any right, title or interest in and to the Unassigned Records or any proprietary rights therein worldwide in perpetuity that it may acquire notwithstanding the foregoing. Upon request by the Seller, the Purchaser shall or shall cause its Affiliates to execute and deliver any financing statements or other documents that may be reasonably necessary or desirable under any laws,

- 35 -

Exhibit 2, Page 102

rule or regulation to preserve or protect, or enable the Seller, IndyMac Federal or any Subsidiary thereof to enforce, its rights hereunder with respect to the Unassigned Records, in each case at the Seller's cost and expense.

(f)     Subject to Sections 8.05 and 8.06, the Purchaser and its Subsidiaries shall have, and the Seller (for itself and on behalf of IndyMac Federal and any Subsidiary thereof (as applicable)) hereby grants, a royalty-free, worldwide, non-exclusive, non-transferable (other than a transfer by operation of law including a merger of the Purchaser or its Subsidiaries, as applicable), perpetual and non-sublicensable right and license to use the Transferred Employee Data for any reasonable purpose to the extent relating to or in connection with (i) the Transferred Employee/Contractor, or (ii) any employee of Purchaser or its Affiliates in connection or relating to such Transferred Employee/Contractor; provided, however, the foregoing right and license are limited to those uses for which the Seller (for itself and on behalf of IndyMac Federal and any Subsidiary thereof (as applicable)) may grant a license and right without violating any applicable Law or legal duty to a Transferred Employee/Contractor. The Purchaser and its Affiliates covenant for each of themselves and on behalf of each of their employees, personnel, contractors, agents and representatives that the Transferred Employee Data will not be used in contravention of the provisions set forth in this Agreement.

(g)     Contractors of the Purchaser and its Subsidiaries may, during their provision of contracted services, use the Transferred Employee Data solely for the purpose stated in Section 8.03(f) in the performance of such services and exclusively for the benefit of the Purchaser and its Subsidiaries, provided that such contractors are bound by confidentiality and data protection and security obligations no less stringent than those set forth in this Agreement.

Section 8.04    Confidentiality.

(a)     On and from the Effective Date, and during the term of this Agreement and each of the other Definitive Agreements and at all times thereafter, the Purchaser and its Affiliates each covenant they will hold, and their agents, representatives, licensees and contractors will hold, in confidence, all Confidential Information disclosed or made available to the Purchaser and its Affiliates by the Seller, IndyMac Federal or any Subsidiary thereof, except pursuant to subpoena, discovery request in pending litigation, other court process, or as otherwise required by Law; provided, however, that in the event the Purchaser receives such a demand, the Purchaser shall, unless expressly prohibited by a court order, promptly notify the Seller in writing of such required disclosure and cooperate with the Seller, at the Seller's cost and expense, in the Seller's efforts to contest or limit the scope of or impose conditions upon such required disclosure including seeking a protective order, or filing motions or otherwise making appearances before a court.

(b)     Except for Privileged Information, the Purchaser and its Subsidiaries may disclose Confidential Information (i) to their personnel, contractors and representatives in exercising their rights under Section 8.03(f) or in connection with the Transaction provided that (x) such disclosure is necessary for the exercise of such rights or the performance of the Purchaser's obligations under this Agreement, (y) such personnel, contractors and

- 36-

Exhibit 2, Page 103

representatives are informed by the Purchaser of the confidential nature of such information, and (z) such personnel, contractors and representatives are bound by confidentiality terms no less stringent than to those contained under this Agreement; and (ii) to any third parties directly in connection with pending litigation relating to a Transferred Employee/Contractor; provided, that prior to any such disclosure pursuant to this clause (ii), the Purchaser shall notify the Seller in writing and shall comply with the Seller's requirements to limit the scope of or impose conditions upon such disclosure including by entry, prior to disclosure, into a protective order governing protection of the Confidential Information.

(c)     With respect to Privileged Information, except with the prior written consent of the Seller, the Purchaser and its Affiliates may only disclose Privileged Information to (i) current employees who have a need to know the contents of the record, and (ii) third parties who are agents retained for the purpose of assisting the Purchaser's in-house or outside counsel in the provision of legal advice to the Purchaser, provided that such current employees or third parties are informed by the Purchaser of the confidential and privileged nature of such information and are bound by confidentiality terms no less stringent than to those contained under this Agreement or as set forth in Section 8.04(a).

(d)     The Purchaser shall be responsible for any failure by its or its Affiliates' personnel, contractors and representatives to comply with the Confidential Information, data protection and security provisions of this Agreement as if the Purchaser or its Affiliates have committed the breach themselves.  The Purchaser and its Affiliates shall take all reasonable measures to ensure that the Confidential Information is not disclosed or used in contravention of this Agreement.  The Purchaser shall use at least the same degree of care to safeguard and to prevent disclosing to third parties the Confidential Information to avoid unauthorized disclosure, publication, dissemination, destruction, loss or alteration of its own information (or information of its customers) of a similar nature, but not less than reasonable care.  If this Agreement or another Definitive Agreement is terminated or expires, the Purchaser and its Affiliates will deliver to the Seller, upon request, all Confidential Information and all copies thereof or destroy such Confidential Information and certify in writing such destruction, except with respect to the Transferred Employee Data, which the Purchaser and its Affiliates may retain in their possession subject to Section 8.03(f) and the confidentiality and data protection and security requirements set forth under this Agreement.

(e)     "**Confidential Information**" means (i) all information marked confidential, restricted or proprietary by the Seller, IndyMac Federal or any Subsidiary thereof, but excluding any information to the extent it is owned by Purchaser pursuant to Section 8.03(c) or is otherwise related to or part of the Assets or the Seller's Intellectual Property (except any information to the extent it is related to or part of Unassigned Records), (ii) any other information that is treated as confidential by the Seller, IndyMac Federal or any Subsidiary thereof and would reasonably be understood to be confidential, whether or not so marked, but excluding any information to the extent it is owned by Purchaser pursuant to Section 8.03(c) or is otherwise related to or part of the Assets or the Seller's Intellectual Property (except any information to the extent it is related to or part of the Unassigned Records), (iii) the Unassigned Records, (iv) data, documents, records and information (including without limitation Personally Identifiable Information) that is identified or designated by any party to be subject to attorney client privilege or work product obligations

- 37 -

Exhibit 2, Page 104

between the Seller, IndyMac Federal or any Subsidiary thereof and their respective counsel, including Privileged Information. Confidential Information will not include information to the extent it can be shown to have been (i) previously known on a non-confidential basis by the Purchaser or its Affiliates, (ii) in the public domain through no fault of the Purchaser or its Affiliates, (iii) later lawfully acquired by the Purchaser or its Affiliates from sources other than the Seller, IndyMac Federal or any Subsidiary thereof, or (iv) independently developed by the Purchaser or its Affiliates, provided the Purchaser or its Affiliates have not come to know of, obtained or accessed such information in breach of its confidentiality obligations under this Agreement.

Section 8.05   No Waiver of Privilege.   The parties acknowledge that the Records and Unassigned Records are found on servers and in other data stores that are being transferred from the Seller to the Purchaser, and that it is impractical and inefficient to separate the Records and Unassigned Records. Both the Seller, IndyMac Federal, and their respective Subsidiaries and the Purchaser have a common interest in defending existing and possible future litigation relating to the Seller, IndyMac Federal and their respective Subsidiaries and acknowledge that the Records and Unassigned Records may contain data, documents, records, and information which Seller, IndyMac Federal, and their respective Subsidiaries or Purchaser and its Affiliates claim are protected from disclosure by the attorney client privilege, the attorney work product doctrine or other applicable privilege or doctrine. Neither party waives any privilege or work product doctrine protection by the delivery or access described in this Article VIII or in Section 10.02. Each party may claim privilege or work product protection in such Records, and Seller, IndyMac Federal, and their respective Subsidiaries may claim privilege or work product protection in such Unassigned Records, and all data, documents, records, and information contained therein, and neither party shall claim that the other party waived privilege or work product protection based on such delivery or access.

Section 8.06   System Security.   The Purchaser and its Affiliates and subcontractors to whom Confidential Information and Unassigned Records are provided shall maintain a comprehensive data security program, which shall include reasonable and appropriate technical, organizational and security measures against the destruction, loss, unavailability, unauthorized access or alteration of Confidential Information and Unassigned Records in the possession or under the control of the Purchaser or such Affiliates, and be no less rigorous than industry accepted security standards for similar types of information. The Purchaser shall promptly notify the Seller in writing of any actual or potential data breach or compromise that may affect any of the Unassigned Records.

Section 8.07   Privacy And Data Protection.

(a)     The Purchaser acknowledges that the Seller, IndyMac Federal and any Subsidiary thereof are and/or will be subject to United States Laws and other Laws throughout the world relating to the collection and   privacy of personally identifiable information including without limitation the Gramm-Leach-Bliley Act, Title V, and applicable regulations thereto (collectively, the "**Privacy Laws**") governing privacy and confidentiality of personal information as defined in the Privacy Laws, and relating to the collection, use, processing, protection, record retention, security or disclosure of data relating to individuals or corporations, including personal data (which may include European Directive 95/46/EC on the

- 38 -

protection of individuals with regard to the processing of personal data and on the free movement of such data, and any legislation implementing such article, and any legislation implementing the same in the relevant state; and may include state breach notification laws) (collectively, the "**Data Protection Laws**"). Each of the Purchaser and its Affiliates covenant that they shall at all times comply with all applicable Privacy Laws and Data Protection Laws in the collection, use, retention and disclosure of the Seller's, IndyMac Federal's and any Subsidiary thereof's customers', employees and other individuals' Personally Identifiable Information provided to or accessible by the Purchaser or its Affiliates pursuant to this Agreement or any other Definitive Agreement; provided, however, that the Purchaser and its Affiliates will not be liable to the Seller, IndyMac Federal or any Subsidiary thereof for any breach of Privacy Laws or Data Protection Laws regarding Personally Identifiable Information to the extent such information is owned by the Purchaser pursuant to Section 8.03(c) or is otherwise related to or part of the Assets or the Seller's Intellectual Property (except any such information to the extent it is related to or part of Unassigned Records and Confidential Information for which this Section will apply).

(b)     The Purchaser shall perform the Services (as defined under the Transitional Services Agreement) and the Purchaser's other obligations pursuant to this Agreement in a manner that complies with all applicable Privacy Laws and Data Protection Laws. Nothing in this Agreement will be deemed to prevent the Seller, IndyMac Federal or any Subsidiary thereof from taking the steps it reasonably deems necessary or appropriate to comply with the Privacy Laws or Data Protection Laws.

## ARTICLE IX

## GROUP 1 TRANSACTION COVENANTS

Section 9.01   Additional Title Documents.  The Seller and the Purchaser each agree, at any time, and from time to time, upon the request of any party hereto, to execute and deliver such additional instruments and documents of conveyance as shall be reasonably necessary to vest in the Purchaser its full legal or equitable title in and to the Group 1 Assets. The Purchaser shall prepare such instruments and documents of conveyance (in form and substance reasonably satisfactory to the Seller) as shall be necessary to vest title to the Group 1 Assets in the Purchaser. The Purchaser shall be responsible for recording such instruments and documents of conveyance at its own expense.

Section 9.02   Thrift Deposits.  From the Effective Date through the Closing Date, the Seller shall use commercially reasonable efforts to maintain customer Thrift Deposits (other than custodial accounts) within an aggregate range of 15% of the aggregate Thrift Deposit balance as of September 30, 2008 (excluding custodial accounts) and shall provide the Purchaser a consultation right with respect to the Seller's efforts to maintain such Thrift Deposits, including a consultation right with respect to the establishment of interest rates for all such Thrift Deposit products.

Section 9.03   Payment of Thrift Deposits.  In the event any depositor does not accept the obligation of the Purchaser to pay any Thrift Deposit liability of IndyMac Federal assumed by the Purchaser pursuant to this Agreement and asserts a claim against the Seller for all or any

- 39-

Exhibit 2, Page 106

portion of any such Thrift Deposit liability, the Purchaser agrees on demand to provide to the Seller funds sufficient to pay such claim in an amount not in excess of the Thrift Deposit liability reflected on the books of the Purchaser at the time such claim is made.  Upon payment by the Purchaser to the Seller of such amount, the Purchaser shall assign back to the Seller any deposit agreements assumed by the Purchaser with respect to such Thrift Deposit, and, thereafter, shall be discharged from any further obligation under this Agreement or otherwise to pay to any such depositor the amount of such Thrift Deposit liability paid to the Seller.

Section 9.04   Withheld Payments.   At any time, the Seller may, in its discretion, determine that all or any portion of any deposit balance assumed by the Purchaser pursuant to this Agreement does not constitute a "Thrift Deposit" (or otherwise, in its discretion, determine that it is in the best interest of the Seller to withhold all or any portion of any deposit), and may direct the Purchaser to withhold payment of all or any portion of any such deposit balance.  Upon such direction, the Purchaser shall hold such deposit and shall not make any payment of such deposit balance to or on behalf of the depositor, or to itself, whether by way of transfer, set-off, or otherwise.  The Purchaser shall maintain the "withheld payment" status of any such deposit balance until directed in writing by the Seller as to its disposition.  At the direction of the Seller, the Purchaser shall return all or any portion of such deposit balance to the Seller, as appropriate, and thereupon the Purchaser shall be discharged from any further liability to such depositor with respect to such returned deposit balance.  If such deposit balance has been paid to the depositor prior to a demand for return by the Seller, and payment of such deposit balance had not been previously withheld pursuant to this Section 9.04, the Purchaser shall not be obligated to return such deposit balance to the Seller.  The Purchaser shall be obligated to reimburse the Seller for the amount of any deposit balance or portion thereof paid by the Purchaser in contravention of any previous direction to withhold payment of such deposit balance or return such deposit balance the payment of which was withheld pursuant to this Section 9.04.

## ARTICLE X

## TRANSACTION COVENANTS

Section 10.01 Pre-Closing Covenants.  Each of the Seller, HoldCo, Intermediate HoldCo and the Purchaser agree as follows with respect to the period between the Effective Date and the Closing or, if earlier, the termination of this Agreement in accordance with its terms:

(a)   Efforts and Actions to Cause Closing to Occur.   Each of the Seller, HoldCo, Intermediate HoldCo and the Purchaser shall use its commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable (subject to compliance with all Laws) to consummate the Transaction as promptly as practicable, including the preparation and filing of all forms, registrations and notices required to be filed to consummate the Transaction.

(b)   Applications; Regulatory and Other Approvals.   Each of the Seller, HoldCo, Intermediate HoldCo and the Purchaser shall provide information reasonably requested by any other party and within the timeframes requested by such other party for the preparation of any applications necessary to consummate the Transaction.  Each of the Seller, HoldCo, Intermediate HoldCo and the Purchaser shall take all commercially reasonable steps necessary or

- 40-

desirable, and proceed diligently and in good faith and use all commercially reasonable efforts, as promptly as practicable to: (i) obtain all consents and approvals of, make all filings with and give all notices to each Governmental Authority or any other Person that are required to be obtained, made or given by the Seller, HoldCo, Intermediate HoldCo or the Purchaser, as the case may be, including all of the consents and approvals listed on Schedule 14.01(g), in order to consummate the Transaction, including but not limited to compliance with all Laws and all contracts (subject, in each case, to any statutory rights of the Seller to assign or transfer any asset or liability without any consent or approval); and (ii) satisfy each other condition to the obligations of the Seller, HoldCo, Intermediate HoldCo or the Purchaser, as the case may be, contained in this Agreement. In furtherance, but not in limitation of the foregoing, HoldCo and Intermediate HoldCo jointly and severally shall use commercially reasonable efforts to (x) organize the Purchaser as a federally chartered, FDIC insured, stock form savings bank or savings association and (y) organize or cause to be organized the Subsidiaries of the Purchaser that are to be party to any of the other Definitive Agreements.

(c)     Access and Information.   The Seller shall afford HoldCo reasonable access to its personnel, properties, contracts, books and records to the extent that the Seller itself has the right to grant such access (provided that, under all circumstances, each party will coordinate all visits and communications with management of the other party upon reasonable notice); provided, however, that the foregoing shall not (1) require the Seller to permit any inspection, or to disclose any information, that in its reasonable judgment would violate any obligations of the Seller to any third party with respect to confidentiality or (2) require any disclosure by the Seller that could, as a result of such disclosure, have the effect of causing the waiver of any attorney-client privilege (it being understood that the Seller shall use commercially reasonable efforts to obtain a consent for such disclosure or otherwise to avoid the impediments described in the foregoing clauses (1) and (2)). In addition to the confidentiality arrangements contained herein, all information provided or obtained in connection with the Transaction shall be held by HoldCo in accordance with and subject to the terms of the Confidentiality Agreement, as modified or amended by this Agreement. In the event of a conflict or inconsistency between the terms of this Agreement and the Confidentiality Agreement, the terms of this Agreement shall govern.

(d)     Minimum Equity Capital; Dividends.   HoldCo will continuously maintain the Minimum Equity Capital and will not declare, set aside or pay any dividend or other distribution to its members which would cause HoldCo to fail to continuously maintain the Minimum Equity Capital.

(e)     Contracts.   Notwithstanding anything to the contrary contained in this Agreement or the other Definitive Agreements, the Seller will (i) give HoldCo the opportunity to review the Contracts listed on Schedule 10.01(e) and (ii) give HoldCo the option to assign back to the Seller any Contracts listed on Schedule 10.01(e) by providing written notice to the Seller, no later than thirty (30) calendar days after the Closing Date, of the Contracts it is so assigning. The Seller shall pay, perform and discharge all of the duties, obligations and liabilities relating to the Reassigned Contracts effective as of the close of business on the last Business Day of the month in which the Seller receives the notice referred to in the prior sentence.

- 41 -

(f)     FHLB Financing.  The Seller shall use commercially reasonable efforts to cooperate with HoldCo with respect to obtaining any financing for the benefit of the Purchaser requested from the FHLB.

(g)     Delivery of Fair Market Value Appraisals.  On the Closing Date, or as soon as reasonably practicable thereafter, HoldCo and Intermediate HoldCo shall deliver to the Seller the appraisal(s), prepared by Industrial Appraisal Company, of all of the assets being purchased at Fair Market Value by the Purchaser pursuant to this Agreement and the other Definitive Agreements.

Section 10.02  Post-Closing Covenants Relating to Records and Accounting Records.

(a)     Retention of Records; Access.  Each of HoldCo, Intermediate HoldCo and the Purchaser agrees that, after the Closing Date, HoldCo, Intermediate HoldCo and the Purchaser shall retain, and maintain for the joint benefit of the Seller and the Purchaser, all Records of which they have custody for at least ten (10) years from the Closing Date and comply with all Laws in connection with the retention, storage and maintenance of all Records, including the length of time such Records are to be retained.  In addition, each of HoldCo, Intermediate HoldCo and the Purchaser shall permit the Seller and its representatives access, upon reasonable notice, to all Records of which HoldCo, Intermediate HoldCo or the Purchaser has custody, and to use, inspect, make extracts from or request copies of any such Records in the manner and to the extent requested, and to duplicate, in the discretion of the Seller, any Record; provided that, in the event that the Seller maintained one or more duplicate copies of any Records, the Purchaser hereby assigns, transfers, and conveys to the Seller one such duplicate copy of each such Record without cost to the Seller, and shall deliver to the Seller all Records assigned and transferred to the Seller under this Article X as soon as reasonably practicable on or after the Closing Date.  Each of HoldCo, Intermediate HoldCo and the Purchaser shall give reasonable notice to the Seller of HoldCo's, Intermediate HoldCo's or the Purchaser's intention to (i) destroy or dispose of any Records, or (ii) disable, discontinue, cancel or permit the lapse of any licenses or permits with respect to any software application or other medium used to obtain access to any Records either directly, or if necessary, after translation into a reasonably usable form (including but not limited to the e-MITS application).  After receipt by Seller of such notice, each of HoldCo, Intermediate HoldCo and the Purchaser will allow the Seller, at its own expense, a reasonable amount of time to plan for the recovery and recover such Records from HoldCo, Intermediate HoldCo or the Purchaser, as the case may be.  The Purchaser shall have the responsibility to respond to subpoenas, discovery requests, and other similar official inquiries with respect to the Records of which it has custody; and shall provide written notice to the Seller of any such subpoenas, requests and inquiries within five (5) Business Days after its receipt of the same.

(b)     Proceedings with Respect to Certain Assets and Liabilities.   In connection with any investigation or proceeding with respect to any asset or liability retained by the Seller, or any Asset or liability acquired or assumed by the Purchaser or any of its Subsidiaries pursuant to this Agreement or any of the other Definitive Agreements (i) each of HoldCo, Intermediate HoldCo and the Purchaser shall cooperate to the extent reasonably required by the Seller and the Seller shall cooperate to the extent reasonably required by HoldCo, Intermediate HoldCo or the Purchaser (ii) each of HoldCo, Intermediate HoldCo and the

- 42-

Purchaser shall provide representatives of the Seller access at reasonable times and locations without other limitation or qualifications to (x) its directors, officers, employees and agents and those of the Subsidiaries acquired by the Purchaser pursuant to the Definitive Agreements and (y) its books and records, the books and records of such Subsidiaries, and copies thereof. Copies of any books and records shall be provided by HoldCo, Intermediate HoldCo and the Purchaser as reasonably requested by the Seller and the costs of duplication thereof shall be borne by the Seller.

(c)     Other Information.   Each of HoldCo, Intermediate HoldCo and the Purchaser promptly shall provide to the Seller such other information, including financial statements and computations, relating to the performance of the provisions of this Agreement as the Seller may reasonably request from time to time.

Section 10.03 FHLB Excess Stock.

(a)     Seller Payment.   To the extent that (i) within three (3) years following the Closing Date, the Purchaser repays all or a portion of the FHLB Advances assumed pursuant to Section 4.01 and delivers a written notice to the FHLB in accordance with 12 U.S.C. § 1421 et seq., the rules and regulations of the FHLB promulgated thereunder and the Capital Plan of the FHLB requesting the redemption or repurchase of Excess Stock and (ii) the FHLB does not, within ninety (90) calendar days of such written notice, redeem or repurchase such Excess Stock, then, subject to the provisions of this Section 10.03, the Seller shall pay to the Purchaser an amount equal to the aggregate par value of the Excess Stock, if any, measured on the first, second and third anniversaries of the Closing Date (the "**Excess Stock Payment**").

(b)     Procedures.   Within thirty (30) calendar days of the anniversary of the Closing Date immediately following the FHLB's failure or refusal to redeem or repurchase Excess Stock as provided in Section 10.03(a), the Purchaser shall deliver to the Seller written notice and supporting documentation (including documentation evidencing repayment of such FHLB Advances, written notice to the FHLB to redeem or repurchase such Excess Stock and documentation evidencing the failure or refusal by the FHLB to redeem or repurchase such Excess Stock) of the Purchaser's demand for payment for such Excess Stock by the Seller under this Section 10.03. The Seller shall make any Excess Stock Payment to the Purchaser within ten (10) Business Days of the receipt of such notice and supporting documentation.

(c)     Annual Reconciliation.   In the event the Seller makes an Excess Stock Payment to the Purchaser, in connection with the next annual measurement of Excess Stock the Purchaser or the Seller, as applicable, shall make the following payments:

(i)     If the Excess Stock at the time of the prior Excess Stock Payment exceeds the Excess Stock measured as of the subsequent annual measurement, the Purchaser shall pay to the Seller the difference in par value of the Excess Stock as of the two annual measurements.

(ii)     If the Excess Stock at the time of the prior Excess Stock Payment is less than the Excess Stock measurement of the subsequent annual measurement, the

- 43-

Exhibit 2, Page 110

Seller shall pay to the Purchaser the difference in par value of the Excess Stock as of the two annual measurements.

In any event, the last measurement of Excess Stock for purposes of any Excess Stock Payment or any annual reconciliation under this paragraph (c) shall be the third anniversary of the Closing Date.  For the avoidance of doubt, any Excess Stock existing on the third anniversary of the Closing Date (regardless of the events creating Excess Stock) shall be eligible for the Excess Stock Payment provisions of Section 10.03(a).

(d)     Reconciliation for Sales of Excess Stock.  With respect to any Excess Stock for which the Seller has made a payment to the Purchaser under this Section 10.03 and for which the Purchaser has not reimbursed the Seller pursuant to Section 10.03(c)(i), if at any time following such payment by the Seller (including after the third anniversary of the Closing Date) and preceding any reimbursement pursuant to Section 10.03(c)(i) with respect to such Excess Stock: (i) the Purchaser shall sell such Excess Stock to any third party; (ii) such Excess Stock is redeemed by the FHLB; or (iii) the Purchaser shall receive dividends from the FHLB with respect to such Excess Stock, then, in each such case, the Purchaser shall promptly pay to the Seller the full amount of the proceeds or income (including dividends) therefrom, as the case may be; provided that, in the case of a sale or redemption pursuant to clause (i) or clause (ii) above, the Purchaser shall have no further obligation to reimburse the Seller with respect to such Excess Stock pursuant to Section 10.03(c)(i).  For the avoidance of doubt, any Excess Stock sold or redeemed and for which the Seller has received payment pursuant to clause (i) or clause (ii) above shall be excluded from all calculations under Section 10.03(c) thereafter (including the calculation of Excess Stock outstanding at the time of a prior Excess Stock Payment).

(e)     Post-Closing Purchases of FHLB Stock.  If at anytime after the Closing Date the Purchaser is required by the FHLB to purchase additional shares of FHLB Stock, the Purchaser shall, to the extent permitted to do so by the FHLB, first offer to purchase such additional shares from the Seller, at par value, before the Purchaser shall otherwise purchase such additional shares of FHLB Stock from any other source.

Section 10.04 Reformation and Amendment of Definitive Agreements in Certain Circumstances.  Notwithstanding anything to the contrary in this Agreement, if the conditions set forth in Section 14.01(n) and Section 14.02(n) have not been satisfied, or have become incapable of satisfaction, or if the transactions contemplated by the Consent and Collateral Assignment shall not have been consummated, prior to the close of business on March 23, 2009, the parties shall use commercially reasonable efforts to amend this Agreement and the other Definitive Agreements, as applicable, to (i) eliminate the transfer and assignment by the Seller to the Purchaser of, and to incorporate into the definition of Excluded Liabilities, any liabilities to the FHLB, including the FHLB Advances and the liabilities under the related FHLB contracts listed on Schedule 4.01(c)(ii), and replace the assumption of such liabilities with Seller Financing under the Mortgage Loan Master Repurchase Agreement, (ii) eliminate the transfer of the FHLB Stock to the Purchaser, (iii) include additional financing in the Seller Financing sufficient to enable the Purchaser to complete the purchase of the Assets included in Group 3 and eliminate any condition from the Seller Financing, as so supplemented, that requires financing from the FHLB or evidence to the effect that the Purchaser and its Affiliates are unable to finance the

- 44-

Exhibit 2, Page 111

acquisitions contemplated by the Definitive Agreements with financing from the FHLB, and (iv) to otherwise amend this Agreement and the other Definitive Agreements as appropriate consistent with the foregoing, including, without limitation, to (A) delete Section 5.09 and Section 10.03 and (B) delete the conditions set forth in Section 14.01(n) and Section 14.02(n) (such agreements, as so amended, the "Reformed Agreements").

## ARTICLE XI

## EMPLOYMENT MATTERS

Section 11.01 Employees. HoldCo has separately provided written notice to the Seller and the FDIC of its decision with respect to the employees of the Seller, the Failed Thrift, IndyMac Federal or their respective Affiliates that are performing services relating to the business of the Failed Thrift, IndyMac Federal or their respective Affiliates (in either case, the "**Seller Employees**") to whom HoldCo or an Affiliate of HoldCo will, subject to this Section 11.01, make offers of employment (such Seller Employees, the "**Offeree Employees**"). HoldCo, Intermediate HoldCo or an Affiliate of HoldCo or Intermediate HoldCo shall make offers of employment to such Offeree Employees, subject to the terms hereof. Such offers shall in all cases be offers for at-will employment unless HoldCo, Intermediate HoldCo or an Affiliate of HoldCo or Intermediate HoldCo, in its sole discretion, elects to offer some other form of employment relationship. The Seller acknowledges that the continued employment of any Transferred Employee (as such term is defined below) following the Closing Date is subject to the sole discretion of HoldCo, Intermediate HoldCo and their Affiliates. Each Offeree Employee who accepts an offer of employment from HoldCo, Intermediate HoldCo or one of their Affiliates, whether such acceptance occurs in writing or by the Offeree Employee continuing to work from and after the Closing Date (provided that any offer of employment to such Offeree Employee has not been declined, withdrawn or otherwise cancelled in accordance with this Section 11.01) is a "**Transferred Employee**" for purposes of this Agreement. The Offeree Employees shall consent to, and HoldCo or Intermediate HoldCo intends to perform, such background and credit checks as HoldCo or Intermediate HoldCo shall deem reasonable and appropriate. In the event that, prior to the Closing, (i) any Offeree Employee does not consent to such background or credit check; (ii) HoldCo, Intermediate HoldCo or one of their Affiliates is permitted or required under applicable law to withdraw, and elects to withdraw, the offer of employment based upon the results of either or both of such background or credit checks; or (iii) cause exists to terminate the Offeree Employee, then, in the case of (i), (ii) or (iii), the Offeree Employee shall not become a Transferred Employee and none of HoldCo, Intermediate HoldCo, the Purchaser and their Affiliates shall have any liability or obligation with respect to such Offeree Employee. Transferred Employees shall, subject to the terms of this Article XI, become employees of HoldCo, Intermediate HoldCo or an Affiliate of HoldCo or Intermediate HoldCo effective as of 12:00 a.m. on the day following the last day of the Transition Period.

Section 11.02 Welfare and Retirement Benefits for Transferred Employees. With regard to the Transferred Employees, each of HoldCo, Intermediate HoldCo and the Purchaser agrees as follows:

(a)     HoldCo, Intermediate HoldCo or the Purchaser shall provide, or shall cause an Affiliate to provide, and until the first anniversary of the Closing Date, shall maintain,

Exhibit 2, Page 112

or shall cause an Affiliate to maintain, health, retirement and other welfare benefits for the Transferred Employees that are, in the aggregate, substantially comparable to the health, retirement and other welfare benefits (excluding any equity or equity-based compensation or retention bonuses) provided by the Seller to such Transferred Employees immediately prior to Closing, considered in the aggregate (the "**Purchaser Employee Plans**"); provided, however, that nothing in this subsection (a) shall (i) prevent the amendment or termination of any Purchaser Employee Plan, (ii) interfere with the right or obligation of HoldCo, Intermediate HoldCo or the Purchaser to make such changes as are necessary to conform or comply with Law or (iii) limit the right of HoldCo, Intermediate HoldCo or the Purchaser to terminate the employment of any Transferred Employee at any time.

(b)    HoldCo, Intermediate HoldCo and the Purchaser shall recognize, and shall cause their respective Affiliates to recognize, for the purposes of determining eligibility for participation in the Purchaser Employee Plans and for any applicable vesting periods pursuant to such plans only (and not for benefit accrual purposes), the service of any Transferred Employee with the Seller, the Failed Thrift, IndyMac Federal, their Affiliates and their respective predecessors, to the extent such service was recognized for purposes of the Seller Employee Plans.

(c)    HoldCo, Intermediate HoldCo and the Purchaser shall cause, or shall cause an Affiliate to cause, (i) any Purchaser Employee Plan that is a self-insured plan and (ii) to the extent practicable without a material increase in premium cost, any other Purchaser Employee Plan, to waive any coverage limitation thereunder due to any pre-existing condition for purposes of the Purchaser Employee Plans to the extent that such condition was covered and would have been waived by the Seller Employee Plans, and such condition would otherwise be covered by the Purchaser Employee Plans in the absence of such pre-existing condition coverage limitation. All Transferred Employees who become participants in the Purchaser Employee Plans shall receive credit for any co-payment and deductibles paid (or accrued) under the Seller Employee Plans for purposes of satisfying any applicable deductible or out-of-pocket requirements under the Purchaser Employee Plans, upon substantiation, in a form satisfactory to HoldCo, the Purchaser or their respective Affiliates that such co-payment and/or deductible has been paid.

(d)    HoldCo, Intermediate HoldCo or the Purchaser shall, or shall cause an Affiliate to, cooperate with the Seller to arrange for a transfer of the Transferred Employees' flexible spending account balances, if any, and HoldCo, Intermediate HoldCo or the Purchaser shall, or shall cause an Affiliate to, take all commercially reasonable actions necessary to assist in facilitating a plan-to-plan transfer of account balances. For this purpose, "account balance" shall mean (a) the amount of each Transferred Employee's reimbursement entitlement for the coverage period that includes the Closing Date, to the extent not drawn as of the Closing Date; (b) the obligation, if any, of the Transferred Employee to pay all or part of the cost of such reimbursement right through salary reduction contributions after the Closing Date and (c) the terms, conditions and limitations applicable to the Transferred Employee's participation in such flexible spending account as in effect immediately prior to the Closing Date.

(e)    If HoldCo, Intermediate HoldCo or the Purchaser maintains, or causes an Affiliate to maintain, a defined contribution plan intended to be qualified under Section 401

- 46-

of the Internal Revenue Code of 1986, as amended, HoldCo, Intermediate HoldCo or the Purchaser (as applicable) will, or will cause an Affiliate to, upon mutually agreeable terms with the Seller, assist in facilitating a trustee-to-trustee transfer of the Transferred Employees' defined contribution plan account balances to HoldCo or the Purchaser's defined contribution plan.

(f)      The Seller shall assume and be responsible for satisfying all obligations under Part 6, Subtitle B, Title I of ERISA (COBRA), if any: (i) with respect to Seller Employees other than the Transferred Employees and their qualified beneficiaries with respect to any benefit plan coverage and (ii) with respect to Transferred Employees and their qualified beneficiaries, but only with respect to qualifying events that occur on or prior to the last day of the Transition Period for that Transferred Employee.

Section 11.03 <u>WARN Act</u>.  From and after the Closing Date, HoldCo, Intermediate HoldCo and the Purchaser shall indemnify and hold harmless the Seller against any liability arising under the Workers Adjustment and Retraining Notification Act and any state or local equivalent (collectively, the "**WARN Act**") in connection with (i) the termination of employment of any Transferred Employee by HoldCo, Intermediate HoldCo or the Purchaser at any time after the Closing Date, or (ii) the issuance of any notices required by the WARN Act with respect to the termination of any Transferred Employee at any time after the Closing Date, and HoldCo, Intermediate HoldCo, the Purchaser and their respective Affiliates shall have no liability or obligation arising under the WARN Act with respect to any Seller Employees other than the Transferred Employees.  On or before the Closing Date, the Seller shall provide HoldCo and the Purchaser with a schedule of all layoffs and any other "employment losses" (as such term is defined in the WARN Act) in the United States, by site of employment, implemented by the Seller, IndyMac Federal, the Failed Thrift or any of their respective Affiliates during the ninety (90)-day period preceding the Closing Date.

Section 11.04 <u>Transition Employees</u>.  In the case of each Transition Employee (as defined below), during the period beginning at the close of business on the Closing Date and ending at the close of business on the last day of the Transition Employee's employment with the Seller or its Affiliates (or, if earlier, midnight Pacific time on March 31, 2009) (for such Transition Employee, the "**Transition Period**"), the Seller shall make available, or cause IndyMac Resources, Inc. to make available, to the Purchaser the services of all the Seller Employees who are expected to become Transferred Employees as a result of satisfying the conditions in <u>Section 11.01</u> hereof (the "**Transition Employees**").  During the applicable Transition Period, the Transition Employees shall perform exclusively such services as the Purchaser may request.  All such services shall be performed for the benefit of the Purchaser and under the supervision, direction and control of the Purchaser or its designees.  During the applicable Transition Period, a Transition Employee shall, and shall have been informed by the Seller that the Transition Employee shall, be subject only to the supervision, direction, control and instructions of the Purchaser.  The Purchaser shall reimburse the Seller for each and every direct cost reasonably incurred by the Seller with respect to the Transition Employees and attributable to the applicable Transition Period, including but not limited to (in each case, to the extent applicable) salaries, wages, overtime pay, on-call pay, payroll taxes, employee benefits, other compensation, unemployment insurance costs and any other expense, in each case which the Seller would not have incurred but for the fact that the Transition Employees remain

- 47-

Exhibit 2, Page 114

# ARTICLE XIII

## CLOSING DELIVERIES FOR GROUP 1 TRANSACTION

Section 13.01 Seller's Deliverables.  In addition to any other documents to be delivered under other provisions of this Agreement, the Seller shall deliver and release, subject to and in accordance with this Section 13.01, to the Purchaser the following on or prior to the Closing:

        (a)      an original Bill of Sale executed by the Seller;

        (b)      four originals of the Assignment and Assumption Agreement executed by the Seller;

        (c)      four originals of the joinder to this Agreement executed by the FDIC as receiver for IndyMac Federal;

        (d)      four originals of each Intellectual Property Assignment executed by the Seller;

        (e)      four originals of the Intellectual Property, Data and Information Technology Assets License executed by the Seller and the FDIC in its corporate capacity;

        (f)      four originals of the Consent and Collateral Assignment for the FHLB Advances executed by the Seller;

        (g)      four originals of the Assignment and Assumption of Leases executed by the Seller;

        (h)      with respect to each of the owned Bank Premises listed on Schedule 5.01(b)(i) and each of the owned Servicing Business Premises listed on Schedule 5.01(b)(ii), an original grant deed in recordable form in the relevant jurisdiction, executed by the Seller; and

        (i)      such other deeds, bills of sale, certificates of title and other instruments of assignment, transfer and conveyance as are set forth on Schedule 13.01(i), in form and substance to be agreed upon by the Purchaser and the Seller prior to Closing.

Section 13.02 Purchaser's Deliverables.  In addition to any other documents to be delivered under other provisions of this Agreement, the Purchaser shall deliver and release, subject to and in accordance with this Section 13.02, to the Seller the following on or prior to the Closing:

        (a)      the Group 1 Closing Payment in accordance with this Agreement;

        (b)      four originals of the Assignment and Assumption Agreement executed by the Purchaser;

Exhibit 2, Page 116

> (c)     four originals of the joinder to this Agreement executed by the Purchaser;

> (d)     four originals of each Intellectual Property Assignment executed by the Purchaser;

> (e)     four originals of the Intellectual Property, Data and Information Technology Assets License executed by the Purchaser;

> (f)     four originals of the Consent and Collateral Assignment for the FHLB Advances executed by the Purchaser; and

> (g)     four originals of the Assignment and Assumption of Leases executed by the Purchaser.

## ARTICLE XIV

## CONDITIONS PRECEDENT TO TRANSACTION

Notwithstanding anything to the contrary in this Article XIV, any failure of any of the conditions set forth in Article IX of the Reverse Mortgage Business Asset Purchase Agreement shall not affect the obligation of either party to consummate the Transaction; provided, however that in such case the Assets included in Group 3 shall not be acquired by the Purchaser and the Aggregate Closing Payment, the Aggregate Final Payment and the Aggregate Final Purchase Price shall be calculated excluding the Group 3 Closing Payment, the Group 3 Final Payment and the Group 3 Final Purchase Price, respectively.

Section 14.01 Conditions to Each of HoldCo's, Intermediate HoldCo's and the Purchaser's Obligation.   The obligation of each of HoldCo, Intermediate HoldCo and the Purchaser to effect the Closing hereunder is subject to the satisfaction (or waiver by HoldCo, Intermediate HoldCo and/or the Purchaser, as applicable) of all of the following conditions on or prior to the Closing:

> (a)     The representations and warranties of the Seller set forth in this Agreement shall be true and accurate in all material respects when made and at and as of the Closing Date;

> (b)     The Seller shall have delivered to HoldCo, Intermediate HoldCo and the Purchaser duly executed copies of (i) each of the Definitive Agreements and other agreements related to the Transaction to which it is named as a party and (ii) the instruments of assignment, transfer and conveyance specifically identified in Article XIII hereof and in each of the other Definitive Agreements;

> (c)     The Seller shall have delivered to HoldCo, Intermediate HoldCo and the Purchaser such certifications and other documents as are expressly set forth on Exhibit FF and all other deliverables (other than those listed in this Article XIV) required to be delivered by it on or prior to the Closing pursuant to this Agreement and the other Definitive Agreements;

Exhibit 2, Page 117

(d)    All approvals of trustees, bond insurers or rating agencies that are necessary to permit the Seller to transfer any mortgage servicing assets shall have been obtained other than those the failure of which to obtain would not have a material adverse effect on the benefits of the Transaction to HoldCo, Intermediate HoldCo or the Purchaser;

(e)    Subject to Section 14.01(d) above, the Seller shall have requested the consent of all other third parties whose consents are required in order to consummate the Transaction other than those the failure of which to obtain would not have a material adverse effect on the benefits of the Transaction to HoldCo, Intermediate HoldCo or the Purchaser;

(f)    No temporary restraining order, preliminary injunction or other order issued by any court of competent jurisdiction or other legal restraint or prohibition preventing the consummation of the Transaction shall be in effect as of the Closing Date;

(g)    All approvals or licenses required by Law or any Governmental Authority that are necessary to permit the Seller, the Purchaser, Intermediate HoldCo or HoldCo to perform their respective obligations hereunder and to consummate the Transaction, all of which are listed on Schedule 14.01(g), shall have been obtained, and all applicable waiting periods (and any extensions thereof) imposed by Law shall have expired or otherwise been terminated, including the receipt by each of J.C. Flowers & Co. LLC and Paulson & Co. Inc. of (i) a determination from the OTS substantially to the effect that it and its Affiliates do not control the Purchaser and therefore it is not required to register as a savings and loan holding company and (ii) a determination from the FDIC substantially to the effect that it and its Affiliates will not be deemed to control the Purchaser within the meaning of Section 3(w)(5) of the FDIA and for purposes of cross-guarantee liability under the FDIA, and will not be deemed to be "controlling stockholders" of the Purchaser for purposes of Section 3(u)(1) of the FDIA;

(h)    The Seller shall have performed and complied in all material respects with all other covenants and agreements required by this Agreement to be performed or complied with by it on or prior to the Closing;

(i)    HoldCo (or the applicable Affiliate of HoldCo) shall have received the requested Seller Financing on the terms and conditions set forth in the Seller Financing Agreements;

(j)    The FDIC, as receiver for IndyMac Federal, shall have entered into this Agreement by executing and delivering the joinder to this Agreement that follows the signature pages hereto;

(k)    All conditions to the obligations of each of HoldCo, Intermediate HoldCo and the Purchaser to consummate the transactions set forth in each of the Servicing Business Asset Purchase Agreement, the Reverse Mortgage Business Asset Purchase Agreement (subject to the introductory paragraph of this Article XIV), the Securities Sale Agreement, the Loan Sale Agreement and the Participation Structure Documents, if any, which conditions and obligations are not otherwise set forth herein, shall have been satisfied (or waived by HoldCo, Intermediate HoldCo or the Purchaser, as applicable);

Exhibit 2, Page 118

(l)      The Seller shall have entered into the Transitional Services Agreement containing such terms as mutually agreed by the Seller and the Purchaser;

(m)      The Seller shall have entered into the Reverse Mortgage Shared-Loss Agreement containing such terms as mutually agreed by the Seller and the Purchaser; and

(n)      Subject to the provisions of Section 10.04 of this Agreement, the FHLB and the Seller shall have entered into the Consent and Collateral Assignment attached hereto as Exhibit C-2.

In furtherance, but not in limitation, of the foregoing, and except as set forth in the introductory paragraph of this Article XIV and in Article IX of the Reverse Mortgage Business Asset Purchase Agreement, each of HoldCo, Intermediate HoldCo and the Purchaser further acknowledges and agrees that it shall not otherwise be a condition to its obligations to consummate the Transaction (or any part thereof) that there shall not have been any material adverse change in the Assets between the date of this Agreement and the Closing.

Section 14.02 Conditions to the Seller's Obligation.  The obligation of the Seller to effect the Closing hereunder is subject to the satisfaction (or waiver by the Seller) of all of the following conditions on or prior to the Closing:

(a)      The representations and warranties of each of the Purchaser, Intermediate HoldCo and HoldCo set forth in this Agreement shall be true and accurate in all material respects when made and at and as of the Closing Date;

(b)      Each of the Purchaser, Intermediate HoldCo and HoldCo shall have delivered, and/or shall have caused its Affiliate to deliver, as applicable, to the Seller (i) duly executed copies of each of the Definitive Agreements and other agreements related to the Transaction to which it is named as a party and (ii) the instruments of assignment, transfer and conveyance specifically identified in Article XIII hereof and in each of the other Definitive Agreements;

(c)      The Purchaser shall have delivered to the Seller such certifications, opinions and other documents expressly set forth in Exhibit GG and all other deliverables (other than those listed in this Article XIV) required to be delivered by it on or prior to the Closing pursuant to this Agreement and the other Definitive Agreements;

(d)      HoldCo and Intermediate HoldCo shall have delivered to the Seller such certifications, opinions and other documents expressly set forth in Exhibit HH and Exhibit II, respectively; and each of HoldCo and Intermediate HoldCo shall have delivered all other deliverables (other than those listed in this Article XIV) required to be delivered by it on or prior to Closing pursuant to this Agreement;

(e)      All approvals of trustees, bond insurers or rating agencies that are necessary to permit the Seller to transfer any mortgage servicing assets shall have been obtained other than those the failure of which to obtain would not have a material adverse effect on the benefits of the Transaction to the Seller;

Exhibit 2, Page 119

(f)     Subject to <u>Section 14.02(e)</u>, each of the Purchaser, Intermediate HoldCo and HoldCo shall have requested the consent of all other third parties whose consents are required to consummate the Transaction other than those the failure of which to obtain would not have a material adverse effect on the benefits of the Transaction to the Seller;

(g)     No temporary restraining order, preliminary injunction or other order issued by any court of competent jurisdiction or other legal restraint or prohibition preventing the consummation of the Transaction shall be in effect as of the Closing Date;

(h)     All approvals or licenses required by Law or any Governmental Authority that are necessary to permit the Seller, the Purchaser, Intermediate HoldCo or HoldCo to perform their respective obligations hereunder and to consummate the Transaction, all of which are listed on <u>Schedule 14.01(g)</u>, shall have been obtained, and all applicable waiting periods (and any extensions thereof) imposed by Law shall have expired or otherwise been terminated, including the receipt by each of J.C. Flowers & Co. LLC and Paulson & Co. Inc. of (i) a determination from the OTS substantially to the effect that it and its Affiliates do not control the Purchaser and therefore it is not required to register as a savings and loan holding company and (ii) a determination from the FDIC substantially to the effect that it and its Affiliates will not be deemed to control the Purchaser within the meaning of Section 3(w)(5) of the FDIA and for purposes of cross-guarantee liability under the FDIA, and will not be deemed to be "controlling stockholders" of the Purchaser for purposes of Section 3(u)(1) of the FDIA;

(i)     Each of the Purchaser, Intermediate HoldCo and HoldCo shall have performed and complied in all material respects with all other covenants and agreements required by this Agreement to be performed or complied with by it on or prior to the Closing;

(j)     The Purchaser shall have entered into this Agreement by executing and delivering the joinder to this Agreement that follows the signature page hereto;

(k)     All conditions to the obligations of the Seller to consummate the transactions set forth in each of the Servicing Business Asset Purchase Agreement, the Reverse Mortgage Business Asset Purchase Agreement, the Securities Sale Agreement, the Loan Sale Agreement and the Participation Structure Documents, which conditions and obligations are not otherwise set forth herein, shall have been satisfied (or waived by the Seller);

(l)     The Purchaser shall have entered into the Transitional Services Agreement containing such terms as mutually agreed by the Seller and the Purchaser;

(m)     The Purchaser and Financial Freedom Acquisition LLC shall have entered into the Reverse Mortgage Shared-Loss Agreement containing such terms as mutually agreed by the Seller and the Purchaser; and

(n)     Subject to the provisions of <u>Section 10.04</u> of this Agreement, the FHLB and the Purchaser shall have entered into the Consent and Collateral Assignment attached hereto as <u>Exhibit C-2</u>.

- 53 -

Exhibit 2, Page 120

## ARTICLE XV

## REPRESENTATIONS AND WARRANTIES

Section 15.01 <u>Seller's Representations and Warranties</u>. The Seller hereby represents and warrants to HoldCo and Intermediate HoldCo, and, on the Closing Date, to the Purchaser that the statements contained in this <u>Section 15.01</u> are correct and complete as of the date of this Agreement and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this <u>Section 15.01</u>).

(a)     <u>Authority of the Seller</u>. The Seller has all requisite corporate power and authority to execute and deliver this Agreement, the other Definitive Agreements and all other related agreements and to perform its obligations hereunder and thereunder.  The execution, delivery and performance of this Agreement and the other Definitive Agreements (including all instruments of transfer to be delivered pursuant to this Agreement, the other Definitive Agreements and all other related agreements) and the consummation of the transactions contemplated hereby and thereby by the Seller have been duly and validly authorized and, assuming the due authorization, execution and delivery by the other parties hereto and thereto (as applicable), this Agreement and the other Definitive Agreements evidence valid and binding obligations of the Seller, enforceable against the Seller in accordance with their respective terms, except as enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting or relating to the enforcement of creditors' rights generally and (ii) general principles of equity.

(b)     <u>No Conflicts</u>.  None of the execution and delivery of this Agreement or any of the other Definitive Agreements by the Seller, the consummation of the Transaction, or the fulfillment of or compliance with the terms and conditions of this Agreement or any of the other Definitive Agreements by the Seller, will conflict with or result in a breach of any of the terms, conditions or provisions of the Seller's charter or by-laws or other constituent documents.

(c)     <u>No Litigation Pending</u>.  Except as set forth on <u>Schedule 15.01(c)</u>, there is no action, suit, proceeding or investigation pending against the Seller which, either individually or in the aggregate, if adversely decided against the Seller would reasonably be expected to materially and adversely affect the Seller's ability to perform its obligations under this Agreement or any of the other Definitive Agreements.

(d)     <u>No Consent Required</u>.  No consent, approval, authorization or order of any court, governmental agency or body, or non-governmental entity is required for the execution, delivery and performance of this Agreement or any of the other Definitive Agreements, or the consummation of the Transaction by the Seller, except for those consents, approvals, authorizations and orders that (x) have been or will be obtained prior to the Closing Date, or (y) have not been and will not be obtained due to the Seller's exercise of its statutory authority to transfer assets without obtaining any approval, assignment or consent with respect to such transfer.

Exhibit 2, Page 121

(e)    No Broker's Fees.  Except for Barclays Capital Inc. (including any predecessor company or company acquired by Barclays Capital Inc.) and Deutsche Bank Securities, Inc., and the fees and expenses payable to each of them (which fees and expenses will not be the responsibility of HoldCo, Intermediate HoldCo or the Purchaser), the Seller has not employed any broker, investment banker or registered financial adviser in a manner that would reasonably be expected to result in any liability on the part of HoldCo, Intermediate HoldCo or the Purchaser for any broker's fees, commissions or similar fees in connection with the consummation of the Transaction.

Section 15.02 Representations and Warranties Regarding the Purchaser.   HoldCo, Intermediate HoldCo and the Purchaser jointly and severally represent and warrant to the Seller that the statements contained in this Section 15.02 are correct and complete as of the Closing Date.

(a)    Due Organization.  The Purchaser is a federally chartered, stock form savings bank or savings association, duly organized, validly existing and in good standing under the laws of the United States of America.

(b)    Authority and Capacity; Performance.  The Purchaser has the requisite power, authority and capacity to execute and deliver this Agreement and the other Definitive Agreements, and the other documents, instruments and agreements required to be executed by the Purchaser in connection with this Agreement and the other Definitive Agreements, to perform its obligations hereunder and thereunder and to consummate the Transaction.  The execution, delivery and performance of the Definitive Agreements by the Purchaser does not and the consummation of the Transaction will not (i) violate any material provision of law, rule or regulation or any judgment, order, writ, injunction or decree of any court or Governmental Authority applicable to the Purchaser, (ii) conflict with any of the terms of (x) the Purchaser's organizational documents or (y) any other governing instrument relating to the conduct of the Purchaser's business or the ownership of its properties, or (iii) result in or give rise to any right of termination, cancellation or acceleration under any other agreement to which the Purchaser is a party or by which it is bound.

(c)    Authorization and Binding Agreement.  The execution and delivery of this Agreement and the other Definitive Agreements, and all documents, instruments and other agreements required to be executed in connection with this Agreement and the other Definitive Agreements, and the consummation of the Transaction, each have been duly authorized by all necessary action on behalf of the Purchaser, and assuming the due authorization, execution and delivery by the other parties hereto and thereto (as applicable), this Agreement and the other Definitive Agreements are, and each document, instrument and other agreement contemplated by this Agreement and the other Definitive Agreements to be delivered by the Purchaser, when executed and delivered in accordance with the provisions hereof and thereof, will be, a legal, valid and binding obligation of the Purchaser, enforceable against the Purchaser in accordance with its terms, except as enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting or relating to the enforcement of creditors' rights generally and (ii) general principles of equity.

(d) <u>No Violation</u>.  The Purchaser is not in violation of any statute, regulation, order, decision, judgment or decree of, or any restriction imposed by, the United States of America, any state, municipality or other political subdivision or agency of any of the foregoing, or any court or other tribunal having jurisdiction over the Purchaser or any assets of the Purchaser, or any foreign government or agency thereof having such jurisdiction, with respect to the conduct of the business of the Purchaser, or the ownership of the properties of the Purchaser, which, either individually or in the aggregate with all other such violations, would materially and adversely affect the business, operations or condition (financial or otherwise) of the Purchaser or the ability of the Purchaser to perform, satisfy or observe any obligation or condition under this Agreement or any of the other Definitive Agreements.

(e) <u>Consents and Approvals of Governmental Authorities</u>.  Except for those consents, approvals, authorizations, orders, waivers, declarations, filings and registrations that have been or will be obtained or made prior to the Closing Date, no consent, approval, authorization, order or waiver of, or declaration, filing or registration with, any court, governmental agency or body, or non-governmental entity is required for the execution, delivery and performance of this Agreement or any of the other Definitive Agreements, or the consummation of the Transaction, by the Purchaser.

(f) <u>Ability to Pay</u>.  At the Closing, the Purchaser will have sufficient funds available to enable it to pay the Aggregate Final Purchase Price (after deducting the Seller Financing).

(g) <u>Excluded Assets</u>.  The Purchaser acknowledges that it is not purchasing and has no right to or interest in any of the Excluded Assets or any amounts recoverable or recovered therefrom.

(h) <u>Limitations on Liability</u>.  The Purchaser acknowledges and agrees that this Agreement and the other Definitive Agreements, except for the FDIC Guaranty, are entered into by the Seller or the FDIC, as receiver for IndyMac Federal, and not by the FDIC in its corporate capacity.

Section 15.03 <u>HoldCo and Intermediate HoldCo's Representations and Warranties</u>.  HoldCo and Intermediate HoldCo jointly and severally represent and warrant to the Seller that the statements contained in this <u>Section 15.03</u> are correct and complete as of the date of this Agreement and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this <u>Section 15.03</u>).

(a) <u>Due Organization</u>.  Each of HoldCo and Intermediate HoldCo is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware.

(b) <u>Authority and Capacity; Performance</u>.   Each of HoldCo and Intermediate HoldCo has the requisite power, authority and capacity to enter into this Agreement and the other documents, instruments and agreements required to be executed by it in connection herewith, to perform its obligations hereunder and thereunder and to consummate the

- 56-

Transaction. Subject solely to the receipt of all prior approvals and consents (if any) that are required to be obtained by HoldCo or Intermediate HoldCo pursuant to Section 14.02 to effect the Transaction, the execution, delivery and performance of this Agreement by HoldCo and Intermediate HoldCo does not and the consummation of the Transaction will not (i) violate any material provision of law, rule or regulation or any judgment, order, writ, injunction or decree of any court or Governmental Authority applicable to HoldCo or Intermediate HoldCo, or (ii) conflict with any of the terms of (x) HoldCo or Intermediate HoldCo's organizational documents or (y) any other governing instrument relating to the conduct of HoldCo or Intermediate HoldCo's business or the ownership of its properties, or (iii) result in or give rise to any right of termination, cancellation or acceleration under any other agreement to which HoldCo or Intermediate HoldCo is a party or by which it is bound.

      (c)    Authorization and Binding Agreement. The execution and delivery of this Agreement and all documents, instruments and other agreements required to be executed in connection herewith, and the consummation of the Transaction, each have been duly authorized by all necessary action on behalf of HoldCo and Intermediate HoldCo, as applicable, and, assuming the due authorization, execution and delivery by the Seller (or any other counterparty), this Agreement is, and each document, instrument and other agreement contemplated by this Agreement to be delivered by HoldCo or Intermediate HoldCo, as applicable, when executed and delivered in accordance with the provisions hereof, will be, a legal, valid and binding obligation of HoldCo and/or Intermediate HoldCo, as applicable, enforceable against HoldCo and/or Intermediate HoldCo, as applicable, in accordance with its terms, except as enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting or relating to the enforcement of creditors' rights generally and (ii) general principles of equity.

      (d)    No Litigation Pending. Except as set forth on Schedule 15.03(d), there is no action, suit, proceeding or investigation pending against HoldCo or Intermediate HoldCo which, either individually or in the aggregate, if adversely decided against HoldCo or Intermediate HoldCo, as applicable, would reasonably be expected to materially and adversely affect HoldCo's or Intermediate HoldCo's ability to perform its obligations under this Agreement.

      (e)    No Violation. None of HoldCo, Intermediate HoldCo or any of their Subsidiaries is in violation of any statute, regulation, order, decision, judgment or decree of, or any restriction imposed by, the United States of America, any state, municipality or other political subdivision or agency of any of the foregoing, or any court or other tribunal having jurisdiction over it or its assets, or any foreign government or agency thereof having such jurisdiction, with respect to the conduct of its business, or the ownership of its properties, which, either individually or in the aggregate with all other such violations, would materially and adversely affect the business, operations or condition (financial or otherwise) of HoldCo or Intermediate HoldCo or the ability of HoldCo or Intermediate HoldCo to perform, satisfy or observe any obligation or condition under this Agreement.

      (f)    Consents and Approvals of Governmental Authorities. Except for those consents, approvals, authorizations, orders, waivers, declarations, filings, determinations and registrations that have been or will be obtained or made prior to the Closing Date, no consent,

- 57 -

Exhibit 2, Page 124

approval, authorization, order or waiver of, or declaration, filing, determination or registration with, any court, governmental agency or body, or non-governmental entity is required for the execution, delivery and performance of this Agreement or any of the other Definitive Agreements, or the consummation of the Transaction, by HoldCo or Intermediate HoldCo, or the contribution of the Minimum Equity Capital to HoldCo and the related acquisition of interests in HoldCo by HoldCo's members.

(g)    No Broker's Fees.  None of HoldCo, HoldCo's members or Intermediate HoldCo has employed any broker, investment banker or registered financial adviser in a manner that would reasonably be expected to result in any liability on the part of the Seller for any broker's fees, commissions or similar fees in connection with the consummation of the Transaction.

(h)    HoldCo Qualifications.   Each of HoldCo, HoldCo's members and Intermediate HoldCo is (i) a sophisticated Person having knowledge and experience in business matters and, in particular, in such matters related to assets similar to the Assets, such that it is capable of evaluating independently the merits and risks of a purchase of the Assets and (ii) is able to bear the economic risks of such a purchase.

(i)    Ability to Pay.  HoldCo has sufficient funds available to enable it to pay the Capital Contribution.

(j)    Limitations on Liability.  Each of HoldCo, on behalf of itself and its members, and Intermediate HoldCo acknowledges and agrees that this Agreement and the other Definitive Agreements, except the FDIC Guaranty, are entered into by the Seller or the FDIC, as receiver for IndyMac Federal, and not by the FDIC in its corporate capacity.

(k)    Government Inquiries.  During the past three (3) years, there have been no material inspection reports, questionnaires, inquiries, demands or requests for information received by HoldCo, Intermediate HoldCo or, to the best of HoldCo's knowledge, HoldCo's members, from, or any material statement, report or other document relating to such an inquiry filed by HoldCo, Intermediate HoldCo, or to the best of HoldCo's knowledge, HoldCo's members, with, the federal government or any federal administrative agency (including, but not limited to, HUD, the Securities and Exchange Commission, Justice Department, Internal Revenue Service, Department of Labor, Occupational Safety and Health Administration, Federal Trade Commission, National Labor Relations Board, and Interstate Commerce Commission), any state securities administrator or any other Governmental Authority, in each case regarding possible illegal conduct by HoldCo, Intermediate HoldCo or HoldCo's members.

(l)    No Bankruptcies.  Other than as a creditor, none of HoldCo, HoldCo's members or Intermediate HoldCo has voluntarily sought, consented to or acquiesced in the protection of, or become party to or made the subject of the Bankruptcy Code of the United States of America or any other applicable liquidation, conservatorship, bankruptcy, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief laws from time to time in effect affecting the rights of creditors generally.

Exhibit 2, Page 125

(m)     Due Diligence.

(i)     HoldCo and Intermediate HoldCo are solely responsible for conducting the due diligence investigation of the assets and liabilities to be acquired pursuant to the Definitive Agreements. Each of HoldCo and Intermediate HoldCo has made detailed inquiries concerning such assets and liabilities and has received and had an opportunity to review all information necessary to make its own independent informed decisions concerning the same and its decision to enter into this Agreement and all other related agreements and to consummate the transactions contemplated hereby and thereby. HoldCo's members have received the information necessary to make their own independent decisions to invest in HoldCo (including the payment of the Minimum Equity Capital). Each of HoldCo, HoldCo's members and Intermediate HoldCo has completed its due diligence investigation of such assets and liabilities to its full satisfaction.

(ii)     None of HoldCo, HoldCo's members or Intermediate HoldCo is relying on any forecasted operating results or budgets prepared by the Seller or any other federal government agency, or any of its respective directors, officers, partners, employees, contractors, attorneys, agents or representatives, but rather is relying upon its own analysis, plan of operation and financial forecasts or such other information as it deems appropriate. Each of HoldCo, on its own behalf and on behalf of its members, and Intermediate HoldCo acknowledges that, independently and without reliance on the Seller (other than with respect to the Seller's representations and warranties set forth in this Agreement and the other Definitive Agreements) or any other government agency or any of its respective officers, directors, partners, employees, contractors, attorneys, agents or representatives, and based upon such information as it deems adequate, appropriate and necessary, (x) each of HoldCo and Intermediate HoldCo has made its own analysis and decision to enter into this Agreement, and all related agreements and to consummate the Transaction and (y) HoldCo's members have made their own analysis and decision to pay the Minimum Equity Capital.

(n)     Representations Remain True.

(i)     (x) Each of HoldCo and its members has executed and delivered to the Seller a Purchaser Eligibility Certification and a confidentiality agreement in connection with this Agreement and the Transaction and (y) each of Paulson & Co. Inc. and IMB Management Holdings LP ("**Holdings**") has executed and delivered to the Seller a Bid Certification and Qualification Request.

(ii)     All certifications, representations and warranties made by or on behalf of HoldCo, HoldCo's members or Intermediate HoldCo in the Qualification Requests, the Purchaser Eligibility Certifications, the confidentiality agreements, the Bid Certifications, the proposal of HoldCo dated December 15, 2008 to acquire the Assets, the business plan of HoldCo submitted with such proposal, the Purchaser's application to the FDIC for deposit insurance, the Purchaser's, HoldCo's and Intermediate HoldCo's application to the OTS for the organization of the Purchaser as a direct, wholly owned subsidiary, and the registration of HoldCo and Intermediate HoldCo as federal savings

- 59-

Exhibit 2, Page 126

and loan holding companies (which are affirmed and ratified hereby) are and remain true and correct in all material respects and, with respect to the foregoing applications and registrations filed with the OTS and FDIC, as amended and supplemented, do not fail to state any fact required to make the information contained therein not misleading.

(o)     Minimum Equity Capital.  HoldCo has received, and since its receipt has continuously maintained, the Minimum Equity Capital; provided that the parties hereto agree that HoldCo is deemed to have received and to have continuously maintained the Deposit as part of the Minimum Equity Capital.

(p)     Written Commitment.  HoldCo has obtained, and has provided to the Seller, a written commitment from each Investor to pay to the Seller any amount of the Minimum Equity Capital that has been paid out to such Investor in violation of this Agreement.

## ARTICLE XVI

## TERMINATION

Section 16.01  Termination of Agreement.  This Agreement may be terminated and the Transaction may be abandoned at any time prior to Closing, except as otherwise provided in the last paragraph of this Section 16.01:

(a)     by the mutual written consent of HoldCo and the Seller;

(b)     by HoldCo upon written notice to the Seller:

(i)     if the Transaction is not consummated as a result of the failure of one of the conditions set forth in Section 14.01 to be satisfied prior to March 31, 2009, or if any of such conditions becomes incapable of satisfaction, unless such failure or incapability is a result of a breach by HoldCo, Intermediate HoldCo or their Affiliates of this Agreement or any of the other Definitive Agreements (including a failure to act by HoldCo, Intermediate HoldCo or their Affiliates);

(ii)     in the event of a material breach of this Agreement by the Seller, which breach was not or cannot be cured within ten (10) days of receipt by the Seller of written notice from HoldCo specifying the nature of such breach and requesting that it be cured; or

(iii)     if the Transaction is not consummated prior to March 31, 2009, provided that (x) such failure to close is not the result of a breach of a representation, warranty, covenant or other agreement contained in this Agreement or any of the other Definitive Agreements by HoldCo, Intermediate HoldCo or their Affiliates and (y) this Agreement has not otherwise been terminated pursuant to Section 16.01(b)(i) or Section 16.01(b)(ii).

(c)     by the Seller upon written notice to HoldCo:

- 60 -

(i)      if the Transaction is not consummated as a result of the failure of one of the conditions set forth in Section 14.02 to be satisfied prior to March 31, 2009, or if any of such conditions becomes incapable of satisfaction, unless such failure or incapability is a result of a breach by the Seller or its Affiliates of this Agreement or the other Definitive Agreements (including a failure to act by the Seller or its Affiliates);

(ii)      in the event of a material breach of this Agreement by HoldCo, which breach was not or cannot be cured within ten (10) days of receipt by HoldCo of written notice from the Seller specifying the nature of such breach and requesting that it be cured; or

(iii)      if the Transaction is not consummated prior to March 31, 2009, provided that (x) such failure to close is not the result of a breach of a representation, warranty, covenant or other agreement contained in this Agreement or the other Definitive Agreements by the Seller and (y) this Agreement has not otherwise been terminated pursuant to Section 16.01(c)(i) or Section 16.01(c)(ii).

Notwithstanding anything in this Section 16.01 to the contrary, if the conditions set forth in Section 14.01(n) and Section 14.02(n) have not been satisfied or have become incapable of satisfaction, or if the transactions contemplated by the Consent and Collateral Assignment shall not have been consummated, prior to the close of business on March 23, 2009, neither party shall have the right to terminate this Agreement unless such party has complied with the obligation set forth in Section 10.04 and, notwithstanding the good faith efforts of the parties, the Reformed Agreements shall not have been executed and delivered and the Transaction shall not have been consummated prior to March 31, 2009.

Section 16.02 Effect of Termination.   In the event of termination of this Agreement pursuant to Section 16.01, none of the parties hereto (nor any of their respective former, current or future general or limited partners, direct or indirect equity holders, managers, members, directors, officers, Affiliates, representatives or agents) will have any liability or further obligation to any other party, except for liabilities or obligations arising from or in connection with any breach under this Agreement or any of the other Definitive Agreements, or as otherwise provided in Section 16.03.

Section 16.03 Survival.  Notwithstanding anything to the contrary in Section 16.02, each of the following Sections of this Agreement shall survive termination of this Agreement: Section 16.04 (Deposit Refund), Section 16.05 (Backstop Purchase), Section 16.06 (Failure to Close), Section 16.07 (Investor Liability), Section 19.02 (Governing Law), Section 19.03 (Costs and Expenses), Section 19.06 (Entire Agreement), Section 19.07 (Jurisdiction and Venue), Section 19.08 (Waiver of Jury Trial) and Section 19.15 (Confidentiality; Disclosures).

Section 16.04 Deposit Refund.   The Seller shall refund the Deposit to HoldCo if this Agreement is terminated pursuant to any subsection of Section 16.01 other than Section 16.01(c)(ii); provided, however, that in the event of termination pursuant to Section 16.01(c)(i), the Seller shall not refund the Deposit if, subject to the introductory paragraph of Article XIV, the failure of one of the conditions set forth in Section 14.02 to be satisfied (or to be capable of satisfaction) is a result of a breach by HoldCo, Intermediate HoldCo

- 61 -

or their Affiliates of this Agreement or any of the other Definitive Agreements (including a failure to act by HoldCo, Intermediate HoldCo or their Affiliates). Except as otherwise provided in Section 16.05, if HoldCo is not entitled to a refund of the Deposit under this Section 16.04, the Deposit shall be retained by the Seller, and none of the Purchaser, Intermediate HoldCo or HoldCo shall have any right of claim therefor. The Seller's retention of the Deposit pursuant to this Section 16.04 shall in no way preclude, or constitute a waiver of, any other remedy the Seller may have against the Purchaser, Intermediate HoldCo or HoldCo at law or in equity for breach of this Agreement.

Section 16.05 <u>Backstop Purchase</u>. If the Transaction is not completed on the terms set forth in this Agreement by March 31, 2009, or if this Agreement is terminated in accordance with Section 16.01, Holdings and Paulson & Co. Inc., on behalf of the Investors listed on Schedule 16.05 (collectively, the "**Backstop Purchasers**") shall acquire the assets and liabilities included in Group 4 and Group 5 on the terms, and at the final purchase price, as adjusted, specified in, the Securities Sale Agreement and the Loan Sale Agreement, respectively (the "**Backstop Purchase**"); provided, however, that the Seller shall have no obligation to enter into the Backstop Purchase; provided, further, that if the Seller does not provide written notice of its intent to enter into the Backstop Purchase within ten (10) Business Days of date of termination of this Agreement in accordance with Section 16.01, the obligation of the Backstop Purchasers under this Section 16.05 shall terminate and be of no further effect. In the event the Seller agrees to the Backstop Purchase, (i) such acquisition shall be subject to the execution and delivery of definitive agreements containing terms and conditions that are, to the extent applicable, substantially the same as those set forth in this Agreement, the Securities Sale Agreement and the Loan Sale Agreement, including only those closing conditions specified in Article XIV hereof, to the extent relevant; provided, however, that such definitive agreements shall contain a structure for the Backstop Purchase that is mutually agreed upon by the Backstop Purchasers and the Seller and (ii) such definitive agreements will be executed within ten (10) Business Days of the Seller's notice to enter into the Backstop Purchase and such Backstop Purchase shall be consummated within fourteen (14) calendar days of the date of execution of such definitive agreements; provided, further, that under the Mortgage Loan Master Repurchase Agreement, a form of which is attached as Exhibit M hereto, REO Property shall be treated no differently with respect to Applicable Percentage and Asset Value Amount than Loans (as such terms are defined in the Mortgage Loan Master Repurchase Agreement). The Backstop Purchase shall not affect any liability that HoldCo may have for any breach of this Agreement or otherwise entitle HoldCo to any refund of the Deposit, except that, if the Transaction is not consummated under circumstances that would permit the Seller to retain the Deposit under Section 16.04, the entire Deposit shall be applied to pay, in part, the amount due at the closing of the Backstop Purchase and, if such Backstop Purchase is completed, HoldCo shall have no further liability under this Agreement or any of the other Definitive Agreements.

Section 16.06 <u>Failure to Close</u>. If this Agreement is terminated (a) because any condition set forth in Section 14.02(a) (only with respect to the failure of a representation and warranty to be true when made), Section 14.02(b), Section 14.02(d), Section 14.02(f), Section 14.02(i) hereof that is required to be satisfied by HoldCo or Intermediate HoldCo has not been satisfied (and HoldCo's or Intermediate HoldCo's inability to satisfy such condition is not due to a breach by the Seller of any of the Seller's delivery obligations under this Agreement), (b) because of HoldCo's or Intermediate HoldCo's failure to comply with any reasonable request

- 62-

of either the Seller or any third party whose consent or approval is required to effect the transfer of the Assets, or (c) because of HoldCo's failure to pay, in a timely manner, amounts due from HoldCo pursuant to this Agreement, each of HoldCo and Intermediate HoldCo specifically acknowledges and agrees that the Seller shall be entitled to exercise any or all of the following remedies, separately or in combination: (i) retain the Deposit to the extent provided in Section 16.04; (ii) disqualify HoldCo, Intermediate HoldCo and the Investors from participating in any future sales of any kind by the Seller or the FDIC, including as receiver or conservator for any entity; and (iii) such other remedies as may be available to the Seller at law or in equity for a breach of this Agreement.

Section 16.07 <u>Investor Liability</u>.  The Seller's sole recourse for breach of this Agreement shall be against HoldCo, except in the case of a breach of the obligation of HoldCo in respect of the Minimum Equity Capital described in <u>Section 10.01(d)</u> hereof in which case no provision of this Agreement shall be construed to preclude any remedy available to the Seller against the Investors; <u>provided</u>, <u>however</u>, that the Seller acknowledges and agrees that, if the Transaction is not consummated, in no event shall the Investors or any of their respective former, current or future general or limited partners, stockholders, managers, members, directors, officers, affiliates or agents have aggregate liability with respect to the Transaction in excess of the Minimum Equity Capital.

## ARTICLE XVII

## REIMBURSEMENT FOR LOSSES

Section 17.01 <u>Reimbursement Related to the Seller's Assets, Acts or Omissions</u>.  From and after the Closing Date and subject to the limitations set forth in this <u>Section 17.01</u> and <u>Section 17.08</u> and compliance by the Reimbursed Parties with <u>Section 17.04</u>, the Seller shall reimburse the Reimbursed Parties as follows:

(a)     The Seller will reimburse the Reimbursed Parties for Losses incurred as a result of any Third Party Claims relating to liabilities arising from assets of or the acts or omissions of the Failed Thrift, IndyMac Federal or the Seller prior to the Closing, including Losses resulting from any settlement of any such Third Party Claim to which the Seller has provided its prior written consent; <u>provided</u>, <u>however</u>, that any Third Party Claim with respect to which reimbursement is sought pursuant to this <u>Section 17.01(a)</u> must be commenced within two (2) years after the Closing Date (three (3) years after the Closing Date if the Third Party Claim is brought by the FHLB under any Contract entered into by the Seller or the Failed Thrift governing the assumed FHLB Advances and assumed by the Purchaser hereunder; <u>provided</u>, <u>however</u>, that the Seller shall have no obligation hereunder following the date that is two (2) years after the Closing Date to reimburse any Reimbursed Party for a Third Party Claim brought by the FHLB after the occurrence of an "Event of Default" by the Purchaser, as such term is used in the Consent and Collateral Assignment).

(b)     Notwithstanding anything to the contrary set forth in this Agreement or the other Definitive Agreements, the Seller will not reimburse the Reimbursed Parties for:

- 63-

(i)      Excluded Losses, unless such Losses are incurred as a direct result of a final, nonappealable order of a court of competent jurisdiction awarding damages in connection with a Third Party Claim;

(ii)      Losses arising from or in connection with any Third Party Claim in which the claimant is a mortgagor unless (x) such Third Party Claim is asserted as a part of a class action lawsuit, (y) a court of competent jurisdiction has rendered a final, nonappealable order in favor of the mortgagor finding that the related mortgage loan or mortgage note is rescinded, void or unenforceable, or (z) a court of competent jurisdiction has, in a final, nonappealable order, awarded damages to the mortgagor that are in excess of the then unpaid principal balance of the related mortgage loan;

(iii)      Losses attributable to or arising from overhead allocations or general internal and administrative costs or the costs of administering or complying with the preapproval, submission or reporting requirements imposed by the Seller in connection with the asset sale (i.e., in-house counsel costs);

(iv)      Losses reimbursable or payable by any Person other than the Seller or the FDIC, including but not limited to recovery in the form of insurance proceeds;

(v)      Losses attributable solely to or arising solely from any violation or alleged violation by any Reimbursed Party (other than the Acquired Subsidiary prior to the Closing Date) of any Law, including the antitrust, branching, banking or bank holding company or securities laws of any Governmental Authority; provided, that reimbursement of Losses attributable solely to or arising solely from any such alleged violation will not be restricted by this clause if there is a final, nonappealable, affirmative finding of a court of competent jurisdiction that no violation of Law related to such allegation exists (other than as a result of any settlement or consent order or decree unless the Seller has consented to the same in writing);

(vi)      Losses arising from or in connection with a claim based on the rights of any present or former shareholder, member, partner or equityholder of the Purchaser or any Subsidiary or Affiliate of the Purchaser regardless of whether any such Person is also a former shareholder of the Failed Thrift;

(vii)      Losses arising from or in connection with any liability for Taxes or fees assessed with respect to the consummation of the Transaction, including any subsequent transfer of any assets or assumption of any liabilities to any Subsidiary or Affiliate of the Purchaser, except as expressly provided herein or in the other Definitive Agreements;

(viii)     except as expressly provided in this Article XVII or in the other Definitive Agreements, Losses attributable to or arising from any claim based on any action or inaction of any Reimbursed Party (other than the Acquired Subsidiary prior to the Closing Date), and nothing in this Agreement shall be construed to provide reimbursement for Losses incurred by (x) the Failed Thrift or the Seller, (y) any Subsidiary or Affiliate of the Failed Thrift or the Seller, or (z) any present or former

- 64-

Exhibit 2, Page 131

director, officer, employee or agent of the Failed Thrift or the Seller or its Subsidiaries or
Affiliates; provided that the Seller, in its discretion, may provide reimbursement
hereunder for any Losses incurred by any present or former director, officer, employee or
agent of the Failed Thrift or the Seller, or its Subsidiaries or Affiliates who is also or
becomes a director, officer, employee or agent of the Purchaser or its Subsidiaries or
Affiliates;

(ix)    Losses caused solely by any inaccuracy or breach by the Purchaser
or any Subsidiary or Affiliate of the Purchaser of any of the representations and
warranties contained in Section 15.02 or Section 15.03 of this Agreement or in the other
Definitive Agreements; or

(x)    except as expressly provided in the other Definitive Agreements,
Losses arising out of or relating to the condition of or generated by an Asset arising from
or relating to the presence, storage or release of any hazardous or toxic substance, or any
pollutant or contaminant, or condition of such Asset which violate any applicable
Federal, State or local law or regulation concerning environmental protection;

(xi)    Losses based on, related to or arising from any asset, including a
loan, acquired or liability assumed by the Purchaser or any Subsidiary or Affiliate of the
Purchaser, other than pursuant to this Agreement or the other Definitive Agreements.

The Reimbursed Party's failure to settle or enter into a consent decree or order shall not
constitute a failure to mitigate Losses with respect to any alleged violation of the type referred to
in clause (v) of this Section 17.01(b) if the Reimbursed Party has provided the Seller with written
notice of, and a request that the Seller consent to, such proposed settlement, order or consent
decree and the Seller fails to provide such consent within ten (10) Business Days after having
received such notice and request.

Section 17.02 Tax Reimbursement.   Notwithstanding Section 17.01, the Seller shall
reimburse and hold harmless the Reimbursed Parties for any Taxes imposed with respect to the
Failed Thrift, IndyMac Federal, the Acquired Subsidiary or the Seller for any taxable periods (or
portions thereof) ending on or before the Closing Date, including as a result of the Failed Thrift,
IndyMac Federal or the Acquired Subsidiary being treated at any time prior to the Closing as a
member of a consolidated, combined, unitary or similar group of companies pursuant to Treasury
Regulation Section 1.1502-6 or any similar provision of Law or as a result of any Tax allocation,
indemnification or sharing agreement or arrangement in effect prior to the Closing. For purposes
of the Definitive Agreements, any Taxes for a Tax period that includes but does not end on the
Closing Date shall be allocated between (i) the portion thereof ending on the Closing Date and
(ii) the portion thereof ending after the Closing Date on a closing of the books basis, except that
in the case of Taxes, deductions or credits determined on a periodic basis, the amount of Tax,
deduction or credit shall be allocated on a daily pro rata basis. Notwithstanding anything in this
Agreement or any of the other Definitive Agreements to the contrary, the Seller's obligations
under this Section 17.02 shall survive for the duration of the statute of limitations for such tax
liabilities; provided, however, that the Reimbursed Parties may not take any action to toll the
statute of limitations for such Taxes, unless (i) such Reimbursed Parties are requested in writing

- 65-

Exhibit 2, Page 132

to do so by the Internal Revenue Service or any relevant taxing authority, or (ii) the Seller provides its written consent, not to be unreasonably withheld or delayed.

Section 17.03 <u>Failure to Obtain Third-Party Consents Reimbursement; GSE Reimbursement</u>.

(a)     Notwithstanding <u>Section 17.01</u>, the Seller shall reimburse the Reimbursed Parties for any Losses (other than Excluded Losses) incurred as a result of the (i) Seller's failure to obtain the consent of all third parties (other than the consents referred to in <u>Section 14.01(d)</u> and <u>Section 14.02(e)</u>) whose consents are required in order to consummate the Transaction and (ii) any breach or alleged breach of a contract or agreement otherwise requiring such third party consent by the Purchaser solely as a result of such failure, regardless of whether the Seller requests a consent that is not received or the Seller does not request a consent consistent with its statutory authority, <u>provided</u>, <u>however</u>, that (i) there shall be no reimbursement to the extent that such Loss has resulted in a reimbursement of a pro-rata portion of the Group 3 Final Purchase Price pursuant to the Reverse Mortgage Business Asset Purchase Agreement or an adjustment to the Aggregate Final Purchase Price, including an adjustment to the Group 2 Final Purchase Price pursuant to the Servicing Business Asset Purchase Agreement, and (ii) such Losses shall have been incurred and a claim for the same made in accordance with the claims procedures specified in <u>Section 17.04</u> within two (2) years after the Closing Date.

(b)     Notwithstanding <u>Section 17.01</u>, the Seller shall reimburse the Reimbursed Parties for any Losses (other than Excluded Losses) incurred as a result of the following Third Party Claims:

(i)     Third Party Claims made by Fannie Mae or Freddie Mac relating to any liabilities or obligations imposed on the seller of Mortgage Loans under the applicable Servicing Agreements (as each such term is defined in the Servicing Business Asset Purchase Agreement), in any case only with respect to Mortgage Loans acquired by Fannie Mae or Freddie Mac from the Seller, IndyMac Federal or the Failed Thrift after July 11, 2008, which claims are commenced within five (5) years after the Closing Date;

(ii)     Third Party Claims made by Ginnie Mae relating to any liabilities or obligations imposed on the seller of Mortgage Loans under the applicable Servicing Agreements (as each such term is defined in the Servicing Business Asset Purchase Agreement), in any case only with respect to Mortgage Loans acquired by Ginnie Mae from the Seller, IndyMac Federal or the Failed Thrift at any time, which claims are commenced within five (5) years after the Closing Date; and

(iii)     Third Party Claims made by Fannie Mae, Freddie Mac or Ginnie Mae relating to any liabilities or obligations imposed on the seller of MSR Mortgage Loans under the applicable Servicing Agreements (as each such term is defined in the Reverse Mortgage Business Asset Purchase Agreement), in any case only with respect to MSR Mortgage Loans acquired by Fannie Mae, Freddie Mac or Ginnie Mae from Seller, Financial Freedom, IndyMac Federal or the Failed Thrift, which claim is commenced within ten (10) years after the Closing Date; <u>provided</u>, <u>however</u>, that the time period shall

Exhibit 2, Page 133

be reduced to five (5) years after the Closing Date, with respect to MSR Mortgage Loans acquired by Fannie Mae from the Seller, IndyMac Federal or the Failed Thrift, at such time as the Seller provides to the Purchaser evidence of an agreement by Fannie Mae to release, or to agree not to make a claim against or otherwise pursue, the Purchaser with respect to any liabilities or obligations imposed on the seller of such MSR Mortgage Loans under the applicable Servicing Agreements.

Section 17.04  Conditions Precedent to Reimbursement.  It shall be a condition precedent to the obligation of the Seller to reimburse any Person pursuant to this Article XVII that such Person shall, with respect to any Third Party Claim against such Person for which such Person is or may be entitled to reimbursement hereunder:

(a)     give written notice to the Seller in the manner and at the address provided in Article XVIII of such Third Party Claim as soon as practicable, but in no event later than ten (10) Business Days, after such Person becomes aware of such Third Party Claim; provided that, such notice shall describe in reasonable detail the facts giving rise to any claim for reimbursement hereunder, the amount of such claim (if known) and such other information with respect thereto as is available to the Person being reimbursed and as the Seller may reasonably request; provided, further, that any failure to give such notice within the 10-Business Day time period will not affect the reimbursement provided hereunder except to the extent that (i) any defense or other rights available to the Seller have been materially prejudiced as a result of such failure or delay or (ii) the Loss to be reimbursed as a result of such Third Party Claim has increased as a result of such failure or delay (in which case the reimbursement to which any Person is entitled under this Article XVII shall be reduced by the amount of such increase);

(b)     provide to the Seller such information and cooperation with respect to such claim as the Seller may reasonably require;

(c)     cooperate and take all steps, as the Seller may reasonably require, to preserve and protect any defense to such Third Party Claim;

(d)     in the event suit or other proceeding is brought against such Person with respect to such Third Party Claim, upon reasonable prior notice, afford to the Seller the right, which the Seller may exercise in its sole discretion, to conduct the investigation, control the defense and effect settlement of any such Third Party Claim raised in such suit or proceeding, including the right to designate counsel and to control all negotiations, litigation, arbitration, settlements, compromises and appeals of any such claim with respect thereto, all of which shall be at the expense of the Seller; provided that (x) the Seller shall have notified the Person claiming reimbursement in writing that such suit or proceeding is a Third Party Claim with respect to which the Person claiming reimbursement is entitled to reimbursement under this Article XVII, (y) if the Person claiming reimbursement hereunder reasonably determines, based on an opinion of counsel, that representation by the Seller's counsel of both the Seller and such Person would present such counsel with a conflict of interest under applicable ethics rules, then such Person may employ separate counsel to represent or defend it in any suit or proceeding and the Seller shall pay the reasonable fees and disbursements of such separate counsel, and (z) the Seller shall obtain the prior written approval of the Reimbursed Party

- 67 -

Exhibit 2, Page 134

before entering into any settlement, adjustment or compromise of such Third Party Claim involving injunctive or similar equitable relief being imposed upon the Reimbursed Party or any of its Affiliates;

(e)    not incur any costs or expenses in connection with any response or suit with respect to such Third Party Claim, unless such costs or expenses were incurred upon the written direction of the Seller or the Seller does not elect to control the defense of such Third Party Claim or otherwise in accordance with Section 17.04(d); provided that the Seller shall not be obligated to reimburse the amount of any such costs or expenses unless such costs or expenses were incurred upon the written direction of the Seller or the Seller does not elect to control the defense of such Third Party Claim or otherwise in accordance with Section 17.04(d);

(f)    not release or settle such Third Party Claim or make any payment or admission with respect thereto, unless the Seller consents in writing thereto, which consent shall not be unreasonably withheld; provided that the Seller shall not be obligated to reimburse the amount of any such settlement or payment unless such settlement or payment was effected with the written consent of the Seller; and

(g)    take reasonable action as the Seller may request in writing as necessary to preserve, protect or enforce the rights of the reimbursed Person against any Primary Indemnitor.

Section 17.05  No Additional Warranty.  Nothing in this Article XVII shall be construed or deemed to (i) expand or otherwise alter any warranty or disclaimer thereof provided under Section 5.10 or any other provision of this Agreement with respect to, among other matters, the title, value, collectability, genuineness, enforceability or condition of any (x) Asset, or (y) asset of the Seller purchased by the Purchaser or any Subsidiary or Affiliate of the Purchaser pursuant to this Agreement or subsequent to the execution hereof, or (ii) create any warranty not expressly provided under this Agreement with respect thereto.

Section 17.06  Indemnification of the Seller.

(a)    From and after the Closing Date, each of HoldCo, Intermediate HoldCo, the Purchaser and its Affiliates (each, a "**Purchaser Indemnitor**") shall indemnify and hold harmless the Seller Indemnitees, from and against any Losses, arising out of or resulting from (x) any breach by any Purchaser Indemnitor or any of its officers, directors, employees, partners, principals, agents or contractors of any of the Purchaser Indemnitor's obligations under or covenants, representations or agreements contained in this Agreement or any other Definitive Agreement or such other related agreements to which such Purchaser Indemnitor is a party (including any claim asserted by the Seller against any Purchaser Indemnitor to enforce its rights hereunder or thereunder or by any third party), or (y) any third-party allegation or claim based upon facts alleged that, if true, would constitute such a breach, or any gross negligence, bad faith or willful misconduct (including any act or omission constituting theft, embezzlement, breach of trust or violation of any Law).  Such indemnity shall survive the termination of this Agreement.  In order for a Seller Indemnitee to be entitled to any indemnification provided for under this Agreement involving a Loss arising out of a Third

- 68-

Party Claim, such Seller Indemnitee shall deliver notice thereof to the Purchaser Indemnitor promptly after receipt by such Seller Indemnitee of written notice of the Third Party Claim, describing in reasonable detail the facts giving rise to any claim for indemnification hereunder, the amount of such claim (if known) and such other information with respect thereto as is available to the Seller Indemnitee and as the Purchaser Indemnitor may reasonably request. The failure or delay to provide such notice, however, shall not release the Purchaser Indemnitor from any of its obligations under this Section 17.06 except to the extent that (i) any defense or other rights available to the Purchaser Indemnitor have been materially prejudiced as a result of such failure or delay or (ii) the Loss to be reimbursed as a result of such Third Party Claim has increased as a result of such failure or delay (in which case the indemnification to which the Seller Indemnitee is entitled under this Article XVII shall be reduced by the amount of such increase).

(b)     If for any reason the indemnification provided for herein is unavailable or insufficient to hold harmless the Seller Indemnitees, the Purchaser Indemnitor shall contribute to the amount paid or payable by the Seller Indemnitees as a result of the Losses of the Seller Indemnitees in such proportion as is appropriate to reflect the relative fault of the Seller Indemnitees, on the one hand, and the Purchaser Indemnitor, on the other hand, in connection with a breach of the Purchaser Indemnitor's obligations under this Agreement.

(c)     If the Purchaser Indemnitor confirms in writing to the Seller Indemnitee within fifteen (15) Business Days after receipt of the notice described in Section 17.06(a) its responsibility to indemnify and hold harmless the Seller Indemnitee therefor, the Purchaser Indemnitor may elect to assume control over the compromise or defense of such Third Party Claim at the Purchaser Indemnitor's expense and by the Purchaser Indemnitor's counsel, which counsel must be reasonably satisfactory to the Seller Indemnitee, provided that (i) the Seller Indemnitee may, if such Seller Indemnitee so desires, employ counsel at such Seller Indemnitee's own expense to assist in the handling (but not control the defense) of any Third Party Claim; (ii) the Purchaser Indemnitor shall keep the Seller Indemnitee advised of all material events with respect to any Third Party Claim; (iii) the Purchaser Indemnitor shall obtain the prior written approval of the Seller Indemnitee before ceasing to defend against any Third Party Claim or entering into any settlement, adjustment or compromise of such Third Party Claim involving injunctive or similar equitable relief being imposed upon the Seller Indemnitee or any of its Affiliates; and (iv) the Purchaser Indemnitor will not, without the prior written consent of the Seller Indemnitee, settle or compromise or consent to the entry of any judgment in any pending or threatened action in respect of which indemnification may be sought hereunder (whether or not any such Seller Indemnitee is a party to such action), unless such settlement, compromise or consent by its terms obligates the Purchaser Indemnitor to satisfy the full amount of the liability in connection with such Third Party Claim and includes an unconditional release of such Seller Indemnitee from all liability arising out of such Third Party Claim.

(d)     Notwithstanding anything contained herein to the contrary, no Purchaser Indemnitor shall be entitled to control (and if the Seller Indemnitee so desires, it shall have sole control over) the defense, settlement, adjustment or compromise of (but the Purchaser Indemnitor shall nevertheless be required to pay all Losses incurred by the Seller Indemnitee in connection with such defense, settlement or compromise):  (i) any Third Party Claim that seeks

- 69-

an order, injunction or other equitable relief against the Seller Indemnitee or any of its Affiliates; (ii) any action in which the Purchaser Indemnitor (or any Affiliate) and the Seller Indemnitee are named as parties and either the Purchaser Indemnitor (or such Affiliate) or the Seller Indemnitee determines with advice of counsel that there may be one or more legal defenses available to it that are different from or additional to those available to the other party or that a conflict of interest between such parties may exist in respect of such action; and (iii) any matter that raises or implicates any issue relating to any power, right or obligation of the FDIC under any Law. If the Purchaser Indemnitor elects not to assume the compromise or defense against the Third Party Claim, fails to timely and properly notify the Seller Indemnitee of its election as herein provided, or, at any time after assuming such defense, fails to diligently defend against such Third Party Claim in good faith, the Seller Indemnitee may pay, compromise or defend against such Third Party Claim (but the Purchaser Indemnitor shall nevertheless be required to pay all Losses incurred by the Seller Indemnitee in connection with such defense, settlement or compromise). In connection with any defense of a Third Party Claim (whether the Purchaser Indemnitor or the Seller Indemnitee), all of the parties hereto shall, and shall cause their respective Affiliates to, cooperate in the defense or prosecution thereof and to in good faith retain and furnish such records, information and testimony, and attend such conferences, discovery proceedings, hearings, trials and appeals, as may be reasonably requested by a party hereto in connection therewith.

Section 17.07 <u>Obligations Supplemental</u>. The obligations of the parties hereto, and the FDIC in its corporate capacity as guarantor under the FDIC Guaranty, to provide reimbursement or indemnification under this <u>Article XVII</u> are to supplement any amount payable by any Primary Indemnitor to the Person being reimbursed or indemnified under this <u>Article XVII</u>. Consistent with that intent, each party hereto agrees to make payments pursuant to such reimbursement only to the extent not payable by a Primary Indemnitor. If the aggregate amount of payments by the Seller, or the FDIC as guarantor pursuant to the FDIC Guaranty, and all Primary Indemnitors with respect to any item of reimbursement under this <u>Article XVII</u>, or by the Purchaser Indemnitors and all Primary Indemnitors with respect to any item of indemnification under this <u>Article XVII</u>, exceeds the amount payable with respect to such item, such Person being reimbursed or indemnified shall notify the Person obligated to make the reimbursement or indemnification payment thereof and, upon request, shall promptly pay to the Seller, or the FDIC as appropriate, or the Purchaser Indemnitor the amount of the Seller's (or FDIC's) or the Purchaser Indemnitor's payments to the extent of such excess.

Section 17.08 <u>Criminal Claims</u>. Notwithstanding any provision of this <u>Article XVII</u> to the contrary, in the event that any Person being reimbursed under this <u>Article XVII</u> shall become involved in any criminal action, suit or proceeding, whether judicial, administrative or investigative, the Seller shall have no obligation hereunder to reimburse such Person for liability with respect to any criminal act or to the extent any costs or expenses are attributable to the defense against the allegation of any criminal act, unless (i) the Person is successful on the merits or otherwise in the defense against any such action, suit or proceeding, or (ii) such action, suit or proceeding is terminated without the imposition of liability on such Person or (iii) such criminal act was solely the act of the Seller, IndyMac Federal, the Failed Thrift or their predecessors-in-interest.

Exhibit 2, Page 137

Section 17.09 Subrogation.   Upon the making of any payment pursuant to the reimbursement and indemnification obligations under this Article XVII, the party making such payment shall become subrogated to all rights of party receiving such payment against any other Person to the extent of such payment.

Section 17.10 Further Cooperation.   For so long as the Seller has reimbursement obligations under Sections 17.01, 17.02 and 17.03 of this Agreement or under any of the other Definitive Agreements, the Purchaser shall cooperate with the Seller and provide the Seller with a copy of the following reports in order to facilitate the Seller's monitoring and assessment of the Seller's potential liability for claims made or that may be made pursuant to Sections 17.01, 17.02 and 17.03 of this Agreement or the reimbursement obligations of the Seller under any other Definitive Agreements:  (i) with respect to any loans serviced for Ginnie Mae and with respect to any loans serviced for Fannie Mae or Freddie Mac that were sold to Fannie Mae or Freddie Mac on or after July 11, 2008 by the Seller (such loans, collectively, the "**GSE Loans**"), monthly servicing reports showing the performance of the GSE Loans, including unpaid principal balances, liquidations, payoffs, delinquencies, etc.; (ii) with respect to the GSE Loans, quarterly reports identifying repurchase and make whole requests and, with respect to each such request, whether the Purchaser has agreed to the repurchase or make whole request, as well as the results of appeals and rescission rates; and (iii) with respect to all loans serviced for Ginnie Mae, Fannie Mae or Freddie Mac, annual reports containing loan-level information of the type provided in the monthly and quarterly reports required by clauses (i) and (ii).

## ARTICLE XVIII

## NOTICES

All notices, requests, demands and other communications required or permitted to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be given by certified or registered mail, postage prepaid, or delivered by hand or by nationally recognized air courier service, in any case directed to the address of such Person as set forth below.

| If to the Seller: | Manager, Structured Transactions |
| | c/o Federal Deposit Insurance Corporation |
| | 550 17th Street, NW (Room F-7008) |
| | Washington, D.C. 20429-0002 |
| | Attention: George Alexander |

| with a copy to: | Senior Counsel |
| | FDIC Legal Division |
| | Litigation and Resolutions Branch, Receivership Section |
| | Special Issues Unit |
| | 3501 Fairfax Drive (Room E-7056) |
| | Arlington, Virginia 22226 |
| | Attention: David Gearin |

Exhibit 2, Page 138

```
If to HoldCo,
Intermediate HoldCo
or the Purchaser:        IMB HoldCo LLC
                         888 East Walnut Street
                         Pasadena, California 91101-7211
                         Attention:  Steven Mnuchin

with a copy to:          Cleary Gottlieb Steen & Hamilton LLP
                         One Liberty Plaza
                         New York, New York 10006
                         Attention: Paul E. Glotzer
```

      Any such notice shall become effective when received (or receipt is refused) by the addressee, provided that any notice or communication that is received (or refused) other than during regular business hours of the recipient shall be deemed to have been given at the opening of business on the next Business Day of the recipient.  From time to time, any Person may designate a new address for purposes of notice hereunder by notice to such effect to the other Persons identified in this Article XVIII.

<div align="center">

## ARTICLE XIX

### MISCELLANEOUS PROVISIONS

</div>

      Section 19.01 Severability.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall be ineffective, but such ineffectiveness shall be limited as follows:  (i) if such provision is prohibited or unenforceable in such jurisdiction only as to a particular Person or Persons and/or under any particular circumstance or circumstances, such provision shall be ineffective, but only in such jurisdiction and only with respect to such particular Person or Persons and/or under such particular circumstance or circumstances, as the case may be; (ii) without limitation of clause (i), such provision shall in any event be ineffective only as to such jurisdiction and only to the extent of such prohibition or unenforceability, and such prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction; and (iii) without limitation of clauses (i) or (ii), such ineffectiveness shall not invalidate any of the remaining provisions of this Agreement.  Without limitation of the preceding sentence, it is the intent of the parties to this Agreement that in the event that in any court proceeding, such court determines that any provision of this Agreement is prohibited or unenforceable in any jurisdiction (because of the duration or scope (geographic or otherwise) of such provision, or for any other reason) such court shall have the power to, and shall, (x) modify such provision (including, to the extent applicable, by limiting the duration or scope of such provision and/or the Persons against whom, and/or the circumstances under which, such provision shall be effective in such jurisdiction) for purposes of such proceeding to the minimum extent necessary so that such provision, as so modified, may then be enforced in such proceeding and (y) enforce such provision, as so modified pursuant to clause (x), in such proceeding.  Nothing in this Section 19.01 is intended to, or shall, limit (1) the ability of any party to this Agreement to appeal any court ruling or the effect of any favorable ruling on appeal or (2) the intended effect of Section 19.02.

<div align="center">

- 72-

</div>

Section 19.02 <u>Governing Law</u>.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL LAW, BUT IF FEDERAL LAW DOES NOT PROVIDE A RULE OF DECISION IT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK (EXCLUDING ANY CONFLICT OF LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE OR THE CONSTRUCTION OF THIS AGREEMENT TO THE LAW OF ANOTHER JURISDICTION).  Nothing in this Agreement shall require any unlawful action or inaction by any party hereto.

Section 19.03 <u>Cost, Fees and Expenses</u>.  Each of HoldCo and the Seller will be responsible for and bear all of its own costs and expenses (including any broker's or finder's fees and the expenses of its representatives) incurred at any time in connection with pursuing or consummating the Transaction, except that HoldCo shall be responsible for and bear all of the documented reasonable out-of-pocket expenses (including reasonable fees, disbursements and other charges of counsel) incurred by the Seller in connection with (i) the preparation, execution, delivery and consummation of the Seller Financing Agreements and (ii) any appraisals conducted by a third party appraiser for the purpose of determining the Fair Market Value of any asset or liability to be acquired by the Purchaser pursuant to this Agreement or any other Definitive Agreement.  In addition, notwithstanding the foregoing, HoldCo and the Seller shall pay equally (x) all fees, costs and expenses of the Independent Accounting Firm under Section 3.03(c) and (y) the fees, costs and expenses referred to in Section 3.04 and Section 5.11 of the Servicing Business Asset Purchase Agreement, Section 3.04 of the Reverse Mortgage Business Asset Purchase Agreement, Section 8.05 of the Securities Sale Agreement, and Section 3.02, Section 3.04, Section 3.05 and Section 3.06 of the Loan Sale Agreement; <u>provided that</u> the Seller's obligation under clause (y) shall not exceed FOUR MILLION THREE HUNDRED FIFTY THOUSAND Dollars ($4,350,000).  In addition, and notwithstanding the foregoing, HoldCo and the Seller shall pay equally all fees, costs and expenses of any trustee in connection with the transfer of servicing rights under the Definitive Agreements and of any rating agency in connection with obtaining "no downgrade" letters.

Section 19.04 <u>Waivers; Amendment and Assignment</u>.  No provision of this Agreement may be amended or waived except in writing executed by all of the parties to this Agreement. This Agreement and the terms, covenants, conditions, provisions, obligations, undertakings, rights and benefits hereof shall be binding upon, and shall inure to the benefit of, the undersigned parties and their respective heirs, executors, administrators, representatives, successors and permitted assigns, and no other Person or Persons shall have any rights or remedies under or by reason of this Agreement.  Notwithstanding the foregoing, this Agreement may not be transferred or assigned without the express prior written consent of the Seller and any attempted assignment without such consent shall be void *ab initio*.

Section 19.05 <u>No Presumption</u>.  This Agreement shall be construed fairly as to each party hereto and if at any time any such term or condition is desired or required to be interpreted or construed, no consideration shall be given to the issue of who actually prepared, drafted or requested any term or condition of this Agreement or any agreement or instrument subject hereto.

Exhibit 2, Page 140

Section 19.06 Entire Agreement. This Agreement, the other Definitive Agreements and the Confidentiality Agreement contain the entire agreement between the parties hereto with respect to the subject matter hereof and supersede any and all other prior agreements, whether oral or written. In the event of a conflict between the terms of this Agreement and the terms of any other Definitive Agreement or other document or instrument executed in connection herewith or in connection with the Transaction, including any translation into a foreign language of this Agreement for the purpose of any other Definitive Agreement or any other document or instrument executed in connection herewith which is prepared for notarization, filing or any other purpose, the terms of this Agreement shall control, and furthermore, the terms of this Agreement shall in no way be or be deemed to be amended, modified or otherwise affected in any manner by the terms of such other Definitive Agreement or other document or instrument.

Section 19.07 Jurisdiction; Venue and Service. Each of HoldCo, Intermediate HoldCo and the Purchaser, for itself and its Affiliates, and the Seller hereby irrevocably and unconditionally:

(a)    (i) agrees that any suit, action or proceeding instituted against it by any other party with respect to this Agreement may be instituted, and that any suit, action or proceeding by it against any other party with respect to this Agreement shall be instituted, only in the United States District Court for the Southern District of New York or the United States District Court for the District of Columbia (and appellate courts from any of the foregoing), (ii) consents and submits, for itself and its property, to the jurisdiction of such courts for the purpose of any such suit, action or proceeding instituted against it by any other party and (iii) agrees that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law;

(b)    agrees that service of all writs, process and summonses in any suit, action or proceeding pursuant to Section 19.07(a) may be effected by the mailing of copies thereof by registered or certified mail, postage prepaid, to its address for notices pursuant to Article XVIII (with copies to such other Persons as specified therein); provided, however, that nothing contained in this Section 19.07 shall affect its ability to be served process in any other manner permitted by Law;

(c)    (i) waives any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement brought in any court specified in Section 19.07(a), (ii) waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum and (iii) agrees not to plead or claim either of the foregoing; and

(d)    agrees that nothing contained in this Section 19.07 shall be construed as a limitation on any removal rights the FDIC may have.

Section 19.08 Waiver of Jury Trial. EACH OF HOLDCO, INTERMEDIATE HOLDCO AND THE PURCHASER, FOR ITSELF AND ITS AFFILIATES, AND THE SELLER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY OF ANY DISPUTE ARISING OUT OF OR RELATING TO

Exhibit 2, Page 141

THIS AGREEMENT AND AGREES THAT ANY SUCH DISPUTE SHALL BE TRIED BEFORE A JUDGE SITTING WITHOUT A JURY.

Section 19.09 Counterparts; Facsimile Signatures. This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original but all of which together shall constitute but one and the same agreement. This Agreement and any amendments hereto, to the extent signed and delivered by facsimile or other electronic means, shall be treated in all manner and respects as an original agreement and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. No signatory to this Agreement shall raise the use of a facsimile machine or other electronic means to deliver a signature or the fact that any signature or agreement was transmitted or communicated through the use of a facsimile machine or other electronic means as a defense to the formation or enforceability of a contract and each such Person forever waives any such defense.

Section 19.10 Headings. Section titles or captions contained in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provisions hereof. All Section and paragraph references contained herein shall refer to Sections and paragraphs in this Agreement unless otherwise specified.

Section 19.11 Compliance with Law. Except as otherwise specifically provided herein, each party to this Agreement shall, at its own cost and expense, obey and comply with all Laws, as they may pertain to such party's performance of its obligations hereunder.

Section 19.12 Use of the FDIC's Name and Reservation of Statutory Powers. None of HoldCo, Intermediate HoldCo or the Purchaser shall use or permit the use by its agents, successors, assigns or Affiliates of any name or combination of letters that is similar to "FDIC" or "Federal Deposit Insurance Corporation." None of HoldCo, Intermediate HoldCo or the Purchaser will represent or imply that it is affiliated with, authorized by or in any way related to the FDIC. The Purchaser and its Subsidiaries that are party to any of the other Definitive Agreements shall be entitled to assert (and claim the benefit of) the statute of limitations established under 12 U.S.C. § 182l (d)(14). However, each of HoldCo, Intermediate HoldCo and the Purchaser acknowledges and agrees that the assignment of any rights or other assets pursuant to the terms of this Agreement or the other Definitive Agreements shall not constitute the assignment of any other rights, powers or privileges granted to the Seller pursuant to the provisions the FDIA, including those granted pursuant to 12 U.S.C. § 182l(d), 12 U.S.C. § l823(e) and 12 U.S.C. § 1825, all such rights and powers being expressly reserved by the Seller, nor shall HoldCo, Intermediate HoldCo or the Purchaser assert or attempt to assert any such right, power or privilege in any pending or future litigation involving any asset transferred hereunder or under the other Definitive Agreements.

Section 19.13 Right to Specific Performance. EACH OF HOLDCO, INTERMEDIATE HOLDCO AND THE PURCHASER, FOR ITSELF AND ITS AFFILIATES, HEREBY ACKNOWLEDGES AND AGREES THAT THE DAMAGES TO BE INCURRED BY THE SELLER AS A RESULT OF HOLDCO'S, INTERMEDIATE HOLDCO'S OR THE PURCHASER'S BREACH OF THIS AGREEMENT WILL BE DIFFICULT, IF NOT IMPOSSIBLE, TO ASCERTAIN, THAT DAMAGES WILL NOT BE AN ADEQUATE

Exhibit 2, Page 142

REMEDY AND THAT ANY BREACH OR THREATENED BREACH OF ANY OF THE PROVISIONS OF THIS AGREEMENT BY HOLDCO, INTERMEDIATE HOLDCO OR THE PURCHASER MAY CAUSE IMMEDIATE IRREPARABLE HARM FOR WHICH THERE MAY BE NO ADEQUATE REMEDY AT LAW. ACCORDINGLY, THE PARTIES AGREE THAT, IN THE EVENT OF ANY SUCH BREACH OR THREATENED BREACH, THE SELLER SHALL BE ENTITLED TO (I) IMMEDIATE AND PERMANENT EQUITABLE RELIEF (INCLUDING INJUNCTIVE RELIEF AND SPECIFIC PERFORMANCE OF THE PROVISIONS OF THIS AGREEMENT) FROM A COURT OF COMPETENT JURISDICTION (IN ADDITION TO ANY OTHER REMEDY TO WHICH IT MAY BE ENTITLED AT LAW OR IN EQUITY), AND (II) SOLELY IN THE CASE OF A BREACH OF <u>SECTION 19.12</u> HEREOF, LIQUIDATED DAMAGES IN THE AMOUNT OF $25,000 FOR EACH BREACH OF SUCH SECTION. THE PARTIES AGREE AND STIPULATE THAT THE SELLER SHALL BE ENTITLED TO EQUITABLE (INCLUDING INJUNCTIVE) RELIEF WITHOUT POSTING A BOND OR OTHER SECURITY AND HOLDCO, INTERMEDIATE HOLDCO AND THE PURCHASER EACH FURTHER WAIVES ANY DEFENSE IN ANY SUCH ACTION FOR SPECIFIC PERFORMANCE OR INJUNCTIVE RELIEF THAT A REMEDY AT LAW WOULD BE ADEQUATE AND ANY REQUIREMENT UNDER LAW TO POST SECURITY AS A PREREQUISITE TO OBTAINING EQUITABLE RELIEF. NOTHING CONTAINED IN THIS SECTION SHALL LIMIT ANY PARTY'S RIGHT TO ANY REMEDIES AT LAW, INCLUDING THE RECOVERY OF DAMAGES FOR BREACH OF THIS AGREEMENT.

Section 19.14  <u>No Third Party Beneficiaries</u>. This Agreement is made for the sole benefit of the Seller, HoldCo, Intermediate HoldCo and the Purchaser and their respective successors and permitted assigns, and no other Person or Persons, including any Seller Employees or Transferred Employees shall have any rights or remedies under or by reason of this Agreement. Notwithstanding the foregoing, the FDIC shall be considered a third party beneficiary of this Agreement.

No provision of this Agreement shall modify or amend any Seller Employee Plan unless this Agreement explicitly states that the provision "amends" such Seller Employee Plan. This shall not prevent the parties entitled to enforce this Agreement from enforcing any provision in this Agreement, but no other party shall be entitled to enforce any provision in this Agreement on the grounds that it is an amendment to such Seller Employee Plan.

Section 19.15  <u>Confidentiality; Disclosures</u>.  No party to this Agreement shall disclose the existence or terms of this Agreement to any third party, other than its respective financial, legal and other professional advisors and its members, limited partners or other investors, without the prior written consent of the other parties except as may be required by Law, including the FDIC's obligations under the Freedom of Information Act. The Seller, HoldCo, Intermediate HoldCo and the Purchaser shall mutually agree to the timing and content of any announcements, press releases or public statements concerning the Transaction. Except as expressly modified hereby, the Confidentiality Agreement shall remain in full force and effect.

Section 19.16  <u>Manner of Payment</u>.  All payments due under this Agreement shall be in lawful money of the United States of America in immediately available funds as each party hereto may specify to the other parties; <u>provided that</u>, in the event the any party is obligated to

- 76-

make any payment hereunder in the amount of $25,000.00 or less, such payment may be made by check.

Section 19.17 <u>Survival of Covenants, Etc</u>. The covenants, representations and warranties in this Agreement shall survive the execution of this Agreement and the consummation of the Transaction, unless otherwise contemplated herein.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Exhibit 2, Page 144

**IN WITNESS WHEREOF**, the parties hereto have caused this Master Purchase Agreement to be executed by their duly authorized representatives as of the date first above written.

FEDERAL DEPOSIT INSURANCE
CORPORATION AS CONSERVATOR FOR
INDYMAC FEDERAL BANK, FSB

By: *Mitchell L. Glassman*
  Name: Mitchell L Glassman
  Title: Director, DRR-FDIC

IMB HOLDCO LLC

By: _____
  Steven T. Mnuchin
  Chief Executive Officer

ONEWEST BANK GROUP LLC

By: _____
  Steven T. Mnuchin
  Chief Executive Officer

Exhibit 2, Page 145

**IN WITNESS WHEREOF**, the parties hereto have caused this Master Purchase Agreement to be executed by their duly authorized representatives as of the date first above written.

**FEDERAL DEPOSIT INSURANCE CORPORATION AS CONSERVATOR FOR INDYMAC FEDERAL BANK, FSB**

By: _____
    Name:
    Title:

**IMB HOLDCO LLC**

By: _____
    Steven T. Mnuchin
    Chief Executive Officer

**ONEWEST BANK GROUP LLC**

By: _____
    Steven T. Mnuchin
    Chief Executive Officer

## JOINDER

By its execution and delivery of this signature page, the undersigned hereby joins in and agrees
to be bound by the terms and conditions of the Master Purchase Agreement, dated as of
March 18, 2009, by and among the Federal Deposit Insurance Corporation as conservator for
IndyMac Federal Bank, FSB, IMB HoldCo LLC and OneWest Bank Group LLC as the
"Purchaser" thereunder and authorizes this signature page to be attached to the Master Purchase
Agreement or counterparts thereof.

**ONEWEST BANK, FSB**

By: _____

Name: Terrence P. Laughlin

Title:   Chief Executive Officer and President

Exhibit 2, Page 148

## JOINDER

By its execution and delivery of this signature page, the undersigned hereby joins in and agrees to be bound by the terms and conditions of the Master Purchase Agreement, dated as of March 18, 2009, by and among the Federal Deposit Insurance Corporation as conservator for IndyMac Federal Bank, FSB, IMB HoldCo LLC and OneWest Bank Group LLC as the "Seller" thereunder and authorizes this signature page to be attached to the Master Purchase Agreement or counterparts thereof.

FEDERAL DEPOSIT INSURANCE
CORPORATION, AS RECEIVER FOR
INDYMAC FEDERAL BANK, FSB

By: _Mitchell L. Glassman_
Name: Mitchell L. Glassman
Title: Director, DRR - FDIC

Exhibit 2, Page 150

## JOINDER

By its execution and delivery of this signature page, the undersigned hereby joins in and agrees to be bound by the terms and conditions of the Master Purchase Agreement, dated as of March 18, 2009, by and among the Federal Deposit Insurance Corporation as conservator for IndyMac Federal Bank, FSB, IMB HoldCo LLC and OneWest Bank Group LLC, solely with respect to Section 11.04 thereunder and authorizes this signature page to be attached to the Master Purchase Agreement or counterparts thereof.

INDYMAC RESOURCES, INC.

By: _____
    Name:  George Alexander
    Title:   Attorney-in-Fact

# EXHIBIT 3

<div align="right">EXECUTION COPY</div>

## GUARANTY AGREEMENT

**THIS GUARANTY AGREEMENT** (this "**Agreement**") is made and entered into as of the 18th day of March, 2009 by and among THE FEDERAL DEPOSIT INSURANCE CORPORATION, in its corporate capacity (the "**FDIC**"), IMB HoldCo LLC ("**HoldCo**") and each other Beneficiary (as defined below) that executes a joinder hereto.

<div align="center">RECITALS</div>

**WHEREAS**, HoldCo is entering into the Master Purchase Agreement, dated as of the date hereof, by and among the FDIC as Conservator for IndyMac Federal Bank, FSB, HoldCo and OneWest Bank Group LLC (as the same may be amended or supplemented, the "**Master Purchase Agreement**"), and, in connection therewith, the Purchaser (as defined in the Master Purchase Agreement) or a subsidiary of the Purchaser will enter into the other Definitive Agreements (as defined in the Master Purchase Agreement) (HoldCo, OneWest Bank Group LLC, the Purchaser and any subsidiary of HoldCo or the Purchaser that is a party to any Definitive Agreement are collectively referred to herein as the "**Beneficiaries**"); and

**WHEREAS**, a condition and an inducement to the obligation of the Beneficiaries to consummate the transactions contemplated by the Master Purchase Agreement and the other Definitive Agreements is the execution and delivery of this Agreement by the FDIC.

**NOW, THEREFORE**, in consideration of the foregoing and the mutual promises and agreements hereinafter contained, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows.

1.      **Definitions.** Capitalized terms used and not defined in this Agreement shall have the respective meanings set forth in the Master Purchase Agreement.  For purposes of Section 3 of this Agreement, the acts and omissions of any Beneficiary shall include the acts and omissions of any and all officers, directors, agents, employees, subsidiaries, members and Affiliates of such Beneficiary.

2.      **Guaranty.** The FDIC hereby unconditionally and irrevocably guarantees for the benefit of the Beneficiaries the payment, reimbursement and related obligations of the FDIC, as Conservator for IndyMac Federal or as Receiver for IndyMac Federal, as the case may be (the "**Seller**"), under the Definitive Agreements (the "**Guaranteed Obligations**").  With respect to Guaranteed Obligations that are payment obligations of the Seller, the FDIC shall be liable under this Agreement only for such amounts, if any, as the Seller is obligated to pay under the Definitive Agreements but shall fail to pay.  Notwithstanding the forgoing, the FDIC shall not have any obligation to take any action or pay any amounts pursuant to this Agreement unless it has received a written request from the applicable Beneficiary setting forth in reasonable detail the basis for such request.  The FDIC shall pay any amounts for which it is liable hereunder within thirty (30) calendar days of the time frames in which the Seller is, or would have been, obligated to pay such amounts under the Definitive Agreements or, if later, thirty (30) calendar

<div align="right">Exhibit 3, Page 154</div>

days after the FDIC's receipt of the notice from the Beneficiary referenced in the preceding sentence.  Notwithstanding anything herein to the contrary, the FDIC shall have no obligation under this Agreement to any Beneficiary that has not signed a joinder to this Agreement.  Any Beneficiary may at any time deliver notice to and proceed against the FDIC in the event of any failure of payment or performance of any of the Guaranteed Obligations.

      **3.**     **Indemnity**.  Subject to the terms, procedures and exclusions of Sections 16.07 and 17.06 of the Master Purchase Agreement, which shall be applicable to this Section 3 as if specifically set forth herein, each Beneficiary shall save, defend, indemnify and hold harmless the FDIC from, and shall promptly reimburse the FDIC for, any and all Losses incurred by or assessed against the FDIC and arising out of or resulting from:

            (a)     such Beneficiary's breach of any representation or warranty made by it in the Master Purchase Agreement or any other Definitive Agreement; or

            (b)     the failure by such Beneficiary to perform any of its obligations in the Master Purchase Agreement or any other Definitive Agreement.

For the avoidance of doubt, no Beneficiary shall be required to indemnify the FDIC under this Section 3 if the Seller Indemnitees have been indemnified under the Master Purchase Agreement in respect of such Beneficiary's breach or failure to perform or the FDIC otherwise shall have been reimbursed for such Losses (including pursuant to a claim under the Master Purchase Agreement).

      **4.**     **Assignment of Claims**.  If and to the extent the FDIC makes any payment to any Beneficiary pursuant to or in connection with this Agreement, the FDIC shall be subrogated to all of the rights of such Beneficiary with respect to any claim to which such payment relates to the extent of such payment, and each Beneficiary, upon acceptance of any such payment, will be deemed to have assigned to the FDIC any and all claims it may have against the Seller or others and for which such Beneficiary receives payment from the FDIC under this Agreement.  Upon the request of the FDIC, the applicable Beneficiary shall execute written assignments of such claims.

      **5.**     **FDIC's Authority**.  The FDIC hereby represents and warrants that it has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder; that the person executing this Agreement has been duly authorized to do so; and that this Agreement constitutes a valid and binding obligation of the FDIC and is enforceable against the FDIC in accordance with its terms.

      **6.**     **Beneficiary's Authority**.  HoldCo and each Beneficiary executing a joinder hereto hereby represents and warrants that it has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder; that the person executing this Agreement or joinder hereto has been duly authorized to do so; and that this Agreement constitutes its valid and binding obligation and is enforceable against it in accordance with its terms.

Exhibit 3, Page 155

7.     **Waiver of Certain Defenses.**

(a)     In the event that any Beneficiary seeks to enforce the FDIC's obligations under this Agreement, the FDIC hereby waives the unenforceability of any provision of the Definitive Agreements to the extent the basis of such unenforceability is attributable to an act or omission of, or otherwise attributable in any way to, the Seller or the FDIC.

(b)     The FDIC hereby (i) waives notice of any amendment, modification, waiver, extension of time or compromise of debts, liabilities and obligations of the Seller that is signed in writing by the Seller or is otherwise effective pursuant to the terms of the Master Purchase Agreement and (ii) consents to each and every such amendment, modification, waiver, extension of time or compromise of debts, liabilities and obligations of the Seller.

(c)     Notwithstanding the foregoing, nothing contained in this Agreement shall relieve any Beneficiary of any of its obligations under the Master Purchase Agreement, including, without limitation, its obligation to comply with all claims procedures contained therein, unless and to the extent the same are expressly waived in writing by the Seller or the FDIC.

8.     **Waivers; Amendment and Assignment**.  No provision of this Agreement may be amended or waived except in writing executed by all of the parties to this Agreement.  This Agreement and the terms, covenants, conditions, provisions, obligations, undertakings, rights and benefits hereof shall be binding upon, and shall inure to the benefit, of the undersigned parties and their respective heirs, executors, administrators, representatives, successors and permitted assigns, and no other Person or Persons shall have any rights or remedies under or by reason of this Agreement.  Notwithstanding the foregoing, no party may assign or otherwise transfer (including by merger or consolidation in it is not the surviving entity) its rights or obligations under this Agreement without the express prior written consent of the FDIC and any attempted assignment without such consent shall be void *ab initio*.

9.     **Counterparts; Facsimile Signatures**.  This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original but all of which together shall constitute but one and the same agreement.  This Agreement and any amendments hereto, to the extent signed and delivered by facsimile or other electronic means, shall be treated in all manner and respects as an original agreement and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  No signatory to this Agreement shall raise the use of a facsimile machine or other electronic means to deliver a signature or the fact that any signature or agreement was transmitted or communicated through the use of a facsimile machine or other electronic means as a defense to the formation or enforceability of a contract and each such Person forever waives any such defense.

10.     **Entire Agreement.**  This Agreement contains the entire agreement between the FDIC and the Beneficiaries with respect to the subject matter hereof and supersedes any and all other prior agreements, whether oral or written.  In the event of a conflict between the terms of this Agreement and the terms of any other Definitive Agreement or other document or instrument executed in connection herewith or in connection with the Transaction, the terms of

3

this Agreement shall control and shall in no way be or be deemed to be amended, modified or otherwise affected in any manner by the terms of such other Definitive Agreements or other documents or instruments.

      **11.**    **Rights Cumulative.**  The rights of each of the parties under this Agreement are cumulative and may be exercised as often as such party considers appropriate.

      **12.**    **Headings.**  Section titles or captions contained in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provisions hereof.  All Section and paragraph references contained herein shall refer to Sections and paragraphs in this Agreement unless otherwise specified.

      **13.**    **Notices.**  Any notice, request, demand or other communication required or permitted to be given pursuant to any provision of this Agreement shall be delivered to:

| | |
|---|---|
| If to any Beneficiary: | IMB HoldCo LLC |
| | 888 East Walnut Street |
| | Pasadena, California  91101-7211 |
| | Attention:  Steven Mnuchin |
| | |
| If to the FDIC: | Manager, Structured Transactions |
| | c/o Federal Deposit Insurance Corporation |
| | 550 17th Street, N.W. (Room F-7008) |
| | Washington, D.C.  20429 |
| | Attention: George Alexander |
| | |
| with a copy to: | FDIC Legal Division |
| | Litigation and Resolutions Branch, Receivership Section |
| | Special Issues Unit |
| | 3501 Fairfax Drive (Room E-7056) |
| | Arlington, Virginia 22226 |
| | Attention:  Senior Counsel |

      **14.**    **Governing Law.**  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL LAW, BUT IF FEDERAL LAW DOES NOT PROVIDE A RULE OF DECISION IT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK (EXCLUDING ANY CONFLICT OF LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE OR THE CONSTRUCTION OF THIS AGREEMENT TO THE LAW OF ANOTHER JURISDICTION).  Nothing in this Agreement shall require any unlawful action or inaction by any party hereto.

      **15.**    **Jurisdiction; Venue and Service.**  Each of HoldCo and each Beneficiary, for itself and its Affiliates, and the FDIC hereby irrevocably and unconditionally:

Exhibit 3, Page 157

(a)      (i) agrees that any suit, action or proceeding instituted against it by any other party with respect to this Agreement may be instituted, and that any suit, action or proceeding by it against any other party with respect to this Agreement shall be instituted, only in the United States District Court for the Southern District of New York or the United States District Court for the District of Columbia (and appellate courts from any of the foregoing), (ii) consents and submits, for itself and its property, to the jurisdiction of such courts for the purpose of any such suit, action or proceeding instituted against it by any other party and (iii) agrees that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law;

(b)      agrees that service of all writs, process and summonses in any suit, action or proceeding pursuant to Section 15(a) may be effected by the mailing of copies thereof by registered or certified mail, postage prepaid, to its address for notices pursuant to Section 13 (with copies to such other Persons as specified therein); provided, however, that nothing contained in this Section 15 shall affect its ability to be served process in any other manner permitted by Law;

(c)      (i) waives any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement brought in any court specified in Section 15(a), (ii) waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum and (iii) agrees not to plead or claim either of the foregoing; and

(d)      agrees that nothing contained in this Section 15 shall be construed as a limitation on any removal rights the FDIC may have.

16.    **Waiver of Jury Trial.**  EACH OF HOLDCO AND EACH BENEFICIARY, FOR ITSELF AND ITS AFFILIATES, AND THE FDIC HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY OF ANY DISPUTE ARISING OUT OF OR RELATING TO THIS AGREEMENT AND AGREES THAT ANY SUCH DISPUTE SHALL BE TRIED BEFORE A JUDGE SITTING WITHOUT A JURY.

17.    **Severability.**  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall be ineffective, but such ineffectiveness shall be limited as follows:  (i) if such provision is prohibited or unenforceable in such jurisdiction only as to a particular Person or Persons and/or under any particular circumstance or circumstances, such provision shall be ineffective, but only in such jurisdiction and only with respect to such particular Person or Persons and/or under such particular circumstance or circumstances, as the case may be; (ii) without limitation of clause (i), such provision shall in any event be ineffective only as to such jurisdiction and only to the extent of such prohibition or unenforceability, and such prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction; and (iii) without limitation of clauses (i) or (ii), such ineffectiveness shall not invalidate any of the remaining provisions of this Agreement.  Without limitation of the preceding sentence, it is the intent of the parties to this Agreement that in the event that in any court proceeding, such court determines that any provision of this Agreement is prohibited or unenforceable in any jurisdiction (because of the

5

duration or scope (geographic or otherwise) of such provision, or for any other reason) such court shall have the power to, and shall, (x) modify such provision (including, to the extent applicable, by limiting the duration or scope of such provision and/or the Persons against whom, and/or the circumstances under which, such provision shall be effective in such jurisdiction) for purposes of such proceeding to the minimum extent necessary so that such provision, as so modified, may then be enforced in such proceeding and (y) enforce such provision, as so modified pursuant to clause (x), in such proceeding.  Nothing in this <u>Section 17</u> is intended to, or shall, limit (1) the ability of any party to this Agreement to appeal any court ruling or the effect of any favorable ruling on appeal or (2) the intended effect of <u>Section 17</u>.

      **18.**   **<u>Cooperation</u>.**  The parties shall act reasonably and in good faith in complying with their obligations hereunder.

      **19.**   **<u>No Third Party Beneficiaries</u>**.  This Agreement is made for the sole benefit of the Beneficiaries who have executed this Agreement or a joinder hereto and the FDIC, and their respective successors and permitted assigns, and no other Person or Persons shall have any rights or remedies under or by reason of this Agreement.

      **20.**   **<u>Termination</u>**.  This Agreement shall terminate upon the expiration of all obligations of the Seller arising under the Definitive Agreements.

<div align="center">[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]</div>

<div align="center">6</div>

**IN WITNESS WHEREOF**, the parties hereto have caused this Guaranty Agreement to be executed by their duly authorized representatives as of the date first above written.

IMB HOLDCO LLC

By: _____

Steven T. Mnuchin
Chief Executive Officer


FEDERAL DEPOSIT INSURANCE
CORPORATION, in its corporate capacity


By: _____

Name:
Title:

**IN WITNESS WHEREOF**, the parties hereto have caused this Guaranty Agreement to
be executed by their duly authorized representatives as of the date first above written.

IMB HOLDCO LLC


By: _____
    Steven T. Mnuchin
    Chief Executive Officer


FEDERAL DEPOSIT INSURANCE
CORPORATION, in its corporate capacity


By: *Mitchell L. Glassman*
Name: Mitchell L. Glassman
Title: Director, DRR - FDIC

Exhibit 3, Page 161

## JOINDER

By its execution and delivery of this signature page, the undersigned hereby joins in and agrees to be bound by the terms and conditions of the Guaranty Agreement, dated as of March 18, 2009, by and among the Federal Deposit Insurance Corporation, in its corporate capacity, IMB HoldCo LLC and each other Beneficiary (as defined therein) that executes a joinder thereto (the "**Guaranty Agreement**"), as a "Beneficiary" thereunder and authorizes this signature page to be attached to the Guaranty Agreement or counterparts thereof.

**[BENEFICIARY]**

By:_____
    Name:
    Title:

8

Exhibit 3, Page 162

# EXHIBIT 4

**Execution Copy**

# SERVICING BUSINESS ASSET PURCHASE AGREEMENT

## BY AND BETWEEN

## THE FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR INDYMAC FEDERAL BANK, FSB

## AND

## ONEWEST BANK, FSB

## Dated as of March 19, 2009

Exhibit 4, Page 163

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS AND CONSTRUCTION ...................................................................2

Section 1.01 Definitions ...............................................................................................2
Section 1.02 Construction.............................................................................................12

ARTICLE II THE PURCHASE AND SALE.......................................................................13

Section 2.01 Purchase and Sale of Assets ................................................................13
Section 2.02 Excluded Assets.....................................................................................14
Section 2.03 Assumption of Liabilities ......................................................................14
Section 2.04 Excluded Liabilities................................................................................15
Section 2.05 Retained Claims and Release ...............................................................16
Section 2.06 Purchase Price; Closing Payment .......................................................17
Section 2.07 Prorations.................................................................................................18
Section 2.08 Closing......................................................................................................18
Section 2.09 Closing Procedure..................................................................................18
Section 2.10 Closing Adjustment Documents ..........................................................18
Section 2.11 Calculation of Adjustments ..................................................................18
Section 2.12 Final Settlement......................................................................................19
Section 2.13 Release of the Advance Holdback Amount........................................19
Section 2.14 Servicing Adjustment ............................................................................19

ARTICLE III PRE-CLOSING COVENANTS ...................................................................20

Section 3.01 Transition.................................................................................................20
Section 3.02 Employees................................................................................................21
Section 3.03 Agency Approvals; Qualification to Act as Servicer ........................21
Section 3.04 Additional Title Documents ..................................................................21

ARTICLE IV CLOSING DELIVERIES ............................................................................21

Section 4.01 Seller's Deliverables...............................................................................21
Section 4.02 Purchaser's Deliverables .......................................................................22

ARTICLE V TRANSFER OF MORTGAGE RELATED ASSETS............................................22

Section 5.01 Transfer of Documents, etc ..................................................................22
Section 5.02 Unremitted Collections; Escrow Accounts and Custodial Accounts ................22
Section 5.03 Invoices....................................................................................................23
Section 5.04 Notice to Mortgagors.............................................................................23
Section 5.05 Forwarding Post-Closing Date Items ..................................................23
Section 5.06 Misapplied and Returned Payments....................................................23
Section 5.07 Notice to Insurers, Tax Authorities and Bankruptcy Trustees ........24
Section 5.08 Tax and Flood Contracts.......................................................................24
Section 5.09 Custodial Agreements............................................................................24
Section 5.10 Servicing of REO Property....................................................................24
Section 5.11 MERS Mortgage Loans ........................................................................25

i

**Page**

Section 5.12 GLBA .........................................................................................25
Section 5.13 Mortgage Loans in Litigation ...................................................25
Section 5.14 Mortgage Loans in Bankruptcy .................................................26
Section 5.15 Retained Claims .........................................................................27

ARTICLE VI REPRESENTATIONS AND WARRANTIES OF THE PURCHASER ..............27

ARTICLE VII REPRESENTATIONS AND WARRANTIES; ASSET-LEVEL
            STATEMENTS .......................................................................27

Section 7.01 Assets Conveyed "AS IS"; Purchaser Acknowledgments .................................27
Section 7.02 Representations and Warranties of the Seller ......................................28
Section 7.03 Asset-Level Statements ................................................................28

ARTICLE VIII REMEDIES FOR DEFECTIVE ASSETS ........................................................29

Section 8.01 Remedy ......................................................................................29
Section 8.02 Conditions Precedent to Remedy ...............................................30
Section 8.03 Excluded Losses .........................................................................30
Section 8.04 Third Party Claims ......................................................................31
Section 8.05 Notice and Evidence of Defect ...................................................31
Section 8.06 Processing of the Remedy Request .............................................32
Section 8.07 Seller Loss Limit ........................................................................33

ARTICLE IX CONDITIONS PRECEDENT TO CLOSING .....................................................33

Section 9.01 Conditions to Purchaser's Obligation .....................................................33
Section 9.02 Conditions to Seller's Obligation. .........................................................33

ARTICLE X POST-CLOSING COVENANTS ......................................................................33

Section 10.01   Discharge of Liabilities ...............................................................33
Section 10.02   Performance of Servicing ...........................................................33
Section 10.03   Standard of Care .......................................................................34
Section 10.04   Mitigation of Losses ...................................................................34
Section 10.05   Reimbursement of Recoveries ....................................................34
Section 10.06   Reimbursement for Draws ..........................................................35
Section 10.07   Tax Reporting ...........................................................................35
Section 10.08   Insured or Guaranteed Mortgage Loans ......................................35
Section 10.09   Notice of Claim .........................................................................35
Section 10.10   Prior Servicer Information ...........................................................35
Section 10.11   Further Assurances; Post-Closing Cooperation ............................36
Section 10.12   Loan Modification Program .........................................................36
Section 10.13   Information and Access for Bond Insurers ...................................37

ARTICLE XI TAX MATTERS ..........................................................................................37

Section 11.01   Responsibility for Filing Tax Returns ..........................................37
Section 11.02   Refund and Tax Benefits. ...........................................................37
Section 11.03   Cooperation on Tax Matters. ......................................................37

Exhibit 4, Page 165

Section 11.04    Tax-Sharing Agreements. .............................................................38

ARTICLE XII NOTICES .........................................................................................38

ARTICLE XIII MISCELLANEOUS PROVISIONS .................................................39

Section 13.01    Severability ................................................................................39
Section 13.02    Governing Law ..........................................................................39
Section 13.03    Waivers; Amendment and Assignment .....................................40
Section 13.04    No Presumption .........................................................................40
Section 13.05    Entire Agreement ......................................................................40
Section 13.06    Jurisdiction; Venue and Service................................................40
Section 13.07    Waiver of Jury Trial..................................................................41
Section 13.08    Counterparts; Facsimile Signatures ..........................................41
Section 13.09    Headings ....................................................................................41
Section 13.10    Compliance with Law ................................................................41
Section 13.11    Right to Specific Performance ...................................................41
Section 13.12    No Third Party Beneficiaries .....................................................42
Section 13.13    Timing .......................................................................................42
Section 13.14    Survival .....................................................................................42
Section 13.15    Termination................................................................................42

Exhibit 4, Page 166

Schedules:

| | |
|---|---|
| Schedule 1.01(a) | Mortgage Loans |
| Schedule 1.01(b) | Servicing Agreement Transactions |
| Schedule 2.01(b) | Servicing Advances |
| Schedule 2.01(c) | Servicing Fee Receivables |
| Schedule 2.01(f) | Escrow Accounts |
| Schedule 2.03(c) | Assumed Litigation |
| Schedule 2.06 | Categories and Applicable Percentages with Respect to Servicing Rights |
| Schedule 7.03(f) | Servicing Agreements |

Exhibits:

| | |
|---|---|
| Exhibit A | Form of Affidavit and Assignment of Claim |
| Exhibit B | Form of Assignment and Assumption Agreement |
| Exhibit C | Term Sheet for Assignment of Funding Obligations to Servicer in HELOC Securitizations and Reimbursement for Draws |
| Exhibit D | Form of Bill of Sale |
| Exhibit E | Form of Limited Power of Attorney |
| Exhibit F | FDIC's Mortgage Loan Modification Program |
| Exhibit G | Affidavit of Lost Certificate |

Exhibit 4, Page 167

## SERVICING BUSINESS ASSET PURCHASE AGREEMENT

THIS SERVICING BUSINESS ASSET PURCHASE AGREEMENT (as the same shall be amended or supplemented, this "**Agreement**") is made and entered into as of the 19th day of March, 2009 by and between THE FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR INDYMAC FEDERAL BANK, FSB (the "**Seller**") and ONEWEST BANK, FSB (the "**Purchaser**").

RECITALS

WHEREAS, on July 11, 2008, the FDIC (as defined below) was appointed Receiver for IndyMac Bank, FSB (the "**Failed Thrift**") and certain assets and obligations of the Failed Thrift were transferred to a newly-formed thrift, IndyMac Federal Bank, FSB ("**IndyMac Federal**"), for which the FDIC was appointed Conservator (the "**Conservator**"), and on the date hereof, the FDIC was appointed Receiver for IndyMac Federal  (the "**Receiver**");

WHEREAS, under the Federal Deposit Insurance Act, as amended, the FDIC is authorized to sell or otherwise dispose of the assets of thrift institutions for which it serves as conservator or receiver;

WHEREAS, IndyMac Federal, among other things, engaged in the business of servicing mortgage loans with primary operations in Austin, Texas, Kalamazoo, Michigan and Kansas City, Missouri (the "**Business**");

WHEREAS, IMB HoldCo LLC ("**HoldCo**") has agreed to purchase certain specified assets and assume certain specified liabilities of IndyMac Federal on the terms and subject to the conditions set forth herein and in the Master Purchase Agreement (as defined below);

WHEREAS, in order to facilitate the transactions provided for herein, HoldCo formed the Purchaser as a new federally-chartered insured savings bank, all of the stock of which will be acquired by OneWest Bank Group LLC, a newly-formed direct wholly-owned subsidiary of HoldCo;

WHEREAS, pursuant to this Agreement, the Seller shall sell, assign, convey and transfer to the Purchaser certain specified assets and certain specified liabilities of the Seller related to the Business; and

WHEREAS, the parties desire to memorialize their agreements relating to the transactions described above and certain other matters as set forth in this Agreement and the Master Purchase Agreement.

NOW, THEREFORE, in consideration of the foregoing and the mutual promises and agreements hereinafter contained, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows.

# ARTICLE I

## DEFINITIONS AND CONSTRUCTION

Section 1.01    Definitions.  For purposes of this Agreement, the following terms shall have the meanings and definitions hereinafter respectively set forth:

"**Accounting Records**" means the general ledger, supporting subsidiary ledgers and schedules, and loan servicing system records of the Seller.

"**Acquired Subsidiary**" means IndyMac Financial Services, a California corporation and wholly owned subsidiary of IndyMac Federal.

"**Adjustment Date**" means, as to each Mortgage Loan, the date on which the Mortgage Interest Rate is adjusted in accordance with the terms of the related Mortgage Note and Mortgage.

"**Advance Holdback Amount**" has the meaning given in Section 2.11.

"**Advance Holdback Calculation Date**" means the date that is eighteen months after the Closing Date.

"**Advance Holdback Settlement Date**" means the date that is fifteen (15) Business Days after the Advance Holdback Calculation Date.

"**Affiliate**" means, with respect to any specified Person, any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with such specified Person.  For purposes of this definition, the term "**control**" (including the phrases "**controlled by**" and "**under common control with**") when used with respect to any specified Person means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or interests, by contract or otherwise.

"**Agency**" means the FHA, the FMHA (now RHCDS), Fannie Mae, Freddie Mac, Ginnie Mae, the VA, RHS or a State Agency, as applicable.

"**Agreement**" has the meaning given in the preamble, and shall include all exhibits, schedules and attachments hereto.

"**Ancillary Documents**" means the Master Purchase Agreement, the Bill of Sale, the Assignment and Assumption Agreement, the Guaranty and any and all other agreements and instruments that may be executed and delivered by the parties in connection with the transactions contemplated by this Agreement, and, upon execution thereof, the definitive agreements executed pursuant to the Term Sheet for Assignment of Funding Obligations to Servicer in HELOC Securitizations and Reimbursement for Draws attached as Exhibit C.

"**Asset-Level Statements**" has the meaning given in Section 7.01(b).

Exhibit 4, Page 169

"**Assets**" has the meaning given in Section 2.01.

"**Affidavit and Assignment of Claim**" means an Affidavit and Assignment of Claim in the form of Exhibit A hereto.

"**Affidavit of Lost Certificate**" means an Affidavit of Lost Stock Certificate in the form of Exhibit G hereto.

"**Assignment and Assumption Agreement**" means an Assignment and Assumption Agreement in the form of Exhibit B hereto.

"**Assumed Liabilities**" has the meaning given in Section 2.03.

"**Bankruptcy Rule**" means the rules set forth under the Federal Rules of Bankruptcy Procedure, as the same may be amended from time to time.

"**Bill of Sale**" means a Bill of Sale in the form of Exhibit D hereto.

"**Bond Insurer**" means any insurer obligated to make payments to the related certificate holders in the event of a payment default in respect of any class of certificates in a Securitization Transaction.

"**Book Value**" means, with respect to any asset purchased or liability assumed by the Purchaser pursuant to this Agreement, the dollar amount thereof stated on the Accounting Records of the Seller, as of the applicable date, determined after adjustments made by the Seller for differences in accounts, suspense items, unposted debits and credits, and other similar adjustments or corrections and for setoffs, whether voluntary or involuntary.  Without limiting the generality of the foregoing, the Book Value of an Assumed Liability shall include all accrued and unpaid interest thereon.  The Book Value of an Asset shall not include any adjustment for loan premiums, discounts or any related deferred income or fees, or general or specific reserves on the Accounting Records of the Seller.

"**Business**" has the meaning given in the recitals.

"**Business Day**" means any day except a Saturday, Sunday or other day on which federal savings banks in California, New York or Washington, D.C. or United States federal government offices are required or authorized by Law to close.

"**Change Fee**" means a fee charged to a Mortgagor for a change in the terms of the Mortgagor's Mortgage Loan.

"**Claims Termination Date**" means the first Business Day after the second anniversary of the Closing Date.

"**Closing**" has the meaning given in Section 2.08.

"**Closing Adjustment Documents**" has the meaning given in Section 2.10.

Exhibit 4, Page 170

"**Closing Date**" means the date on which the Closing occurs.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Collateral Document**" means any pledge agreement, security agreement, personal or corporate guaranty, deed of trust, deed, mortgage, contract for the sale of real property, assignment, collateral agreement or other agreement or document of any kind, whether an original or a copy, whether similar to or different from those enumerated, securing in any manner the performance or payment by any Mortgagor of its obligations or the obligations of any other Mortgagor under any of the Mortgage Loans or the Mortgage Notes evidencing the Mortgage Loans.

"**Conservator**" has the meaning given in the recitals.

"**Contract**" means any written agreement, lease (other than for real property), license or sublicense, evidence of indebtedness, or other written contract, commitment, arrangement or obligation, excluding Mortgage Loan Documents.

"**Custodial Account**" means an account maintained by the Seller or its agent for the deposit of principal and interest payments received in respect of one or more Mortgage Loans.

"**Data Processing Equipment**" means data processing equipment and related hardware and software, and shall include all equipment related thereto, including remote terminals, networked personal computers, cabling, writing and related installation equipment and materials.

"**Defect**" means the failure of any Asset-Level Statement to be true as of the Closing Date.

"**Defect Notice**" has the meaning given in Section 8.05.

"**Defective Asset**" has the meaning given in Section 8.01.

"**Disagreement**" has the meaning given in the Master Purchase Agreement.

"**Draws**" means with respect to a home equity line of credit, an additional borrowing by the related Mortgagor subsequent to the Closing Date in accordance with the related Mortgage Loan Documents.

"**Employee Plan**" means any employee benefit plan as defined in Section 3(3) of ERISA, and each other employment, severance, consulting, deferred compensation, incentive compensation, fringe benefit, change in control, retention, stock option or other equity or equity-based or other compensatory or benefit plan, policy, agreement or arrangement (including any collective bargaining agreement, multiemployer, multiple employer or post retirement benefit plan), in all cases whether or not subject to ERISA, whether formal or informal, oral or written, legally binding or not, that is or was (i) maintained, administered, contributed to or required to be contributed to by the Seller, the Failed Thrift, IndyMac Federal or any of their respective ERISA Affiliates, or to which the Seller, the Failed Thrift, IndyMac Federal or any of their respective ERISA Affiliates is or was a party or had or has any present or future liability thereunder (except

Exhibit 4, Page 171

as custodian, trustee, fiduciary or service provider to a customer plan), and (ii) is or was for the benefit of employees, directors or consultants who perform or previously performed services for the Seller, the Failed Thrift, IndyMac Federal or any of their respective Affiliates or who otherwise have a present or future right to benefits in respect of such services.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" means any entity that, together with the Seller, the Failed Thrift or IndyMac Federal would be treated as a single employer under Section 414 of the Code.

"**Escrow Account**" means an account maintained by the Seller or its agent for the deposit of Escrow Payments received in respect of one or more Mortgage Loans.

"**Escrow Payments**" means the amounts constituting ground rents, taxes, assessments, water rates, common charges in condominiums and planned unit developments, mortgage insurance premiums, fire and hazard insurance premiums and other payments which have been escrowed by the Mortgagor with the Seller or its agent pursuant to any Mortgage Loan.

"**Excluded Assets**" has the meaning given in the Master Purchase Agreement.

"**Excluded Contracts**" has the meaning given in the Master Purchase Agreement.

"**Excluded Liabilities**" means, collectively, all liabilities of the Seller other than the Assumed Liabilities.

"**Excluded Losses**" means any consequential, special or indirect damages, lost profits, lost investment or business opportunity, interest, damages to reputation, punitive damages, exemplary damages, treble damages, nominal damages and operating losses.

"**Excluded Servicing Rights**" has the meaning given in Section 2.14(a).

"**Failed Thrift**" has the meaning given in the recitals.

"**Fair Market Value**" means the fair market value of an asset or a group of assets as set forth in an appraisal prepared prior to the Closing Date by Industrial Appraisal Company.

"**Fannie Mae**" means the Federal National Mortgage Association, or any successor thereto.

"**FDIC**" means the Federal Deposit Insurance Corporation in any capacity.

"**FHA**" means the Federal Housing Administration, an agency within the United States Department of Housing and Urban Development, or any successor thereto and including the Federal Housing Commissioner and the Secretary of Housing and Urban Development where appropriate under the FHA regulations.

"**Foreign Jurisdiction**" means any jurisdiction, other than the United States, and any subdivision of or in such other jurisdiction.

Exhibit 4, Page 172

"**FMHA**" means the Farmers Home Administration, now known as RHCDS, or Rural Housing and Community Development Services, or any successor thereto.

"**Freddie Mac**" means the Federal Home Loan Mortgage Corporation, or any successor thereto.

"**GAAP**" means the United States generally accepted accounting principles as in effect from time to time.

"**Ginnie Mae**" means the Government National Mortgage Association, or any successor thereto.

"**GLBA**" has the meaning given in Section 5.12.

"**Governmental Authority**" means any United States or non-United States national, federal, state, local, municipal or provincial or international government or any political subdivision of any governmental, regulatory or administrative authority, agency or commission, or judicial or arbitral body.

"**Gross Margin**" means, with respect to each Mortgage Loan, the fixed percentage amount set forth in the related Mortgage Note which is added to the Index in order to determine the related Mortgage Interest Rate, as set forth in the Mortgage Loan Schedule.

"**Group 2 Closing Payment**" has the meaning given in Section 2.06(b).

"**Group 2 Final Payment**" has the meaning given in Section 2.11(b).

"**Group 2 Final Purchase Price**" has the meaning given in Section 2.06(a).

"**GSE Mortgage Loans**" has the meaning given in Section 2.03(b).

"**Guaranty**" means the Guaranty Agreement, dated as of March 18, 2009, by and among the FDIC, in its corporate capacity, HoldCo and each other Beneficiary (as defined therein) that executes a joinder thereto.

"**Guidelines**" means the Statement on Loss Mitigation Strategies for Servicers of Residential Mortgages (September 2007), issued by the federal financial institutions regulatory agencies and the Conference of State Bank Supervisors, the Statement on Working with Mortgage Borrowers (April 2007), issued by the federal financial institutions regulatory agencies, and the Program, each as may be amended from time to time.

"**HELOC**" means home equity line of credit.

"**Holdback Settlement Payment**" has the meaning given in Section 2.13(b).

"**HoldCo**" has the meaning given in the preamble.

"**HUD**" means the United States Department of Housing and Urban Development, or any federal agency or official thereof which may from time to time succeed to the functions thereof

Exhibit 4, Page 173

with regard to FHA mortgage insurance.  The term "HUD," for purposes of this Agreement, is also deemed to include subdivisions thereof such as the FHA and Ginnie Mae.

"**Index**" means, with respect to any Mortgage Loan, the index set forth in the related Mortgage Note for the purpose of calculating interest therein.

"**IndyMac Federal**" has the meaning given in the recitals.

"**Initial Calculation Date**" means the close of business on January 31, 2009.

"**Insurer**" means any Person who insures or guarantees (i) all or any portion of the risk of loss upon the Mortgagor's default on any of the Mortgage Notes and (ii) against hazard, flood, earthquake, title or other risk of loss in accordance with (a) the Investor Requirements, (b) the related Trust Documents with respect to any Mortgage Loan or (c) the Mortgage.

"**Investor**" means (i) any Person (including an Agency) having a beneficial interest in a Mortgage Loan, or (ii) the trust in connection with a Securitization Transaction, as applicable.

"**Investor Requirements**" means all responsibilities and obligations established or promulgated by a Security Party.

"**Law**" means any applicable statute, law, ordinance, regulation, rule, code, injunction, judgment, decree or order (including any executive order) of any Governmental Authority.

"**Lien**" means any mortgage, pledge, security interest, equity interest, participation interest, lien or other charge or encumbrance, including the lien or retained security title of a conditional vendor, upon or with respect to any property or assets.

"**Limited Power of Attorney**" means a Limited Power of Attorney in the form of Exhibit E attached hereto.

"**Loss Limit**" has the meaning given in Section 8.07.

"**Losses**" means actual losses, damages, liabilities, costs and expenses (including, reasonable attorneys' fees and litigation and similar costs, and other out-of-pocket expenses incurred in investigating, defending, asserting or preparing the defense or assertion of any of the foregoing), deficiencies, claims, interest, awards, judgments, penalties and fines; provided that, unless expressly stated otherwise herein, Losses shall not include Excluded Losses.

"**Master Purchase Agreement**" means the Master Purchase Agreement, dated as of March 18, 2009, by and among the Conservator (and, on the date hereof, following the appointment of the FDIC as receiver for IndyMac Federal, the Receiver by joinder as of the date hereof), IMB HoldCo LLC, OneWest Bank Group LLC and the Purchaser (by joinder as of the date hereof).

"**Master Servicer**" means, with respect to any Securitization Transaction, the "master servicer," if any, identified in the related transaction documents.

7

Exhibit 4, Page 174

"**MERS**" means Mortgage Electronic Registration Systems, Incorporated.

"**MERS® System**" means the MERSCORP, Inc. mortgage electronic registry system.

"**Monthly Payment**" means, with respect to any Mortgage Loan, the scheduled monthly payment of principal and interest on such Mortgage Loan which is payable by the related Mortgagor from time to time under the related Mortgage Note.

"**Mortgage**" means, with respect to a Mortgage Loan, a mortgage, deed of trust or other security instrument creating a Lien upon real property and any other property described therein which secures a Mortgage Note, together with any assignment, reinstatement, extension, endorsement or modification of any thereof.

"**Mortgage File**" means all documents pertaining to any Mortgage Loan, either copies or originals, that are in the possession of the Seller or any of its employees or contractors responsible for the servicing of the Mortgage Loan, other than (i) the original Mortgage Note, renewals of the Mortgage Note and Collateral Documents and (ii) confidential or privileged communications between the Seller (or any predecessor-in-interest, including the Failed Thrift) and its legal counsel; provided, however, that the Mortgage Files do not include files maintained by other employees or agents of the Seller, or attorney-client or work product privileged materials held by the Seller's legal counsel, unless in the opinion of such counsel, the disclosure of the material is not likely to result in the waiver of the attorney-client or work product privilege.

"**Mortgage Interest Rate**" means, with respect to each fixed rate Mortgage Loan, the fixed annual rate of interest provided for in the related Mortgage Note and, with respect to each adjustable rate Mortgage Loan, the annual rate at which interest accrues and adjusts in accordance with the provisions of the related Mortgage Note.

"**Mortgage Loan**" means a fixed or adjustable rate residential or commercial mortgage loan or home equity line of credit listed on the Mortgage Loan Schedule with respect to which the Seller owns only the related Servicing Rights and not the loan itself.

"**Mortgage Loan Documents**" means the documents in the Mortgage File.

"**Mortgage Loan Schedule**" means the schedule of Mortgage Loans attached as Schedule 1.01(a) (and delivered in electronic format to the Purchaser), which shall be updated as of the Closing Date pursuant to Section 2.10.  The Mortgage Loan Schedule shall contain the following fields of information:

(1) the Mortgage Loan number;

(2) the address, city, state and zip code of the Mortgaged Property;

(3) the current Mortgage Interest Rate;

(4) the current Monthly Payment;

(5) the original term to maturity;

(6) the scheduled maturity date;

Exhibit 4, Page 175

(7)     the unpaid principal balance of the Mortgage Loan;

(8)     the Gross Margin, if applicable;

(9)     the next Adjustment Date, if applicable;

(10)    paid through date or due date;

(11)    monthly Servicing Fee.

"**Mortgage Note**" means, with respect to a Mortgage Loan, a promissory note or notes, or other evidence of indebtedness, with respect to such Mortgage Loan secured by a Mortgage, together with any assignment, reinstatement, extension, endorsement or modification thereof.

"**Mortgaged Property**" means the real property, including any land, fixtures and improvements, securing repayment of the debt evidenced by a Mortgage Note.

"**Mortgagor**" means the obligor on a Mortgage Note.

"**Person**" means any individual, corporation, partnership (general or limited), limited liability company, limited liability partnership, firm, joint venture, association, joint-stock company, trust, estate, unincorporated organization, governmental or regulatory body or other entity.

"**Pooling and Servicing Agreements**" means the pooling and servicing agreements and the sale and servicing agreements listed on Schedule 7.03(f) hereto.

"**Program**" shall include any of the following mortgage loan modification programs: (a) for modifications currently in process or initiated within the first ninety (90) days following the signing of this Agreement, the modification program previously approved by the Board of Directors of IndyMac Federal Bank, FSB in Conservatorship; (b) the FDIC's Mortgage Loan Modification Program, a copy of which is attached as an Exhibit F hereto; and (c) any other modifications either to an individual or to a group of borrowers, with prior written consent of the FDIC.

"**Purchaser**" has the meaning given in the preamble.

"**Receiver**" has the meaning given in the recitals.

"**Records**" means copies and originals of all records and documents, whether in hard copy, microfiche, microfilm or electronic format, including but not limited to magnetic tape, disc storage, card forms, printed copy, and electronic stored information (as defined in Rule 34(a) of the Federal Rules of Civil Procedure) which (i) pertain to, and are utilized to administer, reflect, monitor, evidence or record information respecting the assets purchased and the liabilities assumed by the Purchaser pursuant to this Agreement and (ii) are owned by and in the possession of the Seller as of the Closing Date.

"**Reimbursed Party**" has the meaning given in Section 8.01.

"**Remedy**" has the meaning given in Section 8.01.

Exhibit 4, Page 176

"**REO Property**" means real property to which title is acquired by foreclosure, by deed in lieu of foreclosure, by power of sale or by sale pursuant to the Uniform Commercial Code, in any such case, in connection with the enforcement of the terms of any Mortgage.

"**RESPA**" means the Real Estate Settlement Procedures Act of 1974, as amended, and all rules and regulations promulgated thereunder.

"**RHS**" means the Rural Housing Service of the United States Department of Agriculture, or any successor thereto.

"**Securitization Transaction**" means any transaction involving either (1) a sale or other transfer of some or all of the Mortgage Loans directly or indirectly to an issuing entity in connection with an issuance of publicly-offered or privately-placed, rated or unrated, mortgage-backed securities or (2) an issuance of publicly-offered or privately-placed, rated or unrated, securities, the payments on which are determined primarily by reference to one or more portfolios of residential mortgage loans consisting, in whole or in part, of some or all of the Mortgage Loans.

"**Security Party**" means any of the trustee, Master Servicer, Investor, or Bond Insurer in respect of a Securitization Transaction.

"**Seller**" has the meaning given in the preamble.

"**Servicing Adjustment**" has the meaning set forth in Section 2.14(a).

"**Servicing Adjustment Settlement Date**" means the second anniversary of the Closing Date.

"**Servicing Advance Purchase Price**" has the meaning given in Section 2.06(a).

"**Servicing Advances**" means all customary, reasonable and necessary out-of-pocket costs and expenses (including reasonable attorneys' fees and disbursements) incurred in the performance by the Seller of its servicing obligations, including, but not limited to, costs and expenses related to (a) the funding of principal and interest advances with respect to Mortgage Loans held in connection with a Securitization Transaction, (b) the preservation, restoration and protection of the Mortgaged Property, (c) any enforcement or judicial proceedings, including foreclosures, (d) the management and liquidation of any REO Property, (e) Taxes, assessments, water rates, sewer rents and other charges which are or may become a Lien upon the Mortgaged Property, and fire and hazard insurance coverage and (f) physical inspection of the Mortgaged Property.

"**Servicing Agreements**" means all Contracts (including Pooling and Servicing Agreements) pursuant to which the Seller acts as a mortgage loan servicer and administers or collects payments, remits to trustees, paying agents or Investors, provides foreclosure services or administers escrow accounts with respect to any mortgage loans which are part of the transactions listed on Schedule 1.01(b) hereto, and any other Contracts entered into by the Seller in its capacity as servicer in connection with any Securitization Transaction included on Schedule 1.01(b); provided, however, that "**Servicing Agreements**" shall not include any of the

Exhibit 4, Page 177

contracts with the Federal Home Loan Bank of San Francisco listed on Schedule 4.01(c)(ii) to the Master Purchase Agreement.

"**Servicing Fee**" means, with respect to each Mortgage Loan, the amount set forth on the Mortgage Loan Schedule.

"**Servicing File**" means, with respect to each Mortgage Loan, all documents in the possession of the Seller or its agents relating to the origination and servicing of the related Mortgage Loan, including copies, which may be imaged copies, of all documents in the Mortgage File and all other papers and records in the possession of the Seller used to service the Mortgage Loans.

"**Servicing Rights**" means any and all of the following: (a) all rights to service a Mortgage Loan; (b) all rights to receive servicing fees, additional servicing compensation (including any late fees, Change Fees, assumption fees, penalties (other than prepayment penalties) or similar payments with respect to the Mortgage Loan, and income on escrow accounts or other receipts on or with respect to the Mortgage Loan), reimbursements or indemnification for servicing the Mortgage Loan, and any payments received in respect of the foregoing and proceeds thereof; (c) the right to collect, hold and disburse Escrow Payments or other payments with respect to the Mortgage Loans and any amounts actually collected with respect thereto and to receive interest income on such amounts to the extent permitted by applicable Law; (d) all accounts and other rights to payment related to any of the property described in this paragraph; (e) possession and use of any and all Servicing Files pertaining to the Mortgage Loans or pertaining to the past, present or prospective servicing of the Mortgage Loans; (f) to the extent applicable, all rights and benefits relating to the direct solicitation of the related Mortgagors for refinance or modification of the Mortgage Loans and attendant right, title and interest in and to the list of such Mortgagors and data relating to their respective Mortgage Loans; (g) all rights, powers and privileges incident to any of the foregoing; and (h) all agreements or documents creating, defining or evidencing any of the foregoing rights to the extent they relate to such rights.

"**State Agency**" means any state agency with authority to (i) regulate the businesses of the Purchaser including any state agency with authority to determine the investment, origination, lending or servicing requirements with regard to Mortgage Loans originated, purchased or serviced by the Purchaser or (ii) originate, purchase or service Mortgage Loans, or otherwise promote mortgage lending, including without limitation state and local housing finance authorities.

"**Tax**" or "**Taxes**" means all income, excise, gross receipts, ad valorem, sales, use, employment, franchise, profits, gains, property, transfer, payroll, withholding, severance, occupation, social security, unemployment compensation, alternative minimum, value added, intangibles or other taxes, fees, stamp taxes, duties, charges, levies or assessments of any kind whatsoever (whether payable directly or by withholding), together with any interest and any penalties, fines, additions to tax or additional amounts imposed by any Governmental Authority with respect thereto.

Exhibit 4, Page 178

"**Tax Authority**" means any branch, office, department, agency, instrumentality, court, tribunal, officer, employee, designee, representative, or other Person that is acting for, on behalf of, or as a part of any foreign or domestic government (or any state, local or other political subdivision thereof) that is engaged in or has any power, duty, responsibility or obligation relating to the legislation, promulgation, interpretation, enforcement, regulation, monitoring, supervision or collection of or any other activity relating to any Tax or Tax Return.

"**Tax Return**" means any return, election, declaration, report, schedule, information return, document, information, opinion, statement, or any amendment to any of the foregoing (including any consolidated, combined or unitary return) submitted or required to be submitted to any Tax Authority.

"**Then-Current Interest Rate**" means the most recently published Freddie Mac survey rate for 30-year fixed-rate loans or, if such Freddie Mac survey rate is not available, then another comparable nationally published rate for 30-year fixed-rate loans.

"**Third Party Claim**" means a claim, counterclaim or demand made by any Person (other than the Purchaser or any of its Affiliates) against the Purchaser arising out of or as a result of a Defect.

"**Treasury Regulations**" means the regulations promulgated by the United States Department of the Treasury pursuant to and in respect of provisions of the Code. All references herein to sections of the Treasury Regulations shall include any corresponding provision or provisions of succeeding, substitute, proposed or final Treasury Regulations.

"**Trust Documents**" means, with respect to each Securitization Transaction included on Schedule 1.01(b), (i) the Pooling and Servicing Agreement, (ii) any other applicable Servicing Agreement, (iii) an assignment, assumption and recognition agreement related to such Servicing Agreement, if any, in each case, entered into by and among the applicable Security Parties, which individually relate to the securitization and servicing of the applicable Mortgage Loans, and (iv) the custodial agreement.

"**VA**" means the Department of Veteran's Affairs, or any successor thereto.

Section 1.02   Construction.   This Agreement shall be construed and interpreted in accordance with the following:

(a)      References to "Affiliates" include only other Persons which from time to time constitute "Affiliates" of such specified Person, and do not include, at any particular time, other Persons that may have been, but at such time have ceased to be, "Affiliates" of such specified Person, except to the extent that any such reference specifically provides otherwise.

(b)      The term "or" is not exclusive.

(c)      A reference to a law includes any amendment, modification or replacement to such law.

Exhibit 4, Page 179

(d)     Accounting  terms shall have the meanings assigned to them by GAAP applied on a consistent basis by the accounting entity to which they refer.

(e)     References to any document, instrument or agreement (i) shall be deemed to include all appendices, exhibits, schedules and other attachments thereto and all documents, instruments or agreements issued or executed in replacement thereof, and (ii) shall mean such document, instrument or agreement, or replacement thereto, as amended, modified and supplemented from time to time in accordance with its terms and as the same is in effect at any given time.

(f)     Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

(g)     The words "include" and "including" and words of similar import are not limiting, and shall be construed to be followed by the words "without limitation," whether or not they are in fact followed by such words.

(h)     The word "during" when used with respect to a period of time shall be construed to mean commencing at the beginning of such period and continuing until the end of such period.

(i)     Unless the context otherwise requires, singular nouns and pronouns when used herein shall be deemed to include the plural and vice versa and impersonal pronouns shall be deemed to include the personal pronoun of the appropriate gender.

<div align="center">

**ARTICLE II**

**THE PURCHASE AND SALE**

</div>

Section 2.01   <u>Purchase and Sale of Assets</u>.  On the terms and subject to the conditions contained herein and in the Ancillary Documents, the Seller hereby sells, transfers, conveys, assigns and delivers to the Purchaser, and the Purchaser hereby purchases, accepts and assumes from the Seller, without representation or warranty, express or implied, except as set forth in this Agreement or the Master Purchase Agreement, all of the Seller's rights, title and interests in, to and under the Assets (other than the Excluded Assets).  "**<u>Assets</u>**" means the following assets, whether owned, leased, licensed or otherwise contracted by, or otherwise available to, the Seller, and no others (except that, as set forth below, the Schedules described in this <u>Section 2.01</u> shall be updated as of the Closing and assets included in such updated Schedules shall constitute Assets):

(a)     all Servicing Rights accruing to the Seller under the Servicing Agreements, including all rights to assert claims and take other rightful actions in respect of breaches, defaults and other violations of such Servicing Agreements;

(b)     all unreimbursed Servicing Advances listed on <u>Schedule 2.01(b)</u>;

(c)     all Servicing Fee receivables listed on <u>Schedule 2.01(c)</u>, including all accrued interest;

Exhibit 4, Page 180

(d)      [Reserved];

(e)      all guarantees, warranties, indemnities and similar rights in favor of the Seller with respect to any of the Assets;

(f)      the Escrow Accounts listed on Schedule 2.01(f);

(g)      all rights to causes of action, lawsuits, judgments, claims and demands of any nature available to or being pursued by or for the benefit of the Seller with respect to the Business or the ownership, use, function, value of or other rights pertaining to any Asset, whether arising by way of counterclaim or otherwise, other than any claims retained by the Seller pursuant to Section 2.05; and

(h)      all of the outstanding stock of the Acquired Subsidiary.

To the extent that any party discovers, within 180 days following the Closing Date, that there were assets of the Seller used primarily in the Business that all parties hereto intended to be transferred in connection with the purchase contemplated in this Agreement, but that were omitted from the schedules to this Agreement, the Seller shall or shall cause its Affiliates promptly to assign and transfer to the Purchaser all right, title and interest in such asset.

Each Schedule referenced above shall be updated as of the Closing Date and delivered to the Purchaser in accordance with Section 2.10.

Section 2.02    Excluded Assets.    Notwithstanding anything to the contrary in Section 2.01, the Assets shall not include, and the Purchaser shall not purchase or otherwise acquire, the Excluded Assets.

Section 2.03    Assumption of Liabilities.    On the terms and subject to the conditions contained herein and in the Ancillary Documents (including the retention of all rights and remedies under Article XVII of the Master Purchase Agreement and under Articles VII and VIII hereto), the Purchaser shall assume and agree to pay, perform and discharge in accordance with their terms all of the following obligations, debts and liabilities of the Seller and no others (collectively, the "**Assumed Liabilities**"):

(a)      all accounts payable and other accrued expenses (other than any intracompany accounts payable) as of the Closing Date, in each case that relate to the Assets, as reflected on the Accounting Records;

(b)      with respect to Mortgage Loans acquired by Fannie Mae, Freddie Mac or Ginnie Mae from the Seller, the Failed Thrift or IndyMac Federal ("**GSE Mortgage Loans**"), all obligations of the Seller under the Servicing Agreements from and after the Closing Date;

(c)      with respect to Mortgage Loans other than GSE Mortgage Loans, all obligations imposed on the servicer under the Servicing Agreements from and after the Closing Date; and

(d)      all obligations of the Seller with respect to (i) the lawsuits, judgments, claims or demands listed on Schedule 2.03(c), and (ii) any additional lawsuits, judgments, claims or

14

demands involving foreclosures, bankruptcies, fraud and misrepresentation, contract and mortgage disputes, liens, title disputes, regulatory agency/fair lending, property condition, forfeiture, partition, easement, condemnation and eminent domain, probate, contested foreclosures, tax sale, mechanic's liens, elder abuse and stop notice claims with respect to any of the Assets, but only to the extent any such additional lawsuit, judgment, claim or demand is comparable in nature, scope and substance to those listed on Schedule 2.03(c), as determined by the Seller in its reasonable judgment (as evidenced by written notice thereof given to the Purchaser), if such determination is made (and such  notice is provided) within sixty (60) days after the Closing Date, or by the mutual agreement of the Purchaser and the Seller, if such determination is after such sixty (60)-day period.

Section 2.04    Excluded Liabilities.    Notwithstanding anything to the contrary in Section 2.03, it is understood and agreed that the Seller shall not assign and the Purchaser shall not, pursuant to this Agreement, assume or be liable for any Excluded Liabilities that the Seller has or may have now or in the future, including the following:

(a)    any liabilities and obligations of the Seller arising under this Agreement or any of the Ancillary Documents;

(b)    any liabilities or obligations of the Seller arising under or in connection with any Employee Plan or any liability or obligation of the Seller relating to salaries, wages, bonuses, vacation or severance pay or other compensation, payments or benefits earned, accrued or arising through the end of the Closing Date;

(c)    any liabilities or obligations of the Seller under any Contracts relating to the Excluded Assets or under any Excluded Contracts;

(d)    any legal and accounting fees and expenses incurred by the Seller in connection with the consummation of the transactions contemplated by this Agreement, except as provided in the Master Purchase Agreement;

(e)    any Tax liabilities and obligations of the Seller with respect to the Business for any taxable period (or portion thereof) ending on or before the Closing Date;

(f)    any indebtedness of the Seller for borrowed money;

(g)    any liability or indebtedness of the Seller for contingent liabilities or liabilities in respect of any injury to any Person or property;

(h)    any liabilities or obligations of the Seller resulting from violations of any Laws (including any Laws relating to Taxes, immigration, employment or labor matters, or environmental matters);

(i)    any liabilities or obligations of the Seller attributable to an act, omission or circumstances that occurred or existed prior to the Closing Date, other than the Assumed Liabilities;

(j)    all liabilities and obligations arising out of or with respect to the Excluded Assets;

<div align="center">15</div>

Exhibit 4, Page 182

(k)      all obligations of the Seller with respect to any lawsuits, judgments, claims or demands of any nature existing on or prior to the Closing Date that are not listed on Schedule 2.03(c) or otherwise described in Section 2.03(c);

(l)      any liabilities or obligations imposed on the seller of loans under the Servicing Agreements with respect to Mortgage Loans other than GSE Mortgage Loans, including, without limitation, any repurchase obligations for breaches of loan level representations, any indemnities relating to origination activities or securities laws or any seller indemnity;

(m)      any claim against or liability of the FDIC in its capacity as receiver for the Failed Thrift or the FDIC as receiver for IndyMac Federal that, under and in accordance with applicable Law, was, is or will be subject to the receivership administrative claims processes administered by the FDIC in its capacity as receiver for the Failed Thrift or the FDIC as receiver for IndyMac Federal pursuant to 12 U.S.C. §1821(d)(3) through (13), including claims and liabilities that are affirmative or defensive, now existing or arising in the future, contingent or fixed, monetary or non-monetary, equitable or legal, or declarative or injunctive;

(n)      any claim against or liability based on any alleged act or omission of the Failed Thrift or IndyMac Federal which is not provable or allowable, or is otherwise barred against the FDIC as receiver for the Failed Thrift or the FDIC as receiver for IndyMac Federal under applicable Law, including claims and liabilities that are barred under 12 U.S.C. §§1821(c), (d), (e) (including §1821(e)(3)), (i), or (j); 12 U.S.C. §1822; 12 U.S.C. §1823; or 12 U.S.C. §1825; and

(o)      any stand-alone insurance and indemnity agreements or similar agreements between the Failed Thrift or IndyMac Federal and any Bond Insurer with respect to any Securitization Transaction and all liabilities and obligations thereunder.

Section 2.05    Retained Claims and Release.  Notwithstanding anything to the contrary contained in this Agreement, the Purchaser and the Seller hereby agree that the sale and transfer of the Servicing Rights pursuant to this Agreement will exclude the transfer to the Purchaser of all right, title and interest of the Seller in and to any and all claims of any nature whatsoever that might now exist or hereafter arise, whether known or unknown, that the Seller has or might have against any of the following: (a) officers, directors, employees, insiders, accountants, attorneys, other Persons employed by the Seller, IndyMac Federal or the Failed Thrift or any of their predecessors-in-interest, underwriters or any other similar Persons who have caused a loss to the Seller, IndyMac Federal or the Failed Thrift or any of their predecessors-in-interest in connection with the origination, servicing or administration of a Mortgage Loan, (b) any appraisers, accountants, auditors, attorneys, investment bankers or brokers, loan brokers, deposit brokers, securities dealers or other Persons who performed services for the Seller, IndyMac Federal or the Failed Thrift or any of their predecessors-in-interest relative to a Mortgage Loan, (c) any third parties involved in any alleged fraud or other misconduct relating to the making or servicing of a Mortgage Loan or (d) any appraiser or other Person with whom the Seller, IndyMac Federal or the Failed Thrift or any of their predecessors-in-interest or any servicing agent contracted for services or title insurance in connection with the making, insuring or servicing of a Mortgage Loan.

Exhibit 4, Page 183

Section 2.06     Purchase Price; Closing Payment.

(a)     Subject to the terms and conditions of this Agreement and the Master Purchase Agreement, the Purchaser shall pay to the Seller, in accordance with the procedures set forth in this Agreement and the Master Purchase Agreement, an aggregate purchase price for the Assets in an amount equal to the sum of (such sum, the "**Group 2 Final Purchase Price**"):

(i)     with respect to the Servicing Rights, an amount equal to the sum of each product obtained by multiplying (x) the unpaid principal balance of the Mortgage Loans, as shown on the Mortgage Loan Schedule as updated as of the Closing Date, within each category set forth on Schedule 2.06 by (y) the applicable percentage for such category shown on Schedule 2.06; plus

(ii)     with respect to the outstanding Servicing Advances, an amount equal to the Book Value of such assets as of the Closing Date ("**Servicing Advance Purchase Price**"); plus

(iii)     with respect to the accrued Servicing Fee receivables with respect to Mortgage Loans held in connection with a non-HELOC Securitization Transaction, an amount equal to one hundred percent (100%) of the Book Value of such assets as of the Closing Date; plus

(iv)     with respect to the accrued Servicing Fee receivables with respect to Mortgage Loans held in connection with a HELOC Securitization Transaction, an amount equal to zero percent (0%) of the Book Value of such assets as of the Closing Date; plus

(v)     with respect to the accrued Servicing Fee receivables with respect to Mortgage Loans serviced for an Agency or any Federal Home Loan Bank that are less than thirty (30) days past due, an amount equal to one hundred percent (100%) of the Book Value of such assets as of the Closing Date; plus

(vi)     with respect to the accrued Servicing Fee receivables with respect to Mortgage Loans serviced for an Agency or any Federal Home Loan Bank that are thirty (30) days or more past due, an amount equal to zero percent (0%) of the Book Value of such assets as of the Closing Date.

(b)     On the Closing Date, the Purchaser shall pay to the Seller in accordance with the Master Purchase Agreement an amount equal to the balance of (i) the Group 2 Final Purchase Price, calculated using, where applicable, balances as of the Initial Calculation Date rather than the Closing Date, less (ii) two percent (2.0%) of the Servicing Advance Purchase Price calculated using the Book Value of the Servicing Advances as of the Initial Calculation Date, less (iii) prorated amounts owed by the Seller through and including the Closing Date which are calculable as of the Closing Date, as determined pursuant to Section 2.07, plus (iv) to the extent not otherwise covered, an amount equal to any negative escrow balance (expressed as a negative amount), to the extent such negative escrow balance exists after netting negative escrow balances with positive escrow balances in accordance with Section 5.02 of this Agreement (collectively,

Exhibit 4, Page 184

the "**Group 2 Closing Payment**").  The Seller shall also provide to the Purchaser reasonable supporting information and documentation that is relied upon in connection with such calculation.

Section 2.07    Prorations.  All real and personal property Taxes related to the Assets, whether or not payable after the Closing Date, shall be prorated between the Purchaser and the Seller, as the case may be, on the basis of a 365 day year and the number of days elapsed and days remaining in the applicable period through the end of the Closing Date.  All amounts prorated pursuant to this Section 2.07 will be taken into account in connection with the adjustments provided in Section 2.11.

Section 2.08    Closing.  The closing of the sale provided for in this Agreement, herein referred to as the "**Closing**", shall take place pursuant to the procedures and subject to the conditions  set forth in this Agreement and the Master Purchase Agreement.

Section 2.09    Closing Procedure.  At the Closing, subject to and upon the terms and conditions of this Agreement and the Master Purchase Agreement:

(a)    the Seller shall deliver to the Purchaser the certificates, instruments and documents referred to in Section 4.01;

(b)    the Purchaser shall deliver to the Seller the certificates, instruments and documents referred to in Section 4.02; and

(c)    the Purchaser shall deliver to the Seller the Group 2 Closing Payment.

Section 2.10    Closing Adjustment Documents.    Within sixty (60) calendar days following the Closing Date, the Purchaser shall prepare and deliver to the Seller (i) Schedule 1.01(a), Schedule 2.01(b), Schedule 2.01(c) and Schedule 2.01(f), each updated as of the Closing Date and prepared in accordance with the Accounting Records and consistent with past practice (including the preparation of the Schedules attached hereto), and (ii) a schedule setting forth in reasonable detail the calculations contemplated by Section 2.11 (collectively, the "**Closing Adjustment Documents**").    The parties shall cooperate in the preparation of the Closing Adjustment Documents and such additional documents as may be necessary to calculate the Group 2 Final Payment.  Without limiting the generality of the foregoing, to the extent necessary, the Purchaser shall provide the Seller and its designees with reasonable access to the Purchaser's books, Records, working papers, personnel and representatives which relate to the Assets and the Assumed Liabilities.

Section 2.11    Calculation of Adjustments.  The Closing Adjustment Documents shall set forth the Purchaser's calculation of (a) the Group 2 Final Purchase Price in accordance with Section 2.06(a) and (b) a payment amount (such amount, the "**Group 2 Final Payment**") which shall be the sum of the following: (i) the Group 2 Final Purchase Price, less (ii) two percent (2.0%) of the Servicing Advance Purchase Price calculated as of the Closing Date calculated using the Book Value of the Servicing Advances as of the Closing Date (the "**Advance Holdback Amount**"), less (iii) prorated amounts owed by the Seller through and including the Closing Date, as determined pursuant to Section 2.07, plus (iv) to the extent not otherwise covered, an amount equal to any negative escrow balance (expressed as a negative amount), to the extent such negative escrow balance exists after netting negative escrow balances with

Exhibit 4, Page 185

positive escrow balances in accordance with <u>Section 5.02</u> of this Agreement, <u>less</u> (v) any Servicing Adjustment pursuant to <u>Section 2.14</u> which is calculable at the time of the determination of the Group 2 Final Payment.  The Closing Adjustment Documents shall be reviewed, and any Disagreements related thereto resolved, in accordance with the Master Purchase Agreement.

Section 2.12     <u>Final Settlement</u>.  Final settlement of the Group 2 Final Purchase Price shall be made in accordance with the Master Purchase Agreement.

Section 2.13     <u>Release of the Advance Holdback Amount</u>.

(a)     On the tenth (10th) Business Day following the end of each month between the Closing Date and the Advance Holdback Calculation Date, the Purchaser shall provide to the Seller a schedule setting forth the Servicing Advances outstanding as of the end of each such month as compared to the Servicing Advances outstanding as of the Closing Date and as of the end of the immediately preceding month.  On the fifth (5th) Business Day following the receipt of such schedule, the Purchaser shall pay to the Seller an amount equal to the Advance Holdback Amount multiplied by the quotient of (i) the Servicing Advances repaid to the Purchaser in such month divided by (ii) the total Servicing Advances outstanding as of the Closing Date.

(b)     On the tenth (10th) Business Day following the Advance Holdback Calculation Date, the Purchaser shall provide to the Seller a final schedule setting forth the Servicing Advances, if any, outstanding as of the Advance Holdback Calculation Date and specifying any Servicing Advances that Purchaser, in its good faith reasonable judgment, deems to be non-recoverable and the reasons therefor.  In the event any portion of the Advance Holdback Amount remains unpaid in accordance with the terms of <u>Section 2.13(a)</u> as of the Advance Holdback Calculation Date, then on the Advance Holdback Settlement Date the Purchaser shall pay to the Seller seventy-five percent (75%) of an amount equal to the remainder of the Advance Holdback Amount less the amount of any non-recoverable Servicing Advances (the "**Holdback Settlement Payment**").  For the avoidance of doubt, the Holdback Settlement Payment shall not include any portion of the Advance Holdback Amount attributable to Servicing Advances that have been reimbursed to the Purchaser pursuant to clause (y) of <u>Section 2.14(a)</u>.  The Holdback Settlement Payment shall be paid by wire transfer of immediately available funds to an account designated by the Seller.  Any portion of the Advance Holdback Amount outstanding after the Holdback Settlement Payment is made shall revert to the Purchaser and the Seller shall have no further rights to such portion.

Section 2.14     <u>Servicing Adjustment</u>.

(a)     To the extent that any Servicing Rights are transferred to the Purchaser at the Closing but are involuntarily transferred to a third party after the Closing Date but prior to the Servicing Adjustment Settlement Date and such transfer to the third party is a direct result of the termination of the Servicing Rights prior to the Closing Date, the failure of the Seller to assign and the Purchaser to assume the Excluded Liabilities described in <u>Section 2.04(o)</u> or the failure to obtain any required consent to transfer such Servicing Rights to the Purchaser (the Servicing Rights transferred to the third party, the "**Excluded Servicing Rights**"), then, (x) subject to the provisions of <u>Section 2.14(b)</u>, the Group 2 Final Purchase Price will be reduced (the "**Servicing**

Exhibit 4, Page 186

**Adjustment**") by an amount equal to the purchase price percentage (as set forth on Schedule 2.06) applicable to the category of Mortgage Loans subject to such Excluded Servicing Rights (as set forth in Schedule 2.06) multiplied by the unpaid principal balance of the Mortgage Loans subject to such Excluded Servicing Rights, such unpaid principal balance calculated at the time of the transfer to the third party and (y) the Seller shall reimburse the Purchaser for any outstanding Servicing Advances made with respect to the Excluded Servicing Rights less the amount of any related Advance Holdback Amount.

(b)     The Servicing Adjustment provided for in Section 2.14(a) shall not be made with respect to:

(i)     any transfer of Servicing Rights to a third party after the Closing Date for "cause" due to the acts of the Purchaser as such term is used under the applicable Servicing Agreement;

(ii)    any transfer of Servicing Rights to a third party to which the Purchaser consents or in connection with which the Purchaser or any Affiliate of the Purchaser receives any monetary compensation;

(iii)   any Servicing Rights with respect to any Mortgage Loans for which the primary servicing is transferred to a third party solely as a result of the failure to obtain any of the required consents to transfer such servicing to the Purchaser to the extent that the Purchaser elects to continue to subservice such Mortgage Loans (other than transitional services for less than 90 days, in which case the unpaid principal balance of the Mortgage Loans subject to such Excluded Servicing Rights shall be calculated as of the end of the transitional service period); or

(iv)    any voluntary transfer of Servicing Rights to a special servicer with respect to delinquent Mortgage Loans.

(c)     Within five (5) Business Days after the end of each month between the Closing Date and the Servicing Adjustment Settlement Date, the Purchaser shall deliver to the Seller a report showing Excluded Servicing Rights broken down by the categories set forth on Schedule 2.06.  Within five (5) Business Days following delivery of each such report, the Seller shall pay to the Purchaser the applicable Servicing Adjustment by wire transfer in immediately available funds to an account designated by the Purchaser.

## ARTICLE III

## PRE-CLOSING COVENANTS

Section 3.01   Transition.  The Seller and the Purchaser shall mutually cooperate in order to facilitate an orderly transition of the Assets and Assumed Liabilities to the Purchaser, and in order to facilitate the integration of the operations of the Seller (including all information technology systems) and the Purchaser, as soon as practicable after the Closing Date.  Each party will cooperate in good faith with the other and will take all appropriate action that may be reasonably necessary or advisable to carry out any of the transactions contemplated hereunder.

Exhibit 4, Page 187

From and after the Closing Date, the Seller will promptly refer all inquiries with respect to the Assets (including ownership thereof) and Assumed Liabilities to the Purchaser, and the Purchaser will promptly refer all inquires with respect to the Excluded Assets (including ownership thereof) and Excluded Liabilities to the Seller.

Section 3.02    Employees.  The hiring of the Seller's employees by the Purchaser and related employee benefit issues will be subject to the provisions of the Master Purchase Agreement.

Section 3.03    Agency Approvals; Qualification to Act as Servicer.  As of the Closing Date, the Purchaser will be an approved seller/servicer or issuer, as applicable, of mortgage loans for HUD, Ginnie Mae and Fannie Mae, with the facilities, procedures, and experienced personnel necessary for the sound servicing of mortgage loans of the same type as the Mortgage Loans.  As of the Closing Date, the Purchaser will be a HUD approved mortgagee pursuant to Section 203 of the National Housing Act and will be in good standing to sell mortgage loans to and service mortgage loans for HUD, and no event will have occurred, including a change in insurance coverage, which would make the Purchaser unable to comply with HUD, Ginnie Mae and Fannie Mae eligibility requirements or which would require notification to HUD, Ginnie Mae or Fannie Mae.  Furthermore, if, at any time prior to the termination of this Agreement, the Purchaser is unable to comply with any of the Fannie Mae, Ginnie Mae or HUD eligibility requirements, it shall promptly notify the Seller that it is no longer an approved seller/servicer of reverse mortgage loans for Fannie Mae, Ginnie Mae or HUD.  As of the Closing Date, the Purchaser will be a qualified servicer under each Servicing Agreement.

Section 3.04    Additional Title Documents.  The Seller and the Purchaser each agree, at any time, and from time to time, upon the request of the other party, to execute and deliver such additional instruments and documents of conveyance as shall be reasonably necessary to vest in the Purchaser its full legal or equitable title in and to the Assets.  The Purchaser shall prepare such instruments and documents of conveyance (in form and substance reasonably satisfactory to the Seller) as shall be necessary to vest title to the Assets in the Purchaser.  The Purchaser shall be responsible for recording such instruments and documents of conveyance.  All expenses incurred by the Purchaser in compliance with this Section 3.04 shall be allocated between the Purchaser and the Seller in accordance with Section 19.03 of the Master Purchase Agreement.

## ARTICLE IV

## CLOSING DELIVERIES

Section 4.01    Seller's Deliverables.  In addition to any other documents to be delivered under other provisions of this Agreement or the Master Purchase Agreement, the Seller shall deliver and release, subject to and in accordance with this Section, to the Purchaser the following on or prior to the Closing:

(a)    an original Bill of Sale executed by the Seller;

(b)    four originals of the Assignment and Assumption Agreement executed by the Seller;

Exhibit 4, Page 188

(c)       four originals of this Agreement executed by the Seller;

(d)       executed Affidavit of Lost Certificate for the Acquired Subsidiary;

(e)       an original Limited Power of Attorney granted by the Seller pursuant to Section 5.04 hereof;

(f)       executed resignations from each director and officer of the Acquired Subsidiary;

(g)       a copy of the articles of incorporation of the Acquired Subsidiary, certified by the secretary or another authorized officer of the Acquired Subsidiary; and

(h)       a copy of the bylaws of the Acquired Subsidiary, certified by the secretary or another authorized officer of the Acquired Subsidiary.

Section 4.02     Purchaser's Deliverables.   In addition to any other documents to be delivered under other provisions of this Agreement or the Master Purchase Agreement, the Purchaser shall deliver and release, subject to and in accordance with this Section, to the Seller the following on or prior to the Closing:

(a)       the Group 2 Closing Payment in accordance with the Master Purchase Agreement;

(b)       four originals of the Assignment and Assumption Agreement executed by the Purchaser; and

(c)       four originals of this Agreement executed by the Purchaser.

## ARTICLE V

## TRANSFER OF MORTGAGE RELATED ASSETS

Section 5.01     Transfer of Documents, etc.  The Seller and the Purchaser shall cooperate with each other in the physical or other transfer to the Purchaser or its designee on the Closing Date of the Servicing Rights and the Servicing Files in respect of the Mortgage Loans.

Section 5.02     Unremitted Collections; Escrow Accounts and Custodial Accounts. Escrow funds, custodial funds and other amounts or balances related to the Mortgage Loans on deposit in Escrow Accounts, Custodial Accounts or other accounts held or controlled by the Seller shall be transferred by the Seller, along with the related accounts, to the Purchaser on the Closing Date.  It is intended that the Seller will use commercially reasonable efforts to cause such Escrow Accounts, Custodial Accounts and other accounts to be retitled in the name of the Purchaser.  All such funds and related accounts shall become the responsibility of the Purchaser when transferred by the Seller.  Any negative escrow balances shall be netted against the amount of any positive escrow balances held in the Escrow Accounts transferred to the Purchaser.  On and after the Closing Date, if a shortfall is discovered in an Escrow Account or reserve fund established under a Servicing Agreement or advances are required to be made and the servicer is required pursuant to the terms of the applicable Servicing Agreement either to fund such Escrow

Exhibit 4, Page 189

Account or reserve fund shortfall or to make advances, the Purchaser shall fund such shortfall or make such advances, as applicable (to the extent such amounts have not been accounted for in the calculation of the Group 2 Final Payment pursuant to Section 2.11) .

Section 5.03    Invoices.  All invoices (including Tax and insurance invoices) pertaining to the servicing of the Mortgage Loans or any other Contracts and which are in the Seller's possession on or prior to the Closing Date and due and payable within fifteen (15) Business Days after the Closing Date shall be paid by the Seller in accordance with applicable Investor Requirements and Contract requirements on or prior to the Closing Date.  Notwithstanding the foregoing, amounts so paid by the Seller shall be pro rated between the Seller and the Purchaser and may be netted against amounts otherwise payable by or due to the Purchaser, as applicable, pursuant to Section 2.07.  All other invoices, transmittal lists or any other information used to pay such invoices which are received after the Closing Date shall be forwarded by the Seller to the Purchaser in accordance with Section 5.05.  All penalties and interest due as a result of the Seller's failure to pay invoices which are in the Seller's possession on or prior to the Closing Date and due and payable within fifteen (15) Business Days after the Closing Date or where the Seller failed to forward invoice information to the Purchaser in accordance with Section 5.05 shall be borne by the Seller.

Section 5.04    Notice to Mortgagors.    The Purchaser shall, on a timely basis in accordance with RESPA, Investor Requirements and any other applicable Laws, and pursuant to the Limited Power of Attorney granted by the Seller to the Purchaser, in the form attached hereto as Exhibit E, prepare and transmit to each Mortgagor a joint "hello" and "goodbye" letter, at the Purchaser's expense.  The form of such letter shall be subject to the review and reasonable approval of the Seller.

Section 5.05    Forwarding Post-Closing Date Items.  With respect to any checks or other funds in respect of any Mortgage Loan which are received by the Seller within thirty (30) calendar days after the Closing Date, the Seller shall, to the extent no Limited Power of Attorney is granted to the Purchaser in accordance with Section 5.04, promptly endorse without recourse and send the same to the Purchaser via overnight mail.  Any checks or other funds in respect of any Mortgage Loan which are received by the Seller after such thirty (30) day period shall be endorsed without recourse by the Seller to the Purchaser and sent by first class mail to the Purchaser promptly after receipt.  Except as otherwise provided herein, the Seller shall promptly forward to the Purchaser all Mortgagor, Investor and Insurer correspondence, Tax bills or any other correspondence or documentation related to any of the Mortgage Loans, the Servicing Rights or the other Assets which is received by the Seller after the Closing Date.

Section 5.06    Misapplied and Returned Payments.  Misapplied and returned payments with respect to the Mortgage Loans shall be processed as follows:

(a)    Both parties shall cooperate in correcting misapplication errors;

(b)    The party receiving notice of a misapplied payment shall promptly notify the other party;

Exhibit 4, Page 190

(c)      If a misapplied payment has created an improper Group 2 Closing Payment or Group 2 Final Payment as the result of an inaccurate outstanding principal balance or escrow balance, respectively, a check shall be issued to the party shorted by the improper payment application within ten (10) Business Days after notice thereof by the other party;

(d)      Any check issued under the provisions of this Section 5.06 shall be accompanied by a statement indicating the purpose of the check, the Mortgagor and property address involved, and the corresponding Seller and Purchaser account number; and

(e)      If any Mortgagor's check presented to the Seller prior to the Closing Date is returned unpaid to the Seller for any reason subsequent to the Closing Date, the Seller shall promptly forward the original unpaid check to the Purchaser and, upon the Seller's demand, (i) if the final settlement of the Group 2 Final Purchase Price pursuant to Section 2.12 has not yet occurred, such returned amount will be reflected in the Group 2 Final Purchase Price when calculated or (ii) if the final settlement has already occurred, depending on the category of payment that was returned, such reimbursement shall be calculated by application of the relevant percentage listed on Schedule 2.06.

Section 5.07      Notice to Insurers, Tax Authorities and Bankruptcy Trustees.   Within fifteen (15) days after the Closing Date, the Purchaser shall, in accordance with applicable Insurer requirements, provide written notice of the transfer to any Insurer requiring such notice; provided, however, that the Purchaser may give aggregate notice whenever possible.   The Purchaser shall notify tax-bill services of the transfer.   The form of all notices pursuant to this Section 5.07 shall be subject to the review and reasonable approval of the Seller.

Section 5.08      Tax and Flood Contracts.   The Seller shall cooperate with the Purchaser to assign and transfer to the Purchaser, at the Seller's expense, within a reasonable period of time following the Closing Date, and in no event more than sixty (60) days after the Closing Date, (i) any "life-of-loan" assignable tax contracts with respect to the Mortgage Loans, and (ii) any assignable flood zone certification contracts with respect to the Mortgage Loans.

Section 5.09      Custodial Agreements.   On the Closing Date, the Seller, with the cooperation of the Purchaser, shall assign and transfer to the Purchaser any document custodial agreements between the Seller and any document custodian that relate to the Mortgage Loans.   In the event there exist document custodial agreements that are not assigned, the Purchaser shall be responsible for entering into new document custodial agreements and for obtaining any necessary Agency approvals regarding any new custodial arrangements required as a result of this transaction on the Closing Date.   Any fees charged by the Seller's document custodians due to termination of custodial agreements by the Seller on or prior to the Closing Date shall be borne by the Seller.   The Purchaser shall pay all document custodial fees of any custodian engaged by the Purchaser.   In addition, any and all fees charged for termination of a custodial arrangement after the Closing Date and all fees and other charges incurred to transfer files to or from a custodian in connection with this transaction (whether before or after the Closing Date) shall be paid by the Purchaser.

Section 5.10      Servicing of REO Property.   To the extent the Seller holds title to an REO Property solely as nominee for the benefit of the owner of the Mortgage Loan, with respect to

Exhibit 4, Page 191

each such REO Property, the Seller shall transfer, or cause to be transferred, to the Purchaser an original, executed limited warranty deed, in recordable form on or prior to the Closing Date.

Section 5.11    MERS Mortgage Loans.  With respect to each Mortgage Loan registered on the MERS® System, the Seller shall notify MERS of the transfer of servicing of each Mortgage Loan to the Purchaser.  All expenses incurred in compliance with this Section 5.11 shall be allocated between the Purchaser and the Seller in accordance with Section 19.03 of the Master Purchase Agreement.

Section 5.12    GLBA.  In connection with the sale and transfer of the Servicing Rights hereunder, each of the parties shall comply with the applicable provisions of the Gramm-Leach-Bliley Act of 1999 (the "**GLBA**") and any applicable state and local privacy laws pursuant to the GLBA for financial institutions and applicable state and local privacy laws.

Section 5.13    Mortgage Loans in Litigation.

(a)    With respect to any Mortgage Loans that, at the Closing Date, are subject to any pending litigation that is listed on Schedule 2.03(c) or of which the Purchaser has received written notice from the Seller, the Purchaser shall notify the FDIC's Regional Counsel, 1601 Bryan Street, Dallas, Texas 75201, within thirty (30) Business Days after the Closing Date, or within thirty (30) Business Days after receiving such written notice, as the case may be, of the name of the attorney selected by the Purchaser to represent the Purchaser's interests in the litigation.  The Purchaser shall, within thirty (30) Business Days after the Closing Date, or within thirty (30) Business Days after receiving the written notice described above, as the case may be, notify the clerk of the court or other appropriate official and all counsel of record that ownership of the Asset was transferred from the Seller to the Purchaser.  Subject to the provisions of Section 5.15, the Purchaser shall have its attorney file appropriate pleadings and other documents and instruments with the court or other appropriate body within thirty-five (35) Business Days after the Closing Date, or within thirty-five (35) Business Days after receiving the  written notice described above, as the case may be, substituting the Purchaser's attorney for the Seller's attorney, removing the Seller and IndyMac Federal (or its predecessors-in-interest) as a party to the litigation and substituting the Purchaser as the real party-in-interest.  Except as otherwise provided in Section 5.13(b) (and the Purchaser's compliance with its obligations therein), in the event the Purchaser fails to comply with this Section 5.13(a) within thirty-five (35) Business Days after the Closing Date, or within thirty-five (35) Business Days after receiving the written notice described above, as the case may be, the Seller may, at its option, dismiss with or without prejudice or withdraw from, any such pending litigation.

(b)    If the Purchaser is unable, as a matter of applicable Law or due to the actions or inactions of third parties unrelated to the Purchaser and over whom the Purchaser has no control, to cause the Seller and IndyMac Federal (or its predecessors-in-interest) to be replaced by the Purchaser as party-in-interest in any pending litigation as required by Section 5.13(a), the Purchaser shall provide to the FDIC's Regional Counsel, at the address specified above, within thirty-five (35) Business Days after the Closing Date, or within thirty-five (35) Business Days after receiving the notice described in Section 5.13(a), as the case may be, evidence to such effect and stating the reasons for such failure, including reference to any applicable Law.  In any such event, (i) the Purchaser shall cause its attorney to conduct such

Exhibit 4, Page 192

litigation at the Purchaser's sole cost and expense; (ii) the Purchaser shall cause the removal of the Seller and IndyMac Federal (or its predecessors-in-interest) and substitution of the Purchaser as party-in-interest in such litigation as soon as reasonably practicable; (iii) the Purchaser shall use commercially reasonable efforts to cause such litigation to be resolved by judgment or settlement in as reasonably efficient a manner as practical; (iv) the Seller shall cooperate with the Purchaser and the Purchaser's attorney as reasonably required to bring such litigation or any settlement relating thereto to a reasonable and prompt conclusion; and (v) no settlement shall be agreed upon by the Purchaser or its agents or counsel without the express prior written consent of the Seller, unless such settlement includes an irrevocable and complete waiver and release of any and all potential claims against the Seller and IndyMac Federal (or its predecessors-in-interest) relation to such litigation or the subject Mortgage Loans or obligations by any Person asserting any claim in the litigation and any Mortgagor, and any and all losses, liabilities, claims, causes of action, damages, demands, taxes, fees, costs and expenses relating thereto shall be paid by the Purchaser without recourse of any kind to the Seller or IndyMac Federal (or its predecessors-in-interest).  The Purchaser shall provide to the Seller twenty (20) Business Days following the Closing Date a status report for each pending litigation regarding replacement by the Purchaser as the party-in-interest.  The Purchaser shall pay all of the costs and expenses incurred by it in connection with the actions required to be taken by it pursuant to Section 5.13(a) and this Section 5.13(b), including all legal fees and expenses and court costs, and shall reimburse the Seller for all reasonable out-of-pocket costs, including all legal expenses, incurred by the Seller on or after the Closing Date with respect to any such litigation, including costs incurred in connection with the dismissal thereof or withdrawal therefrom.

(c)     Notwithstanding the foregoing, the Purchaser shall retain all rights and remedies under Article XVII of the Master Purchase Agreement and under Articles VII and VIII hereto.

Section 5.14   Mortgage Loans in Bankruptcy.  In accordance with Bankruptcy Rules 3001 and 3002, the Purchaser agrees to take all actions necessary to file, within thirty (30) Business Days after the Closing Date, (i) proofs of claims in pending bankruptcy cases involving any Mortgage Loans for which the Seller or IndyMac Federal (or its predecessors-in-interest) have not already filed a proof of claim, and (ii) all documents required by Bankruptcy Rule 3001 and to take all such similar actions as may be required in any relevant jurisdiction in any pending bankruptcy or insolvency case or proceeding in such jurisdiction involving any Assets in order to evidence and assert the Purchaser's rights. The Purchaser shall prepare and provide to the Seller, within thirty (30) Business Days after the Closing Date, an Affidavit and Assignment of Claim or any similar forms as may be required in any relevant Foreign Jurisdiction and shall be acceptable to the Seller, for each Mortgage Loan where a Mortgagor under such Mortgage Loan is in bankruptcy as of the Closing Date.  The Purchaser hereby releases the Seller, IndyMac Federal (or its predecessors-in-interest) and the FDIC from any claim, demand, suit or cause of action the Purchaser may have as a result of any action or inaction on the part of the Seller, IndyMac Federal (or its predecessors-in-interest) or the FDIC with respect to such Mortgage Loan, and the Purchaser further agrees to reimburse the Seller for any cost or expense incurred by the Seller as a result of the Purchaser's failure to file an Affidavit and Assignment of Claim or similar forms as required herein.

Exhibit 4, Page 193

Section 5.15   <u>Retained Claims</u>.   The provisions of <u>Section 5.13</u> and <u>Section 5.14</u> are subject to the Seller's retention of claims pursuant to <u>Section 2.05</u> of this Agreement, including any such claims as may have been asserted in litigation pending as of the Closing Date.  If the Seller determines to pursue any claim retained pursuant to <u>Section 2.05</u>, then, at the Seller's discretion, litigation involving any such claims shall be bifurcated, with the Seller remaining the real party-in-interest and retaining control over (and being responsible for pursuing and bearing the related costs to pursue) claims retained by it pursuant to <u>Section 2.05</u> and with the Purchaser substituting itself as the real party-in-interest and taking control of (and being responsible for pursuing and bearing the cost of pursuing) the remaining claims in litigation.

<div align="center">

**ARTICLE VI**

**<u>REPRESENTATIONS AND WARRANTIES
OF THE PURCHASER</u>**

</div>

The representations and warranties made by the Purchaser to the Seller with respect to the transactions contemplated hereby are as set forth in the Master Purchase Agreement.

<div align="center">

**ARTICLE VII**

**<u>REPRESENTATIONS AND WARRANTIES; ASSET-LEVEL STATEMENTS</u>**

</div>

Section 7.01   <u>Assets Conveyed "AS IS"; Purchaser Acknowledgments</u>.

(a)   THE ASSETS WILL BE CONVEYED TO THE PURCHASER "AS IS" AND "WITH ALL FAULTS," WITHOUT ANY REPRESENTATION, WARRANTY OR GUARANTY WHATSOEVER, INCLUDING AS TO COLLECTIBILITY, ENFORCEABILITY, VALUE OF COLLATERAL, ABILITY OF ANY OBLIGOR TO REPAY, CONDITION, FITNESS FOR ANY PARTICULAR PURPOSE, MERCHANTABILITY OR ANY OTHER WARRANTY, WHETHER EXPRESS OR IMPLIED OR BY OPERATION OF LAW, BY ANY PERSON, INCLUDING THE SELLER, THE FAILED THRIFT OR THE FDIC, OR ANY PREDECESSOR-IN-INTEREST OR AFFILIATE OF THE SELLER, THE FAILED THRIFT OR THE FDIC, OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR CONTRACTORS.

(b)   The Purchaser acknowledges that (i) the Seller has performed limited due diligence with respect to the Assets and, therefore, none of the Seller, the Failed Thrift or the FDIC makes (or can make) any representations, warranties or guaranties with respect to the Assets or the presence or absence of Defects, (ii) the statements set forth in <u>Section 7.03</u> (the "**<u>Asset-Level Statements</u>**") are being provided solely as a means for providing the Purchaser with a basis for a remedy in the event a Defect is discovered, so long as all conditions for obtaining a remedy are otherwise met, (iii) the only remedies available to the Purchaser in connection with any Defect are those that are set forth in <u>Section 8.01</u>, and (iv) in no event will the existence of any Defect be evidence of bad faith, misconduct or fraud, even in the event that it is shown that Seller, the Failed Thrift or the FDIC, or any of their respective directors, employees, officers or agents, knew or should have known of the existence of any facts relating to the existence of such Defect.

Exhibit 4, Page 194

(c)      Nothing contained in this Agreement shall be construed as a representation, warranty or guaranty with respect to the Assets or that no Defect exists with respect thereto, whether oral or written, past or present, express or implied or by operation of Law, and each of the Seller, the Failed Thrift and the FDIC specifically disclaims, and the Purchaser expressly waives and releases the Seller, the Failed Thrift and the FDIC from, any and all liability or other obligation under this Agreement with respect to any of the following:

(i)      except for the remedies set forth in <u>Section 8.01</u>, any Defect; or

(ii)     any fraud or misrepresentation of any kind in connection with the origination or servicing of a Mortgage Loan, whether committed by the Mortgagor, the originator, a servicer, an appraiser or any other party involved in the origination or servicing of such Mortgage Loan; or

(iii)    any underwriting deficiency or failure to properly underwrite a Mortgage Loan in any way related to any of the following: (x) a failure to properly verify borrower information, such as income, credit history or rental history, (y) a failure to properly verify the value of the collateral, including as a result of a fraudulent or inaccurate appraisal or otherwise, or (z) the reliance on any fraudulent or overstated borrower information or appraisal.

Section 7.02    <u>Representations and Warranties of the Seller</u>.  The representations and warranties made by the Seller to the Purchaser with respect to the transactions contemplated hereby are as set forth in the Master Purchase Agreement.  In addition, the Seller hereby makes the following representations and warranties to the Purchaser as of the Closing Date:

(a)      <u>Organization, Existence and Good Standing of the Acquired Subsidiary</u>.  The Acquired Subsidiary is duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation.

(b)      <u>Capitalization of the Acquired Subsidiary</u>.  All of the outstanding shares of the Acquired Subsidiary are held of record by IndyMac Federal.

Section 7.03    <u>Asset-Level Statements</u>.  The Seller hereby makes the following statements with respect to the Servicing Rights as of the Closing Date:

(a)      <u>Mortgage Loan Schedule</u>.  As of the Initial Calculation Date, the information set forth in the information fields numbered one (1) through ten (10) inclusive in the Mortgage Loan Schedule is true and correct in all material respects.

(b)      <u>Compliance with Applicable Laws</u>.  Each Mortgage Loan was originated in compliance with those requirements of Laws applicable to the originator or servicer, as the case may be, that, if violated, would render the Mortgage Loan void, voidable, subject to a right of rescission or unenforceable.  Each Mortgage Loan was serviced in material compliance with the requirements of Laws applicable to the servicer.

Exhibit 4, Page 195

(c)      Ownership/Good Title.  The Seller is the sole owner of the Servicing Rights.  The Seller has good and marketable title thereto, and will transfer and sell its rights, title and interest in and to the Servicing Rights to the Purchaser free and clear of any Lien.

(d)      Escrow Accounts; Escrow Payments.  The information provided to the Purchaser as of the Initial Calculation Date with respect to Escrow Accounts and Escrow Payments in connection with the Mortgage Loans is true and correct in all material respects.

(e)      Servicing.  Each Mortgage Loan has been serviced in material compliance with the terms of the related Mortgage and Mortgage Note or the related Servicing Agreement, as applicable; provided that, the Seller makes no statement that the servicer thereof has complied with any obligation relating to the enforcement or notification of any rights against, or obligations of, the related depositor or seller of such Mortgage Loans to any investor (including into any securitization trust or other vehicle).

(f)      Servicing Agreements.  Each Servicing Agreement relating to the Mortgage Loans serviced for others as of the Initial Calculation Date is set forth on Schedule 7.03(f), and a copy of each such Servicing Agreement has been made available to the Purchaser.

(g)      Agency Approvals.  With respect to each Mortgage Loan serviced for any Agency, the Seller has procured all requisite consents and approvals of the related Agency to the transfer of the related Servicing Rights to the Purchaser.

## ARTICLE VIII

## REMEDIES FOR DEFECTIVE ASSETS

Section 8.01      Remedy.  In the event a Defect is discovered with respect to any Servicing Right (a "**Defective Asset**"), then, subject to the terms and conditions of this Article VIII, the Seller shall: (i) if the Seller determines that the Defect is curable using commercially reasonable means, either cure the Defect (which may include, among other things, a purchase price adjustment) or require the Purchaser to cure the Defect and then reimburse the Purchaser for reasonable amounts paid by the Purchaser to third parties to effect such cure, and (ii) reimburse the Purchaser for Losses incurred as a result of the Defect and, in the event of a Third Party Claim, reimburse the Purchaser and its officers, directors, employees, partners, principals, Affiliates, agents and contractors (collectively with the Purchaser, the "**Reimbursed Parties**") for Losses incurred as a result of such Third Party Claim (each, a "**Remedy**").  IN NO EVENT SHALL ANY DEFECT OR THE OBLIGATION TO PROVIDE A REMEDY HEREUNDER WITH RESPECT TO A DEFECTIVE ASSET BE EVIDENCE OF ANY BAD FAITH, MISCONDUCT OR FRAUD ON THE PART OF THE SELLER, THE FAILED THRIFT OR THE FDIC  EVEN IF IT IS SHOWN THAT THE SELLER, THE FAILED THRIFT OR THE FDIC, OR ANY AFFILIATE THEREOF, OR ANY OF THEIR RESPECTIVE DIRECTORS, EMPLOYEES, OFFICERS, CONTRACTORS OR AGENTS, (A) KNEW OR SHOULD HAVE KNOWN OF THE EXISTENCE OF ANY FACTS RELATING TO SUCH DEFECT, (B) CAUSED SUCH DEFECT OR (C) FAILED TO MITIGATE SUCH DEFECT OR ANY OF THE LOSSES RESULTING THEREFROM.

Exhibit 4, Page 196

Section 8.02    Conditions Precedent to Remedy.  The obligation of the Seller to provide a Remedy for any Defective Asset is contingent upon the satisfaction (as determined by the Seller in its sole discretion) or waiver (which may be granted by the Seller in its sole discretion) of each of the following conditions:

(a)    the Purchaser has delivered the Defect Notice and any supporting evidence required by Section 8.05 to the Seller on or prior to the Claims Termination Date, and has provided the Seller with all additional supporting evidence requested by the Seller pursuant to, and within the timeframe set forth in, Section 8.05;

(b)    the Purchaser has delivered the notice required by Section 8.04(a) to the Seller, if applicable;

(c)    neither the Purchaser nor the Purchaser's servicer has caused or materially exacerbated the Defect or increased any resulting Loss;

(d)    neither the Purchaser nor the Purchaser's servicer has taken any action or omitted to take any action (other than as required by Section 8.02(e)) that (x) materially and adversely affects the Seller's ability to process the request for, or provide, a Remedy, or (y) materially and adversely affects the ability or increases the cost to cure the Defect, or the Seller's ability to mitigate Losses, or otherwise results in a Loss (including any Excluded Loss) to the Seller;

(e)    in connection with the Defective Asset, the Purchaser or the Purchaser's servicer has complied in all material respects with the Guidelines, if applicable; and

(f)    the Purchaser has taken such additional actions that the Seller may have reasonably requested in order to mitigate Losses.

Section 8.03    Excluded Losses.  Losses that are reimbursable by the Seller hereunder shall not include any of the following:

(a)    Excluded Losses, unless such Losses are incurred by a Reimbursed Party as a direct result of a final, nonappealable order of a court of competent jurisdiction awarding damages in connection with a Third Party Claim asserted against such Reimbursed Party that would otherwise constitute Excluded Losses;

(b)    Losses arising from or in connection with claims asserted against the Purchaser by any of its Affiliates or any of its or their respective officers, directors, partners, employees, agents, creditors or stockholders (beneficial or of record);

(c)    Losses attributable to or arising from overhead allocations or general internal and administrative costs or the costs of administering or complying with the pre-approval, submission or reporting requirements imposed by or under this Agreement (such as but not limited to in-house counsel costs);

(d)    Losses reimbursable or payable by any Person (other than the Seller), including but not limited to recovery in the form of insurance proceeds; provided, however, that nothing contained herein shall require the Purchaser to pursue potential claims against prior servicers or

30

Exhibit 4, Page 197

originators even if the successful pursuit of such claims could reduce the Seller's reimbursement obligation hereunder; or

(e)     litigation costs (including attorneys' fees and expenses) arising from or with respect to any bankruptcy action or foreclosure with respect to any Mortgage Loan.

Section 8.04    <u>Third Party Claims</u>.

(a)     In connection with any Third Party Claim for which any Reimbursed Party may seek reimbursement of Losses, the Purchaser shall deliver notice thereof to the Seller promptly after receipt by the Reimbursed Party of written notice of the Third Party Claim (but in any event no later than ten (10) Business Days after receipt of such written notice), describing in reasonable detail the facts giving rise to any claim for reimbursement hereunder, the amount of such claim (if known) and such other information with respect thereto as is available to the Reimbursed Party and as the Seller may reasonably request.  The notice required by this <u>Section 8.04</u> shall be in addition to the notice required by <u>Section 8.05</u> with respect to a Defect.

(b)     If the Seller confirms in writing to the Reimbursed Party within fifteen (15) days after receipt of a Third Party Claim that the Seller will reimburse the Reimbursed Party therefor, the Seller may elect to assume control over the compromise or defense of such Third Party Claim at the Seller's own expense and by the Seller's own counsel, which counsel must be reasonably satisfactory to the Reimbursed Party, <u>provided</u> <u>that</u> (x) the Reimbursed Party may, at its option and its own expense, employ counsel to assist in the handling (but not control the defense) of any Third Party Claim; (y) the Seller shall keep the Reimbursed Party advised of all material events with respect to any Third Party Claim; and (z) the Seller shall obtain the prior written approval of the Reimbursed Party before ceasing to defend against any Third Party Claim or entering into any settlement, adjustment or compromise of such Third Party Claim involving injunctive or similar equitable relief being imposed upon the Reimbursed Party or any of its Affiliates.

(c)     If the Seller elects not to assume control over the compromise or defense of such Third Party Claim, the Reimbursed Party, upon providing prior written notice to the Seller, may pay, compromise or defend against such asserted Third Party Claim (but the Seller shall nevertheless be required to pay all Losses incurred by the Reimbursed Party in connection with such defense, settlement or compromise).

(d)     In connection with any defense of a Third Party Claim (whether by the Seller or any Reimbursed Party), all of the parties hereto shall, and shall cause their respective Affiliates to, cooperate in the defense or prosecution thereof and to in good faith retain and furnish such records, information and testimony, and attend such conferences, discovery proceedings, hearings, trials and appeals, as may be reasonably requested by a party hereto in connection therewith.

Section 8.05    <u>Notice and Evidence of Defect</u>.  The Purchaser shall notify the Seller of each Defective Asset with respect to which the Purchaser seeks a Remedy under <u>Section 8.01</u> promptly upon discovery of the Defect, but in any event no later than ten (10) Business Days after the last day of the month in which such discovery occurs; <u>provided</u>, <u>however</u>, that if a Reimbursed Party receives written notice of a Third Party Claim, the Purchaser shall notify the

Exhibit 4, Page 198

Seller of the Defect that is the basis of such Third Party Claim within ten (10) Business Days after the Reimbursed Party receives notice of the Third Party Claim.  Such notice (the "**Defect Notice**") shall be in writing on the Purchaser's letterhead and shall include the following information:

(a)    the Purchaser's tax identification number and wire transfer instructions;

(b)    the identification of the particular statement of the Seller in <u>Section 7.03</u> of this Agreement that the Purchaser believes was untrue at the time such statement was made;

(c)    evidence supporting the basis for requesting a Remedy and the satisfaction of the conditions precedent to the Seller's obligation to provide a Remedy or, if any conditions precedent have not been satisfied, a request for a waiver of such conditions precedent, including the reasons why the Purchaser believes such waiver should be granted;

(d)    information regarding any commercially reasonable means of curing the Defect that are available to the Purchaser and the estimated cost of effecting any such cure; and

(e)    a certification by the Purchaser that the Defect Notice is being submitted in good faith and is complete and accurate in all respects to the best of the Purchaser's knowledge.

Promptly upon request by the Seller, but in any event no later than ten (10) Business Days thereafter, the Purchaser shall supply the Seller with any additional evidence or information that the Seller may reasonably request.

Section 8.06    <u>Processing of the Remedy Request</u>.

(a)    Within a reasonable period of time following the receipt by the Seller of the Defect Notice and all additional information that the Seller may have requested pursuant to <u>Section 8.05</u>, the Seller will notify the Purchaser as to whether the request for a Remedy with respect to a Defective Asset has been accepted or rejected and, if accepted, the Remedy that the Seller expects to provide and the expected timing for such Remedy.

(b)    If the Seller notifies the Purchaser that the Remedy will be a reimbursement to the Purchaser for amounts paid to third parties to cure the Defect and that the Purchaser's proposed means of curing the Defect and the Purchaser's estimated cost thereof is acceptable to the Seller, the Purchaser shall promptly effect such cure using the means specified in the Defect Notice and submit documentation to the Seller regarding the actual costs incurred; provided, however, that the Purchaser shall not, without the prior written consent of the Seller, incur any cost to cure the Defect that is materially in excess of the estimate set forth in the Defect Notice.  If the Seller does not agree to the proposed cure and cost thereof specified in the Defect Notice, the Purchaser shall promptly effect such other commercially reasonable cure as may be directed in writing by the Seller, and the Seller shall reimburse the Purchaser for all costs of effecting such cure. Notwithstanding the foregoing, the Seller shall have no obligation to reimburse the Purchaser for any cure costs unless the Purchaser has demonstrated to the satisfaction of the Seller that such costs are not recoverable from the Mortgagor under the Defective Asset or from any other source. In addition, the Purchaser agrees that the reimbursement of cure costs by the Seller may be conditioned on the Seller's receipt of an undertaking by the Purchaser to repay such costs to the

Exhibit 4, Page 199

Seller if such costs are recovered from any source at any time after payment thereof by the Seller to the Purchaser.

(c)     Subject to the terms and conditions of this Article VIII, and except as otherwise provide herein with respect to Third Party Claims, the Seller will use commercially reasonable efforts to provide the selected Remedy to the Purchaser within sixty (60) days after providing the above-referenced notice to the Purchaser or, if the Remedy is to reimburse the Purchaser for amounts paid to cure the Defect, within sixty (60) days after the Purchaser submits satisfactory documentation thereof to the Seller.

Section 8.07   Seller Loss Limit.  The Seller's obligation to provide a Remedy hereunder in respect of Defective Assets shall cease at such time as the aggregate payments made by the Seller (including payments made by the Seller to third parties to cure Defects) under this Article VIII (including purchase price adjustments) equals or exceeds the aggregate purchase price of the Assets (after taking into account any adjustment in the purchase price due to prorations or set-off amounts) (the "**Loss Limit**"), and the Seller shall have no liability for the cost of any Remedy to the extent such cost exceeds the Loss Limit.  Notwithstanding the foregoing, if the Seller has confirmed to a Reimbursed Party that it will reimburse the Reimbursed Party for Losses incurred with respect to a Third Party Claim, then the Seller will reimburse all such Losses, regardless of the Loss Limit.

## ARTICLE IX

## CONDITIONS PRECEDENT TO CLOSING

Section 9.01   Conditions to Purchaser's Obligation.  The obligation of the Purchaser to effect the Closing hereunder is subject to the satisfaction (or waiver by the Purchaser) of all of the conditions set forth in Section 14.01 of the Master Purchase Agreement (subject to the introductory paragraph of Article XIV of the Master Purchase Agreement).

Section 9.02   Conditions to Seller's Obligation.  The obligation of the Seller to effect the Closing hereunder is subject to the satisfaction (or waiver by the Seller) of all of the conditions set forth in Section 14.02 of the Master Purchase Agreement (subject to the introductory paragraph of Article XIV of the Master Purchase Agreement).

## ARTICLE X

## POST-CLOSING COVENANTS

Section 10.01   Discharge of Liabilities.  Following the Closing Date, the Purchaser agrees to discharge the Assumed Liabilities in accordance with their terms and applicable Law.

Section 10.02   Performance of Servicing.  From and after the Closing Date, the Purchaser shall pay, perform and discharge (i) those liabilities and obligations expressly assumed by Purchaser under this Agreement relating to the Servicing Rights and the other Assets acquired hereunder, including those liabilities and obligations under the related Servicing Agreements, Mortgage Loan Documents and Ancillary Documents; and (ii) all rights, obligations and duties expressly assumed by the Purchaser under this Agreement with respect to the related Escrow

Exhibit 4, Page 200

Payments as required by the Security Parties, the Servicing Agreements and Mortgage Loan Documents, all in accordance with the standard of care set forth in Section 10.03. Notwithstanding anything to the contrary herein, unless prohibited by Law or by contract, in the event a Defect is discovered with respect to any Servicing Right, the Purchaser shall continue to service such Mortgage Loan in accordance with this Section 10.02.  The Purchaser agrees that it will service the Mortgage Loans in accordance with the Guidelines, as applicable.  The Purchaser shall obtain and maintain all licenses necessary to perform all of its obligations hereunder with respect to the Assets and the Assumed Liabilities and shall comply with all state laws requiring licensing to the extent necessary to permit the servicing of the Mortgage Loans in accordance with the terms of this Agreement and the Servicing Agreements.  In addition, the Purchaser shall take any and all actions as may be necessary or appropriate to remain a qualified servicer under each Servicing Agreement.

Section 10.03   Standard of Care.  With respect to the servicing of the Mortgage Loans (including the conduct of foreclosures and the management of the Mortgaged Property) and the collection of advances, the Purchaser shall (i) exercise the degree of care which is standard in the industry with respect to the servicing of similar loans (including the conduct of foreclosures and the management of property) and the collection of similar advances and claims and (ii) service such Mortgage Loans in strict accordance with applicable Law and regulations and in accordance with applicable Investor and Insurer requirements governing servicers and the provisions of the applicable Servicing Agreements.  In the event there is a conflict between any provision of this Agreement on the one hand, and any applicable Servicing Agreement and/or any Investor or Insurer requirements on the other hand, the latter shall govern the Purchaser's conduct.

Section 10.04   Mitigation of Losses.  Subject to the provisions of the remainder of this Section 10.04, the Purchaser shall use its reasonable best efforts at all times to minimize the Losses for which the Seller may be liable under this Agreement.  Without limiting the foregoing, in carrying out its duty to mitigate Losses for which the Seller may be liable, subject to the provisions of the remainder of this Section 10.04, the Purchaser shall, as applicable, pursue any counterclaim, offset, insurance settlement or other claim which would be reasonably likely to result in a recovery that would reduce the Seller's liability under this Agreement, including making prompt and proper application for and diligently pursuing receipt of insurance proceeds. If, in the Purchaser's reasonable judgment, litigation would be reasonably likely to result in a recovery that would reduce the Seller's liability under this Agreement, the Purchaser shall give the Seller written notice at least twenty (20) calendar days prior to instituting any such litigation. If the Seller agrees that such litigation should be pursued, the Purchaser shall institute litigation with respect to such potentially receivable claims.  If the Seller does not consent to such litigation within such twenty (20) day period, no failure of the Purchaser to institute such litigation shall constitute a breach by the Purchaser of its duty to mitigate losses under this Section 10.04.  The Purchaser shall institute litigation with respect to, or assign to the Seller, any such claim if it is requested to do so by the Seller.  For the avoidance of doubt, costs incurred in connection with the foregoing efforts to minimize Losses shall constitute Losses for purposes of this Agreement.

Section 10.05   Reimbursement of Recoveries.  Within fifteen (15) Business Days after receipt, the Purchaser shall refund to the Seller the amounts of all recoveries received by the

Exhibit 4, Page 201

Purchaser with respect to any claim for which the Purchaser has received reimbursement for Losses under this Agreement.

Section 10.06   <u>Reimbursement for Draws</u>.   From and after the Closing Date, (i) the Purchaser will be obligated to fund all Draws as required under the terms of the agreements related to the Securitization Transactions included on <u>Schedule 1.01(b)</u>, and (ii) the Seller will be obligated to reimburse the Purchaser for such Draws, in each case as set forth in the term sheet attached hereto as <u>Exhibit C</u> and the more detailed definitive documentation executed pursuant thereto.   For the avoidance of doubt, the obligations, terms and commitments set forth in the term sheet attached hereto as <u>Exhibit C</u> are binding obligations of the parties hereto as if they were set forth in full herein, notwithstanding any delay in executing or failure to execute more detailed definitive documentation as contemplated therein.

Section 10.07   <u>Tax Reporting</u>.   The Purchaser shall prepare, report to the Internal Revenue Service and provide to Mortgagors, all in accordance with applicable Law, rules and regulations, any and all Tax information required to be provided with respect to the Mortgage Loans for the entire year in which the Closing Date occurs and thereafter.

Section 10.08   <u>Insured or Guaranteed Mortgage Loans</u>.   In connection with the sale and transfer of the Servicing Rights pursuant to this Agreement, if any Mortgage Loans are insured or guaranteed by any department or agency of any governmental unit, federal, state or local,  and such insurance or guaranty is not being specifically terminated by Seller, the Purchaser represents that the Purchaser has been approved by such agency and is an approved servicer. The Purchaser further assumes full responsibility for determining whether or not such insurance or guarantees are in full force and effect on the Closing Date, and with respect to those Mortgage Loans with respect to which any such insurance or guaranty is in full force and effect on the Closing Date, the Purchaser assumes full responsibility for doing all things necessary to insure such insurance or guarantees remain in full force and effect.   The Purchaser agrees to assume all of the Seller's obligations under the contracts of insurance or guaranty, agrees to indemnify and hold the Seller harmless from and against any claims of breach thereof after the Closing and agrees to cooperate with the Seller where necessary to complete forms required by the insuring or guaranteeing department or agency to effect or complete the transfer to the Purchaser.

Section 10.09   <u>Notice of Claim</u>.   Each party hereto shall promptly notify the other party of any claim, threatened claim or litigation against the Failed Thrift, the Seller, the Purchaser or any of their respective employees, officers, agents and representatives arising out of or in any way related to any Mortgage Loan or Servicing Rights purchased by the Purchaser that may come to its attention.

Section 10.10   <u>Prior Servicer Information</u>.   The Purchaser acknowledges and agrees that the Seller might not have access to information from prior servicers of a Mortgage Loan and that the Seller has not requested any information not in the possession of the Seller or its servicing contractor from any prior servicer of a Mortgage Loan.   The Purchaser acknowledges and agrees that the Seller will not be required under the terms of this Agreement to request any information from any prior servicer.

Exhibit 4, Page 202

Section 10.11  <u>Further Assurances; Post-Closing Cooperation</u>.

(a)      At any time or from time to time after the Closing, the Seller shall execute and deliver or cause to be executed and delivered to the Purchaser such other documents and instruments, provide such materials and information and take such other actions as the Purchaser may reasonably request in order to effect the transfer, as provided in this Agreement, of the Assets and the Assumed Liabilities to the Purchaser and, to the full extent permitted by Law, to put the Purchaser in actual possession of the same.

(b)      At any time or from time to time after the Closing, the Purchaser shall execute and deliver or cause to be executed and delivered to the Seller such other documents and instruments, provide such materials and information and take such other actions as the Seller may reasonably request in order to effect the transfer, as provided in this Agreement, of the Assets to the Purchaser and the assumption by the Purchaser of the Assumed Liabilities, and otherwise to cause the Purchaser to fulfill its obligations under this Agreement and the Ancillary Documents.

(c)      If, in order to properly prepare its Tax Returns, other documents or reports required to be filed with Governmental Authorities or its financial statements or to fulfill its obligations hereunder, it is necessary that the Purchaser be furnished with additional information, documents or records relating to the Seller, and such information, documents or records are in the possession or control of the Seller, the Seller shall use commercially reasonable efforts to furnish or make available such information, documents or records (or copies thereof) at the recipient's request, cost and expense.

(d)      Notwithstanding anything to the contrary contained in this <u>Section 10.11</u>, if the parties are in an adversarial relationship in litigation or arbitration, the furnishing of information, documents or records in accordance with any provision of this Agreement shall be subject to applicable rules relating to discovery.

Section 10.12  <u>Loan Modification Program</u>.  The Purchaser shall complete the processing of all Mortgage Loan modifications in process pursuant to the Program as of the Closing Date and will honor all offers of modifications for which processing has not yet commenced in accordance with the terms of the Program.  In addition, the Purchaser agrees that it will comply with the Program for so long as any financing provided by the Seller in connection with the purchase of the Servicing Rights remains outstanding.  The Purchaser agrees that it will comply with the Program as it may be amended by the FDIC from time to time, provided, however, that, unless otherwise required by Law, the Purchaser shall not be required to comply with any changes to the Program after the Closing Date if such changes would (i) require the Purchaser to take any action in violation of applicable Law or the terms of any Servicing Agreement then in effect or (ii) result in the net present value of the estimated cash flows on the related Loan, discounted at the Then-Current Interest Rate, after any such change being less than the net present value of such Loan prior to such change.  The Purchaser acknowledges and agrees that it will be required to comply with reporting requirements with respect to the Program that are acceptable to the FDIC in order to allow the FDIC to monitor compliance with, and the results of, the Program.

Exhibit 4, Page 203

Section 10.13  Information and Access for Bond Insurers.   For each Securitization Transaction with respect to which there is a bond or similar insurer, the Purchaser shall provide to such insurer (x) such annual, quarterly and other financial reports and data and such annual certifications and (y) such access to information and personnel and notice of material events, in each case, as the Purchaser is required to provide to such insurer in accordance with the applicable Servicing Agreement or, if not so required, to the same extent as the Purchaser otherwise is required to provide to the trustee with respect to such Securitization Transaction. Prior to the Closing Date the Seller shall deliver to the Purchaser a list setting forth the name, contact information and Securitization Transactions for each such insurer to the extent known to the Seller.

<div align="center">

**ARTICLE XI**

**TAX MATTERS**

</div>

Section 11.01  Responsibility for Filing Tax Returns.  The Seller shall timely prepare or cause to be prepared and file or cause to be filed, all Tax Returns with respect to the Acquired Subsidiary that are (i) required to be filed on or before the Closing Date; or (ii) filed on consolidated, unitary or combined basis with the Seller or any of its Affiliates.  The Purchaser shall prepare or cause to be prepared and file or cause to be filed all other Tax Returns for the Acquired Subsidiary that are required to be filed after the Closing Date.  The Purchaser shall permit the Seller to review and comment on such Tax Returns described in the preceding sentence prior to filing and shall make such revisions to such Tax Returns as are reasonably requested by the Seller.  In accordance with Section 17.02 of the Master Purchase Agreement, the Seller shall pay to the Purchaser an amount equal to the portion of the Taxes shown on such Tax Returns that are attributable to the Tax periods or portions thereof ending on or before the Closing Date (pursuant to the allocation method described in Section 17.02 of the Master Purchase Agreement) but only to the extent that such Taxes were not paid by the Acquired Subsidiary prior to the Closing Date.

Section 11.02  Refund and Tax Benefits.   Any Tax refunds that are received by the Purchaser or the Acquired Subsidiary, and any amounts credited against Taxes to which the Purchaser or the Acquired Subsidiary become entitled, in each case that related to Tax periods or portions thereof of the Acquired Subsidiary ending on or before the Closing Date shall be for the account of the Seller, and the Purchaser shall pay over to the Seller any such refund or the amount of any such credit within fifteen (15) days after receipt or entitlement thereto.

Section 11.03  Cooperation on Tax Matters.

(a)      The Purchaser, the Acquired Subsidiary and the Seller shall cooperate fully, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns pursuant to this Article XI and any audit, litigation or other proceeding with respect to Taxes.  Such cooperation shall include the retention and (upon the other Party's request) the provision of records and information that are reasonably relevant to any such audit, litigation or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.  The Acquired Subsidiary and the Seller agree (A) to retain all Books and Records with respect to Tax matters

Exhibit 4, Page 204

pertinent to Acquired Subsidiary relating to any taxable period beginning before the Closing Date until the expiration of the statute of limitations and any litigation holds (and, to the extent notified by Purchaser or Seller, any extensions thereof) of the respective taxable periods, and to abide by all record retention agreements entered into with any taxing authority, and (B) to give the other Party reasonable written notice prior to transferring, destroying or discarding any such books and records and, if the other Party so requests, the Acquired Subsidiary or the Seller, as the case may be, shall allow the other Party to take possession of such books and records.

(b)     The Purchaser and the Seller further agree, upon request, to use their best efforts to obtain any certificate or other document from any governmental authority or any other Person as may be necessary to mitigate, reduce or eliminate any Tax that could be imposed (including, but not limited to, with respect to the transactions contemplated hereby).

(c)     The Purchaser and the Seller further agree, upon request, to provide the other Party with all information that either Party may be required to report pursuant to Code Section 6043, Code Section 6043A, or Treasury Regulations promulgated thereunder.

Section 11.04 <u>Tax-Sharing Agreements</u>.    All tax-sharing agreements or similar agreements with respect to or involving the Acquired Subsidiary shall be terminated as of the Closing Date and, after the Closing Date, the Acquired Subsidiary shall not be bound thereby or have any liability thereunder.

<div align="center">

**ARTICLE XII**

**<u>NOTICES</u>**

</div>

All notices, requests, demands and other communications required or permitted to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be given by certified or registered mail, postage prepaid, or delivered by hand or by nationally recognized air courier service, directed to the address of such Person set forth below:

|  |  |
|---|---|
| if to the Purchaser, to: | 888 East Walnut Street |
| | Pasadena, CA 91101-7211 |
| | Attention: Steven Mnuchin |
| | |
| with a copy to: | Cleary Gottlieb Steen & Hamilton LLP |
| | One Liberty Plaza |
| | New York, NY 10006 |
| | Attention: Paul E. Glotzer |
| | |
| if to the Seller, to: | Manager, Structured Transactions |
| | c/o Federal Deposit Insurance Corporation |
| | 550 17th Street, NW (Room F-7008) |
| | Washington, D.C. 20429-0002 |
| | Attention:  George Alexander |

Exhibit 4, Page 205

with a copy to:                    Senior Counsel
                                   FDIC Legal Division
                                   Litigation and Resolutions Branch, Receivership Section
                                   Special Issues Unit
                                   3501 Fairfax Drive (Room E-7056)
                                   Arlington, Virginia 22226
                                   Attention:  David Gearin

Any such notice shall become effective when received (or receipt is refused) by the addressee, provided that any notice or communication that is received (or refused) other than during regular business hours of the recipient shall be deemed to have been given at the opening of business on the next Business Day of the recipient.  From time to time, any Person may designate a new address for purposes of notice hereunder by notice to such effect to the other Persons identified above.

<div align="center">

**ARTICLE XIII**

**<u>MISCELLANEOUS PROVISIONS</u>**

</div>

    Section 13.01  <u>Severability</u>.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall be ineffective, but such ineffectiveness shall be limited as follows:  (i) if such provision is prohibited or unenforceable in such jurisdiction only as to a particular Person or Persons and/or under any particular circumstance or circumstances, such provision shall be ineffective, but only in such jurisdiction and only with respect to such particular Person or Persons and/or under such particular circumstance or circumstances, as the case may be; (ii) without limitation of clause (i), such provision shall in any event be ineffective only as to such jurisdiction and only to the extent of such prohibition or unenforceability, and such prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction; and (iii) without limitation of clauses (i) or (ii), such ineffectiveness shall not invalidate any of the remaining provisions of this Agreement.  Without limitation of the preceding sentence, it is the intent of the parties to this Agreement that in the event that in any court proceeding, such court determines that any provision of this Agreement is prohibited or unenforceable in any jurisdiction (because of the duration or scope (geographic or otherwise) of such provision, or for any other reason) such court shall have the power to, and shall, (x) modify such provision (including without limitation, to the extent applicable, by limiting the duration or scope of such provision and/or the Persons against whom, and/or the circumstances under which, such provision shall be effective in such jurisdiction) for purposes of such proceeding to the minimum extent necessary so that such provision, as so modified, may then be enforced in such proceeding and (y) enforce such provision, as so modified pursuant to clause (x), in such proceeding.  Nothing in this Section is intended to, or shall, limit (1) the ability of any party to this Agreement to appeal any court ruling or the effect of any favorable ruling on appeal or (2) the intended effect of <u>Section 13.02</u>.

    Section 13.02  <u>Governing Law</u>.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL LAW, BUT IF FEDERAL LAW DOES NOT PROVIDE A RULE OF DECISION IT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK (EXCLUDING ANY CONFLICT OF LAWS RULE OR PRINCIPLE THAT MIGHT REFER

Exhibit 4, Page 206

THE GOVERNANCE OR THE CONSTRUCTION OF THIS AGREEMENT TO THE LAW OF ANOTHER JURISDICTION).  Nothing in this Agreement shall require any unlawful action or inaction by any party hereto.

Section 13.03   Waivers; Amendment and Assignment.  No provision of this Agreement may be amended or waived except in writing executed by all of the parties to this Agreement.  This Agreement and the terms, covenants, conditions, provisions, obligations, undertakings, rights and benefits hereof shall be binding upon, and shall inure to the benefit of, the undersigned parties and their respective heirs, executors, administrators, representatives, successors and permitted assigns, and no other Person or Persons (including Mortgagors or any co-lender or other Person with any interest in or liability under any of the Mortgage Loans) shall have any rights or remedies under or by reason of this Agreement.  Notwithstanding the foregoing, this Agreement may not be transferred or assigned without the express prior written consent of the Seller and any attempted assignment without such consent shall be void *ab initio*.

Section 13.04   No Presumption.  This Agreement shall be construed fairly as to each party hereto and if at any time any such term or condition is desired or required to be interpreted or construed, no consideration shall be given to the issue of who actually prepared, drafted or requested any term or condition of this Agreement or any agreement or instrument subject hereto.

Section 13.05   Entire Agreement.  This Agreement and the Ancillary Documents contain the entire agreement between the Seller and the Purchaser and/or its Affiliates with respect to the subject matter hereof and supersede any and all other prior agreements, whether oral or written.  In the event of a conflict between the terms of this Agreement and the terms of any Transfer Document or other document or instrument executed in connection herewith or in connection with the transactions contemplated hereby, including any translation into a foreign language of this Agreement for the purpose of any Transfer Document, or any other document or instrument executed in connection herewith which is prepared for notarization, filing or any other purpose, the terms of this Agreement shall control, and furthermore, the terms of this Agreement shall in no way be or be deemed to be amended, modified or otherwise affected in any manner by the terms of such Transfer Document or other document or instrument.

Section 13.06   Jurisdiction; Venue and Service.  Each of the Purchaser, for itself and its Affiliates,  and the Seller hereby irrevocably and unconditionally:

(a)       (i) agrees that any suit, action or proceeding instituted against it by any other party with respect to this Agreement may be instituted, and that any suit, action or proceeding by it against any other party with respect to this Agreement shall be instituted, only in the U.S. District Court for the Southern District of New York or the United States District Court for the District of Columbia (and appellate courts from any of the foregoing), (ii) consents and submits, for itself and its property, to the jurisdiction of such courts for the purpose of any such suit, action or proceeding instituted against it by any other party and (iii) agrees that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law;

40

Exhibit 4, Page 207

(b)      agrees that service of all writs, process and summonses in any suit, action or proceeding pursuant to Section 13.06(a) may be effected by the mailing of copies thereof by registered or certified mail, postage prepaid, to its address for notices pursuant to Article XII (with copies to such other Persons as specified therein); provided, however, that nothing contained in this Section 13.06 shall affect the ability of any party to be served process in any other manner permitted by Law;

(c)      (i) waives any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement brought in any court specified in Section 13.06(a), (ii) waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum and (iii) agrees not to plead or claim either of the foregoing; and

(d)      agrees that nothing contained in this Section 13.06 shall be construed as a limitation on any removal rights the FDIC may have.

Section 13.07   Waiver of Jury Trial.  EACH OF THE PURCHASER, FOR ITSELF AND ITS   AFFILIATES,   AND   THE   SELLER   HEREBY   IRREVOCABLY   AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY OF ANY DISPUTE ARISING OUT OF OR RELATING TO THIS AGREEMENT AND AGREES THAT ANY SUCH DISPUTE SHALL BE TRIED BEFORE A JUDGE SITTING WITHOUT A JURY.

Section 13.08   Counterparts; Facsimile Signatures.  This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original but all of which together shall constitute but one and the same agreement.  This Agreement and any amendments hereto, to the extent signed and delivered by facsimile or other electronic means, shall be treated in all manner and respects as an original agreement and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  No signatory to this Agreement shall raise the use of a facsimile machine or other electronic means to deliver a signature or the fact that any signature or agreement was transmitted or communicated through the use of a facsimile machine or other electronic means as a defense to the formation or enforceability of a contract and each such Person forever waives any such defense.

Section 13.09   Headings.   Section titles or captions contained in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provisions hereof.  All Section and paragraph references contained herein shall refer to Sections and paragraphs in this Agreement unless otherwise specified.

Section 13.10   Compliance with Law.  Except as otherwise specifically provided herein, each party to this Agreement shall, at its own cost and expense, obey and comply with all applicable Laws, as they may pertain to such party's performance of its obligations hereunder.

Section 13.11   Right to Specific Performance.   THE PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT THE DAMAGES TO BE INCURRED BY THE SELLER AS A RESULT OF THE PURCHASER'S BREACH OF THIS AGREEMENT WILL

Exhibit 4, Page 208

BE DIFFICULT, IF NOT IMPOSSIBLE, TO ASCERTAIN, THAT DAMAGES WILL NOT BE AN ADEQUATE REMEDY AND THAT ANY BREACH OR THREATENED BREACH OF ANY OF THE PROVISIONS OF THIS AGREEMENT BY THE PURCHASER MAY CAUSE IMMEDIATE IRREPARABLE HARM FOR WHICH THERE MAY BE NO ADEQUATE REMEDY AT LAW.  ACCORDINGLY, THE PARTIES AGREE THAT, IN THE EVENT OF ANY SUCH BREACH OR THREATENED BREACH, THE SELLER SHALL BE ENTITLED TO IMMEDIATE AND PERMANENT EQUITABLE RELIEF (INCLUDING INJUNCTIVE RELIEF AND SPECIFIC PERFORMANCE OF THE PROVISIONS OF THIS AGREEMENT) FROM A COURT OF COMPETENT JURISDICTION (IN ADDITION TO ANY OTHER REMEDY TO WHICH IT MAY BE ENTITLED AT LAW OR IN EQUITY).  THE PARTIES AGREE AND STIPULATE THAT THE SELLER SHALL BE ENTITLED TO EQUITABLE (INCLUDING INJUNCTIVE) RELIEF WITHOUT POSTING A BOND OR OTHER SECURITY AND THE PURCHASER FURTHER WAIVES ANY DEFENSE IN ANY SUCH ACTION FOR SPECIFIC PERFORMANCE OR INJUNCTIVE RELIEF THAT A REMEDY AT LAW WOULD BE ADEQUATE AND ANY REQUIREMENT UNDER LAW TO POST SECURITY AS A PREREQUISITE TO OBTAINING EQUITABLE RELIEF.  NOTHING CONTAINED IN THIS SECTION SHALL LIMIT ANY PARTY'S RIGHT TO ANY REMEDIES AT LAW, INCLUDING THE RECOVERY OF DAMAGES FOR BREACH OF THIS AGREEMENT.

Section 13.12   No Third Party Beneficiaries.  This Agreement is made for the sole benefit of the Seller and the Purchaser and their respective successors and permitted assigns, and no other Person or Persons (including any Mortgagor or co-lender or other Person with any interest in or liability under any of the Mortgage Loans) shall have any rights or remedies under or by reason of this Agreement.  Notwithstanding the foregoing, the FDIC shall be considered a third party beneficiary of this Agreement.

Section 13.13   Timing.  The Purchaser agrees that, although the Seller has agreed to use commercially reasonable efforts to take certain actions pursuant to this Agreement within specified periods of time, the failure of the Seller to take any such actions within such specified periods shall not be dispositive evidence of a breach by the Seller of this Agreement.

Section 13.14   Survival.   The covenants, representations and warranties in this Agreement shall survive the execution of this Agreement and the consummation of the transactions contemplated hereunder, unless otherwise contemplated herein.

Section 13.15   Termination.  This Agreement shall terminate upon the termination of the Master Purchase Agreement in accordance with its terms.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

Exhibit 4, Page 209

**IN WITNESS WHEREOF**, the parties hereto have caused this Servicing Business Asset Purchase Agreement to be executed as of the day and year first above written.

FEDERAL DEPOSIT INSURANCE
CORPORATION AS RECEIVER FOR
INDYMAC FEDERAL BANK, FSB


By: _George C. Alyal_____
    Name: George C. Alexander
    Title: Manager, Structured Transactions



ONEWEST BANK, FSB



By: _____
    Name: Joshua P. Eaton
    Title:  Authorized Signatory

**IN WITNESS WHEREOF**, the parties hereto have caused this Servicing Business Asset Purchase Agreement to be executed as of the day and year first above written.

FEDERAL DEPOSIT INSURANCE
CORPORATION AS RECEIVER FOR
INDYMAC FEDERAL BANK, FSB


By: _____
    Name:
    Title:



ONEWEST BANK, FSB


By: _____
    Name: Joshua P. Eaton
    Title:  Authorized Signatory

**EXHIBIT A**

**AFFIDAVIT AND ASSIGNMENT OF CLAIM**

**(For use with Loans in Bankruptcy)**

*(Note to Preparer:  When preparing the actual Affidavit and Assignment, delete this instruction and the reference to Exhibit A  above.)*

State of _____)
                                              )
County of _____)

The undersigned, being first duly sworn, deposes and states as follows:

The Federal Deposit Insurance Corporation as Receiver for IndyMac Federal Bank, FSB ("Assignor"), acting by and through its duly authorized officers and agents, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, does hereby sell, transfer, assign and set over to [_____], a {insert type of entity} ("Assignee") and its successors and assigns, all of the Assignor's interest in any claim (including any and all proofs of claim filed by the Assignor with the Bankruptcy Court (as defined below) in respect of such claim) in the bankruptcy case commenced by or against {insert Obligor's name} ("Obligor") in the {insert (1) appropriate U. S. Bankruptcy Court, including the district of the court, such as for the Western District of Texas, or (2) the Foreign Jurisdiction Bankruptcy Court} ("Bankruptcy Court") being designated as Case Number {insert docket number assigned case} ("Bankruptcy Claim"), or such part of said Bankruptcy Claim as is based on the promissory note of {insert the names of the makers of the note exactly as they appear on the note}, dated {insert the date the note was made}, and made payable to {insert the name of the payee on the note exactly as it appears on the note}, provided, however, that this assignment is made pursuant to the terms and conditions as set forth in that certain Servicing Business Asset Purchase Agreement between the Assignor and the Assignee dated March 19, 2009 (the "Agreement").

For purposes of Rule 3001 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rule 3001"), this assignment and affidavit represent the unconditional transfer of the Bankruptcy Claim or such part of the Bankruptcy Claim as is based on the promissory note or notes described above and shall constitute the statement of the transferor acknowledging the transfer and stating the consideration therefor as required by said Bankruptcy Rule 3001.  The Assignor hereby waives any objection to the transfer of the Bankruptcy Claim to the Assignee to the extent set forth above on the books and records of the Obligor and the Bankruptcy Court, and hereby waives to the fullest extent permitted by law any notice or right to a hearing as may be imposed by Bankruptcy Rule 3001, the Bankruptcy Code, applicable local bankruptcy rules or applicable law with respect to the Bankruptcy Claim to such extent.  The Assignor acknowledges and understands, and hereby stipulates, that an order of the Bankruptcy Court may be entered without further notice to the Assignor transferring to the Assignee the Bankruptcy Claim to the extent set forth above and recognizing the Assignee as the sole owner and holder of the Bankruptcy Claim to such extent.  The Assignor further notifies the Obligor, the Bankruptcy Court and all other

**Exhibit 4, Page 212**

interested parties that all further notices relating to the Bankruptcy Claim to such extent, and all payments or distributions of money or property in respect of the Bankruptcy Claim to such extent, shall be delivered or made to the Assignee.

This transfer was not for the purpose of the enhancement of any claim in a pending bankruptcy. The transfer of the debt was pursuant to the Agreement, through which numerous debts were sold; no specific amount of the total consideration was assigned to the debt that forms the basis of claim.

This assignment shall also evidence the unconditional transfer of the Assignor's interest in any security held for the Bankruptcy Claim.

IN WITNESS WHEREOF, the Assignor has caused this Affidavit and Assignment of Claim to be executed this ___ day of _____, 20__.

FEDERAL DEPOSIT INSURANCE
CORPORATION AS RECEIVER
FOR INDYMAC FEDERAL BANK, FSB


By:_____
    Name:
    Title:  Attorney-in-Fact

Exhibit 4, Page 213

ACKNOWLEDGMENT

STATE OF _____)
                              )
COUNTY OF _____)

      Before me, the undersigned authority, a Notary Public in and for the county and state aforesaid, on this day personally appeared George Alexander, known to me to be the person whose name is subscribed to the foregoing instrument, as _____ of the Federal Deposit Insurance Corporation acting in the capacity stated above, and he acknowledged to me that he executed the same as the act of the Federal Deposit Insurance Corporation, for the purposes and consideration therein expressed, and in the capacity therein stated.

      Given under my hand and seal of office on this the ___ day of _____, 20__.

                                     _____
                                     Notary Public

[SEAL]                         My Commission expires: _____

Exhibit 4, Page 214

## EXHIBIT B

## FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT

**THIS ASSIGNMENT AND ASSUMPTION AGREEMENT** is made and entered into as of the ___day of _____, 2009 by and between the FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR INDYMAC FEDERAL BANK, FSB ("**Assignor**") and ONEWEST BANK, FSB ("**Assignee**").

**WHEREAS**, Assignor and Assignee have entered into that certain Servicing Business Asset Purchase Agreement, dated March 19, 2009 (the "**Sale Agreement**"), pursuant to which Assignor has agreed to sell, transfer and assign to Assignee certain mortgage servicing rights and other assets and Assignee has agreed to assume certain obligations:

**NOW, THEREFORE**, in consideration of the foregoing, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.      <u>Assignor's Assignment</u>.  Assignor hereby transfers, grants, conveys and assigns to Assignee all of Assignor's right, title and interest in the Assets, including, without limitation, the Servicing Agreements.

2.      <u>Assignee's Acceptance</u>.  Assignee does hereby accept such assignment from Assignor and assumes all obligations arising from and after the date hereof.

3.      <u>Excluded Assets</u>.  Other than the Assumed Liabilities, Assignee is not assuming and shall not be liable for or bound by any liabilities of Assignor.  Nothing contained in this Agreement shall transfer or assign to Assignee any right to any of the Excluded Assets.

4.      <u>Incorporation of terms of the Sales Agreement</u>.  This Agreement is made, executed and delivered pursuant to the Sale Agreement, and is subject to all the terms, provisions and conditions thereof.  To the extent of any conflict between the terms of the Sale Agreement and this Agreement, the Sale Agreement shall be controlling.  Initially capitalized terms used and not defined herein have the meanings given them in the Sale Agreement.

5.      <u>Beneficiaries of this Assignment</u>.  This Assignment shall be binding upon and shall inure to the benefit of Assignor and Assignee and their respective successors and assigns, and the Federal Deposit Insurance Corporation in its corporate capacity shall be a third-party beneficiary with respect hereto.

6.      <u>Controlling Law</u>.  Federal law of the United States shall control this Agreement. To the extent that federal law does not supply a rule of decision, this Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York. Nothing in this Agreement will require any unlawful action or inaction by either party.

7.      <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

Exhibit 4, Page 215

**IN WITNESS WHEREOF**, each of the parties has caused this Assignment and Assumption Agreement to be executed and delivered by its duly authorized officer or agent as of the day and year first written above.

<div style="text-align: right;">

**ASSIGNOR**:
FEDERAL DEPOSIT INSURANCE
CORPORATION AS RECEIVER FOR
INDYMAC FEDERAL BANK, FSB

</div>

_____          By: _____
WITNESS                                  Name:
                                         Its:

<div style="text-align: right;">

**ASSIGNEE**:
ONEWEST BANK, FSB

</div>

_____          By: _____
WITNESS                                  Name:
                                         Its:

B-2

Exhibit 4, Page 216

**EXHIBIT C**

**TERM SHEET FOR ASSIGNMENT OF FUNDING OBLIGATIONS TO SERVICER IN HELOC SECURITIZATIONS AND REIMBURSEMENT FOR DRAWS**

SEE TAB 41.

## EXHIBIT D

### FORM OF BILL OF SALE

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and pursuant to the terms and conditions of the Servicing Business Asset Purchase Agreement by and between the FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR INDYMAC FEDERAL BANK, FSB ("**Seller**"), and ONEWEST BANK, FSB ("**Purchaser**"), dated March 19, 2009 (the "**Agreement**"), the Seller does hereby bargain, sell, assign, transfer, set over and convey to the Purchaser, its successors and assigns, without recourse, all right, title and interest of the Seller in and to the Assets, as defined in the Agreement, including the Servicing Rights (as identified on Schedule 1.01(a) thereto), for all purposes, in accordance with Article II of the Agreement.

THIS BILL OF SALE IS EXECUTED AND DELIVERED WITHOUT RECOURSE AND WITHOUT REPRESENTATION OR WARRANTY, WHETHER EXPRESS, IMPLIED OR CREATED BY OPERATION OF LAW, EXCEPT AS PROVIDED IN THE AGREEMENT AND THE MASTER PURCHASE AGREEMENT.

Executed this _____ day of _____, 2009.

**SELLER:**
FEDERAL DEPOSIT INSURANCE
CORPORATION AS RECEIVER FOR
INDYMAC FEDERAL BANK, FSB

By:_____

Name:_____

_____          Title:_____
WITNESS

Exhibit 4, Page 218

ACKNOWLEDGMENT

STATE OF _____)
                                          )
COUNTY OF _____)

      Before me, the undersigned authority, a Notary Public in and for the county and state aforesaid, on this day personally appeared George Alexander, known to me to be the person whose name is subscribed to the foregoing instrument, as _____ of the Federal Deposit Insurance Corporation as Receiver of IndyMac Federal Bank, FSB, and he acknowledged to me that he executed the same as the act of the Federal Deposit Insurance Corporation, for the purposes and consideration therein expressed, and in the capacity therein stated.

Given under my hand and seal of office on this the ___ day of _____, 2009.

_____
Notary Public

[SEAL]                    My Commission expires:  _____

Exhibit 4, Page 219

**EXHIBIT E**

**FORM OF LIMITED POWER OF ATTORNEY**

**[SALE NAME]**

*(Note to Preparer:  When preparing the actual Limited Power of Attorney, delete this instruction and the reference to Exhibit E above.)*

KNOW ALL PERSONS BY THESE PRESENTS, that the FEDERAL DEPOSIT INSURANCE CORPORATION ("FDIC") as Receiver for IndyMac Federal Bank, FSB, hereafter called the "Receiver", hereby designates the individual(s) set out below (the "Attorney(s)-in-Fact") for the sole purpose of executing the documents outlined below:

_____

_____

WHEREAS, the undersigned has full authority to execute this instrument on behalf of the FDIC as Receiver under applicable Resolutions of the FDIC's Board of Directors and redelegations thereof.

NOW THEREFORE, the FDIC as Receiver grants to the above-named Attorney(s)-in-Fact the authority, subject to the limitations herein, as follows:

1.      To execute, acknowledge, seal and deliver on behalf of the FDIC as Receiver for IndyMac Federal Bank, FSB all instruments of transfer and conveyance, appropriately completed, with all ordinary or necessary endorsements, acknowledgments, affidavits and supporting documents as may be necessary or appropriate to evidence the sale and transfer of any asset pursuant to that certain Servicing Business Asset Purchase Agreement, dated as of March 19, 2009, between the Receiver and OneWest Bank, FSB.

The form which the Attorney(s)-in-Fact shall use for endorsing promissory notes or preparing allonges to promissory notes is as follows:

Pay to the order of
OneWest Bank, FSB
Without Recourse

FEDERAL DEPOSIT INSURANCE
CORPORATION as Receiver for IndyMac Federal
Bank, FSB

By: _____
    Name: _____
    Title:     Attorney-in-Fact

Exhibit 4, Page 220

All other documents of assignment, conveyance or transfer shall contain this sentence: "This assignment is made without recourse, representation or warranty, express or implied, by the FDIC in its corporate capacity or as Receiver."

2.      To grant to each Attorney-in-Fact full power and authority to do and perform all acts necessary to carry into effect the powers granted by this Limited Power of Attorney as fully as FDIC or the Receiver might or could do with the same validity as if all and every such act had been herein particularly stated, expressed and especially provided for.

This Limited Power of Attorney shall be effective from _____, 2009 and shall continue in full force and effect through _____, 2010 unless otherwise terminated by an official of the FDIC authorized to do so by the Board of Directors ("Revocation").  At such time this Limited Power of Attorney will be automatically revoked. Any third party may rely upon this document as the named individual(s)' authority to continue to exercise the powers herein granted unless a Revocation has been recorded in the public records of the jurisdiction where this Limited Power of Attorney has been recorded, or unless a third party has received actual notice of a Revocation.

IN WITNESS WHEREOF, the FDIC by its duly authorized officer empowered by appropriate resolution of its Board of Directors, has caused these presents to be executed and subscribed in its name this ___ day of _____, 2009.

**FEDERAL DEPOSIT INSURANCE CORPORATION as Receiver for IndyMac Federal Bank, FSB**

By:_____

Name:_____

Title: _____

**[CONTINUED ON NEXT PAGE]**

Exhibit 4, Page 221

(CORPORATE SEAL)         ATTEST: _____

                                               Name:  Herbert J. Messite

                                               Title:  Counsel

Signed, sealed and delivered
in the presence of

By: _____
Name: _____
       Witness


By: _____
Name: _____
       Witness

**[ACKNOWLEDGMENT ON NEXT PAGE]**

Exhibit 4, Page 222

## ACKNOWLEDGMENT

UNITED STATES OF AMERICA   )
                                  )
DISTRICT OF COLUMBIA       )

On this ___ day of _____, 2009, before me, Notary Public in and for the District of Columbia, personally appeared _____ and Herbert J. Messite, with a business address of 550 17th Street, NW, Washington, DC  20429, who, being duly sworn, severally depose and say:

First, _____, first affiant, for himself, says that he is _____ of the Federal Deposit Insurance Corporation, the Corporation in whose name the foregoing Limited Power of Attorney has been subscribed, that the said Limited Power of Attorney was subscribed on behalf of the said Corporation by due authority of the Corporation's Board of Directors, and that the said _____ acknowledges that said Limited Power of Attorney to be the free act and deed of the said Corporation.

Second, Herbert J. Messite, second affiant, for himself, says that he is a Counsel with the Federal Deposit Insurance Corporation, the Corporation in whose name the foregoing Limited Power of Attorney has been subscribed, that the seal affixed to the said Limited Power of Attorney is the corporate seal of the said Federal Deposit Insurance Corporation, that the said Limited Power of Attorney was subscribed on behalf of the said Corporation and its seal thereto affixed by due authority of the Corporation's Board of Directors, and that the said Herbert J. Messite acknowledged the said Limited Power of Attorney to be the free act and deed of the said Corporation.

_____
**Notary Public, District of Columbia**
**United States of America**

**My Commission Expires:**

_____

Exhibit 4, Page 223

**EXHIBIT F**

**FDIC MORTGAGE LOAN MODIFICATION PROGRAM**

Objective

The objective of this FDIC Mortgage Loan Modification Program ("Program") is to modify the terms of certain residential mortgage loans so as to improve affordability, increase the probability of performance, allow borrowers to remain in their homes and increase the value of the loans to the FDIC and assignees. The Program provides for the modification of Qualifying Loans (as defined below) by reducing the borrower's monthly housing debt to income ratio ("DTI Ratio") to a target of 28%, never to exceed 38%, at the time of the modification and eliminating adjustable interest rate and negative amortization features.

Qualifying Mortgage Loans

In order for a mortgage loan to be a Qualifying Loan it must meet all of the following criteria, which must be confirmed by the lender:

- The collateral securing the mortgage loan is owner-occupied; and

- The mortgagor has a first priority lien on the collateral; and

- Either the borrower is at least 60 days delinquent or a default is reasonably foreseeable.

Modification Process

The lender shall undertake a review of its mortgage loan portfolio to identify Qualifying Loans. For each Qualifying Mortgage Loan, the lender shall determine the net present value ("NPV") of the modified loan and, if it will exceed the NPV of the foreclosed collateral upon disposition, then the Qualifying Loan shall be modified so as to reduce the borrower's monthly DTI Ratio to 28% (or to the lowest DTI Ratio higher than 28%, but not to exceed 38%, resulting in a NPV exceeding the foreclosed collateral upon disposition) at the time of the modification. To achieve this, the lender shall use a combination of interest rate reduction, term extension and principal forbearance, as necessary.

The borrower's monthly DTI Ratio shall be a percentage calculated by dividing the borrower's monthly housing payment (including principal, interest, taxes and insurance) by the borrower's monthly income. For these purposes, (1) the borrower's monthly income shall be the amount of the borrower's (along with any co-borrowers') documented and verified gross monthly income, and (2) the borrower's monthly housing payment shall be the amount required to pay monthly principal and interest plus one-twelfth of the then current annual amount required to pay real property taxes and homeowner's insurance with respect to the collateral.

In order to calculate the monthly principal payment, the lender shall capitalize to the outstanding principal balance of the Qualifying Loan the amount of all delinquent interest, delinquent taxes,

Exhibit 4, Page 224

past due insurance premiums, third party fees and (without duplication) escrow advances (such amount, the "Capitalized Balance").

In order to achieve the goal of reducing the DTI Ratio to 28%, the lender shall take the following steps in the following order of priority with respect to each Qualifying Loan:

    1.    Reduce the interest rate to the then current Freddie Mac Survey Rate for 30-year fixed rate mortgage loans, and adjust the term to 30 years.

    2.    If the DTI Ratio is still in excess of 28%, reduce the interest rate further, but no lower than 3%, until the DTI ratio of 28% is achieved.

    3.    If the DTI Ratio is still in excess of 28% after adjusting the interest rate to 3%, extend the remaining term of the loan by 10 years.

    4.    If the DTI Ratio is still in excess of 28%, calculate a new monthly payment (the "Adjusted Payment Amount") that will result in the borrower's monthly DTI Ratio not exceeding 28%.  After calculating the Adjusted Payment Amount, the lender shall bifurcate the Capitalized Balance into two portions – the amortizing portion and the non-amortizing portion.  The amortizing portion of the Capitalized Balance shall be the mortgage amount that will fully amortize over a 40-year term at an annual interest rate of 3% and monthly payments equal to the Adjusted Payment Amount.  The non-amortizing portion of the Capitalized Balance shall be the difference between the Capitalized Balance and the amortizing portion of the Capitalized Balance.  The lender shall forbear on collecting the non-amortizing portion of the Capitalized Balance, and such amount shall be due and payable only upon the earlier of (i) maturity of the modified loan, (ii) a sale of the property or (iii) a pay-off or refinancing of the loan.  No interest shall be charged on the non-amortizing portion of the Capitalized Balance, but repayment shall be secured by a first lien on the collateral.

    5.    If, under any of the above steps, the NPV of a modification falls short of the NPV of the foreclosed collateral upon disposition, the DTI may be increased to the minimum level where the NPV of the modification exceeds the NPV of the foreclosed collateral upon disposition.  However, under no circumstances will the DTI for the modification exceed 38%.

At the end of the five (5) year period, the interest rate on the modified loan shall adjust to the Freddie Mac Survey Rate as of the date of the loan modification, but subject to an annual adjustment cap of one percent (1%) per year.  At that time, the monthly amount due by the borrower will also adjust to amortize fully the remaining Capitalized Balance (or, in any case in which the Capitalized Balance was bifurcated, the amortizing portion thereof) over the remaining term of the modified loan.

<u>Additional Modification Terms</u>

In connection with the modification of any Qualifying Loan, the following additional requirements shall apply.

    1.    The lender shall not charge (and no borrower shall be required to pay) any modification, refinance or other similar fees or points in connection with the modification, nor shall any such fees, costs or charges be capitalized.

Exhibit 4, Page 225

2.     Unpaid late fees and prepayment penalties otherwise chargeable to the borrower shall be waived.

3.     Modified loans shall not include any prepayment penalties.

4.     With respect to all loan modifications commenced after September 19, 2009, the lender shall establish an escrow account for the payment of future taxes and insurance premiums.  To the extent that the lender has the processes and procedures in place to establish the escrow accounts for modified loans prior to September 19, 2009, the lender will establish such accounts at such earlier date.

Related Junior Lien Mortgage Loans

In cases where the lender holds a junior lien mortgage loan that is collateralized by the same property that collateralizes a Qualifying Loan that is modified as described above, the junior lien mortgage loan shall also be modified to enhance overall affordability to the borrower.  At a minimum, the lender shall reduce the interest rate on the junior lien mortgage loan to no more than 2% per annum.  Further modifications may be made at the lender's discretion as needed to support affordability and performance of the modified first lien Qualifying Loan.

Amendments

The Program may be modified either (i) by the FDIC, upon written notice to the lender of such modification, or (ii) as proposed by the lender with respect to a group of loans with similar characteristics, if approved in writing by the FDIC.

Exhibit 4, Page 226

# EXHIBIT G

## FORM OF AFFIDAVIT OF LOST STOCK CERTIFICATE

The Federal Deposit Insurance Corporation ("FDIC") as Receiver for IndyMac Federal Bank, FSB (the "Receiver") hereby attests, agrees, represents and covenants as follows:

1.     The Receiver is the sole shareholder and legal and beneficial owner of 2,000 shares of capital stock, par value $1.00 per share (the "Shares"), of IndyMac Financial Services, a California corporation (the "Company").  The Receiver obtained its interest in the Company on July 11, 2008, under an Insured Deposit Purchase and Assumption Agreement with the FDIC as Receiver of IndyMac Bank, FSB.

2.     Neither the Shares nor any of the rights of the Receiver therein have been assigned, transferred, hypothecated, pledged or otherwise disposed of in any manner whatsoever, either in whole or in part, and to the knowledge of the Receiver, no claim of right, title or interest adverse to the Receiver in or to the Shares or any interest therein has been made or advanced by any person.

3.     The Receiver is entitled to full and exclusive possession of the Shares.

4.     The stock certificate for the Shares (the "Certificate") has been lost, mislaid or destroyed and is not  in the possession of the Receiver and cannot now be produced.

5.     The Receiver has made, or caused to be made, a diligent search for the Certificate and has been unable to find or recover such Certificate.

6.     The Receiver hereby agrees immediately to surrender the Certificate to the Company for cancellation should it at any time hereafter come into the hands, custody or power of the Receiver without receiving any consideration therefor.

7.     The Receiver hereby requests and instructs the Company to (i) refuse to recognize any person or entity other than OneWest Bank, FSB as the owner of the Certificate, (ii) transfer the record ownership of the Shares on the books of the Company and (iii) issue a new or duplicate certificate in substitution of the Certificate to OneWest Bank, FSB without the surrender of the Certificate for cancellation.

8.     The Receiver agrees to (i) release and forever discharge the Company, its legal representatives, successors and assigns from any and all liability relating to the loss of the Certificate and/or the Company's compliance with the instructions set forth herein and (ii) indemnify, hold harmless and protect the Company, its legal representatives, successors and assigns from any and all loss, damages, liability, cost and/or expense in connection with or in any way relating to or arising out of (x) the loss of the Certificate and/or the Company's compliance with the instructions set forth herein and (y) any breach or violation of any attestation, agreement, representation or covenant contained herein; provided, however, that the Receiver shall not have any obligation to indemnify the Company for any attorney's fees or other expenses incurred by the Company in connection with the issuance of a new certificate or the review and negotiation of this Affidavit of Lost Stock Certificate.

Exhibit 4, Page 227

IN WITNESS WHEREOF, the undersigned has executed this Affidavit of Lost Stock Certificate this _____ day of March, 2009.

FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR INDYMAC FEDERAL BANK, FSB

By: _____
      George Alexander
      Attorney-in-Fact

STATE OF NEW YORK
COUNTY OF NEW YORK

Subscribed and sworn to before me this _____ day of March, 2009

_____
Notary Public

[Seal]

Exhibit 4, Page 228

## **<u>SCHEDULES</u>**

SEE SECTION II (GROUP 2), SCHEDULES TO SERVICING BUSINESS ASSET PURCHASE AGREEMENT, ON THE SCHEDULES CD FOR THE FOLLOWING:

| | |
|---|---|
| Schedule 1.01(a) | Mortgage Loans |
| Schedule 1.01(b) | Servicing Agreement Transactions |
| Schedule 2.01(b) | Servicing Advances |
| Schedule 2.01(c) | Servicing Fee Receivables |
| Schedule 2.01(f) | Escrow Accounts |
| Schedule 2.03(c) | Assumed Litigation |
| Schedule 2.06 | Categories and Applicable Percentages with Respect to Servicing Rights |
| Schedule 7.03(f) | Servicing Agreements |

# EXHIBIT 5

Execution Copy

# LOAN SALE AGREEMENT

## BY AND BETWEEN

## THE FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR INDYMAC FEDERAL BANK, FSB

## AND

## ONEWEST BANK, FSB

**Dated as of March 19, 2009**

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS AND CONSTRUCTION ................................................................. 1

    Section 1.01   Definitions ..................................................................................... 1
    Section 1.02   Construction .................................................................................. 10

ARTICLE II PURCHASE AND SALE OF LOANS ................................................................ 11

    Section 2.01   Terms and Conditions of Sale ...................................................... 11
    Section 2.02   Purchase Price .............................................................................. 14
    Section 2.03   Closing Payment .......................................................................... 14
    Section 2.04   Prorations ..................................................................................... 14
    Section 2.05   Closing ......................................................................................... 14
    Section 2.06   Closing Procedure ........................................................................ 14
    Section 2.07   Closing Adjustment Documents ................................................. 14
    Section 2.08   Calculation of Adjustments ......................................................... 15
    Section 2.09   Final Settlement ........................................................................... 15
    Section 2.10   Offsets Against Deposits ............................................................. 15
    Section 2.11   Allocation of Payments ............................................................... 15
    Section 2.12   Rebates and Refunds .................................................................... 15
    Section 2.13   Interest Conveyed ........................................................................ 15
    Section 2.14   Retained Claims and Release ...................................................... 16
    Section 2.15   Delivery of Closing Documents .................................................. 16

ARTICLE III TRANSFER OF LOANS, COLLATERAL DOCUMENTS AND SERVICING .. 17

    Section 3.01   Transfer of Documents ................................................................ 17
    Section 3.02   MERS Mortgage Loans ............................................................... 17
    Section 3.03   Forwarding Post-Closing Date Items .......................................... 17
    Section 3.04   Delivery of Loans ........................................................................ 17
    Section 3.05   Recordation of Documents .......................................................... 19
    Section 3.06   Additional Actions; Transaction Costs ........................................ 19

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE PURCHASER .............. 19

ARTICLE V COVENANTS, DUTIES AND OBLIGATIONS ................................................ 19

    Section 5.01   Servicing of Loans ...................................................................... 19
    Section 5.02   Collection Agency/Contingency Fee Agreements ...................... 19
    Section 5.03   Insured or Guaranteed Loans ...................................................... 20
    Section 5.04   Reporting to or for the Applicable Taxing Authorities ............... 20
    Section 5.05   Loans in Litigation ...................................................................... 20
    Section 5.06   Loans in Bankruptcy .................................................................... 22
    Section 5.07   Retained Claims ........................................................................... 22
    Section 5.08   Loan Related Insurance ................................................................ 22
    Section 5.09   Unremitted Collections; Escrow Accounts and Custodial Accounts ........ 22
    Section 5.10   [Reserved] .................................................................................... 23

- i -

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS AND CONSTRUCTION ...................................................................1

    Section 1.01  Definitions...........................................................................1
    Section 1.02  Construction......................................................................10

ARTICLE II PURCHASE AND SALE OF LOANS ..................................................................11

    Section 2.01  Terms and Conditions of Sale...........................................11
    Section 2.02  Purchase Price...................................................................14
    Section 2.03  Closing Payment ...............................................................14
    Section 2.04  Prorations .........................................................................14
    Section 2.05  Closing ...............................................................................14
    Section 2.06  Closing Procedure.............................................................14
    Section 2.07  Closing Adjustment Documents .......................................14
    Section 2.08  Calculation of Adjustments...............................................15
    Section 2.09  Final Settlement ................................................................15
    Section 2.10  Offsets Against Deposits...................................................15
    Section 2.11  Allocation of Payments.....................................................15
    Section 2.12  Rebates and Refunds.........................................................15
    Section 2.13  Interest Conveyed .............................................................15
    Section 2.14  Retained Claims and Release............................................16
    Section 2.15  Delivery of Closing Documents........................................16

ARTICLE III TRANSFER OF LOANS, COLLATERAL DOCUMENTS AND SERVICING..17

    Section 3.01  Transfer of Documents ......................................................17
    Section 3.02  MERS Mortgage Loans .....................................................17
    Section 3.03  Forwarding Post-Closing Date Items.................................17
    Section 3.04  Delivery of Loans .............................................................17
    Section 3.05  Recordation of Documents ................................................19
    Section 3.06  Additional Actions; Transaction Costs .............................19

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE PURCHASER ...............19

ARTICLE V COVENANTS, DUTIES AND OBLIGATIONS....................................................19

    Section 5.01  Servicing of Loans ............................................................19
    Section 5.02  Collection Agency/Contingency Fee Agreements............19
    Section 5.03  Insured or Guaranteed Loans............................................20
    Section 5.04  Reporting to or for the Applicable Taxing Authorities.............20
    Section 5.05  Loans in Litigation ...........................................................20
    Section 5.06  Loans in Bankruptcy .........................................................22
    Section 5.07  Retained Claims................................................................22
    Section 5.08  Loan Related Insurance.....................................................22
    Section 5.09  Unremitted Collections; Escrow Accounts and Custodial Accounts.........22
    Section 5.10  [Reserved].........................................................................23

Exhibit 5, Page 232

Section 5.11   Files and Records.................................................................23
Section 5.12   Reimbursement for Use of the Seller's Employees .......................23
Section 5.13   Notice to Borrowers.............................................................23
Section 5.14   Notice of Claim...................................................................23
Section 5.15   Prior Servicer Information ....................................................24
Section 5.16   Release of Seller .................................................................24
Section 5.17   Borrower as Purchaser .........................................................24
Section 5.18   HELOCs.............................................................................25
Section 5.19   Repurchase of Charged-Off Loans ..........................................25
Section 5.20   Loan Modification Program ..................................................25
Section 5.21   Loans in Process .................................................................26
Section 5.22   Cooperation.......................................................................26
Section 5.23   Additional Title Documents...................................................26

ARTICLE VI ...........................................................................................27

REPRESENTATIONS AND WARRANTIES; ASSET-LEVEL STATEMENTS .....................27

Section 6.01   Assets Conveyed "AS IS"; Purchaser Acknowledgments....................27
Section 6.02   No Warranties or Representations with Respect to Escrow
              Accounts ..........................................................................28
Section 6.03   No Warranties or Representations as to Amounts of Unfunded
              Principal ..........................................................................28
Section 6.04   Disclaimer Regarding Calculation or Adjustment of Interest on any
              Loan ...............................................................................28
Section 6.05   No Warranties or Representations with Regard to Information .............28
Section 6.06   Intervening or Missing Assignments .........................................28
Section 6.07   No Warranties or Representations as to Documents.........................28
Section 6.08   Representations and Warranties of the Seller ..............................29
Section 6.09   Asset-Level Statements With Respect to Loans .............................29

ARTICLE VII REMEDIES FOR DEFECTIVE LOANS ...............................................31

Section 7.01   Remedy ............................................................................31
Section 7.02   Conditions Precedent to Remedy .............................................31
Section 7.03   Notice and Evidence of Defect ...............................................32
Section 7.04   Processing of the Remedy Request; Purchaser Cure ......................32
Section 7.05   Re-delivery of Notes, Files and Documents .................................33
Section 7.06   Waiver of Remedy ...............................................................34
Section 7.07   Predatory Lending Defects ....................................................34
Section 7.08   Seller Loss Limit; Satisfaction of Obligation to Provide Remedy ...........35

ARTICLE VIII CONDITIONS PRECEDENT TO CLOSING............................................35

Section 8.01   Conditions to Purchaser's Obligation. ......................................35
Section 8.02   Conditions to Seller's Obligation............................................35

ARTICLE IX NOTICES...............................................................................35

Exhibit 5, Page 233

Section 9.01   Notices ...................................................................................35
Section 9.02   Article VII Notice ..................................................................36
Section 9.03   All Other Notices ..................................................................36

ARTICLE X MISCELLANEOUS PROVISIONS ...................................................37

Section 10.01  Severability ...........................................................................37
Section 10.02  Governing Law ......................................................................37
Section 10.03  Waivers; Amendment and Assignment ...................................37
Section 10.04  No Presumption .....................................................................38
Section 10.05  Entire Agreement ...................................................................38
Section 10.06  Jurisdiction; Venue and Service.............................................38
Section 10.07  Waiver of Jury Trial................................................................39
Section 10.08  Counterparts; Facsimile Signatures ........................................39
Section 10.09  Headings ................................................................................39
Section 10.10  Compliance with Law ............................................................39
Section 10.11  Right to Specific Performance ................................................39
Section 10.12  No Third Party Beneficiaries ..................................................40
Section 10.13  Timing ...................................................................................40
Section 10.14  Survival ..................................................................................40
Section 10.15  Termination.............................................................................40

## ATTACHMENTS

| | |
|---|---|
| ATTACHMENT A | LOAN SCHEDULE |
| ATTACHMENT B | AFFIDAVIT AND ASSIGNMENT OF CLAIM |
| ATTACHMENT C | ASSIGNMENT AND ASSUMPTION OF INTERESTS AND OBLIGATIONS |
| ATTACHMENT D | ASSIGNMENT AND LOST INSTRUMENT AFFIDAVIT |
| ATTACHMENT E | BILL OF SALE |
| ATTACHMENT F | LIMITED POWER OF ATTORNEY |
| ATTACHMENT G | SHARED-LOSS AGREEMENT |
| ATTACHMENT H | TERM SHEET FOR PARTICIPATION INTERESTS IN UNFUNDED HELOC COMMITMENTS |

## SCHEDULES

| | |
|---|---|
| SCHEDULE 1.01(a) | UNFUNDED HELOC COMMITMENTS |
| SCHEDULE 2.01(a) | LSBO SERVICING AGREEMENTS |
| SCHEDULE 2.01(c) | ASSUMED LITIGATION |
| SCHEDULE 2.02 | CATEGORIES AND APPLICABLE PERCENTAGES WITH RESPECT TO LOANS |
| SCHEDULE 6.09(b) | LOANS MODIFIED OR CANDIDATES FOR MODIFICATION |

Exhibit 5, Page 234

## LOAN SALE AGREEMENT

THIS LOAN SALE AGREEMENT (as the same shall be amended or supplemented, this "**Agreement**") is made and entered into as of the 19th day of March, 2009 by and between THE FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR INDYMAC FEDERAL BANK, FSB (the "**Seller**") and ONEWEST BANK, FSB (the "**Purchaser**").

### RECITALS

WHEREAS, on July 11, 2008, the FDIC (as defined below) was appointed Receiver for IndyMac Bank, FSB (the "**Failed Thrift**") and certain assets and obligations of the Failed Thrift were transferred to a newly-formed thrift, IndyMac Federal Bank, FSB ("**IndyMac Federal**"), for which the FDIC was appointed Conservator (the "**Conservator**"), and, on the date hereof, the FDIC was appointed Receiver for IndyMac Federal (the "**Receiver**");

WHEREAS, under the Federal Deposit Insurance Act, as amended, the FDIC is authorized to sell or otherwise dispose of the assets of thrift institutions for which it serves as conservator or receiver;

WHEREAS, the Seller owns the Loans (as defined below) described on the Loan Schedule (as defined below) attached hereto as <u>Attachment A</u>;

WHEREAS, IMB HoldCo LLC ("**HoldCo**") has agreed to purchase the Assets (as defined below) and assume certain specified liabilities of IndyMac Federal on the terms and subject to the conditions set forth herein and in the Master Purchase Agreement (as defined below);

WHEREAS, in order to facilitate the transactions provided for herein, HoldCo formed the Purchaser as a federally-chartered, insured savings association, all of the stock of which will be acquired by OneWest Bank Group LLC ("**OneWest Bank Group**"), a newly-formed direct wholly-owned subsidiary of HoldCo; and

WHEREAS, the parties desire to memorialize their agreements relating to the transactions described above and certain other matters as set forth in this Agreement and the Master Purchase Agreement.

NOW, THEREFORE, in consideration of the foregoing and the mutual promises and agreements hereinafter contained, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

### ARTICLE I

### DEFINITIONS AND CONSTRUCTION

Section 1.01   <u>Definitions</u>.  For purposes of this Agreement, the following terms shall have the meanings and definitions hereinafter respectively set forth:

Exhibit 5, Page 235

"**Accounting Records**" means the general ledger, supporting subsidiary ledgers and schedules, and loan servicing system records of the Seller.

"**Adjustment Date**" means, as to each Loan, the date on which the Mortgage Interest Rate is adjusted in accordance with the terms of the related Note and Mortgage.

"**Advances**" means the sum of all unreimbursed amounts advanced by or on behalf of the Failed Thrift, the Seller (or its predecessors-in-interest) or the Purchaser for the benefit of a Borrower or a third party to meet required scheduled payments or to protect or preserve the Collateral or the priority of the Noteholder's Liens and security interests created by the Loan Documents relating thereto, including ad valorem taxes and insurance premiums (including hazard and other forced placed insurance premiums) as permitted by the terms of any Loan, but does not include Corporate Advances, Disbursements of Principal or Unfunded HELOC Commitments.

"**Affidavit and Assignment of Claim**" means an Affidavit and Assignment of Claim in the form of Attachment B to this Agreement.

"**Affiliate**" means, with respect to any specified Person, any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with such specified Person. For the purposes of this definition, the term "**control**" (including the phrases "**controlled by**" and "**under common control with**") when used with respect to any specified Persons means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or interests, by contract or otherwise.

"**Agreement**" has the meaning given in the preamble, and shall include all exhibits, schedules and attachments hereto.

"**Ancillary Documents**" means the Master Purchase Agreement, the Bill of Sale, the Assignment and Assumption of Interests and Obligations, the Guaranty, the Shared-Loss Agreement and any and all other agreements and instruments that may be executed and delivered by the parties in connection with the transactions contemplated by this Agreement, and upon execution thereof, the definitive agreements executed pursuant to the Term Sheet for Participation Interests in Unfunded HELOC Commitments attached hereto as Attachment H.

"**Asset-Level Statements**" has the meaning given in Section 6.01(b).

"**Assets**" has the meaning given in Section 2.01(a).

"**Assignment and Assumption of Interests and Obligations**" means an Assignment and Assumption of Interests and Obligations in the form of Attachment C to this Agreement.

"**Assignment and Lost Instrument Affidavit**" means an Assignment and Lost Instrument Affidavit in the form of Attachment D to this Agreement.

"**Assumed FHLB Financing Balance**" means the balance of principal, interest, and other fees owed, as of the Closing Date, under any obligation of the Seller for borrowed money

Exhibit 5, Page 236

owed to the Federal Home Loan Bank of San Francisco assumed by the Purchaser pursuant to the Master Purchase Agreement.

"**Assumed Liabilities**" has the meaning given in Section 2.01(c).

"**Bankruptcy Rule**" means the rules set forth under the Federal Rules of Bankruptcy Procedure, as the same may be amended from time to time.

"**Bill of Sale**" means a Bill of Sale in the form of Attachment E to this Agreement.

"**Borrower**" means any borrower or other obligor with respect to any Loan, including any guarantor or surety or any other Person liable for all or any portion of the Loan or the performance of any obligations associated with any Loan.

"**Business Day**" means any day except a Saturday, Sunday or other day on which federal savings banks in California, New York or Washington, D.C. or United States federal government offices are required or authorized by Law to close.

"**Charged-Off Loan**" has the meaning given in the Shared-Loss Agreement.

"**Claims Termination Date**" means the first Business Day after the second anniversary of the Closing Date.

"**Closing**" has the meaning given in Section 2.05.

"**Closing Adjustment Documents**" has the meaning given in Section 2.07.

"**Closing Date**" means the date on which the Closing occurs.

"**Collateral**" means any and all real or personal property, whether tangible or intangible, securing or pledged to secure or collateralize a Loan, including any account, inventory, property of any kind (including equipment and other physical assets), guarantee or contract right, or other interest that is pledged pursuant to or otherwise subject to any Collateral Document (but does not include any property which had been foreclosed upon or repossessed on or prior to the Closing Date and with respect to which the Redemption Period, if any, had expired on or before the Closing Date).

"**Collateral Document**" means any pledge agreement, security agreement, personal or corporate guaranty, deed of trust, deed, mortgage, contract for the sale of real property, assignment, collateral agreement or other agreement or document of any kind, whether an original or a copy, whether similar to or different from those enumerated, securing in any manner the performance or payment by any Borrower of its obligations or the obligations of any other Borrower under any of the Loans or the Notes evidencing the Loans (but does not include any such agreement, instrument or other document insofar as the Collateral encumbered thereby had been foreclosed upon or repossessed on or prior to the Closing Date and with respect to which the Redemption Period, if any, had expired on or before the Closing Date).

"**Conservator**" has the meaning given in the preamble.

- 3 -

Exhibit 5, Page 237

"**Contract for Deed**" means an executory contract with a third party to convey real property, including any installment land contract.

"**Corporate Advances**" means any amounts advanced for the payment of appraisal fees, broker price opinion fees, attorneys' fees or associated legal fees, foreclosure fees, trustee fees, property inspection fees, property preservation and operating cost fees, tax penalties incurred as a result of the Failed Thrift's or the Seller's (or its predecessors-in-interest's) late payment of taxes, title policies or lien search fees.

"**Custodial Account**" means an account maintained by the Seller or its agent for the deposit of principal and interest payments received in respect of one or more Loans.

"**Defect**" means the failure of any Asset-Level Statement to be true as of the Closing Date.

"**Defective Loan**" has the meaning given in Section 7.01.

"**Defect Notice**" has the meaning given in Section 7.03.

"**Deficiency Balance**" means the remaining unpaid principal balance of any Note purchased hereunder after crediting to it the proceeds of a foreclosure sale.

"**Disbursements of Principal**" means incremental funding of loan proceeds under a Note such as in the case of a revolving credit loan or a construction loan.

"**Escrow Account**" means an account maintained by the Seller or its agent for the deposit of Escrow Payments received in respect of one or more Loans.

"**Escrow Payments**" means the amounts constituting ground rents, taxes, assessments, water rates, common charges in condominiums and planned unit developments, mortgage insurance premiums, fire and hazard insurance premiums and other payments which have been escrowed by the Borrower with the Seller or its agent pursuant to any Loan.

"**Excluded Assets**" has the meaning given in the Master Purchase Agreement.

"**Excluded Liabilities**" means, collectively, all liabilities of the Seller other than the Assumed Liabilities.

"**Excluded Losses**" means any consequential, special or indirect damages, lost profits, lost investment or business opportunity, interest, damages to reputation, punitive damages, exemplary damages, treble damages, nominal damages and operating losses.

"**Failed Thrift**" has the meaning given in the recitals.

"**FDIC**" means the Federal Deposit Insurance Corporation in any capacity.

"**Foreign Jurisdiction**" means any jurisdiction, other than the United States, and any subdivision of or in such other jurisdiction.

Exhibit 5, Page 238

"**Foreign Loan**" means a Loan with respect to which any of the Collateral is located in any Foreign Jurisdiction.

"**GAAP**" means United States generally accepted accounting principles as in effect from time to time.

"**Gross Margin**" means, with respect to each Loan, the fixed percentage amount set forth in the related Note which is added to the Index in order to determine the related Mortgage Interest Rate, as set forth in the Loan Schedule.

"**Group 5 Closing Payment**" has the meaning given in <u>Section 2.03</u>.

"**Group 5 Final Payment**" has the meaning given in <u>Section 2.08</u>.

"**Group 5 Final Purchase Price**" has the meaning given in <u>Section 2.02</u>.

"**Governmental Authority**" means any United States or non-United States national, federal, state, local, municipal or provincial or international government or any political subdivision of any governmental, regulatory or administrative authority, agency or commission, or judicial or arbitral body.

"**Guaranty**" means the Guaranty Agreement, dated as of March 18, 2009, by and among the FDIC, in its corporate capacity, HoldCo and each other Beneficiary (as defined therein) that executes a joinder thereto.

"**Guidelines**" means the Statement on Loss Mitigation Strategies for Servicers of Residential Mortgages (September 2007), issued by the federal financial institutions regulatory agencies and the Conference of State Bank Supervisors, the Statement on Working with Mortgage Borrowers (April 2007), issued by the federal financial institutions regulatory agencies, the Home Equity Line of Credit Account Management Guidance (August 2008), issued by the Office of Thrift Supervision, and the FDIC's Loan Modification Program, each as may be amended or supplemented from time to time.

"**HELOC**" means home equity line of credit.

"**HoldCo**" has the meaning given in the recitals.

"**Index**" means, with respect to any Loan, the index set forth in the related Note for the purpose of calculating interest therein.

"**IndyMac Federal**" has the meaning given in the recitals.

"**Initial Calculation Date**" means the close of business on January 31, 2009.

"**Law**" means any applicable statute, law, ordinance, regulation, rule, code, injunction, judgment, decree or order (including any executive order) of any Governmental Authority.

Exhibit 5, Page 239

"**Lien**" means any mortgage, pledge, security interest, equity interest, participation interest, lien or other charge or encumbrance, including the lien or retained security title of a conditional vendor, upon or with respect to any property or assets.

"**Limited Power of Attorney**" means a Limited Power of Attorney in the form of Attachment F to this Agreement.

"**Loan**" means any loan listed on the Loan Schedule and any loan into which any loan listed on the Loan Schedule is refinanced, and includes with respect to each such loan: (i) any obligation evidenced by a Note; (ii) all rights, powers or Liens of the Seller in or under the Collateral Documents; (iii) any Contract for Deed and the real property which is subject to any such Contract for Deed; and (iv) any lease and the related leased property.

"**Loan Documents**" means all documents, agreements, certificates, instruments and other writings (including all Collateral Documents) now or hereafter executed by or delivered or caused to be delivered by any Borrower, any Guarantor or any other obligor evidencing, creating, guaranteeing or securing, or otherwise executed or delivered in respect of, all or any part of a Loan or any Collateral or evidencing any transaction contemplated thereby, and all Modifications thereto.

"**Loan File**" means all documents pertaining to any Loan, either copies or originals, that are in the possession of the Seller or any of its employees or contractors responsible for the servicing of the Loan, other than (i) the original Note, renewals of the Note and Collateral Documents and (ii) confidential or privileged communications between the Seller (or any predecessor-in-interest, including the Failed Thrift) and its legal counsel; provided, however, that the Loan Files do not include files maintained by other employees or agents of the Seller, or attorney-client or work product privileged materials held by the Seller's legal counsel, unless in the opinion of such counsel, the disclosure of the material is not likely to result in the waiver of the attorney-client or work product privilege.

"**Loan Schedule**" means the schedule of Loans attached as Attachment A (and delivered in electronic format to the Purchaser), which shall be updated as of the Closing Date pursuant to Section 2.07. The Loan Schedule shall contain the following fields of information:

(1)   the Loan number;

(2)   the address, city, state and zip code of the Mortgaged Property;

(3)   the current Mortgage Interest Rate;

(4)   the current Monthly Payment;

(5)   the original term to maturity;

(6)   the scheduled maturity date;

(7)   the unpaid principal balance of the Loan;

- 6 -

Exhibit 5, Page 240

(8)     the Gross Margin, if applicable;

(9)     the next Adjustment Date, if applicable; and

(10)    the paid through date or due date.

The Loan Schedule shall identify for each Loan whether it is an LSBO or a Servicing-Released Loan.  The Loan Schedule shall also categorize each Loan into one of the following nine groups:  (i) Current/Non-HELOC Loan Held for Sale; (ii) Current/Non-HELOC Loan Held for Investment; (iii) Current/HELOC Held for Investment; (iv) 30-59 Days Delinquent/Non-HELOC Loan Held for Sale; (v) 30-59 Days Delinquent/Non-HELOC Loan Held for Investment; (vi) 30-59 Days Delinquent/HELOC Held for Investment; (vii) 60+ Days Delinquent/Non-HELOC Loan Held for Sale; (viii) 60+ Days Delinquent/Non-HELOC Loan Held for Investment; (ix) 60+ Days Delinquent/HELOC Held for Investment; or otherwise identify the group to which each Loan belongs.

"**Losses**" means actual losses, damages, liabilities, costs and expenses (including reasonable attorneys' fees and litigation and similar costs, and other out-of-pocket expenses incurred in investigating, defending, asserting or preparing the defense or assertion of any of the foregoing), deficiencies, claims, interest, awards, judgments, penalties and fines, provided, that, unless expressly stated otherwise herein, Losses shall not include Excluded Losses.

"**LSBOs**" means all Loans serviced by a third party which will be transferred and conveyed to the Purchaser pursuant to Section 2.01(a) with the servicing retained by such third party, and which are identified on the Loan Schedule as LSBOs.

"**LSBO Servicing Agreements**" has the meaning given in Section 2.01(a)(iii).

"**Master Purchase Agreement**" means the Master Purchase Agreement, dated as of March 18, 2009, by and among the Conservator (and, on the date hereof, following the appointment of the FDIC as receiver for IndyMac Federal, the Receiver by joinder as of the date hereof), IMB HoldCo LLC, OneWest Bank Group and the Purchaser (by joinder as of the date hereof).

"**MERS**" means Mortgage Electronic Registration Systems, Incorporated.

"**MERS Registered Mortgages**" has the meaning given in Section 3.02.

"**MERS® System**" means the MERSCORP, Inc. mortgage electronic registry system.

"**Modification**" means any extension, renewal, substitution, replacement, supplement, amendment or modification of any agreement, certificate, document, instrument or other writing, whether or not contemplated in the original agreement, document or instrument.

"**Monthly Payment**" means, with respect to any Loan, the scheduled monthly payment of principal and interest on such Loan which is payable by the related Borrower from time to time under the related Note.

Exhibit 5, Page 241

"**Mortgage**" means, with respect to a Loan, a mortgage, deed of trust or other security instrument creating a Lien upon real property and any other property described therein which secures a Note, together with any assignment, reinstatement, extension, endorsement or Modification of any thereof.

"**Mortgage Interest Rate**" means, with respect to each fixed rate Loan, the fixed annual rate of interest provided for in the related Note and, with respect to each adjustable rate Loan, the annual rate at which interest accrues and adjusts in accordance with the provisions of the related Note.

"**Mortgaged Property**" means the real property Collateral, including land, fixtures and improvements, if any, securing the repayment of any Loan.

"**Note**" means each note or promissory note, lost instrument affidavit, loan agreement, shared credit or intercreditor agreement, reimbursement agreement, any other evidence of indebtedness of any kind, or any other agreement, document or instrument evidencing a Loan, and all Modifications to the foregoing.

"**Noteholder**" means a holder of a Note.

"**Obligations**" means all obligations and commitments of the Seller relating to a Loan and arising or due and payable after the Closing Date under and in accordance with any of the related Notes, Collateral Documents, Loan Documents or Related Agreements, including any obligations to make Advances or Disbursements of Principal with respect to any Loan.

"**OneWest Bank Group**" has the meaning given in the recitals.

"**Person**" means any individual, corporation, partnership (general or limited), limited liability company, limited liability partnership, firm, joint venture, association, joint-stock company, trust, estate, unincorporated organization, governmental or regulatory body or other entity.

"**Predatory Lending Defect**" has the meaning given in Section 7.07.

"**Program**" means any of the following mortgage loan modification programs: (a) for modifications currently in process or initiated within the first ninety (90) days following the signing of this Agreement, the modification program previously approved by the Board of Directors of IndyMac Federal Bank, FSB in Conservatorship; (b) the FDIC's Mortgage Loan Modification Program, a copy of which is attached as an exhibit to the Shared Loss Agreement; and (c) any other modifications either to an individual or to a group of borrowers, with prior written consent of the FDIC.

"**Purchaser**" has the meaning given in the preamble.

"**Receiver**" means the FDIC as receiver for IndyMac Federal.

"**Redemption Period**" means the statutory time period, if any, during which a foreclosed owner may buy back foreclosed real property from the foreclosure sale purchaser under the Law

Exhibit 5, Page 242

of the jurisdiction in which the property is located, which period (if the jurisdiction provides for the same) may vary among the jurisdictions which do provide for a Redemption Period.

"**Related Agreement**" means (i) any agreement, document or instrument (other than the Note, the Collateral Documents and the Loan Documents) relating to or evidencing any obligation to pay or securing any Loan (including any equipment lease, letter of credit, bankers' acceptance, draft, system confirmation of transaction, loan history, affidavit, general collection information, and correspondence and comments relating to any obligation), (ii) any real property or rights in or to any real property (including leases, tenancies, concessions, licenses or other rights of occupancy or use and security deposits related thereto) related to any Loan, (iii) any collection, contingency fee, and tax and other service agreements that are specific to the Loans (or any of them), and (iv) any obligations under contracts of insurance or guaranty with respect to any Loans that are insured or guaranteed by any Governmental Authority.   Related Agreements shall not include any performance or completion bond or letter of credit or other assurance filed with any Governmental Authority for the purpose of ensuring that improvements constructed or to be constructed are completed in accordance with any governmental regulations or building requirements applicable to the proposed or completed improvement.   The term Related Agreement does not include any loan servicing agreement that exists between the Seller or the Failed Thrift and any other Person.

"**Related Party**" means any Person related to the Borrower in the manner delineated in 26 U.S.C.A §267(b) and the regulations promulgated thereunder, as such law and regulations may be amended from time to time.

"**Released Parties**" has the meaning given in Section 5.16(b).

"**Remedy**" has the meaning given in Section 7.01.

"**Repurchase Price**" means, with respect to any Loan, an amount equal to the sum of (i) the unpaid principal balance of such Loan as shown on the Loan Schedule, as updated as of the Closing Date, multiplied by the applicable percentage for the category shown on Schedule 2.02 to which such Loan belongs, less prorated amounts owed by the Seller with respect to such Loan through and including the Closing Date as determined pursuant to Section 2.04, plus accrued interest for Loans that are less than thirty (30) days past due, minus (ii) the total of principal, interest, and fees collected in respect of such Loan after the Closing Date, plus (iii) an amount equal to the sum of Corporate Advances outstanding and the negative escrow balance existing at the time of repurchase of such Loan, if any, less (iv) an amount equal to the positive escrow balance existing at the time of repurchase of such Loan, if any.

"**RESPA**" means the Real Estate Settlement Procedures Act of 1974, as amended, and all rules and regulations promulgated thereunder.

"**Seller**" has the meaning given in the preamble.

"**Servicing-Released Loans**" means all Loans other than LSBOs.

"**Shared-Loss Agreement**" means the Shared-Loss Agreement attached as Attachment G, dated as of the date hereof, by and between the Receiver and the Purchaser.

- 9 -

"**Tax**" or "**Taxes**" means all income, excise, gross receipts, ad valorem, sales, use, employment, franchise, profits, gains, property, transfer, payroll, withholding, severance, occupation, social security, unemployment compensation, alternative minimum, value added, intangibles or other taxes, fees, stamp taxes, duties, charges, levies or assessments of any kind whatsoever (whether payable directly or by withholding), together with any interest and any penalties, fines, additions to tax or additional amounts imposed by any Governmental Authority with respect thereto.

"**Then-Current Interest Rate**" has the meaning given in the Shared-Loss Agreement.

"**Transfer Documents**" means the endorsements and allonges to Notes, Assignment and Lost Instrument Affidavits (if applicable), assignments, deeds and other documents of assignment, conveyance or transfer required under any applicable Law to evidence the sale and transfer to the Purchaser of the Assets hereunder or the assignment and assumption of the Assumed Liabilities hereunder. Transfer Documents do not include this Agreement, the Bill of Sale or the Assignment and Assumption of Interests and Obligations.

"**Unfunded HELOC Commitment**" means the obligation pursuant to a HELOC to pay an amount equal to the difference between the maximum outstanding principal balance permitted under the HELOC and the actual outstanding principal balance of such HELOC, each measured as of the Closing Date, which amount once paid will constitute all or a portion of the unpaid principal balance of such HELOC.  The Unfunded HELOC Commitment for each HELOC is listed on Schedule 1.01(a).

"**Uniform Commercial Code**" means the Uniform Commercial Code in effect in the applicable jurisdiction, as the same may be amended from time to time.

Section 1.02   Construction.   This Agreement shall be construed and interpreted in accordance with the following:

(a)   References to "Affiliates" include only other Persons which from time to time constitute "Affiliates" of such specified Person, and do not include, at any particular time, other Persons that may have been, but at such time have ceased to be, "Affiliates" of such specified Person, except to the extent that any such reference specifically provides otherwise.

(b)   The term "or" is not exclusive.

(c)   A reference to a law includes any amendment, modification or replacement to such law.

(d)   Accounting terms shall have the meanings assigned to them by GAAP applied on a consistent basis by the accounting entity to which they refer.

(e)   References to any document, instrument or agreement (i) shall be deemed to include all appendices, exhibits, schedules and other attachments thereto and all documents, instruments or agreements issued or executed in replacement thereof, and (ii) shall mean such document, instrument or agreement, or replacement thereto, as amended, modified and supplemented from time to time in accordance with its terms and as the same is in effect at any given time.

Exhibit 5, Page 244

(f)     Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

(g)     The words "include" and "including" and words of similar import are not limiting, and shall be construed to be followed by the words "without limitation," whether or not they are in fact followed by such words.

(h)     The word "during" when used with respect to a period of time shall be construed to mean commencing at the beginning of such period and continuing until the end of such period.

(i)     Unless the context otherwise requires, singular nouns and pronouns when used herein shall be deemed to include the plural and vice versa and impersonal pronouns shall be deemed to include the personal pronoun of the appropriate gender.

## ARTICLE II

## PURCHASE AND SALE OF LOANS

Section 2.01   Terms and Conditions of Sale.

(a)     Purchase and Sale of Assets.  On the terms and subject to the conditions set forth in this Agreement and in the Ancillary Documents, the Seller hereby sells, transfers, conveys, assigns and delivers to the Purchaser, and the Purchaser hereby purchases, accepts and assumes from the Seller, without representation or warranty, express or implied, except as set forth in this Agreement and the Master Purchase Agreement, all of the Seller's rights, title and interests in, to and under the Assets (other than the Excluded Assets).  "**Assets**" means the following assets, whether owned, leased, licensed or otherwise contracted by, or otherwise available to, the Seller, and no others (except that, as set forth below, the schedules described in this Section 2.01 shall be updated as of the Closing Date and assets included in such updated schedules shall constitute Assets):

(i)     all of the Seller's rights, title and interests in, to and under the Loans (including all Notes, the other Loan Documents and Related Agreements) identified on the Loan Schedule attached hereto as Attachment A, endorsed without recourse, on a servicing-released basis;

(ii)     all of the Seller's rights in, to and under the Collateral pursuant to the Collateral Documents;

(iii)     all rights of and benefits accruing to the Seller under the servicing agreements listed on Schedule 2.01(a) (the "**LSBO Servicing Agreements**") pursuant to which the LSBOs are being serviced by third parties, including all rights to assert claims and to take other rightful actions in respect of breaches, defaults and other violations of such LSBO Servicing Agreements;

- 11 -

(iv)   all rights to causes of action, lawsuits, judgments, claims and demands of any nature available to or being pursued by or for the benefit of the Seller with respect to the Assets or the ownership, use, function, value of or other rights pertaining thereto, whether arising by way of counterclaim or otherwise, other than any claims retained by the Seller pursuant to Section 2.14; and

(v)   all guaranties, warranties, indemnities and similar rights in favor of the Seller with respect to any of the Assets.

To the extent that any party discovers, within 180 days following the Closing Date, that there were assets of the Seller that all parties hereto intended to be transferred in connection with the purchase and assumption contemplated in this Agreement, but that were omitted from the schedules to this Agreement, the Seller shall or shall cause its Affiliates promptly to assign and transfer to the Purchaser all right, title and interest in such asset.

Each schedule referenced above shall be updated as of the Closing Date and delivered to the Purchaser in accordance with Section 2.07.

(b)   Excluded Assets.  The Assets shall not include, and the Purchaser shall not purchase or otherwise acquire, the Excluded Assets.

(c)   Assumption of Liabilities.  On the terms and subject to the conditions contained herein and in the Ancillary Documents, and effective as of the Closing Date, (including the retention of all rights and remedies under Article XVII of the Master Purchase Agreement and under Articles VI and VII hereto), the Purchaser shall assume and agree to pay, perform and discharge in accordance with their terms all of the following obligations, debts and liabilities of the Seller and no others (collectively, the "**Assumed Liabilities**"):

(i)   the Obligations, including the Unfunded HELOC Commitments;

(ii)   all obligations of the Seller under LSBO Servicing Agreements from and after the Closing Date; and

(iii)   all obligations of the Seller with respect to (i) the lawsuits, judgments, claims and demands listed on Schedule 2.01(c), and (ii) any additional lawsuit, judgment, claim or demand involving foreclosures, bankruptcies, liens, title disputes, property condition, forfeiture, partition, easement, condemnation and eminent domain, probate, tax sale, mechanic's liens and stop notice claims with respect to any of the Assets, but only to the extent any such additional lawsuit, judgment, claim or demand is comparable in nature, scope and substance to those listed on Schedule 2.01(c), as determined by the Seller in its reasonable judgment (as evidenced by written notice thereof given to the Purchaser), if such determination is made (and such notice is provided) within sixty (60) days after the Closing Date, or by the mutual agreement of the Purchaser and the Seller, if such determination is after such sixty (60)-day period.

(d)   Excluded Liabilities.  Notwithstanding anything to the contrary in this Section 2.01, it is understood and agreed that the Seller shall not assign and the Purchaser shall

- 12 -

not, pursuant to this Agreement, assume or be liable for any Excluded Liabilities that the Seller has or may have now or in the future, including the following:

(i)     any liabilities and obligations with respect to any claims expressly retained by the Seller pursuant to Section 2.14;

(ii)     any liabilities or obligations of the Seller arising under this Agreement or any of the Ancillary Documents;

(iii)     any legal and accounting fees and expenses incurred by the Seller in connection with the consummation of the transactions contemplated by this Agreement, except as provided in the Master Purchase Agreement;

(iv)     any indebtedness of the Seller for borrowed money;

(v)     any liability or indebtedness of the Seller for contingent liabilities or liabilities in respect of any injury to any Person or property;

(vi)     any liabilities or obligations of the Seller attributable to an act, omission or circumstances that occurred or existed prior to the Closing Date, other than the Assumed Liabilities;

(vii)     all liabilities and obligations arising out of or with respect to the Excluded Assets;

(viii)     all obligations of the Seller with respect to any lawsuits, judgments, claims or demands of any nature existing on or prior to the Closing Date that are not listed on Schedule 2.01(c) or otherwise described in Section 2.01(c)(iii);

(ix)     any claim against or liability of the FDIC in its capacity as receiver for IndyMac Bank, FSB or the FDIC as receiver for IndyMac Federal that, under and in accordance with applicable Law, was, is or will be subject to the receivership administrative claims processes administered by the FDIC in its capacity as receiver for IndyMac Bank, FSB or the FDIC as receiver for IndyMac Federal pursuant to 12 U.S.C. §1821(d)(3) through (13), including claims and liabilities that are affirmative or defensive, now existing or arising in the future, contingent or fixed, monetary or non-monetary, equitable or legal, or declarative or injunctive; and

(x)     any claim against or liability based on any alleged act or omission of IndyMac Bank, FSB or IndyMac Federal which is not provable or allowable, or is otherwise barred against the FDIC as receiver for IndyMac Bank, FSB or the FDIC as receiver for IndyMac Federal, under applicable Law, including claims and liabilities that are barred under 12 U.S.C. §§1821(c), (d), (e) (including §1821(e)(3)), (i), or (j); 12 U.S.C. §1822; 12 U.S.C. §1823; or 12 U.S.C. §1825.

(e)     Loans Subject to Shared-Loss Agreement.  The Seller and the Purchaser agree that the Loans sold and purchased hereunder shall be subject to the terms of the Shared-Loss Agreement.

- 13 -

Exhibit 5, Page 247

Section 2.02   <u>Purchase Price</u>.  Subject to the terms and conditions of this Agreement and the Master Purchase Agreement, the Purchaser shall pay to the Seller, in accordance with the procedures set forth in this Agreement and the Master Purchase Agreement, an aggregate purchase price for the Assets in an amount equal to the sum of each product obtained by multiplying (x) the unpaid principal balance of each Loan, as shown on the Loan Schedule as updated as of the Closing Date, by (y) the applicable percentage for the category set forth on Schedule 2.02 to which such Loan belongs, *plus* accrued interest from the paid-to date up to but not including the Closing Date for Loans that are less than thirty (30) days past due (such sum, the "**Group 5 Final Purchase Price**").

Section 2.03   <u>Closing Payment</u>.  On the Closing Date, the Purchaser shall pay to the Seller in accordance with the Master Purchase Agreement an amount equal to the balance of (i) the Group 5 Final Purchase Price, calculated using, when applicable, balances as of the Initial Calculation Date rather than the Closing Date, <u>less</u> (ii) prorated amounts owed by the Seller through and including the Closing Date which are calculable as of the Closing Date, as determined pursuant to <u>Section 2.04</u>, <u>plus</u> (iii) to the extent not otherwise covered, an amount equal to any negative escrow balance (expressed as a negative number), to the extent such negative escrow balance exists after netting negative escrow balances with positive escrow balances in accordance with <u>Section 5.09</u> of this Agreement (collectively, the "**Group 5 Closing Payment**").  The Seller shall also provide to the Purchaser reasonable supporting information and documentation that is relied upon in connection with such calculation.

Section 2.04   <u>Prorations</u>.  All payments under or pursuant to any LSBO Servicing Agreement assigned to the Purchaser under this Agreement and any real and personal property Taxes related to the Assets, whether or not payable after the Closing Date, shall be prorated between the Purchaser and the Seller, as the case may be, on the basis of a 365 day year and the number of days elapsed and days remaining in the applicable period through the end of the Closing Date.  All amounts prorated pursuant to this <u>Section 2.04</u> will be taken into account in connection with the adjustments provided in <u>Section 2.07</u>.

Section 2.05   <u>Closing</u>.  The closing of the sale provided for in this Agreement, herein referred to as the "**Closing**", shall take place pursuant to the procedures and subject to the conditions set forth in this Agreement and the Master Purchase Agreement.

Section 2.06   <u>Closing Procedure</u>.  At the Closing, subject to and upon the terms and conditions of this Agreement and the Master Purchase Agreement:

(a)   the Purchaser shall deliver to the Seller the certificates, instruments and documents referred to in <u>Section 2.15(a)</u>;

(b)   the Seller shall deliver to the Purchaser the certificates, instruments and documents referred to in <u>Section 2.15(b)</u>; and

(c)   the Purchaser shall deliver to the Seller the Group 5 Closing Payment.

Section 2.07   <u>Closing Adjustment Documents</u>.  Within sixty (60) calendar days following the Closing Date, the Purchaser shall prepare and deliver to the Seller (i) <u>Attachment A</u> updated as of the Closing Date and prepared in accordance with the

- 14 -

Exhibit 5, Page 248

Accounting Records and consistent with past practice (including the preparation of the Attachments attached hereto), and (ii) a schedule setting forth in reasonable detail the calculations contemplated by <u>Section 2.08</u> (collectively, the "**Closing Adjustment Documents**"). The parties shall cooperate in the preparation of the Closing Adjustment Documents and such additional documents as may be necessary to calculate the Group 5 Final Payment. Without limiting the generality of the foregoing, to the extent necessary, the Purchaser shall provide the Seller and its designees with reasonable access to the Purchaser's books, records, working papers, personnel and representatives which relate to the Assets and the Assumed Liabilities.

Section 2.08   <u>Calculation of Adjustments</u>. The Closing Adjustment Documents shall set forth the Purchaser's calculation of (a) the Group 5 Final Purchase Price in accordance with <u>Sections 2.02</u> and <u>2.03</u> and (b) a payment amount (such amount, the "**Group 5 Final Payment**") which shall be the sum of the following: (i) the Group 5 Final Purchase Price, *less* (ii) prorated amounts owed by the Seller through and including the Closing Date, as determined pursuant to <u>Section 2.04</u>, <u>plus</u> (iii) to the extent not otherwise covered, an amount equal to any negative escrow balance (expressed as a negative number), to the extent such negative escrow balance exists after netting negative escrow balances with positive escrow balances in accordance with <u>Section 5.09</u> of this Agreement. The Closing Adjustment Documents shall be reviewed, and any Disagreements related thereto resolved, in accordance with the Master Purchase Agreement.

Section 2.09   <u>Final Settlement</u>. Final settlement of the Group 5 Final Purchase Price shall be made in accordance with the Master Purchase Agreement.

Section 2.10   <u>Offsets Against Deposits</u>. With respect to any Loan, the Seller reserves the right to permit or require offsets against deposit accounts of the Failed Thrift. If allowed by the Seller, such offsets will be retroactive to July 11, 2008. At such time as an offset is effected, the Seller will give notice of such to the Purchaser and pay the Purchaser the amount of the offset on a dollar-for-dollar basis, and the Purchaser shall credit such amount to the Loan according to the terms and conditions of the applicable Note as of July 11, 2008.

Section 2.11   <u>Allocation of Payments</u>. All payments and other amounts received on account of any of the Loans on or before the Closing Date shall belong to the Seller (except with respect to payments on any Loan that has been paid in advance, which shall belong to the Purchaser to the extent that any such prepayments are not reflected in the unpaid principal balance of such Loan as of the Closing Date). All payments and other amounts received on account of any of the Loans after the Closing Date shall belong to the Purchaser.

Section 2.12   <u>Rebates and Refunds</u>. The Purchaser is not entitled to any rebates or refunds from the Seller from any pre-computed interest Loan regardless of when the Note matures. Further, on pre-computed interest Loans, the Seller will not refund any unearned discount amounts to the Purchaser.

Section 2.13   <u>Interest Conveyed</u>. In the event a foreclosure with respect to any Loan occurs after the Closing Date, or occurred on or before the Closing Date but the Redemption Period had not expired on or before the Closing Date, the Seller shall convey to the Purchaser the Deficiency Balance, if any, together with the net proceeds, if any, of such foreclosure sale. If the

Exhibit 5, Page 249

Seller was the purchaser at such foreclosure sale, the Seller shall convey to the Purchaser the Deficiency Balance, if any, together with a special warranty deed to the property purchased at such foreclosure sale.

Section 2.14   Retained Claims and Release.   Notwithstanding anything to the contrary contained in this Agreement, the Purchaser and the Seller hereby agree that the sale and transfer of the Loans pursuant to this Agreement will exclude the transfer to the Purchaser of all right, title and interest of the Seller in and to any and all claims of any nature whatsoever that might now exist or hereafter arise, whether known or unknown, that the Seller has or might have against any of the following: (a) officers, directors, employees, insiders, accountants, attorneys, other Persons employed by the Seller, IndyMac Federal or the Failed Thrift or any of their predecessors-in-interest, underwriters or any other similar Persons who have caused a loss to the Seller, IndyMac Federal or the Failed Thrift or any of their predecessors-in-interest in connection with the origination, servicing or administration of a Loan, (b) any appraisers, accountants, auditors, attorneys, investment bankers or brokers, loan brokers, deposit brokers, securities dealers or other Persons who performed services for the Seller, IndyMac Federal or the Failed Thrift or any of their predecessors-in-interest relative to a Loan, (c) any third parties involved in any alleged fraud or other misconduct relating to the making or servicing of a Loan or (d) any appraiser or other Person with whom the Seller, IndyMac Federal or the Failed Thrift or any of their predecessors-in-interest or any servicing agent contracted for services or title insurance in connection with the making, insuring or servicing of a Loan.

Section 2.15   Delivery of Closing Documents.

(a)      In addition to any other documents to be delivered under other provisions of this Agreement or the Master Purchase Agreement, the Purchaser shall deliver and release, subject to and in accordance with this Section 2.15(a), to the Seller the following on or prior to the Closing:

(i)      the Group 5 Closing Payment in accordance with the Master Purchase Agreement;

(ii)      four originals of the Assignment and Assumption of Interests and Obligations executed by the Purchaser;

(iii)      four originals of this Agreement executed by the Purchaser; and

(iv)      four originals of the Shared-Loss Agreement executed by the Purchaser.

(b)      In addition to any other documents to be delivered under other provisions of this Agreement or the Master Purchase Agreement, the Seller shall deliver and release, subject to and in accordance with this Section 2.15(b), to the Purchaser the following on or prior to the Closing:

(i)      an original of the Bill of Sale executed by the Seller;

- 16 -

Exhibit 5, Page 250

(ii)     four originals of the Assignment and Assumption of Interests and Obligations executed by the Seller;

(iii)    four originals of this Agreement executed by the Seller;

(iv)    four originals of the Shared-Loss Agreement executed by the Seller; and

(v)     one original Limited Power of Attorney granted by the Seller pursuant to Section 3.04 below.

## ARTICLE III

## TRANSFER OF LOANS, COLLATERAL DOCUMENTS AND SERVICING

Section 3.01    Transfer of Documents.  The Seller and the Purchaser shall cooperate with each other in the physical or other transfer to the Purchaser or the custodian or other designee on the Closing Date of the Notes, the Loan Files, the Loan Documents, the Collateral Documents and the Related Agreements.

Section 3.02    MERS Mortgage Loans.  If any of the Mortgages are registered on the MERS® System (the "**MERS Registered Mortgages**"), the Purchaser shall cause the MERS Registered Mortgages to be transferred on the MERS® System on or within a reasonable time after the Closing Date.  The costs imposed by MERS with respect to the transfer of the MERS Registered Mortgages shall be allocated between the Purchaser and the Seller in accordance with Section 19.03 of the Master Purchase Agreement.

Section 3.03    Forwarding Post-Closing Date Items.  With respect to any checks or other funds in respect of any Loan which are received by the Seller within thirty (30) calendar days after the Closing Date, the Seller shall, to the extent no Limited Power of Attorney is granted to the Purchaser in accordance with Section 3.04(a), promptly endorse without recourse and send the same to the Purchaser via overnight mail.  Any checks or other funds in respect of any Loan which are received by the Seller after such thirty (30) day period shall be endorsed without recourse by the Seller to the Purchaser and sent by first class mail to the Purchaser promptly after receipt.  Except as otherwise provided herein, the Seller shall promptly forward to the Purchaser all correspondence, Tax bills or any other correspondence or documentation related to any of the Loans or the other Assets which is received by the Seller after the Closing Date.

Section 3.04    Delivery of Loans.

(a)     The Seller will grant a Limited Power of Attorney to the Purchaser in the form attached hereto as Attachment F.  The Purchaser will prepare and execute on behalf of the Seller, within a reasonable time after the Closing Date, all Transfer Documents not delivered by the Seller to the Purchaser at Closing, and the Purchaser shall perform all acts required to be performed by the Seller pursuant to Section 3.03.  The Seller shall cooperate with the Purchaser with respect to the Purchaser's obligation to prepare and record (if applicable) such Transfer Documents.  All Transfer Documents prepared by the Purchaser shall be in appropriate form suitable for filing or recording (if applicable) in the relevant jurisdiction and otherwise subject to

- 17 -

the limitations set forth herein, and the Purchaser shall be solely responsible for the preparation, contents and form of such documents.  The Purchaser hereby releases the Seller from any loss or damage incurred by the Purchaser due to the contents or form of any documents prepared pursuant to this Section 3.04 and shall indemnify and hold the Seller harmless from and against any claim, action or cause of action asserted by any Person, including the Purchaser, arising out of the contents or form of any Transfer Document, including any claim relating to the adequacy or inadequacy of any such document or instrument for the purposes thereof, and the use (or purported use) by the Purchaser of the Limited Power of Attorney in any way not expressly permitted by its terms.  All expenses incurred by the Purchaser in compliance with this Section 3.04 shall be allocated between the Purchaser and the Seller in accordance with Section 19.03 of the Master Purchase Agreement.

(b)     The parties hereby agree that all Notes evidencing Loans shall be endorsed without recourse, and without representation or warranty by the Seller, express or implied, except (as to the Purchaser) as set forth in this Agreement.  The form of any endorsement of Notes or allonge to the Notes is as follows:

> Pay to the order of
> OneWest Bank, FSB
> Without Recourse
>
> Federal Deposit Insurance Corporation as Receiver
> for IndyMac Federal Bank, FSB
>
> By:_____
> Name:  _____
> Title:  Attorney-in-Fact

All other documents of assignment, conveyance or transfer shall contain the following sentence: "This assignment is made without recourse, representation or warranty, express or implied, by the FDIC in any capacity."

(c)     As to Foreign Loans, the Purchaser must retain counsel licensed in the Foreign Jurisdictions involved with the Foreign Loans.  Such foreign counsel shall draft the documents necessary to assign the Foreign Loans to the Purchaser.  Documents presented to the Seller to assign Foreign Loans to the Purchaser must be accompanied by a letter on the foreign counsel's letterhead, signed by the foreign counsel preparing those documents, certifying that those documents conform to the Law of the Foreign Jurisdiction. Each such document shall be delivered to the Seller in the English language, provided, however, that any document required for its purposes to be executed by the Seller in a language other than the English language shall be delivered to the Seller in such language, accompanied by a translation thereof in the English language, certified as to its accuracy by an executive officer or general counsel of the Purchaser and, if such executive officer or general counsel shall not be fluently bilingual, by the translator thereof.

(d)     Nothing contained herein or elsewhere in this Agreement shall require the Seller to make any agreement, representation or warranty or provide any indemnity in any

- 18 -

Exhibit 5, Page 252

document or instrument or otherwise, nor is the Seller obligated to obtain any consents or approval to the sale or transfer of the Loans or the related servicing rights, if any, or the assumption by the Purchaser of the Assumed Liabilities.

Section 3.05   Recordation of Documents.   The Purchaser shall promptly submit all Transfer Documents for recordation or filing in the appropriate land, chattel, Uniform Commercial Code, and other records of the appropriate county, state or other jurisdictions (including any Foreign Jurisdiction) to effect the transfer of the Assets to the Purchaser, and to render legal, valid and enforceable the obligations of the Borrowers to the Purchaser and the assumption by the Purchaser of Assumed Liabilities.   The Purchaser shall be responsible for following up on the status of all Transfer Documents submitted for recordation.

Section 3.06   Additional Actions; Transaction Costs.   The Seller shall, if such is affirmatively required under applicable Law, take such actions as are necessary to effect the purposes of this Article III. All Taxes, fees, costs and expenses incurred in connection therewith shall be allocated between the Purchaser and the Seller in accordance with Section 19.03 of the Master Purchase Agreement.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The representations and warranties made by the Purchaser to the Seller with respect to the transactions contemplated hereby are as set forth in the Master Purchase Agreement.

## ARTICLE V

## COVENANTS, DUTIES AND OBLIGATIONS

Section 5.01   Servicing of Loans.   From and after the Closing Date, the Purchaser shall comply with all applicable Law with respect to the ownership and/or servicing of the Servicing-Released Loans, including (if applicable), the Fair Debt Collection Practices Act (15 U.S.C. § 1692 *et seq.*, as amended) and similar state Laws, and shall comply with all of the terms and conditions of the Guidelines, the Collateral Documents and any other instruments and documents governing or relating to the Servicing-Released Loans and/or the servicing rights and other rights thereunder.

Section 5.02   Collection Agency/Contingency Fee Agreements. Subject to Section 2.04, the Purchaser acknowledges and agrees that it accepts and acquires the Servicing-Released Loans subject to the agreements with collection agencies and contingency fee agreements with attorneys (all of which are listed on Schedule 4.01(f) of the Master Purchase Agreement) (in either case that are outstanding and in effect as of the Closing Date) that relate to any of the Servicing-Released Loans and are assignable, and assumes and agrees to fulfill all Obligations of the Seller thereunder.   The Purchaser shall indemnify and hold the Seller harmless from and against any and all claims, demands, losses, damages, penalties, forfeitures or judgments made or rendered against the Seller or any legal fees or other costs, fees or expenses incurred by the Seller arising out of or based upon such agreements with collection agencies or contingency fee

agreements with attorneys, but only to the extent arising out of or based upon acts or events occurring after the Closing Date.  The Purchaser shall notify the Seller within thirty (30) Business Days of notice or knowledge of any such claim or demand.

Section 5.03   <u>Insured or Guaranteed Loans</u>.  If any of the Servicing-Released Loans are insured or guaranteed by any Governmental Authority, and such insurance or guaranty is not being specifically terminated by the Seller, the Purchaser acknowledges and agrees that such Servicing-Released Loans must be serviced by a servicer, lender or mortgagee approved by such Governmental Authority, if such approval is required.  The Purchaser further acknowledges and agrees that, upon assumption of the Assumed Liabilities with respect to the Servicing-Released Loans, it assumes full responsibility for determining whether or not any such insurance or guarantees are in full force and effect on the Closing Date and, with respect to those Servicing-Released Loans with respect to which any such insurance or guarantee is in full force and effect on the Closing Date, the Purchaser acknowledges and agrees that, upon assumption of the Assumed Liabilities with respect to the Servicing-Released Loans, it assumes full responsibility for taking any and all actions as may be necessary to insure such insurance or guarantees remain in full force and effect.  The Purchaser acknowledges and agrees that, upon assumption of the Assumed Liabilities with respect to the Servicing-Released Loans, it assumes and agrees to fulfill all of the Seller's or IndyMac Federal's obligations under the contracts of insurance or guaranty.

Section 5.04   <u>Reporting to or for the Applicable Taxing Authorities</u>.  The Seller shall be responsible for submitting all Internal Revenue Service information returns related to the Loans for all applicable periods ending on or prior to December 31, 2008 (except with respect to those LSBOs for which the related servicer is obligated to submit such returns). The Purchaser shall be responsible for submitting all Internal Revenue Service information returns related to such Loans for all applicable periods commencing thereafter.  Information returns include reports on Forms 1098 and 1099.   The Purchaser shall be responsible for submitting all information returns required under applicable Law of any Foreign Jurisdiction, to the extent such are required to be filed by the Purchaser or the Seller under such Law, relating to such Loans, for the calendar or tax year beginning January 1, 2009 and thereafter.  The Seller shall provide the Purchaser with any information that is required to comply with any of the Purchaser's Tax reporting responsibilities, including the responsibilities described herein; provided that, such information is in the possession of the Seller and not in the possession of the Purchaser, OneWest Bank Group or HoldCo.

Section 5.05   <u>Loans in Litigation</u>.

(a)   With respect to any Loans that, as of the Closing Date, are subject to any pending litigation that is listed on Schedule 2.01(c) or of which the Purchaser has received written notice of from the Seller, the Purchaser shall notify the FDIC's Regional Counsel, 1601 Bryan Street, Dallas, Texas 75201, within thirty (30) Business Days after the Closing Date, or within thirty (30) Business Days after receiving such written notice, as the case may be, of the name of the attorney selected by the Purchaser to represent the Purchaser's interests in the litigation.  The Purchaser shall, within thirty (30) Business Days after the Closing Date, or within thirty (30) Business Days after receiving the written notice described above, as the case may be, notify the clerk of the court or other appropriate official and all counsel of record that ownership

Exhibit 5, Page 254

of the Loan was transferred from the Seller to the Purchaser.  Subject to the provisions of <u>Section 5.07</u>, the Purchaser shall have its attorney file appropriate pleadings and other documents and instruments with the court or other appropriate body within thirty-five (35) Business Days after the Closing Date, or within thirty-five (35) Business Days after receiving the written notice described above, as the case may be, substituting the Purchaser's attorney for the Seller's attorney, removing the Seller and IndyMac Federal (or its predecessor-in-interest) as a party to the litigation and substituting the Purchaser as the real party-in-interest.  Except as otherwise provided in <u>Section 5.05(b)</u> (and the Purchaser's compliance with its obligations therein), in the event the Purchaser fails to comply with this <u>Section 5.05(a)</u> within thirty-five (35) Business Days after the Closing Date, or within thirty-five (35) Business Days after receiving the written notice described above, as the case may be, the Seller may, at its option, dismiss with or without prejudice or withdraw from, any such pending litigation.

(b)     If the Purchaser is unable, as a matter of applicable Law or due to the actions or inactions of third parties unrelated to the Purchaser and over whom the Purchaser has no control, to cause the Seller and IndyMac Federal (or its predecessors-in-interest) to be replaced by the Purchaser as party-in-interest in any pending litigation as required by <u>Section 5.05(a)</u>, the Purchaser shall provide to the FDIC's Regional Counsel, at the address specified above, within thirty-five (35) Business Days after the Closing Date, or within thirty-five (35) Business Days after receiving the written notice described in <u>Section 5.05(a)</u>, as the case may be, evidence to such effect, including reference to any applicable Law, and stating the reasons for such inability.  In any such event, (i) the Purchaser shall cause its attorney to conduct such litigation at the Purchaser's sole cost and expense; (ii) the Purchaser shall cause the removal of the Seller and IndyMac Federal (or its predecessor-in-interest) and substitution of the Purchaser as party-in-interest in such litigation as soon as reasonably practicable; (iii) the Purchaser shall use commercially reasonable efforts to cause such litigation to be resolved by judgment or settlement in as reasonably efficient a manner as practical; (iv) the Seller shall cooperate with the Purchaser and the Purchaser's attorney as reasonably required to bring such litigation or any settlement relating thereto to a reasonable and prompt conclusion; and (v) no settlement shall be agreed upon by the Purchaser or its agents or counsel without the express prior written consent of the Seller, unless such settlement includes an irrevocable and complete waiver and release of any and all potential claims against the Seller and IndyMac Federal (or its predecessor-in-interest) in relation to such litigation or the subject Loans or obligations by any Person asserting any claim in the litigation and any Borrower, and any and all losses, liabilities, claims, causes of action, damages, demands, taxes, fees, costs and expenses relating thereto shall be paid by the Purchaser without recourse of any kind to the Seller or IndyMac Federal (or its predecessors-in-interest).  The Purchaser shall provide to the Seller twenty (20) Business Days following the Closing Date a status report for each pending litigation regarding replacement by the Purchaser as the party-in-interest.  The Purchaser shall pay all of the costs and expenses incurred by it in connection with the actions required to be taken by it pursuant to <u>Section 5.05(a)</u> and this <u>Section 5.05(b)</u>, including all legal fees and expenses and court costs, and shall reimburse the Seller for all reasonable out-of-pocket costs, including all legal expenses, incurred by the Seller on or after the Closing Date with respect to any such litigation, including costs incurred in connection with the dismissal thereof or withdrawal therefrom.

Exhibit 5, Page 255

(c)     Notwithstanding the foregoing, the Purchaser shall retain all rights and remedies under Article XVII of the Master Purchase Agreement and under Article VI and Article VII hereto.

Section 5.06   Loans in Bankruptcy.   In accordance with Bankruptcy Rules 3001 and 3002, the Purchaser shall take all actions necessary to file, within thirty (30) Business Days after the Closing Date, (i) proofs of claims in pending bankruptcy cases involving any Loans for which the Seller or IndyMac Federal (or its predecessors-in-interest) has not already filed a proof of claim, and (ii) all documents required by Bankruptcy Rule 3001 and to take all such similar actions as may be required in any relevant jurisdiction in any pending bankruptcy or insolvency case or proceeding in such jurisdiction involving any Loans in order to evidence and assert the Purchaser's rights. The Purchaser shall prepare and provide to the Seller, within thirty (30) Business Days after the Closing Date, an Affidavit and Assignment of Claim or any similar forms as may be required in any relevant Foreign Jurisdiction and shall be acceptable to the Seller, for each Loan where a Borrower under such Loan is in bankruptcy as of the Closing Date. The Purchaser hereby releases the Seller and IndyMac Federal (and its predecessors-in-interest) and the FDIC from any claim, demand, suit or cause of action the Purchaser may have as a result of any action or inaction on the part of the Seller or IndyMac Federal (or its predecessors-in-interest) or the FDIC with respect to such Loan, and the Purchaser further agrees to reimburse the Seller for any cost or expense incurred by the Seller as a result of the Purchaser's failure to file an Affidavit and Assignment of Claim or similar forms as required herein.

Section 5.07   Retained Claims.   The provisions of Sections 5.05 and 5.06 are subject to the Seller's retention of claims pursuant to Section 2.14 of this Agreement, including any such claims as may have been asserted in litigation pending as of the Closing Date.  If the Seller determines to pursue any claim retained pursuant to Section 2.14, then, at the Seller's discretion, litigation involving any such claims shall be bifurcated, with the Seller remaining the real party-in-interest and retaining control over (and being responsible for pursuing and bearing the related costs to pursue) claims retained by it pursuant to Section 2.14 and with the Purchaser substituting itself as the real party-in-interest and taking control of (and being responsible for pursuing and bearing the cost of pursuing) the remaining claims in litigation.

Section 5.08   Loan Related Insurance.   As of the Closing Date, the Purchaser is responsible for having itself substituted as loss payee on all Loan-related insurance with respect to which the Failed Thrift or the Seller is currently identified as a loss payee.  As between the Purchaser and the Seller, the Purchaser shall be solely responsible and liable for any loss after the Closing Date to a Borrower or to the Purchaser, or to the value or collectibility of any Loan, that is due to the lapse of, or to the Seller's cancellation of, any insurance policy after the Closing Date.

Section 5.09   Unremitted Collections; Escrow Accounts and Custodial Accounts. Escrow funds, custodial funds and other amounts or balances related to the Loans on deposit in Escrow Accounts, Custodial Accounts or other accounts held or controlled by the Seller shall be transferred by the Seller, along with the related accounts, to the Purchaser on the Closing Date. It is intended that the Seller will use commercially reasonable efforts to cause such Escrow Accounts, Custodial Accounts and other accounts to be retitled in the name of the Purchaser. All such funds and related accounts shall become the responsibility of the Purchaser when

transferred by the Seller.  Any negative escrow balances shall be netted against the amount of any positive escrow balances held in the Escrow Accounts transferred to the Purchaser.

Section 5.10   [Reserved].

Section 5.11   Files and Records.  The Purchaser shall comply with all applicable Laws in connection with the retention, storage and maintenance of all documents and records relating to the Loans, including the length of time such documents and records are to be retained. The Purchaser shall also:

(a)     allow the Seller the continuing right to use, inspect and make extracts from or copies of any such documents or records upon the Seller's reasonable notice to the Purchaser, provided, that the Seller will reimburse the Purchaser for the Purchaser's actual, reasonable and documented out-of-pocket costs incurred in connection with the Seller's exercise of such right;

(b)     allow the Seller the possession, custody and use of original documents for any reasonable lawful purpose and upon reasonable terms and conditions; and

(c)     give reasonable notice to the Seller of the Purchaser's intention to destroy or dispose of any such documents or records and to allow the Seller, at its own expense, to recover the same from the Purchaser.

Section 5.12   Reimbursement for Use of the Seller's Employees.   In the event of litigation with respect to the Loans, other than litigation relating to the claims retained by the Seller pursuant to Section 2.14 or otherwise, in which the Seller or IndyMac Federal (or its predecessors-in-interest), or any of their employees (or any of the other Released Parties) are requested or required by subpoena, court order or otherwise to perform any acts, including testifying in litigation, preparing responses to subpoenas or other legal process or pleadings or performing any review of public or private records such as tracing funds, whether said litigation is commenced by the Purchaser or any other party, the Seller shall be reimbursed by the Purchaser for all associated reasonable and documented out-of-pocket expenses of such employees, including travel, lodging and per diem costs.  The Seller shall, in its sole and absolute discretion, determine and assign the personnel necessary to perform said acts.  The Purchaser also shall reimburse the Seller for copies made in the course of performing said acts at cost.

Section 5.13   Notice to Borrowers.  The Purchaser shall, on a timely basis in accordance with RESPA and any other applicable Laws, and pursuant to the Limited Power of Attorney granted to it in accordance with Section 3.04(a), prepare and transmit to each Borrower a joint "hello" and "goodbye" letter, at the Purchaser's expense.  The form of such letter shall be subject to the review and reasonable approval of the Seller.

Section 5.14   Notice of Claim.  Each party hereto shall promptly notify the other party of any claim, threatened claim or litigation against the Failed Thrift, the Seller, the Purchaser, or any of their respective employees, officers, agents and representatives arising out of or in any way related to any Loans purchased by the Purchaser that may come to its attention.

Exhibit 5, Page 257

Section 5.15   <u>Prior Servicer Information</u>.  The Purchaser acknowledges and agrees that the Seller might not have access to information from prior servicers of a Loan and that the Seller has not requested any information not in the possession of the Seller or its servicing contractor from any prior servicer of a Loan.  The Purchaser acknowledges and agrees that the Seller will not be required under the terms of this Agreement to request any information from any prior servicer.

Section 5.16   <u>Release of Seller</u>.

(a)     Except as otherwise specifically provided in <u>Article VII</u> of this Agreement or in any Ancillary Document, the Purchaser hereby releases and forever discharges the Seller, the Failed Thrift and its predecessors-in-interest, and the FDIC, and all of their respective officers, directors, employees, agents, attorneys, contractors and representatives, and all of their respective successors, assigns (other than the Purchaser) and Affiliates, from any and all claims (including any counterclaim or defensive claim), demands, causes of action, judgments or legal proceedings and remedies of whatever kind or nature that the Purchaser now has or might have in the future, whether now known or unknown, which are related in any manner whatsoever to the Loans, this Agreement, the servicing of the Loans (before or after the Closing Date) by the Seller, the Failed Thrift or its predecessors-in-interest, the FDIC or any Person acting on behalf of the Seller, the Failed Thrift or its predecessors-in-interest or the FDIC, or the acquisition of the Loans (other than gross negligence or willful misconduct); <u>provided</u>, <u>however</u>, that nothing contained in this <u>Section 5.16(a)</u> shall constitute or be interpreted as a waiver of any express right that the Purchaser has under this Agreement or any of the Ancillary Documents (including any rights under <u>Article XVII</u> of the Master Purchase Agreement and under <u>Article VI and VII</u> of this Agreement).

(b)     Subject to <u>Section 5.20</u>, the Purchaser will not renew, extend, renegotiate, compromise, settle or release any Note or Loan or any right of the Purchaser founded upon or growing out of this Agreement, except upon payment in full thereof, unless all Borrowers on said Note or Loan shall first release and discharge the Failed Thrift and its predecessors-in-interest, the FDIC and the Seller, and their respective agents and assigns (other than the Purchaser) (the "**Released Parties**") from all claims, demands and causes of action which any such Borrower may have against any such Released Party arising from or growing out of any act or omission occurring prior to the date of such release.  If the Purchaser fails to obtain such release, the Purchaser will protect, save and hold the Seller harmless from any expense or damage the Seller suffers that might have been prevented had the Purchaser obtained the release.

Section 5.17   <u>Borrower as Purchaser</u>.  In the event that the Purchaser is the Borrower or a Related Party with respect to any Loan, then the Purchaser, on its own behalf and on behalf of any Related Party, shall, and hereby does, release and discharge and shall indemnify, defend (with counsel reasonably satisfactory to the Seller) and hold harmless the Failed Thrift, the Seller (and its predecessors-in-interest), the FDIC and all of their respective officers, directors, shareholders, principals, employees, agents, attorneys, contractors and representatives, and all of their respective successors, assigns and Affiliates, from and against all damages, losses, claims, demands, liabilities, obligations, causes of action, judgments or legal proceedings and remedies of any kind or nature whatsoever arising out of any act or omission related to such Loan.  The Purchaser acknowledges and agrees that it shall not be entitled to any Remedy pursuant to

Exhibit 5, Page 258

Section 7.01 with respect to any Loan for which the Purchaser or a Related Party is the Borrower pursuant to Article VII of this Agreement. At the Purchaser's request, and upon preparation of appropriate documentation by the Purchaser in conformance with Section 2.15(a), the Seller will release and discharge a Loan for which the Purchaser is the Borrower in lieu of assigning the same to the Purchaser. In any event, the Seller will issue a Form 1099 to report any discharge of indebtedness in connection with the sale or release of the Loan to the Borrower or a Related Party in accordance with Internal Revenue Service regulations and FDIC policy. Notwithstanding the foregoing, any failure by the Seller to issue a Form 1099 does not relieve the Purchaser of its responsibility to report the discharge of indebtedness in accordance with applicable federal tax law.

Section 5.18   HELOCs.

(a)     From and after the Closing Date, (i) the Purchaser will be obligated to fund all Disbursements of Principal with respect to the Unfunded HELOC Commitments, and (ii) the Seller will be obligated to reimburse the Purchaser for such Disbursements of Principal in exchange for participation interests in the HELOCs underlying such Unfunded HELOC Commitments, in each case as set forth in the term sheet attached hereto as Attachment H and the more detailed definitive documentation executed pursuant thereto. For the avoidance of doubt, the obligations, terms and commitments set forth in the term sheet attached hereto as Attachment H are binding obligations of the parties hereto as if they were set forth in full herein, notwithstanding any delay in executing or failure to execute more detailed definitive documentation as contemplated therein.

(b)     Notwithstanding anything to the contrary in this Agreement, on and after the Closing Date, the Purchaser shall (i) to the extent permitted by applicable Law, terminate or suspend each HELOC purchased hereunder with respect to which there is a decline in the value of the Mortgaged Property or the credit score of the Borrower, as and to the extent permitted under the related credit line agreement, and will assist with any refinancing program (or voluntary termination or freeze program) proposed by the Seller with respect to such HELOC. The Purchaser acknowledges and agrees that if at any time after the Closing Date the Purchaser opens any line of credit with respect to any HELOC which the Seller has suspended or terminated future Unfunded HELOC Commitments, any obligation to advance funds under any such reopened HELOC shall at such time and thereafter be the obligation solely of the Purchaser, and the Seller shall have no obligation to reimburse the Purchaser therefor. The Purchaser shall comply with all terms under the related Mortgage Note and shall freeze, modify or terminate any undrawn lines of credit only in a manner consistent with the terms of the related Mortgage Note and the policies set forth in the Guidelines.

Section 5.19   Repurchase of Charged-Off Loans.   The Seller may, at its option, repurchase any Charged-Off Loan with respect to which a loss share payment has been made pursuant to the Shared-Loss Agreement at a repurchase price equal to the unpaid principal balance on such Loan less the amount charged-off.

Section 5.20   Loan Modification Program. Notwithstanding anything to the contrary in Section 5.16, the Purchaser shall complete the processing of all Servicing-Released Loan Modifications in process pursuant to the Program as of the Closing Date and shall honor all

offers of Modifications for which processing has not yet commenced in accordance with the terms of the Program. The Purchaser shall comply with the Program as it may be amended by the FDIC from time to time, provided, however, that, unless otherwise required by Law, the Purchaser shall not be required to comply with any changes to the Program after January 2, 2009 if such changes would (i) require the Purchaser to take any action in violation of applicable Law or the terms of any servicing agreement then in effect or (ii) result in the net present value of the estimated cash flows on the related Loan, discounted at the Then-Current Interest Rate, after any such change being less than the net present value of the estimated cash flows on the related Loan, discounted at the Then-Current Interest Rate, prior to such change. The Seller hereby acknowledges that a loss suffered with respect to any Loan modified in accordance with the Program will be covered by the Shared-Loss Agreement. The Purchaser acknowledges and agrees that it will be required to comply with reporting requirements with respect to the Program that are acceptable to the FDIC in order to allow the FDIC to monitor compliance with, and the results of, the Program. Notwithstanding any of the foregoing, the Purchaser shall be obligated to comply with the Program only for so long as any financing provided by the Seller remains outstanding or, if later, for so long as any of the Loans are subject to the Shared-Loss Agreement. If the Purchaser receives any fees under any government-sponsored, or government-sponsored entity's, program relating to loan modifications, the Purchaser shall use any such fees for purposes that enhance or further the expressed intentions of such program or the Program.

Section 5.21   <u>Loans in Process</u>.  The Purchaser shall continue to process all pending loan applications as they exist at IndyMac Federal as of the Closing Date; <u>provided</u>, <u>however</u>, that the Purchaser shall have no obligation to enter into commitments with respect thereto.

Section 5.22   <u>Cooperation</u>.

(a)   The Seller and the Purchaser shall mutually cooperate in order to facilitate an orderly transition of the Assets and Assumed Liabilities to the Purchaser. Each party will cooperate in good faith with the other and will take all appropriate action that may be reasonably necessary or advisable to carry out any of the transactions contemplated hereunder. From and after the Closing Date, the Seller will promptly refer all inquiries with respect to the Assets (including ownership thereof) and Assumed Liabilities to the Purchaser, and the Purchaser will promptly refer all inquires with respect to the Excluded Assets (including ownership thereof) and Excluded Liabilities to the Seller.

(b)   The Seller acknowledges that the Purchaser may, after the Closing Date, enter into a financing with a Federal Home Loan Bank or with another third party related to, or consummate a securitization transaction in respect of, the Loans. The Seller will, at the Purchaser's expense, cooperate with the Purchaser and any prospective counterparty in connection with any such financing or securitization transaction and provide such reasonable assistance, information or verification of information as may be reasonably requested by the Purchaser or such counterparty and reasonably available to the Seller and its Affiliates.

Section 5.23   <u>Additional Title Documents.</u>  The Seller and the Purchaser each agree, at any time, and from time to time, upon the request of any party hereto, to execute and deliver such additional instruments and documents of conveyance as shall be reasonably necessary to vest in the Purchaser its full legal or equitable title in and to the Assets. The Purchaser shall

Exhibit 5, Page 260

prepare such instruments and documents of conveyance (in form and substance reasonably satisfactory to the Seller) as shall be necessary to vest title to the Assets in the Purchaser. The Purchaser shall be responsible for recording such instruments and documents of conveyance. All expenses incurred by the Purchaser in compliance with this Section 5.23 shall be allocated between the Purchaser and the Seller in accordance with Section 19.03 of the Master Purchase Agreement.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES; ASSET-LEVEL STATEMENTS

Section 6.01    Assets Conveyed "AS IS"; Purchaser Acknowledgments.

(a)    THE ASSETS ARE BEING SOLD TO THE PURCHASER "AS IS" AND "WITH ALL FAULTS," WITHOUT ANY REPRESENTATION, WARRANTY OR GUARANTY WHATSOEVER, INCLUDING AS TO COLLECTIBILITY, ENFORCEABILITY, VALUE OF COLLATERAL, ABILITY OF ANY OBLIGOR TO REPAY, CONDITION, FITNESS FOR ANY PARTICULAR PURPOSE, MERCHANTABILITY OR ANY OTHER WARRANTY, WHETHER EXPRESS OR IMPLIED OR BY OPERATION OF LAW, BY ANY PERSON, INCLUDING THE SELLER, THE FAILED THRIFT OR THE FDIC, OR ANY PREDECESSOR OR AFFILIATE OF THE SELLER, THE FAILED THRIFT OR THE FDIC, OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR CONTRACTORS.

(b)    The Purchaser acknowledges that (i) the Seller has performed limited due diligence with respect to the Assets and, therefore, none of the Seller, the Failed Thrift or the FDIC makes (or can make) any representations, warranties or guaranties with respect to the Assets or the presence or absence of Defects, (ii) the statements set forth in Section 6.09 (the "**Asset-Level Statements**") are being provided solely as a means for providing the Purchaser with a basis for a remedy in the event a Defect is discovered, so long as all conditions for obtaining a remedy are otherwise met, (iii) the only remedies available to the Purchaser in connection with any Defect are those that are set forth in Section 7.01, and (iv) in no event will the existence of any Defect be evidence of bad faith, misconduct or fraud, even in the event that it is shown that Seller, the Failed Thrift or the FDIC, or any of their respective directors, employees, officers or agents, knew or should have known of the existence of any facts relating to the existence of such Defect.

(c)    Nothing contained in this Agreement shall be construed as a representation, warranty or guaranty with respect to the Assets or that no Defect exists with respect thereto, whether oral or written, past or present, express or implied or by operation of law, and each of the Seller, the Failed Thrift and the FDIC specifically disclaims, and the Purchaser expressly waives and releases the Seller, the Failed Thrift and the FDIC from, any and all liability or other obligation under this Agreement with respect to any of the following:

(i)    except for the remedies set forth in Section 7.01, any Defect; or

Exhibit 5, Page 261

(ii)     any fraud or misrepresentation of any kind in connection with the origination or servicing of a Loan, whether committed by the mortgagor, the originator, a servicer, an appraiser or any other party involved in the origination or servicing of such Loan; or

(iii)     any underwriting deficiency or failure to properly underwrite a Loan in any way related to any of the following: (x) a failure to properly verify Borrower information, such as income, credit history or rental history, (y) a failure to properly verify the value of the Collateral, including as a result of a fraudulent or inaccurate appraisal or otherwise, or (z) the reliance on any fraudulent or overstated Borrower information or appraisal.

Section 6.02   No Warranties or Representations with Respect to Escrow Accounts. Without limiting the generality of Section 6.01, the Seller makes no warranties or representations of any kind or nature as to the sufficiency of funds held in any escrow account to discharge any obligations related in any manner to an escrow obligation, as to the accuracy of the amount of any monies held in any escrow account or as to the propriety of any previous disbursements or payments from any escrow account.

Section 6.03   No Warranties or Representations as to Amounts of Unfunded Principal. Without limiting the generality of Section 6.01, the Seller makes no warranties or representations of any kind or nature as to the amount of any additional or future Disbursements of Principal the Purchaser may be obligated to make.

Section 6.04   Disclaimer Regarding Calculation or Adjustment of Interest on any Loan. Without limiting the generality of Section 6.01, the Seller makes no warranties or representations of any kind or nature as to the accuracy of any calculation or adjustment of interest on any Loan, including any adjustable rate Loan, whether such calculation or adjustment is made by the Failed Thrift, the FDIC, the Seller or any Affiliate, agent or contractor of any of the foregoing, or any predecessor-in-interest of the Seller or any other party.

Section 6.05   No Warranties or Representations with Regard to Information.  The Seller makes no warranties or representations of any kind or nature as to the completeness or accuracy of any information provided by or on behalf of the Seller with respect to any Loan.   The Purchaser acknowledges that, for example, and not by way of limitation, some Loan Files may be missing forms or notices, or may contain incomplete or inaccurate forms or notices, that may be required by one or more federal or state consumer protection statutes.

Section 6.06   Intervening or Missing Assignments.  The Purchaser acknowledges and agrees that the Seller shall have no obligation to secure or obtain any missing intervening assignment or any assignment to the Seller or the Failed Thrift that is not contained in the Loan File or among the Collateral Documents.  The Purchaser shall bear all responsibility and expense of securing from the appropriate source any intervening assignment or any assignment to the Seller or the Failed Thrift that may be missing from the Collateral Documents.

Section 6.07   No Warranties or Representations as to Documents.  The Seller makes no warranties or representations of any kind or nature as to the effectiveness or enforceability in any

- 28 -

Exhibit 5, Page 262

Foreign Jurisdiction of this Agreement, the Bill of Sale, the Assignment and Assumption of
Interests and Obligations or any other document or instrument delivered or prepared in
connection herewith, whether or not prepared and executed in the forms provided herewith, all of
such forms being provided for reference only.

Section 6.08   <u>Representations and Warranties of the Seller</u>.   The representations and
warranties made by the Seller to the Purchaser with respect to the transactions contemplated
hereby are as set forth in the Master Purchase Agreement.

Section 6.09   <u>Asset-Level Statements With Respect to Loans</u>.   The Seller hereby makes
the following statements with respect to each Loan as of the Closing Date:

(a)   <u>Loan Schedule</u>.   As of the Initial Calculation Date, the information set
forth in the information fields numbered (1) through (10), inclusive, of the Loan Schedule with
respect to the Loans is true and correct in all material respects.

(b)   <u>Original Terms Modified</u>.   The Seller has not agreed to the impairment,
waiver, alteration or modification of any of the terms of any Note or any Mortgage with respect
to the Loan, except with respect to (i) the Loans identified on <u>Schedule 6.09(b)</u> (which have
either been modified or are candidates for modification under the Guidelines), (ii) any other
Loans that become modified or candidates for modification under the Guidelines at any time
prior to the Closing Date, and (iii) Loans for which an impairment, waiver, alteration or
modification has been reduced to a writing and, if required under the laws of the jurisdiction in
which the related Mortgaged Property is located, has been recorded.

(c)   <u>Hazard Insurance</u>.   With respect to each Loan identified on the Loan
Schedule as being a first lien Loan and pursuant to the terms of the related Mortgage, all
buildings or other improvements upon the related Mortgaged Property were insured by an insurer
against loss by fire, hazards of extended coverage and such other hazards as are customary in the
area where the Mortgaged Property is located.

(d)   <u>Compliance with Applicable Laws</u>.   Each Loan was originated in material
compliance with those requirements of Laws applicable to the originator that, if violated, would
render the Loan void, voidable, subject to a right of rescission or unenforceable. Each Servicing-
Released Loan was serviced in material compliance with the requirements of Laws applicable to
the servicer.

(e)   <u>Satisfaction of Mortgage</u>.   No Mortgage relating to any Loan was
satisfied, canceled, subordinated or rescinded, in whole or in part, nor was any of the Mortgaged
Property released from the lien of the related Mortgage, in whole or in part, other than a partial
satisfaction that is in writing and, if required under the Laws of the jurisdiction in which the
related Mortgaged Property is located, recorded, and the terms of which are reflected on the
Loan Schedule.

(f)   <u>Validity of Loan Documents</u>.   Each Note and the Mortgage relating to the
Loan is genuine and is the legal, valid and binding obligation of the maker thereof enforceable in
accordance with its terms, except as enforceability may be limited by (i) applicable bankruptcy,

insolvency, reorganization, moratorium or similar laws affecting or relating to the enforcement of creditors' rights generally and (ii) general principles of equity.

(g)     Ownership/Good Title.   The Seller is the sole owner of the Loans.   The Seller has good and marketable title thereto, and will transfer and sell its rights, title and interest in and to the Loans to the Purchaser free and clear of any Lien, other than any lien in favor of the Federal Home Loan Bank of San Francisco in connection with the Assumed FHLB Financing Balance.

(h)     Title Insurance.   Each Loan is covered by either (i) an attorney's opinion of title and abstract of title, or (ii) an ALTA lender's title insurance policy or other form of policy of insurance, insuring the Seller and its successors and assigns as to the first priority lien, with respect to Loans identified as first lien loans on the Loan Schedule, with such lien being subject only to the following exceptions:

(i)     the lien of current real property taxes and assessments not yet due and payable;

(ii)     covenants, conditions and restrictions, rights of way, easements and other matters of the public record as of the date of recording acceptable to mortgage lending institutions generally and specifically referred to in the lender's title insurance policy delivered to the originator of the Loan and (i) referred to or otherwise considered in the appraisal made for the originator of the Loan or (ii) which do not adversely affect the appraised value of the Mortgaged Property set forth in such appraisal; and

(iii)     other matters to which like properties are commonly subject which do not materially interfere with the benefits of the security intended to be provided by the Mortgage or the use, enjoyment, value or marketability of the related Mortgaged Property.

(i)     Predatory Lending Regulations.   Notwithstanding the statements in Section 6.09(d) above, as of the date of origination, no Loan was (i) subject to the requirements of the Home Ownership and Equity Protection Act of 1994, as amended, or (ii) a "high cost," "threshold," "covered," "abusive" or "predatory" loan or a similar loan under any state, federal or local law applicable to the originator of such Loan as of the date of origination (or similarly classified loan using different terminology under a law enacted to combat predatory lending).

(j)     Escrow Accounts; Escrow Payments.   The information provided to the Purchaser as of the Initial Calculation Date with respect to escrow accounts and escrow payments in connection with the Loans is true and correct in all material respects.

(k)     No Condemnation.   There is no proceeding pending or, to Seller's knowledge, threatened for the total or partial condemnation of any Mortgaged Property relating to the Loan.

(l)     Delinquent Taxes and Insurance Premiums.   With respect to each Loan which is indicated on the Loan Schedule as being a first lien that is less than thirty (30) days delinquent, there are no delinquent taxes or hazard insurance premiums (in each case, after

application of any applicable grace periods) with respect to the Mortgaged Properties relating to the Loan.

(m)   <u>Principal Advances</u>.  With respect to each HELOC, all draws required to be funded have been funded in compliance with the terms and provisions of the Mortgage, Note and related loan agreement, if any.

(n)   <u>Servicing</u>.  Each Servicing-Released Loan has been serviced in material compliance with the terms of the related Mortgage and Note.

## ARTICLE VII

## REMEDIES FOR DEFECTIVE LOANS

Section 7.01   <u>Remedy</u>.  In the event a Defect is discovered with respect to any Loan (a "**Defective Loan**"), then, subject to the terms and conditions of this <u>Article VII</u>, the Seller shall, at the Seller's sole option, take any of the following actions: (i) if the Seller determines that the Defect is curable using commercially reasonable means, either cure the Defect (which may include, among other things, a purchase price adjustment) or require the Purchaser to cure the Defect and then reimburse the Purchaser for reasonable amounts paid by the Purchaser to effect such cure or (ii) repurchase the Defective Loan at the Repurchase Price (each, a "**Remedy**").  IN NO EVENT SHALL ANY DEFECT OR THE OBLIGATION TO PROVIDE A REMEDY HEREUNDER WITH RESPECT TO A DEFECTIVE LOAN BE EVIDENCE OF ANY BAD FAITH, MISCONDUCT OR FRAUD ON THE PART OF THE SELLER, THE FAILED THRIFT OR THE FDIC EVEN IF IT IS SHOWN THAT THE SELLER, THE FAILED THRIFT OR THE FDIC, OR ANY AFFILIATE THEREOF, OR ANY OF THEIR RESPECTIVE DIRECTORS, EMPLOYEES, OFFICERS, CONTRACTORS OR AGENTS, (A) KNEW OR SHOULD HAVE KNOWN OF THE EXISTENCE OF ANY FACTS RELATING TO SUCH DEFECT, (B) CAUSED SUCH DEFECT OR (C) FAILED TO MITIGATE SUCH DEFECT OR ANY OF THE LOSSES RESULTING THEREFROM.

Section 7.02   <u>Conditions Precedent to Remedy</u>.  The obligation of the Seller to provide a Remedy for any Defective Loan is contingent upon the satisfaction (as determined by the Seller in its sole discretion) or waiver (which may be granted by the Seller in its sole discretion) of each of the following conditions:

(a)   the Purchaser has delivered the Defect Notice (as defined below) and any supporting evidence required by <u>Section 7.03</u> to the Seller on or prior to the Claims Termination Date, and has provided the Seller with all additional supporting evidence requested by the Seller pursuant to, and within the timeframe set forth in, <u>Section 7.03</u>;

(b)   the Purchaser has demonstrated to the Seller's satisfaction that the Defect materially and adversely affects the value, the marketability or the saleability of the Defective Loan;

(c)   neither the Purchaser nor the Purchaser's servicer has caused the Defect or has taken any action or omitted to take any action (other than as required by <u>Section 7.02(d)</u>) with respect to the Defective Loan that (x) materially and adversely affects the Seller's ability to

process the request for, or provide, a Remedy, or (y) materially and adversely affects the ability or increases the cost to cure the Defect, or the Seller's ability to mitigate Losses, or otherwise results in a Loss (including any Excluded Losses) to the Seller;

(d)    in servicing the Defective Loan, the Purchaser or the Purchaser's servicer has complied in all material respects with the Guidelines and, to the extent not inconsistent with the Guidelines, has serviced the Defective Loan in accordance with the customary and usual standards of practice of prudent servicers servicing similar assets; and

(e)    the Purchaser has taken such additional actions that the Seller may have reasonably requested in order to mitigate Losses.

Section 7.03   Notice and Evidence of Defect.  The Purchaser shall notify the Seller of each Defective Loan with respect to which the Purchaser seeks a Remedy under Section 7.01 promptly upon discovery of the Defect, but in any event no later than ten (10) Business Days after the last day of the month in which such discovery occurs.  Such notice (the "**Defect Notice**") shall be in writing on the Purchaser's letterhead and shall include the following information:

(a)    the Purchaser's tax identification number and wire transfer instructions;

(b)    the identification of the particular Asset-Level Statement in Section 6.09 of this Agreement that the Purchaser believes was untrue as to the Loan at the time such statement was made;

(c)    evidence supporting the basis for requesting a Remedy and the satisfaction of the conditions precedent to the Seller's obligation to provide a Remedy or, if any conditions precedent have not been satisfied, a request for a waiver of such conditions precedent, including the reasons why the Purchaser believes such waiver should be granted;

(d)    information regarding any commercially reasonable means of curing the Defect that are available to the Purchaser and the estimated cost of effecting any such cure; and

(e)    a certification by the Purchaser that the Defect Notice is being submitted in good faith and is complete and accurate in all respects to the best of the Purchaser's knowledge.

Promptly upon request by the Seller, but in any event no later than ten (10) Business Days thereafter, the Purchaser shall supply the Seller with any additional evidence or information that the Seller may reasonably request.

Section 7.04   Processing of the Remedy Request; Purchaser Cure.

(a)    Within a reasonable period of time following the receipt by the Seller of the Defect Notice and all additional information that the Seller may have requested pursuant to Section 7.03, the Seller will notify the Purchaser as to whether the request for a Remedy with respect to a Defective Loan has been accepted or rejected and, if accepted, the Remedy that the Seller expects to provide and the expected timing for such Remedy.

- 32 -

Exhibit 5, Page 266

(b)     If the Seller notifies the Purchaser that the Remedy will be a reimbursement to the Purchaser for amounts paid to third parties to cure the Defect and that the Purchaser's proposed means of curing the Defect and the Purchaser's estimated cost thereof is acceptable to the Seller, the Purchaser shall promptly effect such cure using the means specified in the Defect Notice and submit documentation to the Seller regarding the actual costs incurred; provided, however, that the Purchaser shall not, without the prior written consent of the Seller, incur any cost to cure the Defect that is materially in excess of the estimate set forth in the Defect Notice.  If the Seller does not agree to the proposed cure and cost thereof specified in the Defect Notice, the Purchaser shall promptly effect such other commercially reasonable cure as may be directed in writing by the Seller, and the Seller shall reimburse the Purchaser for all costs of effecting such cure.   Notwithstanding the foregoing, the Seller shall have no obligation to reimburse the Purchaser for any cure costs unless the Purchaser has demonstrated to the satisfaction of the Seller that such costs are not recoverable from the borrower under the Defective Loan or from any other source.   In addition, the Purchaser agrees that the reimbursement of cure costs by the Seller may be conditioned on the Seller's receipt of an undertaking by the Purchaser to repay such costs to the Seller if such costs are recovered from any source at any time after payment thereof by the Seller to the Purchaser.

(c)     Subject to the terms and conditions of this Article VII, the Seller will use commercially reasonable efforts to provide the selected Remedy to the Purchaser within sixty (60) days after providing the above-referenced notice to the Purchaser or, if the Remedy is to reimburse the Purchaser for amounts paid to cure the Defect, within sixty (60) days after the Purchaser submits satisfactory documentation thereof to the Seller.

Section 7.05   Re-delivery of Notes, Files and Documents.  If the Remedy to be provided by the Seller pursuant to Section 7.01 is the repurchase of the Defective Loan, the Purchaser shall, as applicable: (i) re-endorse and deliver the Note to the Seller (or its designee), (ii) assign all Collateral Documents associated with such Defective Loan and reconvey any real property subject to a Contract for Deed or transferred by special warranty deed pursuant to Section 2.13 of this Agreement, and execute and deliver such other documents or instruments as shall be necessary or appropriate to convey the Defective Loan to the Seller (or its designee), (iii) deliver to the Seller (or its designee) the Loan File, along with any additional records compiled or accumulated by the Purchaser pertaining to the Defective Loan, (iv) take such actions as are necessary to transfer from the Purchaser to the Seller any litigation or bankruptcy action involving the Defective Loan in accordance with the provisions of Sections 5.05 and 5.06, as applicable, substituting the duties of the Purchaser for the Seller and the Seller for the Purchaser, and with respect to the Affidavit and Assignment of Claim, a form of which is attached as Attachment B, substituting the duties of the Assignor (as defined therein) for the Assignee (as defined therein) and the Assignee for the Assignor, and (v) deliver to the Seller (or its designee) a certification, notarized and executed under penalty of perjury by a duly authorized representative of the Purchaser, certifying that, as of the date of repurchase by the Seller, neither the Purchaser nor the Purchaser's servicer has taken any of the actions set forth in clauses (i) through (xiii) of Section 7.06.  The documents evidencing such conveyance shall be substantially the same as those executed pursuant to Article III of this Agreement to convey the Defective Loan to the Purchaser.   In all cases in which the Purchaser recorded or filed among public records any document or instrument evidencing a transfer of the Defective Loan to the

- 33 -

Exhibit 5, Page 267

Purchaser, the Purchaser shall cause to be recorded or filed among such records a similar document or instrument evidencing the conveyance of the Defective Loan to the Seller.

Section 7.06    Waiver of Remedy.   Except as provided in Section 7.07, the Seller may determine that it will not repurchase any Defective Loan if, without the prior written consent of the Seller, the Purchaser or the Purchaser's servicer:  (i) modifies any of the terms of the Defective Loan (including the terms of any Collateral Document or Contract for Deed); (ii) exercises forbearance with respect to any scheduled payment on the Defective Loan; (iii) accepts or executes new or modified lease documents assigned by the Seller to the Purchaser with respect to the Defective Loan; (iv) sells, assigns or transfers the Defective Loan or any interest therein; (v) fails to employ usual and customary care in the maintenance, collection, servicing and preservation of the Defective Loan, including usual and customary delinquency prevention, collection procedures and protection of the Collateral as warranted; (vi) initiates any litigation in connection with the Defective Loan or the related Collateral other than litigation to force payment or to realize on the Collateral securing the Defective Loan; (vii) completes any action with respect to foreclosure on, or accepts a deed-in-lieu of foreclosure for any Collateral securing the Defective Loan; (viii) causes, by action or inaction, the priority of title to the Defective Loan, Mortgaged Property and other related security to be lower in priority than the priority of title that existed at the time the Defective Loan was conveyed by the Seller; (ix) causes, by action or inaction, the security for the Defective Loan to be different than that conveyed by the Seller, except as may be required by the terms of the Collateral Documents; (x) causes, by action or inaction, a claim of third parties to arise against the Purchaser that, as a result of repurchase of the Defective Loan under this Agreement, might be asserted against the Seller; (xi) causes, by action or inaction, a Lien with respect to the Defective Loan to arise (other than a Lien in favor of the Seller); (xii) is the Borrower or any Related Party under such Defective Loan; or (xiii) makes a disbursement in respect of the Defective Loan other than an Advance, a Corporate Advance or the funding of a draw with respect to a HELOC, unless any of the foregoing actions are permitted by the Guidelines, to the extent applicable to such action. With respect to any Defective Loan that fails to qualify for a repurchase because of any of the foregoing actions or inactions of the Purchaser or the Purchaser's servicer, if the Seller determines that a Defect is not curable using commercially reasonable means, and the Purchaser has not proposed an alternate cure that is reasonably acceptable to the Seller, then, unless the Seller waives the restrictions of this Section 7.06, the Seller will be relieved of its obligation to provide any Remedy for such Defect.

Section 7.07    Predatory Lending Defects.   Notwithstanding anything herein to the contrary, if the Seller becomes aware of any failure of Section 6.09(i) to be true with respect to any Loan as of the date such statement was made (a "**Predatory Lending Defect**"), then the Seller shall have the right to repurchase such Loan from the Purchaser, and the Purchaser shall sell such Loan to the Seller, at the Repurchase Price, regardless of whether the conditions set forth in Section 7.02 have been satisfied and regardless of whether the Purchaser has submitted a Defect Notice with respect to such Loan. In connection with any such repurchase, the Purchaser shall comply with Section 7.05 (except that the Purchaser need not deliver the certification required in clause (iv) thereof).   The Seller's repurchase of any Loan pursuant to this Section 7.07 shall be the sole Remedy available to the Purchaser in the event of a Predatory Lending Defect, whether the Seller exercises its right under this Section 7.07 or the Purchaser provides a Defect Notice with respect to any such Defect.

Exhibit 5, Page 268

Section 7.08   Seller Loss Limit; Satisfaction of Obligation to Provide Remedy.   The Seller's obligation to provide a Remedy hereunder in respect of Defective Loans shall cease at such time as the aggregate payments made by the Seller (including payments made by the Seller to third parties to cure Defects) under this Article VII (including purchase price adjustments) equals or exceeds the aggregate purchase price of the Loans (after taking into account any adjustment in the purchase price due to prorations or set-off amounts), and the Seller shall have no liability for the cost of any Remedy to the extent such cost exceeds such amount.   At such time as the Seller shall have provided a Remedy with respect to a Defect, the Purchaser shall have no further or additional rights to, and shall be deemed to have released the Seller from any obligation to provide, any additional or different Remedy with respect to such Defect.   If the Seller repurchases a Defective Loan, the Purchaser shall have no further or additional rights to, and shall be deemed to have released the Seller from any obligation to provide, any additional or different remedy or any loss-sharing under the Shared-Loss Agreement with respect to such Defective Loan, even if a Defect other than the one specified in the Defect Notice is subsequently identified.

## ARTICLE VIII

## CONDITIONS PRECEDENT TO CLOSING

Section 8.01   Conditions to Purchaser's Obligation.   The obligation of the Purchaser to effect the Closing hereunder is subject to the satisfaction (or waiver by the Purchaser) of all of the conditions set forth in Section 14.01 of the Master Purchase Agreement (subject to the introductory paragraph of Article XIV of the Master Purchase Agreement).

Section 8.02   Conditions to Seller's Obligation.   The obligation of the Seller to effect the Closing hereunder is subject to the satisfaction (or waiver by the Seller) of all of the conditions set forth in Section 14.02 of the Master Purchase Agreement (subject to the introductory paragraph of Article XIV of the Master Purchase Agreement).

## ARTICLE IX

## NOTICES

Section 9.01   Notices.   All notices, requests, demands and other communications required or permitted to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be given by certified or registered mail, postage prepaid, or delivered by hand or by nationally recognized air courier service, directed to the address of such Person as set forth in the applicable Section of this Article IX.   Any such notice shall become effective when received (or receipt is refused) by the addressee, provided that any notice or communication that is received (or refused) other than during regular business hours of the recipient shall be deemed to have been given at the opening of business on the next Business Day of the recipient.   From time to time, any Person may designate a new address for purposes of notice hereunder by notice to such effect to the other Persons identified in this Article IX.

- 35 -

Exhibit 5, Page 269

Section 9.02   <u>Article VII Notice</u>.  Any notice, request, demand or other communication required or permitted to be given to the Seller pursuant to the provisions of <u>Article VII</u> shall be delivered to:

Seller:

Manager, Structured Transactions
c/o Federal Deposit Insurance Corporation
550 17th Street, NW (Room F-7008)
Washington, D.C.  20429-0002
Attention:  George Alexander

with a copy to:

Senior Counsel
FDIC Legal Division
Litigation and Resolutions Branch, Receivership Section
Special Issues Unit
3501 Fairfax Drive (Room E-7056)
Arlington, Virginia 22226
Attention:  David Gearin

Section 9.03   <u>All Other Notices</u>.  Any notice, request, demand or other communication required or permitted to be given pursuant to any provision of this Agreement and that is not governed by the provisions of <u>Section 9.02</u> shall be delivered to:

Purchaser:

888 East Walnut Street
Pasadena, California 91101-7211
Attention:  Steven Mnuchin

with a copy to:

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006
Attention: Paul E. Glotzer

Seller:

Manager, Capital Markets & Resolutions
c/o Federal Deposit Insurance Corporation
550 17th Street, NW (Room F-7008)
Washington, D.C.  20429-0002
Attention:  George Alexander

with a copy to:

Senior Counsel
FDIC Legal Division
Litigation and Resolutions Branch, Receivership Section
Special Issues Unit
3501 Fairfax Drive (Room E-7056)
Arlington, Virginia 22226
Attention:  David Gearin

Exhibit 5, Page 270

## ARTICLE X

## MISCELLANEOUS PROVISIONS

Section 10.01 <u>Severability</u>.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall be ineffective, but such ineffectiveness shall be limited as follows:  (i) if such provision is prohibited or unenforceable in such jurisdiction only as to a particular Person or Persons and/or under any particular circumstance or circumstances, such provision shall be ineffective, but only in such jurisdiction and only with respect to such particular Person or Persons and/or under such particular circumstance or circumstances, as the case may be; (ii) without limitation of clause (i), such provision shall in any event be ineffective only as to such jurisdiction and only to the extent of such prohibition or unenforceability, and such prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction; and (iii) without limitation of clauses (i) or (ii), such ineffectiveness shall not invalidate any of the remaining provisions of this Agreement.  Without limitation of the preceding sentence, it is the intent of the parties to this Agreement that in the event that in any court proceeding, such court determines that any provision of this Agreement is prohibited or unenforceable in any jurisdiction (because of the duration or scope (geographic or otherwise) of such provision, or for any other reason) such court shall have the power to, and shall, (x) modify such provision (including without limitation, to the extent applicable, by limiting the duration or scope of such provision and/or the Persons against whom, and/or the circumstances under which, such provision shall be effective in such jurisdiction) for purposes of such proceeding to the minimum extent necessary so that such provision, as so modified, may then be enforced in such proceeding and (y) enforce such provision, as so modified pursuant to clause (x), in such proceeding.  Nothing in this Section is intended to, or shall, limit (1) the ability of any party to this Agreement to appeal any court ruling or the effect of any favorable ruling on appeal or (2) the intended effect of <u>Section 10.02</u>.

Section 10.02 <u>Governing Law</u>.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL LAW, BUT IF FEDERAL LAW DOES NOT PROVIDE A RULE OF DECISION IT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK (EXCLUDING ANY CONFLICT OF LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE OR THE CONSTRUCTION OF THIS AGREEMENT TO THE LAW OF ANOTHER JURISDICTION).  Nothing in this Agreement shall require any unlawful action or inaction by any party hereto.

Section 10.03 <u>Waivers; Amendment and Assignment</u>.  No provision of this Agreement may be amended or waived except in writing executed by all of the parties to this Agreement.  This Agreement and the terms, covenants, conditions, provisions, obligations, undertakings, rights and benefits hereof shall be binding upon, and shall inure to the benefit of, the undersigned parties and their respective heirs, executors, administrators, representatives, successors and permitted assigns, and no other Person or Persons (including Borrowers or any co-lender or other Person with any interest in or liability under any of the Loans) shall have any rights or remedies under or by reason of this Agreement.  Notwithstanding the foregoing, this Agreement may not be transferred or assigned without the express prior written consent of the Seller and any attempted assignment without such consent shall be void *ab initio*.

- 37 -

Section 10.04 <u>No Presumption</u>.  This Agreement shall be construed fairly as to each party hereto and if at any time any such term or condition is desired or required to be interpreted or construed, no consideration shall be given to the issue of who actually prepared, drafted or requested any term or condition of this Agreement or any agreement or instrument subject hereto.

Section 10.05 <u>Entire Agreement</u>.  This Agreement and the Ancillary Documents contain the entire agreement between the Seller and the Purchaser and/or its Affiliates with respect to the subject matter hereof and supersede any and all other prior agreements, whether oral or written. In the event of a conflict between the terms of this Agreement and the terms of any Transfer Document or other document or instrument executed in connection herewith or in connection with the transactions contemplated hereby, including any translation into a foreign language of this Agreement for the purpose of any Transfer Document, or any other document or instrument executed in connection herewith which is prepared for notarization, filing or any other purpose, the terms of this Agreement shall control, except that, in the event of a conflict with the terms of the Shared-Loss Agreement, the terms of the Shared-Loss Agreement control.  Furthermore, subject to the exception in the preceding sentence, the terms of this Agreement shall in no way be or be deemed to be amended, modified or otherwise affected in any manner by the terms of such Transfer Document or other document or instrument.

Section 10.06 <u>Jurisdiction; Venue and Service</u>.  Each of the Purchaser, for itself and its Affiliates, and the Seller hereby irrevocably and unconditionally:

(a)   (i) agrees that any suit, action or proceeding instituted against it by any other party with respect to this Agreement may be instituted, and that any suit, action or proceeding by it against any other party with respect to this Agreement shall be instituted, only in the United States District Court for the Southern District of New York or the United States District Court for the District of Columbia (and appellate courts from any of the foregoing), (ii) consents and submits, for itself and its property, to the jurisdiction of such courts for the purpose of any such suit, action or proceeding instituted against it by any other party and (iii) agrees that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law;

(b)   agrees that service of all writs, process and summonses in any suit, action or proceeding pursuant to <u>Section 10.06(a)</u> may be effected by the mailing of copies thereof by registered or certified mail, postage prepaid, at its address for notices pursuant to <u>Article IX</u> (with copies to such other Persons as specified therein); <u>provided</u>, <u>however</u>, that nothing contained in this <u>Section 10.06</u> shall affect its ability to be served process in any other manner permitted by Law;

(c)   (i) waives any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement brought in any court specified in <u>Section 10.06(a)</u>, (ii) waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum and (iii) agrees not to plead or claim either of the foregoing; and

- 38 -

(d)     agrees that nothing contained in this <u>Section 10.06</u> shall be construed as a limitation on any removal rights the FDIC may have.

Section 10.07  <u>Waiver of Jury Trial</u>. EACH OF THE PURCHASER, FOR ITSELF AND ITS AFFILIATES, AND THE SELLER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY OF ANY DISPUTE ARISING OUT OF OR RELATING TO THIS AGREEMENT AND AGREES THAT ANY SUCH DISPUTE SHALL BE TRIED BEFORE A JUDGE SITTING WITHOUT A JURY.

Section 10.08  <u>Counterparts; Facsimile Signatures</u>.  This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original but all of which together shall constitute but one and the same agreement.  This Agreement and any amendments hereto, to the extent signed and delivered by facsimile or other electronic means, shall be treated in all manner and respects as an original agreement and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  No signatory to this Agreement shall raise the use of a facsimile machine or other electronic means to deliver a signature or the fact that any signature or agreement was transmitted or communicated through the use of a facsimile machine or other electronic means as a defense to the formation or enforceability of a contract and each such Person forever waives any such defense.

Section 10.09  <u>Headings</u>.  Section titles or captions contained in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provisions hereof.  All Section and paragraph references contained herein shall refer to Sections and paragraphs in this Agreement unless otherwise specified.

Section 10.10  <u>Compliance with Law</u>.  Except as otherwise specifically provided herein, each party to this Agreement shall, at its own cost and expense, obey and comply with all applicable Laws, as they may pertain to such party's performance of its obligations hereunder.

Section 10.11  <u>Right to Specific Performance</u>.  THE PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT THE DAMAGES TO BE INCURRED BY THE SELLER AS A RESULT OF THE PURCHASER'S BREACH OF THIS AGREEMENT WILL BE DIFFICULT, IF NOT IMPOSSIBLE, TO ASCERTAIN, THAT DAMAGES WILL NOT BE AN ADEQUATE REMEDY AND THAT ANY BREACH OR THREATENED BREACH OF ANY OF THE PROVISIONS OF THIS AGREEMENT BY THE PURCHASER MAY CAUSE IMMEDIATE IRREPARABLE HARM FOR WHICH THERE MAY BE NO ADEQUATE REMEDY AT LAW.  ACCORDINGLY, THE PARTIES AGREE THAT, IN THE EVENT OF ANY SUCH BREACH OR THREATENED BREACH, THE SELLER SHALL BE ENTITLED TO IMMEDIATE AND PERMANENT EQUITABLE RELIEF (INCLUDING INJUNCTIVE RELIEF AND SPECIFIC PERFORMANCE OF THE PROVISIONS OF THIS AGREEMENT) FROM A COURT OF COMPETENT JURISDICTION (IN ADDITION TO ANY OTHER REMEDY TO WHICH IT MAY BE ENTITLED AT LAW OR IN EQUITY).  THE PARTIES AGREE AND STIPULATE THAT THE SELLER SHALL BE ENTITLED TO EQUITABLE (INCLUDING INJUNCTIVE) RELIEF WITHOUT POSTING A BOND OR OTHER SECURITY AND THE PURCHASER

Exhibit 5, Page 273

FURTHER WAIVES ANY DEFENSE IN ANY SUCH ACTION FOR SPECIFIC PERFORMANCE OR INJUNCTIVE RELIEF THAT A REMEDY AT LAW WOULD BE ADEQUATE AND ANY REQUIREMENT UNDER LAW TO POST SECURITY AS A PREREQUISITE TO OBTAINING EQUITABLE RELIEF.   NOTHING CONTAINED IN THIS SECTION SHALL LIMIT EITHER PARTY'S RIGHT TO ANY REMEDIES AT LAW, INCLUDING THE RECOVERY OF DAMAGES FOR BREACH OF THIS AGREEMENT.

Section 10.12 <u>No Third Party Beneficiaries</u>.  This Agreement is made for the sole benefit of the Seller and the Purchaser and their respective successors and permitted assigns, and no other Person or Persons (including any Borrower or co-lender or other Person with any interest in or liability under any of the Loans) shall have any rights or remedies under or by reason of this Agreement.   Notwithstanding the foregoing, the FDIC shall be considered a third party beneficiary to this Agreement.

Section 10.13 <u>Timing</u>.  The Purchaser agrees that, although the Seller has agreed to use commercially reasonable efforts to take certain actions pursuant to this Agreement within specified periods of time, the failure of the Seller to take any such actions within such specified periods of time shall not be dispositive evidence of a breach by the Seller of this Agreement.

Section 10.14 <u>Survival</u>.   The covenants, representations and warranties in this Agreement shall survive the execution of this Agreement and the consummation of the transactions contemplated hereunder.

Section 10.15 <u>Termination</u>.  This Agreement shall terminate upon the termination of the Master Purchase Agreement in accordance with its terms.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Exhibit 5, Page 274

IN WITNESS WHEREOF, the parties hereto have caused this Loan Sale Agreement to be executed as of the day and year first above written.

**SELLER:**

FEDERAL DEPOSIT INSURANCE
CORPORATION AS RECEIVER FOR
INDYMAC FEDERAL BANK, FSB

By: _George C. Alfaol_

Name: George C. Alexander

Title: Manager, Structured Transactions

**PURCHASER:**

ONEWEST BANK, FSB

By: _____

Name: Joshua P. Eaton
Title: Authorized Signatory

*Group 5 - Loan Sale Agreement*

Exhibit 5, Page 275

IN WITNESS WHEREOF, the parties hereto have caused this Loan Sale Agreement to be executed as of the day and year first above written.

**SELLER:**

FEDERAL DEPOSIT INSURANCE
CORPORATION AS RECEIVER FOR
INDYMAC FEDERAL BANK, FSB

By: _____
    Name:
    Title:

**PURCHASER:**

ONEWEST BANK, FSB

By: _____
    Name:  Joshua P. Eaton
    Title:  Authorized Signatory

*Group 5 - Loan Sale Agreement*

Exhibit 5, Page 276

**<u>ATTACHMENT A</u>**

**LOAN SCHEDULE**

**[Attached]**

A-1

## ATTACHMENT B

## AFFIDAVIT AND ASSIGNMENT OF CLAIM

### (For use with Loans in Bankruptcy)

*(Note to Preparer:  When preparing the actual Affidavit and Assignment, delete this instruction and the reference to Attachment B above.)*

State of  _____ )
                                              )
County of  _____ )

The undersigned, being first duly sworn, deposes and states as follows:

The Federal Deposit Insurance Corporation as Receiver for IndyMac Federal Bank, FSB ("Assignor"), acting by and through its duly authorized officers and agents, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, does hereby sell, transfer, assign and set over to [_____], a *{insert type of entity}* ("Assignee") and its successors and assigns, all of the Assignor's interest in any claim (including any and all proofs of claim filed by the Assignor with the Bankruptcy Court (as defined below) in respect of such claim) in the bankruptcy case commenced by or against *{insert Obligor's name}* ("Obligor") in the *{insert (1) appropriate U. S. Bankruptcy Court, including the district of the court, such as for the Western District of Texas, or (2) the Foreign Jurisdiction Bankruptcy Court}* ("Bankruptcy Court") being designated as Case Number *{insert docket number assigned case}* ("Bankruptcy Claim"), or such part of said Bankruptcy Claim as is based on the promissory note of *{insert the names of the makers of the note exactly as they appear on the note}*, dated *{insert the date the note was made}*, and made payable to *{insert the name of the payee on the note exactly as it appears on the note}*, provided, however, that this assignment is made pursuant to the terms and conditions as set forth in that certain Loan Sale Agreement between the Assignor and the Assignee dated [_____], 2009 (the "Agreement").

For purposes of Rule 3001 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rule 3001"), this assignment and affidavit represent the unconditional transfer of the Bankruptcy Claim or such part of the Bankruptcy Claim as is based on the promissory note or notes described above and shall constitute the statement of the transferor acknowledging the transfer and stating the consideration therefor as required by said Bankruptcy Rule 3001.  The Assignor hereby waives any objection to the transfer of the Bankruptcy Claim to the Assignee to the extent set forth above on the books and records of the Obligor and the Bankruptcy Court, and hereby waives to the fullest extent permitted by law any notice or right to a hearing as may be imposed by Bankruptcy Rule 3001, the Bankruptcy Code, applicable local bankruptcy rules or applicable law with respect to the Bankruptcy Claim to such extent.  The Assignor acknowledges and understands, and hereby stipulates, that an order of the Bankruptcy Court may be entered without further notice to the Assignor transferring to the Assignee the Bankruptcy Claim to the extent set forth above and recognizing the Assignee as the sole owner and holder of the Bankruptcy Claim to such extent.  The Assignor further notifies the Obligor, the Bankruptcy Court and all other interested parties that all further notices relating to the Bankruptcy Claim to such extent, and all

B-1

Exhibit 5, Page 278

payments or distributions of money or property in respect of the Bankruptcy Claim to such extent, shall be delivered or made to the Assignee.

This transfer was not for the purpose of the enhancement of any claim in a pending bankruptcy.  The transfer of the debt was pursuant to the Agreement, through which numerous debts were sold; no specific amount of the total consideration was assigned to the debt that forms the basis of claim.

This assignment shall also evidence the unconditional transfer of the Assignor's interest in any security held for the Bankruptcy Claim.

IN WITNESS WHEREOF, the Assignor has caused this Affidavit and Assignment of Claim to be executed this ___ day of _____, 20__.

FEDERAL DEPOSIT INSURANCE
CORPORATION AS RECEIVER
FOR INDYMAC FEDERAL BANK, FSB


By:_____
    Name:
    Title:  Attorney-in-Fact

B-2

Exhibit 5, Page 279

## ACKNOWLEDGMENT

STATE OF _____ )
                                )
COUNTY OF _____ )

        Before me, the undersigned authority, a Notary Public in and for the county and state aforesaid, on this day personally appeared _____, known to me to be the person whose name is subscribed to the foregoing instrument, as Attorney-in-Fact of the Federal Deposit Insurance Corporation acting in the capacity stated above, and acknowledged to me that s/he executed the same as the act of the Federal Deposit Insurance Corporation, for the purposes and consideration therein expressed, and in the capacity therein stated.

        Given under my hand and seal of office on this the ___ day of _____, 20__.

                                     _____
                                       Notary Public

[SEAL]                        My Commission expires: _____

Exhibit 5, Page 280

## ATTACHMENT C

## ASSIGNMENT AND ASSUMPTION OF INTERESTS AND OBLIGATIONS

*(Note to FDIC Preparer:  When preparing the actual Assignment, delete this instruction and the reference to Attachment C above.)*

THIS ASSIGNMENT AND ASSUMPTION OF INTERESTS AND OBLIGATIONS ("Assignment") is made and entered into as of the _____ day of _____, 20__ by and between the Federal Deposit Insurance Corporation as Receiver for IndyMac Federal Bank, FSB("Assignor") and OneWest Bank, FSB ("Assignee").

Whereas, Assignor and Assignee have entered into that certain Loan Sale Agreement, dated March 19, 2009 (the "LSA"), pursuant to which Assignor has agreed to sell, assign, transfer and convey to Assignee all the assets identified on <u>Exhibit A</u> attached to this Agreement (the "Assets").  Capitalized terms used herein but not defined herein shall have the meanings set forth in the LSA.  *(Note to Preparer:  Attach Exhibit A which should be the same as Attachment A to the LSA, which shall be as of the Initial Calculation Date and shall be updated after the Closing Date to reflect Closing Date balances.)*

Whereas, pursuant to a Bill of Sale of even date herewith, Assignor has conveyed to Assignee that part of the Assets which consists of tangible personal property.

Whereas, part of the Assets may consist of documents and instruments evidencing loans (including, without limitation, promissory notes, loan agreements, shared credit or participation agreements, inter-creditor agreements, letters of credit, reimbursement agreements, drafts, bankers' acceptances, transmission system confirmations of transaction and other evidences of indebtedness, including loan histories, affidavits, general collection information, correspondence and comments pertaining to such obligations) and equipment leases (the "Agreements to Pay").

Whereas, another part of the Assets may consist of documents securing Agreements to Pay, such as mortgages, deeds of trust, security agreements, loan agreements and other documents or instruments of similar nature relating to the Agreements to Pay (the "Collateral Documents").

Whereas, another part of the Assets may consist of real estate, Contracts for Deed to real estate, and leases, tenancies, concessions, licenses and other rights of occupancy or use related to real estate (including any security deposits relating thereto in Assignor's possession) (the "Real Estate Interests").

Whereas, another part of the Assets may be affected by contracts relating to the Assets, such as collection and service agreements, including with respect to the LSBOs any servicing agreements pursuant to which the LSBOs are being serviced by a third party (the "Miscellaneous Agreements").   The term "Miscellaneous Agreements" does not include loan servicing agreements between Assignor and independent contractors.

Exhibit 5, Page 281

Whereas, under the LSA, Assignor has agreed to assign and convey to Assignee all of Assignor's right, title and interest to the Agreements to Pay, the Collateral Documents, the Real Estate Interests and the Miscellaneous Agreements related to the Assets.

Whereas, Assignee has agreed to accept and assume all of Assignor's duties, obligations and liabilities under the Agreements to Pay, Collateral Documents, Real Estate Interests and Miscellaneous Agreements related to the Assets (the "Obligations").

Whereas, the term "Advances" as used herein means the sum of all unreimbursed amounts advanced by or on behalf of the Assignor, the Failed Thrift, IndyMac Federal or their respective predecessors-in-interest (i) to protect the noteholder's lien position or the collateral, including payment of ad valorem taxes and hazard and forced placed insurance as permitted by the terms of any loan, or (ii) to meet required scheduled payments.  The term "Advances" does not include (A) incremental funding of loan proceeds under an Agreement to Pay, such as in the case of a revolving credit loan or a construction loan, or (B) the payment of appraisal fees, broker opinion fees, attorney fees and associated legal fees, foreclosure fees, trustee fees, property inspection fees, property preservation and operating cost fees, tax penalties, title policies, lien search fees, or any other cost that can be directly associated with the collection and servicing of a loan.

NOW THEREFORE, in consideration of the foregoing and the sum of ten dollars ($10.00), and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee hereby agree as follows:

1.    Assignor's Assignment.  Assignor hereby transfers, grants, conveys and assigns to Assignee all of Assignor's right, title and interest in the Agreements to Pay, the Collateral Documents, the Real Estate Interests and the Miscellaneous Agreements.

2.    Assignee's Acceptance.   Assignee does hereby accept such assignment from Assignor and assumes all Obligations arising from and after the date hereof.  The Obligations assumed include, without limitation, any and all obligations to (i) make payments relating to Agreements to Pay serviced by Assignor; (ii) make Advances with respect to Agreements to Pay serviced by Assignor, (iii) reimburse third party servicers for Advances on Agreements to Pay, and (iv) make incremental disbursements of loan proceeds, such as in the case of a revolving credit loan or a construction loan.

4.    Beneficiaries of this Assignment.  This Assignment shall be binding upon and shall inure to the benefit of Assignor and Assignee and their respective successors and assigns, and the Federal Deposit Insurance Corporation in its corporate capacity shall be a third-party beneficiary with respect hereto.

5.    Incorporation of terms of LSA.  This Assignment is made, executed and delivered pursuant to the LSA, and is subject to all of the terms, provisions and conditions thereof.  In the event of any conflict between the LSA and this Assignment, the LSA shall govern.

6.    Controlling Law.  Federal law of the United States shall control this Agreement.  To the extent that federal law does not supply a rule of decision, this Agreement shall be

Exhibit 5, Page 282

governed by, and construed and enforced in accordance with, the laws of the State of New York. Nothing in this Agreement will require any unlawful action or inaction by either party.

7.    <u>Counterparts</u>.  This Assignment may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

IN WITNESS WHEREOF, each of the parties has caused this Assignment and Assumption of Interests and Obligations to be executed and delivered by its duly authorized officer or agent as of the day and year first written above.

**ASSIGNOR:**

FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR INDYMAC FEDERAL BANK, FSB

By: _____          By: _____
     Name: _____                    Name: _____
            Witness                              Title: _____

**ASSIGNEE:**

ONEWEST BANK, FSB

By: _____          By: _____
     Name: _____                    Name: _____
            Witness                              Title: _____

Exhibit 5, Page 283

## ACKNOWLEDGMENT

STATE OF _____)

                            )

COUNTY OF _____)

      Before me, the undersigned authority, a Notary Public in and for the county and state aforesaid, on this day personally appeared _____, known to me to be the person whose name is subscribed to the foregoing instrument, as _____ of the Federal Deposit Insurance Corporation as Receiver for IndyMac Federal Bank, FSB and acknowledged to me that s/he executed the same as the act of the Federal Deposit Insurance Corporation, for the purposes and consideration therein expressed, and in the capacity therein stated.

      Given under my hand and seal of office on this the __ day of _____, 20__.

_____

Notary Public

[SEAL]               My Commission expires: _____

Exhibit 5, Page 284

## ACKNOWLEDGMENT

STATE OF _____)
                        )
COUNTY OF _____)

     Before me, the undersigned authority, a Notary Public in and for the county and state aforesaid, on this day personally appeared _____, known to me to be the person whose name is subscribed to the foregoing instrument, as _____ of OneWest Bank, FSB and acknowledged to me that s/he executed the same as the act of the Federal Deposit Insurance Corporation, for the purposes and consideration therein expressed, and in the capacity therein stated.

     Given under my hand and seal of office on this the __ day of _____, 20__.

_____
Notary Public

[SEAL]                                My Commission expires: _____

Exhibit 5, Page 285

## ATTACHMENT D

## ASSIGNMENT AND LOST INSTRUMENT AFFIDAVIT

*(Note to Preparer:  When preparing the actual Affidavit delete this instruction and the reference to Attachment D above.)*

STATE OF _____ )

)

COUNTY OF _____ )

Before me, the undersigned authority, personally appeared _____, who upon being duly cautioned and sworn deposes and says, to the best of his /her knowledge, as follows:

1.      That s/he is the Attorney-in-Fact for the Federal Deposit Insurance Corporation (the "FDIC") as Receiver for IndyMac Federal Bank, FSB, whose address is 550 17th Street, NW, Washington, DC 20429-0002 ("Seller").

2.      That at the time of the preparation of transfer to OneWest Bank, FSB ("Purchaser"), the Seller was the owner of that certain loan, obligation or interest in a loan or obligation evidenced by a promissory note, evidencing an indebtedness or evidencing rights in an indebtedness (the "Instrument"), as follows:

Loan Number:      _____

Name of Maker:      _____

Original Principal Balance:  _____

Date of Instrument:      _____

3.      That the original Instrument has been lost or misplaced.  The Instrument was not where it was assumed to be, and a search to locate the Instrument was undertaken, without results. Prior to the transfer to the Purchaser the Instrument had not been assigned, transferred, pledged or hypothecated.

4.      That if the Seller subsequently locates the Instrument, the Seller shall use reasonable efforts to provide written notice to the Purchaser and deliver and endorse the Instrument to the Purchaser in accordance with written instructions received from the Purchaser (or such other party designated in writing by the Purchaser).

5.      That the purpose of this affidavit is to establish such facts.  This affidavit shall not confer any rights or benefits, causes or claims, representations or warranties (including, without limitation, regarding ownership or title to the Instrument or the obligations evidenced thereby) upon the Purchaser, its successors or assigns.  All such rights, benefits, causes or claims, representations and warranties (if any) shall be as set forth in the Loan Sale Agreement between the Purchaser and the Seller dated March 19, 2009 (the "Loan Sale Agreement").

Exhibit 5, Page 286

6.      That, pursuant to the terms and conditions of the aforementioned Loan Sale Agreement, the Instrument (including, without limitation, any and all rights the Seller may have to enforce payment and performance of the Instrument, including any rights under Section 3-309 of the Uniform Commercial Code) is hereby assigned effective as of the date hereof, without recourse, representation or warranty, to the Purchaser, except as set forth in the Loan Sale Agreement and the Master Purchase Agreement (as defined in the Loan Sale Agreement).   A copy of the Instrument is attached to this affidavit, if available.

FEDERAL DEPOSIT INSURANCE
CORPORATION AS RECEIVER FOR
INDYMAC FEDERAL BANK, FSB

By:_____
       Name:
       Title:   Attorney-in-Fact

D-2

Exhibit 5, Page 287

## ACKNOWLEDGMENT

STATE OF _____)
                          )
COUNTY OF _____)

    Before me, the undersigned authority, a Notary Public in and for the county and state aforesaid, on this day personally appeared _____, known to me to be the person whose name is subscribed to the foregoing instrument, as Attorney-in-Fact of the Federal Deposit Insurance Corporation acting in the capacity stated above, and acknowledged to me that s/he executed the same as the act of the Federal Deposit Insurance Corporation, for the purposes and consideration therein expressed, and in the capacity therein stated.

    Given under my hand and seal of office on this the _____ day of _____, 20___.

_____
Notary Public

[SEAL]                My Commission expires: _____

Exhibit 5, Page 288

## ATTACHMENT E

### BILL OF SALE

*(Note to Preparer:  When preparing the actual Bill of Sale, delete this instruction and the reference to Attachment E above.)*

For value received and pursuant to the terms and conditions of the Loan Sale Agreement by and between the Federal Deposit Insurance Corporation as Receiver for IndyMac Federal Bank, FSB ("the "Seller") and OneWest Bank, FSB (the "Purchaser") dated [_____], 2009 (the "Agreement"), the Seller does hereby sell, assign and convey to the Purchaser, its successors and assigns, and the Purchaser does hereby purchase and accept from the Seller, all right, title and interest of the Seller in and to those assets described in Exhibit A attached to this Bill of Sale and made a part hereof for all purposes, which consist of tangible personal property. *(Note to Preparer: Attach Exhibit A which should be the same as Attachment A to the Agreement, which shall be as of the Initial Calculation Date and shall be subsequently updated after the Closing Date to reflect Closing Date balances)*

**THIS BILL OF SALE IS EXECUTED WITHOUT RECOURSE AND WITHOUT REPRESENTATIONS OR WARRANTIES, WHETHER EXPRESS, IMPLIED OR CREATED BY OPERATION OF LAW, EXCEPT AS PROVIDED IN THE AGREEMENT AND THE MASTER PURCHASE AGREEMENT.**

EXECUTED THIS _____ DAY OF _____, 2009.

**SELLER:**

FEDERAL DEPOSIT INSURANCE
CORPORATION AS RECEIVER FOR
INDYMAC FEDERAL BANK, FSB

By:_____     By:_____
   Name: _____        Name:
          Witness        Title:

Exhibit 5, Page 289

## ACKNOWLEDGMENT

STATE OF _____)
                          )
COUNTY OF _____)

      Before me, the undersigned authority, a Notary Public in and for the county and state aforesaid, on this day personally appeared _____, known to me to be the person whose name is subscribed to the foregoing instrument, as _____ of the Federal Deposit Insurance Corporation as Receiver of IndyMac Federal Bank, FSB and acknowledged to me that s/he executed the same as the act of the Federal Deposit Insurance Corporation, for the purposes and consideration therein expressed, and in the capacity therein stated.

      Given under my hand and seal of office on this the ___ day of _____, 2009.

_____
Notary Public

[SEAL]

My Commission expires: _____

E-2

Exhibit 5, Page 290

**ATTACHMENT F**

**LIMITED POWER OF ATTORNEY**

**[Sale Name]**

*(Note to Preparer: When preparing the actual Limited Power of Attorney, delete this instruction and the reference to Attachment F above.)*

KNOW ALL PERSONS BY THESE PRESENTS, that the FEDERAL DEPOSIT INSURANCE CORPORATION ("FDIC") as Receiver for IndyMac Federal Bank, FSB, hereafter called the "Receiver", hereby designates the individual(s) set out below (the "Attorney(s)-in-Fact") for the sole purpose of executing the documents outlined below:

_____

_____

WHEREAS, the undersigned has full authority to execute this instrument on behalf of the FDIC as Receiver under applicable Resolutions of the FDIC's Board of Directors and redelegations thereof.

NOW THEREFORE, the FDIC as Receiver grants to the above-named Attorney(s)-in-Fact the authority, subject to the limitations herein, as follows:

1.      To execute, acknowledge, seal and deliver on behalf of the FDIC as Receiver for IndyMac Federal Bank, FSB all instruments of transfer and conveyance, appropriately completed, with all ordinary or necessary endorsements, acknowledgments, affidavits and supporting documents as may be necessary or appropriate to evidence the sale and transfer of any asset pursuant to that certain Loan Sale Agreement, dated as of March ___ 2009, between the Receiver and OneWest Bank, FSB.

The form which the Attorney(s)-in-Fact shall use for endorsing promissory notes or preparing allonges to promissory notes is as follows:

Pay to the order of
OneWest Bank, FSB
Without Recourse

FEDERAL DEPOSIT INSURANCE
CORPORATION as Receiver for IndyMac Federal
Bank, FSB

By: _____
   Name: _____
   Title:      Attorney-in-Fact

F-1

Exhibit 5, Page 291

All other documents of assignment, conveyance or transfer shall contain this sentence: "This assignment is made without recourse, representation or warranty, express or implied, by the FDIC in its corporate capacity or as Receiver."

2.    To grant to each Attorney-in-Fact full power and authority to do and perform all acts necessary to carry into effect the powers granted by this Limited Power of Attorney as fully as FDIC or the Receiver might or could do with the same validity as if all and every such act had been herein particularly stated, expressed and especially provided for.

This Limited Power of Attorney shall be effective from _____, 2009 and shall continue in full force and effect through _____, 2010 unless otherwise terminated by an official of the FDIC authorized to do so by the Board of Directors ("Revocation"). At such time this Limited Power of Attorney will be automatically revoked. Any third party may rely upon this document as the named individual(s)' authority to continue to exercise the powers herein granted unless a Revocation has been recorded in the public records of the jurisdiction where this Limited Power of Attorney has been recorded, or unless a third party has received actual notice of a Revocation.

IN WITNESS WHEREOF, the FDIC by its duly authorized officer empowered by appropriate resolution of its Board of Directors, has caused these presents to be executed and subscribed in its name this ___ day of _____, 2009.

**FEDERAL DEPOSIT INSURANCE CORPORATION as Receiver for IndyMac Federal Bank, FSB**

By: _____
    Name: _____
    Title: _____

**[CONTINUED ON NEXT PAGE]**

Exhibit 5, Page 292

(CORPORATE SEAL)        ATTEST:_____
                              Name:  Herbert J. Messite
                              Title:  Counsel

Signed, sealed and delivered
in the presence of

By:_____
Name:_____
      Witness

By:_____
Name:_____
      Witness

**[ACKNOWLEDGMENT ON NEXT PAGE]**

Exhibit 5, Page 293

**ACKNOWLEDGMENT**

UNITED STATES OF AMERICA   )
                           )
DISTRICT OF COLUMBIA       )

     On this ___ day of _____, 2009, before me, Notary Public in and for the District of Columbia, personally appeared _____ and Herbert J. Messite, with a business address of 550 17th Street, NW, Washington, DC  20429, who, being duly sworn, severally depose and say:

     First, _____, first affiant, for himself, says that he is _____ of the Federal Deposit Insurance Corporation, the Corporation in whose name the foregoing Limited Power of Attorney has been subscribed, that the said Limited Power of Attorney was subscribed on behalf of the said Corporation by due authority of the Corporation's Board of Directors, and that the said _____ acknowledges that said Limited Power of Attorney to be the free act and deed of the said Corporation.

     Second, Herbert J. Messite, second affiant, for himself, says that he is a Counsel with the Federal Deposit Insurance Corporation, the Corporation in whose name the foregoing Limited Power of Attorney has been subscribed, that the seal affixed to the said Limited Power of Attorney is the corporate seal of the said Federal Deposit Insurance Corporation, that the said Limited Power of Attorney was subscribed on behalf of the said Corporation and its seal thereto affixed by due authority of the Corporation's Board of Directors, and that the said Herbert J. Messite acknowledged the said Limited Power of Attorney to be the free act and deed of the said Corporation.

                                  _____
                                    **Notary Public, District of Columbia**
                                    **United States of America**

                                    **My Commission Expires:**

                                    _____

Exhibit 5, Page 294

**<u>ATTACHMENT G</u>**

**SHARED-LOSS AGREEMENT**

**[Attached]**

Exhibit 5, Page 295

## <u>ATTACHMENT H</u>

## TERM SHEET FOR PARTICIPATION INTERESTS IN UNFUNDED HELOC COMMITMENTS

### [Attached]

Exhibit 5, Page 296

## SCHEDULE 1.01(a)

**UNFUNDED HELOC COMMITMENTS**

Exhibit 5, Page 297

## SCHEDULE 2.01(a)

**LSBO SERVICING AGREEMENTS**

Exhibit 5, Page 298

**<u>SCHEDULE 2.01(c)</u>**

**ASSUMED LITIGATION**

.

**SCHEDULE 2.02**

**CATEGORIES AND APPLICABLE PERCENTAGES
WITH RESPECT TO LOANS**

| Category of Loan | % of Par |
| --- | --- |
| **Held for Sale** | |
| Current | 70.0000% |
| 30 Days Delinquent | 60.0000% |
| 60+ Days Delinquent | 55.0000% |
| | |
| **Held for Investment** | |
| *Whole Loans* | |
| Current | 70.0000% |
| 30 Days Delinquent | 60.0000% |
| 60+ Days Delinquent | 55.0000% |
| *HELOCs* | |
| Current | 58.0000% |
| 30 Days Delinquent | 50.0000% |
| 60+ Days Delinquent | 37.7500% |

## **SCHEDULE 6.09(b)**

**LOANS MODIFIED OR CANDIDATES FOR MODIFICATION**

Exhibit 5, Page 301

# EXHIBIT 6

EXECUTION COPY

INDYMAC MBS, INC.
Depositor

INDYMAC BANK, F.S.B.
Seller and Master Servicer

DEUTSCHE BANK NATIONAL TRUST COMPANY
Trustee

_____

POOLING AND SERVICING AGREEMENT
Dated as of May 1, 2005
_____

RESIDENTIAL ASSET SECURITIZATION TRUST
Series 2005-A7

MORTGAGE PASS-THROUGH CERTIFICATES
Series 2005-G

Exhibit 6, Page 302

# TABLE OF CONTENTS

Page

ARTICLE ONE DEFINITIONS ...................................................................................... 5

    Section 1.01    Definitions. ......................................................................... 5
    Section 1.02    Rules of Construction. ...................................................... 32

ARTICLE TWO CONVEYANCE OF MORTGAGE LOANS; REPRESENTATIONS AND WARRANTIES ..................................................................... 34

    Section 2.01    Conveyance of Mortgage Loans. ...................................... 34
    Section 2.02    Acceptance by the Trustee of the Mortgage Loans............... 37
    Section 2.03    Representations, Warranties, and Covenants of the Seller and the Master Servicer. ............................................................ 39
    Section 2.04    Representations and Warranties of the Depositor as to the Mortgage Loans.................................................................. 40
    Section 2.05    Delivery of Opinion of Counsel in Connection with Substitutions. .................... 41
    Section 2.06    Execution and Delivery of Certificates. ............................ 41
    Section 2.07    REMIC Matters. ............................................................... 41

ARTICLE THREE ADMINISTRATION AND SERVICING OF MORTGAGE LOANS ..................... 42

    Section 3.01    Master Servicer to Service Mortgage Loans....................... 42
    Section 3.02    Subservicing; Enforcement of the Obligations of Subservicers. ......................... 42
    Section 3.03    Rights of the Depositor and the Trustee in Respect of the Master Servicer. ......................................................... 43
    Section 3.04    No Contractual Relationship Between Subservicers and the Trustee................. 43
    Section 3.05    Trustee to Act as Master Servicer. ................................... 43
    Section 3.06    Collection of Mortgage Loan Payments; Servicing Accounts; Collection Account; Certificate Account; Distribution Account. ........................... 44
    Section 3.07    Collection of Taxes, Assessments and Similar Items; Escrow Accounts. ........... 47
    Section 3.08    Access to Certain Documentation and Information Regarding the Mortgage Loans. ............................................................. 48
    Section 3.09    Permitted Withdrawals from the Certificate Account and the Distribution Account. ............................................................ 48
    Section 3.10    Maintenance of Hazard Insurance; Maintenance of Primary Insurance Policies. ............................................................... 49
    Section 3.11    Enforcement of Due-On-Sale Clauses; Assumption Agreements. .................... 51
    Section 3.12    Realization Upon Defaulted Mortgage Loans. .................... 52
    Section 3.13    Trustee to Cooperate; Release of Mortgage Files. .............. 54
    Section 3.14    Documents, Records and Funds in Possession of the Master Servicer to be Held for the Trustee. ......................................... 54
    Section 3.15    Servicing Compensation. .................................................. 55
    Section 3.16    Access to Certain Documentation. .................................... 55
    Section 3.17    Annual Statement as to Compliance. ................................ 55
    Section 3.18    Annual Independent Public Accountants' Servicing Statement; Financial Statements. ....................................................... 56
    Section 3.19    Errors and Omissions Insurance; Fidelity Bonds.............. 56
    Section 3.20    Notification of Adjustments............................................... 56

Section 3.21   Prepayment Charges. ................................................................ 57

ARTICLE FOUR DISTRIBUTIONS AND ADVANCES BY THE MASTER SERVICER ................... 58

Section 4.01   Advances................................................................................ 58
Section 4.02   Priorities of Distribution. ......................................................... 59
Section 4.03   [Reserved]. ............................................................................ 62
Section 4.04   [Reserved]. ............................................................................ 62
Section 4.05   Allocation of Realized Losses. .................................................. 62
Section 4.06   Monthly Statements to Certificateholders. ................................ 63
Section 4.07   [Reserved]. ............................................................................ 65
Section 4.08   Determination of Pass-Through Rates for LIBOR Certificates. .......... 65

ARTICLE FIVE THE CERTIFICATES ........................................................................ 68

Section 5.01   The Certificates. ..................................................................... 68
Section 5.02   Certificate Register; Registration of Transfer and Exchange of
               Certificates. .......................................................................... 68
Section 5.03   Mutilated, Destroyed, Lost or Stolen Certificates. ....................... 72
Section 5.04   Persons Deemed Owners. ........................................................ 72
Section 5.05   Access to List of Certificateholders' Names and Addresses. ......... 72
Section 5.06   Maintenance of Office or Agency. ............................................. 73

ARTICLE SIX THE DEPOSITOR AND THE MASTER SERVICER .......................................... 74

Section 6.01   Respective Liabilities of the Depositor and the Master Servicer. ......... 74
Section 6.02   Merger or Consolidation of the Depositor or the Master Servicer. .......... 74
Section 6.03   Limitation on Liability of the Depositor, the Seller, the Master Servicer,
               and Others. ........................................................................... 74
Section 6.04   Limitation on Resignation of the Master Servicer. ....................... 75

ARTICLE SEVEN DEFAULT .................................................................................. 76

Section 7.01   Events of Default. ................................................................... 76
Section 7.02   Trustee to Act; Appointment of Successor. ................................. 77
Section 7.03   Notification to Certificateholders. ............................................. 78

ARTICLE EIGHT CONCERNING THE TRUSTEE ......................................................... 79

Section 8.01   Duties of the Trustee. .............................................................. 79
Section 8.02   Certain Matters Affecting the Trustee. ....................................... 79
Section 8.03   Trustee Not Liable for Certificates or Mortgage Loans. ................. 81
Section 8.04   Trustee May Own Certificates. .................................................. 81
Section 8.05   Trustee's Fees and Expenses. ................................................... 81
Section 8.06   Eligibility Requirements for the Trustee. ..................................... 82
Section 8.07   Resignation and Removal of the Trustee. .................................... 82
Section 8.08   Successor Trustee. .................................................................. 83
Section 8.09   Merger or Consolidation of the Trustee. ...................................... 83
Section 8.10   Appointment of Co-Trustee or Separate Trustee. .......................... 84
Section 8.11   Tax Matters. .......................................................................... 85
Section 8.12   Periodic Filings. ..................................................................... 87

ii                               Exhibit 6, Page 304

ARTICLE NINE TERMINATION ............................................................................................ 88

    Section 9.01    Termination upon Liquidation or Purchase of the Mortgage Loans. .................. 88
    Section 9.02    Final Distribution on the Certificates. .................................................................. 88
    Section 9.03    Additional Termination Requirements. ................................................................ 90

ARTICLE TEN MISCELLANEOUS PROVISIONS ............................................................. 91

    Section 10.01    Amendment. ........................................................................................................ 91
    Section 10.02    Recordation of Agreement; Counterparts. .......................................................... 92
    Section 10.03    Governing Law. ................................................................................................... 93
    Section 10.04    Intention of Parties. ............................................................................................ 93
    Section 10.05    Notices. ............................................................................................................... 93
    Section 10.06    Severability of Provisions. ................................................................................. 94
    Section 10.07    Assignment. ........................................................................................................ 94
    Section 10.08    Limitation on Rights of Certificateholders. ....................................................... 94
    Section 10.09    Inspection and Audit Rights. .............................................................................. 95
    Section 10.10    Certificates Nonassessable and Fully Paid. ....................................................... 95
    Section 10.11    Official Record. .................................................................................................. 95
    Section 10.12    Protection of Assets. .......................................................................................... 96
    Section 10.13    Qualifying Special Purpose Entity. .................................................................... 96

Exhibit 6, Page 305

## SCHEDULES

Schedule I:        Mortgage Loan Schedule ................................................................................ S-I-1

Schedule II:       Representations and Warranties of the Seller/Master Servicer ............................... S-II-1

Schedule III:      Representations and Warranties as to the Mortgage Loans ................................... S-III-1

Schedule IV:       [Reserved] ........................................................................................................ S-IV-1

Schedule V:        Form of Monthly Report .................................................................................... S-V-1

## EXHIBITS

Exhibit A:         Form of Senior Certificate (other than Notional Amount Certificates) ..................... A-1

Exhibit B:         Form of Subordinated Certificate ........................................................................ B-1

Exhibit C:         Form of Class A-R Certificate .............................................................................. C-1

Exhibit D:         Form of Notional Amount Certificate .................................................................... D-1

Exhibit E:         Form of Reverse of Certificates ........................................................................... E-1

Exhibit F:         Form of Class P Certificates ................................................................................ F-1

Exhibit G:         Form of Initial Certification of Trustee ................................................................. G-1

Exhibit G-1:       Form of Delay Delivery Certification ................................................................... G-1-1

Exhibit H:         Form of Final Certification of Trustee ................................................................... H-1

Exhibit I:         Form of Transfer Affidavit .................................................................................. I-1

Exhibit J:         Form of Transferor Certificate ............................................................................. J-1

Exhibit K:         Form of Investment Letter (Non-Rule 144A) ........................................................ K-1

Exhibit L:         Form of Rule 144A Letter .................................................................................... L-1

Exhibit M:         Form of Request for Release (for Trustee) ........................................................... M-1

Exhibit N:         Request for Release of Documents ....................................................................... N-1

Exhibit O:         Form of Trustee Certification .............................................................................. O-1

THIS POOLING AND SERVICING AGREEMENT, dated as of May 1, 2005, among INDYMAC MBS, INC., a Delaware corporation, as depositor (the "*Depositor*"), IndyMac Bank, F.S.B.  ("*IndyMac*"), a federal savings bank, as seller (in that capacity, the "*Seller*") and as master servicer (in that capacity, the "*Master Servicer*"), and Deutsche Bank National Trust Company, a national banking association, as trustee (the "*Trustee*"),

## WITNESSETH THAT

In consideration of the mutual agreements set forth in this Agreement, the parties agree as follows:

## PRELIMINARY STATEMENT

The Depositor is the owner of the Trust Fund that is hereby conveyed to the Trustee in return for the Certificates.  For federal income tax purposes, the Trust Fund will consist of two REMICs (the "*Subsidiary REMIC*" and the "*Master REMIC*").  Each Certificate, other than the Class A-R Certificate, will represent ownership of one or more regular interests in the Master REMIC for purposes of the REMIC Provisions. The Class A-R Certificate represents ownership of the sole class of residual interest in each of the Subsidiary REMIC and the Master REMIC.  The Master REMIC will hold as assets the several classes of uncertificated Subsidiary REMIC Interests (other than the Class R-1 Interest) and the Subsidiary REMIC will hold as assets all property of the Trust Fund.  For federal income tax purposes, each Subsidiary REMIC Interest (other than the Class R-1 Interest) is hereby designated as a regular interest in the Subsidiary REMIC and each Certificate (other than the Class A-R Certificate) is hereby designated as a regular interest in the Master REMIC.  The latest possible maturity date of all REMIC regular interests created herein shall be the Latest Possible Maturity Date.

**The Subsidiary REMIC**

The Subsidiary REMIC Regular Interests, each of which is hereby designated a REMIC regular interest for federal income tax purposes, shall have the following principal balances, pass-through rates and Corresponding Classes of Certificates in the manner set forth in the following table:

| Subsidiary REMIC Class Designation | Initial Class Principal Balance | Class Interest Rate | Allocation of Interest | Allocation of Principal (1) |
|---|---|---|---|---|
| Class S-A-1 | $25,000,000 | 7.50% | Class A-1, Class A-2 | Class A-1 |
| Class S-A-3 | $102,518,000 | 5.50% | Class A-3 | Class A-3 |
| Class S-A-4 | $100,000,000 | 5.00% | Class A-4 | Class A-4 |
| Class S-A-5 | $5,338,000 | 5.50% | Class A-5 | Class A-5 |
| Class S-A-6 | $27,204,000 | 5.50% | Class A-6 | Class A-6 |
| Class S-A-7 | $1,282,000 | 5.50% | Class A-7 | Class A-7 |
| Class S-A-X | (2) | (3) | Class A-X | N/A |
| Class S-PO | $1,166,752 | N/A(4) | N/A | Class PO |
| Class S-B-1 | $6,184,000 | 5.50% | Class B-1 | Class B-1 |
| Class S-B-2 | $2,061,000 | 5.50% | Class B-2 | Class B-2 |
| Class S-B-3 | $1,374,000 | 5.50% | Class B-3 | Class B-3 |
| Class S-B-4 | $1,099,000 | 5.50% | Class B-4 | Class B-4 |
| Class S-B-5 | $1,099,000 | 5.50% | Class B-5 | Class B-5 |
| Class S-B-6 | $552,862 | 5.50% | Class B-6 | Class B-6 |
| Class S-P(5) | $100 | N/A | N/A | Class P |

Exhibit 6, Page 307

| Subsidiary REMIC Class Designation | Initial Class Principal Balance | Class Interest Rate | Allocation of Interest | Allocation of Principal (1) |
|---|---|---|---|---|
| Class S-$100 | $100 | 5.50% | Class A-R | Class A-R |
| R-1 | N/A | N/A | N/A | N/A |

_____

(1)      On each Distribution Date, each Subsidiary REMIC Interest shall be allocated scheduled principal, prepayments of principal and Realized Losses in the same manner as its corresponding Master REMIC Class designated under the column titled "Allocation of Principal".

(2)      The Class S-A-X Interests will have a notional balance equal to the principal balance of the Non-Discount Loans.

(3)      The Pass-Through Rate of the Class S-A-X Interests for any Distribution Date will be equal to the excess of the weighted average of the Adjusted Net Mortgage Rates of the Non-Discount Mortgage Loans over the Required Coupon.

(4)      The Class S-PO Certificates are Principal Only Certificates and are not entitled to receive distributions of interest.

(5)      The Class S-P Interest will not be entitled to any interest, but will be entitled to 100% of any Prepayment Charges paid on the Mortgage Loans.

**The Master REMIC**

The following table sets forth characteristics of the Certificates, together with the minimum denominations and integral multiples in excess thereof in which such Classes shall be issuable (except that one Certificate of each Class of Certificates may be issued in a different amount:

| Class Designation | Initial Class Certificate Balance | Pass-Through Rate | Minimum Denomination | Integral Multiples in Excess of Minimum |
|---|---|---|---|---|
| Class A-1 | $25,000,000 | Variable(1) | $   25,000 | $1,000 |
| Class A-2 | Notional(2) | Variable(3) | $   25,000(7) | $1,000(7) |
| Class A-3 | $102,518,000 | 5.50% | $   25,000 | $1,000 |
| Class A-4 | $100,000,000 | 5.00% | $   25,000 | $1,000 |
| Class A-5 | $5,338,000 | 5.50% | $   25,000 | $1,000 |
| Class A-6 | $27,204,000 | 5.50% | $   25,000 | $1,000 |
| Class A-7 | $1,282,000 | 5.50% | $   25,000 | $1,000 |
| Class PO | $1,166,752 | N/A(4) | $   25,000 | $1,000 |
| Class A-X | Notional(5) | Variable(6) | $   25,000(7) | $1,000(7) |
| Class A-R | $100 | 5.50% | $        100 | N/A |
| Class B-1 | $6,184,000 | 5.50% | $   25,000 | $1,000 |
| Class B-2 | $2,061,000 | 5.50% | $   25,000 | $1,000 |
| Class B-3 | $1,374,000 | 5.50% | $   25,000 | $1,000 |
| Class B-4 | $1,099,000 | 5.50% | $ 100,000 | $1,000 |
| Class B-5 | $1,099,000 | 5.50% | $ 100,000 | $1,000 |
| Class B-6 | $552,862 | 5.50% | $ 100,000 | $1,000 |
| Class P | $100.00 | 0%(7) | $        100 | N/A |

Exhibit 6, Page 308

(1)     The Class A-1 Certificates will bear interest during each Interest Accrual Period at a per annum rate equal to LIBOR plus 0.25%, subject to a maximum and minimum Pass-Through Rate of 7.50% and 0.25%, respectively.  The Pass-Through Rate for the Class A-1 Certificates during the initial Interest Accrual Period is 3.25% per annum.

(2)     The Class A-2 Certificates will be Notional Amount Certificates, will have no Class Certificate Balance and will bear interest on their Notional Amount, which will be $25,000,000 for the initial Interest Accrual Period.

(3)     The Class A-2 Certificates will bear interest during each Interest Accrual Period at a per annum rate equal to 7.25% minus LIBOR, subject to a maximum and minimum Pass-Through Rate of 7.25% and 0.00%, respectively.  The Pass-Through Rate for the Class A-4 Certificates during the initial Interest Accrual Period will be 4.25% per annum.

(4)     The Class PO Certificates are Principal Only Certificates and are not entitled to receive distributions of interest.

(5)     The Class A-X Certificates will be Notional Amount Certificates, will have no Class Certificate Balance and will bear interest on their Notional Amount, which will be $211,747,508 for the initial Interest Accrual Period.  For federal income tax purposes, the Class A-X Certificates will be entitled to 100% of the Class S-A-X Regular Interest cash flow.

(6)     The Pass-Through Rate of the Class A-X Certificates for any Distribution Date will be equal to the excess of the weighted average of the Adjusted Net Mortgage Rates of the Non-Discount Mortgage Loans over the Required Coupon.  The Pass-Through Rate for the Class A-X Certificates for the first Interest Accrual Period is 0.4393% per annum.

(7)     Denomination is based on Notional Amount.

(8)     The Class P Certificate will not be entitled to any interest, but will be entitled to 100% of any Prepayment Charges paid on the Mortgage Loans.  For the federal income tax purposes, the Class P Certificate will be entitled to 100% of the Class S-P Regular Interest cash flow.

Set forth below are designations of Classes of Certificates to the categories used herein:

| | |
|---|---|
| Accretion Directed Certificates.................................. | None. |
| Accrual Certificates .................................................. | None. |
| Book-Entry Certificates ........................................... | All Classes of Certificates other than the Physical Certificates. |
| COFI Certificates ...................................................... | None. |
| Components ............................................................... | None. |
| Component Certificates ............................................. | None. |
| Delay Certificates...................................................... | All interest-bearing Classes of Certificates other than any Non-Delay Certificates. |

| | |
|---|---|
| ERISA-Restricted Certificates, .................................. | The Residual Certificates and the Private Certificates; until they have been the subject of an ERISA-Qualifying Underwriting, the Class PO Certificates; and Certificates of any Class that ceases to satisfy the rating requirements of the Underwriter's Exemption. |
| LIBOR Certificates .................................................. | Class A-1 and Class A-2 Certificates. |
| Non-Delay Certificates ............................................ | LIBOR Certificates. |
| Notional Amount Certificates ................................... | Class A-2 and Class A-X Certificates. |
| Offered Certificates................................................ | All Classes of Certificates other than the Private Certificates. |
| Physical Certificates............................................... | Class PO, Class P and Class A-R Certificates and the Private Certificates. |
| Planned Principal Classes ........................................ | None. |
| Principal Only Certificates....................................... | Class PO Certificates. |
| Private Certificates.................................................. | Class P, Class B-4, Class B-5 and Class B-6 Certificates. |
| Rating Agencies ...................................................... | Fitch and S&P. |
| Regular Certificates ................................................ | All Classes of Certificates other than the Class A-R Certificates. |
| Residual Certificate................................................. | Class A-R Certificates. |
| Senior Certificates................................................... | Class A-1, Class A-2, Class A-3, Class A-4, Class A-5, Class A-6, Class A-7, Class PO, Class A-X and Class A-R Certificates. |
| Subordinated Certificates.......................................... | Class B-1, Class B-2, Class B-3, Class B-4, Class B-5 and Class B-6 Certificates. |
| Targeted Principal Classes........................................ | None. |
| Targeted Principal Component .................................. | None. |

With respect to any of the foregoing designations as to which the corresponding reference is "None," all defined terms and provisions in this Agreement relating solely to such designations shall be of no force or effect, and any calculations in this Agreement incorporating references to such designations shall be interpreted without reference to such designations and amounts.  Defined terms and provisions in this Agreement relating to statistical rating agencies not designated above as Rating Agencies shall be of no force or effect.

Exhibit 6, Page 310

# ARTICLE ONE

## DEFINITIONS

***Section 1.01    Definitions.***

Unless the context requires a different meaning, capitalized terms are used in this Agreement as defined below.

***Accretion Directed Certificates:***  As specified in the Preliminary Statement.

***Accretion Direction Rule:***  Not applicable.

***Accrual Amount:***  With respect to any Accrual Certificates and any Distribution Date prior to the Accrual Termination Date, the amount allocable to interest on such Class of Accrual Certificates with respect to such Distribution Date pursuant to Section 4.02(a)(i).

***Accrual Certificates:***  As specified in the Preliminary Statement.

***Accrual Termination Date:***  Not applicable.

***Adjusted Mortgage Rate:***  As to each Mortgage Loan and at any time, the per annum rate equal to the Mortgage Rate less the Servicing Fee Rate.

***Adjusted Net Mortgage Rate:***  As to each Mortgage Loan and any Distribution Date, the per annum rate equal to the Mortgage Rate of that Mortgage Loan (as of the Due Date in the month preceding the month in which such Distribution Date occurs) less the Expense Fee Rate for that Mortgage Loan.

***Adjustment Date:***  Not applicable.

***Advance:***  The payment required to be made by the Master Servicer with respect to any Distribution Date pursuant to Section 4.01, the amount of any such payment being equal to the aggregate of payments of principal and interest (net of the Servicing Fee) on the Mortgage Loans that were due during the related Due Period and not received as of the close of business on the related Determination Date, together with an amount equivalent to interest on each REO Property, net of any net income from such REO Property, less the aggregate amount of any such delinquent payments that the Master Servicer has determined would constitute a Nonrecoverable Advance if advanced.

***Advance Notice:***  As defined in Section 4.01(b).

***Advance Deficiency:***  As defined in Section 4.01(b).

***Affiliate:***  With respect to any Person, any other Person controlling, controlled or under common control with such Person.  For purposes of this definition, "control" means the power to direct the management and policies of a Person, directly or indirectly, whether through ownership of voting securities, by contract, or otherwise and "controlling" and "controlled" shall have meanings correlative to the foregoing.  Affiliates also include any entities consolidated with the requirements of generally accepted accounting principles.

***Agreement:***  This Pooling and Servicing Agreement and all amendments and supplements.

**Exhibit 6, Page 311**

***Allocable Share***:  As to any Distribution Date and any Mortgage Loan (i) with respect to the Class A-X Certificates, (a) the ratio that the excess, if any, of the Adjusted Net Mortgage Rate with respect to such Mortgage Loan over the Required Coupon bears to such Adjusted Net Mortgage Rate or (b) if the Adjusted Net Mortgage Rate with respect to such Mortgage Loan does not exceed the Required Coupon, zero; (ii) with respect to the Class PO Certificates, zero and (iii) with respect to each other Class of Certificates the product of (b) the lesser of (I) the ratio that the Required Coupon bears to such Adjusted Net Mortgage Rate and (II) one, multiplied by (b) the ratio that the amount calculated with respect to such Distribution Date for such Class, pursuant to clause (i) of the definition of Class Optimal Interest Distribution Amount (without giving effect to any reduction of such amount pursuant to Section 4.02(d)) bears to the aggregate amount calculated with respect to such Distribution Date for each such Class of Certificates pursuant to clause (i) of the definition of Class Optimal Interest Distribution Amount (without giving effect to any reduction of such amounts pursuant to Section 4.02(d)).

***Amount Available for Senior Principal***:  As to any Distribution Date, the Available Funds for such Distribution Date, reduced by the aggregate amount distributable (or allocable to the Accrual Amount, if applicable) on such Distribution Date in respect of interest on the Senior Certificates pursuant to Section 4.02(a)(iii).

***Amount Held for Future Distribution:***  As to any Distribution Date, the aggregate amount held in the Certificate Account at the close of business on the related Determination Date on account of (i) Principal Prepayments received after the last day of the related Prepayment Period and Liquidation Proceeds and Subsequent Recoveries received in the month of such Distribution Date and (ii) all Scheduled Payments due after the related Due Date.

***Applicable Credit Support Percentage:***  As defined in Section 4.02(e).

***Appraised Value:***  With respect to any Mortgage Loan, the Appraised Value of the related Mortgaged Property shall be: (i) with respect to a Mortgage Loan other than a Refinance Loan, the lesser of (a) the value of the Mortgaged Property based upon the appraisal made at the time of the origination of such Mortgage Loan and (b) the sales price of the Mortgaged Property at the time of the origination of such Mortgage Loan; (ii) with respect to a Refinance Loan, the value of the Mortgaged Property based upon the appraisal made at the time of the origination of such Refinance Loan.

***Available Funds:***  As to any Distribution Date, the sum of (a) the aggregate amount held in the Certificate Account at the close of business on the related Determination Date, including any Subsequent Recoveries, net of the Amount Held for Future Distribution, net of Prepayment Charges and net of amounts permitted to be withdrawn from the Certificate Account pursuant to clauses (i) - (viii), inclusive, of Section 3.09(a) and amounts permitted to be withdrawn from the Distribution Account pursuant to clauses (i) - (ii), inclusive, of Section 3.09(b), (b) the amount of the related Advance, (c) in connection with Defective Mortgage Loans, the aggregate of the Purchase Prices and Substitution Adjustment Amounts deposited on the related Distribution Account Deposit Date, and (d) any amount deposited on the related Distribution Account Deposit Date pursuant to Section 3.10.  The Holders of the Class P Certificates will be entitled to all Prepayment Charges received on the Mortgage Loans and such amounts will not be available for distribution to the Holders of any other Class of  Certificates.

***Bankruptcy Code:***  The United States Bankruptcy Reform Act of 1978, as amended.

***Bankruptcy Coverage Termination Date:***  The point in time at which the Bankruptcy Loss Coverage Amount is reduced to zero.

6

Exhibit 6, Page 312

**Bankruptcy Loss:**  With respect to any Mortgage Loan, a Deficient Valuation or Debt Service Reduction; *provided, however*, that a Bankruptcy Loss shall not be deemed a Bankruptcy Loss under this Agreement so long as the Master Servicer has notified the Trustee in writing that the Master Servicer is diligently pursuing any remedies that may exist in connection with the related Mortgage Loan and either (A) the related Mortgage Loan is not in default with regard to payments due under the Mortgage Loan or (B) delinquent payments of principal and interest under the related Mortgage Loan and any related escrow payments in respect of such Mortgage Loan are being advanced on a current basis by the Master Servicer, in either case without giving effect to any Debt Service Reduction or Deficient Valuation.

**Bankruptcy Loss Coverage Amount:**  As of any date of determination, the Bankruptcy Loss Coverage Amount shall equal the Initial Bankruptcy Loss Coverage Amount as reduced by (i) the aggregate amount of Bankruptcy Losses allocated to the Certificates since the Cut-off Date and (ii) any permissible reductions in the Bankruptcy Loss Coverage Amount as evidenced by a letter of each Rating Agency to the Trustee to the effect that any such reduction will not result in a downgrading, qualification or withdrawal of the then current ratings assigned to the Classes of Certificates rated by it.

**Blanket Mortgage:**  The mortgage or mortgages encumbering a Cooperative Property.

**Book-Entry Certificates:**  As specified in the Preliminary Statement.

**Business Day:**  Any day other than (i) a Saturday or a Sunday, or (ii) a day on which banking institutions in the City of New York, New York, the State of California or the city in which the Corporate Trust Office of the Trustee is located are authorized or obligated by law or executive order to be closed.

**Certificate:**  Any one of the certificates issued by the Trust Fund and executed by the Trustee in substantially the forms attached as exhibits.

**Certificate Account:**  The separate Eligible Account or Accounts created and maintained by the Master Servicer pursuant to Section 3.06(d) with a depository institution in the name of the Master Servicer for the benefit of the Trustee on behalf of Certificateholders and designated "IndyMac Bank, F.S.B., in trust for the registered holders of Residential Asset Securitization Trust 2005-A7, Mortgage Pass-Through Certificates, Series 2005-G."

**Certificate Balance:**  With respect to any Certificate (other than the Notional Amount Certificates) at any date of determination, the maximum dollar amount of principal to which the Holder thereof is then entitled under this Agreement, such amount being equal to the Denomination thereof (A) plus any increase in the Certificate Balance of such Certificate pursuant to Section 4.02 due to the receipt of Subsequent Recoveries, (B) minus the sum of (i) all distributions of principal previously made with respect thereto and (ii) all Realized Losses allocated to that Certificate and, in the case of any Subordinated Certificates, all other reductions in Certificate Balance previously allocated to that Certificate pursuant to Section 4.05 and (C) in the case of any Class of Accrual Certificates, plus the Accrual Amount added to the Class Certificate Balance of such Class prior to such date.  The Notional Amount Certificates do not have Certificate Balances.

**Certificate Owner:**  With respect to a Book-Entry Certificate, the Person who is the beneficial owner of the Book-Entry Certificate.  For the purposes of this Agreement, in order for a Certificate Owner to enforce any of its rights under this Agreement, it shall first have to provide evidence of its beneficial ownership interest in a Certificate that is reasonably satisfactory to the Trustee, the Depositor and/or the Master Servicer, as applicable.

**Certificate Register:**  The register maintained pursuant to Section 5.02.

7

**Exhibit 6, Page 313**

*Certificateholder or Holder:*  The person in whose name a Certificate is registered in the Certificate Register, except that, solely for the purpose of giving any consent pursuant to this Agreement, any Certificate registered in the name of the Depositor or any affiliate of the Depositor is not Outstanding and the Percentage Interest evidenced thereby shall not be taken into account in determining whether the requisite amount of Percentage Interests necessary to effect a consent has been obtained, except that if the Depositor or its affiliates own 100% of the Percentage Interests evidenced by a Class of Certificates, the Certificates shall be Outstanding for purposes of any provision of this Agreement requiring the consent of the Holders of Certificates of a particular Class as a condition to the taking of any action.  The Trustee is entitled to rely conclusively on a certification of the Depositor or any affiliate of the Depositor in determining which Certificates are registered in the name of an affiliate of the Depositor.

*Class:*  All Certificates bearing the same class designation as set forth in the Preliminary Statement.

*Class Certificate Balance:*  For any Class as of any date of determination, the aggregate of the Certificate Balances of all Certificates of the Class as of that date.

*Class Interest Shortfall:*  As to any Distribution Date and Class, the amount by which the amount described in clause (i) of the definition of Class Optimal Interest Distribution Amount for such Class exceeds the amount of interest actually distributed on such Class on such Distribution Date pursuant to such clause (i).

*Class Optimal Interest Distribution Amount:*  With respect to any Distribution Date and interest-bearing Class, the sum of (i) one month's interest accrued during the related Interest Accrual Period at the Pass-Through Rate for such Class, on the related Class Certificate Balance or Notional Amount, as applicable, immediately prior to such Distribution Date, subject to reduction pursuant to Section 4.02(d), and (ii) any Class Unpaid Interest Amounts for such Class.

*Class PO Deferred Amount:*  As to any Distribution Date, the aggregate of the applicable PO Percentage of each Realized Loss, other than any Excess Loss, on a Discount Mortgage Loan to be allocated to the Class PO Certificates on such Distribution Date on or prior to the Senior Credit Support Depletion Date or previously allocated to the Class PO Certificates and not yet paid to the Holders of the Class PO Certificates.

*Class Subordination Percentage:*  With respect to any Distribution Date and each Class of Subordinated Certificates, the fraction (expressed as a percentage) the numerator of which is the Class Certificate Balance of such Class of Subordinated Certificates immediately prior to such Distribution Date and the denominator of which is the aggregate of the Class Certificate Balances of all Classes of Certificates immediately prior to such Distribution Date.

*Class Unpaid Interest Amounts:*  As to any Distribution Date and Class of interest-bearing Certificates, the amount by which the aggregate Class Interest Shortfalls for such Class on prior Distribution Dates exceeds the amount distributed on such Class on prior Distribution Dates pursuant to clause (ii) of the definition of Class Optimal Interest Distribution Amount.

*Closing Date:*  May 27, 2005.

*CMT Index:*  Not applicable.

*Code:*  The Internal Revenue Code of 1986, including any successor or amendatory provisions.

8

Exhibit 6, Page 314

*COFI:*  Not applicable.

*COFI Certificates:*  Not applicable.

*Collection Account:* As defined in Section 3.06(c).

*Commission:*  The United States Securities and Exchange Commission.

*Compensating Interest:* For any Distribution Date, 0.125% multiplied by one-twelfth multiplied by the aggregate Stated Principal Balance of the Mortgage Loans as of the first day of the prior month.

*Co-op Shares:*  Shares issued by a Cooperative Corporation.

*Cooperative Corporation:*  The entity that holds title (fee or an acceptable leasehold estate) to the real property and improvements constituting the Cooperative Property and that governs the Cooperative Property, which Cooperative Corporation must qualify as a Cooperative Housing Corporation under section 216 of the Code.

*Cooperative Loan:*  Any Mortgage Loan secured by Co-op Shares and a Proprietary Lease.

*Cooperative Property:*  The real property and improvements owned by the Cooperative Corporation, including the allocation of individual dwelling units to the holders of the Co-op Shares of the Cooperative Corporation.

*Cooperative Unit:*  A single family dwelling located in a Cooperative Property.

*Corporate Trust Office:*  The designated office of the Trustee in the State of California at which at any particular time its corporate trust business with respect to this Agreement is administered, which office at the date of the execution of this Agreement is located at 1761 East St.  Andrew Place, Santa Ana, California 92705, Attn: Trust Administration-IN0507 (IndyMac MBS, Inc., Residential Asset Securitization Trust 2005-A7, Mortgage Pass-Through Certificates, Series 2005-G), and which is the address to which notices and correspondence with the Trustee should be directed.

*Cut-off Date:*  May 1, 2005.

*Cut-off Date Pool Principal Balance*: $274,878,715.72.

*Cut-off Date Principal Balance:*  As to any Mortgage Loan, its Stated Principal Balance as of the close of business on the Cut-off Date.

*Debt Service Reduction:*  For any Mortgage Loan, a reduction by a court of competent jurisdiction in a proceeding under the Bankruptcy Code in the Scheduled Payment for the Mortgage Loan that became final and non-appealable, except a reduction resulting from a Deficient Valuation or a reduction that results in a permanent forgiveness of principal.

*Defective Mortgage Loan:*  Any Mortgage Loan that is required to be repurchased pursuant to Section 2.02 or 2.03.

*Deficient Valuation:*  For any Mortgage Loan, a valuation by a court of competent jurisdiction of the Mortgaged Property in an amount less than the then outstanding indebtedness under the Mortgage Loan, or any reduction in the amount of principal to be paid in connection with any Scheduled Payment

NY1 5706826v 6

Exhibit 6, Page 315

that results in a permanent forgiveness of principal, which valuation or reduction results from an order of the court that is final and non-appealable in a proceeding under the Bankruptcy Code.

**Definitive Certificates:**  Any Certificate evidenced by a Physical Certificate and any Certificate issued in lieu of a Book-Entry Certificate pursuant to Section 5.02(e).

**Delay Certificates:**  As specified in the Preliminary Statement.

**Delay Delivery Certification:**  A certification substantially in the form of Exhibit G-2.

**Delay Delivery Mortgage Loans:**  The Mortgage Loans identified on the Mortgage Loan Schedule for which none of a related Mortgage File or neither the Mortgage Note nor a lost note affidavit for a lost Mortgage Note has been delivered to the Trustee by the Closing Date.  The Depositor shall deliver the Mortgage Files to the Trustee:

(A)      for at least 70% of the Mortgage Loans, not later than the Closing Date, and

(B)      for the remaining 30% of the Mortgage Loans, not later than five Business Days following the Closing Date.

To the extent that the Seller is in possession of any Mortgage File for any Delay Delivery Mortgage Loan, until delivery of the Mortgage File to the Trustee as provided in Section 2.01, the Seller shall hold the files as Master Servicer, as agent and in trust for the Trustee.

**Deleted Mortgage Loan:**  As defined in Section 2.03(c).

**Delinquent:**  A Mortgage Loan is "Delinquent" if any monthly payment due on a Due Date is not made by the close of business on the next scheduled Due Date for such Mortgage Loan.  A Mortgage Loan is "30 days Delinquent" if such monthly payment has not been received by the close of business on the corresponding day of the month immediately succeeding the month in which such monthly payment was due.  The determination of whether a Mortgage Loan is "60 days Delinquent", "90 days Delinquent", etc.  shall be made in a like manner.

**Denomination:**  For each Certificate, the amount on the face of the Certificate as the "Initial Certificate Balance of this Certificate" or the "Initial Notional Amount of this Certificate" or, if neither of the foregoing, the Percentage Interest appearing on the face of the Certificate.

**Depositor:**  IndyMac MBS, Inc., a Delaware corporation, or its successor in interest.

**Depository:**  The initial Depository shall be The Depository Trust Company, the nominee of which is CEDE & Co., as the registered Holder of the Book-Entry Certificates.  The Depository shall at all times be a "clearing corporation" as defined in Section 8-102(a)(5) of the UCC.

**Depository Participant:**  A broker, dealer, bank, or other financial institution or other Person for whom from time to time a Depository effects book-entry transfers and pledges of securities deposited with the Depository.

**Determination Date:**  As to any Distribution Date, the 18th day of each month or if that day is not a Business Day the next Business Day, except that if the next Business Day is less than two Business Days before the related Distribution Date, then the Determination Date shall be the Business Day preceding the 18th day of the month.

NY1 5706826v 6                                                                                    **Exhibit 6, Page 316**

*Discount Mortgage Loan:*  Any Mortgage Loan with an Adjusted Net Mortgage Rate that is less than the Required Coupon.

*Distribution Account:*  The separate Eligible Account created and maintained by the Trustee pursuant to Section 3.06(e) in the name of the Trustee for the benefit of the Certificateholders and designated "Deutsche Bank National Trust Company  in trust for registered holders of Residential Asset Securitization Trust 2005-A7, Mortgage Pass-Through Certificates, Series 2005-G." Funds in the Distribution Account shall be held in trust for the Certificateholders for the uses and purposes set forth in this Agreement.

*Distribution Account Deposit Date:*  As to any Distribution Date, 12:30 P.M. Pacific time on the Business Day preceding the Distribution Date.

*Distribution Date:*  The 25th day of each calendar month after the initial issuance of the Certificates, or if that day is not a Business Day, the next Business Day, commencing in June 2005.

*Due Date:*  For any Mortgage Loan and Distribution Date, the first day of the month in which such Distribution Date occurs.

*Due Period:*  For any Distribution Date, the period commencing on the second day of the month preceding the month in which the Distribution Date occurs and ending on the first day of the month in which the Distribution Date occurs.

*Eligible Account:* Any of

(i)        an account maintained with a federal or state chartered depository institution or trust company the short-term unsecured debt obligations of which (or, in the case of a depository institution or trust company that is the principal subsidiary of a holding company, the debt obligations of the holding company, but only if Moody's is not a Rating Agency) have the highest short-term ratings of each Rating Agency at the time any amounts are held on deposit therein, or

(ii)       [reserved], or

(iii)      a trust account or accounts maintained with the trust department of a federal or state chartered depository institution or trust company, acting in its fiduciary capacity, or

(iv)      any other account acceptable to each Rating Agency.

Eligible Accounts may bear interest, and may include, if otherwise qualified under this definition, accounts maintained with the Trustee.

*ERISA:*  The Employee Retirement Income Security Act of 1974, as amended.

*ERISA-Qualifying Underwriting:*  A best efforts or firm commitment underwriting or private placement that meets the requirements of the Underwriter's Exemption.

*ERISA-Restricted Certificate:*  As specified in the Preliminary Statement.

*Escrow Account:*  The Eligible Account or Accounts established and maintained pursuant to Section 3.07(a).

*Event of Default:*  As defined in Section 7.01.

11

**Exhibit 6, Page 317**

***Excess Loss:***  The amount of any (i) Fraud Loss on the Mortgage Loans realized after the Fraud Loss Coverage Termination Date, (ii) Special Hazard Loss on the Mortgage Loans realized after the Special Hazard Coverage Termination Date or (iii) Bankruptcy Loss on the Mortgage Loans realized after the Bankruptcy Coverage Termination Date.

***Excess Proceeds:***  For any Liquidated Mortgage Loan, the excess of

(a)  all Liquidation Proceeds from the Mortgage Loan received in the calendar month in which the Mortgage Loan became a Liquidated Mortgage Loan, net of any amounts previously reimbursed to the Master Servicer as Nonrecoverable Advances with respect to the Mortgage Loan pursuant to Section 3.09(a)(iii), over

(b)  the sum of (i) the unpaid principal balance of the Liquidated Mortgage Loan as of the Due Date in the month in which the Mortgage Loan became a Liquidated Mortgage Loan plus (ii) accrued interest at the Mortgage Rate from the Due Date for which interest was last paid or advanced (and not reimbursed) to Certificateholders up to the Due Date applicable to the Distribution Date following the calendar month during which the liquidation occurred.

***Exchange Act:***  The Securities Exchange Act of 1934, as amended.

***Expense Fee Rate:***  As to each Mortgage Loan, the sum of (a) the related Servicing Fee Rate and (b) the Trustee Fee Rate.

***FDIC:***  The Federal Deposit Insurance Corporation, or any successor thereto.

***FHLMC:***  The Federal Home Loan Mortgage Corporation, a corporate instrumentality of the United States created and existing under Title III of the Emergency Home Finance Act of 1970, as amended, or any successor thereto.

***Fitch:***  Fitch, Inc., or any successor thereto.  If Fitch is designated as a Rating Agency in the Preliminary Statement, for purposes of Section 10.05(b) the address for notices to Fitch shall be Fitch, Inc., One State Street Plaza, New York, NY 10004, Attention: MBS Monitoring - IndyMac 2005-G, or any other address Fitch furnishes to the Depositor and the Master Servicer.

***FNMA:***  The Federal National Mortgage Association, a federally chartered and privately owned corporation organized and existing under the Federal National Mortgage Association Charter Act, or any successor thereto.

***Fraud Loan:***  A Liquidated Mortgage Loan as to which a Fraud Loss has occurred.

***Fraud Loss Coverage Amount:***  As of the Closing Date, $2,748,787, subject to reduction from time to time, by the amount of Fraud Losses allocated to the Certificates.  In addition, on each anniversary of the Cut-off Date, the Fraud Loss Coverage Amount will be reduced as follows: (a) on the first, second, third and fourth anniversaries of the Cut-off Date, to an amount equal to the lesser of (i) 1.00% of the then current Stated Principal Balance of the Mortgage Loans in the case of the first and second such anniversaries and 0.50% of the then-current Stated Principal Balance of the Mortgage Loans in the case of the third and fourth such anniversaries and (ii) the excess of the Fraud Loss Coverage Amount as of the preceding anniversary of the Cut-off Date over the cumulative amount of Fraud Losses allocated to the Certificates since such preceding anniversary; and (b) on the fifth anniversary of the Cut-off Date, to zero.

*Fraud Loss Coverage Termination Date:*  The point in time at which the Fraud Loss Coverage Amount is reduced to zero.

*Fraud Losses:*  Realized Losses on Mortgage Loans as to which a loss is sustained by reason of a default arising from fraud, dishonesty or misrepresentation in connection with the related Mortgage Loan, including a loss by reason of the denial of coverage under any related Primary Insurance Policy because of such fraud, dishonesty or misrepresentation.

*Gross Margin:*  Not applicable.

*Index:*  Not applicable.

*Indirect Participant:*  A broker, dealer, bank, or other financial institution or other Person that clears through or maintains a custodial relationship with a Depository Participant.

*Initial Bankruptcy Loss Coverage Amount:*  $100,000.

*Initial LIBOR Rate*: 3.00% per annum.

*Insurance Policy:*  For any Mortgage Loan included in the Trust Fund, any insurance policy, including all riders and endorsements thereto in effect, including any replacement policy or policies for any Insurance Policies.

*Insurance Proceeds:*  Proceeds paid by an insurer pursuant to any Insurance Policy, in each case other than any amount included in such Insurance Proceeds in respect of Insured Expenses.

*Insured Expenses:*  Expenses covered by an Insurance Policy or any other insurance policy with respect to the Mortgage Loans.

*Interest Accrual Period:*  With respect to each Class of Delay Certificates and any Distribution Date, the calendar month prior to the month of such Distribution Date.  With respect to each Class of Non-Delay Certificates and any Distribution Date, the one-month period commencing on the 25th day of the month preceding the month in which such Distribution Date occurs and ending on the 24th day of the month in which such Distribution Date occurs.  All Classes of Certificates will accrue interest on the basis of a 360-day year consisting of twelve 30-day months.

*Interest Determination Date:*  With respect to (a) any Interest Accrual Period for any LIBOR Certificates and (b) any Interest Accrual Period for the COFI Certificates for which the applicable Index is LIBOR, the second Business Day prior to the first day of such Interest Accrual Period.

*Interest Settlement Rate:*  As defined in Section 4.08.

*Last Scheduled Distribution Date:*  The Distribution Date in the month immediately following the month of the latest scheduled maturity date for any of the Mortgage Loans.

*Latest Possible Maturity Date:*  The Distribution Date following the third anniversary of the scheduled maturity date of the Mortgage Loan having the latest scheduled maturity date as of the Cut-off Date.

*Lender PMI Loans:*  Mortgage Loans with respect to which the lender rather than the borrower acquired the primary mortgage guaranty insurance and charged the related borrower an interest premium.

Exhibit 6, Page 319

*LIBOR:*  The London interbank offered rate for one month United States dollar deposits calculated in the manner described in Section 4.08.

*LIBOR Determination Date*: For any Interest Accrual Period, the second London Business Day prior to the commencement of such Interest Accrual Period.

*Liquidated Mortgage Loan:*  For any Distribution Date, a defaulted Mortgage Loan (including any REO Property) that was liquidated in the calendar month preceding the month of the Distribution Date and as to which the Master Servicer has certified (in accordance with this Agreement) that it has received all amounts it expects to receive in connection with the liquidation of the Mortgage Loan, including the final disposition of an REO Property.

*Liquidation Proceeds:*  Amounts, including Insurance Proceeds regardless of when received, received in connection with the partial or complete liquidation of defaulted Mortgage Loans, whether through trustee's sale, foreclosure sale, or otherwise or amounts received in connection with any condemnation or partial release of a Mortgaged Property, and any other proceeds received in connection with an REO Property, less the sum of related unreimbursed Servicing Fees, Servicing Advances, and Advances.

*Loan-to-Value Ratio:*  For any Mortgage Loan and as of any date of determination, is the fraction whose numerator is the original principal balance of the related Mortgage Loan at that date of determination and whose denominator is the Appraised Value of the related Mortgaged Property.

*London Business Day:*  Any day on which dealings in deposits of United States dollars are transacted in the London interbank market.

*Lost Mortgage Note:*  Any Mortgage Note the original of which was permanently lost or destroyed and has not been replaced.

*Maintenance:*  For any Cooperative Unit, the rent paid by the Mortgagor to the Cooperative Corporation pursuant to the Proprietary Lease.

*Master Servicer:*  IndyMac Bank, F.S.B., a federal savings bank, and its successors and assigns, in its capacity as master servicer under this Agreement.

*Master Servicer Advance Date:*  As to any Distribution Date, 12:30 P.M.  Pacific time on the Business Day preceding the Distribution Date.

*MERS*:  Mortgage Electronic Registration Systems, Inc., a corporation organized and existing under the laws of the State of Delaware, or any successor thereto.

*MERS Mortgage Loan*:  Any Mortgage Loan registered with MERS on the MERS® System.

*MERS® System*:  The system of recording transfers of mortgages electronically maintained by MERS.

*MIN*:  The mortgage identification number for any MERS Mortgage Loan.

*MOM Loan*:  Any Mortgage Loan as to which MERS is acting as mortgagee, solely as nominee for the originator of such Mortgage Loan and its successors and assigns.

Exhibit 6, Page 320

*Moneyline Telerate Page 3750:*  The display page currently so designated on the Moneyline Telerate Information Services, Inc.  (or any page replacing that page on that service for the purpose of displaying London inter-bank offered rates of major banks).

*Monthly Statement:*  The statement delivered to the Certificateholders pursuant to Section 4.06.

*Moody's:*  Moody's Investors Service, Inc., or any successor thereto.  If Moody's is designated as a Rating Agency in the Preliminary Statement, for purposes of Section 10.05(b) the address for notices to Moody's shall be Moody's Investors Service, Inc., 99 Church Street, New York, New York 10007, Attention: Residential Loan Monitoring Group, or any other address that Moody's furnishes to the Depositor and the Master Servicer.

*Mortgage:*  The mortgage, deed of trust, or other instrument creating a first lien on an estate in fee simple or leasehold interest in real property securing a Mortgage Note.

*Mortgage File:*  The mortgage documents listed in Section 2.01 pertaining to a particular Mortgage Loan and any additional documents delivered to the Trustee to be added to the Mortgage File pursuant to this Agreement.

*Mortgage Loans:*  Such of the mortgage loans transferred and assigned to the Trustee pursuant to this Agreement, as from time to time are held as a part of the Trust Fund (including any REO Property), the Mortgage Loans so held being identified on the Mortgage Loan Schedule, notwithstanding foreclosure or other acquisition of title of the related Mortgaged Property.

*Mortgage Loan Schedule:*  As of any date, the list set forth in Schedule I of Mortgage Loans included in the Trust Fund on that date.  The Mortgage Loan Schedule shall be prepared by the Seller and shall set forth the following information with respect to each Mortgage Loan:

    (i)       the loan number;

    (ii)      the street address of the Mortgaged Property, including the zip code;

    (iii)     the maturity date;

    (iv)      the original principal balance;

    (v)       the Cut-off Date Principal Balance;

    (vi)      the first payment date of the Mortgage Loan;

    (vii)     the Scheduled Payment in effect as of the Cut-off Date;

    (viii)    the Loan-to-Value Ratio at origination;

    (ix)      a code indicating whether the residential dwelling at the time of origination was represented to be owner-occupied;

    (x)       a code indicating whether the residential dwelling is either (a) a detached single family dwelling, (b) a dwelling in a PUD, (c) a condominium unit, (d) a two- to four-unit residential property, or (e) a Cooperative Unit;

    (xi)      the Mortgage Rate;

Exhibit 6, Page 321

(xii)   the purpose for the Mortgage Loan;

(xiii)   the type of documentation program pursuant to which the Mortgage Loan was originated;

(xiv)   a code indicating whether the Mortgage Loan is a borrower-paid mortgage insurance loan;

(xv)   the Servicing Fee Rate;

(xvi)   a code indicating whether the Mortgage Loan is a Lender PMI Loan;

(xvii)   the coverage amount of any mortgage insurance;

(xviii)   with respect to the Lender PMI Loans, the interest premium charged by the lender;

(xix)   a code indicating whether the Mortgage Loan is a Delay Delivery Mortgage Loan; and

(xx)   a code indicating whether the Mortgage Loan is a MERS Mortgage Loan.

The schedule shall also set forth the total of the amounts described under (v) above for all of the Mortgage Loans.

*Mortgage Note:*  The original executed note or other evidence of the indebtedness of a Mortgagor under a Mortgage Loan.

*Mortgage Rate:*  The annual rate of interest borne by a Mortgage Note from time to time (net of the interest premium for any Lender PMI Loan).

*Mortgaged Property:*  The underlying property securing a Mortgage Loan, which, with respect to a Cooperative Loan, is the related Co-op Shares and Proprietary Lease.

*Mortgagor:*  The obligors on a Mortgage Note.

*National Cost of Funds Index:*  The National Monthly Median Cost of Funds Ratio to SAIF-Insured Institutions published by the OTS.

*Net Prepayment Interest Shortfall:*  As to any Distribution Date, the amount by which the aggregate of Prepayment Interest Shortfalls for such Distribution Date exceeds the Compensating Interest for such Distribution Date.

*Non-Delay Certificates:*  As specified in the Preliminary Statement.

*Non-Discount Mortgage Loan:*  Any Mortgage Loan with an Adjusted Net Mortgage Rate that is greater than or equal to the Required Coupon.

*Non-PO Formula Principal Amount:*  As to any Distribution Date, the sum of (i) the sum of the applicable Non-PO Percentage of (a) all monthly payments of principal due on each Mortgage Loan on the related Due Date, (b) the principal portion of the purchase price of each Mortgage Loan that was repurchased by the Seller pursuant to this Agreement as of such Distribution Date, excluding any

16

**Exhibit 6, Page 322**

Mortgage Loan that was repurchased due to a modification of the Mortgage Rate, (c) the Substitution Adjustment Amount in connection with any Deleted Mortgage Loan received with respect to such Distribution Date, (d) any Insurance Proceeds or Liquidation Proceeds allocable to recoveries of principal of Mortgage Loans that are not yet Liquidated Mortgage Loans received during the calendar month preceding the month of such Distribution Date, (e) with respect to each Mortgage Loan that became a Liquidated Mortgage Loan during the calendar month preceding the month of such Distribution Date, the amount of Liquidation Proceeds allocable to principal received with respect to such Mortgage Loan, and (f) all partial and full Principal Prepayments received during the related Prepayment Period and (ii) (A) any Subsequent Recoveries received during the calendar month preceding the month of such Distribution Date, or (B) with respect to Subsequent Recoveries attributable to a Discount Mortgage Loan that incurred (1) an Excess Loss or (2) a Realized Loss after the Senior Credit Support Depletion Date, the Non-PO Percentage of any Subsequent Recoveries received during the calendar month preceding the month of such Distribution Date.

**Non-PO Percentage:**  As to any Discount Mortgage Loan, a fraction (expressed as a percentage) the numerator of which is the Adjusted Net Mortgage Rate of such Discount Loan and the denominator of which is the Required Coupon.  As to any Non-Discount Mortgage Loan, 100%.

**Nonrecoverable Advance:**  Any portion of an Advance previously made or proposed to be made by the Master Servicer, that, in the good faith judgment of the Master Servicer, will not be ultimately recoverable by the Master Servicer from the related Mortgagor, related Liquidation Proceeds or otherwise.

**Notice of Final Distribution:**  The notice to be provided pursuant to Section 9.02 to the effect that final distribution on any of the Certificates shall be made only upon presentation and surrender thereof.

**Notional Amount:**  With respect to the Class A-X Certificates and any Distribution Date, an amount equal to the aggregate of the Stated Principal Balances of the Non-Discount Mortgage Loans as of the first day of the related Due Period (after giving effect to Principal Prepayments received in the Prepayment Period that ends during such Due Period).  With respect to the Class A-2 Certificates and any Distribution Date, an amount equal to the Class Certificate Balance of the Class A-1 Certificates immediately prior to that Distribution Date.

**Notional Amount Certificates:**  As specified in the Preliminary Statement.

**Offered Certificates:**  As specified in the Preliminary Statement.

**Officer's Certificate:**  A certificate (i) signed by the Chairman of the Board, the Vice Chairman of the Board, the President, a Managing Director, a Vice President (however denominated), an Assistant Vice President, the Treasurer, the Secretary, or one of the Assistant Treasurers or Assistant Secretaries of the Depositor or the Master Servicer, or (ii) if provided for in this Agreement, signed by a Servicing Officer, as the case may be, and delivered to the Depositor and the Trustee as required by this Agreement.

**Opinion of Counsel:**  For the interpretation or application of the REMIC Provisions, a written opinion of counsel who (i) is in fact independent of the Depositor and the Master Servicer, (ii) does not have any direct financial interest in the Depositor or the Master Servicer or in any affiliate of either, and (iii) is not connected with the Depositor or the Master Servicer as an officer, employee, promoter, underwriter, trustee, partner, director, or person performing similar functions.  Otherwise, a written opinion of counsel who may be counsel for the Depositor or the Master Servicer, including in-house counsel, reasonably acceptable to the Trustee.

**Exhibit 6, Page 323**

*Original Applicable Credit Support Percentage:*  With respect to each of the following Classes of Subordinated Certificates, the corresponding percentage described below, as of the Closing Date:

| | |
|---|---|
| Class B-1.................................................. | 4.50% |
| Class B-2.................................................. | 2.25% |
| Class B-3.................................................. | 1.50% |
| Class B-4.................................................. | 1.00% |
| Class B-5.................................................. | 0.60% |
| Class B-6.................................................. | 0.20% |

*Original Mortgage Loan:*  The Mortgage Loan refinanced in connection with the origination of a Refinance Loan.

*Original Subordinated Principal Balance:*  The aggregate Class Certificate Balances of the Subordinated Certificates as of the Closing Date.

*OTS:*  The Office of Thrift Supervision.

*Outside Reference Date:*  Not applicable.

*Outstanding:*  For the Certificates as of any date of determination, all Certificates theretofore executed and authenticated under this Agreement except:

> (i)      Certificates theretofore canceled by the Trustee or delivered to the Trustee for cancellation; and

> (ii)     Certificates in exchange for which or in lieu of which other Certificates have been executed and delivered by the Trustee pursuant to this Agreement.

*Outstanding Mortgage Loan:*  As of any Due Date, a Mortgage Loan with a Stated Principal Balance greater than zero that was not the subject of a Principal Prepayment in Full before the Due Date or during the related Prepayment Period and that did not become a Liquidated Mortgage Loan before the Due Date.

*Ownership Interest:*  As to any Residual Certificate, any ownership interest in the Certificate including any interest in the Certificate as its Holder and any other interest therein, whether direct or indirect, legal or beneficial.

*Pass-Through Rate:*  For each Class of Certificates, the per annum rate set forth or calculated in the manner described in the Preliminary Statement.

*Percentage Interest:*  As to any Certificate, the percentage interest evidenced thereby in distributions required to be made on the related Class, the percentage interest being set forth on its face or equal to the percentage obtained by dividing the Denomination of the Certificate by the aggregate of the Denominations of all Certificates of the same Class.

*Permitted Investments:*  At any time, any of the following:

> (i)      obligations of the United States or any agency thereof backed by the full faith and credit of the United States;

Exhibit 6, Page 324

(ii)      general obligations of or obligations guaranteed by any state of the United States or the District of Columbia receiving the highest long-term debt rating of each Rating Agency, or any lower rating that will not result in the downgrading, qualification or withdrawal of the ratings then assigned to the Certificates by the Rating Agencies, as evidenced by a signed writing delivered by each Rating Agency;

(iii)      commercial or finance company paper that is then receiving the highest commercial or finance company paper rating of each Rating Agency, or any lower rating that will not result in the downgrading, qualification or withdrawal of the ratings then assigned to the Certificates by the Rating Agencies , as evidenced by a signed writing delivered by each Rating Agency;

(iv)      certificates of deposit, demand or time deposits, or bankers' acceptances issued by any depository institution or trust company incorporated under the laws of the United States or of any state thereof and subject to supervision and examination by federal or state banking authorities, provided that the commercial paper or long-term unsecured debt obligations of the depository institution or trust company (or in the case of the principal depository institution in a holding company system, the commercial paper or long-term unsecured debt obligations of the holding company, but only if Moody's is not a Rating Agency) are then rated one of the two highest long-term and the highest short-term ratings of each Rating Agency for the securities, or any lower rating that will not result in the downgrading, qualification or withdrawal of the ratings then assigned to the Certificates by the Rating Agencies, as evidenced by a signed writing delivered by each Rating Agency;

(v)      demand or time deposits or certificates of deposit issued by any bank or trust company or savings institution to the extent that the deposits are fully insured by the FDIC;

(vi)      guaranteed reinvestment agreements issued by any bank, insurance company, or other corporation acceptable to the Rating Agencies at the time of the issuance of the agreements, as evidenced by a signed writing delivered by each Rating Agency;

(vii)      repurchase obligations with respect to any security described in clauses (i) and (ii) above, in either case entered into with a depository institution or trust company (acting as principal) described in clause (iv) above; provided that such repurchase obligation would be accounted for as a financing arrangement under generally accepted accounting principles;

(viii)      securities (other than stripped bonds, stripped coupons, or instruments sold at a purchase price in excess of 115% of their face amount) bearing interest or sold at a discount issued by any corporation incorporated under the laws of the United States or any state thereof that, at the time of the investment, have one of the two highest ratings of each Rating Agency (except if the Rating Agency is Moody's the rating shall be the highest commercial paper rating of Moody's for the securities), or any lower rating that will not result in the downgrading, qualification or withdrawal of the ratings then assigned to the Certificates by the Rating Agencies, as evidenced by a signed writing delivered by each Rating Agency and that have a maturity date occurring no more than 365 days from their date of issuance;

(ix)      units of a taxable money-market portfolio having the highest rating assigned by each Rating Agency (except (i) if Fitch is a Rating Agency and has not rated the portfolio, the highest rating assigned by Moody's and (ii) if S&P is a Rating Agency, "AAAm" or "AAAM-G" by S&P) and restricted to obligations issued or guaranteed by the United States of America or entities whose obligations are backed by the full faith and credit of the United States of America and repurchase agreements collateralized by such obligations; and

Exhibit 6, Page 325

(x)      any other investments bearing interest or sold at a discount acceptable to each Rating Agency that will not result in the downgrading, qualification or withdrawal of the ratings then assigned to the Certificates by the Rating Agencies, as evidenced by a signed writing delivered by each Rating Agency.

No Permitted Investment may (i) evidence the right to receive interest only payments with respect to the obligations underlying the instrument, (ii) be sold or disposed of before its maturity or (iii) be any obligation of the Seller or any of its Affiliates. Any Permitted Investment shall be relatively risk free and no options or voting rights shall be exercised with respect to any Permitted Investment. Any Permitted Investment shall be sold or disposed of in accordance with Financial Accounting Standard 140, paragraph 35c(6) in effect as of the Closing Date.

*Permitted Transferee:*  Any person other than

(i)      the United States, any State or political subdivision thereof, or any agency or instrumentality of any of the foregoing,

(ii)      a foreign government, International Organization, or any agency or instrumentality of either of the foregoing,

(iii)      an organization (except certain farmers' cooperatives described in section 521 of the Code) that is exempt from tax imposed by Chapter 1 of the Code (including the tax imposed by section 511 of the Code on unrelated business taxable income) on any excess inclusions (as defined in section 860E(c)(1) of the Code) with respect to any Residual Certificate,

(iv)      rural electric and telephone cooperatives described in section 1381(a)(2)(C) of the Code,

(v)      an "electing large partnership" as defined in section 775 of the Code,

(vi)      a Person that is not a U.S. Person, and

(vii)      any other Person so designated by the Depositor based on an Opinion of Counsel that the Transfer of an Ownership Interest in a Residual Certificate to the Person may cause any REMIC created hereunder to fail to qualify as a REMIC at any time that the Certificates are outstanding.

*Person:*  Any individual, corporation, partnership, joint venture, association, limited liability company, joint-stock company, trust, unincorporated organization, or government, or any agency or political subdivision thereof.

*Physical Certificates:*  As specified in the Preliminary Statement.

*Planned Balance:*  Not applicable.

*Planned Principal Classes:*  As specified in the Preliminary Statement.

*PO Formula Principal Amount*:  As to any Distribution Date and the Class PO Certificates, the sum of (i) the sum of the applicable PO Percentage of (a) the principal portion of each Scheduled Payment (without giving effect, prior to the Bankruptcy Coverage Termination Date, to any reductions thereof caused by any Debt Service Reductions or Deficient Valuations) due on each Mortgage Loan on the related Due Date, (b) the Stated Principal Balance of each Mortgage Loan that was repurchased by the Seller or the Master Servicer pursuant to this Agreement as of such Distribution Date, excluding any

**Exhibit 6, Page 326**

Mortgage Loan that was repurchased due to a modification of the Mortgage Rate, (c) the Substitution Adjustment Amount in connection with any Deleted Mortgage Loan received with respect to such Distribution Date, (d) any Insurance Proceeds or Liquidation Proceeds allocable to recoveries of principal of Mortgage Loans that are not yet Liquidated Mortgage Loans received during the calendar month preceding the month of such Distribution Date, (e) with respect to each Mortgage Loan that became a Liquidated Mortgage Loan during the month preceding the calendar month of such Distribution Date, the amount of Liquidation Proceeds allocable to principal received with respect to such Mortgage Loan during the month preceding the month of such Distribution Date, and (f) all Principal Prepayments with respect to the Mortgage Loans received during the related Prepayment Period, and (ii) with respect to Subsequent Recoveries attributable to a Discount Mortgage Loan that incurred (1) an Excess Loss or (2) a Realized Loss after the Senior Credit Support Depletion Date, the PO Percentage of any Subsequent Recoveries received during the calendar month preceding the month of such Distribution Date.

*PO Percentage*:  As to any Discount Mortgage Loan, a fraction (expressed as a percentage) the numerator of which is the excess of the Required Coupon over the Adjusted Net Mortgage Rate of such Discount Mortgage Loan and the denominator of which is such Required Coupon.  As to any Non-Discount Mortgage Loan, 0%.

*Pool Stated Principal Balance*:  The aggregate Stated Principal Balance of the Mortgage Loans.

*Prepayment Charge:*  As to a Mortgage Loan, any charge payable by a Mortgagor in connection with certain partial prepayments and all prepayments in full made within the related Prepayment Charge Period, the Prepayment Charges with respect to each applicable Mortgage Loan so held by the Trust Fund being identified in the Prepayment Charge Schedule.

*Prepayment Charge Period:*  As to any Mortgage Loan, the period of time during which a Prepayment Charge may be imposed.

*Prepayment Charge Schedule:*  As of any date, the list of Prepayment  Charges included in the Trust Fund on that date (including the prepayment charge summary attached thereto).  The Prepayment Charge Schedule shall set forth the following information with respect to each Prepayment Charge:

- the Mortgage Loan account number;

- a code indicating the type of Prepayment Charge;

- the state of origination in which the related Mortgage Property is located;

- the first date on which a monthly payment is or was due under the related Mortgage Note;

- the term of the Prepayment Charge;

- the original principal amount of the related Mortgage Loan; and

- the Cut-off Date Principal Balance of the related Mortgage Loan.

The Prepayment Charge Schedule shall be amended from time to time by the Master Servicer in accordance with this Agreement.

*Prepayment Interest Excess:*  As to any Principal Prepayment received by the Master Servicer on a Mortgage Loan from the first day through the fifteenth day of any calendar month other than the  month

21

Exhibit 6, Page 327

of the Cut-off Date, all amounts paid by the related Mortgagor in respect of interest on such Principal Prepayment.  All Prepayment Interest Excess shall be retained by the Master Servicer as additional master servicing compensation.

*Prepayment Interest Shortfall:*  As to any Distribution Date, Mortgage Loan and Principal Prepayment received on or after the sixteenth day of the month preceding the month of such Distribution Date (or, in the case of the first Distribution Date, on or after the Cut-off Date) and on or before the last day of the month preceding the month of such Distribution Date, the amount, if any, by which one month's interest at the related Mortgage Rate, net of the Servicing Fee Rate, on such Principal Prepayment exceeds the amount of interest paid in connection with such Principal Prepayment.

*Prepayment Period:*  As to any Distribution Date and related Due Date, the period from and including the 16th day of the month immediately prior to the month of such Distribution Date (or, in the case of the first Distribution Date, from the Cut-off Date) and to and including the 15th day of the month of such Distribution Date.

*Prepayment Shift Percentage:*  Not applicable.

*Primary Insurance Policy:*  Each policy of primary mortgage guaranty insurance or any replacement policy therefor with respect to any Mortgage Loan.

*Principal Balance Schedules*:  The principal balance schedules attached to this Agreement as Schedule IV.

*Principal Only Certificates:*  As specified in the Preliminary Statement.

*Principal Prepayment:*  Any payment of principal by a Mortgagor on a Mortgage Loan (including the Purchase Price of any Mortgage Loan purchased pursuant to Section 3.12) that is received in advance of its scheduled Due Date and is not accompanied by an amount representing scheduled interest due on any date in any month after the month of prepayment.  The Master Servicer shall apply partial Principal Prepayments in accordance with the related Mortgage Note.

*Principal Prepayment in Full:*  Any Principal Prepayment made by a Mortgagor of the entire principal balance of a Mortgage Loan.

*Priority Amount*:  For any Distribution Date, the sum of (i) the product of (A) the Scheduled Principal Distribution Amount and (B) the Priority Percentage, and (ii) the product of (A) the Unscheduled Principal Distribution Amount, (B) the Priority Percentage and (C) the Shift Percentage.

*Priority Percentage:*  For any Distribution Date occuring during the five-year period beginning on the first Distribution Date will equal 0%.  For any Distribution Date thereafter, the percentage equivalent of a fraction, the numerator of which is the aggregate Class Certificate Balance of the Class A-6 and Class A-7 Certificates immediately prior to such Distribution Date, and the denominator of which is the aggregate Class Certificate Balance of the Senior Certificates (other than the Class PO and Class A-R Certificates) immediately prior to such Distribution Date.

*Private Certificates:*  As specified in the Preliminary Statement.

*Pro Rata Share:*  As to any Distribution Date and any Class of Subordinated Certificates, the portion of the Subordinated Principal Distribution Amount allocable to such Class, equal to the product of the Subordinated Principal Distribution Amount on such Distribution Date and a fraction, the numerator

Exhibit 6, Page 328

of which is the related Class Certificate Balance thereof and the denominator of which is the aggregate of the Class Certificate Balances of the Subordinated Certificates, in each case immediately prior to such Distribution Date.

*Proprietary Lease:*  For any Cooperative Unit, a lease or occupancy agreement between a Cooperative Corporation and a holder of related Co-op Shares.

*Prospectus Supplement:*  The Prospectus Supplement dated May 26, 2005, relating to the Offered Certificates, and any supplement to the Prospectus Supplement.

*PUD:*  Planned Unit Development.

*Purchase Price:*  For any Mortgage Loan required to be purchased by the Seller pursuant to Section 2.02 or 2.03 or purchased by the Master Servicer pursuant to Section 3.12, the sum of

(i)        100% of the unpaid principal balance of the Mortgage Loan on the date of the purchase,

(ii)        accrued and unpaid interest on the Mortgage Loan at the applicable Mortgage Rate (or at the applicable Adjusted Mortgage Rate if (x) the purchaser is the Master Servicer or (y) if the purchaser is the Seller and the Seller is the Master Servicer) from the date through which interest was last paid by the Mortgagor to the Due Date in the month in which the Purchase Price is to be distributed to Certificateholders, net of any unreimbursed Advances made by the Master Servicer on the Mortgage Loan, and

(iii)        any costs and damages incurred by the Trust Fund in connection with any violation by the Mortgage Loan of any predatory or abusive lending law.

If the Mortgage Loan is purchased pursuant to Section 3.12, the interest component of the Purchase Price shall be computed (i) on the basis of the applicable Adjusted Mortgage Rate before giving effect to the related modification and (ii) from the date to which interest was last paid to the date on which the Mortgage Loan is assigned to the Master Servicer pursuant to Section 3.12.

*Qualified Insurer:*  A mortgage guaranty insurance company duly qualified as such under the laws of the state of its principal place of business and each state having jurisdiction over the insurer in connection with the insurance policy issued by the insurer, duly authorized and licensed in such states to transact a mortgage guaranty insurance business in such states and to write the insurance provided by the insurance policy issued by it, approved as a FNMA- or FHLMC-approved mortgage insurer or having a claims paying ability rating of at least "AA" or equivalent rating by a nationally recognized statistical rating organization.  Any replacement insurer with respect to a Mortgage Loan must have at least as high a claims paying ability rating as the insurer it replaces had on the Closing Date.

*Rating Agency:*  Each of the Rating Agencies specified in the Preliminary Statement.  If any of them or a successor is no longer in existence, "Rating Agency" shall be the nationally recognized statistical rating organization, or other comparable Person, designated by the Depositor, notice of which designation shall be given to the Trustee.  References to a given rating or rating category of a Rating Agency means the rating category without giving effect to any modifiers.

*Realized Loss:*  With respect to each Liquidated Mortgage Loan, an amount (not less than zero or more than the Stated Principal Balance of the Mortgage Loan) as of the date of such liquidation, equal to (i) the Stated Principal Balance of the Liquidated Mortgage Loan as of the date of such liquidation, plus (ii) interest at the Adjusted Net Mortgage Rate from the Due Date as to which interest was last paid or

Exhibit 6, Page 329

advanced (and not reimbursed) to Certificateholders up to the Due Date in the month in which Liquidation Proceeds are required to be distributed on the Stated Principal Balance of such Liquidated Mortgage Loan from time to time, minus (iii) the Liquidation Proceeds, if any, received during the month in which such liquidation occurred, to the extent applied as recoveries of interest at the Adjusted Net Mortgage Rate and to principal of the Liquidated Mortgage Loan.  With respect to each Mortgage Loan that has become the subject of a Deficient Valuation, if the principal amount due under the related Mortgage Note has been reduced, the difference between the principal balance of the Mortgage Loan outstanding immediately prior to such Deficient Valuation and the principal balance of the Mortgage Loan as reduced by the Deficient Valuation.  With respect to each Mortgage Loan that has become the subject of a Debt Service Reduction and any Distribution Date, the amount, if any, by which the principal portion of the related Scheduled Payment has been reduced.

To the extent the Master Servicer receives Subsequent Recoveries with respect to any Mortgage Loan, the amount of the Realized Loss with respect to that Mortgage Loan will be reduced by such Subsequent Recoveries.

*Recognition Agreement:*  For any Cooperative Loan, an agreement between the Cooperative Corporation and the originator of the Mortgage Loan that establishes the rights of the originator in the Cooperative Property.

*Record Date:*  With respect to any Distribution Date, the close of business on the last Business Day of the month preceding the month of that Distribution Date.

*Reference Bank:*  As defined in Section 4.08.

*Refinance Loan:*  Any Mortgage Loan the proceeds of which are used to refinance an Original Mortgage Loan.

*Regular Certificates:*  As specified in the Preliminary Statement.

*Relief Act:*  The Servicemembers Civil Relief Act and any similar state or local laws.

*Relief Act Reductions:*  With respect to any Distribution Date and any Mortgage Loan as to which there has been a reduction in the amount of interest collectible thereon for the most recently ended calendar month as a result of the application of the Relief Act, the amount, if any, by which (i) interest collectible on such Mortgage Loan for the most recently ended calendar month is less than (ii) interest accrued thereon for such month pursuant to the Mortgage Note.

*REMIC:*  A "real estate mortgage investment conduit" within the meaning of section 860D of the Code.

*REMIC Provisions:*  Provisions of the federal income tax law relating to real estate mortgage investment conduits, which appear at sections 860A through 860G of Subchapter M of Chapter 1 of the Code, and related provisions, and regulations promulgated thereunder, as the foregoing may be in effect from time to time as well as provisions of applicable state laws.

*REO Property:*  A Mortgaged Property acquired by the Trust Fund through foreclosure or deed-in-lieu of foreclosure in connection with a defaulted Mortgage Loan.

*Request for Release:*  The Request for Release submitted by the Master Servicer to the Trustee, substantially in the form of Exhibits M and N, as appropriate.

24

**Exhibit 6, Page 330**

*Required Coupon*:  5.50% per annum.

*Required Insurance Policy:*  For any Mortgage Loan, any insurance policy that is required to be maintained from time to time under this Agreement.

*Residual Certificates:*  As specified in the Preliminary Statement.

*Responsible Officer:*  When used with respect to the Trustee, any Managing Director, any Director, Vice President, any Assistant Vice President, any Associate, any Assistant Secretary, any Trust Officer, or any other officer of the Trustee customarily performing functions similar to those performed by any of the above designated officers who at such time shall be officers to whom, with respect to a particular matter, the matter is referred because of the officer's knowledge of and familiarity with the particular subject and who has direct responsibility for the administration of this Agreement.

*Restricted Classes:*  As defined in Section 4.02(e).

*SAIF:*  The Savings Association Insurance Fund, or any successor thereto.

*S&P:*  Standard & Poor's, a division of The McGraw-Hill Companies, Inc.  If S&P is designated as a Rating Agency in the Preliminary Statement, for purposes of Section 10.05(b) the address for notices to S&P shall be Standard & Poor's, a division of The McGraw-Hill Companies, Inc., 55 Water Street, New York, New York 10041, Attention: Mortgage Surveillance Monitoring, or any other address that S&P furnishes to the Depositor and the Master Servicer.

*Scheduled Balance:*  Not applicable.

*Scheduled Classes:*  As specified in the Preliminary Statement.

*Scheduled Payment:*  The scheduled monthly payment on a Mortgage Loan due on any Due Date allocable to principal and/or interest on such Mortgage Loan which, unless otherwise specified herein, shall give effect to any related Debt Service Reduction and any Deficient Valuation that affects the amount of the monthly payment due on such Mortgage Loan.

*Scheduled Principal Distribution Amount*: For any Distribution Date, the Senior Percentage of the Non-PO Percentage of all amounts described in subclauses (a) through (d) of clause (i) of the definition of Non-PO Formula Principal Amount for such Distribution Date; provided, however, that if a Bankruptcy Loss that is an Excess Loss is sustained with respect to a Mortgage Loan that is not a Liquidated Mortgage Loan, the Scheduled Principal Distribution Amount will be reduced on the related Distribution Date by the applicable Non-PO Percentage of the principal portion of such Bankruptcy Loss.

*Securities Act:*  The Securities Act of 1933, as amended.

*Security Agreement:*  For any Cooperative Loan, the agreement between the owner of the related Co-op Shares and the originator of the related Mortgage Note that defines the security interest in the Co-op Shares and the related Proprietary Lease.

*Seller:*  IndyMac Bank, F.S.B., a federal savings bank, and its successors and assigns, in its capacity as seller of the Mortgage Loans to the Depositor.

*Senior Certificates:*  As specified in the Preliminary Statement.

25

Exhibit 6, Page 331

*Senior Credit Support Depletion Date:*  The date on which the Class Certificate Balance of each Class of Subordinated Certificates has been reduced to zero.

*Senior Liquidation Amount:*  For any Distribution Date and for each Mortgage Loan that became a Liquidated Mortgage Loan during the calendar month preceding the month of the Distribution Date, the lesser of (a) the Senior Percentage of the applicable Non-PO Percentage of the Stated Principal Balance of the Mortgage Loan and (b) either (x) if an Excess Loss was not sustained on the Liquidated Mortgage Loan during the preceding calendar month, the Senior Prepayment Percentage of the applicable Non-PO Percentage of the amount of the Liquidation Proceeds allocable to principal received on the Mortgage Loan or (y) if an Excess Loss was sustained on the Liquidated Mortgage Loan during the preceding calendar month, the Senior Percentage of the applicable Non-PO Percentage of the amount of the Liquidation Proceeds allocable to principal received on the Mortgage Loan.

*Senior Percentage:*  As to any Distribution Date, the percentage equivalent of a fraction the numerator of which is the aggregate of the Class Certificate Balances of the Senior Certificates (other than the Class PO Certificates and the Notional Amount Certificates) immediately before the Distribution Date and the denominator of which is the aggregate Class Certificate Balance of the Certificates (other than the Class PO Certificates and the Notional Amount Certificates) immediately before the Distribution Date.

*Senior Prepayment Percentage:*  As to any Distribution Date during the five years beginning on the first Distribution Date, 100%.  The Senior Prepayment Percentage for any Distribution Date occurring on or after the fifth anniversary of the first Distribution Date will, except as provided in this Agreement, be as follows: for any Distribution Date in the first year thereafter, the Senior Percentage plus 70% of the Subordinated Percentage for such Distribution Date; for any Distribution Date in the second year thereafter, the Senior Percentage plus 60% of the Subordinated Percentage for such Distribution Date; for any Distribution Date in the third year thereafter, the Senior Percentage plus 40% of the Subordinated Percentage for such Distribution Date; for any Distribution Date in the fourth year thereafter, the Senior Percentage plus 20% of the Subordinated Percentage for such Distribution Date; and for any Distribution Date thereafter, the Senior Percentage for such Distribution Date (unless on any Distribution Date the Senior Percentage exceeds the initial Senior Percentage, in which case the Senior Prepayment Percentage for such Distribution Date will once again equal 100%).  Notwithstanding the foregoing, no decrease in the Senior Prepayment Percentage will occur unless both Senior Step Down Conditions are satisfied.

*Senior Principal Distribution Amount:*  As to any Distribution Date, the sum of (i) the Senior Percentage of all amounts described in subclauses (a) through (d) of clause (i) of the definition of Non-PO Formula Principal Amount for such Distribution Date, (ii) the Senior Liquidation Amount for that Distribution Date, and (iii) the Senior Prepayment Percentage of the applicable Non-PO Percentage of the amounts described in subclause (f) of clause (i) of the definition of Non-PO Formula Principal Amount for such Distribution Date, and (iv) the Senior Prepayment Percentage of any Subsequent Recoveries described in clause (ii) of the definition of Non-PO Formula Principal Amount for such Distribution Date; provided, however, that if a Bankruptcy Loss that is an Excess Loss is sustained with respect to a Mortgage Loan that is not a Liquidated Mortgage Loan, the Senior Principal Distribution Amount will be reduced on the related Distribution Date by the Senior Percentage of the applicable Non-PO Percentage of the principal portion of such Bankruptcy Loss.

*Senior Step Down Conditions:*  As to any Distribution Date: (i) the aggregate Stated Principal Balance of all the Mortgage Loans 60 days or more Delinquent (averaged over the preceding six month period) (including any Mortgage Loans subject to foreclosure proceedings, REO Property (regardless of whether that Mortgage Loan is 60 days or more Delinquent) and Mortgage Loans the mortgagors of which are in bankruptcy), as a percentage of the aggregate Class Certificate Balance of the Subordinated

Exhibit 6, Page 332

Certificates, does not equal or exceed 50%, and (ii) cumulative Realized Losses do not exceed: (a) commencing with the Distribution Date on the fifth anniversary of the first Distribution Date, 30% of the Original Subordinated Principal Balance, (b) commencing with the Distribution Date on the sixth anniversary of the first Distribution Date, 35% of the Original Subordinated Principal Balance, (c) commencing with the Distribution Date on the seventh anniversary of the first Distribution Date, 40% of the Original Subordinated Principal Balance, (d) commencing with the Distribution Date on the eighth anniversary of the first Distribution Date, 45% of the Original Subordinated Principal Balance, and (e) commencing with the Distribution Date on the ninth anniversary of the first Distribution Date, 50% of the Original Subordinated Principal Balance.

*Servicing Account:*  The separate Eligible Account or Accounts created and maintained pursuant to Section 3.06(b).

*Servicing Advances:*  All customary, reasonable, and necessary "out of pocket" costs and expenses incurred in the performance by the Master Servicer of its servicing obligations, including the cost of

(a)  the preservation, restoration, and protection of a Mortgaged Property,

(b)  expenses reimbursable to the Master Servicer pursuant to Section 3.12 and any enforcement or judicial proceedings, including foreclosures,

(c)  the maintenance and liquidation of any REO Property,

(d)  compliance with the obligations under Section 3.10; and

(e)  reasonable compensation to the Master Servicer or its affiliates for acting as broker in connection with the sale of foreclosed Mortgaged Properties and for performing certain default management and other similar services (including appraisal services) in connection with the servicing of defaulted Mortgage Loans.  For purposes of this clause (e), only costs and expenses incurred in connection with the performance of activities generally considered to be outside the scope of customary servicing or master servicing duties shall be treated as Servicing Advances.

*Servicing Fee:*  As to each Mortgage Loan and any Distribution Date, one month's interest at the applicable Servicing Fee Rate on the Stated Principal Balance of the Mortgage Loan, or, whenever a payment of interest accompanies a Principal Prepayment in Full made by the Mortgagor, interest at the Servicing Fee Rate on the Stated Principal Balance of the Mortgage Loan for the period covered by the payment of interest, subject to reduction as provided in Section 3.15.

*Servicing Fee Rate:*  For each Mortgage Loan, the per annum rate specified on the Mortgage Loan Schedule.

*Servicing Officer:*  Any officer of the Master Servicer involved in, or responsible for, the administration and servicing of the Mortgage Loans whose name and facsimile signature appear on a list of servicing officers furnished to the Trustee by the Master Servicer on the Closing Date pursuant to this Agreement, as the list may from time to time be amended.

*Servicing Standard:* That degree of skill and care exercised by the Master Servicer with respect to mortgage loans comparable to the Mortgage Loans serviced by the Master Servicer for itself or others.

**Exhibit 6, Page 333**

**Shift Percentage**: For any Distribution Date occurring during the five years beginning on the first Distribution Date, 0%. For any Distribution Date occurring on or after the fifth anniversary of the first Distribution Date as follows: for any Distribution Date in the first year thereafter, 30%; for any Distribution Date in the second year thereafter, 40%; for any Distribution Date in the third year thereafter, 60%; for any Distribution Date in the fourth year thereafter, 80%; and for any Distribution Date thereafter, 100%.

**Special Hazard Coverage Termination Date:**  The point in time at which the Special Hazard Loss Coverage Amount is reduced to zero.

**Special Hazard Loss:**  Any Realized Loss suffered by a Mortgaged Property on account of direct physical loss, but not including (i) any loss of a type covered by a hazard insurance policy or a flood insurance policy required to be maintained with respect to such Mortgaged Property pursuant to Section 3.10 to the extent of the amount of such loss covered thereby, or (ii) any loss caused by or resulting from:

    (a)      normal wear and tear;

    (b)      fraud, conversion or other dishonest act on the part of the Trustee, the Master Servicer or any of their agents or employees (without regard to any portion of the loss not covered by any errors and omissions policy);

    (c)      errors in design, faulty workmanship or faulty materials, unless the collapse of the property or a part thereof ensues and then only for the ensuing loss;

    (d)      nuclear or chemical reaction or nuclear radiation or radioactive or chemical contamination, all whether controlled or uncontrolled, and whether such loss be direct or indirect, proximate or remote or be in whole or in part caused by, contributed to or aggravated by a peril covered by the definition of the term "Special Hazard Loss";

    (e)      hostile or warlike action in time of peace and war, including action in hindering, combating or defending against an actual, impending or expected attack:

        1.      by any government or sovereign power, de jure or de facto, or by any authority maintaining or using military, naval or air forces; or

        2.      by military, naval or air forces; or

        3.      by an agent of any such government, power, authority or forces;

    (f)      any weapon of war employing nuclear fission, fusion or other radioactive force, whether in time of peace or war; or

    (g)      insurrection, rebellion, revolution, civil war, usurped power or action taken by governmental authority in hindering, combating or defending against such an occurrence, seizure or destruction under quarantine or customs regulations, confiscation by order of any government or public authority, or risks of contraband or illegal transportation or trade.

**Special Hazard Loss Coverage Amount:**  With respect to the first Distribution Date, $2,757,132. With respect to any Distribution Date after the first Distribution Date, the lesser of (a) the greatest of (i) 1% of the aggregate of the principal balances of the Mortgage Loans, (ii) twice the principal balance of the largest Mortgage Loan and (iii) the aggregate of the principal balances of all Mortgage Loans secured

by Mortgaged Properties located in the single California postal zip code area having the highest aggregate principal balance of any such zip code area and (b) the Special Hazard Loss Coverage Amount as of the Closing Date less the amount, if any, of Special Hazard Losses allocated to the Certificates since the Closing Date.  All principal balances for the purpose of this definition will be calculated as of the first day of the calendar month preceding the month of such Distribution Date after giving effect to Scheduled Payments on the Mortgage Loans then due, whether or not paid.

*Special Hazard Mortgage Loan:*  A Liquidated Mortgage Loan as to which a Special Hazard Loss has occurred.

*Startup Day:*  The Closing Date.

*Stated Principal Balance:*  As to any Mortgage Loan and Due Date, the unpaid principal balance of such Mortgage Loan as of such Due Date, as specified in the amortization schedule at the time relating thereto (before any adjustment to such amortization schedule by reason of any moratorium or similar waiver or grace period) after giving effect to the sum of: (i) the payment of principal due on such Due Date and irrespective of any delinquency in payment by the related Mortgagor and (ii) any Liquidation Proceeds allocable to principal received in the prior calendar month and Principal Prepayments received through the last day of the Prepayment Period in which the Due Date occurs, in each case with respect to such Mortgage Loan.

*Subordinated Certificates:*  As specified in the Preliminary Statement.

*Subordinated Percentage:*  As to any Distribution Date, 100% minus the Senior Percentage for such Distribution Date.

*Subordinated Prepayment Percentage:*  As to any Distribution Date, 100% minus the Senior Prepayment Percentage for such Distribution Date.

*Subordinated Principal Distribution Amount:*  As to any Distribution Date and the Subordinated Certificates, the sum of the following: (i) the Subordinated Percentage of the applicable Non-PO Percentage of all amounts described in subclauses (a) through (d) of clause (i) of the definition of Non-PO Formula Principal Amount with respect to such Distribution Date, (ii) for each Mortgage Loan that became a Liquidated Mortgage Loan during the calendar month preceding the month of the Distribution Date, the applicable Non-PO Percentage of the portion of the Liquidation Proceeds allocable to principal received on the Mortgage Loan, after application of the amounts pursuant to clause (ii) of the definition of Senior Principal Distribution Amount, up to the Subordinated Percentage of the applicable Non-PO Percentage of the Stated Principal Balance of the Mortgage Loan, (iii) the Subordinated Prepayment Percentage of the applicable Non-PO Percentage of the amounts described in subclause (f) of clause (i) of the definition of Non-PO Formula Principal Amount for the Distribution Date, and (iv) the Subordinated Prepayment Percentage of any Subsequent Recoveries described in clause (ii) of the definition of Non-PO Formula Principal Amount for the Distribution Date, reduced by the amount of any payments in respect of Class PO Deferred Amounts for such Distribution Date.

*Subsequent Recoveries:*  As to any Distribution Date, with respect to a Liquidated Mortgage Loan that resulted in a Realized Loss in a prior calendar month, unexpected amounts received by the Master Servicer (net of any related expenses permitted to be reimbursed pursuant to Section 3.09) specifically related to such Liquidated Mortgage Loan.

*Subservicer:*  As defined in Section 3.02(a).

**Exhibit 6, Page 335**

*Substitute Mortgage Loan:*  A Mortgage Loan substituted by the Seller for a Deleted Mortgage Loan that must, on the date of substitution, as confirmed in a Request for Release, substantially in the form of Exhibit M,

(i)        have a Stated Principal Balance, after deduction of the principal portion of the Scheduled Payment due in the month of substitution, not in excess of, and not more than 10% less than, the Stated Principal Balance of the Deleted Mortgage Loan (unless the amount of any shortfall is deposited by the Seller in the Certificate Account and held for distribution to the Certificateholders on the related Distribution Date);

(ii)        have a Mortgage Rate no lower than and not more than 1% per annum higher than the Deleted Mortgage Loan;

(iii)        have a Loan-to-Value Ratio no higher than that of the Deleted Mortgage Loan;

(iv)        have a remaining term to maturity no greater than (and not more than one year less than) that of the Deleted Mortgage Loan;

(v)        not be a Cooperative Loan unless the Deleted Mortgage Loan was a Cooperative Loan; and

(vi)        comply with each representation and warranty in Section 2.03.

*Substitution Adjustment Amount:*  As defined in Section 2.03.

*Suspension Notification:*  Notification to the Commission of the suspension of the Trust Fund's obligation to file reports pursuant to Section 15(d) of the Exchange Act.

*Targeted Balance:*  Not applicable.

*Targeted Principal Classes:*  As specified in the Preliminary Statement.

*Transfer:*  Any direct or indirect transfer or sale of any Ownership Interest in a Residual Certificate.

*Trust Fund:*  The corpus of the trust created under this Agreement consisting of

(i)        the Mortgage Loans and all interest and principal received on them after the Cut-off Date, other than amounts due on the Mortgage Loans by the Cut-off Date;

(ii)        the Certificate Account, the Distribution Account and all amounts deposited therein pursuant to this Agreement (including amounts received from the Seller on the Closing Date that will be deposited by the Trustee in the Certificate Account pursuant to Section 2.01);

(iii)        property that secured a Mortgage Loan and has been acquired by foreclosure, deed-in-lieu of foreclosure, or otherwise;

(iv)        the right to collect any amounts under any mortgage insurance policies covering any Mortgage Loan and any collections received under any mortgage insurance policies covering any Mortgage Loan; and

(v)        all proceeds of the conversion, voluntary or involuntary, of any of the foregoing.

Exhibit 6, Page 336

*Trustee:*  Deutsche Bank National Trust Company  and its successors and, if a successor trustee is appointed under this Agreement, the successor.

*Trustee Fee:*  The fee payable to the Trustee on each Distribution Date for its services as Trustee hereunder, in an amount equal to one-twelfth of the Trustee Fee Rate multiplied by the aggregate Stated Principal Balance of the Mortgage Loans immediately prior to such Distribution Date.

*Trustee Fee Rate:*  0.01% per annum.

The terms "**United States**," "**State**," and "**International Organization**" have the meanings in section 7701 of the Code or successor provisions.  A corporation will not be treated as an instrumentality of the United States or of any State or political subdivision thereof for these purposes if all of its activities are subject to tax and, with the exception of the Federal Home Loan Mortgage Corporation, a majority of its board of directors is not selected by such government unit.

*UCC:*  The Uniform Commercial Code for the State of New York.

*Underwriter's Exemption:*  Prohibited Transaction Exemption 2002-41, 67 Fed.  Reg.  54487 (2002) (or any successor thereto), or any substantially similar administrative exemption granted by the U.S. Department of Labor.

*United States Person or U.S. Person:*

(i)        A citizen or resident of the United States;

(ii)       a corporation (or entity treated as a corporation for tax purposes) created or organized in the United States or under the laws of the United States or of any state thereof, including, for this purpose, the District of Columbia;

(iii)      a partnership (or entity treated as a partnership for tax purposes) organized in the United States or under the laws of the United States or of any state thereof, including, for this purpose, the District of Columbia (unless provided otherwise by future Treasury regulations);

(iv)      an estate whose income is includible in gross income for United States income tax purposes regardless of its source; or

(v)       a trust, if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more U.S. Persons have authority to control all substantial decisions of the trust.  Notwithstanding the last clause of the preceding sentence, to the extent provided in Treasury regulations, certain trusts in existence on August 20, 1996, and treated as U.S. Persons before that date, may elect to continue to be U.S. Persons.

*Unscheduled Principal Distribution Amount*: For any Distribution Date, the sum of (i) the Senior Liquidation Amount, (ii) the Senior Prepayment Percentage of the applicable Non-PO Percentage of the amount described in subclause (f) of clause (i) of the definition of Non-PO Formula Principal Amount for such Distribution Date and (iii) any Subsequent Recoveries described in clause (ii) of the definition of Non-PO Formula Principal Amount for such Distribution Date.

*U.S.A. Patriot Act:* The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001.

**Exhibit 6, Page 337**

***Voting Rights:*** The portion of the voting rights of all of the Certificates that is allocated to any Certificate.  As of any date of determination, (a) 1% of all Voting Rights shall be allocated to each Class of Notional Amount Certificates (the Voting Rights to be allocated among the holders of Certificates of each Class in accordance with their respective Percentage Interests), (b) 1% of all Voting Rights shall be allocated to the Holder of the Class A-R Certificates and (c) the remaining Voting Rights shall be allocated among Holders of the remaining Classes of Offered Certificates in proportion to the Certificate Balances of the respective Certificates on the date.

***Withdrawal Date:*** The 18th day of each month, or if such day is not a Business Day, the next preceding Business Day.

### Section 1.02     Rules of Construction.

Except as otherwise expressly provided in this Agreement or unless the context clearly requires otherwise

(a)  References to designated articles, sections, subsections, exhibits, and other subdivisions of this Agreement, such as "Section 6.12 (a)," refer to the designated article, section, subsection, exhibit, or other subdivision of this Agreement as a whole and to all subdivisions of the designated article, section, subsection, exhibit, or other subdivision.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Agreement as a whole and not to any particular article, section, exhibit, or other subdivision of this Agreement.

(b)  Any term that relates to a document or a statute, rule, or regulation includes any amendments, modifications, supplements, or any other changes that may have occurred since the document, statute, rule, or regulation came into being, including changes that occur after the date of this Agreement.

(c)  Any party may execute any of the requirements under this Agreement either directly or through others, and the right to cause something to be done rather than doing it directly shall be implicit in every requirement under this Agreement.  Unless a provision is restricted as to time or limited as to frequency, all provisions under this Agreement are implicitly available and things may happen from time to time.

(d)  The term "including" and all its variations mean "including but not limited to." Except when used in conjunction with the word "either," the word "or" is always used inclusively (for example, the phrase "A or B" means "A or B or both," not "either A or B but not both").

(e)  A reference to "a [thing]" or "any [of a thing]" does not imply the existence or occurrence of the thing referred to even though not followed by "if any," and "any [of a thing]" is any of it.  A reference to the plural of anything as to which there could be either one or more than one does not imply the existence of more than one (for instance, the phrase "the obligors on a note" means "the obligor or obligors on a note").  "Until [something occurs]" does not imply that it must occur, and will not be modified by the word "unless." The word "due" and the word "payable" are each used in the sense that the stated time for payment has passed.  The word "accrued" is used in its accounting sense, i.e., an amount paid is no longer accrued.  In the calculation of amounts of things, differences and sums may generally result in negative numbers, but when the calculation of the excess of one thing over another results in zero or a negative number, the calculation is disregarded and an "excess" does not exist. Portions of things may be expressed as fractions or percentages interchangeably.

(f)  All accounting terms used in an accounting context and not otherwise defined, and accounting terms partly defined in this Agreement, to the extent not completely defined, shall be construed in

32

**Exhibit 6, Page 338**

accordance with generally accepted accounting principles.  To the extent that the definitions of accounting terms in this Agreement are inconsistent with their meanings under generally accepted accounting principles, the definitions contained in this Agreement shall control.  Capitalized terms used in this Agreement without definition that are defined in the Uniform Commercial Code are used in this Agreement as defined in the Uniform Commercial Code.

(g)  In the computation of a period of time from a specified date to a later specified date or an open-ended period, the words "from" and "beginning" mean "from and including," the word "after" means "from but excluding," the words "to" and "until" mean "to but excluding," and the word "through" means "to and including." Likewise, in setting deadlines or other periods, "by" means "by." The words "preceding," "following," and words of similar import, mean immediately preceding or following. References to a month or a year refer to calendar months and calendar years.

(h)  Any reference to the enforceability of any agreement against a party means that it is enforceable, subject as to enforcement against the party, to applicable bankruptcy, insolvency, reorganization, and other similar laws of general applicability relating to or affecting creditors' rights and to general equity principles.

## ARTICLE TWO

### CONVEYANCE OF MORTGAGE LOANS; REPRESENTATIONS AND WARRANTIES

### *Section 2.01     Conveyance of Mortgage Loans.*

(a)  The Seller, concurrently with the execution and delivery of this Agreement, hereby transfers to the Depositor, without recourse, all the interest of the Seller in each Mortgage Loan, including all interest and principal received or receivable by the Seller on each Mortgage Loan after the Cut-off Date and all interest and principal payments on each Mortgage Loan received before the Cut-off Date for installments of interest and principal due after the Cut-off Date but not including payments of principal and interest due by the Cut-off Date. By the Closing Date, the Seller shall deliver to the Depositor or, at the Depositor's direction, to the Trustee or other designee of the Depositor, the Mortgage File for each Mortgage Loan listed in the Mortgage Loan Schedule (except that, in the case of Mortgage Loans that are Delay Delivery Mortgage Loans, such delivery may take place within five Business Days of the Closing Date) as of the Closing Date.  The delivery of the Mortgage Files shall be made against payment by the Depositor of the purchase price, previously agreed to by the Seller and Depositor, for the Mortgage Loans.  With respect to any Mortgage Loan that does not have a first payment date on or before the Due Date in the month of the first Distribution Date, the Seller shall deposit into the Distribution Account on the first Distribution Account Deposit Date an amount equal to one month's interest at the related Adjusted Mortgage Rate on the Cut-off Date Principal Balance of such Mortgage Loan.  Also on the Closing Date the Depositor shall deposit $100 into the Certificate Account.

(b)  The Depositor, concurrently with the execution and delivery of this Agreement, hereby transfers to the Trustee for the benefit of the Certificateholders, without recourse, all the interest of the Depositor in the Trust Fund, together with the Depositor's right to require the Seller to cure any breach of a representation or warranty made in this Agreement by the Seller or to repurchase or substitute for any affected Mortgage Loan in accordance with this Agreement.

(c)  In connection with the transfer and assignment of each Mortgage Loan, the Depositor has delivered (or, in the case of the Delay Delivery Mortgage Loans, will deliver to the Trustee within the time periods specified in the definition of Delay Delivery Mortgage Loans), for the benefit of the Certificateholders the following documents or instruments with respect to each Mortgage Loan so assigned:

(i)     The original Mortgage Note, endorsed by manual or facsimile signature in blank in the following form: "Pay to the order of _____ _____without recourse," with all intervening endorsements showing a complete chain of endorsement from the originator to the Person endorsing the Mortgage Note (each endorsement being sufficient to transfer all interest of the party so endorsing, as noteholder or assignee thereof, in that Mortgage Note) or a lost note affidavit for any Lost Mortgage Note from the Seller stating that the original Mortgage Note was lost or destroyed, together with a copy of the Mortgage Note;

(ii)     Except as provided below and for each Mortgage Loan that is not a MERS Mortgage Loan, the original recorded Mortgage or a copy of such Mortgage certified by the Seller as being a true and complete copy of the Mortgage (or, in the case of a Mortgage for which the related Mortgaged Property is located in the Commonwealth of Puerto Rico, a true copy of the Mortgage certified as such by the applicable notary) and in the case of each MERS Mortgage Loan, the original Mortgage, noting the presence of the MIN of the Mortgage Loan and either language indicating that the Mortgage Loan is a MOM Loan if the Mortgage Loan is a MOM Loan or if the Mortgage Loan was not a MOM Loan at origination, the original Mortgage and the

Exhibit 6, Page 340

assignment thereof to MERS, with evidence of recording indicated thereon, or a copy of the Mortgage certified by the public recording office in which such Mortgage has been recorded;

(iii)      in the case of each Mortgage Loan that is not a MERS Mortgage Loan, a duly executed assignment of the Mortgage (which may be included in a blanket assignment or assignments), together with, except as provided below, all interim recorded assignments of the mortgage (each assignment, when duly and validly completed, to be in recordable form and sufficient to effect the assignment of and transfer to its assignee of the Mortgage to which the assignment relates).  If the related Mortgage has not been returned from the applicable public recording office, the assignment of the Mortgage may exclude the information to be provided by the recording office.  The assignment of Mortgage need not be delivered in the case of a Mortgage for which the related Mortgage Property is located in the Commonwealth of Puerto Rico;

(iv)      The original or copies of each assumption, modification, written assurance, or substitution agreement;

(v)      Except as provided below, the original or duplicate original lender's title policy and all its riders;

(vi)      The originals of the following documents for each Cooperative Loan:

(A)      the Co-op Shares, together with a stock power in blank;

(B)      the executed Security Agreement;

(C)      the executed Proprietary Lease;

(D)      the executed Recognition Agreement;

(E)      the executed UCC-1 financing statement that has been filed in all places required to perfect the Seller's interest in the Co-op Shares and the Proprietary Lease with evidence of recording on it; and

(F)      executed UCC-3 financing statements or other appropriate UCC financing statements required by state law, evidencing a complete and unbroken line from the mortgagee to the Trustee with evidence of recording thereon (or in a form suitable for recordation).  If in connection with any Mortgage Loan the Depositor cannot deliver

(a)      the original recorded Mortgage,

(b)      all interim recorded assignments, or

(c)      the lender's title policy (together with all its riders).

In addition, in connection with the assignment of any MERS Mortgage Loan, the Seller agrees that it will cause, at the Seller's expense, the MERS® System to indicate that the Mortgage Loans sold by the Seller to the Depositor have been assigned by the Seller to the Trustee in accordance with this Agreement for the benefit of the Certificateholders by including (or deleting, in the case of Mortgage Loans that are repurchased in accordance with this Agreement) in such computer files the information

**Exhibit 6, Page 341**

required by the MERS® System to identify the series of the Certificates issued in connection with such Mortgage Loans.  The Seller further agrees that it will not, and will not permit the Master Servicer to, and the Master Servicer agrees that it will not, alter the information referenced in this paragraph with respect to any Mortgage Loan sold by the Seller to the Depositor during the term of this Agreement unless and until such Mortgage Loan is repurchased in accordance with the terms of this Agreement.

In the event that in connection with any Mortgage Loan that is not a MERS Mortgage Loan the Depositor cannot deliver (a) the original recorded Mortgage, (b) all interim recorded assignments or (c) the lender's title policy (together with all riders thereto) satisfying the requirements of clause (ii), (iii) or (v) above, respectively, concurrently with the execution and delivery of this Agreement because such document or documents have not been returned from the applicable public recording office in the case of clause (ii) or (iii) above, or because the title policy has not been delivered to either the Master Servicer or the Depositor by the applicable title insurer in the case of clause (v) above, then the Depositor shall promptly deliver to the Trustee, in the case of clause (ii) or (iii) above, the original Mortgage or the interim assignment, as the case may be, with evidence of recording indicated on when it is received from the public recording office, or a copy of it, certified, if appropriate, by the relevant recording office and in the case of clause (v) above, the original or a copy of a written commitment or interim binder or preliminary report of title issued by the title insurance or escrow company, with the original or duplicate copy thereof to be delivered to the Trustee upon receipt thereof.  The delivery of the original Mortgage Loan and each interim assignment or a copy of them, certified, if appropriate, by the relevant recording office, shall not be made later than one year following the Closing Date, or, in the case of clause (v) above, later than 120 days following the Closing Date.  If the Depositor is unable to deliver each Mortgage by that date and each interim assignment because any documents have not been returned by the appropriate recording office, or, in the case of each interim assignment, because the related Mortgage has not been returned by the appropriate recording office, the Depositor shall deliver the documents to the Trustee as promptly as possible upon their receipt and, in any event, within 720 days following the Closing Date.

The Depositor shall forward to the Trustee (a) from time to time additional original documents evidencing an assumption or modification of a Mortgage Loan and (b) any other documents required to be delivered by the Depositor or the Master Servicer to the Trustee.  If the original Mortgage is not delivered and in connection with the payment in full of the related Mortgage Loan the public recording office requires the presentation of a "lost instruments affidavit and indemnity" or any equivalent document, because only a copy of the Mortgage can be delivered with the instrument of satisfaction or reconveyance, the Master Servicer shall execute and deliver the required document to the public recording office.  If a public recording office retains the original recorded Mortgage or if a Mortgage is lost after recordation in a public recording office, the Seller shall deliver to the Trustee a copy of the Mortgage certified by the public recording office to be a true and complete copy of the original recorded Mortgage.

As promptly as practicable after any transfer of a Mortgage Loan under this Agreement, and in any event within thirty days after the transfer, the Trustee shall (i) affix the Trustee's name to each assignment of Mortgage, as its assignee, and (ii) cause to be delivered for recording in the appropriate public office for real property records the assignments of the Mortgages to the Trustee, except that, if the Trustee has not received the information required to deliver any assignment of a Mortgage for recording, the Trustee shall deliver it as soon as practicable after receipt of the needed information and in any event within thirty days.

The Trustee need not record any assignment that relates to a Mortgage Loan (a) the Mortgaged Property and Mortgage File relating to which are located in California or (b) in any other jurisdiction (including Puerto Rico) under the laws of which, as evidenced by an Opinion of Counsel delivered by the

Exhibit 6, Page 342

Seller (at the Seller's expense) to the Trustee, recording the assignment is not necessary to protect the Trustee's and the Certificateholders' interest in the related Mortgage Loan.  The Seller shall deliver such Opinion of Counsel within 90 days of the Closing Date.

If any Mortgage Loans have been prepaid in full as of the Closing Date, the Depositor, in lieu of delivering the above documents to the Trustee, will deposit in the Certificate Account the portion of the prepayment that is required to be deposited in the Certificate Account pursuant to Section 3.06.

Notwithstanding anything to the contrary in this Agreement, within five Business Days after the Closing Date, the Seller shall either

> (x)      deliver to the Trustee the Mortgage File as required pursuant to this Section 2.01 for each Delay Delivery Mortgage Loan or

> (y)      (A) repurchase the Delay Delivery Mortgage Loan or (B) substitute the Substitute Mortgage Loan for a Delay Delivery Mortgage Loan, which repurchase or substitution shall be accomplished in the manner and subject to the conditions in Section 2.03 (treating each such Delay Delivery Mortgage Loan as a Deleted Mortgage Loan for purposes of such Section 2.03);

provided, however, that if the Seller fails to deliver a Mortgage File for any Delay Delivery Mortgage Loan within the period specified herein, the Seller shall use its best reasonable efforts to effect a substitution, rather than a repurchase of, such Deleted Mortgage Loan and provided further that the cure period provided for in Section 2.02 or in Section 2.03 shall not apply to the initial delivery of the Mortgage File for such Delay Delivery Mortgage Loan, but rather the Seller shall have five (5) Business Days to cure such failure to deliver.  At the end of such period, the Trustee shall send a Delay Delivery Certification for the Delay Delivery Mortgage Loans delivered during such period in accordance with the provisions of Section 2.02.

(d)  The Seller agrees to treat the transfer of the Mortgage Loans to the Depositor as a sale for all tax, accounting, and regulatory purposes.

(e)  The Trust Fund does not intend to acquire or hold any Mortgage Loan that would violate the representations made by the Seller set forth in clause (28) of Schedule III.

### Section 2.02      *Acceptance by the Trustee of the Mortgage Loans.*

The Trustee acknowledges receipt of the documents identified in the Initial Certification in the form of Exhibit G-1, and declares that it holds and will hold such documents and the other documents delivered to it constituting the Mortgage Files for the Mortgage Loans, and that it holds or will hold such other assets as are included in the Trust Fund, in trust for the exclusive use and benefit of all present and future Certificateholders.

The Trustee acknowledges that it will maintain possession of the related Mortgage Notes in the State of California, unless otherwise permitted by the Rating Agencies.  The Trustee agrees to execute and deliver on the Closing Date to the Depositor, the Master Servicer and the Seller an Initial Certification in the form of Exhibit G-1.  Based on its review and examination, and only as to the documents identified in such Initial Certification, the Trustee acknowledges that such documents appear regular on their face and relate to such Mortgage Loans.  The Trustee shall be under no duty or obligation to inspect, review or examine said documents, instruments, certificates or other papers to determine that

**Exhibit 6, Page 343**

the same are genuine, enforceable or appropriate for the represented purpose or that they have actually been recorded in the real estate records or that they are other than what they purport to be on their face.

By the thirtieth day after the Closing Date (or if that day is not a Business Day, the succeeding Business Day), the Trustee shall deliver to the Depositor, the Master Servicer, and the Seller a Delay Delivery Certification with respect to the Mortgage Loans substantially in the form of Exhibit G-2, with any applicable exceptions noted thereon.

By the ninetieth day after the Closing Date (or if that day is not a Business Day, the succeeding Business Day), the Trustee shall deliver to the Depositor, the Master Servicer and the Seller a Final Certification with respect to the Mortgage Loans in the form of Exhibit H, with any applicable exceptions noted thereon.

If, in the course of its review, the Trustee finds any document constituting a part of a Mortgage File that does not meet the requirements of Section 2.01, the Trustee shall list such as an exception in the Final Certification. The Trustee shall not make any determination as to whether (i) any endorsement is sufficient to transfer all interest of the party so endorsing, as noteholder or assignee thereof, in that Mortgage Note or (ii) any assignment is in recordable form or is sufficient to effect the assignment of and transfer to the assignee thereof under the mortgage to which the assignment relates. The Seller shall promptly correct any defect that materially and adversely affects the interests of the Certificateholders within 90 days from the date it was so notified of the defect and, if the Seller does not correct the defect within that period, the Seller shall either (a) substitute for the related Mortgage Loan a Substitute Mortgage Loan, which substitution shall be accomplished in the pursuant Section 2.03, or (b) purchase the Mortgage Loan at its Purchase Price from the Trustee within 90 days from the date the Seller was notified of the defect in writing.

If a substitution or purchase of a Mortgage Loan pursuant to this provision is required because of a delay in delivery of any documents by the appropriate recording office, or there is a dispute between either the Master Servicer or the Seller and the Trustee over the location or status of the recorded document, then the substitution or purchase shall occur within 720 days from the Closing Date. In no other case may a substitution or purchase occur more than 540 days from the Closing Date.

The Trustee shall deliver written notice to each Rating Agency within 270 days from the Closing Date indicating each Mortgage Loan (a) that has not been returned by the appropriate recording office or (b) as to which there is a dispute as to location or status of the Mortgage Loan. The notice shall be delivered every 90 days thereafter until the related Mortgage Loan is returned to the Trustee. Any substitution pursuant to (a) above or purchase pursuant to (b) above shall not be effected before the delivery to the Trustee of the Opinion of Counsel required by Section 2.05, and any substitution pursuant to (a) above shall not be effected before the additional delivery to the Trustee of a Request for Release substantially in the form of Exhibit N. No substitution is permitted to be made in any calendar month after the Determination Date for the month.

The Purchase Price for any Mortgage Loan shall be deposited by the Seller in the Certificate Account by the Distribution Account Deposit Date for the Distribution Date in the month following the month of repurchase and, upon receipt of the deposit and certification with respect thereto in the form of Exhibit O, the Trustee shall release the related Mortgage File to the Seller and shall execute and deliver at the Seller's request any instruments of transfer or assignment prepared by the Seller, in each case without recourse, necessary to vest in the Seller, or a designee, the Trustee's interest in any Mortgage Loan released pursuant hereto.

38

Exhibit 6, Page 344

If pursuant to the foregoing provisions the Seller repurchases a Mortgage Loan that is a MERS Mortgage Loan, the Master Servicer shall either (i) cause MERS to execute and deliver an assignment of the Mortgage in recordable form to transfer the Mortgage from MERS to the Seller and shall cause such Mortgage to be removed from registration on the MERS® System in accordance with MERS' rules and regulations or (ii) cause MERS to designate on the MERS® System the Seller as the beneficial holder of such Mortgage Loan.

The Trustee shall retain possession and custody of each Mortgage File in accordance with and subject to the terms and conditions set forth herein.  The Master Servicer shall promptly deliver to the Trustee, upon the execution or receipt thereof, the originals of any other documents or instruments constituting the Mortgage File that come into the possession of the Master Servicer from time to time.

The obligation of the Seller to substitute for or to purchase any Mortgage Loan that does not meet the requirements of Section 2.01 shall constitute the sole remedy respecting the defect available to the Trustee, the Depositor, and any Certificateholder against the Seller.

**Section 2.03    *Representations, Warranties, and Covenants of the Seller and the Master Servicer.***

(a)  IndyMac, in its capacities as Seller and Master Servicer, makes the representations and warranties in Schedule II, and by this reference incorporated in this Agreement, to the Depositor and the Trustee, as of the Closing Date.

(b)  The Seller, in its capacity as Seller, makes the representations and warranties in Schedule III, and by this reference incorporated in this Agreement, to the Depositor and the Trustee, as of the Closing Date, or if so specified in Schedule III, as of the Cut-off Date.

(c)  Upon discovery by any of the parties hereto of a breach of a representation or warranty made pursuant to Section 2.03(b) that materially and adversely affects the interests of the Certificateholders in any Mortgage Loan, the party discovering such breach shall give prompt notice thereof to the other parties.  The Seller covenants that within 90 days of the earlier of its discovery or its receipt of written notice from any party of a breach of any representation or warranty made pursuant to Section 2.03(b) which materially and adversely affects the interests of the Certificateholders in any Mortgage Loan, it shall cure such breach in all material respects, and if such breach is not so cured, shall, (i) if the 90-day period expires before the second anniversary of the Closing Date, remove the Mortgage Loan (a "*Deleted Mortgage Loan*") from the Trust Fund and substitute in its place a Substitute Mortgage Loan, in accordance with this Section 2.03; or (ii) repurchase the affected Mortgage Loan or Mortgage Loans from the Trustee at the Purchase Price in the manner set forth below.  Any substitution pursuant to (i) above shall not be effected before the delivery to the Trustee of the Opinion of Counsel required by Section 2.05 and a Request for Release substantially in the form of Exhibit N, and the Mortgage File for any Substitute Mortgage Loan.  The Seller shall promptly reimburse the Master Servicer and the Trustee for any expenses reasonably incurred by the Master Servicer or the Trustee in respect of enforcing the remedies for the breach.

With respect to any Substitute Mortgage Loan or Loans, the Seller shall deliver to the Trustee for the benefit of the Certificateholders the Mortgage Note, the Mortgage, the related assignment of the Mortgage, and such other documents and agreements as are required by Section 2.01, with the Mortgage Note endorsed and the Mortgage assigned as required by Section 2.01.  No substitution is permitted to be made in any calendar month after the Determination Date for such month.  Scheduled Payments due with respect to Substitute Mortgage Loans in the month of substitution shall not be part of the Trust Fund and will be retained by the Seller on the next succeeding Distribution Date.  For the month of substitution,

**Exhibit 6, Page 345**

distributions to Certificateholders will include the monthly payment due on any Deleted Mortgage Loan for such month and thereafter the Seller shall be entitled to retain all amounts received in respect of such Deleted Mortgage Loan.

The Master Servicer shall amend the Mortgage Loan Schedule for the benefit of the Certificateholders to reflect the removal of the Deleted Mortgage Loan and the substitution of the Substitute Mortgage Loans and the Master Servicer shall deliver the amended Mortgage Loan Schedule to the Trustee.  Upon the substitution, the Substitute Mortgage Loans shall be subject to this Agreement in all respects, and the Seller shall be deemed to have made with respect to the Substitute Mortgage Loans, as of the date of substitution, the representations and warranties made pursuant to Section 2.03(b) with respect to the Mortgage Loan.  Upon any substitution and the deposit to the Certificate Account of the amount required to be deposited therein in connection with the substitution as described in the following paragraph, the Trustee shall release the Mortgage File held for the benefit of the Certificateholders relating to the Deleted Mortgage Loan to the Seller and shall execute and deliver at the Seller's direction such instruments of transfer or assignment prepared by the Seller, in each case without recourse, as shall be necessary to vest title in the Seller, or its designee, the Trustee's interest in any Deleted Mortgage Loan substituted for pursuant to this Section 2.03.

For any month in which the Seller substitutes one or more Substitute Mortgage Loans for one or more Deleted Mortgage Loans, the Master Servicer will determine the amount (if any) by which the aggregate principal balance of all such Substitute Mortgage Loans as of the date of substitution is less than the aggregate Stated Principal Balance of all such Deleted Mortgage Loans (after application of the scheduled principal portion of the monthly payments due in the month of substitution).  The amount of such shortage (the "**Substitution Adjustment Amount**") plus, if the Seller is not the Master Servicer, an amount equal to the aggregate of any unreimbursed Advances and Servicer Advances with respect to such Deleted Mortgage Loans shall be deposited into the Certificate Account by the Seller by the Distribution Account Deposit Date for the Distribution Date in the month succeeding the calendar month during which the related Mortgage Loan became required to be purchased or replaced hereunder.  If the Seller repurchases a Mortgage Loan, the Purchase Price therefor shall be deposited in the Certificate Account pursuant to Section 3.06 by the Distribution Account Deposit Date for the Distribution Date in the month following the month during which the Seller became obligated hereunder to repurchase or replace the Mortgage Loan and upon such deposit of the Purchase Price and receipt of a Request for Release in the form of Exhibit N, the Trustee shall release the related Mortgage File held for the benefit of the Certificateholders to such Person, and the Trustee shall execute and deliver at such Person's direction such instruments of transfer or assignment prepared by such Person, in each case without recourse, as shall be necessary to transfer title from the Trustee.  The obligation under this Agreement of any Person to cure, repurchase, or replace any Mortgage Loan as to which a breach has occurred and is continuing shall constitute the sole remedy against the Person respecting the breach available to Certificateholders, the Depositor, or the Trustee on their behalf.

The representations and warranties made pursuant to this Section 2.03 shall survive delivery of the respective Mortgage Files to the Trustee for the benefit of the Certificateholders.

**Section 2.04     Representations and Warranties of the Depositor as to the Mortgage Loans.**

The Depositor represents and warrants to the Trustee with respect to each Mortgage Loan as of the date of this Agreement or such other date set forth in this Agreement that as of the Closing Date, and following the transfer of the Mortgage Loans to it by the Seller, the Depositor had good title to the Mortgage Loans and the Mortgage Notes were subject to no offsets, defenses, or counterclaims.

40

**Exhibit 6, Page 346**

The representations and warranties in this Section 2.04 shall survive delivery of the Mortgage Files to the Trustee.  Upon discovery by the Depositor or the Trustee of any breach of any of the representations and warranties in this Section that materially and adversely affects the interest of the Certificateholders, the party discovering the breach shall give prompt written notice to the others and to each Rating Agency.

### Section 2.05      Delivery of Opinion of Counsel in Connection with Substitutions.

(a)  Notwithstanding any contrary provision of this Agreement, no substitution pursuant to Section 2.02 or 2.03 shall be made more than 90 days after the Closing Date unless the Seller delivers to the Trustee an Opinion of Counsel, which Opinion of Counsel shall not be at the expense of either the Trustee or the Trust Fund, addressed to the Trustee, to the effect that such substitution will not (i) result in the imposition of the tax on "prohibited transactions" on the Trust Fund or contributions after the Startup Date, as defined in sections 860F(a)(2) and 860G(d) of the Code, respectively or (ii) cause any REMIC created under this Agreement to fail to qualify as a REMIC at any time that any Certificates are outstanding.

(b)  Upon discovery by the Depositor, the Seller, the Master Servicer or the Trustee that any Mortgage Loan does not constitute a "qualified mortgage" within the meaning of section 860G(a)(3) of the Code, the party discovering such fact shall promptly (and in any event within five Business Days of discovery) give written notice thereof to the other parties.  In connection therewith, the Trustee shall require the Seller, at the Seller's option, to either (i) substitute, if the conditions in Section 2.03(c) with respect to substitutions are satisfied, a Substitute Mortgage Loan for the affected Mortgage Loan, or (ii) repurchase the affected Mortgage Loan within 90 days of such discovery in the same manner as it would a Mortgage Loan for a breach of representation or warranty made pursuant to Section 2.03.  The Trustee shall reconvey to the Seller the Mortgage Loan to be released pursuant hereto in the same manner, and on the same terms and conditions, as it would a Mortgage Loan repurchased for breach of a representation or warranty contained in Section 2.03.

### Section 2.06      Execution and Delivery of Certificates.

The Trustee acknowledges the transfer and assignment to it of the Trust Fund and, concurrently with such transfer and assignment, has executed and delivered to or upon the order of the Depositor, the Certificates in authorized denominations evidencing directly or indirectly the entire ownership of the Trust Fund.  The Trustee agrees to hold the Trust Fund and exercise the rights referred to above for the benefit of all present and future Holders of the Certificates.

### Section 2.07      REMIC Matters.

The Preliminary Statement sets forth the designations and "latest possible maturity date" for federal income tax purposes of all interests created under this Agreement.  The "Startup Day" for purposes of the REMIC Provisions shall be the Closing Date.

Each REMIC's fiscal year shall be the calendar year.

<div align="center">ARTICLE THREE</div>

<div align="center">ADMINISTRATION AND SERVICING OF MORTGAGE LOANS</div>

**Section 3.01     *Master Servicer to Service Mortgage Loans.***

For and on behalf of the Certificateholders, the Master Servicer shall service and administer the Mortgage Loans in accordance with this Agreement and the Servicing Standard.

The Master Servicer shall not make or permit any modification, waiver, or amendment of any term of any Mortgage Loan that would cause any REMIC created under this Agreement to fail to qualify as a REMIC or result in the imposition of any tax under section 860F(a) or section 860G(d) of the Code.

Without limiting the generality of the foregoing, the Master Servicer, in its own name or in the name of the Depositor and the Trustee, is hereby authorized and empowered by the Depositor and the Trustee, when the Master Servicer believes it appropriate in its reasonable judgment, to execute and deliver, on behalf of the Trustee, the Depositor, the Certificateholders, or any of them, any instruments of satisfaction or cancellation, or of partial or full release or discharge, and all other comparable instruments, with respect to the Mortgage Loans, and with respect to the Mortgaged Properties held for the benefit of the Certificateholders.  The Master Servicer shall prepare and deliver to the Depositor or the Trustee any documents requiring execution and delivery by either or both of them appropriate to enable the Master Servicer to service and administer the Mortgage Loans to the extent that the Master Servicer is not permitted to execute and deliver such documents pursuant to the preceding sentence.  Upon receipt of the documents, the Depositor or the Trustee shall execute the documents and deliver them to the Master Servicer.

The Master Servicer further is authorized and empowered by the Trustee, on behalf of the Certificateholders and the Trustee, in its own name or in the name of the Subservicer, when the Master Servicer or the Subservicer, as the case may be, believes it appropriate in its best judgment to register any Mortgage Loan on the MERS® System, or cause the removal from the registration of any Mortgage Loan on the MERS® System, to execute and deliver, on behalf of the Trustee and the Certificateholders or any of them, any and all instruments of assignment and other comparable instruments with respect to such assignment or re-recording of a Mortgage in the name of MERS, solely as nominee for the Trustee and its successors and assigns.

In accordance with and to the extent of the Servicing Standard, the Master Servicer shall advance funds necessary to effect the payment of taxes and assessments on the Mortgaged Properties, which advances shall be reimbursable in the first instance from related collections from the Mortgagors pursuant to Section 3.07, and further as provided in Section 3.09.  The costs incurred by the Master Servicer in effecting the timely payments of taxes and assessments on the Mortgaged Properties and related insurance premiums shall not, for the purpose of calculating monthly distributions to the Certificateholders, be added to the Stated Principal Balances of the related Mortgage Loans, notwithstanding that the Mortgage Loans so permit.

**Section 3.02     *Subservicing; Enforcement of the Obligations of Subservicers.***

(a)  The Master Servicer may arrange for the subservicing of any Mortgage Loan by a subservicer pursuant to a subservicing agreement (a "***Subservicer***").  The subservicing arrangement and the related subservicing agreement must provide for the servicing of the Mortgage Loans in a manner consistent with the servicing arrangements contemplated hereunder.  Unless the context otherwise requires, references in this Agreement to actions taken or to be taken by the Master Servicer in servicing the Mortgage Loans

**Exhibit 6, Page 348**

include actions taken or to be taken by a Subservicer on behalf of the Master Servicer.  Notwithstanding anything in any subservicing agreement or this Agreement relating to agreements or arrangements between the Master Servicer and a Subservicer or references to actions taken through a Subservicer or otherwise, the Master Servicer shall remain obligated and liable to the Trustee and Certificateholders for the servicing and administration of the Mortgage Loans in accordance with this Agreement without diminution of its obligation or liability by virtue of the subservicing agreements or arrangements or by virtue of indemnification from the Subservicer and to the same extent and under the same terms as if the Master Servicer alone were servicing and administering the Mortgage Loans.  All actions of each Subservicer performed pursuant to the related subservicing agreement shall be performed as agent of the Master Servicer with the same effect as if performed directly by the Master Servicer.

(b)  For purposes of this Agreement, the Master Servicer shall be deemed to have received any collections, recoveries, or payments with respect to the Mortgage Loans that are received by the Subservicer regardless of whether the payments are remitted by the Subservicer to the Master Servicer.

### Section 3.03  *Rights of the Depositor and the Trustee in Respect of the Master Servicer.*

The Depositor may, but is not obligated to, enforce the obligations of the Master Servicer under this Agreement and may, but is not obligated to, perform, or cause a designee to perform, any defaulted obligation of the Master Servicer under this Agreement and in connection with any such defaulted obligation to exercise the related rights of the Master Servicer under this Agreement; provided that the Master Servicer shall not be relieved of any of its obligations under this Agreement by virtue of such performance by the Depositor or its designee.  Neither the Trustee nor the Depositor shall have any responsibility or liability for any action or failure to act by the Master Servicer nor shall the Trustee or the Depositor be obligated to supervise the performance of the Master Servicer under this Agreement or otherwise.

### Section 3.04  *No Contractual Relationship Between Subservicers and the Trustee.*

Any subservicing arrangement that may be entered into and any other transactions or services relating to the Mortgage Loans involving a Subservicer in its capacity as such and not as an originator shall be deemed to be solely between the Subservicer and the Master Servicer alone, and the Trustee and Certificateholders shall not be deemed parties thereto and shall have no claims, rights, obligations, duties, or liabilities with respect to the Subservicer in its capacity as such except as set forth in Section 3.05.

### Section 3.05  *Trustee to Act as Master Servicer.*

If the Master Servicer for any reason is no longer the Master Servicer under this Agreement (including because of the occurrence or existence of an Event of Default), the Trustee or its successor shall assume all of the rights and obligations of the Master Servicer under this Agreement arising thereafter (except that the Trustee shall not be

(i)      liable for losses of the Master Servicer pursuant to Section 3.10 or any acts or omissions of the predecessor Master Servicer hereunder,

(ii)     obligated to make Advances if it is prohibited from doing so by applicable law,

(iii)    obligated to effectuate repurchases or substitutions of Mortgage Loans hereunder, including repurchases or substitutions pursuant to Section 2.02 or 2.03,

(iv)    responsible for expenses of the Master Servicer pursuant to Section 2.03, or

43

Exhibit 6, Page 349

(v)      deemed to have made any representations and warranties of the Master Servicer hereunder).  Any assumption shall be subject to Section 7.02.

Every subservicing agreement entered into by the Master Servicer shall contain a provision giving the successor Master Servicer the option to terminate the agreement if a successor Master Servicer is appointed.

If the Master Servicer is no longer the Master Servicer for any reason (including because the occurrence or existence of any Event of Default), the Trustee (or any other successor Master Servicer) may, at its option, succeed to any rights and obligations of the Master Servicer under any subservicing agreement in accordance with its terms.  The Trustee (or any other successor Master Servicer) shall not incur any liability or have any obligations in its capacity as successor Master Servicer under a subservicing agreement arising before the date of succession unless it expressly elects to succeed to the rights and obligations of the Master Servicer thereunder; and the Master Servicer shall not thereby be relieved of any liability or obligations under the subservicing agreement arising before the date of succession.

The Master Servicer shall, upon request of the Trustee, but at the expense of the Master Servicer, deliver to the assuming party all documents and records relating to each subservicing agreement and the Mortgage Loans then being serviced thereunder and an accounting of amounts collected held by it and otherwise use its best efforts to effect the orderly and efficient transfer of the subservicing agreement to the assuming party.

Notwithstanding anything else in this Agreement to the contrary, in no event shall the Trustee be liable for any servicing fee or for any differential in the amount of the Servicing Fee paid under this Agreement and the amount necessary to induce any successor Master Servicer to act as successor Master Servicer under this Agreement and the transactions provided for in this Agreement.

### Section 3.06    Collection of Mortgage Loan Payments; Servicing Accounts; Collection Account; Certificate Account; Distribution Account.

(a)  In accordance with and to the extent of the Servicing Standard, the Master Servicer shall make reasonable efforts in accordance with the customary and usual standards of practice of prudent mortgage servicers to collect all payments called for under the Mortgage Loans to the extent the procedures are consistent with this Agreement and any related Required Insurance Policy.  Consistent with the foregoing, the Master Servicer may in its discretion (i) waive any late payment charge or, subject to Section 3.21, any Prepayment Charge in connection with the prepayment of a Mortgage Loan and (ii) extend the due dates for payments due on a Delinquent Mortgage Loan for a period not greater than 125 days.  In connection with a seriously delinquent or defaulted Mortgage Loan, the Master Servicer may, consistent with the Servicing Standard, waive, modify or vary any term of that Mortgage Loan (including modifications  that change the Mortgage Rate, forgive the payment of principal or interest or extend the final maturity date of that Mortgage Loan ), accept payment from the related Mortgagor of an amount less than the Stated Principal Balance in final satisfaction of that Mortgage Loan, or consent to the postponement of strict compliance with any such term or otherwise grant indulgence to any Mortgagor if in the Master Servicer's determination such waiver, modification, postponement or indulgence is not materially adverse to the interests of the Certificateholders (taking into account any estimated loss that might result absent such action) and is expected to minimize the loss on such Mortgage Loan; provided, however, the Master Servicer shall not initiate new lending to such Mortgagor through the Trust and cannot, except as provided in the immediately succeeding sentence, extend the maturity of any Mortgage Loan past the date on which the final payment is due on the latest maturing Mortgage Loan as of the Cut-off Date.  With respect to no more than 5% of the Mortgage Loans (measured by aggregate Cut-off Date

NY1 5706826v 6

Exhibit 6, Page 350

Principal Balance of the Mortgage Loans), the Master Servicer may extend the maturity of a Mortgage Loan past the date on which the final payment is due on the latest maturing Mortgage Loan as of the Cut-off Date, but in no event more than one year past such date. In the event of any such arrangement, the Master Servicer shall make Advances on the related Mortgage Loan in accordance with Section 4.01 during the scheduled period in accordance with the amortization schedule of the Mortgage Loan without modification thereof because of the arrangements.  The Master Servicer shall not be required to institute or join in litigation with respect to collection of any payment (whether under a Mortgage, Mortgage Note, or otherwise or against any public or governmental authority with respect to a taking or condemnation) if it reasonably believes that enforcing the provision of the Mortgage or other instrument pursuant to which the payment is required is prohibited by applicable law.  The Master Servicer shall not have the discretion to sell any Delinquent or defaulted Mortgage Loan.

(b)  The Master Servicer shall establish and maintain (or, if a Mortgage Loan is subserviced by another Person, cause the related Subservicer to establish and maintain) one or more Servicing Accounts (the "*Servicing Account*") into which the Master Servicer shall deposit on a daily basis within one Business Day of receipt, the following payments and collections received by it or remitted by any Subservicer in respect of Mortgage Loans after the Cut-off Date (other than in respect of principal and interest due on the Mortgage Loans by the Cut-off Date):

(i)     all payments on account of principal on the Mortgage Loans, including Principal Prepayments;

(ii)    all payments on account of interest on the Mortgage Loans, net of the related Servicing Fee; and

(iii)   all Insurance Proceeds, Subsequent Recoveries and Liquidation Proceeds, other than proceeds to be applied to the restoration or repair of the Mortgaged Property or released to the Mortgagor in accordance with the Master Servicer's normal servicing procedures.

By the Withdrawal Date in each calendar month, the Master Servicer shall (a) withdraw from the Servicing Account all amounts on deposit therein pursuant to clauses (i) and (ii) above (other than amounts attributable to a Principal Prepayment in Full) and (b) deposit such amounts in the Collection Account.

By the Business Day in each calendar month following the deposit in the Servicing Account of amounts on deposit therein pursuant to clause (iii) above or pursuant to any Principal Prepayment in Full, the Master Servicer shall (a) withdraw such amounts from the Servicing Account and (b) deposit such amounts in the Collection Account.

(c)  The Master Servicer shall establish and maintain a Collection Account (the "*Collection Account*") into which the Master Servicer shall deposit, as and when required by paragraph (b) of this Section 3.06, all amounts required to be deposited into the Collection Account pursuant to that paragraph. The Collection Account shall be an Eligible Account held for the benefit of the Certificateholders.

(d)  The Master Servicer shall establish and maintain a Certificate Account into which the Master Servicer shall deposit on a daily basis (i) within one Business Day of deposit in the Collection Account (in the case of items (i) through (iii) below) and (2) within one Business Day of receipt (in the case of all other items), except as otherwise specified herein, the following payments and collections received by it or remitted by any Subservicer in respect of Mortgage Loans after the Cut-off Date (other than in respect of principal and interest due on the Mortgage Loans by the Cut-off Date) and the following amounts required to be deposited hereunder:

Exhibit 6, Page 351

(i)       all payments on account of principal on the Mortgage Loans, including Principal Prepayments;

(ii)      all payments on account of interest on the Mortgage Loans, net of the Servicing Fee;

(iii)     all Insurance Proceeds, Subsequent Recoveries and Liquidation Proceeds, other than proceeds to be applied to the restoration or repair of the Mortgaged Property or released to the Mortgagor in accordance with the Master Servicer's normal servicing procedures;

(iv)      any amount required to be deposited by the Master Servicer pursuant to Section 3.06(f) in connection with any losses on Permitted Investments;

(v)       any amounts required to be deposited by the Master Servicer pursuant to Sections 3.10 and 3.12;

(vi)      all Purchase Prices from the Master Servicer or Seller and all Substitution Adjustment Amounts;

(vii)     all Advances made by the Master Servicer pursuant to Section 4.01;

(viii)    any other amounts required to be deposited under this Agreement; and

(ix)      all Prepayment Charges collected.

In addition, with respect to any Mortgage Loan that is subject to a buydown agreement, on each Due Date for the Mortgage Loan, in addition to the monthly payment remitted by the Mortgagor, the Master Servicer shall cause funds to be deposited into the Certificate Account in an amount required to cause an amount of interest to be paid with respect to the Mortgage Loan equal to the amount of interest that has accrued on the Mortgage Loan from the preceding Due Date at the Mortgage Rate net of the Servicing Fee Rate on that date.

The foregoing requirements for remittance by the Master Servicer shall be exclusive, it being understood and agreed that, without limiting the generality of the foregoing, payments in the nature of late payment charges or assumption fees, if collected, need not be remitted by the Master Servicer.  If the Master Servicer remits any amount not required to be remitted, it may at any time withdraw that amount from the Certificate Account, any provision in this Agreement to the contrary notwithstanding.  The withdrawal or direction may be accomplished by delivering written notice of it to the Trustee or any other institution maintaining the Certificate Account that describes the amounts deposited in error in the Certificate Account.  The Master Servicer shall maintain adequate records with respect to all withdrawals made pursuant to this Section 3.06.  All funds deposited in the Certificate Account shall be held in trust for the Certificateholders until withdrawn in accordance with Section 3.09.

(e)  The Trustee shall establish and maintain the Distribution Account on behalf of the Certificateholders.  The Trustee shall, promptly upon receipt, deposit in the Distribution Account and retain in the Distribution Account the following:

(i)       the aggregate amount remitted by the Master Servicer to the Trustee pursuant to Section 3.09(a);

Exhibit 6, Page 352

(ii)      any amount deposited by the Master Servicer pursuant to Section 3.06(f) in connection with any losses on Permitted Investments; and

(iii)      any other amounts deposited under this Agreement that are required to be deposited in the Distribution Account.

If the Master Servicer remits any amount not required to be remitted, it may at any time direct the Trustee in writing to withdraw that amount from the Distribution Account, any provision in this Agreement to the contrary notwithstanding.  The direction may be accomplished by delivering an Officer's Certificate to the Trustee that describes the amounts deposited in error in the Distribution Account.  All funds deposited in the Distribution Account shall be held by the Trustee in trust for the Certificateholders until disbursed in accordance with this Agreement or withdrawn in accordance with Section 3.09.  In no event shall the Trustee incur liability for withdrawals from the Distribution Account at the direction of the Master Servicer.

(f)  Each institution at which the Certificate Account is maintained shall invest the funds in such account as directed in writing by the Master Servicer in Permitted Investments, which shall mature not later than the second Business Day preceding the related Distribution Account Deposit Date (except that if the Permitted Investment is an obligation of the institution that maintains the account, then the Permitted Investment shall mature not later than the Business Day preceding the Distribution Account Deposit Date) and which shall not be sold or disposed of before its maturity.  The funds in the Distribution Account shall remain uninvested.  All such Permitted Investments shall be made in the name of the Trustee, for the benefit of the Certificateholders.  All income realized from any such investment of funds on deposit in the Certificate Account shall be for the benefit of the Master Servicer as servicing compensation and shall be remitted to it monthly as provided in this Agreement.  The amount of any realized losses on Permitted Investments in the Certificate Account shall promptly be deposited by the Master Servicer in the Certificate Account.  The Trustee shall not be liable for the amount of any loss incurred in respect of any investment or lack of investment of funds held in the Certificate Account and made in accordance with this Section 3.06.

(g)  The Master Servicer shall give notice to the Trustee, the Seller, each Rating Agency and the Depositor of any proposed change of the location of the Certificate Account not later than 30 days and not more than 45 days prior to any change of this Agreement.  The Trustee shall give notice to the Master Servicer, the Seller, each Rating Agency and the Depositor of any proposed change of the location of the Distribution Account not later than 30 days and not more than 45 days prior to any change of this Agreement.

**Section 3.07      *Collection of Taxes, Assessments and Similar Items; Escrow Accounts.***

(a)  To the extent required by the related Mortgage Note and not violative of current law, the Master Servicer shall establish and maintain one or more accounts (each, an "***Escrow Account***") and deposit and retain therein all collections from the Mortgagors (or advances) for the payment of taxes, assessments, hazard insurance premiums or comparable items for the account of the Mortgagors.  Nothing herein shall require the Master Servicer to compel a Mortgagor to establish an Escrow Account in violation of applicable law.

(b)  Withdrawals of amounts so collected from the Escrow Accounts may be made only to effect timely payment of taxes, assessments, hazard insurance premiums, condominium or PUD association dues, or comparable items, to reimburse (without duplication) the Master Servicer out of related collections for any payments made pursuant to Section 3.01 (with respect to taxes and assessments and insurance premiums) and Section 3.10 (with respect to hazard insurance), to refund to any Mortgagors

NY1 5706826v 6

Exhibit 6, Page 353

any sums determined to be overages, to pay interest, if required by law or the related Mortgage or Mortgage Note, to Mortgagors on balances in the Escrow Account or to clear and terminate the Escrow Account at the termination of this Agreement in accordance with Section 9.01.  The Escrow Accounts shall not be a part of the Trust Fund.

(c)  The Master Servicer shall advance any payments referred to in Section 3.07(a) that are not timely paid by the Mortgagors or advanced by the Master Servicer on the date when the tax, premium or other cost for which such payment is intended is due, but the Master Servicer shall be required so to advance only to the extent that such advances, in the good faith judgment of the Master Servicer, will be recoverable by the Master Servicer out of Insurance Proceeds, Liquidation Proceeds or otherwise.

**Section 3.08      Access to Certain Documentation and Information Regarding the Mortgage Loans.**

The Master Servicer shall afford the Depositor and the Trustee reasonable access to all records and documentation regarding the Mortgage Loans and all accounts, insurance information and other matters relating to this Agreement, such access being afforded without charge, but only upon reasonable request and during normal business hours at the office designated by the Master Servicer.

Upon reasonable advance notice in writing, the Master Servicer will provide to each Certificateholder or Certificate Owner that is a savings and loan association, bank, or insurance company certain reports and reasonable access to information and documentation regarding the Mortgage Loans sufficient to permit the Certificateholder or Certificate Owner to comply with applicable regulations of the OTS or other regulatory authorities with respect to investment in the Certificates.  The Master Servicer shall be entitled to be reimbursed by each such Certificateholder or Certificate Owner for actual expenses incurred by the Master Servicer in providing the reports and access.

**Section 3.09      Permitted Withdrawals from the Certificate Account and the Distribution Account.**

(a)  The Master Servicer may (and, in the case of clause (ix) below, shall) from time to time make withdrawals from the Certificate Account for the following purposes:

(i)      to pay to the Master Servicer or the related subservicer (to the extent not previously retained) the servicing compensation to which it is entitled pursuant to Section 3.15, and to pay to the Master Servicer, as additional master servicing compensation, earnings on or investment income with respect to funds in or credited to the Certificate Account;

(ii)      to reimburse the Master Servicer or successor Master Servicer for the unreimbursed Advances made by it, such right of reimbursement pursuant to this subclause (ii) being limited to amounts received on the Mortgage Loans in respect of which the Advance was made;

(iii)      to reimburse the Master Servicer or successor Master Servicer for any Nonrecoverable Advance previously made by it;

(iv)      to reimburse the Master Servicer for Insured Expenses from the related Insurance Proceeds;

(v)      to reimburse the Master Servicer for (a) unreimbursed Servicing Advances, the Master Servicer's right to reimbursement pursuant to this clause (a) with respect to any Mortgage

**Exhibit 6, Page 354**

Loan being limited to amounts received on the Mortgage Loans that represent late recoveries of the payments for which the advances were made pursuant to Section 3.01 or Section 3.07 and (b) for unpaid Servicing Fees as provided in Section 3.12;

      (vi)    to pay to the purchaser, with respect to each Mortgage Loan or property acquired in respect of such Mortgage Loan that has been purchased pursuant to Section 2.02, 2.03, or 3.12, all amounts received thereon after the date of such purchase;

      (vii)   to reimburse the Seller, the Master Servicer, or the Depositor for expenses incurred by any of them and reimbursable pursuant to Section 6.03;

      (viii)  to withdraw any amount deposited in the Certificate Account and not required to be deposited in the Certificate Account;

      (ix)    by the Distribution Account Deposit Date, to withdraw (1) the Available Funds and the Trustee Fee for the Distribution Date, to the extent on deposit, and (2) the Prepayment Charges on deposit, and remit such amount to the Trustee for deposit in the Distribution Account; and

      (x)    to clear and terminate the Certificate Account upon termination of this Agreement pursuant to Section 9.01.

The Master Servicer shall keep and maintain separate accounting, on a Mortgage Loan by Mortgage Loan basis, to justify any withdrawal from the Certificate Account pursuant to subclauses (i), (ii), (iv), (v), and (vi).  Before making any withdrawal from the Certificate Account pursuant to subclause (iii), the Master Servicer shall deliver to the Trustee an Officer's Certificate of a Servicing Officer indicating the amount of any previous Advance determined by the Master Servicer to be a Nonrecoverable Advance and identifying the related Mortgage Loans and their respective portions of the Nonrecoverable Advance.

(b)  The Trustee shall withdraw funds from the Distribution Account for distributions to Certificateholders in the manner specified in this Agreement (and to withhold from the amounts so withdrawn the amount of any taxes that it is authorized to withhold pursuant to the last paragraph of Section 8.11).  In addition, the Trustee may from time to time make withdrawals from the Distribution Account for the following purposes:

      (i)    to pay to itself the Trustee Fee for the related Distribution Date;

      (ii)   to withdraw and return to the Master Servicer any amount deposited in the Distribution Account and not required to be deposited therein; and

      (iii)  to clear and terminate the Distribution Account upon termination of the Agreement pursuant to Section 9.01.

### Section 3.10    *Maintenance of Hazard Insurance; Maintenance of Primary Insurance Policies.*

(a)  The Master Servicer shall maintain, for each Mortgage Loan, hazard insurance with extended coverage in an amount that is at least equal to the lesser of

      (i)    the maximum insurable value of the improvements securing the Mortgage Loan and

**Exhibit 6, Page 355**

(ii)     the greater of (y) the outstanding principal balance of the Mortgage Loan and (z) an amount such that the proceeds of the policy are sufficient to prevent the Mortgagor or the mortgagee from becoming a co-insurer.

Each policy of standard hazard insurance shall contain, or have an accompanying endorsement that contains, a standard mortgagee clause.  Any amounts collected under the policies (other than the amounts to be applied to the restoration or repair of the related Mortgaged Property or amounts released to the Mortgagor in accordance with the Master Servicer's normal servicing procedures) shall be deposited in the Certificate Account.  Any cost incurred in maintaining any insurance shall not, for the purpose of calculating monthly distributions to the Certificateholders or remittances to the Trustee for their benefit, be added to the principal balance of the Mortgage Loan, notwithstanding that the Mortgage Loan so permits.  Such costs shall be recoverable by the Master Servicer out of late payments by the related Mortgagor or out of Liquidation Proceeds to the extent permitted by Section 3.09.  No earthquake or other additional insurance is to be required of any Mortgagor or maintained on property acquired in respect of a Mortgage other than pursuant to any applicable laws and regulations in force that require additional insurance.  If the Mortgaged Property is located at the time of origination of the Mortgage Loan in a federally designated special flood hazard area and the area is participating in the national flood insurance program, the Master Servicer shall maintain flood insurance for the Mortgage Loan.  The flood insurance shall be in an amount equal to the least of (i) the original principal balance of the related Mortgage Loan, (ii) the replacement value of the improvements that are part of the Mortgaged Property, and (iii) the maximum amount of flood insurance available for the related Mortgaged Property under the national flood insurance program.

If the Master Servicer obtains and maintains a blanket policy insuring against hazard losses on all of the Mortgage Loans, it shall have satisfied its obligations in the first sentence of this Section 3.10.  The policy may contain a deductible clause on terms substantially equivalent to those commercially available and maintained by comparable servicers.  If the policy contains a deductible clause and a policy complying with the first sentence of this Section 3.10 has not been maintained on the related Mortgaged Property, and if a loss that would have been covered by the required policy occurs, the Master Servicer shall deposit in the Certificate Account, without any right of reimbursement, the amount not otherwise payable under the blanket policy because of the deductible clause.  In connection with its activities as Master Servicer of the Mortgage Loans, the Master Servicer agrees to present, on behalf of itself, the Depositor, and the Trustee for the benefit of the Certificateholders, claims under any blanket policy.

(b)  The Master Servicer shall not take any action that would result in non-coverage under any applicable Primary Insurance Policy of any loss that, but for the actions of the Master Servicer, would have been covered thereunder.  The Master Servicer shall not cancel or refuse to renew any Primary Insurance Policy that is in effect at the date of the initial issuance of the Certificates and is required to be kept in force hereunder unless the replacement Primary Insurance Policy for the canceled or non-renewed policy is maintained with a Qualified Insurer.  The Master Servicer need not maintain any Primary Insurance Policy if maintaining the Primary Insurance Policy is prohibited by applicable law.  The Master Servicer agrees, to the extent permitted by applicable law, to effect the timely payment of the premiums on each Primary Insurance Policy, and any costs not otherwise recoverable shall be recoverable by the Master Servicer from the related liquidation proceeds.

In connection with its activities as Master Servicer of the Mortgage Loans, the Master Servicer agrees to present, on behalf of itself, the Trustee and the Certificateholders, claims to the insurer under any Primary Insurance Policies and, in this regard, to take any reasonable action in accordance with the Servicing Standard necessary to permit recovery under any Primary Insurance Policies respecting defaulted Mortgage Loans.  Any amounts collected by the Master Servicer under any Primary Insurance Policies shall be deposited in the Certificate Account or the Collection Account (as applicable).

Exhibit 6, Page 356

### Section 3.11    Enforcement of Due-On-Sale Clauses; Assumption Agreements.

(a)  Except as otherwise provided in this Section 3.11, when any property subject to a Mortgage has been conveyed by the Mortgagor, the Master Servicer shall to the extent that it has knowledge of the conveyance and in accordance with the Servicing Standard, enforce any due-on-sale clause contained in any Mortgage Note or Mortgage, to the extent permitted under applicable law and governmental regulations, but only to the extent that enforcement will not adversely affect or jeopardize coverage under any Required Insurance Policy.  Notwithstanding the foregoing, the Master Servicer is not required to exercise these rights with respect to a Mortgage Loan if the Person to whom the related Mortgaged Property has been conveyed or is proposed to be conveyed satisfies the conditions contained in the Mortgage Note and Mortgage related thereto and the consent of the mortgagee under the Mortgage Note or Mortgage is not otherwise so required under the Mortgage Note or Mortgage as a condition to the transfer.

If (i) the Master Servicer is prohibited by law from enforcing any due-on-sale clause, (ii) coverage under any Required Insurance Policy would be adversely affected, (iii) the Mortgage Note does not include a due-on-sale clause, or (iv) nonenforcement is otherwise permitted hereunder, the Master Servicer is authorized, subject to Section 3.11(b), to take or enter into an assumption and modification agreement from or with the person to whom the property has been or is about to be conveyed, pursuant to which the person becomes liable under the Mortgage Note and, unless prohibited by applicable state law, the Mortgagor remains liable thereon.  The Mortgage Loan must continue to be covered (if so covered before the Master Servicer enters into the agreement) by the applicable Required Insurance Policies.

The Master Servicer, subject to Section 3.11(b), is also authorized with the prior approval of the insurers under any Required Insurance Policies to enter into a substitution of liability agreement with the Person, pursuant to which the original Mortgagor is released from liability and the Person is substituted as Mortgagor and becomes liable under the Mortgage Note.  Notwithstanding the foregoing, the Master Servicer shall not be deemed to be in default under this Section 3.11 because of any transfer or assumption that the Master Servicer reasonably believes it is restricted by law from preventing, for any reason whatsoever.

(b)  Subject to the Master Servicer's duty to enforce any due-on-sale clause to the extent set forth in Section 3.11(a), in any case in which a Mortgaged Property has been conveyed to a Person by a Mortgagor, and the Person is to enter into an assumption agreement or modification agreement or supplement to the Mortgage Note or Mortgage that requires the signature of the Trustee, or if an instrument of release signed by the Trustee is required releasing the Mortgagor from liability on the Mortgage Loan, the Master Servicer shall prepare and deliver to the Trustee for signature and shall direct the Trustee, in writing, to execute the assumption agreement with the Person to whom the Mortgaged Property is to be conveyed, and the modification agreement or supplement to the Mortgage Note or Mortgage or other instruments appropriate to carry out the terms of the Mortgage Note or Mortgage or otherwise to comply with any applicable laws regarding assumptions or the transfer of the Mortgaged Property to the Person.  In connection with any such assumption, no material term of the Mortgage Note may be changed.

In addition, the substitute Mortgagor and the Mortgaged Property must be acceptable to the Master Servicer in accordance with its underwriting standards as then in effect.  Together with each substitution, assumption, or other agreement or instrument delivered to the Trustee for execution by it, the Master Servicer shall deliver an Officer's Certificate signed by a Servicing Officer stating that the requirements of this subsection have been met in connection with such Officer's Certificate.  The Master Servicer shall notify the Trustee that any substitution or assumption agreement has been completed by forwarding to the Trustee the original of the substitution or assumption agreement, which in the case of

**Exhibit 6, Page 357**

the original shall be added to the related Mortgage File and shall, for all purposes, be considered a part of the Mortgage File to the same extent as all other documents and instruments constituting a part of the Mortgage File.  The Master Servicer will retain any fee collected by it for entering into an assumption or substitution of liability agreement as additional master servicing compensation.

### Section 3.12    *Realization Upon Defaulted Mortgage Loans.*

The Master Servicer shall use reasonable efforts in accordance with the Servicing Standard to foreclose on or otherwise comparably convert the ownership of assets securing such of the Mortgage Loans as come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments.  In connection with the foreclosure or other conversion, the Master Servicer shall follow the Servicing Standard and shall follow the requirements of the insurer under any Required Insurance Policy.  The Master Servicer shall not be required to expend its own funds in connection with any foreclosure or towards the restoration of any property unless it determines (i) that the restoration or foreclosure will increase the proceeds of liquidation of the Mortgage Loan after reimbursement to itself of restoration expenses and (ii) that restoration expenses will be recoverable to it through Liquidation Proceeds (respecting which it shall have priority for purposes of withdrawals from the Certificate Account).  The Master Servicer shall be responsible for all other costs and expenses incurred by it in any foreclosure proceedings.  The Master Servicer is entitled to reimbursement of such costs and expenses from the liquidation proceeds with respect to the related Mortgaged Property, as provided in the definition of Liquidation Proceeds.  If the Master Servicer has knowledge that a Mortgaged Property that the Master Servicer is contemplating acquiring in foreclosure or by deed in lieu of foreclosure is located within a one mile radius of any site listed in the Expenditure Plan for the Hazardous Substance Clean Up Bond Act of 1984 or other site with environmental or hazardous waste risks known to the Master Servicer, the Master Servicer will, before acquiring the Mortgaged Property, consider the risks and only take action in accordance with its established environmental review procedures.

With respect to any REO Property, the deed or certificate of sale shall be taken in the name of the Trustee for the benefit of the Certificateholders, or its nominee, on behalf of the Certificateholders.  The Trustee's name shall be placed on the title to the REO Property solely as the Trustee hereunder and not in its individual capacity.  The Master Servicer shall ensure that the title to the REO Property references the Pooling and Servicing Agreement and the Trustee's capacity hereunder.  Pursuant to its efforts to sell the REO Property, the Master Servicer shall either itself or through an agent selected by the Master Servicer protect and conserve the REO Property in accordance with the Servicing Standard.

The Master Servicer shall perform the tax reporting and withholding required by sections 1445 and 6050J of the Code with respect to foreclosures and abandonments, the tax reporting required by section 6050H of the Code with respect to the receipt of mortgage interest from individuals and, if required by section 6050P of the Code with respect to the cancellation of indebtedness by certain financial entities, by preparing any required tax and information returns, in the form required.

If the Trust Fund acquires any Mortgaged Property as aforesaid or otherwise in connection with a default or imminent default on a Mortgage Loan, the REO Property shall only be held temporarily, shall be actively marketed for sale, and the Master Servicer shall dispose of the Mortgaged Property as soon as practicable, and in any case before the end of the third calendar year following the calendar year in which the Trust Fund acquires the property.  Notwithstanding any other provision of this Agreement, no Mortgaged Property acquired by the Trust Fund shall be rented (or allowed to continue to be rented) or otherwise used for the production of income by or on behalf of the Trust Fund.

The decision of the Master Servicer to foreclose on a defaulted Mortgage Loan shall be subject to a determination by the Master Servicer that the proceeds of the foreclosure would exceed the costs and expenses of bringing a foreclosure proceeding.  The proceeds received from the maintenance of any REO Properties, net of reimbursement to the Master Servicer for costs incurred (including any property or other taxes) in connection with maintenance of the REO Properties and net of unreimbursed Servicing Fees, Advances, and Servicing Advances, shall be applied to the payment of principal of and interest on the related defaulted Mortgage Loans (with interest accruing as though the Mortgage Loans were still current and adjustments, if applicable, to the Mortgage Rate were being made in accordance with the Mortgage Note) and all such proceeds shall be deemed, for all purposes in this Agreement, to be payments on account of principal and interest on the related Mortgage Notes and shall be deposited into the Certificate Account.  To the extent the net proceeds received during any calendar month exceeds the amount attributable to amortizing principal and accrued interest at the related Mortgage Rate on the related Mortgage Loan for the calendar month, the excess shall be considered to be a partial prepayment of principal of the related Mortgage Loan.

The proceeds from any liquidation of a Mortgage Loan, as well as any proceeds from an REO Property, will be applied in the following order of priority: first, to reimburse the Master Servicer for any related unreimbursed Servicing Advances or Servicing Fees or for any related unreimbursed Advances, as applicable; second, to reimburse the Master Servicer, as applicable, and to reimburse the Certificate Account for any Nonrecoverable Advances (or portions thereof) that were previously withdrawn by the Master Servicer pursuant to Section 3.09(a)(iii) that related to the Mortgage Loan; third, to accrued and unpaid interest (to the extent no Advance has been made for such amount or any such Advance has been reimbursed) on the Mortgage Loan or related REO Property, at the Adjusted Net Mortgage Rate to the Due Date occurring in the month in which such amounts are required to be distributed; and fourth, as a recovery of principal of the Mortgage Loan.  The Master Servicer will retain any Excess Proceeds from the liquidation of a Liquidated Mortgage Loan as additional servicing compensation pursuant to Section 3.15.

The Master Servicer may agree to a modification of any Mortgage Loan at the request of the related Mortgagor if (i) the modification is in lieu of a refinancing and the Mortgage Rate on the Mortgage Loan, as modified, is approximately a prevailing market rate for newly-originated Mortgage Loans having similar terms and (ii) the Master Servicer purchases that Mortgage Loan from the Trust Fund as described below.  Upon the agreement of the Master Servicer to modify a Mortgage Loan in accordance with the preceding sentence, the Master Servicer shall purchase that Mortgage Loan and all interest of the Trustee in that Mortgage Loan shall automatically be deemed transferred and assigned to the Master Servicer and all benefits and burdens of ownership thereof, including the right to accrued interest thereon from the date of purchase and the risk of default thereon, shall pass to the Master Servicer.  The Master Servicer shall promptly deliver to the Trustee a certification of a Servicing Officer to the effect that all requirements of this paragraph have been satisfied with respect to a Mortgage Loan to be repurchased pursuant to this paragraph.

The Master Servicer shall deposit the Purchase Price for any Mortgage Loan repurchased pursuant to Section 3.12 in the Certificate Account pursuant to Section 3.06 within one Business Day after the purchase of the Mortgage Loan.  Upon receipt by the Trustee of written notification of any such deposit signed by a Servicing Officer, the Trustee shall release to the Master Servicer the related Mortgage File and shall execute and deliver such instruments of transfer or assignment, in each case without recourse, as shall be necessary to vest in the Master Servicer any Mortgage Loan previously transferred and assigned pursuant hereto.  The Master Servicer covenants and agrees to indemnify the Trust Fund against any liability for any "prohibited transaction" taxes and any related interest, additions, and penalties imposed on the Trust Fund established hereunder as a result of any modification of a Mortgage Loan effected pursuant to this Section, or any purchase of a Mortgage Loan by the Master

Exhibit 6, Page 359

Servicer in connection with a modification (but such obligation shall not prevent the Master Servicer or any other appropriate Person from contesting any such tax in appropriate proceedings and shall not prevent the Master Servicer from withholding payment of such tax, if permitted by law, pending the outcome of such proceedings).  The Master Servicer shall have no right of reimbursement for any amount paid pursuant to the foregoing indemnification, except to the extent that the amount of any tax, interest, and penalties, together with interest thereon, is refunded to the Trust Fund.

Section 3.13     *Trustee to Cooperate; Release of Mortgage Files.*

Upon the payment in full of any Mortgage Loan, or the receipt by the Master Servicer of a notification that payment in full will be escrowed in a manner customary for such purposes, the Master Servicer will immediately notify the Trustee by delivering a Request for Release substantially in the form of Exhibit N.  Upon receipt of the request, the Trustee shall promptly release the related Mortgage File to the Master Servicer, and the Trustee shall at the Master Servicer's direction execute and deliver to the Master Servicer the request for reconveyance, deed of reconveyance, or release or satisfaction of mortgage or such instrument releasing the lien of the Mortgage in each case provided by the Master Servicer, together with the Mortgage Note with written evidence of cancellation thereon.  The Master Servicer is authorized to cause the removal from the registration on the MERS System of such Mortgage and to execute and deliver, on behalf of the Trustee and the Certificateholders or any of them, any and all instruments of satisfaction or cancellation or of partial or full release.  Expenses incurred in connection with any instrument of satisfaction or deed of reconveyance shall be chargeable to the related Mortgagor.

From time to time and as shall be appropriate for the servicing or foreclosure of any Mortgage Loan, including for such purpose collection under any policy of flood insurance, any fidelity bond or errors or omissions policy, or for the purposes of effecting a partial release of any Mortgaged Property from the lien of the Mortgage or the making of any corrections to the Mortgage Note or the Mortgage or any of the other documents included in the Mortgage File, the Trustee shall, upon delivery to the Trustee of a Request for Release in the form of Exhibit M signed by a Servicing Officer, release the Mortgage File to the Master Servicer or its designee.  Subject to the further limitations set forth below, the Master Servicer shall cause the Mortgage File or documents so released to be returned to the Trustee when the need therefor by the Master Servicer no longer exists, unless the Mortgage Loan is liquidated and the proceeds thereof are deposited in the Certificate Account, in which case the Master Servicer shall deliver to the Trustee a Request for Release in the form of Exhibit N, signed by a Servicing Officer.

If the Master Servicer at any time seeks to initiate a foreclosure proceeding in respect of any Mortgaged Property as authorized by this Agreement, the Master Servicer shall deliver to the Trustee, for signature, as appropriate, any court pleadings, requests for trustee's sale, or other documents necessary to effectuate such foreclosure or any legal action brought to obtain judgment against the Mortgagor on the Mortgage Note or the Mortgage or to obtain a deficiency judgment or to enforce any other remedies or rights provided by the Mortgage Note or the Mortgage or otherwise available at law or in equity.

Section 3.14     *Documents, Records and Funds in Possession of the Master Servicer to be Held for the Trustee.*

The Master Servicer shall account fully to the Trustee for any funds it receives or otherwise collects as Liquidation Proceeds or Insurance Proceeds in respect of any Mortgage Loan.  All Mortgage Files and funds collected or held by, or under the control of, the Master Servicer in respect of any Mortgage Loans, whether from the collection of principal and interest payments or from Liquidation Proceeds, including any funds on deposit in the Certificate Account, shall be held by the Master Servicer for and on behalf of the Trustee and shall be and remain the sole and exclusive property of the Trustee, subject to the applicable provisions of this Agreement.  The Master Servicer also agrees that it shall not

Exhibit 6, Page 360

create, incur or subject any Mortgage File or any funds that are deposited in the Certificate Account, the Collection Account, Distribution Account, or any Escrow Account, or any funds that otherwise are or may become due or payable to the Trustee for the benefit of the Certificateholders, to any claim, lien, security interest, judgment, levy, writ of attachment, or other encumbrance, or assert by legal action or otherwise any claim or right of setoff against any Mortgage File or any funds collected on, or in connection with, a Mortgage Loan, except, however, that the Master Servicer shall be entitled to set off against and deduct from any such funds any amounts that are properly due and payable to the Master Servicer under this Agreement.

Section 3.15   Servicing Compensation.

As compensation for its activities hereunder, the Master Servicer may retain or withdraw from the Servicing Account, the Collection Account, or the Certificate Account the Servicing Fee for each Mortgage Loan for the related Distribution Date.  Notwithstanding the foregoing, the Servicing Fee payable to the Master Servicer shall be reduced by the lesser of the aggregate of the Prepayment Interest Shortfalls with respect to the Distribution Date and the aggregate Compensating Interest for the Distribution Date.

The Master Servicer may retain or withdraw from the Servicing Account, the Collection Account, or the Certificate Account the Servicing Fee for each Mortgage Loan for the related Distribution Date.  If the Master Servicer directly services a Mortgage Loan, the Master Servicer may retain the Servicing Fee for its own account as compensation for performing services.  If a Subservicer directly services a Mortgage Loan, unless the Subservicer retains the Servicing Fee, the Master Servicer shall remit the Servicing Fee to the related Subservicer as compensation for performing services.

Additional master servicing compensation in the form of Excess Proceeds, Prepayment Interest Excess, assumption fees, late payment charges and all income net of any losses realized from Permitted Investments shall be retained by the Master Servicer to the extent not required to be deposited in the Certificate Account pursuant to Section 3.06.  The Master Servicer shall be required to pay all expenses incurred by it in connection with its servicing activities hereunder (including the fees of any Subservicer, payment of any premiums for hazard insurance, and any Primary Insurance Policy and maintenance of the other forms of insurance coverage required by this Agreement) and shall not be entitled to reimbursement therefor except as specifically provided in this Agreement.

Section 3.16   Access to Certain Documentation.

The Master Servicer shall provide to the OTS and the FDIC and to comparable regulatory authorities supervising Holders of Certificates and Certificate Owners and the examiners and supervisory agents of the OTS, the FDIC, and such other authorities, access to the documentation regarding the Mortgage Loans required by applicable regulations of the OTS and the FDIC.  Access shall be afforded without charge, but only upon reasonable prior written request and during normal business hours at the offices designated by the Master Servicer.  Nothing in this Section 3.16 shall limit the obligation of the Master Servicer to observe any applicable law prohibiting disclosure of information regarding the Mortgagors and the failure of the Master Servicer to provide access as provided in this Section 3.16 as a result of such obligation shall not constitute a breach of this Section 3.16.

Section 3.17   Annual Statement as to Compliance.

By March 1 of each year, commencing with 2006, the Master Servicer shall deliver to the Depositor and the Trustee an Officer's Certificate signed by two Servicing Officers stating, as to each signer thereof, that (i) a review of the activities of the Master Servicer during the preceding calendar year

55                                                                              Exhibit 6, Page 361

and of the performance of the Master Servicer under this Agreement has been made under such officer's supervision, and (ii) to the best of such officer's knowledge, based on the review, the Master Servicer has fulfilled all its obligations under this Agreement throughout the year, or, if there has been a default in the fulfillment of any obligation, specifying each default known to the officer and the nature and status thereof.  The Trustee shall forward a copy of each compliance statement to each Rating Agency.

   *Section 3.18  Annual Independent Public Accountants' Servicing Statement; Financial Statements.*

   By March 1 of each year, commencing with 2006, the Master Servicer at its expense shall cause a nationally or regionally recognized firm of independent public accountants (who may also render other services to the Master Servicer, the Seller or any affiliate thereof) which is a member of the American Institute of Certified Public Accountants to furnish a statement to the Trustee and the Depositor to the effect that the firm has examined certain documents and records relating to the servicing of the Mortgage Loans under this Agreement or of mortgage loans under pooling and servicing agreements substantially similar to this Agreement (the statement to have attached to it a schedule of the pooling and servicing agreements covered by it) and that, on the basis of its examination, conducted substantially in compliance with the Audit Guide for Audits of HUD Approved Nonsupervised Mortgagees, the Uniform Single Attestation Program for Mortgage Bankers, or the Audit Program for Mortgages serviced for FNMA and FHLMC, such servicing has been conducted in compliance with this Agreement except for any significant exceptions or errors in records that, in the opinion of the firm, the Audit Guide for Audits of HUD Approved Nonsupervised Mortgagees, the Uniform Single Attestation Program for Mortgage Bankers, or the Audit Program for Mortgages serviced for FNMA and FHLMC requires it to report.  In rendering the statement, the firm may rely, as to matters relating to direct servicing of Mortgage Loans by the subservicers, upon comparable statements for examinations conducted substantially in compliance with the Audit Guide for Audits of HUD Approved Nonsupervised Mortgagees, the Uniform Single Attestation Program for Mortgage Bankers, or the Audit Program for Mortgages serviced for FNMA and FHLMC (rendered within one year of the statement) of independent public accountants with respect to the related Subservicer.  The Master Servicer shall deliver the statement to the Trustee so that the Trustee can provide copies of the statement to any Certificateholder or Certificate Owner on request at the Master Servicer's expense.

   *Section 3.19  Errors and Omissions Insurance; Fidelity Bonds.*

   The Master Servicer shall obtain and maintain in force (a) policies of insurance covering errors and omissions in the performance of its obligations as Master Servicer hereunder and (b) a fidelity bond covering its officers, employees, and agents.  Each policy and bond shall, together, comply with the requirements from time to time of FNMA or FHLMC for persons performing servicing for mortgage loans purchased by FNMA or FHLMC.  If any policy or bond ceases to be in effect, the Master Servicer shall obtain a comparable replacement policy or bond from an insurer or issuer meeting the above requirements as of the date of the replacement.

   *Section 3.20  Notification of Adjustments.*

   On each Adjustment Date, the Master Servicer shall make interest rate adjustments for each Mortgage Loan in compliance with the requirements of the related Mortgage and Mortgage Note and applicable regulations.  The Master Servicer shall execute and deliver the notices required by each Mortgage and Mortgage Note and applicable regulations regarding interest rate adjustments.  The Master Servicer also shall provide timely notification to the Trustee of all applicable data and information regarding such interest rate adjustments and the Master Servicer's methods of implementing such interest rate adjustments.  Upon the discovery by the Master Servicer or the Trustee that the Master Servicer has

failed to adjust or has incorrectly adjusted a Mortgage Rate or a monthly payment pursuant to the terms of the related Mortgage Note and Mortgage, the Master Servicer shall immediately deposit in the Certificate Account from its own funds the amount of any loss caused thereby without reimbursement therefor; provided, however, the Master Servicer shall not be liable with respect to any interest rate adjustments made by any servicer prior to the Master Servicer.

### Section 3.21    *Prepayment Charges.*

The Master Servicer will not waive any part of any Prepayment Charge unless the waiver relates to a default or a reasonably foreseeable default, the Prepayment Charge would cause an undue hardship to the related borrower, the Mortgaged Property is sold by the Mortgagor, the collection of any Prepayment Charge would violate any relevant law or regulation or the waiving of the Prepayment Charge would otherwise benefit the Trust Fund and it is expected that the waiver would maximize recovery of total proceeds taking into account the value of the Prepayment Charge and related Mortgage Loan and doing so is standard and customary in servicing similar Mortgage Loans (including any waiver of a Prepayment Charge in connection with a refinancing of a Mortgage Loan that is related to a default or a reasonably foreseeable default).  The Master Servicer will not waive a Prepayment Charge in connection with a refinancing of a Mortgage Loan that is not related to a default or a reasonably foreseeable default.

Exhibit 6, Page 363

ARTICLE FOUR

DISTRIBUTIONS AND ADVANCES BY THE MASTER SERVICER

### Section 4.01     Advances.

(a)  The Master Servicer shall determine on or before each Master Servicer Advance Date whether it is required to make an Advance pursuant to the definition thereof.  If the Master Servicer determines it is required to make an Advance, it shall, on or before the Master Servicer Advance Date, either (i) deposit into the Certificate Account an amount equal to the Advance or (ii) make an appropriate entry in its records relating to the Certificate Account that any Amount Held for Future Distribution has been used by the Master Servicer in discharge of its obligation to make any such Advance.  Any funds so applied shall be replaced by the Master Servicer by deposit in the Certificate Account no later than the close of business on the next Master Servicer Advance Date.  The Master Servicer shall be entitled to be reimbursed from the Certificate Account for all Advances of its own funds made pursuant to this Section 4.01 as provided in Section 3.09.  The obligation to make Advances with respect to any Mortgage Loan shall continue if such Mortgage Loan has been foreclosed or otherwise terminated and the Mortgaged Property has not been liquidated.  The Master Servicer shall inform the Trustee of the amount of the Advance to be made on each Master Servicer Advance Date no later than the second Business Day before the related Distribution Date.

(b)  If the Master Servicer determines that it will be unable to comply with its obligation to make the Advances as and when described in the second sentence of Section 4.01(a), it shall use its best efforts to give written notice thereof to the Trustee (each such notice an "***Advance Notice***"; and such notice may be given by telecopy), not later than 3:00 P.M., New York time, on the Business Day immediately preceding the related Master Servicer Advance Date, specifying the amount that it will be unable to deposit (each such amount an "***Advance Deficiency***") and certifying that such Advance Deficiency constitutes an Advance hereunder and is not a Nonrecoverable Advance.  If the Trustee receives a Trustee Advance Notice on or before 3:00 P.M., New York time on a Master Servicer Advance Date, the Trustee is entitled to immediately terminate the Master Servicer under Section 7.01, and shall, not later than 3:00 P.M., New York time, on the related Distribution Date, deposit in the Distribution Account an amount equal to the Advance Deficiency identified in such Trustee Advance Notice unless it is prohibited from so doing by applicable law.  Notwithstanding the foregoing, the Trustee shall not be required to make such deposit if the Trustee shall have received written notification from the Master Servicer that the Master Servicer has deposited or caused to be deposited in the Certificate Account an amount equal to such Advance Deficiency by 3:00 P.M. New York time on the related Distribution Date.  If the Trustee has not terminated the Master Servicer, the Master Servicer shall reimburse the Trustee for the amount of any Advance (including interest at the Prime Rate on the day of such reimbursement published in *The Wall Street Journal*) on such amount, made by the Trustee pursuant to this Section 4.01(b) not later than the second day following the related Master Servicer Advance Date.  In the event that the Master Servicer does not reimburse the Trustee in accordance with the requirements of the preceding sentence, the Trustee shall immediately (a) terminate all of the rights and obligations of the Master Servicer under this Agreement in accordance with Section 7.01 and (b) subject to the limitations set forth in Section 3.05, assume all of the rights and obligations of the Master Servicer hereunder.

(c)  The Master Servicer shall, not later than the close of business on the Business Day immediately preceding each Master Servicer Advance Date, deliver to the Trustee a report (in form and substance reasonably satisfactory to the Trustee) that indicates (i) the Mortgage Loans with respect to which the Master Servicer has determined that the related Scheduled Payments should be advanced and (ii) the amount of the related Scheduled Payments.  The Master Servicer shall deliver to the Trustee on

Exhibit 6, Page 364

the related Master Servicer Advance Date an Officer's Certificate of a Servicing Officer indicating the amount of any proposed Advance determined by the Master Servicer to be a Nonrecoverable Advance.

**Section 4.02**     *Priorities of Distribution.*

(a)  On each Distribution Date, the Trustee shall withdraw the Available Funds from the Distribution Account and apply such funds to distributions on the Certificates in the following order and priority and, in each case, to the extent of Available Funds remaining:

(i)       concurrently, to each interest-bearing Class of Senior Certificates, an amount allocable to interest equal to the related Class Optimal Interest Distribution Amount, any shortfall being allocated among such Classes in proportion to the amount of the Class Optimal Interest Distribution Amount that would have been distributed in the absence of such shortfall; provided that prior to the Accrual Termination Date, the Accrual Amount shall be distributed as provided in Section 4.02(a)(ii);

(ii)      [reserved];

(iii)     concurrently, to the Classes of Senior Certificates as follows:

(A)      to the Class PO Certificates an amount allocable to the PO Formula Principal Amount up to the Class Certificate Balance thereof; and

(B)      on each Distribution Date prior to the Senior Credit Support Depletion Date, the Non-PO Formula Principal Amount up to the amount of the Senior Principal Distribution Amount for such Distribution Date will be distributed, sequentially, as follows:

(a)  to the Class A-R Certificates, until its Class Certificate Balance is reduced to zero;

(b)  concurrently, to the Class A-6 and Class A-7 Certificates, pro rata, the Priority Amount, until their respective Class Certificate Balances are reduced to zero;

(c)  concurrently, to the Class A-1, Class A-3 and Class A-4 Certificates, pro rata, until their respective Class Certificate Balances are reduced to zero;

(d)  to the Class A-5 Certificates, until its Class Certificate Balance is reduced to zero; and

(e)  to the Class A-6 and Class A-7 Certificates, without regard to the Priority Amount, until their respective Class Certificate Balances are reduced to zero.

(iv)      to the Class PO Certificates, any Class PO Deferred Amount, up to an amount not to exceed the amount calculated pursuant to the definition of Subordinated Principal Distribution Amount actually received or advanced for such Distribution Date (with such amount to be allocated first from amounts calculated pursuant to (i) and (ii) and then (iii) of the definition of Subordinated Principal Distribution Amount;

**Exhibit 6, Page 365**

(v)     On each Distribution Date, Available Funds remaining after making the
distributions described in Section 4.02(a)(i)-(iv) will be distributed to the Subordinated
Certificates, subject to paragraph 4.02(e) below, in the following order of priority:

   (A)     to the Class B-1 Certificates, an amount allocable to interest equal to the
Class Optimal Interest Distribution Amount for such Class for such
Distribution Date;

   (B)     to the Class B-1 Certificates, an amount allocable to principal equal to its
Pro Rata Share for such Distribution Date until the Class Certificate
Balance thereof is reduced to zero;

   (C)     to the Class B-2 Certificates, an amount allocable to interest equal to the
Class Optimal Interest Distribution Amount for such Class for such
Distribution Date;

   (D)     to the Class B-2 Certificates, an amount allocable to principal equal to its
Pro Rata Share for such Distribution Date until the Class Certificate
Balance thereof is reduced to zero;

   (E)     to the Class B-3 Certificates, an amount allocable to interest equal to the
Class Optimal Interest Distribution Amount for such Class for such
Distribution Date;

   (F)     to the Class B-3 Certificates, an amount allocable to principal equal to its
Pro Rata Share for such Distribution Date until the Class Certificate
Balance thereof is reduced to zero;

   (G)     to the Class B-4 Certificates, an amount allocable to interest equal to the
Class Optimal Interest Distribution Amount for such Class for such
Distribution Date;

   (H)     to the Class B-4 Certificates, an amount allocable to principal equal to its
Pro Rata Share for such Distribution Date until the Class Certificate
Balance thereof is reduced to zero;

   (I)     to the Class B-5 Certificates, an amount allocable to interest equal to the
Class Optimal Interest Distribution Amount for such Class for such
Distribution Date;

   (J)     to the Class B-5 Certificates, an amount allocable to principal equal to its
Pro Rata Share for such Distribution Date until the Class Certificate
Balance thereof is reduced to zero;

   (K)     to the Class B-6 Certificates, an amount allocable to interest equal to the
Class Optimal Interest Distribution Amount for such Class for such
Distribution Date; and

   (L)     to the Class B-6 Certificates, an amount allocable to principal equal to its
Pro Rata Share for such Distribution Date until the Class Certificate
Balance thereof is reduced to zero;

(vi) [reserved]; and

(vii) to the Class A-R Certificates, any remaining funds; provided, that such amounts shall not include the $100 held in trust for the Class P Certificates.

On each Distribution Date, all amounts representing Prepayment Charges received during the related Prepayment Period will be distributed to the holders of the Class P Certificates.  On the Distribution Date immediately following the expiration of the latest prepayment penalty term of the Mortgage Loans, the $100 held in trust for the Class P Certificates will be distributed to the holders of the Class P Certificates.

On any Distribution Date, amounts distributed in respect of Class PO Deferred Amounts will not reduce the Class Certificate Balance of the Class PO Certificates.

On any Distribution Date, to the extent the Amount Available for Senior Principal is insufficient to make the full distribution required to be made pursuant to clause (a)(iii), (A) the amount distributable on the Class PO Certificate in respect of principal shall be equal to the product of (1) the Amount Available for Senior Principal and (2) a fraction, the numerator of which is the PO Formula Principal Amount and the denominator of which is the sum of such PO Formula Principal Amount and the Senior Principal Distribution Amount and (B) the amount distributable on the Senior Certificates other than the Class PO Certificates, in respect of principal shall be equal to the product of (1) the Amount Available for Senior Principal and (2) a fraction, the numerator of which is such Senior Principal Distribution Amount and the denominator of which is such Senior Principal Distribution Amount and the PO Formula Principal Amount.

(b)  On each Distribution Date prior to and including the applicable Accrual Termination Date with respect to each Class of Accrual Certificates, the Accrual Amount for such Class for such Distribution Date shall not (except as provided in the second to last sentence in this paragraph) be distributed as interest with respect to such Class of Accrual Certificates, but shall instead be added to the related Class Certificate Balance of such Class on the related Distribution Date.  With respect to any Distribution Date prior to and including the applicable Accrual Termination Date on which principal payments on any Class of Accrual Certificates are distributed pursuant to Section 4.02(a)(iii)(y), the related Accrual Amount shall be deemed to have been added on such Distribution Date to the related Class Certificate Balance (and included in the amount distributable on the related Class or Classes or Accretion Directed Certificates pursuant to Section 4.02(a)(ii) for such Distribution Date) and the related distribution thereon shall be deemed to have been applied concurrently towards the reduction of all or a portion of the amount so added and, to the extent of any excess, towards the reduction of the Class Certificate Balance of such Class of Accrual Certificates immediately prior to such Distribution Date. Notwithstanding any such distribution, each such Class or Component shall continue to be a Class of Accrual Certificates on each subsequent Distribution Date until the applicable Accrual Termination Date.

(c)  On each Distribution Date on or after the Senior Credit Support Depletion Date, notwithstanding the allocation and priority set forth in Section 4.02(a)(iii)(B), the Non-PO Formula Principal Amount up to the amount of the Senior Principal Distribution Amount for such Distribution Date available will be distributed concurrently, as principal, of the Classes of Senior Certificates (other than the Notional Amount Certificates and the Class PO Certificates), pro rata, on the basis of their respective Class Certificate Balances, until the Class Certificate Balances thereof are reduced to zero.

(d)  On each Distribution Date, the amount referred to in clause (i) of the definition of Class Optimal Interest Distribution Amount for each Class of Certificates for such Distribution Date shall be

61

**Exhibit 6, Page 367**

reduced by (i) the related Class' pro rata share of Net Prepayment Interest Shortfalls based on the related Class Optimal Interest Distribution Amount and (ii) the related Class' Allocable Share of (A) after the Special Hazard Coverage Termination Date, with respect to each Mortgage Loan that became a Special Hazard Mortgage Loan during the calendar month preceding the month of such Distribution Date, the excess of one month's interest at the Adjusted Net Mortgage Rate on the Stated Principal Balance of such Mortgage Loan as of the Due Date in such month over the amount of Liquidation Proceeds applied as interest on such Mortgage Loan with respect to such month, (B) after the Bankruptcy Coverage Termination Date, with respect to each Mortgage Loan that became subject to a Bankruptcy Loss during the calendar month preceding the month of such Distribution Date, the interest portion of the related Debt Service Reduction or Deficient Valuation, (C) each Relief Act Reduction for the Mortgage Loans incurred during the calendar month preceding the month of such Distribution Date and (D) after the Fraud Loss Coverage Termination Date, with respect to each Mortgage Loan that became a Fraud Loan during the calendar month preceding the month of such Distribution Date, the excess of one month's interest at the related Adjusted Net Mortgage Rate on the Stated Principal Balance of such Mortgage Loan as of the Due Date in such month over the amount of Liquidation Proceeds applied as interest on such Mortgage Loan with respect to such month.

(e)  Notwithstanding the priority and allocation contained in Section 4.02(a), if, with respect to any Class of Subordinated Certificates, on any Distribution Date the sum of the related Class Subordination Percentages of such Class and of all Classes of Subordinated Certificates that have a higher numerical Class designation than such Class (the "*Applicable Credit Support Percentage*") is less than the Original Applicable Credit Support Percentage for such Class, no distribution of Principal Prepayments on the Mortgage Loans will be made to any such Classes (the "*Restricted Classes*") and the amount of such Principal Prepayments otherwise distributable to the Restricted Classes shall be distributed to the Classes of Subordinated Certificates having lower numerical Class designations than such Class, pro rata, based on their respective Class Certificate Balances immediately prior to such Distribution Date and shall be distributed in the sequential order set forth in Section 4.02(a)(v). Notwithstanding the foregoing, the Class of Subordinated Certificates then outstanding with the lowest numerical class designation shall not be a Restricted Class.

(f)  If the amount of a Realized Loss on a Mortgage Loan has been reduced by application of Subsequent Recoveries with respect to such Mortgage Loan, the amount of such Subsequent Recoveries will be applied sequentially, in the order of payment priority, to increase the Class Certificate Balance of each Class of Certificates to which Realized Losses have been allocated, but in each case by not more than the amount of Realized Losses previously allocated to that Class of Certificates pursuant to Section 4.05.  Holders of such Certificates will not be entitled to any payment in respect of the Class Optimal Interest Distribution Amount on the amount of such increases for any Interest Accrual Period preceding the Distribution Date on which such increase occurs.  Any such increases shall be applied to the Certificate Balance of each Certificate of such Class in accordance with its respective Percentage Interest.

> **Section 4.03**    *[Reserved].*

> **Section 4.04**    *[Reserved].*

> **Section 4.05**    *Allocation of Realized Losses.*

(a)  On or prior to each Determination Date, the Trustee shall determine the total amount of Realized Losses, including Excess Losses, with respect to each related Distribution Date.

Realized Losses with respect to any Distribution Date shall be allocated as follows:

Exhibit 6, Page 368

(i)     the applicable PO Percentage of any Realized Loss, including any Excess Loss, shall be allocated to the Class PO Certificates until its Class Certificate Balance is reduced to zero; and

(ii)    (A) the applicable Non-PO Percentage of any Realized Loss (other than any Excess Loss) shall be allocated first to the Subordinated Certificates in reverse order of their respective numerical Class designations (beginning with the Class of Subordinated Certificates then outstanding with the highest numerical Class designation) until the respective Class Certificate Balance of each such Class is reduced to zero, and second to the Classes of Senior Certificates (other than any Notional Amount Certificates, if applicable, and the Class PO Certificates), *pro rata* on the basis of their respective Class Certificate Balances, in each case immediately prior to the related Distribution Date, until the respective Class Certificate Balance of each such Class is reduced to zero; *provided, however,* that the applicable Non-PO Percentage of any Realized Losses on the Mortgage Loans that would otherwise be allocated to the Class A-6 Certificates will instead first be allocated to the Class A-7 Certificates until its Class Certificate Balance is reduced to zero;

(B) the applicable Non-PO Percentage of any Excess Losses on the Mortgage Loans shall be allocated to the Classes of Senior Certificates (other than the Class PO Certificates and Notional Amount Certificates) and the Classes of Subordinated Certificates then outstanding, *pro rata*, on the basis of their respective Class Certificate Balances, in each case immediately prior to such Distribution Date and until the respective Class Certificate Balances thereof have been reduced to zero.

(b)  The Class Certificate Balance of the Class of Subordinated Certificates then outstanding with the highest numerical Class designation shall be reduced on each Distribution Date by the sum of (i) the amount of any payments on the Class PO Certificates in respect of Class PO Deferred Amounts and (ii) the amount, if any, by which the aggregate of the Class Certificate Balances of all outstanding Classes of Certificates (after giving effect to the distribution of principal and the allocation of Realized Losses and Class PO Deferred Amounts on such Distribution Date) exceeds the aggregate Stated Principal Balance of the Mortgage Loans for the following Distribution Date.

(c)  Any Realized Loss allocated to a Class of Certificates or any reduction in the Class Certificate Balance of a Class of Certificates pursuant to Section 4.05(b) shall be allocated among the Certificates of such Class in proportion to their respective Certificate Balances.

(d)  Any allocation of Realized Losses to a Certificate or any reduction in the Certificate Balance of a Certificate pursuant to Section 4.05(b) shall be accomplished by reducing the Certificate Balance thereof immediately following the distributions made on the related Distribution Date in accordance with the definition of Certificate Balance.

### Section 4.06     *Monthly Statements to Certificateholders.*

(a)  Not later than each Distribution Date, the Trustee shall prepare and make available on its website at https://www.tss.db.com/invr to each Certificateholder, the Master Servicer and the Depositor a statement for the related distribution of:

(i)     the amount of the distribution allocable to principal, separately identifying the aggregate amount of any Principal Prepayments and Liquidation Proceeds included therein;

Exhibit 6, Page 369

(ii)      the amount of the distribution allocable to interest, any Class Unpaid Interest Shortfall Amounts included in the distribution and any remaining Class Unpaid Interest Shortfall Amounts after giving effect to the distribution;

(iii)     if the distribution to the Holders of any Class of Certificates is less than the full amount that would be distributable to them if sufficient funds were available, the amount of the shortfall and the allocation of the shortfall between principal and interest;

(iv)     the Class Certificate Balance or Notional Amount of each Class of Certificates after giving effect to the distribution of principal on the Distribution Date;

(v)      the Pool Stated Principal Balance for the following Distribution Date;

(vi)     the Senior Percentage and Subordinated Percentage for the following Distribution Date;

(vii)    the amount of the Servicing Fees paid to or retained by the Master Servicer or Subservicer (with respect to the Subservicers, in the aggregate) and the amounts of any additional servicing compensation received by the Master Servicer attributable to penalties, fees, excess Liquidation Proceeds or other similar charges or fees and items with respect to the Distribution Date;

(viii)   the Pass-Through Rate for each Class of Certificates as of the day before the preceding Distribution Date;

(ix)     the Pass-Through Rate for each Class of Certificates, if adjusted from the date of the last monthly statement, expected to be applicable on the next Distribution Date;

(x)      the amount of Advances included in the distribution on the Distribution Date and the aggregate amount of Advances outstanding as of the close of business on the Distribution Date;

(xi)     the number and aggregate principal amounts of Mortgage Loans (A) delinquent (exclusive of Mortgage Loans in foreclosure) (1) 1 to 30 days, (2) 31 to 60 days, (3) 61 to 90 days, and (4) 91 or more days and (B) in foreclosure and delinquent (1) 1 to 30 days, (2) 31 to 60 days, (3) 61 to 90 days, and (4) 91 or more days, as of the close of business on the last day of the calendar month preceding the Distribution Date;

(xii)    for each of the preceding 12 calendar months, or all calendar months since the Cut-off Date, whichever is less, the aggregate dollar amount of the Scheduled Payments

(A)      due on all Outstanding Mortgage Loans on each of the Due Dates in each such month and

(B)      delinquent 60 days or more on each of the Due Dates in each such month;

(xiii)   with respect to any Mortgage Loan that became an REO Property during the preceding calendar month, the loan number and Stated Principal Balance of the Mortgage Loan as of the close of business on the Determination Date preceding the Distribution Date and the date of acquisition thereof;

Exhibit 6, Page 370

(xiv)    the total number and principal balance of any REO Properties (and market value, if available) as of the close of business on the Determination Date preceding the Distribution Date;

(xv)    the Senior Prepayment Percentage for such Distribution Date;

(xvi)    the aggregate amount of Realized Losses incurred and Subsequent Recoveries, if any, received during the preceding calendar month and aggregate Realized Losses through such Distribution Date;

(xvii)    the Special Hazard Loss Coverage Amount, the Fraud Loss Coverage Amount and the Bankruptcy Loss Coverage Amount, in each case as of the related Determination Date; and

(xviii)   with respect to the second Distribution Date, the number and aggregate balance of any Delay Delivery Mortgage Loans not delivered within the time periods specified in the definition of Delay Delivery Mortgage Loans.

The Trustee's responsibility for disbursing the above information to the Certificateholders is limited to the availability, timeliness and accuracy of the information derived from the Master Servicer.

By each Determination Date the Master Servicer shall provide to the Trustee in electronic form the information needed to determine the distributions to be made pursuant to Section 4.02 and any other information on which the Master Servicer and the Trustee mutually agree.

(b)  On or before the fifth Business Day following the end of each Prepayment Period (but in no event later than the third Business Day prior to the related Distribution Date), the Master Servicer shall deliver to the Trustee (which delivery may be by electronic data transmission) a report in substantially the form set forth as Schedule V.

(c)  Within a reasonable period of time after the end of each calendar year, the Trustee shall cause to be furnished to each Person who at any time during the calendar year was a Certificateholder, a statement containing the information set forth in clauses (a)(i) and (a)(ii) of this Section 4.06 aggregated for such calendar year or applicable portion thereof during which such Person was a Certificateholder. Such obligation of the Trustee shall be deemed to have been satisfied to the extent that substantially comparable information shall be provided by the Trustee pursuant to any requirements of the Code as from time to time in effect.

**Section 4.07     [Reserved].**

**Section 4.08     Determination of Pass-Through Rates for LIBOR Certificates.**

On each LIBOR Determination Date so long as the LIBOR Certificates are outstanding, the Trustee will determine LIBOR on the basis of the British Bankers' Association ("**BBA**") "Interest Settlement Rate" for one-month deposits in U.S. dollars as found on Moneyline Telerate Page 3750 as of 11:00 a.m. London time on each LIBOR Determination Date.

(a)  If LIBOR cannot be determined as provided in the first paragraph of this Section 4.08, the Trustee shall either (i) request each Reference Bank to inform the Trustee of the quotation offered by its principal London office for making one-month United States dollar deposits in leading banks in the London interbank market, as of 11:00 a.m. (London time) on such LIBOR Determination Date or (ii) in

Exhibit 6, Page 371

lieu of making any such request, rely on such Reference Bank quotations that appear at such time on the Reuters Screen LIBO Page (as defined in the International Swap Dealers Association Inc. Code of Standard Wording, Assumptions and Provisions for Swaps, 1986 Edition), to the extent available.

(b)   LIBOR for the next Interest Accrual Period for a Class of LIBOR Certificates will be established by the Trustee on each LIBOR Determination Date as follows:

(i)   If on any LIBOR Determination Date two or more Reference Banks provide such offered quotations, LIBOR for the next Interest  Accrual Period for a Class of LIBOR Certificates shall be the arithmetic mean of such offered quotations (rounding such arithmetic mean upwards if necessary to the nearest whole multiple of 1/32%).

(ii)   If on any LIBOR Determination Date only one or none of the Reference Banks provides such offered quotations, LIBOR for the next Interest Accrual Period for a Class of LIBOR Certificates shall be whichever is the higher of (i) LIBOR as determined on the previous LIBOR Determination Date or (ii) the Reserve Interest Rate.  The "Reserve Interest Rate" shall be the rate per annum which the Trustee determines to be either (i) the arithmetic mean (rounded upwards if necessary to the nearest whole multiple of 1/32%) of the one-month United States dollar lending rates that New York City banks selected by the Trustee are quoting, on the relevant LIBOR Determination Date, to the principal London offices of at least two of the Reference Banks to which such quotations are, in the opinion of the Trustee, being so made, or (ii) in the event that the Trustee can determine no such arithmetic mean, the lowest one-month United States dollar lending rate which New York City banks selected by  the Trustee are quoting on such LIBOR Determination Date  to leading European banks.

(iii)   If on any LIBOR Determination Date the Trustee is required but is unable to determine the Reserve Interest Rate in the manner provided in paragraph (b) above, LIBOR shall be LIBOR as determined on the preceding LIBOR Determination Date, or, in the case of the first LIBOR Determination Date, the Initial LIBOR Rate.

(c)   Until all of the LIBOR Certificates are paid in full, the Trustee will at all times retain at least four Reference Banks for the purpose of determining LIBOR with respect to each LIBOR Determination Date.  The Master Servicer initially shall designate the Reference Banks.  Each "Reference Bank" shall be a leading bank engaged in transactions in Eurodollar deposits in the international Eurocurrency market, shall not control, be controlled by, or be under common control with, the Trustee and shall have an established place of business in London.  If any such Reference Bank should be unwilling or unable to act as such or if the Master Servicer should terminate its appointment as Reference Bank, the Trustee shall promptly appoint or cause to be appointed another Reference Bank.  The Trustee shall have no liability or responsibility to any Person for (i) the selection of any Reference Bank for purposes of determining LIBOR or (ii) any inability to retain at least four Reference Banks which is caused by circumstances beyond its reasonable control.

(d)   The Pass-Through Rate for each Class of LIBOR Certificates for each related Interest Accrual Period shall be determined by the Trustee on each LIBOR Determination Date so long as the LIBOR Certificates are outstanding on the basis of LIBOR and the respective formulae appearing in footnotes corresponding to the LIBOR Certificates in the table relating to the Certificates in the Preliminary Statement.

(e)   In determining LIBOR, any Pass-Through Rate for the LIBOR Certificates, any Interest Settlement Rate, or any Reserve Interest Rate, the Trustee may conclusively rely and shall be protected in relying upon the offered quotations (whether written, oral or on the Dow Jones Markets) from the BBA

66                                      **Exhibit 6, Page 372**

designated banks, the Reference Banks or the New York City banks as to LIBOR, the Interest Settlement Rate or the Reserve Interest Rate, as appropriate, in effect from time to time.  The Trustee shall not have any liability or responsibility to any Person for (i) the Trustee's selection of New York City banks for purposes of determining any Reserve Interest Rate or (ii) its inability, following a good-faith reasonable effort, to obtain such quotations from, the BBA designated banks, the Reference Banks or the New York City banks or to determine such arithmetic mean, all as provided for in this Section 4.08.

(f)  The establishment of LIBOR and each Pass-Through Rate for the LIBOR Certificates by the Trustee shall (in the absence of manifest error) be final, conclusive and binding upon each Holder of a Certificate and the Trustee.

Exhibit 6, Page 373

ARTICLE FIVE

THE CERTIFICATES

### Section 5.01    The Certificates.

The Certificates shall be substantially in the forms attached hereto as exhibits.  The Certificates shall be issuable in registered form, in the minimum denominations, integral multiples of $1,000 in excess thereof (except that one Certificate in each Class may be issued in a different amount which must exceed the applicable minimum denomination) and aggregate denominations per Class set forth in the Preliminary Statement.

Subject to Section 9.02 respecting the final distribution on the Certificates, on each Distribution Date the Trustee shall make distributions to each Certificateholder of record on the preceding Record Date either (x) by wire transfer in immediately available funds to the account of such holder at a bank or other entity having appropriate facilities therefor, if such Holder has so notified the Trustee at least five Business Days before the related Record Date or (y) by check mailed by first class mail to such Certificateholder at the address of such holder appearing in the Certificate Register.

The Trustee shall execute the Certificates by the manual or facsimile signature of an authorized officer.  Certificates bearing the manual or facsimile signatures of individuals who were, at the time such signatures were affixed, authorized to sign on behalf of the Trustee shall bind the Trustee, notwithstanding that such individuals or any of them have ceased to be so authorized before the countersignature and delivery of any such Certificates or did not hold such offices at the date of such Certificate.  No Certificate shall be entitled to any benefit under this Agreement, or be valid for any purpose, unless countersigned by the Trustee by manual signature, and such countersignature upon any Certificate shall be conclusive evidence, and the only evidence, that such Certificate has been duly executed and delivered hereunder.  All Certificates shall be dated the date of their countersignature.  On the Closing Date, the Trustee shall countersign the Certificates to be issued at the direction of the Depositor, or any affiliate thereof.

The Depositor shall provide the Trustee, on a continuous basis with an adequate inventory of Certificates to facilitate transfers.

### Section 5.02    Certificate Register; Registration of Transfer and Exchange of Certificates.

(a)  The Trustee shall maintain, in accordance with Section 5.06, a Certificate Register for the Trust Fund in which, subject to subsections (b) and (c) below and to such reasonable regulations as it may prescribe, the Trustee shall provide for the registration of Certificates and of transfers and exchanges of Certificates as herein provided.  Upon surrender for registration of transfer of any Certificate, the Trustee shall execute and deliver, in the name of the designated transferee or transferees, one or more new Certificates of the same Class and aggregate Percentage Interest.

At the option of a Certificateholder, Certificates may be exchanged for other Certificates of the same Class in authorized denominations and evidencing the same aggregate Percentage Interest upon surrender of the Certificates to be exchanged at the office or agency of the Trustee.  Whenever any Certificates are so surrendered for exchange, the Trustee shall execute, authenticate, and deliver the Certificates that the Certificateholder making the exchange is entitled to receive.  A written instrument of transfer in form satisfactory to the Trustee duly executed by the holder of a Certificate or his attorney duly authorized in writing shall accompany every Certificate presented or surrendered for registration of transfer or exchange.

68                                        **Exhibit 6, Page 374**

No service charge to the Certificateholders shall be made for any registration of transfer or exchange of Certificates, but payment of a sum sufficient to cover any tax or governmental charge that may be imposed in connection with any transfer or exchange of Certificates may be required.

All Certificates surrendered for registration of transfer or exchange shall be cancelled and subsequently destroyed by the Trustee in accordance with the Trustee's customary procedures.

(b)  No transfer of a Private Certificate shall be made unless such transfer is made pursuant to an effective registration statement under the Securities Act and any applicable state securities laws or is exempt from the registration requirements under the Securities Act and such state securities laws.  If a transfer is to be made in reliance on an exemption from the Securities Act and such state securities laws, to assure compliance with the Securities Act and such state securities laws, the Certificateholder desiring to effect such transfer and such Certificateholder's prospective transferee shall each certify to the Trustee in writing the facts surrounding the transfer in substantially the form set forth in Exhibit J (the "***Transferor Certificate***") and deliver to the Trustee either (i) a letter in substantially the form of either Exhibit K (the "***Investment Letter***") or Exhibit L (the "***Rule 144A Letter***") or (ii) at the expense of the transferor, an Opinion of Counsel that the transfer may be made without registration under the Securities Act.  The Depositor shall provide to any Holder of a Private Certificate and any prospective transferee designated by that Holder, information regarding the related Certificates and the Mortgage Loans and any other information necessary to satisfy the condition to eligibility in Rule 144A(d)(4) for transfer of the Certificate without registration thereof under the Securities Act pursuant to the registration exemption provided by Rule 144A.  The Trustee and the Master Servicer shall cooperate with the Depositor in providing the Rule 144A information referenced in the preceding sentence, including providing to the Depositor such information regarding the Certificates, the Mortgage Loans, and other matters regarding the Trust Fund as the Depositor reasonably requests to meet its obligation under the preceding sentence. Each Holder of a Private Certificate desiring to effect a transfer shall, and does hereby agree to, indemnify the Trustee, the Depositor, the Seller, and the Master Servicer against any liability that may result if the transfer is not so exempt or is not made in accordance with such federal and state laws.

No transfer of an ERISA-Restricted Certificate shall be made unless the Trustee shall have received either (i) a representation from the transferee of such Certificate acceptable to and in form and substance satisfactory to the Trustee (if the Certificate is a Private Certificate, the requirement is satisfied only by the Trustee's receipt of a representation letter from the transferee substantially in the form of Exhibit K or Exhibit L, and if the Certificate is a Residual Certificate, the requirement is satisfied only by the Trustee's receipt of a representation letter from the transferee substantially in the form of Exhibit I), to the effect that (x) the transferee is not an employee benefit plan or arrangement subject to section 406 of ERISA or a plan subject to section 4975 of the Code, or a person acting on behalf of any such plan or arrangement or using the assets of any such plan or arrangement to effect the transfer, or (y) if the ERISA-Restricted Certificate has been the subject of an ERISA-Qualifying Underwriting, a representation that the transferee is an insurance company that is purchasing such Certificate with funds contained in an "insurance company general account" (as such term is defined in Section V(e) of Prohibited Transaction Class Exemption 95-60 ("***PTCE 95-60***") and that the purchase and holding of such Certificate satisfy the requirements for exemptive relief under Sections I and III of PTCE 95-60, or (ii) in the case of any ERISA-Restricted Certificate presented for registration in the name of an employee benefit plan subject to ERISA, or a plan or arrangement subject to section 4975 of the Code (or comparable provisions of any subsequent enactments), or a trustee of any such plan or any other person acting on behalf of any such plan or arrangement or using such plan's or arrangement's assets, an Opinion of Counsel satisfactory to the Trustee, which Opinion of Counsel shall not be an expense of the Trustee, the Master Servicer or the Trust Fund, addressed to the Trustee and the Master Servicer, to the effect that the purchase and holding of such ERISA-Restricted Certificate will not result in a non-exempt prohibited transaction under ERISA or section 4975 of the Code and will not subject the Trustee or the Master

Exhibit 6, Page 375

Servicer to any obligation in addition to those expressly undertaken in this Agreement or to any liability. For purposes of the preceding sentence, with respect to an ERISA-Restricted Certificate that is not a Residual Certificate, if the appropriate representation letter or Opinion of Counsel referred to in the preceding sentence is not furnished, the representation in clause (i) above shall be deemed to have been made to the Trustee by the transferee's (including an initial acquirer's) acceptance of the ERISA-Restricted Certificates.  If the representation is violated, or any attempt is made to transfer to a plan or arrangement subject to section 406 of ERISA or a plan subject to section 4975 of the Code, or a person acting on behalf of any such plan or arrangement or using the assets of any such plan or arrangement, without the Opinion of Counsel described above, the attempted transfer or acquisition shall be void.

To the extent permitted under applicable law (including ERISA), the Trustee shall be under no liability to any Person for any registration of transfer of any ERISA-Restricted Certificate that is in fact not permitted by this Section 5.02(b) or for making any payments due on such Certificate to the Holder thereof or taking any other action with respect to such Holder under this Agreement so long as the transfer was registered by the Trustee in accordance with the foregoing requirements.

(c)  Each Person who has or who acquires any Ownership Interest in a Residual Certificate shall be deemed by the acceptance or acquisition of such Ownership Interest to have agreed to be bound by the following provisions, and the rights of each Person acquiring any Ownership Interest in a Residual Certificate are expressly subject to the following provisions:

(i)      Each Person holding or acquiring any Ownership Interest in a Residual Certificate shall be a Permitted Transferee and shall promptly notify the Trustee of any change or impending change in its status as a Permitted Transferee.

(ii)      No Ownership Interest in a Residual Certificate may be registered on the Closing Date or thereafter transferred, and the Trustee shall not register the Transfer of any Residual Certificate unless, in addition to the certificates required to be delivered to the Trustee under subparagraph (b) above, the Trustee shall have been furnished with an affidavit (a "***Transfer Affidavit***") of the initial owner or the proposed transferee in the form of Exhibit I.

(iii)      Each Person holding or acquiring any Ownership Interest in a Residual Certificate shall agree (A) to obtain a Transfer Affidavit from any other Person to whom such Person attempts to Transfer its Ownership Interest in a Residual Certificate, (B) to obtain a Transfer Affidavit from any Person for whom such Person is acting as nominee, trustee or agent in connection with any Transfer of a Residual Certificate and (C) not to Transfer its Ownership Interest in a Residual Certificate or to cause the Transfer of an Ownership Interest in a Residual Certificate to any other Person if it has actual knowledge that such Person is not a Permitted Transferee.

(iv)      Any attempted or purported Transfer of any Ownership Interest in a Residual Certificate in violation of this Section 5.02(c) shall be absolutely null and void and shall vest no rights in the purported Transferee.  If any purported transferee shall become a Holder of a Residual Certificate in violation of this Section 5.02(c), then the last preceding Permitted Transferee shall be restored to all rights as Holder thereof retroactive to the date of registration of Transfer of such Residual Certificate.  The Trustee shall be under no liability to any Person for any registration of Transfer of a Residual Certificate that is in fact not permitted by Section 5.02(b) and this Section 5.02(c) or for making any payments due on such Certificate to the Holder thereof or taking any other action with respect to such Holder under this Agreement so long as the Transfer was registered after receipt of the related Transfer Affidavit, Transferor Certificate and either the Rule 144A Letter or the Investment Letter.  The Trustee shall be entitled but not

70                                    Exhibit 6, Page 376

obligated to recover from any Holder of a Residual Certificate that was in fact not a Permitted Transferee at the time it became a Holder or, at such subsequent time as it became other than a Permitted Transferee, all payments made on such Residual Certificate at and after either such time.  Any such payments so recovered by the Trustee shall be paid and delivered by the Trustee to the last preceding Permitted Transferee of such Certificate.

(v)     The Depositor shall use its best efforts to make available, upon receipt of written request from the Trustee, all information necessary to compute any tax imposed under section 860E(e) of the Code as a result of a Transfer of an Ownership Interest in a Residual Certificate to any Holder who is not a Permitted Transferee.

The restrictions on Transfers of a Residual Certificate set forth in this Section 5.02(c) shall cease to apply (and the applicable portions of the legend on a Residual Certificate may be deleted) with respect to Transfers occurring after delivery to the Trustee of an Opinion of Counsel, which Opinion of Counsel shall not be an expense of the Trust Fund, the Trustee, the Seller or the Master Servicer, to the effect that the elimination of such restrictions will not cause any REMIC created under this Agreement to fail to qualify as a REMIC at any time that the Certificates are outstanding or result in the imposition of any tax on the Trust Fund, a Certificateholder or another Person.  Each Person holding or acquiring any Ownership Interest in a Residual Certificate hereby consents to any amendment of this Agreement which, based on an Opinion of Counsel furnished to the Trustee, is reasonably necessary (a) to ensure that the record ownership of, or any beneficial interest in, a Residual Certificate is not transferred, directly or indirectly, to a Person that is not a Permitted Transferee and (b) to provide for a means to compel the Transfer of a Residual Certificate which is held by a Person that is not a Permitted Transferee to a Holder that is a Permitted Transferee.

(d)  The preparation and delivery of all certificates and opinions referred to above in this Section 5.02 in connection with transfer shall be at the expense of the parties to such transfers.

(e)  Except as provided below, the Book-Entry Certificates shall at all times remain registered in the name of the Depository or its nominee and at all times: (i) registration of the Certificates may not be transferred by the Trustee except to another Depository; (ii) the Depository shall maintain book-entry records with respect to the Certificate Owners and with respect to ownership and transfers of such Book-Entry Certificates; (iii) ownership and transfers of registration of the Book-Entry Certificates on the books of the Depository shall be governed by applicable rules established by the Depository; (iv) the Depository may collect its usual and customary fees, charges and expenses from its Depository Participants; (v) the Trustee shall deal with the Depository, Depository Participants and Indirect Participants as representatives of the Certificate Owners of the Book-Entry Certificates for purposes of exercising the rights of holders under this Agreement, and requests and directions for and votes of such representatives shall not be deemed to be inconsistent if they are made with respect to different Certificate Owners; and (vi) the Trustee may rely and shall be fully protected in relying upon information furnished by the Depository with respect to its Depository Participants and furnished by the Depository Participants with respect to Indirect Participants and persons shown on the books of such Indirect Participants as direct or indirect Certificate Owners.

All transfers by Certificate Owners of Book-Entry Certificates shall be made in accordance with the procedures established by the Depository Participant or brokerage firm representing the Certificate Owner.  Each Depository Participant shall only transfer Book-Entry Certificates of Certificate Owners it represents or of brokerage firms for which it acts as agent in accordance with the Depository's normal procedures.

71

Exhibit 6, Page 377

If (x) (i) the Depository or the Depositor advises the Trustee in writing that the Depository is no longer willing or able to properly discharge its responsibilities as Depository, and (ii) the Trustee or the Depositor is unable to locate a qualified successor or (y) after the occurrence of an Event of Default, Certificate Owners representing at least 51% of the Certificate Balance of the Book-Entry Certificates together advise the Trustee and the Depository through the Depository Participants in writing that the continuation of a book-entry system through the Depository is no longer in the best interests of the Certificate Owners, the Trustee shall notify all Certificate Owners, through the Depository, of the occurrence of any such event and of the availability of definitive, fully-registered Certificates (the "Definitive Certificates") to Certificate Owners requesting the same.  Upon surrender to the Trustee of the related Class of Certificates by the Depository, accompanied by the instructions from the Depository for registration, the Trustee shall issue the Definitive Certificates.  Neither the Master Servicer, the Depositor nor the Trustee shall be liable for any delay in delivery of such instruction and each may conclusively rely on, and shall be protected in relying on, such instructions.  The Master Servicer shall provide the Trustee with an adequate inventory of certificates to facilitate the issuance and transfer of Definitive Certificates.  Upon the issuance of Definitive Certificates all references herein to obligations imposed upon or to be performed by the Depository shall be deemed to be imposed upon and performed by the Trustee, to the extent applicable with respect to such Definitive Certificates and the Trustee shall recognize the Holders of the Definitive Certificates as Certificateholders hereunder; provided that the Trustee shall not by virtue of its assumption of such obligations become liable to any party for any act or failure to act of the Depository.

### Section 5.03     Mutilated, Destroyed, Lost or Stolen Certificates.

If (a) any mutilated Certificate is surrendered to the Trustee, or (b) the Trustee receives evidence to its satisfaction of the destruction, loss, or theft of any Certificate and the Master Servicer and the Trustee receive the security or indemnity required by them to hold each of them harmless, then, in the absence of notice to the Trustee that the Certificate has been acquired by a Protected Purchaser, and if the requirements of Section 8-406 of the UCC are met and subject to Section 8-405 of the UCC, the Trustee shall execute, countersign, and deliver, in exchange for or in lieu of any such mutilated, destroyed, lost, or stolen Certificate, a new Certificate of like Class, tenor, and Percentage Interest.  In connection with the issuance of any new Certificate under this Section 5.03, the Trustee may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Trustee) connected therewith.  Any replacement Certificate issued pursuant to this Section 5.03 shall constitute complete and indefeasible evidence of ownership, as if originally issued, whether or not the lost, stolen, or destroyed Certificate is found at any time.

### Section 5.04     Persons Deemed Owners.

The Master Servicer, the Trustee, and any agent of the Master Servicer or the Trustee may treat the Person in whose name any Certificate is registered as the owner of such Certificate for the purpose of receiving distributions as provided in this Agreement and for all other purposes whatsoever, and neither the Master Servicer, the Trustee nor any agent of the Master Servicer or the Trustee shall be affected by any notice to the contrary.

### Section 5.05     Access to List of Certificateholders' Names and Addresses.

If three or more Certificateholders and/or Certificate Owners (a) request such information in writing from the Trustee, (b) state that such Certificateholders and/or Certificate Owners desire to communicate with other Certificateholders and/or Certificate Owners with respect to their rights under this Agreement or under the Certificates, and (c) provide a copy of the communication which such

Exhibit 6, Page 378

Certificateholders and/or Certificate Owners propose to transmit, or if the Depositor or Master Servicer shall request such information in writing from the Trustee, then the Trustee shall, within ten Business Days after the receipt of such request, provide the Depositor, the Master Servicer or such Certificateholders and/or Certificate Owners at such recipients' expense the most recent list of the Certificateholders of such Trust Fund held by the Trustee.  The Depositor and every Certificateholder and/or Certificate Owner, by receiving and holding a Certificate, agree that the Trustee shall not be held accountable because of the disclosure of any such information as to the list of the Certificateholders hereunder, regardless of the source from which such information was derived.

   **Section 5.06**  *Maintenance of Office or Agency.*

   The Trustee will maintain at its expense an office or offices or agency or agencies in New York City located at c/o DTC Transfer Services, 55 Water Street, Jeanette Park Entrance, New York, New York 10041, where Certificates may be surrendered for registration of transfer or exchange.  The Trustee will give prompt written notice to the Certificateholders of any change in such location of any such office or agency.

Exhibit 6, Page 379

## ARTICLE SIX

### THE DEPOSITOR AND THE MASTER SERVICER

**Section 6.01     Respective Liabilities of the Depositor and the Master Servicer.**

The Depositor and the Master Servicer shall each be liable in accordance with this Agreement only to the extent of the obligations specifically and respectively imposed upon and undertaken by them in this Agreement.

**Section 6.02     Merger or Consolidation of the Depositor or the Master Servicer.**

The Depositor and the Master Servicer will each keep in full effect their existence and their rights and franchises as a corporation and a federal savings bank, respectively, under the laws of the United States or under the laws of one of the states thereof and will each obtain and preserve its qualification to do business as a foreign corporation in each jurisdiction in which such qualification is or shall be necessary to protect the validity and enforceability of this Agreement, or any of the Mortgage Loans and to perform its respective duties under this Agreement.

Any Person into which the Depositor or the Master Servicer may be merged or consolidated, or any Person resulting from any merger or consolidation to which the Depositor or the Master Servicer shall be a party, or any person succeeding to the business of the Depositor or the Master Servicer, shall be the successor of the Depositor or the Master Servicer, as the case may be, hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding; provided, however, that the successor or surviving Person to the Master Servicer shall be qualified to sell mortgage loans to, and to service mortgage loans on behalf of, FNMA or FHLMC.

**Section 6.03     Limitation on Liability of the Depositor, the Seller, the Master Servicer, and Others.**

None of the Depositor, the Seller, the Master Servicer or any of the directors, officers, employees or agents of the Depositor, the Seller or the Master Servicer shall be under any liability to the Certificateholders for any action taken or for refraining from the taking of any action in good faith pursuant to this Agreement, or for errors in judgment; provided, however, that this provision shall not protect the Depositor, the Seller, the Master Servicer or any such Person against any breach of representations or warranties made by it herein or protect the Depositor, the Seller, the Master Servicer or any such Person from any liability which would otherwise be imposed by reasons of willful misfeasance, bad faith or gross negligence in the performance of duties or because of reckless disregard of obligations and duties hereunder.  The Depositor, the Seller, the Master Servicer, and any director, officer, employee or agent of the Depositor, the Seller or the Master Servicer may rely in good faith on any document of any kind prima facie properly executed and submitted by any Person respecting any matters arising hereunder. The Depositor, the Seller, the Master Servicer, and any director, officer, employee or agent of the Depositor, the Seller or the Master Servicer shall be indemnified by the Trust Fund and held harmless against any loss, liability or expense incurred in connection with any audit, controversy or judicial proceeding relating to a governmental taxing authority or any legal action relating to this Agreement or the Certificates, other than any loss, liability or expense related to any specific Mortgage Loan or Mortgage Loans (except as any such loss, liability or expense shall be otherwise reimbursable pursuant to this Agreement) and any loss, liability or expense incurred because of willful misfeasance, bad faith or gross negligence in the performance of duties hereunder or because of reckless disregard of obligations and duties hereunder.  None of the Depositor, the Seller or the Master Servicer shall be under any

Exhibit 6, Page 380

obligation to appear in, prosecute or defend any legal action that is not incidental to its respective duties hereunder and which in its opinion may involve it in any expense or liability; provided, however, that any of the Depositor, the Seller or the Master Servicer may in its discretion undertake any such action that it may deem appropriate in respect of this Agreement and the rights and duties of the parties hereto and interests of the Trustee and the Certificateholders hereunder.  In such event, the legal expenses and costs of such action and any liability resulting therefrom shall be expenses, costs and liabilities of the Trust Fund, and the Depositor, the Seller, and the Master Servicer shall be entitled to be reimbursed therefor out of the Certificate Account.

**Section 6.04    Limitation on Resignation of the Master Servicer.**

The Master Servicer shall not resign from the obligations and duties hereby imposed on it except (a) upon appointment of a successor servicer and receipt by the Trustee of a letter from each Rating Agency that such a resignation and appointment will not result in a downgrading, qualification or withdrawal of the rating of any of the Certificates or (b) upon determination that its duties under this Agreement are no longer permissible under applicable law.  Any such determination under clause (b) permitting the resignation of the Master Servicer shall be evidenced by an Opinion of Counsel to such effect delivered to the Trustee.  No such resignation shall become effective until the Trustee or a successor master servicer shall have assumed the Master Servicer's responsibilities, duties, liabilities and obligations under this Agreement.

NY1 5706826v 6

Exhibit 6, Page 381

## ARTICLE SEVEN

### DEFAULT

**Section 7.01     *Events of Default.***

"***Event of Default***," wherever used in this Agreement, means any one of the following events:

(a) any failure by the Master Servicer to deposit in the Certificate Account or remit to the Trustee any payment required to be made by it under this Agreement, which failure continues unremedied for five days after the date on which written notice of the failure has been given to the Master Servicer by the Trustee or the Depositor or to the Master Servicer and the Trustee by the Holders of Certificates of any Class evidencing not less than 25% of the aggregate Percentage Interests of the Class; or

(b) any failure by the Master Servicer to observe or perform in any material respect any other of the covenants or agreements on the part of the Master Servicer contained in this Agreement, which failure materially affects the rights of Certificateholders and continues unremedied for a period of 60 days after the date on which written notice of such failure shall have been given to the Master Servicer by the Trustee or the Depositor, or to the Master Servicer and the Trustee by the Holders of Certificates of any Class evidencing not less than 25% of the Percentage Interests of the Class; provided that the sixty-day cure period shall not apply to the initial delivery of the Mortgage File for Delay Delivery Mortgage Loans nor the failure to repurchase or substitute in lieu thereof; or

(c) a decree or order of a court or agency or supervisory authority having jurisdiction in the premises for the appointment of a receiver, conservator or liquidator in any insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs, shall have been entered against the Master Servicer and such decree or order shall have remained in force undischarged or unstayed for a period of 60 consecutive days; or

(d) the Master Servicer shall consent to the appointment of a receiver, conservator or liquidator in any insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings of or relating to the Master Servicer or all or substantially all of the property of the Master Servicer; or

(e) the Master Servicer shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of, or commence a voluntary case under, any applicable insolvency or reorganization statute, make an assignment for the benefit of its creditors, or voluntarily suspend payment of its obligations; or

(f) the Master Servicer shall fail (i) to make an Advance on the Master Servicer Advance Date or (ii) to reimburse in full the Trustee within two days of the Master Servicer Advance Date for any Advance made by the Trustee pursuant to Section 4.01(b).

If an Event of Default described in clauses (a) through (f) of this Section 7.01 occurs, then, and in each and every such case, so long as such Event of Default shall not have been remedied, the Trustee may, or at the direction of the Holders of Certificates of any Class evidencing not less than 66 2/3% of the Percentage Interests of the Class, the Trustee shall by notice in writing to the Master Servicer (with a copy to each Rating Agency), terminate all of the rights and obligations of the Master Servicer under this Agreement and in the Mortgage Loans and the proceeds thereof, other than its rights as a Certificateholder hereunder.  On and after the receipt by the Master Servicer of such written notice, all authority and power of the Master Servicer hereunder, whether with respect to the Mortgage Loans or otherwise, shall pass to and be vested in the Trustee.  The Trustee shall make any Advance that the

Exhibit 6, Page 382

Master Servicer failed to make subject to Section 3.05, whether or not the obligations of the Master Servicer have been terminated pursuant to this Section.  The Trustee is hereby authorized and empowered to execute and deliver, on behalf of the Master Servicer, as attorney-in-fact or otherwise, any documents and other instruments, and to do or accomplish all other acts or things necessary or appropriate to effect the purposes of such notice of termination, whether to complete the transfer and endorsement or assignment of the Mortgage Loans and related documents, or otherwise.  Unless expressly provided in such written notice, no such termination shall affect any obligation of the Master Servicer to pay amounts owed pursuant to Article VIII.  The Master Servicer agrees to cooperate with the Trustee in effecting the termination of the Master Servicer's responsibilities and rights hereunder, including the transfer to the Trustee of all cash amounts which shall at the time be credited to the Certificate Account, or thereafter be received with respect to the Mortgage Loans.  If the Master Servicer fails to make any Advance required under Section 4.01 of this Agreement, thereby triggering an Event of Default described in clause (f) of this Section 7.01, the Trustee shall make such Advance on that Distribution Date.

Notwithstanding any termination of the activities of the Master Servicer under this Agreement, the Master Servicer shall be entitled to receive, out of any late collection of a Scheduled Payment on a Mortgage Loan which was due before the notice terminating such Master Servicer's rights and obligations as Master Servicer hereunder and received after such notice, that portion thereof to which such Master Servicer would have been entitled pursuant to Sections 3.09(a)(i) through (viii), and any other amounts payable to such Master Servicer hereunder the entitlement to which arose before the termination of its activities hereunder.

### Section 7.02    Trustee to Act; Appointment of Successor.

On and after the time the Master Servicer receives a notice of termination pursuant to Section 7.01, the Trustee shall, subject to and to the extent provided in Section 3.05, be the successor to the Master Servicer in its capacity as master servicer under this Agreement and the transactions set forth or provided for herein and shall be subject to all the responsibilities, duties and liabilities relating thereto placed on the Master Servicer by the terms hereof and applicable law including the obligation to make Advances pursuant to Section 4.01.  As compensation therefor, the Trustee shall be entitled to all funds relating to the Mortgage Loans that the Master Servicer would have been entitled to charge to the Certificate Account or Distribution Account if the Master Servicer had continued to act hereunder, including, if the Master Servicer was receiving the Servicing Fee, the Servicing Fee.  Notwithstanding the foregoing, if the Trustee has become the successor to the Master Servicer in accordance with Section 7.01, the Trustee may, if it shall be unwilling to so act, or shall, if it is prohibited by applicable law from making Advances pursuant to Section 4.01 or if it is otherwise unable to so act, appoint, or petition a court of competent jurisdiction to appoint, any established mortgage loan servicing institution the appointment of which does not adversely affect the then current rating of the Certificates by each Rating Agency, as the successor to the Master Servicer hereunder in the assumption of all or any part of the responsibilities, duties or liabilities of the Master Servicer hereunder.  Any successor to the Master Servicer shall be an institution which is a FNMA and FHLMC approved seller/servicer in good standing, which has a net worth of at least $15,000,000, which is willing to service the Mortgage Loans and which executes and delivers to the Depositor and the Trustee an agreement accepting such delegation and assignment, containing an assumption by such Person of the rights, powers, duties, responsibilities, obligations and liabilities of the Master Servicer (other than liabilities of the Master Servicer under Section 6.03 incurred before termination of the Master Servicer under Section 7.01), with like effect as if originally named as a party to this Agreement; provided that each Rating Agency acknowledges that its rating of the Certificates in effect immediately before such assignment and delegation will not be qualified or reduced as a result of such assignment and delegation.  Pending appointment of a successor to the Master Servicer hereunder, the Trustee shall act in such capacity as provided above, subject to section 3.03 and unless prohibited by law.  In connection with such appointment and assumption, the Trustee may

Exhibit 6, Page 383

make such arrangements for the compensation of such successor out of payments on Mortgage Loans as it and such successor shall agree; provided, however, that in no case shall the rate of such compensation exceed the Servicing Fee Rate.  The Trustee and such successor shall take such action, consistent with this Agreement, as shall be necessary to effectuate any such succession.  Neither the Trustee nor any other successor master servicer shall be deemed to be in default hereunder because of any failure to make, or any delay in making, any distribution hereunder or any portion thereof or any failure to perform, or any delay in performing, any duties or responsibilities hereunder, in either case caused by the failure of the Master Servicer to deliver or provide, or any delay in delivering or providing, any cash, information, documents or records to it.

In connection with the termination or resignation of the Master Servicer hereunder, either (i) the successor Master Servicer, including the Trustee if the Trustee is acting as successor Master Servicer, shall represent and warrant that it is a member of MERS in good standing and shall agree to comply in all material respects with the rules and procedures of MERS in connection with the servicing of the Mortgage Loans that are registered with MERS, or (ii) the predecessor Master Servicer shall cooperate with the successor Master Servicer either (x) in causing MERS to execute and deliver an assignment of Mortgage in recordable form to transfer the Mortgage from MERS to the Trustee and to execute and deliver such other notices, documents and other instruments as may be necessary or desirable to effect a transfer of such Mortgage Loan or servicing of such Mortgage Loan on the MERS® System to the successor Master Servicer or (y) in causing MERS to designate on the MERS® System the successor Master Servicer as the servicer of such Mortgage Loan.  The predecessor Master Servicer shall file or cause to be filed any such assignment in the appropriate recording office.  The successor Master Servicer shall cause such assignment to be delivered to the Trustee promptly upon receipt of the original with evidence of recording thereon or a copy certified by the public recording office in which such assignment was recorded.

Any successor to the Master Servicer as master servicer shall give notice to the Mortgagors of such change of servicer and shall, during the term of its service as master servicer, maintain in force the policy or policies that the Master Servicer is required to maintain pursuant to this Agreement.

### Section 7.03     Notification to Certificateholders.

(a)  Upon any termination of or appointment of a successor to the Master Servicer, the Trustee shall give prompt written notice thereof to Certificateholders and to each Rating Agency.

(b)  Within 60 days after the occurrence of any Event of Default, the Trustee shall transmit by mail to all Certificateholders and each Rating Agency notice of each such Event of Default hereunder known to the Trustee, unless such Event of Default shall have been cured or waived.

78

**Exhibit 6, Page 384**

ARTICLE EIGHT

CONCERNING THE TRUSTEE

### Section 8.01    Duties of the Trustee.

The Trustee, before the occurrence of an Event of Default and after the curing of all Events of Default that may have occurred, shall undertake to perform such duties and only such duties as are specifically set forth in this Agreement.  In case an Event of Default has occurred and remains uncured, the Trustee shall exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

The Trustee, upon receipt of all resolutions, certificates, statements, opinions, reports, documents, orders or other instruments furnished to the Trustee that are specifically required to be furnished pursuant to any provision of this Agreement shall examine them to determine whether they are in the form required by this Agreement.  The Trustee shall not be responsible for the accuracy or content of any such resolution, certificate, statement, opinion, report, document, order, or other instrument.

No provision of this Agreement shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act or its own willful misconduct; provided, however, that, unless an Event of Default known to the Trustee has occurred and is continuing,

(a)  the duties and obligations of the Trustee shall be determined solely by the express provisions of this Agreement, the Trustee shall not be liable except for the performance of the duties and obligations specifically set forth in this Agreement, no implied covenants or obligations shall be read into this Agreement against the Trustee, and the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any certificates or opinions furnished to the Trustee and conforming to the requirements of this Agreement which it believed in good faith to be genuine and to have been duly executed by the proper authorities respecting any matters arising hereunder;

(b)  the Trustee shall not be liable for an error of judgment made in good faith by a Responsible Officer or Responsible Officers of the Trustee, unless it is finally proven that the Trustee was negligent in ascertaining the pertinent facts; and

(c)  the Trustee shall not be liable with respect to any action taken, suffered, or omitted to be taken by it in good faith in accordance with the direction of Holders of Certificates evidencing not less than 25% of the Voting Rights of Certificates relating to the time, method, and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee under this Agreement.  As long as any Voting Rights are held by parties other than the Seller, its Affiliates, or its agents, Voting Rights of Certificates held by the Seller, its Affiliates or its agents, as the Seller shall certify to the Trustee upon any entity obtaining such ownership, will be excluded from participating in such voting arrangements, and excluded from determining the 25% threshold.

### Section 8.02    Certain Matters Affecting the Trustee.

Except as otherwise provided in Section 8.01:

(a)  the Trustee may request and rely upon and shall be protected in acting or refraining from acting upon any resolution, Officer's Certificate, certificate of auditors or any other certificate, statement,

Exhibit 6, Page 385

instrument, opinion, report, notice, request, consent, order, appraisal, bond or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties and the Trustee shall have no responsibility to ascertain or confirm the genuineness of any signature of any such party or parties;

(b)  the Trustee may consult with counsel, financial advisers or accountants and the advice of any such counsel, financial advisers or accountants and any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by it hereunder in good faith and in accordance with such Opinion of Counsel;

(c)  the Trustee shall not be liable for any action taken, suffered or omitted by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Agreement;

(d)  the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond or other paper or document, unless requested in writing so to do by Holders of Certificates evidencing not less than 25% of the Voting Rights allocated to each Class of Certificates;

(e)  the Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents, accountants or attorneys and the Trustee shall not be responsible for any misconduct or negligence on the part of any agents, accountants or attorneys appointed with due care by it hereunder;

(f)  the Trustee shall not be required to risk or expend its own funds or otherwise incur any financial liability in the performance of any of its duties or in the exercise of any of its rights or powers hereunder if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not assured to it;

(g)  the Trustee shall not be liable for any loss on any investment of funds pursuant to this Agreement (other than as issuer of the investment security);

(h)  the Trustee shall not be deemed to have knowledge of an Event of Default until a Responsible Officer of the Trustee shall have received written notice thereof;

(i)  the Trustee shall be under no obligation to exercise any of the trusts, rights or powers vested in it by this Agreement or to institute, conduct or defend any litigation hereunder or in relation hereto at the request, order or direction of any of the Certificateholders, pursuant to this Agreement, unless such Certificateholders shall have offered to the Trustee reasonable security or indemnity satisfactory to the Trustee against the costs, expenses and liabilities which may be incurred therein or thereby;

(j)  the Trustee or its Affiliates are permitted to receive additional compensation that could be deemed to be in the Trustee's economic self-interest for (i) serving as investment adviser, administrator, shareholder servicing agent, custodian or sub-custodian with respect to certain of the Permitted Investments, (ii) using Affiliates to effect transactions in certain Permitted Investments and (iii) effecting transactions in certain Permitted Investments.  The Trustee does not guarantee the performance of any Permitted Investment; and

(k)  the Trustee shall not knowingly take any action that would cause the Trust Fund to fail to qualify as a qualifying special purpose entity.

80

**Exhibit 6, Page 386**

In order to comply with its duties under the U.S.A. Patriot Act, the Trustee shall obtain and verify certain information and documentation from the other parties to this Agreement, including, but not limited to, such parties' name, address, and other identifying information.

**Section 8.03        Trustee Not Liable for Certificates or Mortgage Loans.**

The recitals contained herein and in the Certificates shall be taken as the statements of the Depositor or the Seller, as the case may be, and the Trustee assumes no responsibility for their correctness.  The Trustee makes no representations as to the validity or sufficiency of this Agreement or of the Certificates or of any Mortgage Loan or related document other than with respect to the Trustee's execution and countersignature of the Certificates.  The Trustee shall not be accountable for the use or application by the Depositor or the Master Servicer of any funds paid to the Depositor or the Master Servicer in respect of the Mortgage Loans or deposited in or withdrawn from the Certificate Account by the Depositor or the Master Servicer.

Except as provided in Section 2.01(c), the Trustee shall have no responsibility for filing or recording any financing or continuation statement in any public office at any time or to otherwise perfect or maintain the perfection of any security interest or lien granted to it hereunder (unless the Trustee shall have become the successor Master Servicer).  The Trustee makes no representations as to the validity or sufficiency of this Agreement or of the Certificates or of any Mortgage Loan or related document or of MERS or the MERS® System other than with respect to the Trustee's execution and counter-signature of the Certificates.

The Trustee executes the Certificates not in its individual capacity but solely as Trustee of the Trust Fund created by this Agreement, in the exercise of the powers and authority conferred and vested in it by this Agreement.  Each of the undertakings and agreements made on the part of the Trustee on behalf of the Trust Fund in the Certificates is made and intended not as a personal undertaking or agreement by the Trustee but is made and intended for the purpose of binding only the Trust Fund.

**Section 8.04        Trustee May Own Certificates.**

The Trustee in its individual or any other capacity may become the owner or pledgee of Certificates with the same rights as it would have if it were not the Trustee.

**Section 8.05        Trustee's Fees and Expenses.**

As compensation for its activities under this Agreement, on each Distribution Date the Trustee may withdraw from the Distribution Account the Trustee Fee for that Distribution Date.  The Trustee and any director, officer, employee, or agent of the Trustee shall be indemnified by the Master Servicer against any loss, liability, or expense (including reasonable attorney's fees) resulting from any error in any tax or information return prepared by the Master Servicer or incurred in connection with any claim or legal action relating to

(a)  this Agreement, (b) the Certificates, or (c) the performance of any of the Trustee's duties under this Agreement, other than any loss, liability or expense incurred because of willful misfeasance, bad faith or negligence in the performance of any of the Trustee's duties hereunder or incurred by reason of any action of the Trustee taken at the direction of the Certificateholders under this Agreement.  This indemnity shall survive the termination of this Agreement or the resignation or removal of the Trustee under this Agreement.  Without limiting the foregoing, except as otherwise agreed upon in writing by the Depositor and the Trustee, and except for any expense, disbursement, or advance arising from the Trustee's negligence, bad faith, or willful misconduct, the Master Servicer shall pay or reimburse the

**Exhibit 6, Page 387**

Trustee, for all reasonable expenses, disbursements, and advances incurred or made by the Trustee in accordance with this Agreement with respect to

(A)  the reasonable compensation, expenses, and disbursements of its counsel not associated with the closing of the issuance of the Certificates,

(B)  the reasonable compensation, expenses, and disbursements of any accountant, engineer, or appraiser that is not regularly employed by the Trustee, to the extent that the Trustee must engage them to perform services under this Agreement, and

(C)  printing and engraving expenses in connection with preparing any Definitive Certificates.

Except as otherwise provided in this Agreement, the Trustee shall not be entitled to payment or reimbursement for any routine ongoing expenses incurred by the Trustee in the ordinary course of its duties as Trustee, Registrar, or Paying Agent under this Agreement or for any other expenses.

### Section 8.06    Eligibility Requirements for the Trustee.

The Trustee hereunder shall at all times be a corporation or association organized and doing business under the laws of a state or the United States of America, authorized under such laws to exercise corporate trust powers, having a combined capital and surplus of at least $50,000,000, subject to supervision or examination by federal or state authority and with a credit rating which would not cause either of the Rating Agencies to reduce their respective then current ratings of the Certificates (or having provided such security from time to time as is sufficient to avoid such reduction) as evidenced in writing by each Rating Agency.  If such corporation or association publishes reports of condition at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purposes of this Section 8.06 the combined capital and surplus of such corporation or association shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published.  In case at any time the Trustee shall cease to be eligible in accordance with this Section 8.06, the Trustee shall resign immediately in the manner and with the effect specified in Section 8.07.  The entity serving as Trustee may have normal banking and trust relationships with the Depositor and its affiliates or the Master Servicer and its affiliates; provided, however, that such entity cannot be an affiliate of the Seller, the Depositor or the Master Servicer other than the Trustee in its role as successor to the Master Servicer.

### Section 8.07    Resignation and Removal of the Trustee.

The Trustee may at any time resign and be discharged from the trusts hereby created by giving written notice of resignation to the Depositor, the Master Servicer, and each Rating Agency not less than 60 days before the date specified in such notice, when, subject to Section 8.08, such resignation is to take effect, and acceptance by a successor trustee in accordance with Section 8.08 meeting the qualifications set forth in Section 8.06.  If no successor trustee meeting such qualifications shall have been so appointed and have accepted appointment within 30 days after the giving of such notice or resignation, the resigning Trustee may petition any court of competent jurisdiction for the appointment of a successor trustee.

If at any time the Trustee shall cease to be eligible in accordance with Section 8.06 and shall fail to resign after written request thereto by the Depositor, or if at any time the Trustee shall become incapable of acting, or shall be adjudged as bankrupt or insolvent, or a receiver of the Trustee or of its property shall be appointed, or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation, or a tax is imposed with respect to the Trust Fund by any state in which the Trustee or the Trust Fund is located and the imposition

82

**Exhibit 6, Page 388**

of such tax would be avoided by the appointment of a different trustee, then the Depositor or the Master Servicer may remove the Trustee and appoint a successor trustee by written instrument, in triplicate, one copy of which shall be delivered to the Trustee, one copy to the Master Servicer and one copy to the successor trustee.

The Holders of Certificates entitled to at least 51% of the Voting Rights may at any time remove the Trustee and appoint a successor trustee by written instrument or instruments, in triplicate, signed by such Holders or their attorneys-in-fact duly authorized, one complete set of which shall be delivered by the successor Trustee to the Master Servicer, one complete set to the Trustee so removed and one complete set to the successor so appointed.  As long as any Voting Rights are held by parties other than the Seller, its Affiliates, or its agents, Voting Rights of Certificates held by the Seller, its Affiliates or its agents, as the Seller shall certify to the Trustee upon any entity obtaining such ownership, will be excluded from participating in such voting arrangements, and excluded from determining the 51% threshold.  The successor trustee shall notify each Rating Agency of any removal of the Trustee.

Any resignation or removal of the Trustee and appointment of a successor trustee pursuant to this Section 8.07 shall become effective upon acceptance of appointment by the successor trustee as provided in Section 8.08.

### Section 8.08     Successor Trustee.

Any successor trustee appointed as provided in Section 8.07 shall execute, acknowledge and deliver to the Depositor and to its predecessor trustee and the Master Servicer an instrument accepting such appointment hereunder and thereupon the resignation or removal of the predecessor trustee shall become effective and such successor trustee, without any further act, deed or conveyance, shall become fully vested with all the rights, powers, duties and obligations of its predecessor hereunder, with the like effect as if originally named as trustee herein.  The Depositor, the Master Servicer and the predecessor trustee shall execute and deliver such instruments and do such other things as may reasonably be required for more fully and certainly vesting and confirming in the successor trustee all such rights, powers, duties, and obligations.

No successor trustee shall accept appointment as provided in this Section 8.08 unless, at the time of its acceptance, the successor trustee is eligible under Section 8.06 and its appointment does not adversely affect the then current rating of the Certificates.

Upon acceptance of appointment by a successor trustee as provided in this Section 8.08, the Depositor shall mail notice of the succession of such trustee hereunder to all Holders of Certificates.  If the Depositor fails to mail such notice within 10 days after acceptance of appointment by the successor trustee, the successor trustee shall cause such notice to be mailed at the expense of the Depositor.

### Section 8.09     Merger or Consolidation of the Trustee.

Any corporation into which the Trustee may be merged or converted or with which it may be consolidated or any corporation resulting from any merger, conversion or consolidation to which the Trustee shall be a party, or any corporation succeeding to the business of the Trustee, shall be the successor of the Trustee hereunder, provided that such corporation shall be eligible under Section 8.06 without the execution or filing of any paper or further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding.

**Exhibit 6, Page 389**

**Section 8.10      Appointment of Co-Trustee or Separate Trustee.**

Notwithstanding any other provisions of this Agreement, at any time, for the purpose of meeting any legal requirements of any jurisdiction in which any part of the Trust Fund or property securing any Mortgage Note may at the time be located, the Master Servicer and the Trustee acting jointly shall have the power and shall execute and deliver all instruments to appoint one or more Persons approved by the Trustee to act as co-trustee or co-trustees jointly with the Trustee, or separate trustee or separate trustees, of all or any part of the Trust Fund, and to vest in such Person or Persons, in such capacity and for the benefit of the Certificateholders, such title to the Trust Fund or any part thereof, whichever is applicable, and, subject to the other provisions of this Section 8.10, such powers, duties, obligations, rights and trusts as the Master Servicer and the Trustee may consider appropriate.  If the Master Servicer shall not have joined in such appointment within 15 days after the receipt by it of a request to do so, or in the case an Event of Default shall have occurred and be continuing, the Trustee alone shall have the power to make such appointment.  No co-trustee or separate trustee hereunder shall be required to meet the terms of eligibility as a successor trustee under Section 8.06 and no notice to Certificateholders of the appointment of any co-trustee or separate trustee shall be required under Section 8.08.

Every separate trustee and co-trustee shall, to the extent permitted by law, be appointed and act subject to the following provisions and conditions:

(a)  To the extent necessary to effectuate the purposes of this Section 8.10, all rights, powers, duties and obligations conferred or imposed upon the Trustee, except for the obligation of the Trustee under this Agreement to advance funds on behalf of the Master Servicer, shall be conferred or imposed upon and exercised or performed by the Trustee and such separate trustee or co-trustee jointly (it being understood that such separate trustee or co-trustee is not authorized to act separately without the Trustee joining in such act), except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed (whether as Trustee hereunder or as successor to the Master Servicer hereunder), the Trustee shall be incompetent or unqualified to perform such act or acts, in which event such rights, powers, duties and obligations (including the holding of title to the applicable Trust Fund or any portion thereof in any such jurisdiction) shall be exercised and performed singly by such separate trustee or co-trustee, but solely at the direction of the Trustee;

(b)  No trustee hereunder shall be held personally liable because of any act or omission of any other trustee hereunder and such appointment shall not, and shall not be deemed to, constitute any such separate trustee or co-trustee as agent of the Trustee;

(c)  The Trustee may at any time accept the resignation of or remove any separate trustee or co-trustee; and

(d)  The Master Servicer, and not the Trustee, shall be liable for the payment of reasonable compensation, reimbursement and indemnification to any such separate trustee or co-trustee.

Any notice, request or other writing given to the Trustee shall be deemed to have been given to each of the separate trustees and co-trustees, when and as effectively as if given to each of them.  Every instrument appointing any separate trustee or co-trustee shall refer to this Agreement and the conditions of this Article VIII.  Each separate trustee and co-trustee, upon its acceptance of the trusts conferred, shall be vested with the estates or property specified in its instrument of appointment, either jointly with the Trustee or separately, as may be provided therein, subject to all the provisions of this Agreement, specifically including every provision of this Agreement relating to the conduct of, affecting the liability of, or affording protection to, the Trustee.  Every such instrument shall be filed with the Trustee and a copy thereof given to the Master Servicer and the Depositor.

Exhibit 6, Page 390

Any separate trustee or co-trustee may, at any time, constitute the Trustee its agent or attorney-in-fact, with full power and authority, to the extent not prohibited by law, to do any lawful act under or in respect of this Agreement on its behalf and in its name.  If any separate trustee or co-trustee shall die, become incapable of acting, resign or be removed, all of its estates, properties, rights, remedies and trusts shall vest in and be exercised by the Trustee, to the extent permitted by law, without the appointment of a new or successor trustee.

**Section 8.11    Tax Matters.**

It is intended that the assets with respect to which one or more REMIC elections pertaining to the Trust Fund is to be made, as set forth in the Preliminary Statement, shall constitute, and that the conduct of matters relating to such assets shall be such as to qualify such assets as, a "real estate mortgage investment conduit" as defined in and in accordance with the REMIC Provisions.  In furtherance of such intention, the Trustee covenants and agrees that it shall act as agent (and the Trustee is hereby appointed to act as agent) on behalf of each REMIC created under this Agreement and that in such capacity it shall:

(a)  prepare and file in a timely manner, a U.S. Real Estate Mortgage Investment Conduit Income Tax Return (Form 1066 or any successor form adopted by the Internal Revenue Service) with respect to each REMIC created hereunder and prepare and file with the Internal Revenue Service and applicable state or local tax authorities income tax or information returns for each taxable year with respect to each REMIC described in the Preliminary Statement, containing such information and at the times and in the manner as may be required by the Code or state or local tax laws, regulations, or rules, and furnish to Certificateholders the schedules, statements or information at such times and in such manner as may be required thereby;

(b)  within thirty days of the Closing Date, furnish to the Internal Revenue Service, on Forms 8811 or as otherwise may be required by the Code, the name, title, address, and telephone number of the person that the holders of the Certificates may contact for tax information relating thereto, together with such additional information as may be required by such Form, and update such information at the time or times in the manner required by the Code;

(c)  make an election that each REMIC created under this Agreement be treated as a REMIC on the federal tax return for its first taxable year (and, if necessary, under applicable state law);

(d)  prepare and forward to the Certificateholders and to the Internal Revenue Service and, if necessary, state tax authorities, all information returns and reports as and when required to be provided to them in accordance with the REMIC Provisions, including the calculation of any original issue discount using the Prepayment Assumption (as defined in the Prospectus Supplement);

(e)  provide information necessary for the computation of tax imposed on the transfer of a Residual Certificate to a Person that is not a Permitted Transferee, or an agent (including a broker, nominee or other middleman) of a Person that is not a Permitted Transferee, or a pass-through entity in which a Person that is not a Permitted Transferee is the record holder of an interest (the reasonable cost of computing and furnishing such information may be charged to the Person liable for such tax);

(f)  to the extent that they are under its control, conduct matters relating to such assets at all times that any Certificates are outstanding so as to maintain the status as any REMIC created under this Agreement under the REMIC Provisions;

(g)  not knowingly or intentionally take any action or omit to take any action that would cause the termination of the REMIC status of any REMIC created under this Agreement;

85

**Exhibit 6, Page 391**

(h)  pay, from the sources specified in the last paragraph of this Section 8.11, the amount of any federal or state tax, including prohibited transaction taxes as described below, imposed on any REMIC before its termination when and as the same shall be due and payable (but such obligation shall not prevent the Trustee or any other appropriate Person from contesting any such tax in appropriate proceedings and shall not prevent the Trustee from withholding payment of such tax, if permitted by law, pending the outcome of such proceedings);

(i)  ensure that federal, state or local income tax or information returns shall be signed by the Trustee or such other person as may be required to sign such returns by the Code or state or local laws, regulations or rules;

(j)  maintain records relating to each REMIC created under this Agreement, including the income, expenses, assets, and liabilities thereof and the fair market value and adjusted basis of the assets determined at such intervals as may be required by the Code, as may be necessary to prepare the foregoing returns, schedules, statements or information; and

(k)  as and when necessary and appropriate, represent each REMIC created under this Agreement in any administrative or judicial proceedings relating to an examination or audit by any governmental taxing authority, request an administrative adjustment as to any taxable year of such REMIC, enter into settlement agreements with any governmental taxing agency, extend any statute of limitations relating to any tax item of such REMIC, and otherwise act on behalf of such REMIC in relation to any tax matter or controversy involving it.

To enable the Trustee to perform its duties under this Agreement, the Depositor shall provide to the Trustee within ten days after the Closing Date all information or data that the Trustee requests in writing and determines to be relevant for tax purposes to the valuations and offering prices of the Certificates, including the price, yield, prepayment assumption, and projected cash flows of the Certificates and the Mortgage Loans.  Thereafter, the Depositor shall provide to the Trustee promptly upon written request therefor any additional information or data that the Trustee may, from time to time, reasonably request to enable the Trustee to perform its duties under this Agreement.  The Depositor hereby indemnifies the Trustee for any losses, liabilities, damages, claims, or expenses of the Trustee arising from any errors or miscalculations of the Trustee that result from any failure of the Depositor to provide, or to cause to be provided, accurate information or data to the Trustee on a timely basis.

If any tax is imposed on "prohibited transactions" (as defined in section 860F(a)(2) of the Code) of any REMIC created under this Agreement, on the "net income from foreclosure property" of any REMIC created under this Agreement as defined in section 860G(c) of the Code, on any contribution to any REMIC created under this Agreement after the Startup Day pursuant to section 860G(d) of the Code, or any other tax is imposed, including any minimum tax imposed on any REMIC created hereunder pursuant to sections 23153 and 24874 of the California Revenue and Taxation Code, if not paid as otherwise provided for herein, the tax shall be paid by (i) the Trustee, if any such other tax arises out of or results from negligence of the Trustee in the performance of any of its obligations under this Agreement, (ii) the Master Servicer or the Seller, in the case of any such minimum tax, if such tax arises out of or results from a breach by the Master Servicer or Seller of any of their obligations under this Agreement, (iii) the Seller, if any such tax arises out of or results from the Seller's obligation to repurchase a Mortgage Loan pursuant to Section 2.02 or 2.03, or (iv) in all other cases, or if the Trustee, the Master Servicer, or the Seller fails to honor its obligations under the preceding clauses (i), (ii), or (iii), any such tax will be paid with amounts otherwise to be distributed to the Certificateholders, as provided in Section 3.09(b).

**Section 8.12     Periodic Filings.**

Beginning with the first Distribution Date, the Trustee, pursuant to written instructions of the Depositor (which instructions shall be deemed to be this Section 8.12), shall prepare and file all periodic reports required under the Exchange Act in conformity with the terms of the relief granted to issuers similar to the Trust Fund. The Trustee shall execute the Form 8-Ks pursuant to a limited power of attorney from the Depositor which shall terminate upon written notice from the Depositor or the termination of this Agreement.  In connection with the preparation and filing of such periodic reports, the Depositor and the Master Servicer shall timely provide to the Trustee all material information available to them that is required to be included in such reports and not known to them to be in the possession of the Trustee and such other information as the Trustee reasonably may request from either of them (including any certification required pursuant to Section 3.02(a) of the Sarbanes-Oxley Act of 2002 and any regulations promulgated thereunder (the "***Required Certifications***")) and otherwise reasonably shall cooperate with the Trustee.  The Depositor shall execute the Form 10-Ks and the Required Certifications. The Trustee shall have no responsibility for making any of the Required Certifications; provided, however, that upon the request of the Master Servicer or the Depositor in connection with the delivery of the Required Certifications on behalf of the Trust Fund, the Trustee shall furnish to the Master Servicer or the Depositor, as applicable, a certificate signed by an officer of the Trustee (the "***Trustee Certification***"), which is attached as Exhibit O to this Agreement.  The Trustee shall indemnify and hold harmless the Master Servicer and the Depositor, their respective officers and directors from and against any and all losses, claims, expenses, damages or liabilities, as and when such losses, claims, expenses, damages or liabilities are incurred, insofar as such losses, claims, expenses, damages or liabilities (or actions in respect thereof) arise out of or are based upon any untrue statement of any material fact contained in the Trustee Certification.  The Trustee shall prepare the Form 10-K and provide such to the Depositor by March 10th of each year, commencing in 2006.  The Depositor shall execute such Form 10-K upon its receipt and shall provide the original of such executed Form 10-K to the Trustee no later than five Business Days following its receipt from the Trustee.

Prior to January 30th of the first year in which the Trustee is able to do so under applicable law, the Trustee shall file under the Exchange Act a Suspension Notification with respect to the Trust Fund. The Trustee shall have no liability with respect to any failure to properly prepare or file such periodic reports resulting from or relating to the Trustee's inability or failure to obtain any information not resulting from its own negligence or willful misconduct.

The Trustee and any director, officer, employee, or agent of the Trustee shall be indemnified by the Master Servicer against any loss, liability, or expense (including reasonable attorney's fees) incurred in connection with any claim or legal action relating to the preparation of the Required Certification, other than any loss, liability or expense incurred because of willful misfeasance, bad faith or negligence in the performance of any of the Trustee's duties under this Agreement or incurred by reason of any action of the Trustee taken at the direction of the Certificateholders under this Agreement.  This indemnity shall survive the termination of this Agreement or the resignation or removal of the Trustee under this Agreement.

**Exhibit 6, Page 393**

ARTICLE NINE

TERMINATION

### Section 9.01     Termination upon Liquidation or Purchase of the Mortgage Loans.

Subject to Section 9.03, the obligations and responsibilities of the Depositor, the Master Servicer, and the Trustee created hereby shall terminate upon the earlier of

(a)  the purchase by the Master Servicer of all Mortgage Loans (and REO Properties) at the price equal to the sum of

(i)     100% of the Stated Principal Balance of each Mortgage Loan (other than in respect of a Delinquent Mortgage Loan or REO Property) plus one month's accrued interest thereon at the applicable Adjusted Mortgage Rate less any amounts collected by the Master Servicer representing principal and interest due after the related Due Date,

(ii)     the lesser of (x) the appraised value of any Delinquent Mortgage Loan or REO Property as determined by the higher of two appraisals completed by two independent appraisers selected by the Master Servicer at the expense of the Master Servicer and (y) the Stated Principal Balance of each such Delinquent Mortgage Loan or Mortgage Loan related to such REO Property, in each case plus accrued and unpaid interest thereon at the applicable Adjusted Net Mortgage Rate and

(iii)     any costs and damages incurred by the Trust Fund in connection with any violation by each Mortgage Loan of any predatory or abusive lending law and

(b)  the later of

(i)     the maturity or other liquidation (or any Advance with respect thereto) of the last Mortgage Loan and the disposition of all REO Property and

(ii)     the distribution to Certificateholders of all amounts required to be distributed to them pursuant to this Agreement.  In no event shall the trusts created hereby continue beyond the expiration of 21 years from the death of the survivor of the descendants of Joseph P.  Kennedy, the late Ambassador of the United States to the Court of St. James's, living on the date of this Agreement.

The right to purchase all Mortgage Loans and REO Properties pursuant to clause (a) above shall be conditioned upon the aggregate Stated Principal Balance of those Mortgage Loans, at the time of any such repurchase, aggregating less than ten percent (10%) of the aggregate Stated Principal Balance of the Mortgage Loans as of the Cut-off Date.  The Master Servicer shall effect any such repurchase by depositing the purchase price, as calculated above, as of the month preceding the date on which such purchase price shall be distributed to Certificateholders into the Certificate Account.

### Section 9.02     Final Distribution on the Certificates.

If on any Determination Date the Master Servicer determines that there are no Outstanding Mortgage Loans and no other funds or assets in the Trust Fund other than the funds in the Certificate Account, the Master Servicer shall direct the Trustee promptly to send a final distribution notice to each Certificateholder.  If the Master Servicer elects to terminate the Trust Fund pursuant to clause (a) of

88

Exhibit 6, Page 394

Section 9.01, no later than the 15th day of the month preceding the month of the final Distribution Date the Master Servicer shall notify the Depositor and the Trustee of the date the Master Servicer intends to terminate the Trust Fund and of the applicable repurchase price of the Mortgage Loans and REO Properties.

Notice of any termination of the Trust Fund specifying the Distribution Date on which Certificateholders may surrender their Certificates for payment of the final distribution and cancellation shall be given promptly by the Trustee by letter to Certificateholders mailed not earlier than the 15th day and not later than the last day of the month next preceding the month of such final distribution.  Any such notice shall specify (a) the Distribution Date upon which final distribution on the Certificates will be made upon presentation and surrender of Certificates at the office therein designated, (b) the amount of such final distribution, (c) the location of the office or agency at which such presentation and surrender must be made, and (d) that the Record Date otherwise applicable to the Distribution Date is not applicable, distributions being made only upon presentation and surrender of the Certificates at the office therein specified.  The Master Servicer will give such notice to each Rating Agency at the time such notice is given to Certificateholders.

If this notice is given, the Master Servicer shall cause all funds in the Certificate Account to be remitted to the Trustee for deposit in the Distribution Account on the Business Day before the applicable Distribution Date in an amount equal to the final distribution in respect of the Certificates.  Upon such final deposit with respect to the Trust Fund and the receipt by the Trustee of a Request for Release therefor, the Trustee shall promptly release to the Master Servicer the Mortgage Files for the Mortgage Loans.

Upon presentation and surrender of the Certificates, the Trustee shall cause to be distributed to the Certificateholders of each Class, in each case on the final Distribution Date and in the order set forth in Section 4.02, in proportion to their respective Percentage Interests, with respect to Certificateholders of the same Class, an amount equal to (i) as to each Class of Regular Certificates, its Certificate Balance plus for each such Class accrued interest thereon (or on their Notional Amount, if applicable) in the case of an interest-bearing Certificate and (ii) as to the Residual Certificates, any amount remaining on deposit in the Distribution Account (other than the amounts retained to meet claims) after application pursuant to clause (i) above.  Notwithstanding the reduction of the Certificate Balance of any Class of Certificates to zero, such Class will be outstanding hereunder solely for the purpose of receiving distributions and for no other purpose until the termination of the respective obligations and responsibilities of the Depositor, the Master Servicer and the Trustee hereunder in accordance with Article Nine.  The foregoing provisions are intended to distribute to each Class of Regular Certificates any accrued and unpaid interest and principal to which they are entitled based on the Pass-Through Rates and actual Class Certificate Balances or Notional Amounts set forth in the Preliminary Statement upon liquidation of the Trust Fund.

If any affected Certificateholder does not surrender its Certificates for cancellation within six months after the date specified in the above mentioned written notice, the Trustee shall give a second written notice to the remaining Certificateholders to surrender their Certificates for cancellation and receive the final distribution with respect thereto.  If within six months after the second notice all the applicable Certificates shall not have been surrendered for cancellation, the Trustee may take appropriate steps, or may appoint an agent to take appropriate steps, to contact the remaining Certificateholders concerning surrender of their Certificates, and the cost thereof shall be paid out of the funds and other assets which remain a part of the Trust Fund.  If within one year after the second notice all Certificates shall not have been surrendered for cancellation, then the Class A-R Certificateholders shall be entitled to all unclaimed funds and other assets of the Trust Fund which remain subject hereto.

Exhibit 6, Page 395

### Section 9.03      *Additional Termination Requirements.*

(a)  If the Master Servicer exercises its purchase option with respect to the Mortgage Loans as provided in Section 9.01, the Trust Fund shall be terminated in accordance with the following additional requirements, unless the Trustee has been supplied with an Opinion of Counsel, at the expense of the Master Servicer, to the effect that the failure to comply with the requirements of this Section 9.03 will not (i) result in the imposition of taxes on "prohibited transactions" on any REMIC created hereunder as defined in section 860F of the Code, or (ii) cause any REMIC created under this Agreement to fail to qualify as a REMIC at any time that any Certificates are outstanding:

(b)  The Trustee shall sell all of the assets of the Trust Fund to the Master Servicer, and, within 90 days of such sale, shall distribute to the Certificateholders the proceeds of such sale in complete liquidation of each REMIC created under this Agreement.

(c)  The Trustee shall attach a statement to the final federal income tax return for each REMIC created under this Agreement stating that pursuant to Treasury Regulation § 1.860F-1, the first day of the 90-day liquidation period for such REMIC was the date on which the Trustee sold the assets of the Trust Fund to the Master Servicer.

ARTICLE TEN

MISCELLANEOUS PROVISIONS

**Section 10.01    Amendment.**

This Agreement may be amended from time to time by the Depositor, the Master Servicer and the Trustee without the consent of any of the Certificateholders (i) to cure any ambiguity or mistake, (ii) to correct any defective provision in this Agreement or to supplement any provision in this Agreement which may be inconsistent with any other provision in this Agreement, (iii) to conform this Agreement to the Prospectus Supplement, (iv) to add to the duties of the Depositor, the Seller or the Master Servicer, (v) to modify, alter, amend, add to or rescind any of the terms or provisions contained in this Agreement to comply with any rules or regulations promulgated by the Securities and Exchange Commission from time to time, (vi) to add any other provisions with respect to matters or questions arising under this Agreement, or (vii) to modify, alter, amend, add to, or rescind any of the terms or provisions contained in this Agreement.

No action pursuant to clauses (vi) or (vii) above may, as evidenced by an Opinion of Counsel (which Opinion of Counsel shall not be an expense of the Trustee or the Trust Fund), adversely affect in any material respect the interests of any Certificateholder.  The amendment shall not be deemed to adversely affect in any material respect the interests of the Certificateholders if the Person requesting the amendment obtains a letter from each Rating Agency stating that the amendment would not result in the downgrading, qualification or withdrawal of the respective ratings then assigned to the Certificates.  Any such letter in and of itself will not represent a determination as to the materiality of any amendment and will represent a determination only as to the credit issues affecting any rating.  Each party to this Agreement agrees that it will cooperate with each other party in amending this Agreement pursuant to clause (v) above.

The Trustee, the Depositor, and the Master Servicer also may at any time and from time to time amend this Agreement without the consent of the Certificateholders to modify, eliminate or add to any of its provisions to the extent necessary or helpful to (i) maintain the qualification of any REMIC created under this Agreement as a REMIC under the Code, (ii) avoid or minimize the risk of the imposition of any tax on any REMIC created under this Agreement pursuant to the Code that would be a claim at any time before the final redemption of the Certificates, or (iii) comply with any other requirements of the Code, if the Trustee has been provided an Opinion of Counsel, which opinion shall be an expense of the party requesting such opinion but in any case shall not be an expense of the Trustee or the Trust Fund, to the effect that the action is necessary or helpful for one of the foregoing purposes.

This Agreement may also be amended from time to time by the Depositor, the Master Servicer, and the Trustee with the consent of the Holders of Certificates evidencing Percentage Interests aggregating not less than 51% of each Class of Certificates adversely affected thereby for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Agreement or of modifying in any manner the rights of the Holders of Certificates.  As long as any Voting Rights are held by parties other than the Seller, its Affiliates, or its agents, Voting Rights of Certificates held by the Seller, its Affiliates or its agents, as the Seller shall certify to the Trustee upon any entity obtaining such ownership, will be excluded from participating in such voting arrangements, and excluded from determining the 51% threshold.  No amendment shall

(i)        reduce in any manner the amount of, or delay the timing of, payments required to be distributed on any Certificate without the consent of the Holder of such Certificate,

91

**Exhibit 6, Page 397**

(ii)      amend, modify, add to, rescind, or alter in any respect Section 10.13, notwithstanding any contrary provision of this Agreement, without the consent of the Holders of Certificates evidencing Percentage Interests aggregating not less than 66 2/3% (provided, however, that no Certificates held by the Seller, the Depositor or any Affiliate thereby shall be given effect for the purpose of calculating any such aggregation of Percentage Interests), or

(iii)     reduce the aforesaid percentages of Certificates the Holders of which are required to consent to any such amendment, without the consent of the Holders of all such Certificates then outstanding.

Notwithstanding any contrary provision of this Agreement, the Trustee shall not consent to any amendment to this Agreement unless (i) it shall have first received an Opinion of Counsel, which opinion shall not be an expense of the Trustee or the Trust Fund, to the effect that such amendment will not cause the imposition of any tax on any REMIC created under this Agreement or the Certificateholders or cause any REMIC created hereunder to fail to qualify as a REMIC at any time that any Certificates are outstanding and (ii) because the Trust Fund is required to be a Qualifying Special Purpose Entity (as that term is defined in Statement of Financial Accounting Standards No. 140 ("SFAS 140"), in order for the Seller to continue to account for the transfer of the Mortgage Loans under this Agreement as a sale under SFAS 140, prior to the parties hereto entering into such an amendment, the Trustee shall receive an Officer's Certificate, which shall not be an expense of the Trustee or the Trust Fund, to the effect that such amendment would not "significantly change" (within the meaning of SFAS 140) the permitted activities of the Trust Fund so as to cause the Trust Fund to fail to qualify as a Qualifying Special Purpose Entity.

Promptly after the execution of any amendment to this Agreement requiring the consent of Certificateholders, the Trustee shall furnish written notification of the substance or a copy of such amendment to each Certificateholder and each Rating Agency.

It shall not be necessary for the consent of Certificateholders under this Section 10.01 to approve the particular form of any proposed amendment, but it shall be sufficient if such consent shall approve the substance thereof.  The manner of obtaining such consents and of evidencing the authorization of the execution thereof by Certificateholders shall be subject to such reasonable regulations as the Trustee may prescribe.

Nothing in this Agreement shall require the Trustee to enter into an amendment without receiving an Opinion of Counsel (which Opinion shall not be an expense of the Trustee or the Trust Fund), satisfactory to the Trustee that (i) such amendment is permitted and is not prohibited by this Agreement and that all requirements for amending this Agreement have been complied with; and (ii) either (A) the amendment does not adversely affect in any material respect the interests of any Certificateholder or (B) the conclusion set forth in the preceding clause (A) is not required to be reached pursuant to this Section 10.01.

### Section 10.02    Recordation of Agreement; Counterparts.

This Agreement is subject to recordation in all appropriate public offices for real property records in all the counties or other comparable jurisdictions in which any or all of the properties subject to the Mortgages are situated, and in any other appropriate public recording office or elsewhere, such recordation to be effected by the Master Servicer at its expense, but only upon receipt of an Opinion of Counsel to the effect that such recordation materially and beneficially affects the interests of the Certificateholders.

NY1 5706826v 6

Exhibit 6, Page 398

For the purpose of facilitating the recordation of this Agreement as herein provided and for other purposes, this Agreement may be executed simultaneously in any number of counterparts, each of which counterparts shall be deemed to be an original, and such counterparts shall constitute but one and the same instrument.

### Section 10.03   Governing Law.

THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE SUBSTANTIVE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED IN THE STATE OF NEW YORK AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HERETO AND THE CERTIFICATEHOLDERS SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

### Section 10.04   Intention of Parties.

It is the express intent of the parties hereto that the conveyance (i) of the Mortgage Loans by the Seller to the Depositor and (ii) of the Trust Fund by the Depositor to the Trustee each be, and be construed as, an absolute sale thereof.  It is, further, not the intention of the parties that such conveyances be deemed a pledge thereof.  However, if, notwithstanding the intent of the parties, the assets are held to be the property of the Seller or Depositor, as the case may be, or if for any other reason this Agreement is held or deemed to create a security interest in either such assets, then (i) this Agreement shall be deemed to be a security agreement within the meaning of the UCC and (ii) the conveyances provided for in this Agreement shall be deemed to be an assignment and a grant (i) by the Seller to the Depositor or (ii) by the Depositor to the Trustee, for the benefit of the Certificateholders, of a security interest in all of the assets transferred, whether now owned or hereafter acquired.

The Seller and the Depositor for the benefit of the Certificateholders shall, to the extent consistent with this Agreement, take such actions as may be necessary to ensure that, if this Agreement were deemed to create a security interest in the Trust Fund, such security interest would be deemed to be a perfected security interest of first priority under applicable law and will be maintained as such throughout the term of the Agreement.  The Depositor shall arrange for filing any Uniform Commercial Code continuation statements in connection with any security interest granted or assigned to the Trustee for the benefit of the Certificateholders.

### Section 10.05   Notices.

(a)  The Trustee shall use its best efforts to promptly provide notice to each Rating Agency with respect to each of the following of which it has actual knowledge:

1.  Any material change or amendment to this Agreement;

2.  The occurrence of any Event of Default that has not been cured;

3.  The resignation or termination of the Master Servicer or the Trustee and the appointment of any successor;

4.  The repurchase or substitution of Mortgage Loans pursuant to Section 2.03; and

5.  The final payment to Certificateholders.

In addition, the Trustee shall promptly furnish to each Rating Agency copies of the following:

Exhibit 6, Page 399

1.  Each report to Certificateholders described in Section 4.06;

2.  Each annual statement as to compliance described in Section 3.17;

3.  Each annual independent public accountants' servicing report described in Section 3.18; and

4.  Any notice of a purchase of a Mortgage Loan pursuant to Section 2.02, 2.03 or 3.11.

(b)  All directions, demands and notices hereunder shall be in writing and shall be deemed to have been duly given when delivered to (a) in the case of the Depositor, IndyMac MBS, Inc., 155 North Lake Avenue, Pasadena, California 91101, Attention: Secondary Marketing, Transaction Management; (b) in the case of the Master Servicer, IndyMac Bank, F.S.B., 155 North Lake Avenue, Pasadena, California 91101, Attention: Secondary Marketing, Transaction Management, or such other address as may be hereafter furnished to the Depositor and the Trustee by the Master Servicer in writing; (c) in the case of the Trustee to the Corporate Trust Office, Deutsche Bank National Trust Company, 1761 East St. Andrew Place, Santa Ana, California 92705-4934, Attention:  Trust Administration IN0507, Series 2005-A7, or such other address as the Trustee may hereafter furnish to the Depositor or Master Servicer and (d) in the case of each of the Rating Agencies, the address specified therein in the definition corresponding to the name of such Rating Agency.  Notices to Certificateholders shall be deemed given when mailed, first class postage prepaid, to their respective addresses appearing in the Certificate Register.

### Section 10.06    Severability of Provisions.

If any one or more of the covenants, agreements, provisions or terms of this Agreement shall be for any reason whatsoever held invalid, then such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of this Agreement and shall in no way affect the validity or enforceability of the other provisions of this Agreement or of the Certificates or the rights of the Holders thereof.

### Section 10.07    Assignment.

Notwithstanding anything to the contrary contained in this Agreement, except as provided in Section 6.02, this Agreement may not be assigned by the Master Servicer without the prior written consent of the Trustee and Depositor.

### Section 10.08    Limitation on Rights of Certificateholders.

The death or incapacity of any Certificateholder shall not operate to terminate this Agreement or the trust created by this Agreement, nor entitle such Certificateholder's legal representative or heirs to claim an accounting or to take any action or commence any proceeding in any court for a petition or winding up of the trust created hereby, or otherwise affect the rights, obligations and liabilities of the parties to this Agreement or any of them.

No Certificateholder shall have any right to vote (except as provided in this Agreement) or in any manner otherwise control the operation and management of the Trust Fund, or the obligations of the parties to this Agreement, nor shall anything herein set forth or contained in the terms of the Certificates be construed so as to constitute the Certificateholders from time to time as partners or members of an association; nor shall any Certificateholder be under any liability to any third party because of any action taken by the parties to this Agreement pursuant to any provision of this Agreement.

**Exhibit 6, Page 400**

No Certificateholder shall have any right by virtue or by availing itself of any provisions of this Agreement to institute any suit, action or proceeding in equity or at law upon or under or with respect to this Agreement, unless such Holder previously shall have given to the Trustee a written notice of an Event of Default and of the continuance thereof, as provided in this Agreement, and unless the Holders of Certificates evidencing not less than 25% of the Voting Rights evidenced by the Certificates shall also have made written request to the Trustee to institute such action, suit or proceeding in its own name as Trustee hereunder and shall have offered to the Trustee such reasonable indemnity as it may require against the costs, expenses, and liabilities to be incurred therein or thereby, and the Trustee, for 60 days after its receipt of such notice, request and offer of indemnity shall have neglected or refused to institute any such action, suit or proceeding; it being understood and intended, and being expressly covenanted by each Certificateholder with every other Certificateholder and the Trustee, that no one or more Holders of Certificates shall have any right in any manner whatever by virtue or by availing itself or themselves of any provisions of this Agreement to affect, disturb or prejudice the rights of the Holders of any other of the Certificates, or to obtain or seek to obtain priority over or preference to any other such Holder or to enforce any right under this Agreement, except in the manner herein provided and for the common benefit of all Certificateholders.  For the protection and enforcement of this Section 10.08, each Certificateholder and the Trustee shall be entitled to any relief that can be given either at law or in equity. As long as any Voting Rights are held by parties other than the Seller, its Affiliates, or its agents, Voting Rights of Certificates held by the Seller, its Affiliates or its agents, as the Seller shall certify to the Trustee upon any entity obtaining such ownership, will be excluded from participating in such voting arrangements, and excluded from determining the 25% threshold.

**Section 10.09   Inspection and Audit Rights.**

The Master Servicer agrees that, on reasonable prior notice, it will permit any representative of the Depositor or the Trustee during the Master Servicer's normal business hours, to examine all the books of account, records, reports and other papers of the Master Servicer relating to the Mortgage Loans, to make copies and extracts therefrom, to cause such books to be audited by independent certified public accountants selected by the Depositor or the Trustee and to discuss its affairs, finances and accounts relating to the Mortgage Loans with its officers, employees and independent public accountants (and by this provision the Master Servicer hereby authorizes said accountants to discuss with such representative such affairs, finances and accounts), all at such reasonable times and as often as may be reasonably requested.  Any out-of-pocket expense incident to the exercise by the Depositor or the Trustee of any right under this Section 10.09 shall be borne by the party requesting such inspection; all other such expenses shall be borne by the Master Servicer or the Subservicer.

**Section 10.10   Certificates Nonassessable and Fully Paid.**

It is the intention of the Depositor that Certificateholders shall not be personally liable for obligations of the Trust Fund, that the interests in the Trust Fund represented by the Certificates shall be nonassessable for any reason whatsoever, and that the Certificates, upon due authentication thereof by the Trustee pursuant to this Agreement, are and shall be deemed fully paid.

**Section 10.11   Official Record.**

The Seller agrees that this Agreement is and shall remain at all times before the time at which this Agreement terminates an official record of the Seller as referred to in Section 13(e) of the Federal Deposit Insurance Act.

**Exhibit 6, Page 401**

***Section 10.12    Protection of Assets.***

(a)  Except for transactions and activities entered into in connection with the securitization that is the subject of this Agreement, the trust created by this Agreement is not authorized and has no power to:

(1)        borrow money or issue debt;

(2)        merge with another entity, reorganize, liquidate or sell assets;

(3)        engage in any business or activities.

(b)  Each party to this Agreement agrees that it will not file an involuntary bankruptcy petition against the Trustee or the Trust Fund or initiate any other form of insolvency proceeding until after the Certificates have been paid in full.

***Section 10.13    Qualifying Special Purpose Entity.***

Notwithstanding any contrary provision of this Agreement, the Trust Fund shall not hold any property or engage in any activity that would disqualify the Trust Fund from being a qualifying special purpose entity under generally accepted accounting principles.

\* \* \* \* \* \*

Exhibit 6, Page 402

NY1 5706826v 6

IN WITNESS WHEREOF, the Depositor, the Trustee, the Seller and the Master Servicer have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the day and year first above written.

INDYMAC MBS, INC.,
as Depositor

By: _____
Name: Isaac Carrillo
Title: Vice President

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Trustee

By: _____
Name:
Title:

By: _____
Name:
Title:

INDYMAC BANK, F.S.B.,
as Seller and Master Servicer

By: _____
Name: Isaac Carrillo
Title: Vice President

IndyMac MBS, Inc. Residential Asset Securitization Trust 2005-A7
Pooling and Servicing Agreement

Exhibit 6, Page 403

IN WITNESS WHEREOF, the Depositor, the Trustee, the Seller and the Master Servicer have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the day and year first above written.

INDYMAC MBS, INC.,
   as Depositor

By: _____
     Name:
     Title:


DEUTSCHE BANK NATIONAL TRUST COMPANY,
   as Trustee

By: _____
     Name:   **Ronaldo Reyes**
     Title:    **Vice President**

By: _____
     Name:   **Jennifer Hermansader**
     Title:    **Associate**


INDYMAC BANK, F.S.B.,
   as Seller and Master Servicer

By: _____
     Name:
     Title:


IndyMac MBS, Inc. Residential Asset Securitization Trust 2005-A7
Pooling and Servicing Agreement

STATE OF CALIFORNIA          )
                             : ss.:
COUNTY OF Los Angeles   )

     On this 27th day of May, 2005, before me, personally appeared Isaac Carrillo, known to me to be a Vice President of IndyMac MBS, Inc., one of the entities that executed the within instrument, and also known to me to be the person who executed it on behalf of said entity, and acknowledged to me that such entity executed the within instrument.

     IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

_____
Notary Public

[NOTARIAL SEAL]

REBECCA LEE
Commission # 1429631
Notary Public - California
Los Angeles County
My Comm. Expires Jul 10, 2007

Exhibit 6, Page 405

STATE OF CALIFORNIA          )
                             : ss.:
COUNTY OF _Orange_           )

      On this _27_ th day of May, 2005, before me, personally appeared _Jennifer Hernansader_ and _Ronaldo Reyes_, known to me to be a _Associate_ and a _Vice President_, respectively, of Deutsche Bank National Trust Company, one of the entities that executed the within instrument, and also known to me to be the person who executed it on behalf of said entity, and acknowledged to me that such entity executed the within instrument.

      IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.



                                 Notary Public

[NOTARIAL SEAL]

MANUEL RIVAS
Commission # 1532851
Notary Public - California
Orange County
My Comm. Expires Dec 9, 2008

Exhibit 6, Page 406

STATE OF CALIFORNIA          )
                             : ss.:
COUNTY OF Los Angeles   )

       On this 27th day of May, 2005, before me, personally appeared Isaac Carrillo, known to me to be a Vice President of IndyMac Bank, F.S.B., one of the entities that executed the within instrument, and also known to me to be the person who executed it on behalf of said entity, and acknowledged to me that such entity executed the within instrument.

       IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

                               _____
                               Notary Public

[NOTARIAL SEAL]



REBECCA LEE
Commission # 1429631
Notary Public - California
Los Angeles County
My Comm. Expires Jul 10, 2007

Exhibit 6, Page 407

Schedule I

MORTGAGE LOAN SCHEDULE [DELIVERED AT CLOSING TO TRUSTEE]

Exhibit 6, Page 408

Schedule II

INDYMAC MBS, INC. MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2005-G

### Representations and Warranties of the Seller/Master Servicer

Indy Mac Bank, F.S.B. ("*IndyMac*") hereby makes the representations and warranties set forth in this Schedule II to the Depositor and the Trustee, as of the Closing Date.  Capitalized terms used but not otherwise defined in this Schedule II shall have the meanings assigned thereto in the Pooling and Servicing Agreement (the "*Pooling and Servicing Agreement*") relating to the above-referenced Series, among IndyMac, as seller and master servicer, IndyMac MBS, Inc., as depositor, and Deutsche Bank National Trust Company, as trustee.

(1) IndyMac is duly organized as a federally insured savings bank and is validly existing and in good standing under the laws of the United States of America and is duly authorized and qualified to transact any business contemplated by the Pooling and Servicing Agreement to be conducted by IndyMac in any state in which a Mortgaged Property is located or is otherwise not required under applicable law to effect such qualification and, in any event, is in compliance with the doing business laws of any such state, to the extent necessary to ensure its ability to enforce each Mortgage Loan, to service the Mortgage Loans in accordance with the Pooling and Servicing Agreement and to perform any of its other obligations under the Pooling and Servicing Agreement in accordance with the terms thereof.

(2) IndyMac has the full corporate power and authority to sell and service each Mortgage Loan, and to execute, deliver and perform, and to enter into and consummate the transactions contemplated by the Pooling and Servicing Agreement and has duly authorized by all necessary corporate action on the part of IndyMac the execution, delivery and performance of the Pooling and Servicing Agreement; and the Pooling and Servicing Agreement, assuming the due authorization, execution and delivery thereof by the other parties thereto, constitutes a legal, valid and binding obligation of IndyMac, enforceable against IndyMac in accordance with its terms, except that (a) the enforceability thereof may be limited by bankruptcy, insolvency, moratorium, receivership and other similar laws relating to creditors' rights generally and (b) the remedy of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding therefor may be brought.

(3) The execution and delivery of the Pooling and Servicing Agreement by IndyMac, the sale and servicing of the Mortgage Loans by IndyMac under the Pooling and Servicing Agreement, the consummation of any other of the transactions contemplated by the Pooling and Servicing Agreement, and the fulfillment of or compliance with the terms thereof are in the ordinary course of business of IndyMac and will not (A) result in a material breach of any term or provision of the charter or by-laws of IndyMac or (B) materially conflict with, result in a material breach, violation or acceleration of, or result in a material default under, any other material agreement or instrument to which IndyMac is a party or by which it may be bound, or (C) constitute a material violation of any statute, order or regulation applicable to IndyMac of any court, regulatory body, administrative agency or governmental body having jurisdiction over IndyMac (including the OTS, the Federal Deposit Insurance Corporation or any other governmental entity having regulatory authority over IndyMac); and IndyMac is not in breach or violation of any material indenture or other material agreement or instrument, or in violation of any statute, order or regulation of any court, regulatory body, administrative agency or

Exhibit 6, Page 409

governmental body having jurisdiction over it (including the OTS, the Federal Deposit Insurance Corporation or any other governmental entity having regulatory authority over IndyMac) which breach or violation may materially impair IndyMac's ability to perform or meet any of its obligations under the Pooling and Servicing Agreement.

(4) IndyMac is an approved servicer of conventional mortgage loans for FNMA or FHLMC or is a mortgagee approved by the Secretary of Housing and Urban Development pursuant to Sections 203 and 211 of the National Housing Act.

(5) No litigation is pending or, to the best of IndyMac's knowledge, threatened against IndyMac that would prohibit the execution or delivery of, or performance under, the Pooling and Servicing Agreement by IndyMac.

(6) IndyMac is a member of MERS in good standing, and will comply in all material respects with the rules and procedures of MERS in connection with the servicing of the MERS Mortgage Loans for as long as such Mortgage Loans are registered with MERS.

Exhibit 6, Page 410

Schedule III

INDYMAC MBS, INC.
MORTGAGE PASS-THROUGH CERTIFICATES,
SERIES 2005-G

*Representations and Warranties as to the Mortgage Loans*

IndyMac Bank, F.S.B. ("***IndyMac***") hereby makes the representations and warranties set forth in this Schedule III to the Depositor and the Trustee, as of the Closing Date or if so specified in this Schedule III, as of the Cut-off Date with respect to each Mortgage Loan.  Capitalized terms used but not otherwise defined in this Schedule III shall have the meanings assigned to them in the Pooling and Servicing Agreement (the "***Pooling and Servicing Agreement***") relating to the above-referenced Series, among IndyMac, as seller and master servicer, IndyMac MBS, Inc., as depositor, and Deutsche Bank National Trust Company, as trustee.

(1) The information set forth on Schedule I to the Pooling and Servicing Agreement with respect to each Mortgage Loan is true and correct in all material respects as of the Closing Date.

(2) All regularly scheduled monthly payments due with respect to each Mortgage Loan up to and including the Due Date before the Cut-off Date have been made; and as of the Cut-off Date, no Mortgage Loan had a regularly scheduled monthly payment that was 60 or more days Delinquent during the twelve months before the Cut-off Date.

(3) With respect to any Mortgage Loan that is not a Cooperative Loan, each Mortgage is a valid and enforceable first lien on the Mortgaged Property subject only to (a) the lien of nondelinquent current real property taxes and assessments and liens or interests arising under or as a result of any federal, state or local law, regulation or ordinance relating to hazardous wastes or hazardous substances and, if the related Mortgaged Property is a unit in a condominium project or planned unit development, any lien for common charges permitted by statute or homeowner association fees, (b) covenants, conditions and restrictions, rights of way, easements and other matters of public record as of the date of recording of such Mortgage, such exceptions appearing of record being generally acceptable to mortgage lending institutions in the area wherein the related Mortgaged Property is located or specifically reflected in the appraisal made in connection with the origination of the related Mortgage Loan, and (c) other matters to which like properties are commonly subject which do not materially interfere with the benefits of the security intended to be provided by such Mortgage.

(4) Immediately before the assignment of the Mortgage Loans to the Depositor, the Seller had good title to, and was the sole owner of, each Mortgage Loan free and clear of any pledge, lien, encumbrance or security interest and had full right and authority, subject to no interest or participation of, or agreement with, any other party, to sell and assign the same pursuant to the Pooling and Servicing Agreement.

(5) As of the date of origination of each Mortgage Loan, there was no delinquent tax or assessment lien against the related Mortgaged Property.

(6) There is no valid offset, defense or counterclaim to any Mortgage Note or Mortgage, including the obligation of the Mortgagor to pay the unpaid principal of or interest on such Mortgage Note.

Exhibit 6, Page 411

(7) There are no mechanics' liens or claims for work, labor or material affecting any Mortgaged Property which are or may be a lien prior to or equal with, the lien of such Mortgage, except those which are insured against by the title insurance policy referred to in item (11) below.

(8)  No Mortgaged Property has been materially damaged by water, fire, earthquake, windstorm, flood, tornado or similar casualty (excluding casualty from the presence of hazardous wastes or hazardous substances, as to which the Seller makes no representation) so as to affect adversely the value of the related Mortgaged Property as security for the Mortgage Loan.

(9) Each Mortgage Loan at origination complied in all material respects with applicable local, state and federal laws and regulations, including usury, equal credit opportunity, real estate settlement procedures, truth-in-lending, and disclosure laws, or any noncompliance does not have a material adverse effect on the value of the related Mortgage Loan.

(10) The Seller has not modified the Mortgage in any material respect (except that a Mortgage Loan may have been modified by a written instrument which has been recorded or submitted for recordation, if necessary, to protect the interests of the Certificateholders and which has been delivered to the Trustee); satisfied, cancelled or subordinated such Mortgage in whole or in part; released the related Mortgaged Property in whole or in part from the lien of such Mortgage; or executed any instrument of release, cancellation, modification or satisfaction with respect thereto.

(11) A lender's policy of title insurance together with a condominium endorsement and extended coverage endorsement, if applicable, in an amount at least equal to the Cut-off Date Principal Balance of each such Mortgage Loan or a commitment (binder) to issue the same was effective on the date of the origination of each Mortgage Loan and each such policy is valid and remains in full force and effect.

(12) Each Mortgage Loan was originated (within the meaning of Section 3(a)(41) of the Exchange Act) by an entity that satisfied at the time of origination the requirements of Section 3(a)(41) of the Exchange Act.

(13) To the best of the Seller's knowledge, all of the improvements which were included for the purpose of determining the Appraised Value of the Mortgaged Property lie wholly within the boundaries and building restriction lines of such property, and no improvements on adjoining properties encroach upon the Mortgaged Property, unless such failure to be wholly within such boundaries and restriction lines or such encroachment, as the case may be, does not have a material effect on the value of the Mortgaged Property.

(14) To the best of the Seller's knowledge, as of the date of origination of each Mortgage Loan, no improvement located on or being part of the Mortgaged Property is in violation of any applicable zoning law or regulation unless such violation would not have a material adverse effect on the value of the related Mortgaged Property.  To the best of the Seller's knowledge, all inspections, licenses and certificates required to be made or issued with respect to all occupied portions of the Mortgaged Property and, with respect to the use and occupancy of the same, including certificates of occupancy and fire underwriting certificates, have been made or obtained from the appropriate authorities, unless the lack thereof would not have a material adverse effect on the value of the Mortgaged Property.

(15) The Mortgage Note and the related Mortgage are genuine, and each is the legal, valid and binding obligation of the maker thereof, enforceable in accordance with its terms and under applicable law.

(16) The proceeds of the Mortgage Loan have been fully disbursed and there is no requirement for future advances thereunder.

(17) The related Mortgage contains customary and enforceable provisions which render the rights and remedies of the holder thereof adequate for the realization against the Mortgaged Property of the benefits of the security, including, (i) in the case of a Mortgage designated as a deed of trust, by trustee's sale, and (ii) otherwise by judicial foreclosure.

(18) With respect to each Mortgage constituting a deed of trust, a trustee, duly qualified under applicable law to serve as such, has been properly designated and currently so serves and is named in such Mortgage, and no fees or expenses are or will become payable by the Certificateholders to the trustee under the deed of trust, except in connection with a trustee's sale after default by the Mortgagor.

(19) At the Cut-off Date, the improvements upon each Mortgaged Property are covered by a valid and existing hazard insurance policy with a generally acceptable carrier that provides for fire and extended coverage and coverage for such other hazards as are customarily required by institutional single family mortgage lenders in the area where the Mortgaged Property is located, and the Seller has received no notice that any premiums due and payable thereon have not been paid; the Mortgage obligates the Mortgagor thereunder to maintain all such insurance including flood insurance at the Mortgagor's cost and expense.  Anything to the contrary in this item (19) notwithstanding, no breach of this item (19) shall be deemed to give rise to any obligation of the Seller to repurchase or substitute for such affected Mortgage Loan or Loans so long as the Master Servicer maintains a blanket policy pursuant to the second paragraph of Section 3.10(a) of the Pooling and Servicing Agreement.

(20) If at the time of origination of each Mortgage Loan, the related Mortgaged Property was in an area then identified in the Federal Register by the Federal Emergency Management Agency as having special flood hazards, a flood insurance policy in a form meeting the then-current requirements of the Flood Insurance Administration is in effect with respect to the Mortgaged Property with a generally acceptable carrier.

(21) To the best of the Seller's knowledge, there is no proceeding pending or threatened for the total or partial condemnation of any Mortgaged Property, nor is such a proceeding currently occurring.

(22) To the best of the Seller's knowledge, there is no material event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a material non-monetary default, breach, violation or event of acceleration under the Mortgage or the related Mortgage Note; and the Seller has not waived any material non-monetary default, breach, violation or event of acceleration.

(23) Each Mortgage File contains an appraisal of the related Mortgaged Property in a form acceptable to FNMA or FHLMC.

(24) Any leasehold estate securing a Mortgage Loan has a stated term at least as long as the term of the related Mortgage Loan.

**Exhibit 6, Page 413**

(25) Each Mortgage Loan was selected from among the outstanding fixed-rate one- to four-family mortgage loans in the Seller's portfolio at the Closing Date as to which the representations and warranties made with respect to the Mortgage Loans set forth in this Schedule III can be made. No such selection was made in a manner intended to adversely affect the interests of the Certificateholders.

(26) No more than 0.23% of the Mortgage Loans are Cooperative Loans.

(27) The aggregate PO Percentage of the Stated Principal Balances of the Discount Mortgage Loans does not exceed $1,166,752.97.

(28) None of the Mortgage Loans is a "high cost" mortgage loan or "covered" mortgage loan as defined by applicable federal, state and local predatory and abusive lending laws.

(29) Each Mortgage Loan at the time it was made complied in all material respects with applicable local, state, and federal laws, including, but not limited to, all applicable predatory and abusive lending laws.

(30) No Mortgage Loan is a "High-Cost Home Loan" as defined in the New Jersey Home Ownership Act effective November 27, 2003 (N.J.S.A. 46:10B-22 et seq.).

(31) No Mortgage Loan is a "High-Cost Home Loan" as defined in the New Mexico Home Loan Protection Act effective January 1, 2004 (N.M. Stat. Ann. §§ 58-21A-1 et seq.).

(32) Each Mortgage Loan has been underwritten and serviced substantially in accordance with the Seller's guidelines, subject to such variances as are reflected on the Mortgage Loan Schedule or that the Seller has approved.

(33) No Mortgage Loan is a High Cost Loan or Covered Loan, as applicable (as such terms are defined in the then-current version of Standard & Poor's LEVELS® Glossary, which is now Version 5.6 Revised, Appendix E) and no Mortgage Loan originated on or after October 1, 2002 through March 6, 2003 is governed by the Georgia Fair Lending Act (Exclusion Representation).

(34) The Pooling and Servicing Agreement creates a valid and continuing "security interest" (as defined in Section 1-201(37) of the UCC) in each Mortgage Note in favor of the Trustee, which security interest is prior to all other liens and is enforceable as such against creditors of and purchasers from the Depositor. Each Mortgage Note constitutes "promissory notes" (as defined in Section 9-102(a)(65) of the UCC). Immediately before the assignment of each Mortgage Note to the Trustee, the Depositor had good and marketable title to such Mortgage Note free and clear of any lien, claim, encumbrance of any Person. All original executed copies of each Mortgage Note have been or shall be delivered to the Trustee within five Business Days following the Closing Date. Other than the security interest granted to the Trustee, the Depositor has not pledged, assigned, sold, granted a security interest in, or otherwise conveyed any Mortgage Note. The Depositor has not authorized the filing of and is not aware of any financing statements against the Depositor that include a description of any of the Mortgage Notes. The Depositor is not aware of any judgment or tax liens filed against the Depositor. None of the Mortgage Notes has any marks or notations indicating that they have been pledged, assigned or otherwise conveyed to any Person other than the Trustee.

**Exhibit 6, Page 414**

(35)     To the best of the Seller's knowledge, there was no fraud involved in the origination of any Mortgage Loan by the mortgagee or by the Mortgagor, any appraiser or any other party involved in the origination of the Mortgage Loan.

(36)     No Mortgage Loan is a "High-Cost Home Mortgage Loan" as defined in the Massachusetts Predatory Home Loan Practices Act effective November 7, 2004 (Mass. Gen. Laws ch. 183C).

(37)     No Mortgage Loan originated on or after January 1, 2005 is a "High Cost Home Loan" as defined in the Indiana Home Loan Practices Act, effective January 1, 2005 (Ind. Code Ann. Sections 24-9-1 through 24-9-9).

(38)     The Pooling and Servicing Agreement creates a valid and continuing "security interest" (as defined in Section 1-201(37) of the UCC) in each Mortgage Note in favor of the Trustee, which security interest is prior to all other liens and is enforceable as such against creditors of and purchasers from the Depositor. Each Mortgage Note constitutes "promissory notes" (as defined in Section 9-102(a)(65) of the UCC). Immediately before the assignment of each Mortgage Note to the Trustee, the Depositor had good and marketable title to such Mortgage Note free and clear of any lien, claim, encumbrance of any Person. All original executed copies of each Mortgage Note have been or shall be delivered to the Trustee within five Business Days following the Closing Date. Other than the security interest granted to the Trustee, the Depositor has not pledged, assigned, sold, granted a security interest in, or otherwise conveyed any Mortgage Note. The Depositor has not authorized the filing of and is not aware of any financing statements against the Depositor that include a description of any of the Mortgage Notes. The Depositor is not aware of any judgment or tax liens filed against the Depositor.  None of the Mortgage Notes has any marks or notations indicating that they have been pledged, assigned or otherwise conveyed to any Person other than the Trustee

Exhibit 6, Page 415

Exhibit 6, Page 416

Schedule IV
[Reserved]

Exhibit 6, Page 417

Schedule V
Form of Monthly Report

[to be provided]

Exhibit 6, Page 418

EXHIBIT A

[FORM OF SENIOR CERTIFICATE (OTHER THAN THE NOTIONAL AMOUNT CERTIFICATE)]

[UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.]

SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES, THIS CERTIFICATE IS A "REGULAR INTEREST" IN A "REAL ESTATE MORTGAGE INVESTMENT CONDUIT," AS THOSE TERMS ARE DEFINED, RESPECTIVELY, IN SECTIONS 860G AND 860D OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE").

[UNTIL THIS CERTIFICATE HAS BEEN THE SUBJECT OF AN ERISA-QUALIFYING UNDERWRITING, NEITHER THIS CERTIFICATE NOR ANY INTEREST HEREIN MAY BE TRANSFERRED UNLESS THE TRANSFEREE DELIVERS TO THE TRUSTEE EITHER A REPRESENTATION LETTER TO THE EFFECT THAT SUCH TRANSFEREE IS NOT AND IS NOT INVESTING ON BEHALF OF OR WITH PLAN ASSETS OF AN EMPLOYEE BENEFIT PLAN SUBJECT TO THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA"), OR A PLAN SUBJECT TO SECTION 4975 OF THE CODE, OR AN OPINION OF COUNSEL IN ACCORDANCE WITH THE PROVISIONS OF THE AGREEMENT REFERRED TO HEREIN.  NOTWITHSTANDING ANYTHING ELSE TO THE CONTRARY HEREIN, ANY PURPORTED TRANSFER OF THIS CERTIFICATE TO OR ON BEHALF OF AN EMPLOYEE BENEFIT PLAN SUBJECT TO ERISA OR TO THE CODE WITHOUT THE OPINION OF COUNSEL SATISFACTORY TO THE TRUSTEE AS DESCRIBED ABOVE SHALL BE VOID AND OF NO EFFECT.]

Certificate No.                                        :

Cut-off  Date                                          :

First Distribution Date                                :

Initial Certificate Balance of
this Certificate
("Denomination")                                       :            $

Initial Certificate Balances of
all Certificates of this Class                         :            $

CUSIP                                                  :

Interest Rate                                          :            %

Maturity Date                                          :

<div align="center">

INDYMAC MBS, INC.
Residential Asset Securitization Trust 200_-_
Mortgage Pass-Through Certificates, Series 200_-_
Class [___]

</div>

evidencing a percentage interest in the distributions allocable to the Certificates of the above-referenced Class with respect to a Trust Fund consisting primarily of a pool of conventional mortgage loans (the "Mortgage Loans") secured by first liens on one- to four-family residential properties.

<div align="center">

IndyMac MBS, Inc., as Depositor

</div>

Principal in respect of this Certificate is distributable monthly as set forth herein or in the Agreement (defined below).  Accordingly, the Certificate Balance at any time may be less than the Certificate Balance as set forth herein.  This Certificate does not evidence an obligation of, or an interest in, and is not guaranteed by the Depositor, the Seller, the Master Servicer or the Trustee referred to below or any of their respective affiliates.  Neither this Certificate nor the Mortgage Loans are guaranteed or insured by any governmental agency or instrumentality.

This certifies that _____ is the registered owner of the Percentage Interest evidenced by this Certificate (obtained by dividing the denomination of this Certificate by the aggregate Initial Certificate Balances of all Certificates of the Class to which this Certificate belongs) in certain monthly distributions with respect to a Trust Fund consisting primarily of the Mortgage Loans deposited by IndyMac MBS, Inc. (the "Depositor").  The Trust Fund was created pursuant to a Pooling and Servicing Agreement dated as of the Cut-off Date specified above (the "Agreement") among the Depositor, IndyMac Bank, F.S.B., as seller (in such capacity, the "Seller") and as master servicer (in such capacity, the "Master Servicer"), and Deutsche Bank National Trust Company, as trustee (the "Trustee").  To the extent not defined herein, the capitalized terms used herein have the meanings assigned in the Agreement.  This Certificate is issued under and is subject to the terms, provisions and conditions of the Agreement, to which Agreement the Holder of this Certificate by virtue of the acceptance hereof assents and by which such Holder is bound.

**Exhibit 6, Page 420**

Reference is hereby made to the further provisions of this Certificate set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

This Certificate shall not be entitled to any benefit under the Agreement or be valid for any purpose unless manually countersigned by an authorized signatory of the Trustee.

Exhibit 6, Page 421

IN WITNESS WHEREOF, the Trustee has caused this Certificate to be duly executed.

Dated: _____, 20__

> DEUTSCHE BANK NATIONAL TRUST COMPANY,
>    as Trustee
>
>
> By _____

Countersigned:

By _____
    Authorized Signatory of
    DEUTSCHE BANK NATIONAL TRUST COMPANY,
    as Trustee

Exhibit 6, Page 422

EXHIBIT B

[FORM OF SUBORDINATED CERTIFICATE]

[UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.]

SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES, THIS CERTIFICATE IS A "REGULAR INTEREST" IN A "REAL ESTATE MORTGAGE INVESTMENT CONDUIT," AS THOSE TERMS ARE DEFINED, RESPECTIVELY, IN SECTIONS 860G AND 860D OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE").

THIS CERTIFICATE IS SUBORDINATED IN RIGHT OF PAYMENT TO CERTAIN CERTIFICATES AS DESCRIBED IN THE AGREEMENT REFERRED TO HEREIN.

[THIS CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT").  ANY RESALE OR TRANSFER OF THIS CERTIFICATE WITHOUT REGISTRATION THEREOF UNDER THE ACT MAY ONLY BE MADE IN A TRANSACTION EXEMPTED FROM THE REGISTRATION REQUIREMENTS OF THE ACT AND IN ACCORDANCE WITH THE PROVISIONS OF THE AGREEMENT REFERRED TO HEREIN.]

[NEITHER THIS CERTIFICATE NOR ANY INTEREST HEREIN MAY BE TRANSFERRED UNLESS THE TRANSFEREE REPRESENTS TO THE TRUSTEE THAT SUCH TRANSFEREE IS NOT AND IS NOT INVESTING ON BEHALF OF OR WITH PLAN ASSETS OF AN EMPLOYEE BENEFIT PLAN SUBJECT TO THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA"), OR A PLAN SUBJECT TO SECTION 4975 OF THE CODE, OR, DELIVERS A REPRESENTATION IN ACCORDANCE WITH THE PROVISIONS OF THE AGREEMENT REFERRED TO HEREIN, OR DELIVERS TO THE TRUSTEE AN OPINION OF COUNSEL IN ACCORDANCE WITH THE PROVISIONS OF THE AGREEMENT REFERRED TO HEREIN.  NOTWITHSTANDING ANYTHING ELSE TO THE CONTRARY HEREIN, ANY PURPORTED TRANSFER OF THIS CERTIFICATE TO OR ON BEHALF OF AN EMPLOYEE BENEFIT PLAN SUBJECT TO ERISA OR TO SECTION 4975 OF THE CODE WITHOUT THE OPINION OF COUNSEL SATISFACTORY TO THE TRUSTEE AS DESCRIBED ABOVE SHALL BE VOID AND OF NO EFFECT.]

Exhibit 6, Page 423

Certificate No.                                    :

Cut-off  Date                                      :

First Distribution Date                            :

Initial Certificate Balance of
this Certificate
("Denomination")                                   :          $

Initial Certificate Balances of
all Certificates of this Class                     :          $

CUSIP                                              :

<div align="center">

INDYMAC MBS, INC.

Residential Asset Securitization Trust 200_-_

Mortgage Pass-Through Certificates, Series 200_-_

Class [___]

</div>

     evidencing a percentage interest in the distributions allocable to the Certificates of the above-referenced Class with respect to a Trust Fund consisting primarily of a pool of conventional mortgage loans (the "Mortgage Loans") secured by first liens on one- to four-family residential properties.

<div align="center">

IndyMac MBS, Inc., as Depositor

</div>

Principal in respect of this Certificate is distributable monthly as set forth herein or in the Agreement (defined below).  Accordingly, the Certificate Balance at any time may be less than the Certificate Balance as set forth herein.  This Certificate does not evidence an obligation of, or an interest in, and is not guaranteed by the Depositor, the Seller, the Master Servicer or the Trustee referred to below or any of their respective affiliates.  Neither this Certificate nor the Mortgage Loans are guaranteed or insured by any governmental agency or instrumentality.

This certifies that _____ is the registered owner of the Percentage Interest evidenced by this Certificate (obtained by dividing the denomination of this Certificate by the aggregate Initial Certificate Balances of the denominations of all Certificates of the Class to which this Certificate belongs) in certain monthly distributions with respect to a Trust Fund consisting primarily of the Mortgage Loans deposited by IndyMac MBS, Inc. (the "Depositor").  The Trust Fund was created pursuant to a Pooling and Servicing Agreement dated as of the Cut-off Date specified above (the "Agreement") among the Depositor, IndyMac Bank, F.S.B., as seller (in such capacity, the "Seller"), and as master servicer (in such capacity, the "Master Servicer"), and Deutsche Bank National Trust Company, as trustee (the "Trustee").  To the extent not defined herein, the capitalized terms used herein have the meanings assigned in the Agreement.  This Certificate is issued under and is subject to the terms, provisions and conditions of the Agreement, to which Agreement the Holder of this Certificate by virtue of the acceptance hereof assents and by which such Holder is bound.

[No transfer of a Certificate of this Class shall be made unless such transfer is made pursuant to an effective registration statement under the Securities Act and any applicable state securities laws or is

exempt from the registration requirements under said Act and such laws.  In the event that a transfer is to be made in reliance upon an exemption from the Securities Act and such laws, in order to assure compliance with the Securities Act and such laws, the Certificateholder desiring to effect such transfer and such Certificateholder's prospective transferee shall each certify to the Trustee in writing the facts surrounding the transfer.  In the event that such a transfer is to be made within three years from the date of the initial issuance of Certificates pursuant hereto, there shall also be delivered (except in the case of a transfer pursuant to Rule 144A of the Securities Act) to the Trustee an Opinion of Counsel that such transfer may be made pursuant to an exemption from the Securities Act and such state securities laws, which Opinion of Counsel shall not be obtained at the expense of the Trustee, the Seller, the Master Servicer or the Depositor.  The Holder hereof desiring to effect such transfer shall, and does hereby agree to, indemnify the Trustee and the Depositor against any liability that may result if the transfer is not so exempt or is not made in accordance with such federal and state laws.]

[No transfer of a Certificate of this Class shall be made unless the Trustee shall have received either (i) a representation [letter] from the transferee of such Certificate, acceptable to and in form and substance satisfactory to the Trustee, to the effect that such transferee is not an employee benefit plan or other benefit plan subject to Section 406 of ERISA or Section 4975 of the Code, nor a person acting on behalf of or investing plan assets of any such plan, which representation letter shall not be an expense of the Trustee or the Master Servicer, (ii) if the purchaser is an insurance company, a representation that the purchaser is an insurance company which is purchasing such Certificates with funds contained in an "insurance company general account" (as such term is defined in Section V(e) of Prohibited Transaction Class Exemption 95-60 ("PTCE 95-60")) and that the purchase and holding of such Certificates are covered under Sections I and III of PTCE 95-60 or (iii) in the case of any such Certificate presented for registration in the name of an employee benefit plan subject to ERISA or Section 4975 of the Code (or comparable provisions of any subsequent enactments), or a trustee of any such plan or any other person acting on behalf of any such plan, an Opinion of Counsel satisfactory to the Trustee and the Master Servicer to the effect that the purchase or holding of such Certificate will not result in a nonexempt prohibited transaction under ERISA or Section 4975 of the Code and will not subject the Trustee or the Master Servicer to any obligation in addition to those undertaken in the Agreement, which Opinion of Counsel shall not be an expense of the Trustee, the Master Servicer or the Trust Fund.  Notwithstanding anything else to the contrary herein, any purported transfer of a Certificate of this Class to or on behalf of an employee benefit plan subject to ERISA or to Section 4975 of the Code without the opinion of counsel satisfactory to the Trustee as described above shall be void and of no effect.]

Reference is hereby made to the further provisions of this Certificate set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

This Certificate shall not be entitled to any benefit under the Agreement or be valid for any purpose unless manually countersigned by an authorized signatory of the Trustee.

B-3

Exhibit 6, Page 425

IN WITNESS WHEREOF, the Trustee has caused this Certificate to be duly executed.

Dated: _____, 20__

DEUTSCHE BANK NATIONAL TRUST COMPANY,
   as Trustee

By _____

Countersigned:

By _____
   Authorized Signatory of
   DEUTSCHE BANK NATIONAL TRUST COMPANY,
   as Trustee

Exhibit 6, Page 426

EXHIBIT C

[FORM OF CLASS A-R CERTIFICATE]

SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES, THIS CERTIFICATE IS A "RESIDUAL INTEREST" IN A "REAL ESTATE MORTGAGE INVESTMENT CONDUIT," AS THOSE TERMS ARE DEFINED, RESPECTIVELY, IN SECTIONS 860G AND 860D OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE").

NEITHER THIS CERTIFICATE NOR ANY INTEREST HEREIN MAY BE TRANSFERRED UNLESS THE PROPOSED TRANSFEREE DELIVERS TO THE TRUSTEE A TRANSFER AFFIDAVIT IN ACCORDANCE WITH THE PROVISIONS OF THE AGREEMENT REFERRED TO HEREIN.

NEITHER THIS CERTIFICATE NOR ANY INTEREST HEREIN MAY BE TRANSFERRED UNLESS THE TRANSFEREE REPRESENTS TO THE TRUSTEE THAT SUCH TRANSFEREE IS NOT AND IS NOT INVESTING ON BEHALF OF OR WITH PLAN ASSETS OF AN EMPLOYEE BENEFIT PLAN SUBJECT TO THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA"), OR A PLAN SUBJECT TO SECTION 4975 OF THE CODE, OR, IF SUCH PURCHASER IS AN INSURANCE COMPANY, DELIVERS A REPRESENTATION IN ACCORDANCE WITH THE PROVISIONS OF THE AGREEMENT REFERRED TO HEREIN, OR DELIVERS TO THE TRUSTEE AN OPINION OF COUNSEL IN ACCORDANCE WITH THE PROVISIONS OF THE AGREEMENT REFERRED TO HEREIN.  NOTWITHSTANDING ANYTHING ELSE TO THE CONTRARY HEREIN, ANY PURPORTED TRANSFER OF THIS CERTIFICATE TO OR ON BEHALF OF AN EMPLOYEE BENEFIT PLAN SUBJECT TO ERISA OR TO SECTION 4975 OF THE CODE WITHOUT THE OPINION OF COUNSEL SATISFACTORY TO THE TRUSTEE AS DESCRIBED ABOVE SHALL BE VOID AND OF NO EFFECT.

Exhibit 6, Page 427

| | | |
|---|---|---|
| Certificate No. | : | |
| Cut-off  Date | : | |
| First Distribution Date | : | |
| Initial Certificate Balance of this Certificate ("Denomination") | : | $ |
| Initial Certificate Balances of all Certificates of this Class | : | $ |
| CUSIP | : | |

<div align="center">

**INDYMAC MBS, INC.**

Residential Asset Securitization Trust 200_-_

Mortgage Pass-Through Certificates, Series 200_-_

</div>

evidencing the distributions allocable to the Class A-R Certificates with respect to a Trust Fund consisting primarily of a pool of conventional mortgage loans (the "Mortgage Loans") secured by first liens on one- to four-family residential properties.

<div align="center">

**IndyMac MBS, Inc., as Depositor**

</div>

Principal in respect of this Certificate is distributable monthly as set forth herein or in the Agreement (defined below).  Accordingly, the Certificate Balance at any time may be less than the Certificate Balance as set forth herein.  This Certificate does not evidence an obligation of, or an interest in, and is not guaranteed by the Depositor, the Seller, the Master Servicer or the Trustee referred to below or any of their respective affiliates.  Neither this Certificate nor the Mortgage Loans are guaranteed or insured by any governmental agency or instrumentality.

This certifies that _____ is the registered owner of the Percentage Interest (obtained by dividing the denomination of this Certificate by the aggregate Initial Certificate Balances of the denominations of all Certificates of the Class to which this Certificate belongs) in certain monthly distributions with respect to a Trust Fund consisting of the Mortgage Loans deposited by IndyMac MBS, Inc. (the "Depositor").  The Trust Fund was created pursuant to a Pooling and Servicing Agreement dated as of the Cut-off Date specified above (the "Agreement") among the Depositor, IndyMac Bank, F.S.B., as seller (in such capacity, the "Seller") and as master servicer (in such capacity, the "Master Servicer"), and Deutsche Bank National Trust Company, as trustee (the "Trustee").  To the extent not defined herein, the capitalized terms used herein have the meanings assigned in the Agreement.  This Certificate is issued under and is subject to the terms, provisions and conditions of the Agreement, to which Agreement the Holder of this Certificate by virtue of the acceptance hereof assents and by which such Holder is bound.

Any distribution of the proceeds of any remaining assets of the Trust Fund will be made only upon presentation and surrender of this Class A-R Certificate at the Corporate Trust Office or the office or agency maintained by the Trustee in New York, New York.

<div align="center">C-2</div>

<div align="right">**Exhibit 6, Page 428**</div>

No transfer of a Class A-R Certificate shall be made unless the Trustee shall have received either (i) a representation letter from the transferee of such Certificate, acceptable to and in form and substance satisfactory to the Trustee, to the effect that such transferee is not an employee benefit plan subject to Section 406 of ERISA or Section 4975 of the Code, nor a person investing on behalf of or with plan assets of any such plan, which representation letter shall not be an expense of the Trustee or the Master Servicer, (ii) if the purchaser is an insurance company, a representation that the purchaser is an insurance company which is purchasing such Certificate with funds contained in an "insurance company general account" (as such term is defined in Section V(e) of Prohibited Transaction Class Exemption 95-60 ("PTCE 95-60")) and that the purchase and holding of such Certificate are covered under Sections I and III of PTCE 95-60 or (iii) in the case of any such Certificate presented for registration in the name of an employee benefit plan subject to ERISA or Section 4975 of the Code (or comparable provisions of any subsequent enactments), or a trustee of any such plan or any other person acting on behalf of any such plan, an Opinion of Counsel satisfactory to the Trustee and the Master Servicer to the effect that the purchase or holding of such Class A-R Certificate will not result in a nonexempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code and will not subject the Trustee or the Master Servicer to any obligation in addition to those undertaken in the Agreement, which Opinion of Counsel shall not be an expense of the Trustee, the Master Servicer or the Trust Fund.  Such representation shall be deemed to have been made to the Trustee by the Transferee's acceptance of this Class A-R Certificate and by a beneficial owner's acceptance of its interest in such Certificate.  Notwithstanding anything else to the contrary herein, any purported transfer of a Class A-R Certificate to or on behalf of an employee benefit plan subject to ERISA or to Section 4975 of the Code without the opinion of counsel satisfactory to the Trustee as described above shall be void and of no effect.

Each Holder of this Class A-R Certificate will be deemed to have agreed to be bound by the restrictions of the Agreement, including but not limited to the restrictions that (i) each person holding or acquiring any Ownership Interest in this Class A-R Certificate must be a Permitted Transferee, (ii) no Ownership Interest in this Class A-R Certificate may be transferred without delivery to the Trustee of (a) a transfer affidavit of the proposed transferee and (b) a transfer certificate of the transferor, each of such documents to be in the form described in the Agreement, (iii) each person holding or acquiring any Ownership Interest in this Class A-R Certificate must agree to require a transfer affidavit and to deliver a transfer certificate to the Trustee as required pursuant to the Agreement, (iv) each person holding or acquiring an Ownership Interest in this Class A-R Certificate must agree not to transfer an Ownership Interest in this Class A-R Certificate if it has actual knowledge that the proposed transferee is not a Permitted Transferee and (v) any attempted or purported transfer of any Ownership Interest in this Class A-R Certificate in violation of such restrictions will be absolutely null and void and will vest no rights in the purported transferee.

Reference is hereby made to the further provisions of this Certificate set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

This Certificate shall not be entitled to any benefit under the Agreement or be valid for any purpose unless manually countersigned by an authorized signatory of the Trustee.

IN WITNESS WHEREOF, the Trustee has caused this Certificate to be duly executed.

Dated: _____, 20__

DEUTSCHE BANK NATIONAL TRUST COMPANY,
    as Trustee

By _____

Countersigned:

By _____
    Authorized Signatory of
    DEUTSCHE BANK NATIONAL TRUST COMPANY,
    as Trustee

C-4

Exhibit 6, Page 430

EXHIBIT D

[FORM OF NOTIONAL AMOUNT CERTIFICATE]

[UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.]

SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES, THIS CERTIFICATE IS A "REGULAR INTEREST" IN A "REAL ESTATE MORTGAGE INVESTMENT CONDUIT," AS THOSE TERMS ARE DEFINED, RESPECTIVELY, IN SECTIONS 860G AND 860D OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE").

[UNTIL THIS CERTIFICATE HAS BEEN THE SUBJECT OF AN ERISA-QUALIFYING UNDERWRITING, NEITHER THIS CERTIFICATE NOR ANY INTEREST HEREIN MAY BE TRANSFERRED UNLESS THE TRANSFEREE DELIVERS TO THE TRUSTEE EITHER A REPRESENTATION LETTER TO THE EFFECT THAT SUCH TRANSFEREE IS NOT AND IS NOT INVESTING ON BEHALF OF OR WITH PLAN ASSETS OF AN EMPLOYEE BENEFIT PLAN SUBJECT TO THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED, OR A PLAN SUBJECT TO SECTION 4975 OF THE CODE, OR AN OPINION OF COUNSEL IN ACCORDANCE WITH THE PROVISIONS OF THE AGREEMENT REFERRED TO HEREIN.  NOTWITHSTANDING ANYTHING ELSE TO THE CONTRARY HEREIN, ANY PURPORTED TRANSFER OF THIS CERTIFICATE TO OR ON BEHALF OF AN EMPLOYEE BENEFIT PLAN SUBJECT TO ERISA OR TO SECTION 4975 OF THE CODE WITHOUT THE OPINION OF COUNSEL SATISFACTORY TO THE TRUSTEE AS DESCRIBED ABOVE SHALL BE VOID AND OF NO EFFECT.]

THIS CERTIFICATE HAS NO PRINCIPAL BALANCE AND IS NOT ENTITLED TO ANY DISTRIBUTIONS IN RESPECT OF PRINCIPAL.

D-1

Exhibit 6, Page 431

| | | |
|---|---|---|
| Certificate No. | : | |
| Cut-off  Date | : | |
| First Distribution Date | : | |
| Initial Notional Amount of this Certificate ("Denomination") | : | $ |
| Initial Notional Amount of all Certificates of this Class | : | $ |
| CUSIP | : | |
| Interest Rate | : | % |
| Maturity Date | : | |

INDYMAC MBS, INC.
Residential Asset Securitization Trust 200_-_
Mortgage Pass-Through Certificates, Series 200_-_
Class [__]

evidencing a percentage interest in the distributions allocable to the Certificates of the above-referenced Class with respect to a Trust Fund consisting primarily of a pool of conventional mortgage loans (the "Mortgage Loans") secured by first liens on one- to four-family residential properties.

IndyMac MBS, Inc., as Depositor

This Certificate does not evidence an obligation of, or an interest in, and is not guaranteed by the Depositor, the Seller, the Master Servicer or the Trustee referred to below or any of their respective affiliates.  Neither this Certificate nor the Mortgage Loans are guaranteed or insured by any governmental agency or instrumentality.

Exhibit 6, Page 432

This certifies that _____ is the registered owner of the Percentage Interest evidenced by this Certificate (obtained by dividing the denomination of this Certificate by the aggregate Initial Notional Amounts of all Certificates of the Class to which this Certificate belongs) in certain monthly distributions with respect to a Trust Fund consisting primarily of the Mortgage Loans deposited by IndyMac MBS, Inc. (the "Depositor").  The Trust Fund was created pursuant to a Pooling and Servicing Agreement dated as of the Cut-off Date specified above (the "Agreement") among the Depositor, IndyMac Bank, F.S.B., as seller (in such capacity, the "Seller") and as master servicer (in such capacity, the "Master Servicer"), and Deutsche Bank National Trust Company, as trustee (the "Trustee").  To the extent not defined herein, the capitalized terms used herein have the meanings assigned in the Agreement.  This Certificate is issued under and is subject to the terms, provisions and conditions of the Agreement, to which Agreement the Holder of this Certificate by virtue of the acceptance hereof assents and by which such Holder is bound.

[Until this certificate has been the subject of an ERISA-Qualifying Underwriting, no transfer of a Certificate of this Class shall be made unless the Trustee shall have received either (i) a representation letter from the transferee of such Certificate, acceptable to and in form and substance satisfactory to the Trustee, to the effect that such transferee is not an employee benefit plan subject to Section 406 of ERISA or Section 4975 of the Code, nor a person investing on behalf of or with plan assets of any such plan, which representation letter shall not be an expense of the Trustee or the Master Servicer, or (ii) in the case of any such Certificate presented for registration in the name of an employee benefit plan subject to ERISA or Section 4975 of the Code (or comparable provisions of any subsequent enactments), or a trustee of any such plan or any other person acting on behalf of any such plan, an Opinion of Counsel satisfactory to the Trustee and the Master Servicer to the effect that the purchase or holding of such Certificate will not result in a nonexempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code and will not subject the Trustee or the Master Servicer to any obligation in addition to those undertaken in the Agreement, which Opinion of Counsel shall not be an expense of the Trustee, the Master Servicer, or the Trust Fund.  Notwithstanding anything else to the contrary herein, until this certificate has been the subject of an ERISA-Qualifying Underwriting, any purported transfer of a Certificate of this Class to or on behalf of an employee benefit plan subject to ERISA or to the Code without the opinion of counsel satisfactory to the Trustee as described above shall be void and of no effect.]

Reference is hereby made to the further provisions of this Certificate set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

This Certificate shall not be entitled to any benefit under the Agreement or be valid for any purpose unless manually countersigned by an authorized signatory of the Trustee.

D-3

**Exhibit 6, Page 433**

IN WITNESS WHEREOF, the Trustee has caused this Certificate to be duly executed.

Dated: _____, 20__

DEUTSCHE BANK NATIONAL TRUST COMPANY,
    as Trustee

By _____

Countersigned:

By _____
    Authorized Signatory of
    DEUTSCHE BANK NATIONAL TRUST COMPANY,
    as Trustee

Exhibit 6, Page 434

EXHIBIT E

[Form of Reverse of Certificates]

INDYMAC MBS, INC.
Residential Asset Securitization Trust 200_-_
Mortgage Pass-Through Certificates, Series 200_-_

This Certificate is one of a duly authorized issue of Certificates designated as IndyMac MBS, Inc. Mortgage Pass-Through Certificates, of the Series specified on the face hereof (herein collectively called the "Certificates"), and representing a beneficial ownership interest in the Trust Fund created by the Agreement.

The Certificateholder, by its acceptance of this Certificate, agrees that it will look solely to the funds on deposit in the Distribution Account for payment hereunder and that the Trustee is not liable to the Certificateholders for any amount payable under this Certificate or the Agreement or, except as expressly provided in the Agreement, subject to any liability under the Agreement.

This Certificate does not purport to summarize the Agreement and reference is made to the Agreement for the interests, rights and limitations of rights, benefits, obligations and duties evidenced thereby, and the rights, duties and immunities of the Trustee.

Pursuant to the terms of the Agreement, a distribution will be made on the 25th day of each month or, if such 25th day is not a Business Day, the Business Day immediately following (the "Distribution Date"), commencing on the first Distribution Date specified on the face hereof, to the Person in whose name this Certificate is registered at the close of business on the applicable Record Date in an amount equal to the product of the Percentage Interest evidenced by this Certificate and the amount required to be distributed to Holders of Certificates of the Class to which this Certificate belongs on such Distribution Date pursuant to the Agreement.  The Record Date applicable to each Distribution Date is the last Business Day of the month next preceding the month of such Distribution Date.

Distributions on this Certificate shall be made by wire transfer of immediately available funds to the account of the Holder hereof at a bank or other entity having appropriate facilities therefor, if such Certificateholder shall have so notified the Trustee in writing at least five Business Days prior to the Record Date and such Certificateholder shall satisfy the conditions to receive such form of payment set forth in the Agreement, or, if not, by check mailed by first class mail to the address of such Certificateholder appearing in the Certificate Register.  The final distribution on each Certificate will be made in like manner, but only upon presentment and surrender of such Certificate at the Corporate Trust Office or such other location specified in the notice to Certificateholders of such final distribution.

The Agreement permits, with certain exceptions therein provided, the amendment thereof and the modification of the rights and obligations of the Trustee and the rights of the Certificateholders under the Agreement at any time by the Depositor, the Master Servicer and the Trustee with the consent of the Holders of Certificates affected by such amendment evidencing the requisite Percentage Interest, as provided in the Agreement.  Any such consent by the Holder of this Certificate shall be conclusive and binding on such Holder and upon all future Holders of this Certificate and of any Certificate issued upon the transfer hereof or in exchange therefor or in lieu hereof whether or not notation of such consent is made upon this Certificate.  The Agreement also permits the amendment thereof, in certain limited circumstances, without the consent of the Holders of any of the Certificates.

Exhibit 6, Page 435

As provided in the Agreement and subject to certain limitations therein set forth, the transfer of this Certificate is registrable in the Certificate Register of the Trustee upon surrender of this Certificate for registration of transfer at the Corporate Trust Office or the office or agency maintained by the Trustee in New York, New York, accompanied by a written instrument of transfer in form satisfactory to the Trustee and the Certificate Registrar duly executed by the holder hereof or such holder's attorney duly authorized in writing, and thereupon one or more new Certificates of the same Class in authorized denominations and evidencing the same aggregate Percentage Interest in the Trust Fund will be issued to the designated transferee or transferees.

The Certificates are issuable only as registered Certificates without coupons in denominations specified in the Agreement.  As provided in the Agreement and subject to certain limitations therein set forth, Certificates are exchangeable for new Certificates of the same Class in authorized denominations and evidencing the same aggregate Percentage Interest, as requested by the Holder surrendering the same.

No service charge will be made for any such registration of transfer or exchange, but the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

The Depositor, the Master Servicer, the Seller and the Trustee and any agent of the Depositor or the Trustee may treat the Person in whose name this Certificate is registered as the owner hereof for all purposes, and neither the Depositor, the Trustee, nor any such agent shall be affected by any notice to the contrary.

On any Distribution Date on which the aggregate Stated Principal Balance of the Mortgage Loans in the mortgage pool is less than 10% of the Cut-off Date Pool Principal Balance, the Master Servicer will have the option to repurchase, in whole, from the Trust Fund all remaining Mortgage Loans in the mortgage pool and all property acquired in respect of the Mortgage Loans in the mortgage pool at a purchase price determined as provided in the Agreement.  In the event that no such optional termination occurs, the obligations and responsibilities created by the Agreement will terminate upon the later of the maturity or other liquidation (or any advance with respect thereto) of the last Mortgage Loan remaining in the Trust Fund or the disposition of all property in respect thereof and the distribution to Certificateholders of all amounts required to be distributed pursuant to the Agreement.  In no event, however, will the trust created by the Agreement continue beyond the expiration of 21 years from the death of the last survivor of the descendants living at the date of the Agreement of a certain person named in the Agreement.

Any term used herein that is defined in the Agreement shall have the meaning assigned in the Agreement, and nothing herein shall be deemed inconsistent with that meaning.

E-2

**Exhibit 6, Page 436**

## ASSIGNMENT

FOR VALUE RECEIVED, the undersigned hereby sell(s), assign(s) and transfer(s) unto

_____

_____

_____

(Please print or typewrite name and address including postal zip code of assignee)

the Percentage Interest evidenced by the within Certificate and hereby authorizes the transfer of registration of such Percentage Interest to assignee on the Certificate Register of the Trust Fund.

I (We) further direct the Trustee to issue a new Certificate of a like denomination and Class, to the above named assignee and deliver such Certificate to the following address:

_____.

Dated: _____

_____

Signature by or on behalf of assignor

## DISTRIBUTION INSTRUCTIONS

The assignee should include the following for purposes of distribution:

Distributions shall be made, by wire transfer or otherwise, in immediately available funds to____

_____,

for the account of _____,

account number _____, or, if mailed by check, to_____

_____

_____.

Applicable statements should be mailed to _____

_____

_____

This information is provided by _____,

the assignee named above, or _____,

as its agent.

Exhibit 6, Page 437

STATE OF CALIFORNIA        )

                               : ss.:

COUNTY OF _____   )

       On the _th day of _____, 20_ before me, a notary public in and for said State, personally appeared _____, known to me who, being by me duly sworn, did depose and say that he executed the foregoing instrument.

                               _____

                                      Notary Public

[Notarial Seal]

Exhibit 6, Page 438

EXHIBIT F

[FORM OF CLASS P CERTIFICATE]

SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES, THIS CERTIFICATE IS A "REGULAR INTEREST" IN A "REAL ESTATE MORTGAGE INVESTMENT CONDUIT," AS THOSE TERMS ARE DEFINED, RESPECTIVELY, IN SECTIONS 860G AND 860D OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE").

THIS CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT").  ANY RESALE OR TRANSFER OF THIS CERTIFICATE WITHOUT REGISTRATION THEREOF UNDER THE ACT MAY ONLY BE MADE IN A TRANSACTION EXEMPTED FROM THE REGISTRATION REQUIREMENTS OF THE ACT AND IN ACCORDANCE WITH THE PROVISIONS OF THE AGREEMENT REFERRED TO HEREIN.

NEITHER THIS CERTIFICATE NOR ANY INTEREST HEREIN MAY BE TRANSFERRED UNLESS THE TRANSFEREE DELIVERS TO THE TRUSTEE EITHER A REPRESENTATION LETTER TO THE EFFECT THAT SUCH TRANSFEREE IS NOT AND IS NOT INVESTING ON BEHALF OF OR WITH PLAN ASSETS OF AN EMPLOYEE BENEFIT PLAN SUBJECT TO THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA"), OR A PLAN SUBJECT TO SECTION 4975 OF THE CODE, OR, IF THE CERTIFICATE HAS BEEN THE SUBJECT OF AN ERISA-QUALIFYING UNDERWRITING AND THE PURCHASER IS AN INSURANCE COMPANY, A REPRESENTATION IN ACCORDANCE WITH THE AGREEMENT REFERRED TO HEREIN, OR AN OPINION OF COUNSEL IN ACCORDANCE WITH THE PROVISIONS OF THE AGREEMENT REFERRED TO HEREIN.   NOTWITHSTANDING ANYTHING ELSE TO THE CONTRARY HEREIN, ANY PURPORTED TRANSFER OF THIS CERTIFICATE TO OR ON BEHALF OF AN EMPLOYEE BENEFIT PLAN SUBJECT TO ERISA OR TO SECTION 4975 OF THE CODE WITHOUT THE OPINION OF COUNSEL SATISFACTORY TO THE TRUSTEE AS DESCRIBED ABOVE SHALL BE VOID AND OF NO EFFECT.

Exhibit 6, Page 439

| | | |
|---|---|---|
| Certificate No. | : | |
| Cut-off Date | : | |
| First Distribution Date | : | |
| Initial Certificate Balance of this Certificate ("Denomination") | : | $ |
| Initial Certificate Balances of all Certificates of this Class | : | $ |
| CUSIP | : | |
| Interest Rate | : | |
| Maturity Date | : | |

<div align="center">

INDYMAC MBS, INC.
Residential Asset Securitization Trust 200_-__
Mortgage Pass-Through Certificates, Series 200_-__

Class P

</div>

evidencing a percentage interest in the distributions allocable to the Certificates of the above-referenced Class with respect to a Trust Fund consisting primarily of a pool of conventional mortgage loans (the "Mortgage Loans") secured by first liens on one- to four-family residential properties.

Distributors in respect of this Certificate are distributable monthly as set forth herein.  Accordingly, the Certificate Balance at any time may be less than the Certificate Balance as set forth herein.  This Certificate does not evidence an obligation of, or an interest in, and is not guaranteed by the Depositor, the Seller, the Master Servicer or the Trustee referred to below or any of their respective affiliates. Neither this Certificate nor the Mortgage Loans are guaranteed or insured by any governmental agency or instrumentality.

This certifies that _____ is the registered owner of the Percentage Interest evidenced by this Certificate (obtained by dividing the denomination of this Certificate by the aggregate of the denominations of all Certificates of the Class to which this Certificate belongs) in certain monthly distributions with respect to a Trust Fund consisting primarily of the Mortgage Loans deposited by IndyMac MBS, Inc. (the "Depositor").  The Trust Fund was created pursuant to a Pooling and Servicing Agreement dated as of the Cut-off Date specified above (the "Agreement") among the Depositor, IndyMac Bank, F.S.B., as seller and master servicer (the "Seller" or the "Master Servicer", as appropriate),  and Deutsche Bank National Trust Company, as trustee (the "Trustee").  To the extent not defined herein, the capitalized terms used herein have the meanings assigned in the Agreement.  This

Exhibit 6, Page 440

Certificate is issued under and is subject to the terms, provisions and conditions of the Agreement, to which Agreement the Holder of this Certificate by virtue of the acceptance hereof assents and by which such Holder is bound.

The Certificates are limited in right of payment to certain collections and recoveries respecting the Mortgage Loans, all as more specifically set forth herein and in the Agreement.  As provided in the Agreement, withdrawals from the Collection Account and the Distribution Account may be made from time to time for purposes other than distributions to Certificateholders, such purposes including reimbursement of advances made, or certain expenses incurred, with respect to the Mortgage Loans.

This Certificate does not have a Certificate Balance or Pass-Through Rate and will be entitled to distributions only to the extent set forth in the Agreement.  In addition, any distribution of the proceeds of any remaining assets of the Trust will be made only upon presentment and surrender of this Certificate at the Corporate Trust Office or the office or agency maintained by the Trustee.

No transfer of a Certificate of this Class shall be made unless such disposition is exempt from the registration requirements of the Securities Act of 1933, as amended (the "1933 Act"), and any applicable state securities laws or is made in accordance with the 1933 Act and such laws.  In the event of any such transfer, the Trustee shall require the transferor to execute a transferor certificate (in substantially the form attached to the Pooling and Servicing Agreement) and deliver either (i) an Investment Letter  or the Rule 144A Letter, in either case substantially in the form attached to the Agreement, or (ii) a written Opinion of Counsel to the Trustee that such transfer may be made pursuant to an exemption, describing the applicable exemption and the basis therefor, from the 1933 Act or is being made pursuant to the 1933 Act, which Opinion of Counsel shall be an expense of the transferor.

No transfer of a Certificate of this Class shall be made unless the Trustee shall have received either (i) a representation letter from the transferee of such Certificate, acceptable to and in form and substance satisfactory to the Trustee, to the effect that such transferee is not an employee benefit plan subject to Section 406 of ERISA or Section 4975 of the Code, nor a person acting on behalf of or investing plan assets of any such plan, which representation letter shall not be an expense of the Trustee or (y) if the Certificate has been the subject of an ERISA-Qualifying Underwriting, that the transferee is purchasing such Certificate with funds contained in an "insurance company general account" (as such term is defined in Section V(e) of Prohibited Transaction Class Exemption 95-60 ("PTCE 95-60")) and that the purchase and holding of such Certificate are covered under Sections I and III of PTCE 95-60, or (ii) in the case of a Certificate presented for registration in the name of an employee benefit plan subject to ERISA, or a plan or arrangement subject to Section 4975 of the Code (or comparable provisions of any subsequent enactments), or a trustee of any such plan or any other person acting on behalf of any such plan or arrangement or using such plan's or arrangement's assets, an Opinion of Counsel satisfactory to the Trustee and the Master Servicer, which Opinion of Counsel shall not be an expense of the Trustee, the Master Servicer or the Trust Fund, addressed to the Trustee, to the effect that the purchase or holding of such Certificate will not result in a nonexempt prohibited transaction under ERISA or Section 4975 of the Code and will not subject the Trustee or the Master Servicer to any obligation in addition to those expressly undertaken in this Agreement or to any liability.

Reference is hereby made to the further provisions of this Certificate set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

This Certificate shall not be entitled to any benefit under the Agreement or be valid for any purpose unless manually countersigned by an authorized signatory of the Trustee.

<p style="text-align:center">*      *      *</p>

<p style="text-align:center">F-3</p>

<p style="text-align:right">Exhibit 6, Page 441</p>

IN WITNESS WHEREOF, the Trustee has caused this Certificate to be duly executed.

Dated: _____, _____

<div style="text-align:right">

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Trustee


By  _____

</div>

Countersigned:


By _____
      Authorized Signatory of
      DEUTSCHE BANK NATIONAL TRUST
      COMPANY, as Trustee

Exhibit 6, Page 442

INDYMAC MBS, INC.
Residential Asset Securitization Trust 200_-__
Mortgage Pass-Through Certificates

This Certificate is one of a duly authorized issue of Certificates designated as IndyMac MBS, Inc. Mortgage Pass-Through Certificates, of the Series specified on the face hereof (herein collectively called the "Certificates"), and representing a beneficial ownership interest in the Trust Fund created by the Agreement.

The Certificateholder, by its acceptance of this Certificate, agrees that it will look solely to the funds on deposit in the Distribution Account for payment hereunder and that the Trustee is not liable to the Certificateholders for any amount payable under this Certificate or the Agreement or, except as expressly provided in the Agreement, subject to any liability under the Agreement.

This Certificate does not purport to summarize the Agreement and reference is made to the Agreement for the interests, rights and limitations of rights, benefits, obligations and duties evidenced thereby, and the rights, duties and immunities of the Trustee.

Pursuant to the terms of the Agreement, a distribution will be made on the 25th day of each month or, if such 25th day is not a Business Day, the Business Day immediately following (the "Distribution Date"), commencing on the first Distribution Date specified on the face hereof, to the Person in whose name this Certificate is registered at the close of business on the applicable Record Date in an amount equal to the product of the Percentage Interest evidenced by this Certificate and the amount required to be distributed to Holders of Certificates of the Class to which this Certificate belongs on such Distribution Date pursuant to the Agreement.  The Record Date applicable to each Distribution Date is the last Business Day of the month next preceding the month of such Distribution Date.

Distributions on this Certificate shall be made by wire transfer of immediately available funds to the account of the Holder hereof at a bank or other entity having appropriate facilities therefor, if such Certificateholder shall have so notified the Trustee in writing at least five Business Days prior to the related Record Date and such Certificateholder shall satisfy the conditions to receive such form of payment set forth in the Agreement, or, if not, by check mailed by first class mail to the address of such Certificateholder appearing in the Certificate Register.  The final distribution on each Certificate will be made in like manner, but only upon presentment and surrender of such Certificate at the Corporate Trust Office or such other location specified in the notice to Certificateholders of such final distribution.

The Agreement permits, with certain exceptions therein provided, the amendment thereof and the modification of the rights and obligations of the Trustee and the rights of the Certificateholders under the Agreement at any time by the Depositor, the Master Servicer and the Trustee with the consent of the Holders of Certificates affected by such amendment evidencing the requisite Percentage Interest, as provided in the Agreement.  Any such consent by the Holder of this Certificate shall be conclusive and binding on such Holder and upon all future Holders of this Certificate and of any Certificate issued upon the transfer hereof or in exchange therefor or in lieu hereof whether or not notation of such consent is made upon this Certificate.  The Agreement also permits the amendment thereof, in certain limited circumstances, without the consent of the Holders of any of the Certificates.

As provided in the Agreement and subject to certain limitations therein set forth, the transfer of this Certificate is registrable in the Certificate Register of the Trustee upon surrender of this Certificate for registration of transfer at the Corporate Trust Office or the office or agency maintained by the Trustee in New York, New York, accompanied by a written instrument of transfer in form satisfactory to the Trustee and the Certificate Registrar duly executed by the holder hereof or such holder's attorney duly authorized

Exhibit 6, Page 443

in writing, and thereupon one or more new Certificates of the same Class in authorized denominations and evidencing the same aggregate Percentage Interest in the Trust Fund will be issued to the designated transferee or transferees.

The Certificates are issuable only as registered Certificates without coupons in denominations specified in the Agreement.  As provided in the Agreement and subject to certain limitations therein set forth, Certificates are exchangeable for new Certificates of the same Class in authorized denominations and evidencing the same aggregate Percentage Interest, as requested by the Holder surrendering the same.

No service charge will be made for any such registration of transfer or exchange, but the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

The Depositor, the Master Servicer, the Seller and the Trustee and any agent of the Depositor or the Trustee may treat the Person in whose name this Certificate is registered as the owner hereof for all purposes, and neither the Depositor, the Trustee, nor any such agent shall be affected by any notice to the contrary.

On any Distribution Date on which the aggregate Stated Principal Balance of the Mortgage Loans is less than 10% of the Cut-off Date Pool Principal Balance, the Master Servicer will have the option to repurchase, in whole, from the Trust Fund all remaining Mortgage Loans and all property acquired in respect of the Mortgage Loans at a purchase price determined as provided in the Agreement.  In the event that no such optional termination occurs, the related obligations and responsibilities created by the Agreement will terminate upon the later of the maturity or other liquidation (or any advance with respect thereto) of the last Mortgage Loan remaining in the Trust Fund or the disposition of all property in respect thereof and the distribution to Certificateholders of all amounts required to be distributed pursuant to the Agreement.  In no event, however, will the trust created by the Agreement continue beyond the expiration of 21 years from the death of the last survivor of the descendants living at the date of the Agreement of a certain person named in the Agreement.

Any term used herein that is defined in the Agreement shall have the meaning assigned in the Agreement, and nothing herein shall be deemed inconsistent with that meaning.

Exhibit 6, Page 444

<u>ASSIGNMENT</u>

FOR VALUE RECEIVED, the undersigned hereby sell(s), assign(s) and transfer(s) unto
_____
_____
_____
(Please print or typewrite name and address including postal zip code of assignee)

the Percentage Interest evidenced by the within Certificate and hereby authorizes the transfer of registration of such Percentage Interest to assignee on the Certificate Register of the Trust Fund.

I (We) further direct the Trustee to issue a new Certificate of a like denomination and Class, to the above named assignee and deliver such Certificate to the following address:
_____ .

Dated: _____

_____
Signature by or on behalf of assignor

DISTRIBUTION INSTRUCTIONS

The assignee should include the following for purposes of distribution:

Distributions shall be made, by wire transfer or otherwise, in immediately available funds to ___
_____ ,
for the account of _____ ,
account number _____ , or, if mailed by check, to _____
_____ .
Applicable statements should be mailed to _____
_____ ,
_____ .

This information is provided by _____ ,
the assignee named above, or _____ ,
as its agent.

Exhibit 6, Page 445

STATE OF _____     )
                                   ) ss.:
COUNTY OF _____       )


       On the _th day of **_____**, 20_ before me, a notary public in and for said State, personally appeared _____, known to me who, being by me duly sworn, did depose and say that he executed the foregoing instrument.


                                        _____
                                                  Notary Public


[Notarial Seal]

Exhibit 6, Page 446

EXHIBIT G-1

FORM OF INITIAL CERTIFICATION OF TRUSTEE

[date]

[Depositor]

[Master Servicer]

[Seller]

_____

_____

Re:     Pooling and Servicing Agreement among IndyMac MBS, Inc., as Depositor, IndyMac Bank, F.S.B., as Seller and Master Servicer, and Deutsche Bank National Trust Company, as Trustee, Mortgage Pass-Through Certificates, Series 200 - _____

Gentlemen:

In accordance with Section 2.02 of the above-captioned Pooling and Servicing Agreement (the "Pooling and Servicing Agreement"), the undersigned, as Trustee, hereby certifies that, as to each Mortgage Loan listed in the Mortgage Loan Schedule (other than any Mortgage Loan listed in the attached schedule), it has received:

(i)  the original Mortgage Note, endorsed as provided in the following form:  "Pay to the order of _____, without recourse"; and

(ii)  a duly executed assignment of the Mortgage (which may be included in a blanket assignment or assignments); provided, however, that it has received no assignment with respect to any Mortgage for which the Mortgaged Property is located in the Commonwealth of Puerto Rico.

Based on its review and examination and only as to the foregoing documents, such documents appear regular on their face and to such Mortgage Loan.

The Trustee has made no independent examination of any documents contained in each Mortgage File beyond the review specifically required in the Pooling and Servicing Agreement.  The Trustee makes no representations as to:  (i) the validity, legality, sufficiency, enforceability or genuineness of any of the documents contained in each Mortgage File of any of the Mortgage Loans identified on the Mortgage Loan Schedule, or (ii) the collectability, insurability, effectiveness or suitability of any such Mortgage Loan.

Capitalized words and phrases used herein shall have the respective meanings assigned to them in the Pooling and Servicing Agreement.

Exhibit 6, Page 447

DEUTSCHE BANK NATIONAL TRUST COMPANY,
    as Trustee


By:_____
        Name:
        Title:

G-1-2

Exhibit 6, Page 448

EXHIBIT G-2

FORM OF DELAY DELIVERY CERTIFICATION (MORTGAGE LOANS)

[date]

[Depositor]

[Master Servicer]

[Seller]

_____

_____

> Re:   Pooling and Servicing Agreement among IndyMac MBS, Inc., as Depositor, IndyMac Bank, F.S.B., as Seller and Master Servicer, and Deutsche Bank National Trust Company, as Trustee, <u>Mortgage Pass-Through Certificates, Series 200  -          </u>

Gentlemen:

Reference is made to the Initial Certification of Trustee relating to the above-referenced series, with the schedule of exceptions attached thereto (the "Schedule A"), delivered by the undersigned, as Trustee, on the Closing Date in accordance with Section 2.02 of the above-captioned Pooling and Servicing Agreement (the "Pooling and Servicing Agreement").  The undersigned hereby certifies that, as to each Delay Delivery Mortgage Loan listed on Schedule A attached hereto (other than any Mortgage Loan paid in full or listed on Schedule B attached hereto) it has received:

(i)      the original Mortgage Note, endorsed by the Seller or the originator of such Mortgage Loan, without recourse in the following form:  "Pay to the order of _____ without recourse", with all intervening endorsements that show a complete chain of endorsement from the originator to the Seller, or, if the original Mortgage Note has been lost or destroyed and not replaced, an original lost note affidavit from the Seller, stating that the original Mortgage Note was lost or destroyed, together with a copy of the Mortgage Note;

(ii)     the original recorded Mortgage;

(iii)    a duly executed assignment of the Mortgage to "Deutsche Bank National Trust Company, as trustee under the Pooling and Servicing Agreement dated as of May 1, 2005, without recourse" (each such assignment, when duly and validly completed, to be in recordable form and sufficient to effect the assignment of and transfer to the assignee thereof, under the Mortgage to which such assignment relates);

(iv)    the original recorded assignment or assignments of the Mortgage together with all interim recorded assignments of such Mortgage;

(v)     the original or copies of each assumption, modification, written assurance or substitution agreement, if any, with evidence of recording thereon if recordation thereof is permissible under applicable law; and

Exhibit 6, Page 449

> (vi) the original or duplicate original lender's title policy and all riders, if any, thereto or, in the event such original title policy has not been received from the insurer, any one of an original title binder, an original preliminary title report or an original title commitment, or a copy thereof certified by the title company, with the original policy of title insurance to be delivered within one year of the Closing Date.

In the event that in connection with any Mortgage Loan for which the Seller cannot deliver the original recorded Mortgage or all interim recorded assignments of the Mortgage satisfying the requirements of clause (ii), (iii) or (iv), as applicable, the Trustee has received, in lieu thereof, a true and complete copy of such Mortgage and/or such assignment or assignments of the Mortgage, as applicable, each certified by the Seller, the applicable title company, escrow agent or attorney, or the originator of such Mortgage Loan, as the case may be, to be a true and complete copy of the original Mortgage or assignment of Mortgage submitted for recording.

Based on its review and examination and only as to the foregoing documents, (i) such documents appear regular on their face and related to such Mortgage Loan, and (ii) the information set forth in items (i), (iv), (vi) and (xi) of the definition of the "Mortgage Loan Schedule" in Section 1.01 of the Pooling and Servicing Agreement accurately reflects information set forth in the Mortgage File.

The Trustee has made no independent examination of any documents contained in each Mortgage File beyond the review specifically required in the above-referenced Pooling and Servicing Agreement. The Trustee makes no representations as to:  (i) the validity, legality, sufficiency, enforceability or genuineness of any of the documents contained in each Mortgage File of any of the Mortgage Loans identified on the [Mortgage Loan Schedule][Loan Number and Borrower Identification Mortgage Loan Schedule] or (ii) the collectability, insurability, effectiveness or suitability of any such Mortgage Loan.

Capitalized words and phrases used herein shall have the respective meanings assigned to them in the Pooling and Servicing Agreement.

DEUTSCHE BANK NATIONAL TRUST COMPANY, as Trustee

By:_____
     Name:
     Title:

Exhibit 6, Page 450

EXHIBIT H

FORM OF FINAL CERTIFICATION OF TRUSTEE

[date]

[Depositor]

[Master Servicer]

[Seller]

_____

_____

<div style="margin-left: 2em">

Re:    Pooling and Servicing Agreement among IndyMac MBS, Inc., as Depositor, IndyMac Bank, F.S.B., as Seller and Master Servicer, and Deutsche Bank National Trust Company, as Trustee, Mortgage Pass-Through Certificates, Series 200_-_

</div>

Gentlemen:

In accordance with Section 2.02 of the above-captioned Pooling and Servicing Agreement (the "Pooling and Servicing Agreement"), the undersigned, as Trustee, hereby certifies that as to each Mortgage Loan listed in the Mortgage Loan Schedule (other than any Mortgage Loan paid in full or listed on the attached Document Exception Report) it has received:

(i)  The original Mortgage Note, endorsed in the form provided in Section 2.01(c) of the Pooling and Servicing Agreement, with all intervening endorsements showing a complete chain of endorsement from the originator to the Seller.

(ii)  The original recorded Mortgage.

(iii)  A duly executed assignment of the Mortgage in the form provided in Section 2.01(c) of the Pooling and Servicing Agreement; provided, however, that it has received no assignment with respect to any Mortgage for which the Mortgaged Property is located in the Commonwealth of Puerto Rico, or, if the Depositor has certified or the Trustee otherwise knows that the Mortgage has not been returned from the applicable recording office, a copy of the assignment of the Mortgage (excluding information to be provided by the recording office).

(iv)  The original or duplicate original recorded assignment or assignments of the Mortgage showing a complete chain of assignment from the originator to the Seller.

(v)  The original or duplicate original lender's title policy and all riders thereto or, any one of an original title binder, an original preliminary title report or an original title commitment, or a copy thereof certified by the title company.

Based on its review and examination and only as to the foregoing documents, (a) such documents appear regular on their face and related to such Mortgage Loan, and (b) the information set forth in items (i), (ii), (iii), (iv), (vi) and (xi) of the definition of the "Mortgage Loan Schedule" in Section 1.01 of the Pooling and Servicing Agreement accurately reflects information set forth in the Mortgage File.

Exhibit 6, Page 451

The Trustee has made no independent examination of any documents contained in each Mortgage File beyond the review specifically required in the Pooling and Servicing Agreement.  The Trustee makes no representations as to:  (i) the validity, legality, sufficiency, enforceability or genuineness of any of the documents contained in each Mortgage File of any of the Mortgage Loans identified on the Mortgage Loan Schedule, or (ii) the collectability, insurability, effectiveness or suitability of any such Mortgage Loan.  Notwithstanding anything herein to the contrary, the Trustee has made no determination and makes no representations as to whether (i) any endorsement is sufficient to transfer all right, title and interest of the party so endorsing, as noteholder or assignee thereof, in and to that Mortgage Note or (ii) any assignment is in recordable form or sufficient to effect the assignment of and transfer to the assignee thereof, under the Mortgage to which the assignment relates.

Capitalized words and phrases used herein shall have the respective meanings assigned to them in the Pooling and Servicing Agreement.

DEUTSCHE BANK NATIONAL TRUST COMPANY, as Trustee

By:_____
      Name:
      Title:

Exhibit 6, Page 452

EXHIBIT I

TRANSFER AFFIDAVIT

IndyMac MBS, Inc.
Mortgage Pass-Through Certificates
Series 200_-_

STATE OF CALIFORNIA        )
                           : ss.:
COUNTY OF _____     )

The undersigned, being first duly sworn, deposes and says as follows:

1.      The undersigned is an officer of _____, the proposed Transferee of an Ownership Interest in a Class A-R Certificate (the "Certificate") issued pursuant to the Pooling and Servicing Agreement, (the "Agreement"), relating to the above-referenced Series, by and among IndyMac MBS, Inc., as depositor (the "Depositor"), IndyMac Bank, F.S.B., as seller and master servicer and Deutsche Bank National Trust Company, as Trustee.  Capitalized terms used, but not defined herein or in Exhibit 1 hereto, shall have the meanings ascribed to such terms in the Agreement.  The Transferee has authorized the undersigned to make this affidavit on behalf of the Transferee.

2.      The Transferee is, as of the date hereof, and will be, as of the date of the Transfer, a Permitted Transferee.  The Transferee is acquiring its Ownership Interest in the Certificate for its own account.

3.      The Transferee has been advised of, and understands that (i) a tax will be imposed on Transfers of the Certificate to Persons that are not Permitted Transferees; (ii) such tax will be imposed on the transferor, or, if such Transfer is through an agent (which includes a broker, nominee or middleman) for a Person that is not a Permitted Transferee, on the agent; and (iii) the Person otherwise liable for the tax shall be relieved of liability for the tax if the subsequent Transferee furnished to such Person an affidavit that such subsequent Transferee is a Permitted Transferee and, at the time of Transfer, such Person does not have actual knowledge that the affidavit is false.

4.      The Transferee has been advised of, and understands that a tax will be imposed on a "pass-through entity" holding the Certificate if at any time during the taxable year of the pass-through entity a Person that is not a Permitted Transferee is the record holder of an interest in such entity.  The Transferee understands that such tax will not be imposed for any period with respect to which the record holder furnishes to the pass-through entity an affidavit that such record holder is a Permitted Transferee and the pass-through entity does not have actual knowledge that such affidavit is false.  (For this purpose, a "pass-through entity" includes a regulated investment company, a real estate investment trust or common trust fund, a partnership, trust or estate, and certain cooperatives and, except as may be provided in Treasury Regulations, persons holding interests in pass-through entities as a nominee for another Person.)

5.      The Transferee has reviewed the provisions of Section 5.02(c) of the Agreement (attached hereto as Exhibit 2 and incorporated herein by reference) and understands the legal consequences of the acquisition of an Ownership Interest in the Certificate including, without limitation, the restrictions on subsequent Transfers and the provisions regarding voiding the Transfer and mandatory sales.  The Transferee expressly agrees to be bound by and to abide by the provisions of Section 5.02(c)

I-1                          Exhibit 6, Page 453

of the Agreement and the restrictions noted on the face of the Certificate.  The Transferee understands and agrees that any breach of any of the representations included herein shall render the Transfer to the Transferee contemplated hereby null and void.

6.      The Transferee agrees to require a Transfer Affidavit from any Person to whom the Transferee attempts to Transfer its Ownership Interest in the Certificate, and in connection with any Transfer by a Person for whom the Transferee is acting as nominee, trustee or agent, and the Transferee will not Transfer its Ownership Interest or cause any Ownership Interest to be Transferred to any Person that the Transferee knows is not a Permitted Transferee.  In connection with any such Transfer by the Transferee, the Transferee agrees to deliver to the Trustee a certificate substantially in the form set forth as Exhibit J to the Agreement (a "Transferor Certificate") to the effect that such Transferee has no actual knowledge that the Person to which the Transfer is to be made is not a Permitted Transferee.

7.      The Transferee does not have the intention to impede the assessment or collection of any tax legally required to be paid with respect to the Certificate.

8.      The Transferee's taxpayer identification number is _____.

9.      The Transferee is a U.S. Person as defined in Code Section 7701(a)(30).

10.      The Transferee is aware that the Certificate may be a "noneconomic residual interest" within the meaning of proposed Treasury regulations promulgated pursuant to the Code and that the transferor of a noneconomic residual interest will remain liable for any taxes due with respect to the income on such residual interest, unless no significant purpose of the transfer was to impede the assessment or collection of tax.

11.      The Transferee is not a foreign permanent establishment or fixed base (within the meaning of an applicable income tax treaty) of a U.S. taxpayer.

12.      The Transferee will not transfer the Certificates, directly or indirectly, to a foreign permanent establishment or fixed base (within the meaning of an applicable income tax treaty) of the Transferee or another U.S. taxpayer.

13.      The Transferee will not cause income from the Certificates to be attributable to a foreign permanent establishment or fixed base (within the meaning of an applicable income tax treaty) of the Transferee or another U.S. taxpayer.

14.      Either:

(a) (i) At the time of the transfer, and at the close of each of the Transferee's two fiscal years preceding the Transferee's fiscal year of transfer, the Transferee's gross assets for financial reporting purposes exceed $100 million and its net assets for financial reporting purposes exceed $10 million. For purposes of the preceding sentence, the gross assets and net assets of a Transferee do not include any obligation of any Related Person, as defined below, or any other asset if a principal purpose for holding or acquiring the other asset is to permit the Transferee to satisfy the conditions of this paragraph 15(a); (ii) The Transferee is an Eligible Corporation, as defined below, and hereby agrees that any subsequent transfer of the interest will be to another Eligible Corporation in a transaction that satisfies this Transfer Affidavit, including this paragraph 15(a); and (iii) The Transferee has not given the Transferor any reason to know that the Transferee will not honor the restrictions on subsequent transfers of the residual interest or that the Transferee cannot or will not pay any taxes associated with the residual interest; or

**Exhibit 6, Page 454**

(b)(i) The Transferee is a United States Person; (ii) The present value of the anticipated tax liabilities associated with holding the residual interest does not exceed the sum of: (A) The present value of any consideration given to the Transferee to acquire the interest; (B) The present value of the expected future distributions on the interest; and (C) The present value of the anticipated tax savings associated with holding the interest as any REMIC generates losses; and (iii) For purposes of calculating the aforementioned present values: (A) The transferee has assumed that it pays tax at a rate equal to the highest rate of tax specified in Code Section 11(b)(1) (unless the Transferee has been subject to the alternative minimum tax under Code Section 55 in the preceding two years and will compute its taxable income in the current taxable year using the alternative minimum tax rate, in which case the Transferee can assume that it pays tax at the rate specified in Code Section 55(b)(1)(B) provided the Transferee states in this Transfer Affidavit that it is using such alternate rate and that has been subject to the alternative minimum tax under Code Section 55 in the preceding two years and will compute its taxable income in the current taxable year using the alternative minimum tax rate):and (B) The Transferee uses a discount rate equal to the Federal short-term rate prescribed by section 1274(d) for the month of the transfer and the compounding period used by the Transferee.

The term "Eligible Corporation" means any domestic C corporation (as defined in section 1361(a)(2) of the Code) other than a corporation which is exempt from, or is not subject to, tax under section 11 of the Code, an entity described in section 851(a) or 856(a) of the Code, a REMIC; or an organization to which part I, subchapter T, chapter 1, subtitle A of the Code applies.  The Term "Related Person" means any person that bears a relationship to the Transferee enumerated in section 267(b) or 707(b)(1) of the Code, using "20 percent" instead of "50 percent" where it appears under the provisions; or is under common control (within the meaning of section 52(a) and (b) of the Code) with the Transferee.

15.     Either (i) the Transferee is not an employee benefit plan that is subject to ERISA or a plan that is subject to Section 4975 of the Code, and the Transferee is not acting on behalf of or with plan assets of such a plan; or (ii) the Transferee is an insurance company that is investing funds contained in an "insurance company general account" (as such term is defined in Section V(e) of Prohibited Transaction Class Exemption 95-60 ("PTCE 95-60") and the purchase and holding of the Class A-R Certificate satisfy the requirements for exemptive relief under Sections I and III of PTCE 95-60.

<div align="center">*     *     *</div>

Exhibit 6, Page 455

IN WITNESS WHEREOF, the Transferee has caused this instrument to be executed on its behalf, pursuant to authority of its Board of Directors, by its duly authorized officer and its corporate seal to be hereunto affixed, duly attested, this ___ day of _____, 20_.

_____

Print Name of Transferee


By:_____

       Name:

       Title:


[Corporate Seal]

ATTEST:

[Assistant] Secretary

Personally appeared before me the above-named _____, known or proved to me to be the same person who executed the foregoing instrument and to be the _____ of the Transferee, and acknowledged that he executed the same as his free act and deed and the free act and deed of the Transferee.

Subscribed and sworn before me this ___ day of ____, 20_.


_____

NOTARY PUBLIC


My Commission expires the __ day of _____, 20_.

Exhibit 6, Page 456

**EXHIBIT 1**
**to EXHIBIT I**

Certain Definitions

"Ownership Interest":  As to any Certificate, any ownership interest in such Certificate, including any interest in such Certificate as the Holder thereof and any other interest therein, whether direct or indirect, legal or beneficial.

"Permitted Transferee":  Any Person other than (i) the United States, any State or political subdivision thereof, or any agency or instrumentality of any of the foregoing, (ii) a foreign government, International Organization or any agency or instrumentality of either of the foregoing, (iii) an organization (except certain farmers' cooperatives described in Code Section 521) which is exempt from tax imposed by Chapter 1 of the Code (including the tax imposed by Code Section 511 on unrelated business taxable income) on any excess inclusions (as defined in Code Section 860E(c)(1)) with respect to any Class A-R Certificate, (iv) rural electric and telephone cooperatives described in Code Section 1381(a)(2)(c), (v) a Person that is not a citizen or resident of the United States, a corporation, partnership, or other entity created or organized in or under the laws of the United States or any political subdivision thereof, or an estate or trust whose income from sources without the United States is includible in gross income for federal income tax purposes regardless of its connection with the conduct of a trade or business within the United States, and (vi) any other Person so designated by the Depositor based upon an Opinion of Counsel that the Transfer of an Ownership Interest in a Class A-R Certificate to such Person may cause the Trust Fund to fail to qualify as a REMIC at any time that certain Certificates are Outstanding.  The terms "United States," "State" and "International Organization" shall have the meanings set forth in Code Section 7701 or successor provisions.  A corporation will not be treated as an instrumentality of the United States or of any State or political subdivision thereof if all of its activities are subject to tax, and, with the exception of the FHLMC, a majority of its board of directors is not selected by such governmental unit.

"Person":  Any individual, corporation, partnership, joint venture, bank, joint stock company, trust (including any beneficiary thereof), unincorporated organization or government or any agency or political subdivision thereof.

"Transfer":  Any direct or indirect transfer or sale of any Ownership Interest in a Certificate, including the acquisition of a Certificate by the Depositor.

"Transferee":  Any Person who is acquiring by Transfer any Ownership Interest in a Certificate.

Exhibit 6, Page 457

EXHIBIT 2
to EXHIBIT I

Section 5.02(c) of the Agreement

(c)  Each Person who has or who acquires any Ownership Interest in a Residual Certificate shall be deemed by the acceptance or acquisition of such Ownership Interest to have agreed to be bound by the following provisions, and the rights of each Person acquiring any Ownership Interest in a Residual Certificate are expressly subject to the following provisions:

(i)  Each Person holding or acquiring any Ownership Interest in a Residual Certificate shall be a Permitted Transferee and shall promptly notify the Trustee of any change or impending change in its status as a Permitted Transferee.

(ii)  No Ownership Interest in a Residual Certificate may be registered on the Closing Date or thereafter transferred, and the Trustee shall not register the Transfer of any Residual Certificate unless, in addition to the certificates required to be delivered to the Trustee under subparagraph (b) above, the Trustee shall have been furnished with an affidavit (a "Transfer Affidavit") of the initial owner or the proposed transferee in the form attached hereto as Exhibit I.

(iii)  Each Person holding or acquiring any Ownership Interest in a Residual Certificate shall agree (A) to obtain a Transfer Affidavit from any other Person to whom such Person attempts to Transfer its Ownership Interest in a Residual Certificate, (B) to obtain a Transfer Affidavit from any Person for whom such Person is acting as nominee, trustee or agent in connection with any Transfer of a Residual Certificate and (C) not to Transfer its Ownership Interest in a Residual Certificate or to cause the Transfer of an Ownership Interest in a Residual Certificate to any other Person if it has actual knowledge that such Person is not a Permitted Transferee.

(iv)  Any attempted or purported Transfer of any Ownership Interest in a Residual Certificate in violation of the provisions of this Section 5.02(c) shall be absolutely null and void and shall vest no rights in the purported Transferee.  If any purported transferee shall become a Holder of a Residual Certificate in violation of the provisions of this Section 5.02(c), then the last preceding Permitted Transferee shall be restored to all rights as Holder thereof retroactive to the date of registration of Transfer of such Residual Certificate.  The Trustee shall be under no liability to any Person for any registration of Transfer of a Residual Certificate that is in fact not permitted by Section 5.02(b) and this Section 5.02(c) or for making any payments due on such Certificate to the Holder thereof or taking any other action with respect to such Holder under the provisions of this Agreement so long as the Transfer was registered after receipt of the Transfer Affidavit, Transferor Certificate and either the Rule 144A Letter or the Investment Letter.  The Trustee shall be entitled but not obligated to recover from any Holder of a Residual Certificate that was in fact not a Permitted Transferee at the time it became a Holder or, at such subsequent time as it became other than a Permitted Transferee, all payments made on such Residual Certificate at and after either such time. Any such payments so recovered by the Trustee shall be paid and delivered by the Trustee to the last preceding Permitted Transferee of such Certificate.

Exhibit 6, Page 458

     (v)  The Depositor shall use its best efforts to make available, upon receipt of written request from the Trustee, all information necessary to compute any tax imposed under Section 860E(e) of the Code as a result of a Transfer of an Ownership Interest in a Residual Certificate to any Holder who is not a Permitted Transferee.

EXHIBIT J

FORM OF TRANSFEROR CERTIFICATE

_____, 200__

IndyMac MBS, Inc.
155 North Lake Avenue, 7th Floor
Pasadena, CA  91101
Attention:  John Olinski

Deutsche Bank National Trust Company
1761 East St. Andrew Place
Santa Ana, CA  92705-4934
Attention:  Trust Administration, Series 200 -

       Re:     IndyMac MBS, Inc.
              Mortgage Pass-Through Certificates, Series 200 -, Class

Ladies and Gentlemen:

       In connection with our disposition of the above Certificates we certify that (a) we understand that the Certificates have not been registered under the Securities Act of 1933, as amended (the "Act"), and are being disposed by us in a transaction that is exempt from the registration requirements of the Act, (b) we have not offered or sold any Certificates to, or solicited offers to buy any Certificates from, any person, or otherwise approached or negotiated with any person with respect thereto, in a manner that would be deemed, or taken any other action which would result in, a violation of Section 5 of the Act and (c) to the extent we are disposing of a Class A-R Certificate, we have no knowledge the Transferee is not a Permitted Transferee.

Very truly yours,

_____
Print Name of Transferor

By: _____
            Authorized Officer

J-1

Exhibit 6, Page 460

EXHIBIT K

FORM OF INVESTMENT LETTER (NON-RULE 144A)

_____, 200__

IndyMac MBS, Inc.
155 North Lake Avenue, 7th Floor
Pasadena, CA  91101
Attention:  John Olinski

Deutsche Bank National Trust Company
1761 East St. Andrew Place
Santa Ana, CA  92705-4934
Attention:  Trust Administration, Series 200 -

       Re:     IndyMac MBS, Inc.
                Mortgage Pass-Through Certificates, Series 200 -, Class

Ladies and Gentlemen:

        In connection with our acquisition of the above-referenced Certificates we certify that (a) we understand that the Certificates are not being registered under the Securities Act of 1933, as amended (the "Act"), or any state securities laws and are being transferred to us in a transaction that is exempt from the registration requirements of the Act and any such laws, (b) we are an "accredited investor," as defined in Regulation D under the Act, and have such knowledge and experience in financial and business matters that we are capable of evaluating the merits and risks of investments in the Certificates, (c) we have had the opportunity to ask questions of and receive answers from the Depositor concerning the purchase of the Certificates and all matters relating thereto or any additional information deemed necessary to our decision to purchase the Certificates, (d) either (i) we are not an employee benefit plan that is subject to the Employee Retirement Income Security Act of 1974, as amended, or a plan or arrangement that is subject to Section 4975 of the Internal Revenue Code of 1986, as amended, nor are we acting on behalf of any such plan or arrangement or using the assets of any such plan or arrangement to effect such acquisition or (ii) [if the Certificate has been the subject of an ERISA-Qualifying Underwriting,] we are an insurance company which is purchasing such Certificates with funds contained in an "insurance company general account" (as such term is defined in Section V(e) of Prohibited Transaction Class Exemption 95-60 ("PTCE 95-60")) and the purchase and holding of such Certificates are covered under Sections I and III of PTCE 95-60, (e) we are acquiring the Certificates for investment for our own account and not with a view to any distribution of such Certificates (but without prejudice to our right at all times to sell or otherwise dispose of the Certificates in accordance with clause (g) below), (f) we have not offered or sold any Certificates to, or solicited offers to buy any Certificates from, any person, or otherwise approached or negotiated with any person with respect thereto, or taken any other action which would result in a violation of Section 5 of the Act, and (g) we will not sell, transfer or otherwise dispose of any Certificates unless (1) such sale, transfer or other disposition is made pursuant to an effective registration statement under the Act or is exempt from such registration requirements, and if requested, we will at our expense provide an opinion of counsel satisfactory to the addressees of this Certificate that such sale, transfer or other disposition may be made pursuant to an exemption from the Act, (2) the purchaser or transferee of such Certificate has executed and delivered to you a certificate to substantially

the same effect as this certificate, and (3) the purchaser or transferee has otherwise complied with any
conditions for transfer set forth in the Pooling and Servicing Agreement.

Very truly yours,

_____

Print Name of Transferee

By: _____

        Authorized Officer

EXHIBIT L

FORM OF RULE 144A LETTER

_____, 200__

IndyMac MBS, Inc.
155 North Lake Avenue, 7th Floor
Pasadena, CA  91101
Attention:  John Olinski

Deutsche Bank National Trust Company
1761 East St. Andrew Place
Santa Ana, CA 92705-4934
Attention:  Trust Administration, Series 200 -

       Re:     IndyMac MBS, Inc.
              <u>Mortgage Pass-Through Certificates, Series 200 -, Class</u>

Ladies and Gentlemen:

       In connection with our acquisition of the above-referenced Certificates we certify that (a) we understand that the Certificates are not being registered under the Securities Act of 1933, as amended (the "Act"), or any state securities laws and are being transferred to us in a transaction that is exempt from the registration requirements of the Act and any such laws, (b) we have such knowledge and experience in financial and business matters that we are capable of evaluating the merits and risks of investments in the Certificates, (c) we have had the opportunity to ask questions of and receive answers from the Depositor concerning the purchase of the Certificates and all matters relating thereto or any additional information deemed necessary to our decision to purchase the Certificates, (d) either (i) we are not an employee benefit plan that is subject to the Employee Retirement Income Security Act of 1974, as amended, or a plan or arrangement that is subject to Section 4975 of the Internal Revenue Code of 1986, as amended, nor are we acting on behalf of any such plan or arrangement or using the assets of any such plan or arrangement to effect such acquisition, or (ii) [if the Certificate has been the subject of an ERISA-Qualifying Underwriting,] we are purchasing the Certificates with funds contained in an "insurance company general account" (as defined in Section V(e) of Prohibited Transaction Class Exemption 95-60 ("PTCE 95-60")) and our purchase and holding of the Certificates satisfy the requirements for exemptive relief under Sections I and III of PTCE 95-60, (e) we have not, nor has anyone acting on our behalf offered, transferred, pledged, sold or otherwise disposed of the Certificates, any interest in the Certificates or any other similar security to, or solicited any offer to buy or accept a transfer, pledge or other disposition of the Certificates, any interest in the Certificates or any other similar security from, or otherwise approached or negotiated with respect to the Certificates, any interest in the Certificates or any other similar security with, any person in any manner, or made any general solicitation by means of general advertising or in any other manner, or taken any other action, that would constitute a distribution of the Certificates under the Act or that would render the disposition of the Certificates a violation of Section 5 of the Act or require registration pursuant thereto, nor will act, nor has authorized or will authorize any person to act, in such manner with respect to the Certificates, (f) we are a "qualified institutional buyer" as that term is defined in Rule 144A under the Act ("Rule 144A") and have completed either of the forms of certification to that effect attached hereto as Annex 1 or Annex 2, (g) we are aware that the sale to us is being made in reliance on Rule 144A, and (h) we are acquiring the

L-1

Exhibit 6, Page 463

Certificates for our own account or for resale pursuant to Rule 144A and further, understand that such Certificates may be resold, pledged or transferred only (A) to a person reasonably believed to be a qualified institutional buyer that purchases for its own account or for the account of a qualified institutional buyer to whom notice is given that the resale, pledge or transfer is being made in reliance on Rule 144A, or (B) pursuant to another exemption from registration under the Act.

Very truly yours,

_____
Print Name of Transferee

By:_____
                Authorized Officer

Exhibit 6, Page 464

ANNEX 1 TO EXHIBIT L

QUALIFIED INSTITUTIONAL BUYER STATUS UNDER SEC RULE 144A

[For Transferees Other Than Registered Investment Companies]

The undersigned (the "Buyer") hereby certifies as follows to the parties listed in the Rule 144A Transferee Certificate to which this certification relates with respect to the Certificates described therein:

1.   As indicated below, the undersigned is the President, Chief Financial Officer, Senior Vice President or other executive officer of the Buyer.

2.   In connection with purchases by the Buyer, the Buyer is a "qualified institutional buyer" as that term is defined in Rule 144A under the Securities Act of 1933, as amended ("Rule 144A") because (i) the Buyer owned and/or invested on a discretionary basis $        1 in securities (except for the excluded securities referred to below) as of the end of the Buyer's most recent fiscal year (such amount being calculated in accordance with Rule 144A and (ii) the Buyer satisfies the criteria in the category marked below.

_____   Corporation, etc.  The Buyer is a corporation (other than a bank, savings and loan association or similar institution), Massachusetts or similar business trust, partnership, or charitable organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended.

_____   Bank.  The Buyer (a) is a national bank or banking institution organized under the laws of any State, territory or the District of Columbia, the business of which is substantially confined to banking and is supervised by the State or territorial banking commission or similar official or is a foreign bank or equivalent institution, and (b) has an audited net worth of at least $25,000,000 as demonstrated in its latest annual financial statements, a copy of which is attached hereto.

_____   Savings and Loan.  The Buyer (a) is a savings and loan association, building and loan association, cooperative bank, homestead association or similar institution, which is supervised and examined by a State or Federal authority having supervision over any such institutions or is a foreign savings and loan association or equivalent institution and (b) has an audited net worth of at least $25,000,000 as demonstrated in its latest annual financial statements, a copy of which is attached hereto.

_____   Broker-dealer.  The Buyer is a dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934.

_____   Insurance Company.  The Buyer is an insurance company whose primary and predominant business activity is the writing of insurance or the reinsuring of risks underwritten by insurance companies and which is subject to supervision by the

---

1   Buyer must own and/or invest on a discretionary basis at least $100,000,000 in securities unless Buyer is a dealer, and, in that case, Buyer must own and/or invest on a discretionary basis at least $10,000,000 in securities.

L-3

Exhibit 6, Page 465

insurance commissioner or a similar official or agency of a State, territory or the District of Columbia.

_____ State or Local Plan.  The Buyer is a plan established and maintained by a State, its political subdivisions, or any agency or instrumentality of the State or its political subdivisions, for the benefit of its employees.

_____ ERISA Plan.  The Buyer is an employee benefit plan within the meaning of Title I of the Employee Retirement Income Security Act of 1974.

_____ Investment Advisor.  The Buyer is an investment advisor registered under the Investment Advisors Act of 1940.

_____ Small Business Investment Company.  Buyer is a small business investment company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958.

_____ Business Development Company.  Buyer is a business development company as defined in Section 202(a)(22) of the Investment Advisors Act of 1940.

3.   The term "securities" as used herein does not include (i) securities of issuers that are affiliated with the Buyer, (ii) securities that are part of an unsold allotment to or subscription by the Buyer, if the Buyer is a dealer, (iii) securities issued or guaranteed by the U.S. or any instrumentality thereof, (iv) bank deposit notes and certificates of deposit, (v) loan participations, (vi) repurchase agreements, (vii) securities owned but subject to a repurchase agreement and (viii) currency, interest rate and commodity swaps.

4.   For purposes of determining the aggregate amount of securities owned and/or invested on a discretionary basis by the Buyer, the Buyer used the cost of such securities to the Buyer and did not include any of the securities referred to in the preceding paragraph, except (i) where the Buyer reports its securities holdings in its financial statements on the basis of their market value, and (ii) no current information with respect to the cost of those securities has been published.  If clause (ii) in the preceding sentence applies, the securities may be valued at market.  Further, in determining such aggregate amount, the Buyer may have included securities owned by subsidiaries of the Buyer, but only if such subsidiaries are consolidated with the Buyer in its financial statements prepared in accordance with generally accepted accounting principles and if the investments of such subsidiaries are managed under the Buyer's direction.  However, such securities were not included if the Buyer is a majority-owned, consolidated subsidiary of another enterprise and the Buyer is not itself a reporting company under the Securities Exchange Act of 1934, as amended.

5.   The Buyer acknowledges that it is familiar with Rule 144A and understands that the seller to it and other parties to the Certificates are relying and will continue to rely on the statements made herein because one or more sales to the Buyer may be in reliance on Rule 144A.

6.   Until the date of purchase of the Rule 144A Securities, the Buyer will notify each of the parties to which this certification is made of any changes in the information and conclusions herein.  Until such notice is given, the Buyer's purchase of the Certificates will constitute a reaffirmation of this certification as of the date of such purchase.  In addition, if the Buyer is a bank or savings and loan is provided above, the Buyer agrees that it will furnish to such parties updated annual financial statements promptly after they become available.

**Exhibit 6, Page 466**

_____

Print Name of Buyer


By:_____
       Name:
       Title:


_____

Date:

Exhibit 6, Page 467

ANNEX 2 TO EXHIBIT L

<u>QUALIFIED INSTITUTIONAL BUYER STATUS UNDER SEC RULE 144A</u>

[For Transferees That are Registered Investment Companies]

The undersigned (the "Buyer") hereby certifies as follows to the parties listed in the Rule 144A Transferee Certificate to which this certification relates with respect to the Certificates described therein:

1. As indicated below, the undersigned is the President, Chief Financial Officer or Senior Vice President of the Buyer or, if the Buyer is a "qualified institutional buyer" as that term is defined in Rule 144A under the Securities Act of 1933, as amended ("Rule 144A") because Buyer is part of a Family of Investment Companies (as defined below), is such an officer of the Adviser.

2. In connection with purchases by Buyer, the Buyer is a "qualified institutional buyer" as defined in SEC Rule 144A because (i) the Buyer is an investment company registered under the Investment Company Act of 1940, as amended and (ii) as marked below, the Buyer alone, or the Buyer's Family of Investment Companies, owned at least $100,000,000 in securities (other than the excluded securities referred to below) as of the end of the Buyer's most recent fiscal year.  For purposes of determining the amount of securities owned by the Buyer or the Buyer's Family of Investment Companies, the cost of such securities was used, except (i) where the Buyer or the Buyer's Family of Investment Companies reports its securities holdings in its financial statements on the basis of their market value, and (ii) no current information with respect to the cost of those securities has been published.  If clause (ii) in the preceding sentence applies, the securities may be valued at market.

_____   The Buyer owned $_____ in securities (other than the excluded securities referred to below) as of the end of the Buyer's most recent fiscal year (such amount being calculated in accordance with Rule 144A).

_____   The Buyer is part of a Family of Investment Companies which owned in the aggregate $_____ in securities (other than the excluded securities referred to below) as of the end of the Buyer's most recent fiscal year (such amount being calculated in accordance with Rule 144A).

3. The term "<u>Family of Investment Companies</u>" as used herein means two or more registered investment companies (or series thereof) that have the same investment adviser or investment advisers that are affiliated (by virtue of being majority owned subsidiaries of the same parent or because one investment adviser is a majority owned subsidiary of the other).

4. The term "<u>securities</u>" as used herein does not include (i) securities of issuers that are affiliated with the Buyer or are part of the Buyer's Family of Investment Companies, (ii) securities issued or guaranteed by the U.S. or any instrumentality thereof, (iii) bank deposit notes and certificates of deposit, (iv) loan participations, (v) repurchase agreements, (vi) securities owned but subject to a repurchase agreement and (vii) currency, interest rate and commodity swaps.

5. The Buyer is familiar with Rule 144A and understands that the parties listed in the Rule 144A Transferee Certificate to which this certification relates are relying and will continue to rely on the statements made herein because one or more sales to the Buyer will be in reliance on Rule 144A.  In addition, the Buyer will only purchase for the Buyer's own account.

Exhibit 6, Page 468

6.  Until the date of purchase of the Certificates, the undersigned will notify the parties listed in the Rule 144A Transferee Certificate to which this certification relates of any changes in the information and conclusions herein.  Until such notice is given, the Buyer's purchase of the Certificates will constitute a reaffirmation of this certification by the undersigned as of the date of such purchase.

_____
Print Name of Buyer


By:_____
        Name:
        Title:


_____
Date:

Exhibit 6, Page 469

EXHIBIT M

REQUEST FOR RELEASE
(for Trustee)

IndyMac MBS, Inc.
Mortgage Pass-Through Certificates
Series 200_-_

<u>Loan Information</u>

      Name of Mortgagor:

      Servicer
      Loan No.:         _____

<u>Trustee</u>

      Name:         _____

      Address:      _____

                 _____

Trustee
Mortgage File No.:

      The undersigned Master Servicer hereby acknowledges that it has received from Deutsche Bank National Trust Company, as Trustee for the Holders of Mortgage Pass-Through Certificates, of the above-referenced Series, the documents referred to below (the "Documents").  All capitalized terms not otherwise defined in this Request for Release shall have the meanings given them in the Pooling and Servicing Agreement (the "Pooling and Servicing Agreement") relating to the above-referenced Series among the Trustee, IndyMac Bank, F.S.B., as Seller and Master Servicer and IndyMac MBS, Inc., as Depositor.

( )      Mortgage Note dated _____, 20\_, in the original principal sum of $\_\_\_\_\_, made by _____, payable to, or endorsed to the order of, the Trustee.

( )      Mortgage recorded on _____ as instrument no. _____ in the County Recorder's Office of the County of _____, State of _____ in book/reel/docket _____ of official records at page/image _____.

( )      Deed of Trust recorded on _____ as instrument no. _____ in the County Recorder's Office of the County of _____, State of _____ in book/reel/docket _____ of official records at page/image _____.

( )      Assignment of Mortgage or Deed of Trust to the Trustee, recorded on _____ as instrument no. _____ in the County Recorder's Office of the County of \_\_\_\_\_, State of _____ in book/reel/docket _____ of official records at page/image _____.

Exhibit 6, Page 470

( )    Other documents, including any amendments, assignments or other assumptions of the Mortgage Note or Mortgage.

The undersigned Master Servicer hereby acknowledges and agrees as follows:

(1)    The Master Servicer shall hold and retain possession of the Documents in trust for the benefit of the Trustee, solely for the purposes provided in the Agreement.

(2)    The Master Servicer shall not cause or knowingly permit the Documents to become subject to, or encumbered by, any claim, liens, security interest, charges, writs of attachment or other impositions nor shall the Servicer assert or seek to assert any claims or rights of setoff to or against the Documents or any proceeds thereof.

(3)    The Master Servicer shall return each and every Document previously requested from the Mortgage File to the Trustee when the need therefor no longer exists, unless the Mortgage Loan relating to the Documents has been liquidated and the proceeds thereof have been remitted to the Certificate Account and except as expressly provided in the Agreement.

(4)    The Documents and any proceeds thereof, including any proceeds of proceeds, coming into the possession or control of the Master Servicer shall at all times be earmarked for the account of the Trustee, and the Master Servicer shall keep the Documents and any proceeds separate and distinct from all other property in the Master Servicer's possession, custody or control.

INDYMAC BANK, F.S.B.

By: _____
      Name:
      Title:

Date: _____, 20

M-2

**Exhibit 6, Page 471**

EXHIBIT N

REQUEST FOR RELEASE OF DOCUMENTS

To:      Deutsche Bank National Trust Company

Attn:    Mortgage Custody Services

Re:      The Pooling & Servicing Agreement dated May 1, 2005 among IndyMac
         Bank, F.S.B. as Master Servicer, Inc, IndyMac MBS, Inc. and Deutsche
         Bank National Trust Company, as Trustee

Ladies and Gentlemen:

        In connection with the administration of the Mortgage Loans held by you as Trustee for IndyMac MBS, Inc., we request the release of the Mortgage Loan File for the Mortgage Loan(s) described below, for the reason indicated.

        FT Account #:   Pool #:

Mortgagor's Name, Address and Zip Code:

Mortgage Loan Number:

Reason for Requesting Documents (check one)

_____1.       Mortgage Loan paid in full (IndyMac hereby certifies that all amounts have been
                received.)

_____2.       Mortgage Loan Liquidated (IndyMac hereby certifies that all proceeds of foreclosure,
                insurance, or other liquidation have been finally received.)

_____3.       Mortgage Loan in Foreclosure.

_____4.       Other (explain): _____

        If item 1 or 2 above is checked, and if all or part of the Mortgage File was previously released to us, please release to us our previous receipt on file with you, as well as an additional documents in your possession relating to the above-specified Mortgage Loan.  If item 3 or 4 is checked, upon return of all of the above documents to you as Trustee, please acknowledge your receipt by signing in the space indicated below, and returning this form.

Exhibit 6, Page 472

INDYMAC BANK, F.S.B.
155 North Lake Ave.
Pasadena, CA  91101

By:_____
Name:_____
Title:_____
Date:_____

TRUSTEE CONSENT TO RELEASE AND
ACKNOWLEDGEMENT OF RECEIPT

By:_____
Name:_____
Title:_____
Date:_____

Exhibit 6, Page 473

EXHIBIT O

FORM OF TRUSTEE CERTIFICATION

To:     IndyMac MBS, Inc.
        IndyMac Bank, F.S.B.

Re:     The Pooling & Servicing Agreement dated May 1, 2005 among IndyMac
        Bank, F.S.B. as Master Servicer, Inc, IndyMac MBS, Inc. and Deutsche
        Bank National Trust Company, as Trustee

Ladies and Gentlemen:

In connection with the delivery of the Required Certifications on behalf of the Trust Fund, we certify, based on the information provided by the Master Servicer to the Trustee, the information contained in the Monthly Statements, taken as a whole, does not contain an untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading as of the last day of the period covered by any Required Certification.

DEUTSCHE BANK NATIONAL TRUST COMPANY

By:_____
Name:_____
Title:_____
Date:_____

# EXHIBIT 7

## NOTICE REGARDING INDYMAC BANK, F.S.B.

Dated: February 18, 2009

The Federal Deposit Insurance Corporation (the "FDIC") as conservator for IndyMac Federal Bank, FSB ("IndyMac Federal") hereby gives you notice of the proposed sale of the mortgage loan servicing portfolio and operations of IndyMac Federal, as further described in this Notice.

On July 11, 2008, the FDIC was appointed receiver for IndyMac Bank, F.S.B. (the "Failed Thrift"), and certain assets and obligations of the Failed Thrift, including substantially all of its mortgage loan servicing portfolio and operations, were transferred to and assumed by IndyMac Federal, a newly-formed federal savings bank for which the FDIC was appointed conservator. Under the Federal Deposit Insurance Act, as amended, the FDIC is authorized to sell or otherwise dispose of the assets of financial institutions for which it acts as conservator or receiver. Furthermore, under 12 U.S.C. § 1821(d)(2)(G), the FDIC as conservator or receiver is permitted to transfer any asset of such financial institutions "without any approval, assignment, or consent with respect to such transfer." Pursuant to this authority, on January 2, 2009, the FDIC, acting in its capacity as conservator for IndyMac Federal, executed a letter of intent with IMB HoldCo LLC ("IMB HoldCo") whereby the FDIC, as conservator for IndyMac Federal, agreed to sell, and IMB HoldCo agreed to buy, on the terms and subject to the conditions contained in such definitive agreements as are executed in connection with the transaction, substantially all of the assets of IndyMac Federal, including substantially all of its mortgage loan servicing portfolio and operations. It is expected that, in order to effect the proposed sale, (i) prior to the closing, IMB HoldCo will organize a savings and loan holding company as a direct, wholly owned subsidiary of IMB HoldCo (such subsidiary, "Intermediate HoldCo") and (ii) at closing, the following will occur virtually simultaneously: (a) the FDIC will be appointed receiver for IndyMac Federal, (b) Intermediate HoldCo will form a federally chartered, FDIC insured, savings association as a direct, wholly owned subsidiary of Intermediate HoldCo ("New Bank") and (c) the FDIC, in its capacity as receiver for IndyMac Federal, will sell and transfer the mortgage loan servicing portfolio and operations of IndyMac Federal that are to be acquired by IMB HoldCo to New Bank and will transfer certain other assets to a subsidiary thereof. It is anticipated that the closing of the above-described transactions will occur on or about February 28, 2009, or such later date as may be agreed by the parties (such date, the "Effective Date").

As of the Effective Date, IndyMac Federal will assign to New Bank all of the right, title and interest of IndyMac Federal (and the Failed Thrift) as servicer or master servicer under certain pooling and servicing agreements, servicing agreements, reconstituted servicing agreements and assignments, assumption and recognition agreements, as applicable, and similar agreements pursuant to which IndyMac Federal (or the Failed Thrift) is acting as servicer (each such agreement identified on Schedule A hereto (as the same may be amended once due diligence is complete), a "Servicing Agreement" and collectively, the "Servicing Agreements") and with respect to which you are the owner of the related loans or for which you are serving as trustee, owner trustee, indenture trustee or master servicer, as applicable, or for which you have provided mortgage insurance or credit enhancement. Such transfers shall be conditioned on New Bank meeting all requirements of a successor servicer or successor master servicer and assuming all of the obligations of the servicer or master servicer, as applicable, under such Servicing Agreements as of the Effective Date. **Neither New Bank nor any subsidiary of New Bank is**

Exhibit 7, Page 475

**assuming any other obligations of IndyMac Federal or the Failed Thrift under the Servicing Agreements, including, without limitation, any repurchase obligations for breaches of loan level representations, any indemnities relating to origination activities or securities laws, any seller indemnity, or any other obligations or liabilities arising prior to the Effective Date under the Servicing Agreements.**

Requests for information should be directed to:

Robert Manning
Federal Deposit Insurance Corporation
550 17th Street, NW, Room F-7062
Washington, D.C.  20429


NOTHING HEREIN SHALL BE DEEMED TO BE A WAIVER OF ANY OF THE FDIC'S RIGHTS UNDER APPLICABLE LAW, INCLUDING THE FEDERAL DEPOSIT INSURANCE ACT OR ANY OF YOUR RIGHTS AGAINST THE FAILED THRIFT OR INDYMAC FEDERAL.

BY:   FEDERAL DEPOSIT INSURANCE CORPORATION,
         as conservator for Indymac Federal Bank, FSB

Exhibit 7, Page 476

SCHEDULE A

21421445\0001\10070089\V-15

Exhibit 7, Page 477

# EXHIBIT 8

**Federal Deposit Insurance Corporation as Receiver for:**

**10007 – Indymac Bank, F.S.B.  Pasadena, CA**

(Name of Bank/Financial Institution and Location)

**PROOF OF CLAIM**

## CONFIDENTIAL  TREATMENT  REQUESTED

*Attachment A contains confidential, non-public financial information.  Claimant Deutsche Bank National Trust Company requests that the claim, the information contained in Attachment A, and the non-public documents attached hereto be considered and treated as confidential.*

SSN/Tax ID # (1)      **see Attachment A**

The undersigned, (2) Barbara Campbell, Vice President

says that the      **Indymac Bank, F.S.B.**      now in liquidation is

(Name of Bank/Financial Institution)

justly indebted to (3)      **Deutsche Bank National Trust Company**      in the sum of

(Individual/Joint/Corporation/Partnership/Firm/Agency)

(4)      **$8,117,939,412 (approximately, see Attachment A)**      Dollars upon the following Claim:

| | Description of (invoice) claim: | Liability Number | Amount of Claim |
|---|---|---|---|
| C L A I M S | (5) **See Exhibit A** | 500006062-000 | **$5,439,292,941  to $8,117,939,412 approx., (see Attachment A).** |
| | | Total Claim: (6) | **Approximately $8,117,939,412, (see Attachment A).** |

The undersigned further states that he/she makes this Claim on behalf of

(7) **Deutsche Bank National Trust Company**

that no part of said debt has been paid, that

(8) **Deutsche Bank National Trust Company**

(Individual/Joint/Corporation/Partnership/Firm/Agency)

has given no endorsement or assignment of the same or any part thereof, and that there is no set-off or counterclaim, or other legal or equitable defense to said Claim or any part thereof.

NAME (9)    Barbara Campbell              , Vice President

(Signature of Person making the Claim)                    (Title)

FIRM    **Deutsche Bank National Trust Company**

(If applicable)

ADDRESS (10)   **1761 East St Andrew Pl**

CITY/STATE/ZIP      **Santa Ana, CA 92705-4934**

TELEPHONE NUMBER      **714-247-6278**

The penalty for knowingly making or inviting reliance of any false, forged, or counterfeit statement, document, or thing for the purpose of influencing in any way the action of the Federal Deposit Insurance Corporation is a fine of not more than $1,000,000 or imprisonment for not more than thirty years, or both  (18 U.S.C. Section 1007).

RLS7212

Exhibit 8, Page 478

<u>**CONFIDENTIAL TREATMENT REQUESTED**</u>

**ATTACHMENT A**
to
**Proof of Claim of**
**DEUTSCHE BANK NATIONAL TRUST COMPANY,**
**AS TRUSTEE AND CUSTODIAN**

**A. <u>CAPACITIES AND DOCUMENTS</u>.**

1.    This proof of claim ("<u>Proof of Claim</u>") is made by Deutsche Bank National Trust Company ("<u>DBNTC</u>") (a) as trustee ("<u>Trustee</u>") for the 243 securitization trusts listed on Exhibit A-1 attached hereto (the "<u>Trusts</u>"), on behalf of itself, the Trusts and the owners of certain residential mortgaged backed securities issued by the Trusts (the "<u>Securities</u>"), (b) as trustee of certain "net interest margin" trusts listed on Exhibit A-2 ("<u>NIM Trusts</u>", and collectively with the Trusts, the "<u>Securitization Trusts</u>") pursuant to which DBNTC owns, on behalf of NIM Trust beneficiaries, interests in certain Securities (the "<u>NIM Trustee</u>") and (c) as custodian (the "<u>Custodian</u>") under certain custody agreements listed on Exhibit A-3 (the "Custody Agreements") by and among DBNTC, and one or more of Indymac Bank, F.S.B. and/or its affiliates (collectively, "Indymac"), and/or third party lenders or purchasers of mortgage loans.

2.    Each of the Trusts holds, as Trust assets or collateral, mortgage loans originated by and/or sold into the Trusts by Indymac.

3.    With respect to each Trust, DBNTC entered into one or more Pooling and Servicing Agreements, Servicing Agreements, Indentures or Trust Agreements, and related ancillary agreements (collectively, the "<u>Governing Documents</u>").  The Governing Documents are voluminous and are in the possession of both the Trustee and Indymac. Accordingly it is impractical and wasteful to attach each and every one of them to this Proof of Claim.  However, electronic files containing a representative sample of Governing Documents relating to approximately 216 Trusts have been provided to the FDIC concurrently with a copy of this Proof of Claim.  Additional documentation regarding the Trusts is available on the SEC's EDGAR website at <u>http://sec.gov/</u>, and the monthly distribution reports and prospectus supplements for each Trust are available on the Trustee's investor reporting website at <u>https://tss.sfs.db.com/investpublic/</u>. Upon request by the FDIC, the Trustee will furnish electronic or hard copies of any additional Governing Documents in its possession.

4.    Pursuant to the Governing Documents for each Trust, Indymac sold, either directly or indirectly, mortgage loans into the related Trusts.  In connection with such sales, Indymac also made numerous representations, warranties and covenants ("<u>Representations and Warranties</u>") concerning the mortgage loans, which Representations and Warranties were ultimately assigned to the Trusts pursuant the Governing Documents and certain ancillary agreements.  The Trusts have claims for breach of such Representations and Warranties as further described herein.

5.      DBNTC has also served as Custodian under the Custody Agreements.  Pursuant to the Custody Agreements, DBNTC has held in custody mortgage loan files evidencing mortgage loans originated, purchased, financed and/or serviced by Indymac.  In addition, pursuant to certain Custody Agreements, the Custodian held and disbursed funds with respect to the funding and/or financing of such mortgage loans in accordance with instructions furnished to the Custodian by Indymac, loan purchasers or lenders. The Custody Agreements are voluminous and are in the possession of both the Trustee and Indymac. Accordingly it is impractical and unnecessary to attach them to this Proof of Claim.  However, electronic files containing a representative sample of Custody Agreements have been provided to the FDIC concurrently with a copy of this Proof of Claim.

6.      DBNTC is aware that certain other parties to the Trusts, including, without limitation, securities underwriters, depositors, loan servicers, insurers and investors, intend to file proofs of claim in these proceedings relating to the Governing Documents and ancillary agreements which may be duplicative of, or supplemental to, the claims stated herein (the "Third Party Trust Related Claims").  To the extent that such Third Party Trust Related Claims relate to or are property of the Trusts, DBNTC incorporates such Third Party Trust Related Claims herein by reference.

## B.  DESCRIPTION OF CLAIMS.

### Claims Arising from Breach of Representations and Warranties (Estimated Range: $5.439 billion to $8.117 billion)

7.      Pursuant to the Governing Documents, Indymac, as seller and [master] servicer, made certain Representations and Warranties in connection with the sale of the mortgage loans to the Trusts.  Indymac has breached certain of these Representations and Warranties.  Pursuant to the Governing Documents, Indymac has express contractual obligations (i) to notify certain parties to the Governing Documents, including the Trustee, when Indymac becomes aware of breaches of Representations and Warranties, (ii) to make certain cure payments with respect to certain such breaches or (iii) to repurchase the mortgage loans affected by Indymac's breaches, at the repurchase price (the "Repurchase Price") specified in the Governing Documents (typically equal to the unpaid principal balance of such mortgage loans, plus accrued interest thereon through the date of repurchase) (the "Repurchase Obligations").  Further, as described below, Indymac is liable to the Trustee and the Trusts for all liability, loss, cost and expense arising from breaches of Representations and Warranties, including all costs and expenses of enforcement of these obligations.

8.      It is currently unclear to the Trustee whether Indymac Federal Bank, F.S.B., as successor-in-interest to Indymac ("Indymac Federal"), has or intends to assume or repudiate the Governing Documents. The Trustee is informed and believes, on the basis of the FDIC's public statements and on the basis of discussions with the FDIC, that Indymac Federal (or its successors and assigns) intends to assume Indymac's rights and obligations as [master] servicer of mortgages. The Trustee asserts that such servicing rights and obligations can only be assumed together with, and not separately from, Indymac's obligations with respect to Repurchase Obligations, since a single

entity—Indymac—generally entered into the Governing Documents both as seller and as [master] servicer and since the Representations and Warranties were typically made by Indymac "as seller and [master] servicer." In addition, the Governing Documents represent an integrated set of contractual undertakings on behalf of Indymac with respect to the formation and servicing of the Trusts and Indymac Federal (or its successors and assigns) cannot selectively assume the benefits of these undertakings while repudiating the related burdens. To the extent that Indymac has either (a) failed to notify the Trustee and other transaction parties of material breaches of Representations and Warranties of which it was aware, and/or (b) repudiates and fails to perform its obligations to replace or repurchase defective loans, the Trusts have claims for breach of such obligations (the "Repurchase Claims").

9.      As stated above, the Trustee serves as Trustee for 243 Trusts, which hold in excess of $81 billion in current principal balance outstanding of mortgage loans sold to the Trusts by Indymac.   Notwithstanding provisions of the Governing Documents permitting the Trustee and certain other parties access to Indymac's books and records concerning the mortgage loans, during the last 12 months, Indymac has consistently refused to allow the Trustee, bond insurers, and investors with an interest in the Trusts to perform any meaningful due diligence to determine whether Representations and Warranties were breached.  As sampling of correspondence regarding such parties' attempts to access to mortgage loan files is attached hereto as Exhibit A-4. Moreover, immediately prior to the initiation of these receivership and conservation proceedings, disputes concerning these access rights gave rise to certain of the litigation described under "Indemnification Claims" below.  Since Indymac's denial of counterparties' contractual inspection rights has deprived those parties of the ability to detect and quantify specific breaches of Representations and Warranties, claimants must be given reasonable access and time to investigate their claims prior to specifying them with greater particularity.  Nevertheless, on the basis of the limited data currently available to the Trustee, the Trustee further describes these claims below.

10.     Assuming, for purposes of this Proof of Claim, that Indymac has and will continue to breach its obligations with respect to Repurchase Claims, the damages flowing from such breaches will vary depending on the losses suffered by the Trusts in respect of the related mortgage loans.   Certain of the properties underlying the mortgage loans subject to Repurchase Claims either (a) have been foreclosed upon and are owned by the Trusts as of the date of this Proof of Claim (the "REO Loans") or (b) are owned by the Mortgagors (the "Mortgagor-Owned Loans").   The dollar amount of any Repurchase Claims related to REO Loans and Mortgagor-Owned Loans will be affected by the value of those loans and their underlying collateral because the damages suffered by the Trusts as a result of Indymac's breach will be partially offset by the value of the collateral retained by the Trusts.  Due to the ever-changing nature of market forces impacting the value of REO Loans and Mortgagor-Owned Loans, the amount due to the Trusts on account of the REO Loans and Mortgagor-Owned Loans remains in flux. Until the amount of Indymac's exposure on REO Loans and Mortgagor-Owned Loans is finally determined, the Trusts' corresponding claim remains unliquidated and may decrease or increase as a result of fluctuations in the valuation of the underlying property and related loans, and payments of principal and interest either made or not made by the mortgagor of the underlying loans. Certain of

the properties underlying the mortgage loans subject to Repurchase Claims have been foreclosed upon and in turn sold ("REO Sold Loans").  The sale prices of the properties underlying the REO Sold Loans will be a partial offset to the Repurchase Price related to such REO Sold Loans.

11.    On information and belief, using claims estimation methodologies that take into account (a) industry information regarding frequency of breaches of representations and warranties in portfolios of mortgage loans similar to those sold by Indymac to the Trusts, (b) the performance of the mortgage loans held by the Trusts and (c) the severity of losses experienced by the Trusts to date and anticipated in the future, the Trustee estimates that the Trusts have claims in respect to breaches of Representations and Warranties, in the estimated range of $5.439 to $8.117 billion.

12.    Although Representations and Warranties were breached at the time that they were made, certain of the Repurchase Claims of the Trusts are unmatured, unliquidated and/or contingent in nature because, although breaches of Representation and Warranties exist for certain mortgage loans, such breaches have not been (a) discovered and/or (b) asserted, and/or (c) otherwise given rise to claims for the Repurchase Price as of the date hereof. The actual Repurchase Claims relating to such loans would be increased by accrued interest thereon and the Trusts' cost of enforcement, and be partially offset by the value of mortgage loan collateral and mortgage payments retained by the Trusts by reason of Indymac's failure to repurchase such loans.

13.    On the basis of breaches of Representations and Warranties, two mortgage insurers have sought to rescind, in their entirety or in respect of particular loans, policies of insurance on mortgage loans held by the Trusts.  Such rescission claims give rise to claims of the Trust against Indymac in the following amounts:

(a)    Rescissions asserted by MGIC: approximately $4.9 million, plus interest and costs (See, e.g. Exhibit A-5 hereto - actual rescission letters will be provided upon request and are not attached hereto because they contain confidential borrower information).

(b)    Rescissions asserted by Radian: approximately $77 million plus interest and costs (See, e.g. "Indemnification Claims" below).

14.    In addition to the foregoing, under the Governing Documents, Indymac is also subject to Repurchase Claims with respect to missing or defective documents in mortgage loan files.  The Governing Documents generally provide that if a material defect in any Mortgage File is discovered which may materially and adversely affect the value of the related Mortgage Loan, or the interests of the Trustee (as pledgee of the Mortgage Loans), the Noteholders or the Certificateholders in such Mortgage Loan, then the responsible party shall cure such defect, repurchase the related Mortgage Loan at the purchase price or substitute a qualified substitute mortgage loan for the related Mortgage Loan upon the same terms and conditions set forth for breaches of representations and warranties as to the Mortgage.

15.    The Trustee or other document custodian has furnished Indymac, on an ongoing basis, document exception reports with respect to missing or defective loan file documents.

A copy of the Exception Report Summary for the Trusts is attached hereto as Exhibit A-6. If Indymac repudiates or fails to satisfy its obligations under the Governing Documents, the Trustee will require additional time to assess the materiality of the remaining missing defective documents and to calculate the amount of any Repurchase Claims with respect thereto. For purposes of this Proof of Claim, however, the Trustee asserts that all loans with missing or defective loan file documents are subject to Repurchase Claims for the Repurchase Price. The Trustee is not in a position to calculate the amount of such Repurchase Price until the population of such loans and the materiality of any document exceptions are finally determined (since borrowers continue to pay interest on some of these loans and, in many cases, other recoveries continue to be made on collateral securing such loans).

### Indemnification Claims (not less than $77 million)

16. The Trusts have been damaged by virtue of Indymac's defaults and breaches with respect to the Representations and Warranties under the Governing Documents and ancillary agreements. Without limiting the generality of the foregoing, the Trusts have incurred, and will continue to incur, significant legal expenses enforcing mortgage loan documents and defending against borrower counterclaims and third party claims arising from breaches or alleged breaches of Representations and Warranties or of other obligations of Indymac (including loan servicing obligations) under the Governing Documents.

17. Without limiting the generality of the foregoing, Indymac is obligated to indemnify, defend and hold the Trusts and the Trustee harmless all liability, loss, cost or expense arising from the claims asserted in the following litigation matters:

(a) <u>Radian Insurance Inc. v. Deutsche Bank National Trust Company et al</u>, filed June 26, 2008, in the United States District Court, Eastern District of Pennsylvania, seeking to rescind mortgage insurance policies which provide certain Trusts with approximately $77 million of aggregate coverage for losses on Indymac-originated mortgage loans, by reason of Indymac's breach of Representations and Warranties. To the extent that Radian prevails in this suit, Indymac will be liable to the Trusts for the full amount of all lost coverage, plus all litigation expenses.

(b) <u>Indymac v. Radian Insurance Inc.</u>, filed on June 27, 2008 in the Superior Court of California, County of California, in which Indymac seeks to enforce the policies at issue in the foregoing matter. These matters are likely to be consolidated into a single matter for disposition.

(c) <u>Indymac v. Financial Guaranty Insurance Company ("FGIC")</u> filed on July 1, 2008 in the United District Court, Central District of California, seeking a declaration that Indymac has not breached certain Governing Documents, as alleged by FGIC in correspondence and in the following matter.

(d) <u>FGIC v. Indymac</u> filed on July 1, 2008 in the United States District Court, Southern District of New York. Suit for breach of contract, specific performance, declaratory relief by FGIC, a bond insurer with respect to securities issued by certain Trusts, alleging INDY has breached various obligations under Governing Documents

for those Trusts, including the obligation to furnish access to books and records concerning mortgage loans held by certain Trusts.

(e)  <u>XL Capital Assurance v. Indymac</u> filed on June 27, 2008 in the United District Court, Southern District of New York, A claim by a bond insurer with respect to securities issued by certain Trusts, claiming that Indymac has breached its obligations under relevant Governing Documents and seeking access to books and records relating to mortgage loans held by certain Trusts.

(f)  Suits and other proceedings against the Trusts and/or the Trustee by the cities of Buffalo, NY, Cleveland, OH, and other jurisdictions claiming that REO properties owned by the Trusts have not been maintained in accordance with law and constitute a nuisance.  In addition, the Trusts and/or the Trustee have been forced to address similar allegations.  Such property maintenance is the sole obligation of Indymac, as loan servicer, with respect to certain of the properties at issue in these matters.  The affected Trusts and the Trustee are entitled to indemnification by Indymac, its successors and assigns, against any liability, loss, cost or expense suffered in connection with such matters

(g)  Suits or counterclaims (typically asserted in the context of foreclosure proceedings) alleging breaches, <u>inter alia</u>, of the Truth in Lending Act, Fair Debt Collection Practices Act and other laws, in connection with the origination and/or servicing of Indymac-originated mortgage loans currently owned by Trusts.  The affected Trusts and the Trustee are entitled to indemnification by Indymac, its successors and assigns, against any liability, loss, cost or expense suffered in connection with such matters.

(h)  Allegations by certain Trust investors that Indymac, as [master] servicer, has failed to charge-off mortgage loans in accordance with the Governing Documents.

18.  Pursuant to the Governing Documents and applicable law, Indymac is liable to the Trusts and the Trustee for any losses, claims, expenses or damages, including legal fees and related costs, arising out of or based upon any breaches of any representation, warranty or covenant made by Indymac or any affiliate of Indymac in the Governing Documents.  Such liability arises both from Indymac's breach of its contractual obligation to the Trusts and the Trustee to perform all of its obligations under the Governing Documents and from Indymac's obligation to indemnify, defend and hold the Trusts and the Trustee harmless from any liability, loss, cost or expense arising from Indymac's failure to perform such obligations. To the extent that Indymac (a) assumes, or assumes and assigns, any of its rights under the Governing Documents, and (b) indemnifies, or causes its successor-in-interest to indemnify, the Trusts and the Trustee for such matters, such indemnification obligation will have been satisfied. Although, to date, Indymac Federal in conservation has performed certain of such obligations, Indymac, Indymac Federal and the FDIC have not expressly assumed, or assumed and assigned, such obligations.  Accordingly, for purposes of this Proof of Claim, the Trustee assumes such obligations may not be fully satisfied.

19. Based upon the foregoing, the Trustee asserts a claim against Indymac for indemnification for, *inter alia*, all losses, claims, expenses and damages, including legal fees and related costs, arising out of or based upon any breaches of any representation, warranty or covenant made by Indymac under the Governing Documents.

**<u>Servicing Claims</u>**

20. As stated above, Indymac generally served as "servicer" or "master servicer" with respect to the mortgage loans held by the Trusts. The Trustee is informed and believes, on the basis of the FDIC's public statements and on the basis of discussions with the FDIC, that Indymac Federal (or its successors and assigns) intends to assume Indymac's loan servicing rights and obligations. To the extent that such assumption takes place, and the successor-in-interest to Indymac, as [master] servicer, performs all obligations of Indymac, as [master] servicer, under the Governing Documents (including by curing any breaches that have occurred), Indymac will have mitigated claims with respect to Indymac's servicing of the loans. The Trustee reserves the right to amend this Proof of Claim to specify further any servicing claims in the event that such assumption does not take place. In addition, as a precaution, the Trustee describes below certain issues relating to Indymac's and Indymac Federal's servicing of loans, which issues may have given rise to and/or may, in the future, give rise to breaches of Indymac's and/or Indymac Federal's obligations in respect to the servicing of mortgage loans on behalf of the Trusts.

21. On the basis of the Trustee's investigations to date, the Trustee notes the following possible inadequacies in Indymac and/or Indymac Federal's servicing of mortgage loans on behalf of the trusts:

(a) Loss mitigation activities may suffer from the material deficiencies that violate the Governing Documents, due to (i) inadequate or improper staffing of key functions, resulting in collections delays and losses, (ii) inadequate or improper controls over loss mitigation activities, (iii) substantive and procedural biases against effective collection activity and in favor of loan modifications, even when such modifications are likely to result in a lower net present value return on the mortgage loans to the Trusts, and (iv) poor organization and accountability regarding loss mitigation efforts.

(b) Failure to notify the Trustee and other transaction parties of breaches of Representations and Warranties known to Indymac.

(c) Allegations by certain Trust investors that Indymac, as [master] servicer, has failed to charge-off mortgage loans in accordance with the Governing Documents.

22. In addition, in the event that any of the obligations of Indymac as [master] servicer are subsequently repudiated by the FDIC, the Trustee will be obligated, pursuant to the terms and conditions of the Governing Documents, to replace Indymac as [master] servicer. All loss, cost and expense of such replacement will constitute additional claims against Indymac and/or Indymac Federal Bank

**<u>Claims as NIM Trustee</u>**

23.    As NIM Trustee, the Trustee is the legal owner, for the benefit of securities holders under the NIM Trusts, of Securities issued by the Trusts.  Since the NIM Trusts were formed concurrently and in conjunction with the corresponding Trusts, the NIM Trustee was the original purchaser of such Securities.

24.    As purchaser of the such Securities on behalf of the NIM Trusts, the NIM Trustee hereby alleges that, to the extent that Indymac knew or should have known of the breaches of Representations and Warranties described above, the NIM Trusts have a claim for common law fraud and/or negligent misrepresentation and/or violation of applicable federal and state securities laws in connection with the issuance, distribution and sale of the such Securities to the NIM Trusts.  Such claim is unliquidated and partially unmatured, but would be measured by the impact, if any, of such breaches on cash flows to the NIM Trusts.

**Claims as Custodian**

25.    Pursuant to the Custody Agreements, DBNTC is entitled to be paid certain fees stipulated therein, plus expenses incurred in connection with its serving as Custodian. In addition, where Indymac is seller/servicer under the Custody Agreement, Indymac has agreed to indemnify, defend and hold the Custodian harmless against all liabilities, loss, cost and expense incurred by the Custodian in the performance of its duties as Custodian.  (See, e.g., Exhibit A-7).

26.    Indymac has generally continued to pay the fees and expenses of DBNTC as Custodian upon invoicing thereof.  As of the date hereof, however, approximately $243,122.35 in fees and expenses incurred by DBNTC as Custodian remain due and payable by Indymac.  Additional invoices for fees and expenses that have been received by the Custodian to date have been submitted to Indymac for payment pursuant to the related Custody Agreements and Governing Documents.  The Custodian will furnish to Indymac, under separate cover, copies of such invoices, together with invoices for fees incurred (and included in such amount) but not invoiced as of the date hereof.

**C.   MISCELLANEOUS**

27.    By executing and filing this Proof of Claim, DBNTC does not waive any right to any security or any other right or rights with respect to any claim that DBNTC has or may have against Indymac or any other person or persons. The filing of this Proof of Claim is not intended and should not be construed to be an election of remedies or waiver of any past, present or future Defaults or Events of Default under the Governing Documents and ancillary agreements.

28.    To the knowledge of the signatory hereto, the claims are not subject to any setoff or counterclaim, and no judgment has been rendered on the claims. The amount of all payments made prior to the date hereof, if any, have been credited and deducted.

29.    DBNTC reserves its right to amend and/or supplement this Proof of Claim and to assert any and all other claims of whatever kind or nature that it has, or may have, that come to DBNTC's attention or arise after the filing of this Proof of Claim. The filing of this Proof of Claim shall not be deemed a waiver of any such claims or rights.

30.   Nothing contained in this Proof of Claim shall be deemed or construed as: (a) a waiver of, or other limitation on, any rights or remedies of DBNTC or the Securitization Trusts, or any predecessor in interest to DBNTC or the Securitization Trusts, under the Governing Documents or ancillary agreements, at law, or in equity (including any setoff rights, lien rights, rights of recoupment, or any other rights that the Trustee or each Trust has or may have against Indymac or any other entity), all of which rights are expressly reserved; (b) a consent by DBNTC or the Securitization Trusts, or any predecessor in interest to DBNTC or the Securitization Trusts, to the jurisdiction of any court with respect to proceedings, if any, commenced in any action against, or otherwise involving DBNTC or the Securitization Trusts, or any predecessor in interest to DBNTC or the Securitization Trusts; (c) a waiver or release of, or any limitation on DBNTC's or the Securitization Trusts', or any predecessor in interest to DBNTC's or the Securitization Trusts', right to trial by jury in the Court or any other court in any proceeding; (d) a waiver or release of, or any other limitation on, DBNTC's or the Securitization Trusts', or any predecessor in interest to DBNTC or the Securitization Trusts', rights to have any orders entered only after de novo review by the applicable court; (e) a waiver of, or any other limitation on, DBNTC or the Securitization Trusts', or any predecessor in interest to DBNTC's or the Securitization Trusts', right to seek a withdrawal of the reference with respect to any matter, including any matter relating to this Proof of Claim; or (f) a waiver or release of, or any other limitation on, DBNTC's or the Securitization Trusts', or any predecessor in interest to DBNTC's or the Securitization Trusts', right to assert that any portion of the claims asserted herein are entitled to treatment as priority claims.   Without limiting the generality of the foregoing, the Trustee asserts, on behalf of each Trust and itself, the right to set off the amount of all claims of such Trust and itself as Trustee of such Trust, against all claims and amounts assertable by or distributable to Indymac (or its successors-in-interest under the Governing Documents) in any capacity, including, without limitation, any rights of Indymac to recover delinquency advances, servicing advances or other amounts distributable with respect to securities or other interests in such Trusts.

10701777 6

DB2/20860024.6

# EXHIBIT 9

**FDIC** 488

**Federal Deposit Insurance Corporation**
1601 Bryan Street, Dallas, TX 75201

Division of Resolutions and Receiverships

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED – 7008 1830 0000 8031 9925**

March 31, 2009

Deutsche Bank National Trust Company
Attn: Kellie Rodriguez
Case # 07CH18916 USDC=08 C 1183
1761 East Saint Andrew Place
Santa Anna, CA 92705

SUBJECT:   10007– IndyMac Bank, F.S.B.
           Pasadena, CA – In Receivership
           **NOTICE OF DISALLOWANCE OF CLAIM**

Dear Claimant:

The Receiver of IndyMac Bank, F.S.B. has reviewed your claim against the receivership. After a thorough review of your filed claim along with your supporting documentation, the Receiver has determined to disallow your claim for the following reason(s):

> Your claim was not fixed and certain as of bank failure on July 11, 2008 and therefore your claim is not proven to the satisfaction of the Receiver.

Pursuant to 12 U.S.C. Section 1821 (d) (6), if you do not agree with this disallowance, you have the right to file a lawsuit on your claim (or continue any lawsuit commenced before the appointment of the Receiver), in the United States District (or Territorial) Court for the District within which the failed institution's principal place of business was located or the United States District Court for the District of Columbia within 60 days from the date of this notice.

**IF YOU DO NOT FILE A LAWSUIT** (or continue any lawsuit commenced before the appointment of the Receiver) **BEFORE THE END OF THE 60-DAY PERIOD, THE DISALLOWANCE WILL BE FINAL, YOUR CLAIM WILL BE FOREVER BARRED AND YOU WILL HAVE NO FURTHER RIGHTS OR REMEDIES WITH RESPECT TO YOUR CLAIM. 12 U.S.C. Section 1821(d)(6)(B).**

However, if a portion of your claim is for an insured deposit, your claim is not against the Receiver but rather is against the FDIC in its "corporate" capacity as deposit insurer. An insured depositor's rights are prescribed in 12 U.S.C. Section 1821(f) and differ from the rights described in the preceding paragraphs.

If you have any questions about this letter, please contact the undersigned at (972) 761-2665.

Sincerely,

Jeffry M. Quick
Claims Agent
Claims Department

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com℠

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark Here

Sent To  KELLIE RODRIGUEZ , DEUTSCHE BA
Street, Apt No; or PO Box No  1761  E. ST. ANDREW PL
City, State, ZIP+4  SANTA ANA , CA  92705

**EXHIBIT 3**
**Page 63**

RLS7218

Exhibit 9, Page 488

## CERTIFICATE OF SERVICE

I am a citizen of the United States and employed in Los Angeles County, California. I am over the age of eighteen years and not a party to the within-titled action. My business address is 300 South Grand Avenue, 22nd Floor, Los Angeles, California 90071.

I hereby certify that a true and correct copy of the foregoing **FIRST AMENDED COMPLAINT FOR BREACH OF CONTRACT; REPUDIATION; BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING; BREACH OF FIDUCIARY DUTY; UNCONSTITUTIONAL TAKING; AND DUE PROCESS - DEMAND FOR JURY TRIAL** was served on all counsel of record in on May 3, 2011 as follows:

1)   **BY HAND:** by causing the document(s) listed above to be personally delivered to the person(s) at the address(es) set forth below by handing said documents to a representative of First Legal Support Services for delivery to:

> Michael H. Bierman, Esq.
> Luce, Forward, Hamilton & Scripps LLP
> 601 South Figueroa, Suite 3900
> Los Angeles, CA 90017

2)   **BY FIRST CLASS MAIL:** by placing such sealed envelope with postage prepaid for fist class mail, for collection and mailing at Morgan Lewis & Bockius LLP, Los Angeles, California, following ordinary business practices addressed to:

> Thomas L. Holzman, Esq.
> Federal Deposit Insurance Corporation
> 3501 Fairfax Drive
> Arlington, VA 22206

I am readily familiar with the business practices of Morgan, Lewis & Bockius LLP for collection and processing of correspondence for mailing with the United States Postal Service. Pursuant to said practices the envelope(s) would be deposited with the United States Postal Service that same day in the ordinary course of business.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FIRST AMENDED COMPLAINT

1    I declare under the penalty of perjury under the laws of the United States of

2  America that the foregoing is true and correct.

3    Executed this 3rd day of May, 2011 at Los Angeles, California.

4

5

6  _____
   Michelle M. Bronk

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28