LINKS:  59, 60

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DEUTSCHE BANK NATIONAL TRUST COMPANY, | ) **Case No. CV 09-3852 GAF (FFMx)** |
| Plaintiff, | ) |
| vs. | ) **MEMORANDUM & ORDER RE: MOTION FOR RECONSIDERATION AND MOTION TO CERTIFY INTERLOCUTORY APPEAL BY FDIC AS RECEIVER FOR INDYMAC FEDERAL BANK, FSB** |
| FEDERAL DEPOSIT INSURANCE CORPORATION, *as Receiver of IndyMac Bank, F.S.B.; Federal Deposit Insurance Corporation, as Conservator and Receiver of IndyMac Federal Bank F.S.B.; Federal Deposit Insurance Corporation, in its corporate capacity; and Federal Deposit Insurance Corporation, as Government Entity,* | ) |
| Defendants. | ) |

## I.

## INTRODUCTION

Deutsche Bank National Trust Company ("Deutsche Bank") brings suit on behalf of itself and as trustee for numerous investors who hold mortgage-backed securities issued by IndyMac Bank, FSB ("IndyMac").  Deutsche Bank asserts claims against the Federal Deposit Insurance Corporation ("FDIC") in various capacities as the successor to IndyMac, which failed in 2008.  Before its failure, IndyMac had aggressively marketed mortgage-backed securities that were sold to investors.  These securities consisted of mortgage pools that were established by so-called "Pooling and

Servicing Agreements" ("PSAs") and evidenced by certificates held in a trust managed by Deutsche Bank as trustee.  When the real estate market collapsed, mortgage loan defaults skyrocketed, and IndyMac failed.

The Office of Thrift Supervision ("OTS") declared IndyMac insolvent, and FDIC took control of the institution and began to wind up its affairs.  At the time of the seizure, OTS authorized the creation of a new federally-chartered savings bank, IndyMac Federal, to which FDIC as receiver for IndyMac ("FDIC-R") transferred substantially all of IndyMac's assets.  FDIC operated the business of IndyMac for eight months and sold a substantial portion of IndyMac's assets, including the right to service the mortgage loans deposited into the trusts, to a newly formed financial institution, OneWest Bank.  OneWest acquired these rights without the consent of Deutsche Bank, contrary to a provision in the PSAs requiring Deutsche Bank's consent to any transfer of the rights, and without being required also to assume liabilities that IndyMac had undertaken to maintain the quality of the mortgage loans that had been deposited into the trusts.  Deutsche Bank challenges this transfer, among other things, and seeks damages in an amount between six and eight billion dollars from FDIC in its corporate capacity ("FDIC-C") and as receiver for IndyMac and IndyMac Federal ("FDIC-R").

In February 2010, FDIC-R[1] and FDIC-C brought motions to dismiss Deutsche Bank's claims arising out of FDIC's sale of assets to OneWest Bank.  (Docket Nos. 21, 22.)  Ruling on those motions, the Court dismissed with prejudice Deutsche Bank's breach of fiduciary duty, takings, and due process claims, as well as the third count for breach of contract to the extent it was based on FDIC-R's sale of servicing rights without an accompanying transfer of the obligation to maintain the quality of the mortgage loans in the trusts.  (Docket No. 58, 1/7/11 Order at 33.)  The Court also dismissed all remaining claims against FDIC-C with leave to amend.  (Id.)  The Court's

---

[1]      FDIC-R brought a single motion on behalf of the FDIC as receiver for IndyMac and as receiver for IndyMac Federal.

1    ruling on the motion to dismiss left the following claims remaining against FDIC-R:

2    claims one and two for breach of contract before and after IndyMac's failure,

3    respectively, claim three for breach of contract to the extent it was based on FDIC-R's

4    failure to obtain consent before transferring servicing rights to OneWest, claim four for

5    damages resulting from repudiation of the governing agreements pertaining to three

6    specific trusts ("the Radian Trusts"), claim five for breach of the implied covenant of

7    good faith and fair dealing, and claim eleven for a constructive trust.  (See id.)

8        On February 9, 2011, FDIC-R filed two motions:  a motion for leave to file a

9    motion for reconsideration of the Court's Order on the motion to dismiss (along with a

10   proposed motion for reconsideration) and a motion to certify that Order for

11   interlocutory appeal.  (Docket Nos. 59, 60.)  These motions seek reconsideration of, or

12   certification of an interlocutory appeal of, two of the Court's determinations:  (1) that

13   Deutsche Bank's claims are not prudentially moot because, absent repudiation, a post-

14   receivership breach of contract claim is not subject to the priority distribution scheme of

15   § 1821(d)(11) of the Financial Institutions Reform, Recovery, and Enforcement Act

16   ("FIRREA"); and (2) that § 1821(d)(2)(G)(i)(II) of FIRREA does not preempt a

17   contractual provision that required FDIC to obtain consent from Deutsche Bank before

18   selling the failed bank's servicing rights.

19       On May 2, 2011, the Court granted FDIC-R's motion for leave to file a motion

20   for reconsideration and denied the motion for reconsideration in part.  (Docket No. 77,

21   5/2/11 Order.)  Specifically, the Court declined to reverse its earlier holding that

22   FIRREA § 1821(d)(2)(G)(i)(II) does not preempt contractual consent-to-transfer

23   requirements.  (Id. at 8.)  The Court deferred deciding whether to reverse its earlier

24   decision on the prudential mootness issue.  This Order addresses the motion to

25   reconsider that issue and the motion to certify an interlocutory appeal.

26

27

28

## II.

### DISCUSSION

**A. MOTION FOR RECONSIDERATION**

    **1. THE COURT'S PREVIOUS DECISION**

As the Court explained in its previous Order, the doctrine of prudential mootness applies when "there are no set of circumstances under which [plaintiffs] can recover any money or property as a result of [their] claims," such as when the amount realized from the liquidation of an insolvent bank's assets is insufficient to meet its liabilities. Nasoordeen v. F.D.I.C., No. 08-5631, 2010 WL 1135888, at *8 (C.D. Cal. Mar. 17, 2010). Under this doctrine, the Court should decline to exercise its judicial power in such circumstances. See id. at *6.

FIRREA establishes a priority scheme for distributing the amounts realized from the resolution of a failed bank. See 12 U.S.C. § 1821(d)(11). Under this distribution priority:

> [Such] amounts realized . . . shall be distributed to pay claims (other than secured claims to the extent of any such security) in the following order of priority:
> (i) Administrative expenses of the receiver.
> (ii) Any deposit liability of the institution.
> (iii) Any other general or senior liability of the institution . . . .

Id. FDIC-R and Deutsche Bank dispute which category Deutsche Bank's claims fall within. FDIC-R argues that Deutsche Bank's claims are third-tier general unsecured claims that will not receive any compensation. The FDIC has made a determination that the assets of IndyMac and IndyMac Federal "are insufficient to make any distribution on general unsecured claims and therefore, such claims, asserted or unasserted, will recover nothing and have no value." Fed. Deposit Ins. Corp., Notice, Determination of Insufficient Assets to Satisfy Claims Against Financial Institution in Receivership, 74 Fed. Reg. 59,540 (Nov. 18, 2009).[2] Because the receiverships of

---

[2]    Deutsche Bank suggests that taking note of the status of the IndyMac receivership estate amounts to a "factual finding[] that [is] inappropriate at the motion to dismiss stage." (Opp. to

1    IndyMac and IndyMac Federal have insufficient funds to meet <u>any</u> general unsecured

2    claims, FDIC-R contends that Deutsche Bank's claims are prudentially moot.  Deutsche

3    Bank, on the other hand, contends that its claims for FDIC-R's post-receivership breach

4    of the pre-receivership contracts fall outside the § 1821(d)(11) distribution priority

5    scheme altogether and thus that it could recover money for its injuries.

6         In its previous Order, the Court agreed with Deutsche Bank that its claims for

7    FDIC-R's post-receivership breach of the trusts' governing agreements fell outside of

8    the § 1821(d)(11) distribution priority and thus were not prudentially moot.  (1/7/11

9    Order at 15–18.)  In support of this conclusion, the Court relied on the Ninth Circuit's

10   decision in <u>Sharpe v. FDIC</u>, 126 F.3d 1147 (9th Cir. 1997), which held that a claim

11   against the FDIC for breach—as opposed to repudiation—of a pre-receivership contract

12   did not qualify as a "claim" for purposes of FIRREA's exhaustion requirement.  <u>Id.</u> at

13   1157.  The Court reasoned that if a claim for post-receivership breach of a pre-

14   receivership contract does not qualify as a "claim" within the meaning of FIRREA's

15   exhaustion requirement, it likewise did not qualify as a "claim" subject to the §

16   1821(d)(11) distribution priority.  (1/7/11 Order at 17.)

17        **2. RECONSIDERATION OF THAT DECISION**

18        In its motion for reconsideration, FDIC-R contends that the Court erred in

19   assuming that if something did not qualify as a "claim" within the meaning of

20   FIRREA's exhaustion requirement, it also did not qualify as a "claim" under the

21

22   ───────────────

23   Mot. for Reconsideration at 3.)  The Court disagrees.  The Court can properly take judicial notice
     of the Federal Register notice announcing the FDIC's determination that the IndyMac

24   receivership estate has insufficient assets to pay anything on general unsecured claims.  <u>See</u>
     <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 322 (2007) (noting that courts ruling

25   on 12(b)(6) motions to dismiss may take into consideration "matters of which a court may take
     judicial notice").  The fact of IndyMac's insufficient funds is judicially noticeable because it is

26   "not subject to reasonable dispute" in that it is "capable of accurate and ready determination by
     resort to sources whose accuracy cannot reasonably be questioned."  <u>See</u> Fed. R. Evid. 201(b).

27   Indeed, FDIC-R's no-value determination is "conclusive and binding on the court."  <u>Nasoordeen</u>,
     2010 WL 1135888, at *8.  Because the FDIC's no-value determination is binding, Deutsche Bank

28   cannot challenge it to avoid prudential mootness.

1    § 1821(d)(11) distribution priority.  In support, FDIC-R points to the Ninth Circuit's

2    decision in Battista v. FDIC, 195 F.3d 1113 (9th Cir. 1999), which FDIC-R contends

3    makes clear that something can qualify as a "claim" under other FIRREA sections even

4    if it does not qualify as a "claim" for purposes of the administrative exhaustion

5    requirement.  Further, FDIC-R contends that Sharpe does not establish a blanket rule

6    that a claim for breach of a pre-receivership contract never qualifies as a "claim" under

7    FIRREA's exhaustion requirement.  In particular, FDIC-R contends that a later Ninth

8    Circuit decision, McCarthy v. FDIC, 348 F.3d 1075 (2003), limited Sharpe to the

9    narrow circumstances present in that case.  (Mot. for Reconsideration at 1–2.).

10   According to FDIC-R, this narrowing makes clear that Deutsche Bank's claims, unlike

11   the claims in Sharpe, are "claims" within the meaning of FIRREA, and thus are subject

12   to the § 1821(d)(11) distribution priority.  The Court addresses each argument in turn.

### a. *Battista*

14
15        FDIC-R contends that Battista makes clear that the term "claim" does not have a

16   uniform meaning throughout FIRREA.  (Mot. for Interlocutory Appeal at 16.)  Thus, it

17   contends, even if Sharpe establishes that Deutsche Bank's breach of contract claim does

18   not qualify as a "claim" for administrative exhaustion purposes, that claim could

19   nonetheless qualify as a "claim" for purposes of the distribution priority.  In support of

20   this contention, FDIC-R cites Battista's discussion of § 1821(i)(2), which provides that

21   the FDIC's "'maximum liability . . . to any person having a claim against the receiver of

22   the insured depository institution'" is limited to "'the amount such claimant would have

23   received if the Corporation had liquidated the assets and liabilities of such institution.'"

24   Battista, 195 F.3d at 1118 (quoting 12 U.S.C. § 1821(i)(2)) (emphasis added).  FDIC-R

25   points to the court's remark in that case that § 1821(i) "gives no indication that its

26   provisions are limited to claims under § 1821(d)," the administrative claims provision.

27   Id.  Thus, FDIC-R argues, a "claim" under § 1821(i)(2) is not necessarily also a "claim"

28   under § 1821(d).

FDIC-R takes these statements in <u>Battista</u> radically out of context.  In <u>Battista</u>, the court considered whether claims for repudiation damages were subject to the § 1821(d) administrative claims process and distribution priority, or whether § 1821(e) governing repudiation established a "separate right to payment" of damages in cash, outside of the distribution priority scheme.  <u>Id.</u> 1116–17.  The court offered several reasons why claims for repudiation damages under § 1821(e) were "merely a subset of the claims discussed in § 1821(d)."  <u>Id.</u> at 1117.  Section 1821(i)'s limitation on liability was one such reason:  it limited the FDIC's liability to the amount of the failed institution's assets, whether or not the claims were for repudiation damages.  Although perhaps inartfully phrased, the court's statement that § 1821(i) "gives no indication that its provisions are limited to claims under § 1821(d)" meant that § 1821(i)'s limitation likewise applied to repudiation damages—an aggrieved party to a repudiated contract could not demand payment in cash, which could subject the FDIC to liability beyond the funds available from liquidation of the failed institution.  Indeed, the court ultimately concluded that claims for repudiation damages qualified as "claims" under § 1821(d).  <u>Id.</u> at 1119–20.  Thus, nothing in the opinion establishes that "claim" has a different meaning throughout the statute.  <u>Battista</u> thus does not undermine this Court's reasoning that a claim that is not a "claim" for administrative exhaustion purposes is likewise not a "claim" for purposes of the § 1821(d)(11) distribution priority.

### *b. Sharpe and McCarthy*

FDIC-R also contends that <u>McCarthy</u> limited <u>Sharpe</u> in a way that renders Deutsche Bank's claim for breach of contract damages a "claim" under § 1821(d). Understanding how <u>McCarthy</u> might have limited <u>Sharpe</u> requires a very close reading of those two cases.  The Court will accordingly discuss those cases in some detail.

### 1. Sharpe

In <u>Sharpe</u>, the plaintiffs had entered into a settlement agreement with Pioneer Bank under which the parties were to simultaneously exchange consideration on July 8,

1994. <u>Sharpe</u>, 126 F.3d at 1150.  On the appointed date, the Sharpes performed their part of the bargain, delivering a promissory note, deed of trust, and reconveyance documents to Pioneer Bank.  <u>Id.</u>  The bank, however, did not perform its part of the bargain, which required it to wire the Sharpes $510,000.  <u>Id.</u> at 1150–51.  Instead, the bank issued two cashier's checks in that amount.  <u>Id.</u> at 1151.  After the close of business that day, state regulators seized the bank, FDIC was appointed as receiver, and FDIC notified the Sharpes that it would not honor the cashier's checks.  <u>Id.</u>  The Sharpes submitted a claim for breach of contract to the FIRREA administrative claims process, and the FDIC allowed the claim.  <u>Id.</u>  In compensation, the FDIC paid the Sharpes $100,000 in cash and $380,000 in receiver's certificates.  <u>Id.</u>  Unsatisfied, the Sharpes sued the FDIC in federal court for breach of contract.  <u>Id.</u>

The district court held that it had no jurisdiction to review the Sharpes' claim because FIRREA did not authorize judicial review of claims "allowed" by the FDIC. <u>Id.</u>  On appeal, the Ninth Circuit reviewed this determination, among other things. Rather than considering whether it had jurisdiction to review an "allowed" claim, however, the Circuit re-framed the question as whether the Sharpes were required to exhaust their claim at all before suing in federal court.  <u>Id.</u> at 1152.  If they were not, then the court had jurisdiction.  In concluding that the Sharpes were not required to pursue the administrative claims process, the court offered two lines of reasoning:  a parsing of the statute and policy reasons why exhaustion should not be required.

### a.  Parsing the Statute

Under FIRREA, "except as otherwise provided in this subsection," federal courts lack jurisdiction over:

> (i) any claim or action for payment from, or any action seeking a determination of rights with respect to, the assets of any depository institution for which the Corporation has been appointed receiver, including assets which the Corporation may acquire from itself as such receiver; or
>
> (ii) any claim relating to any act or omission of such institution or the Corporation as receiver.

12 U.S.C. § 1821(d)(13)(D).  The "except as otherwise provided" language allows for judicial review of such claims that have been exhausted through the administrative claims process.  <u>Sharpe</u>, 126 F.3d at 1156.

The court in <u>Sharpe</u> noted that this language was "broad," but not absolute, given other precedents not requiring exhaustion of certain types of claims.  <u>Id.</u>  The court noted that "[n]othing in the statute addresses whether a cause of action by a party to a contract breached by the FDIC is considered a 'claim' for the purposes of the administrative exhaustion requirement."  <u>Id.</u>  The court, however, concluded that the Sharpe's breach of contract claim did not qualify as a "claim" within the meaning of this provision, and that the Sharpes therefore were not required first to exhaust it in the administrative process.  <u>Id.</u>  In reaching this conclusion, the court first reasoned that the statute requires "creditors"—and, impliedly, <u>only</u> creditors—to submit "claims" for administrative resolution.  The Court concluded that only "creditors" have "claims" because the statute requires the receiver to publish a notice only to the institution's <u>creditors</u> advising them to present their claims by a specified date.  <u>Id.</u> (citing 12 U.S.C. § 1821(d)(3)(B)).  Thus, the court reasoned, "[i]f the Sharpes are considered creditors, they are subject to that claims process."  <u>Id.</u>  The court then concluded that the Sharpes were <u>not</u> creditors by virtue of their possession of the cashier's checks drawn on the failed bank.  <u>Id.</u>  The Sharpes were not creditors because the Sharpes did not intend to maintain credit there, as the agreement required a simultaneous wire transfer and the Sharpes' arguable creditor status came about only as a result of the breach of that requirement.  <u>Id.</u> at 1152, 1156.  Because the Sharpes were not creditors, they did not have a "claim" within the meaning of the exhaustion requirement.  <u>Id.</u> at 1157 ("The Sharpes cannot be considered creditors of the FDIC, and we hold that their claim is not a 'claim' for the purposes of the FIRREA exhaustion requirement.").

In sum, the Circuit's statutory construction reasoning followed five logical steps:  (1)  Only "claims" are subject to exhaustion.  (2)  Only "creditors" have claims.

(3)  The Sharpes were not creditors because they did not intend to be creditors and would not be creditors but for the FDIC's breach.  (4)  Because they were not "creditors," the Sharpes did not have a "claim" for exhaustion purposes.  (5)  Because they did not have a "claim," they were not required to exhaust their administrative remedies, and the § 1821(d)(13) bar on judicial review of unexhausted "claim[s]" did not apply.

### b.  Policy Reasons

In addition to this statutory analysis, the court also offered policy reasons in support of its decision.  First, the court reasoned that deeming the Sharpes to be creditors would allow the FDIC "to breach any pre-receivership contract, keep the benefit of the bargain, and then escape the consequences by hiding behind the FIRREA claims process."  Id. at 1156.  Similarly, the court reasoned, allowing the FDIC "to avoid its contractual obligations by invoking the administrative claims process would effectively preempt state contract law."  Id.  The court concluded that Congress did not intend broadly to preempt state contract law, and "adopt[ed] the reasoning" of the D.C. Circuit's decision to that effect in Waterview Management Co. v. FDIC, 105 F.3d 696, 699 (D.C. Cir. 1997).  The court, however, did not identify what, precisely, it adopted from Waterview.  Waterview did not address whether a breach of contract claim was subject to FIRREA's exhaustion requirement, but rather whether FIRREA's provision authorizing FDIC to transfer any asset of a failed institution without consent preempted a pre-existing contractual right of consent.  See id. at 699.  At the page cited by Sharpe, the Waterview court concluded that it did not because such a "blanket 'preemption' of all valid pre-receivership contracts" would mean that the FDIC "could simply vitiate the terms of existing assets, taking rights of value from private owners with no compensation in return," which would "raise serious constitutional questions."  Id. Considered in context, Sharpe is thus best understood as adopting Waterview's

reasoning that allowing FIRREA to preempt contract rights would raise serious constitutional questions.

Finally, the court noted that its conclusion was "further supported" by FIRREA's provision allowing the FDIC to repudiate contracts so long as it informs the parties within a reasonable time and pays compensatory damages, 12 U.S.C. § 1821(e). Sharpe, 126 F.3d at 1157.  The court remarked that it "would have been a very different case" had the FDIC repudiated the contract here.  Id.  However, it breached the contract rather than repudiating it, and "it cannot be the case that the FDIC is in a better position when it breaches a contract than when it chooses to repudiate pursuant to § 1821(e)."  Id.

### 2.  **McCarthy**

The decision in Sharpe did not squarely address the issue presented here: whether a claim for post-receivership breach of a pre-receivership contract qualifies as a general unsecured liability under the § 1821(d)(11) distribution priority, or whether it falls outside of that scheme altogether.  In its previous Order, the Court relied on Sharpe's holding that the Sharpes' claim for a post-receivership breach of a pre-receivership contract did not amount to a "claim" for purposes of FIRREA's administrative exhaustion requirement.  The Court reasoned that if such a claim did not qualify as a "claim" for administrative exhaustion purposes, it likewise did not qualify as a "claim" subject to the § 1821(d)(11) priority order for distributing assets "to pay claims."  Now, FDIC-R contests the validity of this reasoning because, it contends, McCarthy limited the circumstances in which a claim for post-receivership breach of a pre-receivership contract will not qualify as a "claim" under FIRREA.

In McCarthy, the Circuit considered a breach of fiduciary duty claim by a borrower who had taken out a loan from a bank operated by FDIC-R without knowing that the bank was under receivership.  McCarthy, 348 F.3d at 1077.  The borrower claimed that the bank improperly offered him the loan on a "take-it-or-leave-it" basis

1    and that he would not have accepted the loan had he known of the receivership.  Id.  In

2    that case, the court confronted whether the plaintiff—who was a debtor, not a

3    creditor—was subject to the FIRREA administrative exhaustion requirement.  Id.  The

4    court concluded that the debtor-plaintiff was required to exhaust because FIRREA's bar

5    on judicial review broadly required exhaustion of "any claim or action" that asserts a

6    right to assets of a failed institution.  Id. (citing 12 U.S.C. § 1821(d)(13)(D)) (emphasis

7    added by McCarthy).  Already, this decision undercuts Sharpe's reasoning.  As

8    explained above, Sharpe based its conclusion on the proposition that only "creditors"

9    have "claims" subject to exhaustion.  By holding that a debtor can have a "claim"

10   subject to exhaustion, McCarthy eliminates that key step in Sharpe's logic.

11          McCarthy, however, did not—and could not—overrule Sharpe.  Instead, the

12   court distinguished Sharpe and limited its holding that a claimant need not exhaust

13   administrative remedies to claims "arising out of a breach of contract in the

14   circumstances present in Sharpe."  Id. at 1079.  The court, however, did not precisely

15   identify what the relevant circumstances in Sharpe were.  To the contrary, the court

16   offered two competing characterizations of Sharpe—one that would apply to the

17   situation here, and one that would not.  See id. at 1078, 1081.  At one point, the

18   McCarthy court characterized Sharpe as holding that "a cause of action for breach of

19   contract is not a 'claim' subject to the FIRREA claims process" and explained that the

20   decision "turned on the claimants' being aggrieved parties to a contract that the FDIC

21   had not repudiated."  Id. at 1078.  Under this understanding of Sharpe, Deutsche Bank's

22   claim would similarly not qualify as a "claim" because Deutsche Bank is the aggrieved

23   party to a contract that the FDIC breached rather than repudiating.  Later, however, the

24   McCarthy court held that claims must be administratively exhausted unless they are

25   claims "made in connection with bankruptcy proceedings or arising out of a breach of

26   contract fully performed by the aggrieved party but not repudiated by the receiver."  Id.

27   at 1081 (emphasis added).  Under this understanding of Sharpe, Deutsche Bank would

28

not fall within the <u>Sharpe</u> exception because Deutsche Bank had not fully performed its obligations, but rather had continuing obligations to pay servicing fees over time.

### 3. Reconsideration in Light of <u>McCarthy</u>

For these reasons, <u>McCarthy</u>'s explanation of <u>Sharpe</u> is ambiguous. <u>McCarthy</u> limited <u>Sharpe</u> to its factual circumstances, without clearly identifying which factual circumstances were relevant. <u>McCarthy</u>'s reasoning directly conflicts with, and undercuts, the <u>Sharpe</u> statutory analysis, but the decision unquestionably left <u>Sharpe</u> intact. Thus, <u>Sharpe</u>'s policy reasons must independently support the holding that the Sharpes' claims were not subject to FIRREA's administrative exhaustion requirement. It is these policy reasons that continue to control.

Unfortunately, the court in <u>Sharpe</u> did not thoroughly explain the policy reasons supporting its decision. All of the policy reasons cited by the <u>Sharpe</u> court reflect the notion that the FDIC should not be able to breach a failed institution's contracts with impunity. The court refers to the FDIC "escap[ing] the consequences," "avoid[ing] its contractual obligations," and being "in a better position when it breaches a contract than when it chooses to repudiate." <u>Sharpe</u>, 126 F.3d at 1156–57. The court, however, did not specify in what ways the claims process would allow the FDIC to avoid the consequences of its breach or to be in a "better position" than if it had repudiated the contract.

The court's statement that the FDIC should not be in a better position when it breaches than when it repudiates appears to have been based on an assumption that repudiation damages were not subject to the administrative claims process, but rather were payable in full by the FDIC outside of the ordinary claims scheme.[3] At the time, the Circuit had not yet decided <u>Battista</u>, which established for the first time that

---

[3]     Immediately before remarking that this would have been "a very different case" if FDIC had repudiated the contract, the Circuit noted that when the FDIC repudiates a contract, "it must inform the parties to the contract within a reasonable time and pay compensatory damages." <u>Sharpe</u>, 126 F.3d at 1157.

§ 1821(e) did not establish "a separate right to payment" of damages based on a repudiated contract, but rather that such damages were subject to the § 1821(d) "payment scheme." Battista, 195 F.3d at 1116. Thus, to the extent Sharpe based its reasoning on the assumption that FDIC would always pay compensatory damages for repudiating a contract because repudiation damages were recoverable outside of the administrative claims process, its reasoning was later undercut by Battista.

In short, McCarthy undercuts Sharpe's statutory analysis, leaving only Sharpe's policy reasoning intact. Sharpe, however, does not clearly explain the policy reasons supporting its holding, and Battista appears to undercut those policy reasons at least in part. In light of this, the Court find that Sharpe is limited to the unique circumstances presented in that case. Given the tension in the case law, the Court finds it prudent to adopt McCarthy's more narrow characterization of Sharpe as establishing only that claims "arising out of a breach of contract fully performed by the aggrieved party but not repudiated by the receiver" do not qualify as "claims" under § 1821(d)'s administrative exhaustion requirement. McCarthy, 348 F.3d at 1081. Deutsche Bank's claims do not fall within the Sharpe exception so understood. Deutsche Bank had not fully performed its obligations, but rather had continuing obligations to pay servicing fees over time. Thus, its claims for post-receivership breach of pre-receivership contracts are subject to the § 1821(d)(11) distribution priority.

This conclusion finds support in the policies underlying FIRREA and its statutory text. First, FIRREA establishes a depositor-preference by allowing depositors to recover from the failed institution ahead of creditors with general unsecured claims. See 12 U.S.C. § 1821(d)(11). Although FDIC-R may have acted beyond its statutory authority in breaching the contracts, there is no reason why this breach should result in a super-priority claim that would disadvantage other claimants, including depositors. It is unlikely that Congress intended to create such a super-priority status for these claims without explicitly so stating.

Second, Deutsche Bank's interpretation of the statute would prevent FDIC from maximizing the assets of the receivership, in contravention of its statutory mandate to "conduct its operations in a manner which . . . maximizes the net present value return from the sale or disposition of . . . assets [of any insured depository institution for which FDIC has been appointed conservator or receiver]."  See 12 U.S.C. § 1821(d)(13)(E). According to Deutsche Bank, the PSAs did not permit FDIC-R to sell the servicing rights without Deutsche Bank's written consent.  (See Docket No. 46-1, Pooling and Servicing Agreement § 10.07.)  If FDIC-R had repudiated these contracts (rather than simply breaching their consent requirement), it would have destroyed the contract, leaving no contractual rights left to sell.  If FDIC-R had complied with the consent requirement and sought Deutsche Bank's consent to sell the servicing rights, Deutsche Bank could have denied its consent, effectively holding the servicing rights hostage until FDIC-R had no choice but to sell them to Deutsche Bank below value or to allow them simply to revert to Deutsche Bank after resolution of the receivership.  In Deutsche Bank's view, it should have been able to prevent the value-maximizing sale of the servicing rights in this way.  This, however, would have prevented FDIC-R from maximizing the value of the receivership, and accordingly would have elevated Deutsche Bank's interests above those of all other creditors, and depositors, of the institution.

The statute does not evidence any congressional intent to elevate the claims of aggrieved parties to a breached contract above the claims of the institution's depositors and other creditors in this way.  To the contrary, the statutory text suggests that Congress did not intend for such breach of contract claims to have super-priority. Section 1821(d)(20) explicitly provides that damages "for the breach of an agreement executed or approved by such receiver or conservator after the date of its appointment shall be paid as a[] [first-priority] administrative expense of the receiver or conservator."  12 U.S.C. § 1821(d)(20).  If damages for the breach of a pre-receivership contract not executed or approved by the receiver were likewise recoverable as an

administrative expense or on a super-priority basis, Congress would not have included the "executed or approved by such receiver" limitation in this provision.

Third, contrary to Deutsche Bank's contention, concluding that a claim for post-receivership breach of a pre-receivership contract is merely a third-tier general unsecured claim would not effectively render the repudiation provisions a nullity.  To the contrary, the FDIC would retain incentives to repudiate, rather than breach, because repudiation results in a limitation on damages.  See 12 U.S.C. § 1821(e)(3)(A).

Finally, Battista's reasoning explaining why claims for repudiation damages are subject to the § 1821(d)(11) distribution priority applies equally here.  "[I]f Congress had wished to depart from the § 1821(d) regime for claims for damages" for repudiation or for breach of contract, "presumably it would have said so."  See Battista, 195 F.3d at 1117.  In fact, it did so in § 1821(f) with respect to payment of insured deposits.  Id. Second, § 1821(i) limits the FDIC's liability to the amount of the failed institution's assets, and nothing suggests that this provision is inapplicable to claims for breach of contract damages, just as nothing suggests that the provision is inapplicable to claims for repudiation damages.  See id. at 1118.  Thus, payment of such damages on a super-priority basis would not harm the FDIC itself, but rather only other creditors and depositors—a result that cannot be reconciled with Congress's depositor preference. Finally, the distribution priority in § 1821(d)(11) "makes little sense if parties injured by" repudiations or breaches of contract "are treated separately from parties with claims under § 1821(d)."  See id.  If such claims "were to be treated differently from claims under § 1821(d), . . . one would have expected Congress to have given [such] claims a place in § 1821(d)(11)'s hierarchy."  Id.

For these reasons, the Court now concludes that Deutsche Bank's breach of contract-based claims are not entitled to super-priority, but rather are third-tier general unsecured claims.  Deutsche Bank therefore cannot recover anything on those claims given IndyMac's deep insolvency.  Deutsche Bank's claims—except for the second

cause of action against FDIC-R for post-failure breach of contract to the extent that it is based on the alleged breach of contracts that FDIC-R "executed or approved," which would be entitled to a priority right of payment under 12 U.S.C. § 1821(d)(20)—are accordingly prudentially moot. The Court therefore **DISMISSES** all remaining claims with prejudice, except for count two to the extent that it claims a priority right of payment under § 1821(d)(20).

## B. MOTION TO CERTIFY THE ORDER FOR INTERLOCUTORY APPEAL

FDIC-R also brings a motion seeking certification of an interlocutory appeal. (Docket No. 59.)  Specifically, FDIC-R seeks an order certifying an interlocutory appeal of (1) whether § 1821(d)(2)(G) renders contractual consent requirements unenforceable and (2) whether Deutsche Bank's breach of contract claims are subject to the § 1821(d)(11) distribution priority.  Because the Court has now ruled in FDIC-R's favor on the prudential mootness issue, FDIC-R no longer has an adverse decision to appeal with respect to these issues.  The only remaining claim, count 2, is based on FDIC-R's failure to cure IndyMac's breaches of the Governing Agreements, and does not seek recovery for FDIC-R's breach of the contractual consent-to-transfer requirement.  FDIC-R's motion for certification of an interlocutory appeal is accordingly moot.  The Court, however, can and will sua sponte consider whether to certify the prudential mootness issue for interlocutory appeal by Deutsche Bank. See Al-Haramain Islamic Found., Inc. v. Bush, 507 F.3d 1190, 1196 (9th Cir. 2007) (noting that district court sua sponte certified its order for interlocutory appeal).

### 1. STANDARD FOR CERTIFICATION OF INTERLOCUTORY APPEAL UNDER 28 U.S.C. § 1292(B)

Under 28 U.S.C. § 1292(b), the court may certify an issue for interlocutory appeal if three elements are satisfied: (1) the issue is a controlling question of law; (2) the issue offers substantial grounds for a difference of opinion; and (3) an immediate appeal may materially advance the ultimate termination of the litigation.  In re Cement

_Antitrust Litig._, 673 F.2d 1020, 1026 (9th Cir. 1982), aff'd sub nom., _Ariz. v. Ash Grove Cement Co._, 459 U.S. 1190 (1983).  Certification is warranted only where "'exceptional circumstances justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment.'"  _Id._ (quoting _Coopers & Lybrand v. Livesay_, 437 U.S. 463, 475 (1978)).  The Ninth Circuit has held that certification to file an interlocutory appeal should be granted sparingly.  _United States v. Woodbury_, 263 F.2d 784, 788 n.11 (1959).  Thus, a court should grant such certification only where allowing an immediate appeal "might avoid protracted and expensive litigation."  _United States Rubber Co. v. Wright_, 359 F.2d 784, 785 (9th Cir. 1966).

**2. APPLICATION**

**_a.  Controlling Question of Law_**

To qualify as a "controlling question of law," it need not be the case that "the reversal of the district court's order [would] terminate the litigation."  _In re Cement Antitrust Litig._, 673 F.2d at 1026.  Rather, "all that must be shown in order for a question to be 'controlling' is that resolution of the issue on appeal could materially affect the outcome of litigation in the district court."  _Id._  The Court concludes that the question whether claims for post-receivership breach of a pre-receivership contract are subject to the § 1821(d)(11) distribution priority constitutes a controlling question law worthy of certification.

If the appeals court reversed this Court's decision on the prudential mootness issue, that would revive counts 3, 5, and 11.[4]  This would "materially affect the

_____

[4]  Even if the Circuit concluded that claims for post-failure breaches of contract by the FDIC-R are not subject to the § 1821(d)(11) distribution priority, counts 1 and 4—for IndyMac's pre-failure breach of contract and FDIC-R's repudiation of the Radian Trusts, respectively—would still be prudentially moot.  In its initial motion to dismiss, FDIC-R sought dismissal of all claims for money damages—which would include counts 1 and 4—on prudential mootness grounds, but the Court overlooked the request to dismiss counts 1 and 4 and thus did not issue a ruling on those claims.  (See Docket No. 22, FDIC-R's Not. at 2; Docket No. 23, FDIC-R's Mem in

outcome" of litigation in this Court.  If Deutsche Bank's claims are not prudentially moot, it would be far more efficient to resolve those claims along with count 2, currently the only remaining claim.  The Court accordingly concludes that this case involves a "controlling question of law."

### b. Substantial Grounds for a Difference of Opinion

There are also substantial grounds for a difference of opinion with respect to whether Deutsche Bank's claims relating to FDIC-R's post-failure breach of contract are third-tier general unsecured claims under the § 1821(d)(11) distribution priority and thus prudentially moot.  This Court's own ruling reversing its earlier decision on this issue, and the tension in the Ninth Circuit precedent discussed above, makes clear that substantial grounds for differing opinions exist here.

"To determine if a 'substantial ground for difference of opinion' exists under 28 U.S.C. § 1292(b), courts must examine the extent to which the controlling law is unclear." Davis Moreno Constr., Inc. v. Frontier Steel Bldg. Corp., No. 1:08-cv-00854, 2011 WL 347127, at *2 (E.D. Cal. Feb. 2, 2011).  Although "a sufficient number of conflicting and contradictory opinions will provide substantial ground for disagreement, . . . a dearth of cases does not constitute substantial ground for difference of opinion." Id.  Even where no conflicting case law exists, however, it is still possible to establish a substantial ground for a difference of opinion.  Stuart v. Radioshack Corp., No. 07-

_____

Support of Mot. to Dismiss at 26–27.)  In count 1, Deutsche Bank asserts a breach of contract claim based on (1) IndyMac's pre-failure breaches of the PSAs' governing agreements and (2) FDIC-R's failure to cure those breaches. (Compl. ¶¶ 117–31.)  To the extent that this claim seeks damages for IndyMac's pre-failure breach, its claim is no more than a third-tier general unsecured liability.  Because the receivership has insufficient funds to satisfy any third-tier claims, this claim is prudentially moot.  In count 4, Deutsche Bank asserts a claim for damages resulting from FDIC-R's repudiation of the governing agreements of the three Radian trusts. (Compl. ¶¶ 156–60.)  Claims for damages based on FDIC-R's repudiation of pre-receivership contracts are payable as general liabilities of the institution.  See Battista, 195 F.3d at 1120. Because the FDIC has insufficient assets to make any distribution on such general unsecured liabilities, these claims have no value.  Because Deutsche Bank thus will not be able to recover any money on this claim, it is prudentially moot.

4499, 2009 WL 1817007, at *3 (N.D. Cal. June 25, 2009).  In such circumstances, the Court must make "an inquiry into the merits" to determine whether there is substantial grounds for a difference of opinion.  Oyster v. Johns-Manville Corp., 568 F. Supp. 83, 86 (E.D. Pa. 1983).

As noted above, there is no controlling precedent on this issue.  Neither Sharpe nor McCarthy addresses whether a claim for post-receivership breach of a pre-receivership contract falls within the § 1821(d)(11) priority scheme.  Thus, no controlling precedent precludes a finding that there are substantial grounds for differing opinions on the issues in this case.  Moreover, Ninth Circuit case law is unclear on the extent to which a claim for post-receivership breach of a pre-receivership contract qualifies as a "claim" for purposes of § 1821(d).  McCarthy and Sharpe are difficult to reconcile, and McCarthy did not clearly identify the extent to which it left Sharpe's holding intact.  As outlined above, FDIC-R has made strong arguments that Deutsche Bank's claims qualify as "claims" subject to the § 1821(d)(11) distribution priority.  Deutsche Bank, however, has also made strong arguments that its claims are entitled to priority status, or to compensation outside of the § 1821(d)(11) scheme because, as Sharpe teaches, FDIC-R should not be in a better position when it breaches a contract than when it repudiates one.  See Sharpe, 126 F.3d at 1157.  These arguments are certainly strong enough to give rise to substantial grounds for a difference of opinion.

### c.  Materially Advance Ultimate Termination of the Litigation

Finally, interlocutory appeal would materially advance the ultimate termination of the litigation.  One claim remains in this case—count 2 for breach of the PSAs to the extent that FDIC-R "approved or executed" them.  This claim could potentially involve extensive discovery and litigation on whether FDIC-R "approved or executed" the PSAs such that its breach gives rise to a priority right of payment under § 1821(d)(20) and on whether and to what extent FDIC-R actually breached the representations and warranties in the PSAs.  If the Court will ultimately have to resolve other claims that it

has determined are prudentially moot, it would be far more efficient to resolve them along with count 2, rather than separately after an appeal.

For these reasons, the Court concludes that this case is appropriate for interlocutory appeal. The Court accordingly hereby **CERTIFIES** for interlocutory appeal the following controlling question of law: whether Deutsche Bank's claims for post-failure breach by FDIC-R of contracts executed by a failed bank are payable only as third-tier general unsecured claims under the § 1821(d)(11) distribution priority. If Deutsche Bank wishes to appeal this issue to the Circuit at this stage, it must make an appropriate application within ten days after the entry of this Order. See 28 U.S.C. § 1292(b). If Deutsche Bank appeals, the Court will stay further proceedings in this case pending resolution of proceedings in the Circuit.

## III.

### CONCLUSION

For the reasons set forth above, the Court **GRANTS** FDIC-R's motion for reconsideration and concludes that Deutsche Bank's claims are prudentially moot because they are payable only as third-tier general unsecured claims under 12 U.S.C. § 1821(d)(11). The Court accordingly **DISMISSES** all remaining claims in this case **with prejudice**, except for count 2 to the extent that it claims a priority right of payment under § 1821(d)(20).

FDIC-R's motion for certification of an interlocutory appeal is **DENIED as moot**. The Court, however, **CERTIFIES** this Order for interlocutory appeal for the reasons stated above.

**IT IS SO ORDERED.**

DATED: June 28, 2011

_____

Judge Gary Allen Feess
United States District Judge