1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3               WESTERN DIVISION

4    THE HON. JUDGE GARY ALLEN FEESS, JUDGE PRESIDING

5

6    DEUTSCHE BANK NATIONAL TRUST          )
     COMPANY,                              )
7                                          )
                        Plaintiff,         )
8                                          )
          vs.                              ) NO. 09-CV-3852-GAF
9                                          )
     FEDERAL DEPOSIT INSURANCE CORP.,      )
10                                         )
                        Defendant.         )
11   _____)

12

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16               Los Angeles, California

17                Monday, May 9, 2011

18

19

20

21

22

23          LISA M. GONZALEZ, CSR No. 5920, CCRR
        Edward R. Roybal Federal Building & U.S. Courthouse
24           255 East Temple Street - Room 181-C
                Los Angeles, California 90012
25             (213) 621-7709; csrlisag@aol.com

```
1   APPEARANCES:

2

3   FOR THE PLAINTIFF:    MORGAN LEWIS & BOCKIUS LLP
                          BY:  JAMI WINTZ McKEON, ATTORNEY AT LAW
4                         One Market, Spear Street Tower
                          San Francisco, California  94105
5                         (415) 442-1405

6

    FOR THE DEFENDANT:    LUCE FORWARD
7                         BY:  MICHAEL H. BIERMAN
                          601 South Figueroa
8                         Suite 3900
                          Los Angeles, California  90017
9                         (213) 892-4992

10                        FEDERAL DEPOSIT INSURANCE CORPORATION
                          BY:  J. SCOTT WATSON
11                        3501 Fairfax Drive, Room D-7008
                          Arlington, VA  22226
12                        (703) 562-2384

13

14

15

16

17

18

19

20

21

22

23

24

25
```

*Los Angeles, California, Monday, May 9, 2011*

*9:30  a.m.*

*-oOo-*

THE CLERK:  Calling case No. CV-09-3852-GAF,
Deutsche Bank National Trust Company v. Federal Deposit
Insurance Corporation.

Counsel, please state your appearance.

MS. McKEON:  Your Honor, Jami McKeon from Morgan
Lewis for the plaintiff.

MR. BIERMAN:  Michael Bierman appearing with FDIC.
With me is J. Scott Watson from the appellate division in
Washington, who will be arguing today; and Lawrence Richman,
who is head of the appellate division.

THE COURT:  The matter is here today because the
FDIC has asked for reconsideration of the Court's prior
ruling in this case, and I have a number of thoughts
somewhat in the nature, I think, of thinking out loud that I
want to go through.  And then I want to hear from the
parties, and I will do my best to sit and listen at that
point.

I will say, as a general sort of overarching
concept, I still have the feeling at this point that there
is some fundamental issue here or some fundamental point or
perspective that is alluding me and that is not articulated
in the parties' papers and that I'm struggling to work

```
 1   through.  It's a complicated issue and obviously one that's

 2   important to all of the parties in this case.  That's why,

 3   even though the request for reconsideration doesn't meet the

 4   standard, I have decided to reconsider it.

 5           I know that Deutsche Bank asks me not to do it,

 6   but I can depart from the local rule if my conclusion would

 7   conclude that doing so would have a slight negative effect

 8   on the litigants.  The reality is getting the order out

 9   quickly, the impact is on the Court, especially when I've

10   spent hours, without the benefit of McCarthy.

11           Rule 54(b) also, I'm sure you know, says that I

12   can revise any decision that I've made at any time prior to

13   the entry of final judgment, and so I'm certainly going to

14   do that, and I'm thinking about the issue at this point.

15           As you know, I'm not revising my presumption

16   ruling.  I've issued a ruling on that.  I don't want to hear

17   argument on that at this hearing.  That's done.  I know what

18   I think about that part of the case, and I'm not interested

19   in hearing any further debate on that.  But prudential

20   mootness and the issues about the question of prudential

21   mootness I do want to hear about.  I am giving very serious

22   thought to the question, and I am considering reversing my

23   prior ruling, although that doesn't mean that I have

24   tentatively decided to do that.  It just means I'm seriously

25   considering it.  I don't have a tentative decision at this
```

1   point.

2          In considering the question, I do want to start

3   with what was really kind of a secondary point that I think

4   was made by FDIC but which I think is actually more

5   fundamental, and that is the question of whether or not

6   under FIRREA "claim" means different things in different

7   parts of the statute.  I do not think so.

8          And I think that reaching such a conclusion in

9   this case so that FDIC could claim a victory here, if not

10  disastrous for the agency in the long term, would create

11  needless complications for the FDIC's operation on that

12  statute.  I don't think the FDIC wants a decision out there

13  other than perhaps to win this case, that says that "claim"

14  means different things for different purposes under this

15  comprehensive statutory scheme.

16         In my view "claim" means the same thing for

17  administrative exhaustion as for distribution priority, and

18  I read Bautista to hold quite clearly that repudiation

19  claims are just a subset of the claims described in 1821(d);

20  so I don't think that really moves the ball in the FDIC's

21  direction much at all.

22         But I think my view is that "claim" means "claim,"

23  and we just have to -- it means the same thing throughout

24  the statute.  That doesn't mean that it's clear what a claim

25  is yet because the cases, I think, are not very clear on

1    that point.  But I don't think that the statute gives any

2    indication that Congress meant different things in different

3    sections.

4            Now, having gone then and looked at McCarthy,

5    which the parties have -- excuse me, which FDIC has

6    suggested is the controlling decision here, it's clearly

7    true that McCarthy distinguishes Sharp.  But I think it is

8    less clear whether McCarthy distinguishes it in the way

9    which sets out some sort of a general rule, which Sharp is

10   then identified as an exception or to which Sharp is

11   identified as an exception, or whether we're dealing with a

12   very large, complicated area of the statute with two small

13   pieces of it where we said, well, Sharp, we know what Sharp

14   means.  We know what McCarthy means.

15           But looking at the two of them in light of each

16   other still doesn't tell us what the entire landscape is

17   necessarily going to look like, and I think that's partly

18   because Sharp does not make clear whether its ruling is

19   based on the language of the statute leading to the

20   conclusion that the Sharps were not creditors with the

21   claim, or whether Sharp is saying that the Sharps win in

22   that case for policy reasons, because that's where we get

23   into this whole discussion about the FDIC can't hide a

24   breach of contract behind a FIRREA claims process and escape

25   liability, which is rooted in constitutional principles.  So

1   it's not sure whether it's the language of the statute, it's

2   policy, or some combination of both.  And in my view

3   McCarthy isn't as helpful as one would hope in terms of

4   pointing to Sharp and saying, well, this is how we are

5   distinguishing Sharp.

6          McCarthy certainly did hold that a debtor-claimant

7   was subject to judicial review bar even though not a

8   creditor, and that would undermine Sharp's view that

9   claimants are creditors by definition.  But the opinion in

10  my view is ambiguous as to whether a cause of action for

11  breach of contract is a claim or and whether that turns on

12  the FDIC's decision to repudiate or not, or whether it's a

13  subset of breach of contract where the claimant using that

14  in a generic sense for a moment is someone who has fully

15  executed their duties and obligations and which needs to do

16  nothing more other than be paid by the institution, because

17  Sharp did have that rather unique feature.

18         So, on reflection I look at these two cases and I

19  look at McCarthy, and it seems to me that McCarthy treats

20  Sharp in two different ways.  I don't know whether they're

21  saying, look, this is because Sharp is a case just involving

22  a cause of action for breach of contract as a claim and

23  that's what the case is about, or whether it has to do with

24  the repudiation and the failure to repudiate or not and

25  that's what the case is about.

```
1          So it's -- I'm not at all sure where McCarthy
2   ultimately gets us, although it clearly does move me away
3   from the clear position that I had in mind under Sharp on my
4   prior ruling.
5          So I think what I want to do is hear from FDIC
6   first as to -- and you don't have to track anything that
7   I've said here per se, but understand I am trying to make
8   sure that when I issue my final decision in this case, I've
9   at least articulated my ruling on the basis of the best
10  understanding I've got as to the existing authority at this
11  point in time.
12         Now, we all know where this case is going after
13  you're all done with me, whichever way it goes, and we all
14  know that the Circuit will do what it wants to do, but I
15  want to try to get it right here anyway, even though they'll
16  review it de novo.
17         Let me hear from FDIC.
18         MR. WATSON:  Thank you, Your Honor.  May it please
19  the Court, as Mr. Bierman said, I'm Scott Watson from FDIC's
20  appellate litigation unit in Washington.  And based on your
21  comments just a moment ago, I'd like to start off with what
22  I think is the fundamental principle of both Sharp and
23  McCarthy and that should guide this Court as well, and that
24  principle is that creditors are subject to the
25  administrative claims process and that the creditors are
```

1  subject to the (d)(11) distribution scheme.

2          And from that rule, this case can only survive

3  prudential mootness if the Court deviates from Congress's

4  distribution scheme in (d)(11).  That deviation would

5  require an extension of Sharp to find that claim is not, as

6  the Court described it, claim as it's understood, and the

7  claims must be paid under (d)(11) unless the Court deviates

8  from the scheme and extends Sharp.

9          THE COURT:  Do you think that after McCarthy -- I

10 think Sharp talked about FDIC being in a better position by

11 virtue of performing and ultimately breaching the contract

12 as opposed to repudiating it, but maybe, in light of

13 McCarthy, if Sharp is -- if they're both right, maybe FDIC

14 is in a worst position if they breach as opposed to being in

15 a better position.

16         So maybe if we look at the overall objective of

17 what FIRREA is supposed to do and what the FDIC's

18 responsibility is, we would say, no, the FDIC really doesn't

19 obtain a benefit from breaching the contract, a statutory

20 benefit.  And so Sharp's just wrong on that point.

21         MR. WATSON:  I believe that's correct, Your Honor,

22 because if you look at the statute, the statute provides

23 that in the event of an actual breach, the party' going to

24 be able to obtain its damages, and repudiation is really to

25 the FDIC's benefit.  It's among its arsenal of decisions,

1    and it can make the decision to repudiate in order to obtain

2    the benefit of a limitation of damages.

3          THE COURT:  Is there any consequence, though, then

4    of breach if the FDIC takes over an institution and in its

5    post receivership operation breaches contracts, a contract

6    or one or more, is there any consequence outside the scope

7    of FIRREA for that behavior?

8          MR. WATSON:  I don't believe there is.  I think

9    FIRREA provides the consequence for the breach of contract.

10   It gives rise to a claim.  It's a claim that would have to

11   be submitted through the administrative claims process.  And

12   if allowed or if ultimately on a judicial determination of

13   the claim it were deemed allowed by the Court, it would then

14   be paid in accordance with (d)(11).  So FIRREA provides the

15   consequence for the breach by the FDIC.

16          And in looking at -- the Court's focused on Sharp

17   and McCarthy, and I think Sharp and McCarthy help explain

18   why Sharp provided what the McCarthy Court later explained

19   is the exceptional circumstances that in that case led to

20   the Sharps' not being creditors.  And that's what we focused

21   on in our papers, which is the Court noted that there was to

22   be a simultaneous exchange under a Court-approved settlement

23   where the Sharps never intended any future debt or

24   performance on the part of anyone.  There just wasn't an

25   intention to create a creditor relationship.

1          And when the bank showed up with the checks, there

2    was no intention on the part of the Sharps to create a

3    creditor relationship, and that was what the Court deemed

4    important in Sharp and what the McCarthy Court then later

5    focused on.

6          And to quote Sharp, the Court consistently

7    discussed that.  It concluded that the Sharps were not

8    required to submit their cause of action because they're not

9    creditors of the FDIC.  That's at 1156.

10          At 1156 they also discussed -- the Sharp panel

11   also discussed Section 1821(d) requiring creditors submit

12   claims, and the Court conceded:  If the Sharps are

13   considered creditors, they're subject to the claims process.

14          The Court cannot accept the argument that the

15   Sharps were made creditors for the purposes of FIRREA just

16   because the FDIC did not honor the cashier's checks when

17   there was never an intention on the part of the parties to

18   that original settlement agreement that there ever be a

19   creditor relationship.

20          And therefore at 1157, because the Sharps cannot

21   be considered creditors of the FDIC, the Ninth Circuit held

22   that their claim was not a claim for purposes of the

23   exhaustion requirement.

24          THE COURT:  But, you know, everything you've said

25   is literally true.  The problem is the definition of

1    debtor-creditor relationships generally does not have an

2    intentionality element to it if we're going to have a

3    lawsuit.  I mean, there's behavior which either does or does

4    not result in a debtor-creditor relationship, and one

5    becomes a creditor in certain circumstances by breaching the

6    contract in failing to honor certain obligations that one

7    may have.  It may be by operation of law, but it's still

8    essentially the same.  So I wonder whether or not that moves

9    the ball very far.

10           MR. WATSON:  Well, I think it does, Your Honor,

11   because I think what you're recognizing is that a party to a

12   breach of contract, just a fundamental tenet of insolvency

13   law, that those parties are creditors of the estate.

14   They're owed a future performance.  And it was solely in the

15   unique circumstances or the special circumstances -- they're

16   not necessarily unique, but the special circumstances of

17   Sharp that the Sharp panel found that they were not

18   creditors for purposes of the statute.

19           It was a very unique transaction that intended a

20   simultaneous exchange, and it was that element that led the

21   Court to conclude that they weren't creditors and that the

22   administrative claims process and its exhaustion requirement

23   wouldn't apply.  That was the only -- that was the only

24   discussion the Court had upon concluding that they weren't

25   creditors and the process wouldn't apply.  It was only later

1    that the Court discussed repudiation or the other elements

2    that were present, but they didn't go into the Court's

3    holding.

4              THE COURT:  But when you say what you've just

5    said, and given the point that you made about bankruptcy, I

6    mean, what you really think is Sharp's wrong.  I mean, isn't

7    that true?  I mean, you think that Sharp was wrongly

8    decided?

9              MR. WATSON:  It's not necessary for us to get that

10   far, Your Honor.

11             THE COURT:  I know it's not.  I know it's not.

12   But humor me.  You think it's wrongly decided; don't you?  I

13   mean, you think McCarthy is right and Sharp is wrong?

14             MR. WATSON:  I think McCarthy's right, but I think

15   McCarthy is consistent with Sharp because they both

16   recognize the creditor relationship.  The creditor

17   relationship has to be submitted to the claims process and

18   is paid as a claim under (d)(11).  That's our extension of

19   McCarthy because that's the only thing that (d)(11) actually

20   contemplates.  Claims are paid in accordance with that

21   statute.

22             One could question whether the Sharp panel's

23   conclusion that they weren't creditors could be questioned,

24   but the McCarthy panel found it unnecessary to do that

25   because it could find the unique circumstances that were

```
 1   there that the Court focused on.

 2              THE COURT:  Well, the McCarthy panel can't

 3   overrule Sharp.

 4              MR. WATSON:  Exactly.

 5              THE COURT:  It's not allowed.  Only an en banc

 6   panel can do that.

 7              Well, all right.  Go ahead.

 8              MR. WATSON:  I should mention that in finding that

 9   the breach of contract generally gives rise to a creditor

10   relationship and that a creditor has to go through the

11   claims process, that's consistent with the four other

12   decisions by the Courts of Appeals that apply the

13   administrative claims process to breach-of-contract claims.

14   It's consistent with just the general understanding of what

15   the language a creditor intends.

16              It's not disputed here that Deutsche Bank is a

17   creditor of the receivership.  It really couldn't be.  And

18   the unique circumstances in Sharp led that Court to conclude

19   that they were not creditors for purposes of the statute,

20   but they recognize that creditors generally are subject to

21   the statute.  McCarthy reinforced that and explained that

22   there were special circumstances in Sharp that the Court

23   could focus on.

24              THE COURT:  Well, doesn't McCarthy even say

25   that -- well, I don't remember now.  I don't remember if it
```

1   says it or if it essentially treats it as saying that Sharp

2   essentially said creditors have claims, and McCarthy said:

3   No.  Claimants have claims -- because it was a debtor in the

4   McCarthy case who actually was bringing the claim, and they

5   said, well, the statute says claims or actions, and you

6   don't have to define the person who's bringing the claim or

7   the action to say that it comes within the scope of the

8   statute.

9          And so to that extent -- and again, I'm not

10  remembering at the moment whether or not McCarthy directly

11  addresses this, but certainly they ignored and followed a

12  different path than Sharp did, because Sharp took the view

13  that creditors -- it's creditors who have claims.  McCarthy

14  does not take that view.

15         MR. WATSON:  I believe that's correct.  And the

16  McCarthy decision is consistent with the language of the

17  statute, and I think the decision reflected that, that the

18  claims process envisions any claim regarding any act or

19  omission of either the receiver or the failed bank, any

20  claim with respect to the assets of the institution.  All of

21  those are envisioned as being claims that are submitted

22  through the claims process and ultimately if the claim is

23  allowed, satisfied through D-11's distribution priorities.

24         But the claims process, that's why the Court was

25  careful in McCarthy to explain that there were just two

1    limited exceptions, and that was the limited exception of

2    bankruptcy and the Sharp exception in the unusual

3    circumstances that were presented there, and makes no other

4    distinction on the basis of a breach-of-contract claim

5    somehow not being either a claim or a creditor; rather it's

6    the unique circumstances in Sharp.

7            The McCarthy panel just recognized what the

8    statute commands, which is that any claim be submitted

9    through the administrative claims process.  The Sharp panel

10   had focused on the language of creditor that's found in the

11   notice requirements in 1821(d(3) that the initial notices

12   are sent to creditors.

13           THE COURT:  All right.  Let me ask you to address

14   one other thing while you're at the lectern, and that

15   relates to counts one and four which I think were not

16   properly addressed previously; and what the plaintiff

17   continues to argue I can't deal with because it requires me

18   to address and assume certain facts and circumstances that I

19   can't take into account at this point for purposes of ruling

20   on the motion.

21           Do you want to address that now?

22           MR. WATSON:  Yes, I think I can address those.

23   Those all go to breaches that were committed by IndyMac

24   while IndyMac was an open institution.

25           THE COURT:  Understood.

```
1            MR. WATSON:  And being breaches that -- there's no
2    call even under the analysis that's offered by the
3    plaintiff, Deutsche Bank here, for finding that those would
4    somehow come under an exception to claims of a creditor that
5    are subject to the administrative claims process and then
6    subject to distributions under (d)(11).  So they would also
7    be rendered prudentially moot by the hopeless insolvency of
8    the failed bank.
9            And so they're -- each of those is prudentially
10   moot and don't give rise to any argument that they fall
11   under the super priority.  There's no allegation of the
12   super priority that could survive.  I use super priority to
13   describe this deviation from (d)(11).
14           THE COURT:  All right.  Let me hear from Deutsche
15   Bank.
16           MR. WATSON:  Thank you, Your Honor.
17           MS. McKEON:  May it please the Court, Jami McKeon
18   for Deutsche Bank.  Your Honor, let me jump right in and
19   address what you were discussing with Mr. Watson and the
20   question the Court raised.
21           We don't think that there's any conflict between
22   Sharp and McCarthy, and in fact McCarthy was not an unknown
23   case to all the parties last time we were here.  Our view is
24   it wasn't argued because everybody recognizes that it is not
25   germane, and that's found at a minimum exactly in the
```

1    language of McCarthy itself.  Notwithstanding the

2    characterization of the limitation of McCarthy, what

3    McCarthy says when it talks about Sharp in the opinion is

4    our decision in Sharp turned on the Sharps' being aggrieved

5    parties to a contract that the FDIC had not repudiated.

6    That is exactly this case.

7            Now, we think, Your Honor, that McCarthy and Sharp

8    are perfectly reconcilable.  McCarthy involved all

9    post-receiver conduct.  It expressly explained Sharp as

10   relating to breaches of contract in contracts that the FDIC

11   had not repudiated.  So even if you read McCarthy very

12   narrowly, McCarthy carved out exactly the case before

13   Your Honor, but we don't think you need to read it that

14   narrowly.

15           As Your Honor knows and Your Honor quoted

16   liberally from Sharp in the Court's decision, the notion

17   that Sharp somehow was limited just to its facts really

18   cannot be squared with the language in Sharp.  And

19   McCarthy -- although it could not, as Your Honor points out,

20   overrule Sharp -- did absolutely nothing to try to back away

21   from that language.

22           There was no effort from McCarthy to back away

23   from the language that FIRREA does not authorize the breach

24   of contracts; that it doesn't preempt state law so as to

25   abrogate state law contracts; that the FDIC can escape the

1   obligations of contract only through prescribed mechanisms;

2   that it cannot breach contracts at will; that it doesn't act

3   within the statutory powers when it breaches the contract.

4   And that, Your Honor, is I think what the Court turned upon

5   last time.

6           As the Court looked and said, yes, there is a

7   mechanism here; the FDIC does have a choice with these

8   contracts that it assumed.  It can either repudiate them or

9   it can honor them.

10          When the FDIC decides that it is not going to do

11  what Congress has allowed it to do, it cannot then turn

12  around and say, well, gee, we get to take advantage of the

13  statutory provision.  And if we look at the case here, I

14  think it really underscores that.

15          THE COURT:  And let's do that, because what I have

16  in mind and the question that I've always had on the other

17  side of this case is this: that the FDIC comes in, takes

18  over IndyMac, and does what I think most would want it to

19  do, which is to keep it going to the extent it's possible,

20  to keep operations going forward.

21          It could have conceivably repudiated, or it could

22  have repudiated the servicing agreement contract, which I

23  guess your view is at which point it becomes Deutsche Bank's

24  right?

25          MS. McKEON:  Very clear in the contract that only

1    Deutsche Bank can select the successor servicer.  And if the

2    contract were repudiated, those rights would revert to

3    Deutsche Bank, which would have the ability itself to either

4    sell them or to make good on them.

5         THE COURT:  Why is a right to select a

6    reversion -- you say it reverts to Deutsche Bank.  I'm not

7    entirely clear that that's so.  You're right that there's

8    language about selection, but is that equivalent in your

9    mind to a reversion of all of the servicing rights?

10        MS. McKEON:  I don't know whether reversion is the

11   right word, Your Honor, for me to use.  But what is clear

12   under the statute is to the degree -- if the FDIC had

13   repudiated this or if IndyMac breached and was no longer

14   performing under any of those circumstances, the trustee

15   clearly has those rights, and that's why what happened here

16   happened.

17        THE COURT:  But interestingly in this case the

18   trustee has no obligation.  I mean, it's kind of interesting

19   as I went back and looked at the case to see that one of the

20   concerns obviously is that there are these bad loans, and

21   the bad loans aren't getting replaced.  And so One West

22   doesn't have any obligation to do anything like that.  But

23   neither does Deutsche Bank.

24        If Deutsche bank takes over, the way the pooling

25   and service agreement is written is that Deutsche Bank can

1    succeed in certain sets of circumstances to the servicing

2    rights, but the pooling and servicing agreement expressly

3    and emphatically excludes any obligation on the part of

4    Deutsche Bank to make good on the loans.

5              So it seems to me that if one sort of steps back

6    and looks at this case in broad perspective, that this is an

7    effort by Deutsche Bank to somehow put the taxpayers on the

8    hook for the obligations, for the damages that these

9    investors are going to be suffering, because if you get a

10   six- to eight-billion-dollar super priority, then that puts

11   all of the assets essentially in the hands of people who

12   took great risks and forces the payoff of the depositors out

13   of the insurance fund; right?

14             MS. McKEON:  Not so, Your Honor, and this is why.

15   The reason that language is in there is because of the

16   inherent nature of trustees.  If Deutsche Bank had these

17   rights, it would provide for another servicer.  It would do

18   what the FDIC did basically.  It would sell the rights to

19   somebody else.  Deutsche Bank is not a servicer.  It doesn't

20   have a servicing arm.

21             So the point is not whether Deutsche Bank would be

22   doing it.  The point is that the whole import of

23   Your Honor's ruling, which we believe was absolutely

24   correct, was that the FDIC --

25             THE COURT:  I wish I were as sure as you are.

1          MS. McKEON:  Well, I'm very sure, Your Honor.  The

2     FDIC could not do what it did without seeking Deutsche

3     Bank's consent.  If the Court then were to rule that

4     notwithstanding that, the FDIC can hide behind the priority

5     provisions of FIRREA, it essentially eviscerates not only

6     Sharp, but it eviscerates the consent ruling.

7          And that's why I say if you look at what happened

8     here -- Your Honor pointed out in your opinion that the FDIC

9     knew how to repudiate.  It repudiated three out of the 240

10     loans that it didn't want.  It didn't repudiate the rest.

11     Why didn't it repudiate the rest?  Because it wanted to sell

12     them and take those valuable moneys, which were very

13     extensive.  We're talking, you know, many, many hundreds of

14     millions if not a billion dollars here.

15          They didn't want to ask for Deutsche Bank's

16     consent because they knew if Deutsche Bank said no, they

17     wouldn't be able to do it.  So what did they do?  They just

18     ignored what they knew the requirements were and breached.

19     And why not?  If Your Honor were to reverse the Court's

20     earlier ruling, that would actually be the smart thing to

21     do, because although they say, well, Your Honor, there is a

22     penalty, we could be liable for exemplary or punitive or

23     consequential damages -- by the way, all of which are

24     subject to (d)(11) and are general, unsecured claims that

25     are prudentially moot.

1          And in their papers they go one step further and

2    they admit the truth here, which is that in almost every one

3    of these insolvency cases, you're going to have prudential

4    mootness.  There are never going to be enough money for

5    general, unsecured creditors.

6          So this would actually be a license for the FDIC

7    to do just what Sharp said it couldn't.  Go ahead and ignore

8    that you have to repudiate or honor; go ahead and ignore the

9    language that you can't breach with impunity; do whatever

10   you want, because then you're going to run into court and

11   you're going to say, well, you know, we admit there's a

12   claim against us, but, sorry.  It's prudentially moot.

13   You're going to be faced with that in every single case.

14         So we think that if you look at the language of

15   Sharp, which is not at all backed away from in McCarthy, and

16   McCarthy, though even its carve-out, if you looked at

17   McCarthy as carving this out, the carve-out fits exactly

18   this case.

19         If Your Honor backs away from that ruling, it's

20   the equivalent of saying to the FDIC:  You don't have to

21   comply with the statutory scheme.  The language in Sharp was

22   completely meaningless.  Because of prudential mootness, you

23   can do what you want and hide behind it.

24         And we don't think that that's what Sharp intends.

25   We don't think that's what McCarthy intends.  We don't think

1  that's the right result.  I think the Court got it right

2  last time here, and the Court acknowledged that it isn't

3  clear yet what the actual ultimate result will be and where

4  the moneys will come from, but the case ought to go forward

5  on that basis.

6         I would also note, and I guess this plays into

7  Your Honor's questions about the ---

8         THE COURT:  First and fourth claims.

9         MS. McKEON:  -- first and fourth claims, although

10  I actually stopped myself because I was going to say

11  something else first.  There is a constructive trust claim

12  here, and that constructive trust remedy follows

13  Your Honor's decision on the consent.  If Your Honor is

14  correct, and we believe Your Honor is, and you haven't

15  indicated that you're considering changing this, that the

16  FDIC breached that contract when it failed to seek Deutsche

17  Bank's consent, then that constructive trust remedy is an

18  appropriate remedy.  And for that reason alone the case

19  wouldn't be prudentially moot.

20         So we believe, Your Honor, the Court was right,

21  Sharp and McCarthy can be harmonized; that the Court didn't

22  have the benefit of McCarthy only because everybody actually

23  realized that McCarthy didn't back away from Sharp; and that

24  this is sort of a post hoc and tortured effort to sort of

25  find some way to back away from the clear teaching of Sharp,

1   which is if you decide you're not going to follow the

2   process Congress gives you, then you don't get the

3   protections of what Congress gives you.

4           And I think the result here -- any other result

5   here would actually encourage the FDIC never to comply with

6   the repudiation obligation, because why would you?  There's

7   no penalty if every time you're going to have prudential

8   mootness, which the FDIC acknowledges it will.

9           THE COURT:  Well, if you're right about that,

10   doesn't that mean that they would be crazy not to repudiate?

11           MS. McKEON:  They would be crazy either not to

12   repudiate or not to seek consent, if that's what they were

13   supposed to do, or they would honor.

14           In other words, there are multiple options.  I

15   mean, I think the Court -- possibly it was at oral argument.

16   I'm not sure if I'm recalling the transcript correctly, but

17   I think the Court has observed before that the FDIC should

18   do an analysis; and if it can't be bothered to repudiate

19   something, that's not the problem of the litigants.

20           Congress gave them a choice.  It wasn't an

21   unlimited choice.  It was a choice.  And they exercised that

22   choice with respect to three trusts here, and they decided

23   not to with the others.  And when they didn't do that with

24   the others, in addition they violated the consent provision.

25           So to come up with a result here, Your Honor, that

1    says that the FDIC was obligated to use the consent

2    provision and breached that obligation, the FDIC was

3    obligated to follow the statutory language and breached it

4    but the net result is it doesn't matter because everything

5    is prudentially moot and you're stuck with a general

6    unsecured claim, really eviscerates Sharp.

7              THE COURT:  All right.

8              MS. McKEON:  Your Honor, I did not address counts

9    one and four.  I apologize.

10             I'm not sure that it's fair to say the trustee's

11   position is that you can't deal with those.  I think it's

12   fair to say that there are issues in this case related to

13   the ones we've just been talking about that make counts one

14   and four not suitable for disposition as prudentially moot.

15             I would concede, Your Honor, that count four,

16   which is the radiant repudiated contracts, I don't think we

17   would concede those are going to be dealt with as general

18   unsecured claims.  But count one does not fit into that

19   category because count one is the obligations of IndyMac

20   into which the receiver -- the receiver stepped into the

21   shoes of IndyMac; and when the receiver then breached, it's

22   liable for those breaches.  So we don't believe count one

23   should be dismissed on that basis.

24             THE COURT:  Okay.  Let me hear from Mr. Watson

25   again in response to counsel's argument.

```
1              MS. McKEON:  Okay.

2              MR. WATSON:  Thank you again, Your Honor.  Our

3    response is that effectively the trustee here is turning the

4    statute on its head and the purposes for which Congress

5    created the FDIC and the idea behind the orderly resolution

6    of the institution.  This starts out as an insolvency.  And

7    the idea that the FDIC by following a priority distribution

8    scheme that Congress intended is somehow hiding behind the

9    statute is just not right.

10             THE COURT:  Well, one of the things that is

11   somewhat mysterious to me -- and maybe there's an obvious

12   reason for it that the FDIC would know, but I'm not clear

13   why the FDIC would choose to repudiate three of these

14   trusts -- I think it was three -- and perform on the

15   remainder and then breach.  I don't understand why some were

16   repudiated and others weren't.  Is there a reason for that?

17             MR. WATSON:  I can't answer the reason there.  I

18   can presume that -- I can't honestly answer the reason for

19   that, Your Honor.  I would presume that there was no

20   remaining value in the -- there may have been no remaining

21   value in the radiant contracts, and repudiating them was

22   just the way for the FDIC as receiver to limit its damages.

23   I can't address why they would do that, but I need to

24   address the presumption here that Congress is mandating

25   repudiation.
```

1          And harkening back to your initial discussion, the
2    FDIC is worse off by failing to repudiate and by breaching a
3    contract.  It opens itself up to more damages that are
4    potentially available, but the creation of those damages and
5    the change in amount should not affect the distribution
6    under 1821(d)(11).  There's just nothing in the statute to
7    support the creation of a super priority beyond the
8    priorities that are established there.  Congress made
9    clear --
10         THE COURT:  So is your view, then, that the
11   consequence of not repudiating, because 1821(e) clearly and
12   unambiguously exists precisely to direct the FDIC in how it
13   must be deal with contracts.  And if it doesn't repudiate
14   and it does perform for some period and breach, what is the
15   consequences?  Is it just that they lose the protection of
16   the damage limitation?
17         MR. WATSON:  That's correct.
18         THE COURT:  Is that the protection?
19         MR. WATSON:  Yes.
20         THE COURT:  That's the consequence, I mean.
21         MR. WATSON:  That's the consequence of failing to
22   repudiate.
23         And the statute makes clear in addition to any
24   other rights that the FDIC has, it has the right to
25   repudiate and then to result in that limitation of damages.

1    But the only exception that's created in the statute to the

2    distribution scheme in (d)(11) is contained right there in

3    the statute itself.  It provides that unsecured -- excuse

4    me, that secured claims will not be subject to the

5    distribution scheme that's there.

6          What the Bautista decision makes clear is that

7    even though repudiation -- that repudiation, although it was

8    argued to be something outside the (d)(11) scheme and

9    outside the administrative claims process, it's a subset.

10   And Bautista discussed that you would expect Congress,

11   especially where it's already created an exception, that

12   having created a hierarchy, it would describe a place for

13   the contracts or the claims, excuse me, that would fall

14   outside it; and that in the absence of creating a place --

15   and that's the language used in Bautista -- that Congress

16   intended for the distribution scheme to apply.

17         And so the idea that a breach-of-contract claim

18   that does give rise to damages somehow falls outside that

19   scheme isn't supported by the statute and is contrary to the

20   reasoning of Bautista.

21         I also have to -- I have to respond to this

22   comment.  It's just wrong to say -- and the FDIC has never

23   said -- that in all of these contracts people with valid

24   claims for breaches of contract are not going to recover

25   anything.  It's simply not true.

```
 1              The problem here is the massive insolvency, the

 2    hole that was dug by IndyMac.  But I can tell you that the

 3    FDIC frequently makes payments to general unsecured

 4    creditors.  There are instances where the FDIC has paid all

 5    general, unsecured creditors all of their claimed amounts.

 6    So it's simply not true to suggest that this is somehow a

 7    dodge on the part of the FDIC to avoid its liabilities.

 8    It's the consequence of the insolvency here.

 9              THE COURT:  The Sharps got some money.  They just

10    didn't get all of their money, as I recall from that case.

11              MR. WATSON:  That's correct.  And what the Court

12    ended up doing there by saying -- and again I'd like to

13    direct the Court to carefully examine the holding in the

14    Sharp decision.  It's under Section B, and the holding that

15    concluded that they were not creditors and not subject to

16    the claims process is there at 1156.  And it's only later

17    that there's a discussion of repudiation as further

18    bolstering that idea.

19              The discussion of the FDIC acting outside the

20    statutory powers falls nowhere there in B.  It's a

21    discussion in the earlier section on a different

22    jurisdictional limitation on the Courts under 1821(j), and

23    it's one of the specific elements where the FDIC's acting

24    with a power or function of the receiver.

25              It wasn't an element of the Court's conclusion
```

1   that this fell outside of the claims process, and ultimately

2   the Court in Sharp remanded back to the District Court to

3   determine if there was a basis for any other recovery.

4          Again, the FDIC can't escape its liabilities and

5   doesn't intend to escape its liabilities for breaches of

6   contract here, and counsel for the plaintiff described the

7   statute correctly that the FDIC did not do what Congress

8   allowed the FDIC to do.  What's clear from that language is

9   that the statute doesn't mandate -- does not mandate

10  repudiation, and that could plainly have been directed and

11  rather it's not.

12         And the language of (d)(20) further supports the

13  idea that the FDIC has additional rights which include the

14  right to terminate or breach and that the repudiation is not

15  the limitation of the FDIC's rights and the only way it can

16  deal with contracts.

17         THE COURT:  Well, I certainly see how you can talk

18  about what Congress allowed; that is, the repudiation.  But

19  I don't see how you can say, well, the statute by

20  implication allowed repudiation or breach.  Breach makes no

21  sense when you can repudiate, in my view, and I don't read

22  the statute to say those are the two alternatives.  It

23  says -- to me it gives you the option of it's more

24  reasonable to say to repudiate or perform.  You can do one

25  or the other.  Isn't that a more rational interpretation of

1   the language?

2          When they say, look, if you don't want to perform

3   these contracts, just repudiate them, and you can do all of

4   these different things.  And even if you do, you can walk in

5   and on day one and say, no, we're not performing any of

6   these contracts.  Here's the book.  Here's what we've got on

7   the books.  Here are the contracts.  We're repudiating all

8   of those contracts and, you know, come to our administrative

9   proceeding and make your claim; or perform them.

10          MR. WATSON:  And in the event that the performance

11   is breached, the result is a claim of a creditor that goes

12   through the administrative claims process and is paid under

13   the distribution scheme.  None of those statutory provisions

14   provides for this super priority that would be had at the

15   expense of the other creditors and claimants who are also

16   suffering from breaches of IndyMac.

17          It allows -- the super priority is one that wasn't

18   intended for creditors here, even if the creditors suffered

19   a breach.  Their opportunity is to bring a claim to the

20   administrative claims process and then have it satisfied in

21   the order that Congress dictated.

22          While we've been arguing for the reconsideration

23   here, I should take a moment to step aside and say that I

24   think the discussion that we're having plainly supports our

25   motion to certify this at the very least.

33

```
1              THE COURT:  Oh, I agree.
2              MR. WATSON:  At the very least there are
3   substantial grounds for difference of opinion.
4              THE COURT:  Look, I don't know -- depending on how
5   the ultimate ruling goes, I mean, it's going to be -- if
6   it's not teed up so that someone can take an appeal to the
7   Circuit, I'll certify it.  I have no doubt.  I don't even
8   need to hear argument on that.
9              I think that's -- I had decided that before I
10  wrote my first order.  I said this is going to go to the
11  Circuit, and it's going to go sooner rather than later.
12             MR. WATSON:  Thank you, Your Honor.
13             THE COURT:  Okay.  See how easy that was.
14             MR. WATSON:  Yes.  Thank you.
15             And I would just summarize that we, I think, have
16  provided ample authority in the Bautista decision and the
17  Henrick's decision to demonstrate that it's intended and the
18  Ninth Circuit has held that the recovery here for claims
19  against the receiver is limited to the receivership of
20  state.  And to find a super priority that leaps above other
21  creditors here isn't envisioned by the statute and actually
22  does harm to the statute as Congress created it.
23             Thank you, Your Honor.
24             THE COURT:  Okay.  Thank you.  Counsel, I'll give
25  you five minutes, and then we're done today.  You don't have
```

1    to take it all.

2         MS. McKEON:  I won't, Your Honor.  I really only

3    want to make one point.  I think -- although we haven't

4    discussed this at length today, it is referenced in the

5    briefs.  I think the formulation that Mr. Watson just

6    delivered to the Court of the FDIC's interpretation of

7    FIRREA really explains why the Waterview Court observed that

8    to accept exactly the argument that's being made would

9    implicate constitutional principles.

10        Essentially what the FDIC is saying is:  We came

11   in and for eight months we operated under these very

12   valuable contracts, and we got the money under those, and we

13   continued to operate.  We decided that that was the biggest

14   asset of the estate, and we wanted to sell it off, and we

15   wanted to sell it off without being bound by the consent

16   provisions that were required.

17        THE COURT:  Let me ask you -- let me interrupt you

18   for just a second, though.

19        MS. McKEON:  Sure.

20        THE COURT:  We would agree, wouldn't we, that

21   during the period of time prior to the sale when the FDIC

22   was operating and performing, that there was benefit to

23   Deutsche Bank and its -- and the beneficiaries of these

24   trusts?

25        MS. McKEON:  Absolutely.  And in fact part of the

1  basis of our claims have to do with what obligations the

2  FDIC had during that period.  No argument there.

3         But my point, Your Honor, is they used that time

4  to assess the value of these contracts and decided that they

5  were going to take that value without compensating Deutsche

6  Bank, and they were going to sell it off to get those -- the

7  value of those assets.  That's a serious problem.  That

8  reaches into every formulation of taking, you know, private

9  rights and selling them without just compensation.

10        And I think the whole position the FDIC is taking

11  here, which goes right to Your Honor's question about the

12  statute says that you can repudiate or perform, it doesn't

13  say you get to breach.  And repudiating or performing here

14  would have had a very different result than the breach,

15  which the FDIC now contends that it could do with impunity.

16  I think that's less than five minutes, Your Honor.

17        THE COURT:  It is.

18        MS. McKEON:  And I just want to say again, we

19  thought Your Honor got it right the last time.  I hope the

20  Court will affirm its earlier ruling.  Thank you.

21        THE COURT:  All right.  Thank you for your

22  arguments.  I will think long and hard about what to do here

23  and issue a ruling.  And one way or another the case will be

24  set up so that you all can get to the Circuit and get

25  someone who actually can make a decision on what this all

36

1    means and get it decided.

2         MR. BIERMAN:  Your Honor, could I bring up a

3    housekeeping matter that I have in the absence of an absent

4    party?

5         THE COURT:  Yes.

6         MR. BIERMAN:  The Deutsche Bank has recently filed

7    a first amended complaint, and the parties had stipulated

8    that both the receiver and the Court were to respond at a

9    certain time.  Could we suspend the response date?

10        THE COURT:  Yeah.  Don't do anything until you get

11   my ruling.

12        MR. BIERMAN:  Okay.

13        THE COURT:  And then figure out a schedule, and

14   we'll just see where we are at that point.  And then we'll

15   figure out what we're going to do with the schedule.

16        MR. BIERMAN:  Thank you very much, Your Honor.

17        MS. McKEON:  Thank you, Your Honor.

18

19            *(Thereupon, proceedings adjourned)*

20

21                      *-oOo-*

22

23

24

25

Lisa M. Gonzalez, Official Reporter

1              *CERTIFICATE*

2

3          *I hereby certify that pursuant to Section 753,*

4    *Title 28, United States Code, the foregoing is a true and*

5    *correct transcript of the stenographically reported*

6    *proceedings held in the above-entitled matter and that the*

7    *transcript format is in conformance with the regulations of*

8    *the Judicial Conference of the United States.*

9

10   *Date:  May 16, 2011*

11

12

                    */s/*_____
13                  *Lisa M. Gonzalez, U.S. Court Reporter*
                    *CSR No. 5920*
14

15

16

17

18

19

20

21

22

23

24

25