1              UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3                   WESTERN DIVISION

4    THE HON. JUDGE GARY ALLEN FEESS, JUDGE PRESIDING

5

6    DEUTSCHE BANK NATIONAL TRUST        )
     COMPANY,                            )
7                                        )
                         Plaintiff,      )
8                                        )
            vs.                          ) NO. 09-CV-03852-GAF
9                                        )
     FEDERAL DEPOSIT INSURANCE CORP.,    )
10                                       )
                         Defendant.      )
11   _____)

12

13

14

15           REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                Los Angeles, California

17               Monday, October 25, 2010

18

19

20

21

22

23         LISA M. GONZALEZ, CSR No. 5920, RPR CCRR
       Edward R. Roybal Federal Building & U.S. Courthouse
24            255 East Temple Street - Room 181-C
                 Los Angeles, California 90012
25              (213) 621-7709; csrlisag@aol.com

```
 1  APPEARANCES:

 2


 3  FOR THE PLAINTIFF:    MORGAN, LEWIS
                          BY:  JAMI WINTZ McKEON, ATTORNEY AT LAW
 4                        1 Market Spear Street Tower
                          San Francisco, California  94105
 5                        (415) 442-1405

 6
    FOR THE DEFENDANT:    LUCE, FORWARD, HAMILTON & SCRIPPS LLC
 7                        BY:  MICHAEL H. BIERMAN, ESQ.
                           and JEFFREY D. WEXLER, ESQ.
 8                        601 South Figueroa Street
                          Suite 3900
 9                        Los Angeles, California  90017
                          (213) 892-4992
10

11                        FEDERAL DEPOSIT INSURANCE CORPORATION
                          LEGAL DIVISION
12                        BY:  THOMAS L. HOLZMAN, ESQ.
                          3501 Fairfax Drive, Suite D7024
13                        Arlington, Virginia  22226
                          (703) 562-2369
14

15

16

17

18

19

20

21

22

23

24

25
```

1      *Los Angeles, California, Monday, October 25, 2010*

2                      *9:40 a.m.*

3                       *-o0o-*

4          THE CLERK:  Case CV-09-3852-GAF, Deutsche Bank

5    National Trust Company versus Federal Deposit Insurance

6    Corporation.

7          Counsel, please state your appearance.

8          MS. McKEON:  Good morning, Your Honor.  Jami

9    McKeon for the plaintiff.

10         THE COURT:  Good morning.

11         MR. BIERMAN:  Good morning, Your Honor.  Michael

12   Bierman of Luce, Forward appearing for the FDIC-receiver

13   defendants and with me is Kay Ellison (ph) of FDIC.

14         MS. ELLISON:  Good morning.

15         MR. HOLZMAN:  Tom Holzman appearing for the

16   Federal Deposit Insurance Corporation.

17         MR. WEXLER:  Jeffrey D. Wexler also with Luce,

18   Forward, also with the FDIC as receiver.

19         THE COURT:  You folks want to submit on the

20   papers?

21         (laughter)

22         THE COURT:  I'll move along.  I didn't think you

23   would.

24         This is a case in which the Office of Thrift

25   Supervision declared IndyMac insolvent back in, I believe it

4

1   was, 2008 and installed the FDIC as the receiver.

2           In that capacity, the FDIC entered into a

3   transaction where all assets and liabilities were conveyed

4   to a pass through entity, IndyMac Federal, which operated

5   under the control of the FDIC acting as a conservator.

6   There was then a contract, an arrangement made to transfer

7   substantially all of the assets and many of the liabilities

8   to a new group of investors who formed One West Bank.

9           One West paid $14 billion for what they -- for

10  what they got, and those assets were transferred over to One

11  West.

12          The problem, the problem, IndyMac, through a

13  complicated trust arrangement with Deutsche Bank had sold

14  billions of dollars in collateralized mortgage obligations

15  to investors under an agreement that, in sum and substance,

16  established IndyMac as the indemnitor of the underlying

17  mortgages; the underlying mortgages being the vehicles which

18  generated the income to investors who had purchased CMOs.

19          So under the pooling and servicing agreements if a

20  mortgage went bad, e.g., the borrower defaults, IndyMac had

21  an obligation to engage in some sort of curative activity --

22  repurchase, substitute a new mortgage or some such thing.

23  There were a variety of options that were provided under the

24  terms of the agreement.  But once IndyMac became insolvent,

25  of course, then the risk that was inherent in the investment

1    came to fruition.

2           Deutsche Bank seeks through this litigation

3    essentially to put its -- to put the investors in a position

4    where they have a superpriority over claims, and they do it

5    through a breach of contract claim, claim for breach of

6    fiduciary duty, breach of covenant of good faith and fair

7    dealing and so forth.

8           And let me go through those briefly, tell you what

9    my tentative thinking is with respect to each, and then I

10   will let you make your presentations.

11          First of all, with respect to the breach of

12   contract claim, it seems to me, after spending a fair amount

13   of time with the contract, the exemplary contract that was

14   presented and the complaint, that there is somewhat of a

15   conflation of a contract cause of action and a statutory --

16   FIRREA claim.  And I've separately analyzed them since I

17   think my responsibility under 12(b)(6) motion is to look at

18   the substance of the claim regardless of the label; so I've

19   teased out essentially two claims.

20          The first, let's talk about the statutory

21   violation.

22          Deutsche Bank appears to claim that the FDIC

23   violated 1821(e)(8) regarding qualified financial contracts.

24   That provision obligating FDIC upon seizure of an

25   institution to either sell all QFCs or none of the QFCs.

1    The argument here being that since FDIC allegedly split the

2    contract by conveying assets without transferring

3    liabilities, it has acted in violation of its statutory

4    authority.  I don't agree.

5            I think that the pooling and servicing agreement,

6    although in one long piece of paper or set of papers, pages,

7    is two agreements.  That essentially there is a QFC as part

8    of it and that's really the front end.  There's a front end

9    and there's the back end.  The front end of the agreement is

10   this:  We'll sell all of these mortgages into the trust,

11   which are then pooled and marketed -- we'll convey them into

12   the trust, then they're going to be marketed to investors

13   who will receive income through these devices.  And so our

14   obligation is to convey, your obligation is to give us the

15   money.  And once that front end of the transaction is set

16   up, we've got the ownership of the right to the flow of

17   income in those who have invested in the CMOs and IndyMac

18   with the cash that is obtained through the sale of those

19   assets.

20           There's a second part of the agreement.  The

21   second part of the agreement is the servicing relationship.

22   And under the servicing relationship IndyMac undertook the

23   obligation to service the loans.  The buyer agreed to pay

24   for the servicing of the loans.  The transfer of servicing

25   rights, however, in my view, does not implicate the

1   securities element of the transaction and is not a QFC and

2   so that the activity, at least for statutory purposes, the

3   sale of the servicing rights without requiring the

4   assumption of liabilities, does not violate FIRREA.

5         Now, we then have the question about contract.

6   The contract required IndyMac to obtain the trustee's

7   consent before the servicing rights could be assigned.  It

8   does appear to me that the FDIC breached that contract in

9   conveying the assets to One West, or the investors who

10  formed One West, without their consent.

11        Now, FDIC argues that FIRREA says we don't have to

12  get consent and that the provision of 1821(d) says that

13  consent is not required, but the cases -- Sahni, Sharpe,

14  Waterview and cases similar to those and that have followed

15  those have essentially said what that means is there's

16  federal preemption over state statutory and regulatory

17  consent obligations, but that the FDIC may not simply ignore

18  contract rights and breach a contractual right to consent

19  with impunity.

20        So I do think that there is a breach, but there

21  are problems because, one, Deutsche Bank doesn't have any

22  superior claim of priority by virtue of that breach under

23  the statute and given the status of the institution and the

24  fact that the liabilities far exceed assets, my view is that

25  under the doctrine of prudential mootness, which has been

1   articulated not in the Ninth Circuit yet -- although Judge

2   Morrow has written several memorandum decisions which adopt

3   this doctrine.  It has been articulated in a number of

4   circuits -- that under the Doctrine of Prudential mootness,

5   there's no point in pursuing these claims because they will

6   not yield a recovery.

7        Prudential mootness, by the way, I think, then

8   would resolve the covenant of good faith and fair dealing

9   claim and breach of fiduciary duty to the extent that that

10  claim is rooted in contractual obligations.

11       To the extent that the breach of fiduciary duty

12  claim is based on an independent duty allegedly owed by the

13  FDIC, with an obligation to make good on the claim out of

14  its own funds, I see no authority whatsoever for that

15  proposition.  Any citation to authorities that involve sort

16  of general notions of fiduciary duties, where we're not

17  talking about the FDIC, just aren't persuaded.

18       With respect to the constructive trust, there is a

19  lot of argument back and forth about whether or not that's

20  an 821(j) issue.  821(j) bars equitable relief -- bars the

21  court from issuing equitable relief which would preclude

22  conduct by FDIC receiver or conservator.  It seems to me

23  that in this case that bar is proper, although I don't even

24  know if you need to reach 821(j).

25       It seems to me that, again, in essence, the

1   attempt to impose a constructive trust in favor of Deutsche

2   Bank on the proceeds of the sale to One West is an effort to

3   obtain a superpriority and that the Deutsche Bank investors

4   don't have any right or, frankly, any equitable position

5   that would entitle them to a superpriority to those

6   proceeds.

7          I think the establishment of constructive trust

8   would be inconsistent with the priority rules established

9   under the statute and therefore should not be done.

10          Finally, there's the takings claim and the due

11   process claims.  The takings claim has to be brought against

12   the United States, and it has to be brought in the court of

13   claims.  It's simply not cognizable here.  And the due

14   process claim can't be -- I mean to the extent that that's

15   an end run around the takings requirements, it really

16   doesn't succeed because you can't really pursue a due

17   process against an agency.  Bivens says that you're going to

18   do a due process claim of the sort you're talking about

19   here, it would have to be brought against individuals and

20   not the FDIC, but the problem in this case is not due

21   process.  There's process that's been given at basically

22   every step of the proceeding.  It's just that the result is

23   not what the -- what Deutsche Bank would like.

24          So, in essence, I think that's still part and

25   parcel of the takings claim, which if it's going to be

1   pursued has to go to the Court of Claims.

2           So that's my tentative thinking in this case.

3   I'll hear from Deutsche Bank first.

4           MS. McKEON:  Thank you, Your Honor.  Your Honor,

5   Jami McKeon from Morgan, Lewis for Deutsche Bank as the

6   trustee of the various trusts that are identified in the

7   complaint.

8           Let me go right to the tentative that Your Honor

9   has issued and address some of the issues that were raised.

10          With respect to the QFCs, Your Honor, we disagree

11  that the court can or should take what are unified,

12  integrated contracts and split out certain rights underneath

13  them.

14          THE COURT:  Doesn't the statute specifically

15  contemplate that the master agreements may include both QFCs

16  and non-QFCs and isn't this sort of a classic example of

17  what's contemplated by the statute itself?

18          MS. McKEON:  No, Your Honor, we disagree.  The

19  statute does contemplate that you can have a master

20  agreement that has certain subsidiary agreements under this,

21  but in this case the agreement we're talking about is a

22  pooling and servicing agreement which is a single agreement

23  that we have pleaded and that on its face shows that IndyMac

24  was acting both as seller and servicer in a unified,

25  integrated set of arrangements, and we have pleaded that

Lisa M. Gonzalez, Official Reporter

1    IndyMac, as being both seller and servicer, was an integral

2    part of the bargain.

3            And there are good reasons for that, Your Honor,

4    because as the Court noted, some of the breaches that are

5    complained of here are things that IndyMac, as the seller,

6    was in a superior position to know.  It wasn't just when

7    certain loans went bad that IndyMac had an obligation to

8    notify and re-purchase.  It was IndyMac and then the FDIC

9    had a continuing obligation to be monitoring the pools of

10   these loans and to alert the trustee and the investors when

11   there were problems and to re-purchase.

12           THE COURT:  As the servicer, yes.

13           MS. McKEON:  As the seller and servicer,

14   Your Honor.  There's nothing in the agreement --

15           THE COURT:  Once the seller is done -- why isn't

16   it the case that once the sale is, it's over and now there's

17   a new set of obligations which is undertaken.

18           Clearly, IndyMac could have simply sold, and then

19   the parties could have said we're going to retain a

20   different servicer than IndyMac; right?

21           MS. McKEON:  That's absolutely right, Your Honor,

22   and that --

23           THE COURT:  And you would have expected them to do

24   exactly the same that IndyMac was expected to do in this

25   case; right?

```
1            MS. McKEON:  With one exception.  First of all, I
2    think the Court's point that you could do this in two
3    different agreements actually proves the situation here.
4    The negotiations, the economic arrangements and the
5    consideration applied is often different when you have a
6    unified seller and servicer than when you have two different
7    ones.
8            There's no question, that if this had just been a
9    servicing agreement, we could have an argument about whether
10   or not that qualifies as a QFC.  We actually would argue
11   that it does.  But we don't think --
12           THE COURT:  That the servicing agreement itself
13   would be a QFC?
14           MS. McKEON:  It could be a QFC depending on the
15   terms of the servicing agreement, but in this case,
16   especially the motion to dismiss level, we don't think you
17   have to get that far.  This is a unified agreement.  It did
18   contain obligations as seller and servicer.  We pleaded that
19   the negotiation and that the consideration for that
20   arrangement was bound up in the seller and servicer
21   language.
22           THE COURT:  Now, wait a minute.  There's no
23   question as to the terms and conditions of these agreements,
24   that they're complicated, they're lengthy written
25   agreements, exemplars of which have been provided to me and
```

```
 1   the parties seem to agree that the exemplar document is

 2   essentially the same as all of the pooling and servicing

 3   agreements; right?  I mean they're not different, are they?

 4           MS. McKEON:  Well, some of them are different.

 5   For example, three --

 6           THE COURT:  The Radian trust.

 7           MS. McKEON:  The Radian trust.

 8           THE COURT:  Okay.

 9           MS. McKEON:  And those are interesting,

10   Your Honor, because those provided that it was the servicer

11   who had the re-purchase obligations, and the FDIC quickly

12   repudiated those.  Okay.  The only ones that were repudiated

13   were those ones.  They had different terms and different

14   divisions.

15           THE COURT:  Does that help you or hurt you?

16           MS. McKEON:  I think it actually helps us because

17   part of our argument, Your Honor, and I'll go to the second

18   part here, is that the statute makes this quite clear, that

19   the FDIC only had two things it could do here.  It could

20   either repudiate these agreements and be liable for damages,

21   or it could assume them, in which case it was not permitted

22   to breach them under the statute.

23           And in fact the FDIC sent a letter -- this is

24   pleaded in our complaint -- in 2008, I think it was

25   September of 2008, acknowledging that it had these
```

1   obligations under the PSAs, and it was going to perform them

2   and it continued do that for eight months.  These PSAs were

3   never repudiated.  So there was never a repudiation and a

4   claim for damages.  They were assumed by the operation of

5   the FDIC, and it then turned around and breached them when

6   it failed to get the consent from Deutsche Bank as trustee

7   and also a number of other breaches we allege in the

8   complaint.

9           THE COURT:  I think I said that I agreed with that

10  part of the analysis, that it is a breach.  I don't disagree

11  that at some point there was a breach of the servicing

12  agreement.

13          MS. McKEON:  That's correct, Your Honor, but then

14  I think where the Court went after that is to say yes, there

15  is a breach, but it doesn't give you a superpriority and

16  prudential mootness applies --

17          THE COURT:  It doesn't give you a superpriority.

18  There is no set of circumstances in any case or in this

19  statute that says:  Investors who take market risks are

20  going to be placed in a better position than the depositors

21  of the institution, for example.

22          So I don't see -- and that's really what we're

23  talking about.  If we take and sort of look at the

24  10,000-foot view of this case, we've got investors who went

25  into the marketplace who undertook a risk by buying these

1    certificates that something could go wrong with them, among

2    other things, the insolvency of the servicer.

3           MS. McKEON:  That's true, Your Honor, but when

4    they took that risk and there was that insolvency, they also

5    had the right to rely on the protections that they were

6    entitled to.  And with respect, we don't agree because we

7    think that Sharpe makes very, very clear, that if the FDIC

8    doesn't do what the statute requires, it loses its statutory

9    protections, one of which is the claims process.  So 1821 --

10          THE COURT:  So what's the remedy, then?

11          MS. McKEON:  So the remedy is it's an

12    administrative priority claim against the FDIC and that --

13          THE COURT:  To the damage of all of those who

14    statutorily should be prior to your investors?

15          MS. McKEON:  Well, Your Honor, we don't agree with

16    that formulation.

17          First of all, it was the investors who put up the

18    money that allowed these things to be purchased.

19          THE COURT:  So what?  That doesn't move the ball

20    forward.  I'm still talking about the billions of dollars

21    that IndyMac had on deposit which were insured and where the

22    persons who deposited that money undertook no risk because

23    FDIC insured that money.  As compared with the investors who

24    bought these certificates, who took significant risks, they

25    may not have appreciated what they were before 2007, but

1    they sure know now.

2              MS. McKEON:  Well, Your Honor, I think, though, if

3    you look at the contract, they knew what the risk was and

4    here was one of the things -- here's one of the risks that

5    they took.  If that contract was assumed by the FDIC, which

6    was one option that the statute allowed them to do, they

7    would be fully protected.  If it was repudiated by the

8    FDIC --

9              THE COURT:  How?

10             MS. McKEON:  Because under -- because under FIRREA

11   and under Sharpe, if the FDIC assumes the contract, it must

12   perform it; and one of the things that it had to do under

13   that performance was get the consent for an assignment.  And

14   if the consent had been denied or if the FDIC had

15   repudiated, what gets left with the investors are those very

16   valuable servicing rights that the FDIC chunked off and

17   sold.

18             So there was no reason to believe, there's no body

19   of authority out there, Your Honor, the FDIC has cited any,

20   we haven't cited any, that says that the FDIC is permitted

21   to assume an agreement and then breach it and not have to

22   pay statutory damages for that, not have to pay priority

23   damages.

24             If you look at 1821(d)(20), for example, the --

25   FIRREA divides two things, and it says, okay, in a

1   pre-receivership contract you can only do two things.  You

2   assume or you repudiate.  If they had repudiated, we would

3   have had those servicing rights.  We would have had that

4   value to offset the negatives.

5           If you assume, then, you assume the entire

6   contract, and you can't breach it.  Sharpe said expressly

7   FIRREA doesn't even contemplate the possibility of a breach

8   by the FDIC in a pre-receivership contract.  That's not

9   something that they're permitted to do, and when they do

10  that, they lose the protection of ---

11          THE COURT:  I thought what Sharpe said was the

12  statute -- we don't know what the consequences are.  The

13  statute doesn't say you're barred from doing it.  The

14  statute just doesn't speak to what happens when that occurs.

15          MS. McKEON:  But then Sharpe goes on and answers

16  the question and it says, here's what happens if that

17  occurs.  You lose the protections of FIRREA.  And that's why

18  in Sharpe they address, for example, specifically 1821(j)

19  and they say, if you don't honor your statutory

20  requirements, the things that the statute let's you do, then

21  you don't have those protections.  And that's exactly what

22  the FDIC is relying on here, Your Honor, is the protection

23  of the priority scheme.

24          So in this case, you have a situation where the

25  FDIC assumed these contracts both because of their own

1   behavior and also because they didn't do the only other

2   thing the statute let's them do, which is repudiate, then

3   turned around and breached.

4          And Sharpe is very clear that the FDIC is not free

5   to breach any pre-receivership contract, keep the benefit of

6   the bargain and then escape the consequences by hiding

7   behind FIRREA; and that's exactly what's happening here.

8          THE COURT:  Hold on a second.  So if reading

9   Sharpe the way you're reading it, you would say this:  That

10  when the FDIC failed to exercise one of the two options

11  available to it, the breach then essentially put -- your

12  client put Deutsche Bank in control of the servicing rights;

13  is that correct?

14         MS. McKEON:  I would say, Your Honor, Deutsche

15  Bank as trustee was always in control of the servicing

16  rights because it had the right to consent to any

17  assignment --

18         THE COURT:  It's a yes or no.  You don't have to

19  tell me how to build the watch.  I just want to know what

20  time --

21         MS. McKEON:  I think the answer to your question

22  is yes, but I wanted to be clear.

23         THE COURT:  At that point, then the consequence of

24  that is that whatever value there are in the servicing

25  rights are held by Deutsche Bank and Deutsche Bank can go

1    into the marketplace and either exercise those rights itself

2    or go into the marketplace and sell them to some other party

3    to service the loans.

4            MS. McKEON:  Yes, Your Honor.  There's a specific

5    provision in the pooling and servicing agreement.  I'll get

6    it for you, but I think it's section 305 or something --

7            THE COURT:  Yeah, I know.  It's in the threes.

8            MS. McKEON:  It essentially says if IndyMac for

9    any reason can't be the servicer, then the trustee becomes

10   the servicer and is the only party with the right to select

11   a successor servicer.

12           So, in this particular circumstance, one of the

13   reasons that consent requirement was so important is because

14   if the FDIC had come to the trustee and said, "We want you

15   to consent to a transfer," then obviously the trustee would

16   have consented to that only to the extent that the investors

17   were protected.

18           If the FDIC had repudiated this agreement because

19   it was too burdensome which, of course, the FDIC is

20   permitted to do, then those servicing rights, by operation

21   of the contract protected under Sharpe, would have reverted

22   to the trustee.

23           So what happened here is something that was not

24   consistent with sort of a reasonable risk that the investors

25   took.  What happened here was a breach of the contract, a

1   clear breach of the contract, which Sharpe says the FDIC

2   cannot do, which then damaged the investors.

3         Now, the question Your Honor went to next is does

4   prudential mootness apply.  And we would suggest to you,

5   Your Honor, that every single case the FDIC has cited, every

6   single one -- I'll get to the one exception -- is a

7   pre-receivership breach.  There's no argument that the FDIC

8   acted outside its statutory authority like the facts in this

9   case; and even the most recent ones, like Borten that

10   Your Honor referred to, note that Sharpe is an exception to

11   this rule.

12         The one post-receivership case that the FDIC cites

13   is one under 1821(d)(20).  It's the RJM or RLM case, where

14   there was a post-receivership contract that the FDIC

15   breached.

16         So prudential mootness here simply doesn't apply

17   because prudential mootness only applies when the FDIC IS

18   acting within its statutory authority where the claim that's

19   presented is not that the FDIC has breached a

20   pre-receivership contract and where there is no basis for an

21   administrative priority claim.

22         And I would submit to the Court, that particularly

23   when we're looking at a motion to dismiss and the question

24   is whether or not there is a set of facts on which recovery

25   can be had, this is a case that we believe should not be

1  dismissed on that basis.  There are fact questions about

2  prudential mootness.  There are fact questions that we

3  believe the priority claim --

4           THE COURT:  What do you think those fact questions

5  are?  I'm at a loss to see that there are fact questions in

6  this matter on that issue.  What are they?

7           MS. McKEON:  First of all, with respect to the

8  whole issue of prudential mootness, we had no discovery on

9  how the FDIC is calculating these things, what its basis is,

10  how the funds are being distributed.  There's certainly

11  questions, in our view, about our entitlement even under

12  Your Honor's view of this to a priority status because, it

13  seems to us, that there are issues related to how what this

14  contract meant, what the parties' reasonable reliance was,

15  what the expectations were, and we think, under the

16  authority of Sharpe, Your Honor, the breach by the FDIC at

17  least gives rise to a very strong argument that the FDIC is

18  acting outside the statutory authority.  And if it does that

19  prudential mootness does not apply.

20           So we would encourage the Court to revisit that

21  issue having found that there is a breach, and we agree with

22  the Court on that issue, that there is in fact a breach.

23           We believe, that if you look at the statute

24  together with Sharpe and if you look at all the other cases,

25  there is no case that stands for the proposition that the

```
 1   FDIC can come in and do this and then hide behind the

 2   statutory priority framework.

 3            Our takings claim is in the alternative.  I just

 4   want to address that briefly because we believe what

 5   Waterview and Sharpe clearly signal is, that if a Court does

 6   come along and say that the FDIC can breach a contract, can

 7   ignore the consent requirements, can ignore the successor

 8   servicer requirements, simply chunk off the parts that it

 9   believes are valuable and hand them off to someone else and

10   have the money go back into the FDIC Deposit Insurance Fund

11   instead of coming back to the investors, that that would

12   create, as Waterview said and Sharpe adopted, serious

13   Constitutional issues.  And we don't believe it gets that

14   far because we believe, as the Sharpe court suggested, and

15   we think that's binding precedent here, that the Court

16   should interpret this statute in such a way that does not

17   affect a taking; and the way to do that is to recognize,

18   when there is this kind of a breach and these rights are

19   taken, then there's entitlement to an administrative

20   priority claim.

21            I also want to note, Your Honor, that the FDIC in

22   its reply brief clarified and acknowledged that it is not

23   moving to dismiss Count 2 on any basis, including prudential

24   mootness.  And Count 2 is the post-petition receivership

25   claims against the FDIC which we have pleaded our priority
```

1    claims and are in the 6- to 8 billion dollar range, and so

2    we believe that that continues to go forward.

3            Count 2 also incorporated Count 1, which is the

4    continuing breach failure.  These issues, Your Honor, are

5    not insignificant from the perspective of the investors.

6    This is not Deutsche Bank as the trustee.  These are

7    investors like the Orange County Employee Funds, these are

8    people who made an investment under a contract that they

9    reasonably had the right to believe under the law would be

10   enforced.

11           THE COURT:  Are you suggesting that you think I've

12   taken this lightly?  That I have spent no time on it --

13           MS. McKEON:  No, no.

14           THE COURT:  Well, then don't tell me it's an

15   important case.  I figured that out.

16           MS. McKEON:  I apologize, Your Honor.  I didn't

17   mean that I was suggesting this is an important case, I

18   meant that the rights that were affected, this is not simply

19   a question of whether or not the FDIC sold off the servicing

20   rights, and that's what's abandoned.  There are other issues

21   also of breach of contract that the FDIC breached both in

22   Count 1 and Count 2 that we simply haven't addressed in this

23   particular part of the conversation, but there are

24   indemnification rights that we plead in the complaint are in

25   the neighborhood of $77 million and more.

```
 1            There are re-purchase claims that may be orphaned

 2   or will be orphaned because even though during that

 3   eight-month period where the FDIC was operating under the

 4   agreement, it was honoring much of the agreement, there are

 5   many claims now that harken back to that period.

 6            THE COURT:  Tell me a little bit about what I made

 7   a number of notes to myself about have to do with the actual

 8   status of the certificates of this point.

 9            Do you have data as to the percentage of mortgages

10   that are backing these various CMOs that are in default at

11   this point?

12            MS. McKEON:  That information is available,

13   Your Honor.  I don't have it right here.  As I think we said

14   in our papers, we started out with 150,000 loans with $81

15   billion principal balance.  There's been a lot of reports in

16   the press and at the government, which obviously we haven't

17   cited because they weren't appropriate on a motion to

18   dismiss, about the problems with those loans and the quality

19   of those loans which have, I think, clarified that there are

20   significant defaults here.

21            THE COURT:  I assume that your client must know,

22   though, in their role as trustee, how many loans in each --

23   underlying each one of these certificates is actually

24   currently in default.

25            MS. McKEON:  I believe that the client would know
```

Lisa M. Gonzalez, Official Reporter

1  that.  There has been an issue when we pleaded it in our

2  complaint about some of the level of information and access

3  to information that we've gotten, but I agree with the Court

4  that that's knowable, but I don't have that information

5  right here.

6           If I could just make a comment on that access

7  issue, Your Honor.

8           THE COURT:  Yeah.

9           MS. McKEON:  One of the arguments that the FDICC

10  makes that I think Your Honor's ruling probably disposes of,

11  but I want to address it anyway, is that the claims against

12  the FDICC are not sufficiently pleaded to survive a motion

13  to dismiss; that FDIC in its corporate capacity, because

14  there's not sufficient pleading about its involvement in

15  this series of transactions.

16           And I do want to make the point, Your Honor, that

17  we believe that we have pleaded that properly.  That we've

18  pleaded in paragraph 151, for example, that the FDICC

19  benefitted from this transaction because the funds went to

20  the Federal Deposit Insurance Fund, but, in addition, we've

21  also pleaded that there were many efforts on our part to get

22  access to information before bringing this lawsuit, which we

23  were not able to get.  We now do have, for example, through

24  a FOIA request the guarantee that the FDICC provided to One

25  West to back up the performance by the FDICR, and if

1  permitted to replead, which we hope we should be, we would

2  plead that.

3          But I think the main point, from our perspective,

4  Your Honor, really does go to the Court's tentative, which

5  is that we believe that under the statutory framework and

6  under the holding of Sharpe, the breaches that Your Honor

7  has concluded existed, in fact, mean that the FDIC is not

8  permitted then to use the statutory framework, and we would

9  ask that the Court consider the tentative and give us the

10 opportunity at this motion to dismiss stage to move the case

11 forward or, in the alternative, to permit us to replead.

12         THE COURT:  All right.  Thank you, counsel.  Let

13 me hear from the FDIC.

14         MR. BIERMAN:  Your Honor, I would like to start by

15 noting that the breaches at issue here were breaches not by

16 a receiver but by IndyMac Federal which was in

17 conservatorship and the law, in particular, Sharpe, which

18 Deutsche Bank relies on, is a receivership case.  And I

19 cannot give you a clear discussion of the difference between

20 the receiver and the conservator here, but there are

21 differences and, fundamentally, the conservator is operating

22 an institution, a bank, whereas the receiver is disposing of

23 assets and dealing with liabilities.  And I would suggest

24 that the law of Sharpe applies specifically in a

25 receivership context and not to breaches of contract by an

1  ordinary -- it's not an ordinary but by an operating

2  business.

3          THE COURT:  Well, in a way, though, isn't that --

4  as I listen to Deutsche's counsel today and what they're

5  talking about, isn't that actually somewhat consistent with

6  their argument which is, wait a second.  You look at Sharpe.

7  Sharpe is a pre-receiver violation.  In that case, as I

8  recall, wire transfers were actually handled as cashier's

9  checks --

10          MR. BIERMAN:  True.

11          THE COURT:  They were sent to the party that had

12  entered into the resolution of a dispute with the

13  institution and there was then an after-the-fact repudiation

14  of the cashier's checks.

15          And in this case, we're saying, well, we've got

16  the FDIC in control -- I mean you can say it's IndyMac

17  Federal, but it's run by the FDIC, and they're saying, look,

18  here's how we're going to operate this institution, and

19  we're operating under the same contract that IndyMac had; so

20  isn't their contractual obligation the same as it would have

21  been for IndyMac, and aren't they subject to the same kinds

22  of actions against them that IndyMac would have been if

23  IndyMac had done them.

24          MR. BIERMAN:  The answer to both of your last two

25  questions is yes, they're acting under exactly the same

1  contract.  They assume the obligations.  They have the same

2  liabilities that IndyMac would have had.

3          With respect to Sharpe, the original breach was

4  the giving of cashier's checks instead of a wire transfer.

5          THE COURT:  Right.

6          MR. BIERMAN:  But if you read the opinion, the

7  Ninth Circuit says that what caused that breach to mature to

8  be -- to give rise to a claim was the receiver's refusal to

9  honor the cashier's checks and it was thus post-receivership

10  conduct that gave rise to the claim because until the

11  receiver refused to honor the cashier's checks, there was no

12  damages.

13          THE COURT:  Well, let's go to this question,

14  though, because it seems to me that the big issue in the

15  case is what happens if the FDIC, in the operation of an

16  institution, breaches a contract.  And it really is very

17  difficult to find any authority that really controls in a

18  situation like this one.  It's a very clear situation, in my

19  mind, with respect to the contract where the FDIC is in

20  control of the institution, they create the pass-through

21  entity and then they engage in the sale of these rights,

22  which seems to me to be inconsistent with what the pooling

23  and servicing agreement provides for in terms of offering

24  them first to Deutsche Bank.

25          MR. BIERMAN:  I'd like to address that question,

1   Your Honor.

2           THE COURT:  Please.

3           MR. BIERMAN:  Because we believe, quite strongly,

4   that the cases you have cited do not mean that there has

5   been an actionable breach of contract here.  And I'd like to

6   go in and discuss the cases.  Before I do, I would like to

7   say whether or not there's a breach of contract, it is clear

8   that the FDIC is not acting outside of its statutory

9   authority because the plain language of the statute says

10  that the FDIC can transfer any asset or liability without

11  consent and there's nothing that suggests that doesn't mean

12  what it says.

13          It is a more difficult issue to say whether or not

14  there might be a state law claim arising from the transfer,

15  that is, the FDIC might have state contractual consequences,

16  but it clearly has the power to do what it is doing because

17  (d)(2)(G), that's what it says.

18          And if it were anything else, the FDIC would not

19  be able, upon the failure of a bank, to transfer wholesale

20  assets and liabilities in its role as receiver in order to

21  have a smooth transition to a new operating bank.

22          THE COURT:  Well, if -- then, let's see if I

23  understand what your position is.  If we look at -- I think

24  Sahni is the partnership case.  And Sahni says, if we look

25  at FIRREA, and we compare it to, I think it was 15509 of the

1    California Corporation's Code, which would have required

2    consent on the part of, I believe, it was limited partners

3    in that case, to a certain transaction, and say FIRREA

4    clearly preempts that, the FDIC has no obligation to seek

5    consent in that case.

6           But Sharpe and Waterview seem to suggest that it's

7    different if we're dealing with a contractual right because

8    the contract is an asset that the FDIC is -- among the

9    assets that the FDIC assumes control of when it takes

10   control of the institution, and thereafter then we look at

11   what the FDIC does with that particular asset and how it

12   deals with it.  If it fails to obtain consent, then it's in

13   breach under state contract claim of the obligation to

14   obtain consent.  What's the consequence of that?  You say,

15   well, they've got the authority to breach it under FIRREA

16   (d)(2)(G), 1821(d)(2)(G); right?

17          MR. BIERMAN:  Yes.

18          THE COURT:  So they have the authority to do it,

19   but then the question is does that mean there are no

20   consequences to it?

21          MR. BIERMAN:  With respect to a contractual right

22   to consent, Your Honor.

23          THE COURT:  Yes.

24          MR. BIERMAN:  There is no consequence.  In Sahni

25   you could insert the words "state law contract consent

1  right" for Corporations Code, whatever it is, and the

2  preemption analysis would be exactly the same.  Both of them

3  conflict equally with 1821(d)(2)(G).

4          THE COURT:  But isn't counsel right, that if you

5  look at Sharpe and you look at especially the conclusion in

6  Sharpe, is that FDIC does not have the right to breach

7  contracts with impunity?

8          MR. BIERMAN:  That is true, Your Honor, and in

9  Sharpe there is no provision in FIRREA which authorized the

10  FDIC to not honor this check, or to otherwise not make good

11  on the breach.  And likewise, in Waterview, there is no

12  provision in FIRREA that says option contracts can be

13  voided.

14          THE COURT:  So you're saying if the contractual

15  provision happens to be couched as a provision requiring

16  consent, that's a different kind of contractual provision

17  than in Sharpe and Waterview?

18          MR. BIERMAN:  Absolutely.  In Waterview --

19          THE COURT:  And it's distinguishable sufficiently

20  to require a different result?

21          MR. BIERMAN:  Absolutely, Your Honor.  In

22  Waterview the, I guess it was the RTC argued, essentially,

23  as I read the case, that the option and exclusive marketing

24  agreement was in the penumbra, kind of, of the transfer

25  power without consent and the DC Circuit said no, it's

1  different.  You have a right to transfer without consent but

2  that does not nullify any other kind of state law contract

3  right, such as an option or a right to exclusive marketing.

4          Or, in Sharpe, the right to have your check

5  honored.  It is precisely consent.  The language of the

6  statute is clear and plain, and it has an exception in it so

7  it is hard to argue that the plain language of the statute

8  doesn't mean what it says.  And what it says is, a state law

9  contract consent right is inconsistent with it and therefore

10  should be preempted.

11          THE COURT:  All right.  Go ahead.

12          MR. BIERMAN:  Well, Your Honor, unless you have

13  some other questions -- with respect to the takings

14  clause --

15          THE COURT:  Yes.

16          MR. BIERMAN:  -- a takings clause cannot be based

17  on extra legal or unlegal activity under the law.  It needs

18  to be based on lawful actions.  And in this case, the claim

19  is based on alleged breaches.

20          THE COURT:  All right.  Let me hear from counsel

21  for the FDIC in its other capacity.

22          MR. HOLZMAN:  Good morning, Your Honor.  As you're

23  aware, the FDIC operates in several separate legal

24  capacities and the case law is clear that none of these

25  capacities is responsible for the actions of the others.

```
 1   Corporate, which represent, provides deposit insurance and
 2   supervises and regulates insured institutions.  It's not
 3   involved in the process of the receivership.  The
 4   receivership and its decisions are left to the business
 5   people in the receiver part of the operation who are much
 6   better at that than our bank examiners.
 7           With respect to the takings and due process
 8   issues, we will submit on Your Honor's tentative and
 9   Mr. Bierman's comments.
10           Counsel for Deutsche Bank claims they have
11   adequately pleaded that we were somehow involved or that we
12   somehow assumed obligations.  Corporate disagrees
13   completely.
14           When the government enters into a contract or
15   assumes contractual liability, this is a waiver of sovereign
16   immunity and courts don't likely assume that that's
17   happening.
18           Here there are two contracts that are crucial:
19   The pooling and servicing contract and the March 2009
20   agreement transferring the servicing rights.  They've not
21   alleged that we've signed either of those agreements, nor
22   could we have signed the pooling and servicing agreement.
23   They've not alleged that we're a successor by operation of
24   law to those agreements.  They've not alleged that those
25   agreements were assigned to us.  They depend on some sort of
```

1   assumption theory for which they don't have any adequate

2   factual basis.  Cases -- Izbal, Al-Kidd, are very clear that

3   they have to allege specific things with regard to FDIC

4   corporate because there is no vicarious liability.  Here we

5   have only the vaguest and most conclusory allegations.

6           THE COURT:  So your view is their beef is with the

7   receivership side not with your side?

8           MR. HOLZMAN:  Exactly, Your Honor.  If Your Honor

9   has no further questions, we'd simply ask that corporate be

10  dismissed without leave to amend.

11          THE COURT:  I don't have any further questions.

12          I'll hear final thoughts from counsel for Deutsche

13  Bank.

14          MS. McKEON:  Thank you, Your Honor.  Let me pick

15  up where you and Mr. Bierman were speaking about Sahni.

16  Your Honor asked a question about whether or not there is a

17  remedy or whether or not things can be -- you can act with

18  impunity, and the answer, I think, is made very clear in

19  Sharpe.  The answer is no.  Sharpe discussed Sahni.  It

20  discussed the fact that in Sahni there had been a conclusion

21  that the consent -- that the consent required by statute was

22  effectively set aside, if you will, by 1821, but it reached

23  exactly the opposite conclusion with respect to state law,

24  state contract law.

25          Sharpe stands for the proposition and is

1    constantly cited for the proposition that you cannot

2    aggregate state law and there are quotes that are ample from

3    Sharpe and Sahni, of course, they're in our briefs, but

4    FIRREA doesn't authorize a breach of contract.  FIRREA

5    doesn't preempt state law so as to aggregate state law

6    contract rights.

7          If the contract is too burdensome, the FDIC has

8    the right to repudiate and pay damages.  The FDIC cannot

9    improve its position by breaching the contract.  And the

10   FDIC cannot increase the value of the assets in its hands by

11   preempting out pre-receiver contractual obligations.  That

12   is exactly what is happening here, Your Honor.  That is

13   exactly what the FDIC has done.  It's taken state law

14   contract rights, it's ignored them, it's preempted them,

15   it's treated them as if they mean nothing, and in doing so

16   it's improved its position over what its position would have

17   been had it done the only thing the statute permitted it to

18   do, which was to repudiate.

19         And, Your Honor, I think if you look at

20   1821(d)(20) that really shows what it is that Congress

21   intended here.

22         In 1821 where they talked about pre-receiver

23   contracts, they said the FDIC can assume or repudiate.  In

24   1821(d)(20) for post-receivership breaches, they said the

25   FDIC is liable.  Liable as an administrative claim,

1    Your Honor.

2           The -- Sharpe makes clear that, in its view, that

3    Congress did not intend to permit the FDIC to breach

4    pre-receivership contracts and that's why you have this

5    authority in Sharpe and in Waterview that says if you guys

6    do this you're acting outside the statutory authority and

7    you will not be protected.  And here the result that the

8    FDIC is urging flies right in the face of Sharpe.  It does

9    exactly what Sharpe said it could not do.

10          So, in our view, the answer to your question, is

11   that if the FDIC is permitted to do this, there is no

12   ramification to doing exactly what Sharpe said you could not

13   do.  All of those quotes from Sharpe, from Waterview, we

14   think, apply here with equal force.

15          In addition, the comment Mr. Bierman made about

16   takings has to be based on lawful action.  Just to be clear

17   about this, I think we clarified this in our papers, but if

18   we didn't, I want to.

19          Our claim is that if the Court conclude that this

20   was lawful action, if the Court concludes that the FDIC was

21   free to breach then there would be a takings claim because

22   that would result in the taking of property under the

23   auspices of the statute.

24          With respect to the comments on the FDIC -- the

25   FDICC, I think the FDICC's effort to characterize itself as

1    a stranger to this action is unavailing.  The FDIC was

2    involved in this very transaction.  I understood the point

3    about who operates, but in this very transaction where these

4    servicing rights were alienated from a unified contract,

5    transferred, in our view, outside of the statutory

6    provisions and outside of what the law permits and

7    transferred to One West, the FDICC, as an inducement to the

8    obligations under the agreement, unconditionally and

9    irrevocably guaranteed the obligations of the FDIC as the

10   receiver.

11            So here you have a situation where through a web

12   of transactions this deal gets done, done to the detriment

13   of the investors.  We believe that for that reason the FDICC

14   belongs in this case as well.

15            We've also cited, on the contract side, New York

16   law which applies here in the Dial-A-Mattress case and

17   Impulse Marketing that says that even if you're not a

18   signatory to the contract, if you are significantly involved

19   and receive the benefits then you can be held under the

20   contract.

21            Again, Your Honor, at a motion to dismiss stage,

22   we believe that we've pleaded enough, but we would welcome

23   the opportunity to replead now that we have further

24   information.

25            Finally, I want to address the constructive trust

1  point, Your Honor, that came up in connection with the

2  Sharpe decision.  What Sharpe says is that you don't get to

3  hide behind the protection from the imposition of a

4  constructive trust if you have acted outside the statutory

5  authority and breached these state law rights.

6          In this particular case, we believe that we've

7  pleaded sufficiently and the law supports a right to move

8  forward on the theory that by taking these state law

9  contract rights, not assuming or repudiating but instead

10  assuming and breaching, which the FDIC was not permitted to

11  do, that they now cannot rely on the protection of 1821(j),

12  and that we should be able to pursue a claim for a

13  constructive trust impressed upon the value of what was

14  transferred to One West that belonged properly with the

15  investors, and that is the servicing rights.

16          THE COURT:  All right.  Thank you.

17          MS. McKEON:  Thank you, Your Honor.

18          THE COURT:  You want to say something; is that why

19  you're standing up, or can you just not wait to leave?

20          MR. BIERMAN:  Perhaps three sentences, Your Honor.

21  Lawyer sentences not regular people sentences.  On (d)(20),

22  the language for which claims are to be paid as

23  administrative claims is contracts, the breach of an

24  agreement, executed or approved by the receiver conservator.

25  It does not say "assumed."  These are for contracts that are

1  explicitly adopted giving performance going forward.

2          With respect to the constructive trust point, it

3  is not the -- the deposit of preference statute is not

4  something that the FDIC is hiding behind.  The deposit of

5  preference statute is Congress's command as to how the money

6  is to be laid out, and if the FDIC has somehow done

7  something wrong, it is -- that is no justification for

8  prejudicing depositors by altering the scheme that Congress

9  has applied.

10         THE COURT:  Okay.

11         All right.  Anything further from counsel for the

12  conservator?  You don't have to say anything.  I'm just

13  giving you the chance.

14         MR. HOLZMAN:  One thing I'll just add briefly.  In

15  the question of whether FDIC in its corporate capacity

16  benefits.  It benefits, but only in the same way that any

17  other creditor benefits when it is subrogee of the insured

18  depositors and it gets the same dividend that uninsured

19  depositors get under depositor preference.

20         THE COURT:  Okay.  All right.  Thank you, counsel.

21         Do we have any dates scheduled in this case at

22  this point?

23         MS. McKEON:  I don't believe so, Your Honor.

24         MR. BIERMAN:  I don't believe so, Your Honor.

25         THE COURT:  So I don't have to vacate any while

1   we're trying to figure out our final answer.

2         MS. McKEON:  Thank you, Your Honor.

3            *(Thereupon, proceedings adjourned)*

4

5                  *-oOo-*

6

7              *CERTIFICATE*

8

9         *I hereby certify that pursuant to Section 753,*

10  *Title 28, United States Code, the foregoing is a true and*

11  *correct transcript of the stenographically reported*

12  *proceedings held in the above-entitled matter and that the*

13  *transcript format is in conformance with the regulations of*

14  *the Judicial Conference of the United States.*

15

16  *Date:  December 22, 2010*

17

18

19         _____

20         *Lisa M. Gonzalez, U.S. Court Reporter*
           *CSR No. 5920*

21

22

23

24

25

Lisa M. Gonzalez, Official Reporter