UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT



**FILED**

MAY 30 2014

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

DEUTSCHE BANK NATIONAL
TRUST COMPANY, as Trustee for
certain residential mortgage-backed
securitization trusts sponsored by
IndyMac Bank, F.S.B.,

               Plaintiff - Appellant,

  v.

FEDERAL DEPOSIT INSURANCE
CORPORATION, as Receiver of
IndyMac Bank, F.S.B.; et al.,

            Defendants - Appellees.

No. 11-56339

D.C. No. 2:09-cv-03852-GAF-FFM
U.S. District Court for Central
California, Los Angeles

**MANDATE**



**RECEIVED**
CLERK, U.S. DISTRICT COURT

5/30/14

CENTRAL DISTRICT OF CALIFORNIA
BY: _____MAT_____ DEPUTY

The judgment of this Court, entered March 11, 2014, takes effect this date.

This constitutes the formal mandate of this Court issued pursuant to Rule

41(a) of the Federal Rules of Appellate Procedure.

                    FOR THE COURT:
                    Molly C. Dwyer
                    Clerk of Court

                    Craig Westbrooke
                    Deputy Clerk

FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| DEUTSCHE BANK NATIONAL TRUST COMPANY, as Trustee for certain residential mortgage-backed securitization trusts sponsored by IndyMac Bank, F.S.B., *Plaintiff-Appellant*, | No. 11-56339<br><br>D.C. No.<br>2:09-cv-03852-GAF-FFM |
| v. | OPINION |
| FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver of IndyMac Bank, F.S.B.; Federal Deposit Insurance Corporation, as Conservator and Receiver of IndyMac Federal Bank F.S.B.; Federal Deposit Insurance Corporation, in its corporate capacity; and Federal Deposit Insurance Corporation; FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR INDYMAC BANK, FSB; DEFENDANT FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR INDYMAC BANK FSB, *Defendants-Appellees*. | |

Appeal from the United States District Court
for the Central District of California
Gary A. Feess, District Judge, Presiding

Argued and Submitted
April 9, 2013—Pasadena, California

Filed March 11, 2014

Before:  Ferdinand F. Fernandez, Johnnie B. Rawlinson,
and Jay S. Bybee, Circuit Judges.

Opinion by Judge Rawlinson

---

## SUMMARY[*]

---

### Mootness

In an interlocutory appeal, the panel affirmed the district court's dismissal of Deutsche Bank National Trust Co.'s claims against the Federal Deposit Insurance Corporation on prudential mootness grounds.

The panel held that the scope of the appeal was limited to the question of law—prudential mootness—certified by the district court.  The panel held that because Deutsche Bank was a quintessential creditor, its claims were third-tier general unsecured liabilities under 12 U.S.C. § 1821(d)(11)(A)(iii), and the district court properly held that Deutsche Bank's

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

claims were prudentially moot, as there were insufficient funds to satisfy general unsecured liabilities.

## COUNSEL

Thomas M. Peterson (argued) and Jami Wintz McKeon, Morgan, Lewis & Bockius LLP, San Francisco, California; Allyson N. Ho and William S.W. Chang, Morgan, Lewis & Bockius LLP, Houston, Texas; and Gregory T. Parks and Maire E. Donovan, Morgan, Lewis & Bockius LLP, Philadelphia, Pennsylvania, for Appellant.

Colleen J. Boles, Assistant General Counsel, Lawrence H. Richmond, Senior Counsel, J. Scott Watson (argued), Minodora D. Vancea, Counsel, Federal Deposit Insurance Corporation, Arlington, Virginia, for Appellee.

## OPINION

RAWLINSON, Circuit Judge:

In this interlocutory appeal, Appellant Deutsche Bank National Trust Co. (Deutsche Bank) challenges the district court's dismissal of its claims against the Federal Deposit Insurance Corporation (FDIC).

The dispositive issue is whether Deutsche Bank's claims are general unsecured claims under 12 U.S.C. § 1821(d)(11) and thereby prudentially moot because of the lack of sufficient funds in the estate to pay unsecured claims. Deutsche Bank maintains that it possesses superpriority claims and that 12 U.S.C. § 1821(d)(11) is inapplicable because the FDIC exceeded its statutory authority by splitting the agreements and transferring the servicing rights without Deutsche Bank's consent. Assuming that the FDIC breached the agreements, we nevertheless affirm the district court's dismissal of Deutsche Bank's claims because the purported breach did not transform Deutsche Bank's general unsecured claims into superpriority claims.

## I.  BACKGROUND

### A.  Deutsche Bank's Lawsuit Against The FDIC

According to its Complaint, Deutsche Bank served in the capacity as trustee for more than 240 mortgage securitization trusts created by IndyMac. Prior to its failure in July, 2008, IndyMac functioned as a mortgage securitizer, acquiring mortgage loans that it sold to the Trusts. According to Deutsche bank, the Trusts subsequently sold residential

mortgage-backed securities "supported by the cash flows on the underlying mortgage loans."

IndyMac's success in attracting investors to purchase the mortgage-backed securities sold by IndyMac depended on IndyMac's representations and promises that a single entity (IndyMac) would perform the interrelated services necessary to protect, preserve and service the Trust assets.   The mortgage-backed securities transactions were governed by agreements that established and regulated the Trusts and the related relationships among the parties with interests in the Trusts.  Among the Governing Agreements were Pooling and Servicing Agreements (PSAs), Sale and Servicing Agreements, Indentures, and Trust Agreements.  Pursuant to the Governing Agreements, IndyMac was required, *inter alia*, to:  enforce the loan obligations; collect payments from the borrowers; administer the documents related to the mortgage loans; provide notification concerning missing or defective loan documentation; provide notification of mortgages that did not comply with IndyMac's representations; cure breaches of representations or warranties adversely affecting the Trust's beneficiaries; and modify seriously delinquent loans.  In return, IndyMac received the loans' purchase prices and "monthly fees and income from the Trusts based on the aggregate outstanding principal balance of the mortgage loans in each Trust. . . ."

On July 11, 2008, the Office of Thrift Supervision (OTC) closed IndyMac and appointed the FDIC as its receiver (FDIC-R).  The OTC created a new savings bank, IndyMac Federal, and appointed the FDIC as conservator (FDIC-C). Another federal savings bank, OneWest Bank, was formed as a thrift holding company to purchase IndyMac Federal's assets and liabilities.  As receiver and conservator, the FDIC

6      Deutsche Bank Nat'l Trust Co. v. FDIC

"succeeded to all rights, titles, powers, and privileges of IndyMac Federal, including those arising under the Governing Agreements or otherwise related to the Trusts." As IndyMac Federal's conservator, the FDIC administered the Trusts and serviced the mortgages based on servicing rights established by the Governing Agreements. In that capacity, the FDIC sold certain assets and rights of IndyMac Federal to OneWest for approximately $13.9 billion.

Deutsche Bank alleged that

> [t]he sale to OneWest included many valuable rights that IndyMac held under the Governing Agreements or that were otherwise related to the Trusts, but improperly excluded certain of IndyMac's obligations to the Trusts and the Trustee under those same Governing Agreements without making alternate arrangements to assure the performance of those excluded obligations. Specifically, the sale to OneWest included what the FDI characterized as the "servicing rights" under the Governing Agreements, including IndyMac's right to service the mortgage loans in the Trusts and the corresponding right to receive the servicing fees and income provided in the Governing Agreements. The sale, however, excluded certain obligations imposed on IndyMac under the same Governing Agreements, including . . . "any repurchase obligations for breaches of loan level representations, any indemnities relating to origination activities or securities laws or any seller indemnity."

According to Deutsche Bank, the FDIC exceeded its statutory authority "[i]n attempting to sell, and thereby reap the benefits of, the Governing Agreements without assuming and assigning (or otherwise performing) the related obligations . . ." Deutsche Bank averred that "[i]n the sale to OneWest, the FDIC purported to split unitary contracts and divide rights and obligations that [were] not severable."

Deutsche Bank also alleged that the FDIC, as receiver, breached several representations and warranties and failed to comply with the Governing Agreements, particularly in servicing the mortgage loans. Deutsche Bank averred that the FDIC's conduct resulted in approximately $6 billion to $8 billion in damages to the Trusts and Trustee.

Deutsche Bank asserted causes of action against the FDIC for pre-failure breach of contract as IndyMac Federal's receiver and conservator, (Count One); post-failure breach of contract as conservator, (Count Two); breach of contract for sale to OneWest as conservator, receiver, and in its corporate capacity, (Count Three); repudiation of certain trusts as receiver, (Count Four); breach of the duty of good faith and fair dealing as receiver and conservator, (Count Five); breach of fiduciary duty as receiver and conservator, (Count Six); unconstitutional taking via the sale to OneWest and the splitting of obligations, (Count Seven); unconstitutional taking of right to appoint a successor servicer, (Count Eight); due process violations premised on the sale to OneWest, the splitting of obligations and the right to appoint a successor servicer, (Counts Nine and Ten); and constructive trust (Count Eleven).

8      DEUTSCHE BANK NAT'L TRUST CO. V. FDIC

**B.  Legal and Statutory Framework**

Because Deutsche Bank's claims depend on whether it is a general unsecured creditor under the distribution priorities set forth in 12 U.S.C. § 1821(d)(11), discussion of the applicable statutory framework, as interpreted in our precedent, sets the stage for our resolution of this case.[1]

"Congress passed FIRREA in 1989 in response to the crisis in the nation's banking and savings and loan industries. The statute allows the FDIC to act as receiver or conservator of a failed institution for the protection of depositors and creditors." *Sharpe v. FDIC*, 126 F.3d 1147, 1154 (9th Cir. 1997) (citation omitted).  "Congress granted the FDIC broad powers in conserving and disposing of the assets of the failed institution.  To enable the FDIC to move quickly and without undue interruption to preserve and consolidate the assets of the failed institution, Congress enacted a broad limit on the power of courts to interfere with the FDIC's efforts. . . ." *Id.* (citation and internal quotation marks omitted).

Pursuant to 12 U.S.C. § 1821(d)(2)(H), "[t]he [FDIC], as conservator or receiver, shall pay all valid obligations of the insured depository institution in accordance with the prescriptions and limitations of this chapter."  The FDIC has the additional task under 12 U.S.C. § 1821(d)(13)(E) of "maximiz[ing] the net present value return from the sale or disposition of such assets" and "minimiz[ing] the amount of any loss realized in the resolution of cases[.]"  However, under 12 U.S.C. § 1821(e), the FDIC also has the authority to

---

[1] The statutory provisions of this case are part and parcel of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA) codified in Title 12 of the United States Code.

repudiate "any contract or lease . . . the performance of which
the conservator or receiver, in the conservator's or receiver's
discretion, determines to be burdensome . . ."  12 U.S.C.
§ 1821(e)(1)(B).  If the FDIC decides to repudiate a contract
under this provision, "the liability of the conservator or
receiver for the disaffirmance or repudiation . . . shall be – (i)
limited to actual direct compensatory damages . . ."  *Id.*
§ 1821(e)(3)(A)(i).

     As a corollary to FIRREA, in 1993 Congress adopted the
National Depositor Preference Amendment to the Federal
Deposit Insurance Act.  This legislation provided "that in the
distribution of the assets of a failed institution depositors be
paid before general creditors could collect on their claims."
*MBIA Ins. Corp. v. FDIC*, 708 F.3d 234, 236 (D.C. Cir. 2013)
(footnote reference omitted).  This preference amendment
establishing the distribution priority framework for failed
institutions was codified in 12 U.S.C. § 1821(d)(11).  *See id.*
The codified distribution priority framework sets forth the
following hierarchy of claims:

> Subject to section 1815(e)(2)(C) of this title,
> amounts realized from the liquidation or other
> resolution of any insured depository
> institution by any receiver appointed for such
> institution shall be distributed to pay claims
> (other than secured claims to the extent of any
> such security) in the following order of
> priority:

> (i) Administrative expenses of the receiver.

> (ii) Any deposit liability of the institution.

(iii) Any other general or senior liability of the institution (which is not a liability described in clause (iv) or (v)).

(iv) Any obligation subordinated to depositors or general creditors (which is not an obligation described in clause (v)).

(v) Any obligation to shareholders or members arising as a result of their status as shareholders or members (including any depository institution holding company or any shareholder or creditor of such company).

12 U.S.C. § 1821(d)(11)(A).

The dispositive issue in this appeal is whether Deutsche Bank's claims constitute third-tier general liabilities under 12 U.S.C. § 1821(d)(11)(A)(iii) rather than a claim payable outside the strictures of § 1821(d). Deutsche Bank maintains that because the FDIC exceeded its statutory authority and breached the agreements without properly repudiating them, the distribution scheme delineated in § 1821(d)(11) does not apply, and thus its claims are payable without regard to these provisions. Deutsche Bank's argument is primarily premised on its interpretation of three cases: *Sharpe*; *Battista v. FDIC*, 195 F.3d 1113 (9th Cir. 1999); and *McCarthy v. FDIC*, 348 F.3d 1075 (9th Cir. 2003).

1.   *Sharpe v. FDIC*

In *Sharpe*, Whitney and Mona Sharpe entered into a settlement agreement with Pioneer Bank to resolve a real estate foreclosure action. *See Sharpe*, 126 F.3d at 1150. The

Sharpes and Pioneer agreed that Pioneer would remit
$510,000 by wire transfer to the Sharpes when the Sharpes
provided the requisite note, deed of trust, and reconveyance
documents. *See id.* at 1150–51. In direct contravention of the
settlement agreement's wire transfer requirement, Pioneer
sent the Sharpes two cashier's checks. *See id.* at 1151.
Before the Sharpes could deposit the checks, state regulators
seized Pioneer, and the FDIC was appointed as Pioneer's
receiver. *See id.* As receiver, the FDIC "step[ped] into the
shoes" of Pioneer. *Id.* at 1152. The FDIC took possession of
the reconveyance documents provided by the Sharpes and
recorded them, but informed the Sharpes that it would not
honor the cashier's checks. *See id.* at 1151.

The Sharpes sued the FDIC for enforcement of the
settlement agreement. *See id.* However, the district court
held that FIRREA precluded judicial review of the Sharpes'
claims because they were "effectively depositors, and
therefore creditors of Pioneer" subject to FIRREA's
exhaustion requirements. *Id.* On appeal, the Sharpes asserted
that "the district court failed to accept the breach of contract
nature of their cause of action and improperly applied
FIRREA requirements as if the Sharpes were creditors of
Pioneer. . . ." *Id.* at 1152. The FDIC maintained that
dismissal was warranted on jurisdictional grounds because
the Sharpes were creditors as holders of Pioneer's cashier's
checks and that 12 U.S.C. § 1821(j) deprived the district court
of jurisdiction over the Sharpes' claims for equitable relief.
*See id.*[2]

---

[2] 12 U.S.C. § 1821(j) provides:

> Except as provided in this section, no court may take
> any action, except at the request of the Board of

In analyzing whether the Sharpes' claims were covered by
FIRREA's administrative claims process, we opined that the
settlement agreement governed the Sharpes' relationship with
Pioneer, and that the Sharpes were "neither creditors nor
depositors under the agreement." *Id.* at 1152–53. Instead,
"[t]hey [were] parties to a contract they fully performed." *Id.*
at 1153. Applying basic contract interpretation principles, we
determined that "[t]he FDIC failed to perform its obligations
under the contract," and "that this failure to perform the
express terms of the settlement agreement [was] a
breach. . . ." *Id.* (citations omitted). Because Pioneer issued
a cashier's check in lieu of the contractually agreed upon wire
transfer, it breached the settlement agreement. *See id.* "[T]he
bank's tender by cashier's check and the FDIC's subsequent
refusal to honor the checks constitute[d] material breaches of
the settlement agreement." *Id.* "Had the FDIC honored the
cashier's checks, the Sharpes would have suffered no
damages as a result of the breach; the failure to honor the
checks gives rise to a cause of action for breach of contract
with a remedy." *Id.*

We held "that the FDIC did not act within its statutorily
granted powers in breaching the Sharpes' settlement
agreement because recording of the reconveyance of the
debtor's deed of trust for which it did not pay full
consideration cannot be considered a statutorily authorized
function of the FDIC." *Id.* at 1155. Therefore, the Sharpes'
claims for rescission and declaratory relief were not barred by
12 U.S.C. § 1821(j). *See id.*

---

Directors [of the FDIC] by regulation or order, to
restrain or affect the exercise of powers or functions of
the Corporation as a conservator or a receiver.

We also rejected the FDIC's argument that "the Sharpes' cause of action constitute[d] an administrative claim subject to the exhaustion requirement. . . ." *Id.* We observed that "Section 1821(d) sets forth an administrative claims process, which requires that creditors submit claims to the FDIC for administrative resolution.  If the Sharpes [were] considered creditors, they [would be] subject to that claims process." *Id.* at 1156 (footnote reference and internal quotation marks omitted).  However, we concluded that the Sharpes were not required to submit to the FDIC administrative process because they did not become creditors of the FDIC by accepting the cashier's check.  *See id.*  We reasoned that "[b]ut for the FDIC's breach, the full cash amount specified in the settlement agreement would have been wired to the Sharpes.  It is only as a consequence of the FDIC's breach that the FDIC can construe the Sharpes as creditors of the FDIC. . . ." *Id.*

Notably, we observed that "[b]ecause the FDIC did not repudiate the agreement pursuant to § 1821(e), we need not decide here whether claims against the FDIC regarding contract repudiation under § 1821(e) are subject to the exhaustion requirement." *Id.* at 1157 n.7 (citations omitted).

We held:

> The Sharpes [were] a party to a pre-receivership contract breached by the FDIC, and they retain[ed] the rights accompanying that contract notwithstanding the appointment of the FDIC as receiver.  The Sharpes cannot be considered creditors of the FDIC, and we hold that their claim is not a

claim for the purposes of the FIRREA exhaustion requirement.

*Id.* at 1157.

### 2. *Battista v. FDIC*

In *Battista*, former employees of an insolvent bank sued the FDIC based on the FDIC's repudiation of their employment contracts. *See Battista*, 195 F.3d at 1115. In the context of resolving the case, we considered whether claims for damages based on repudiated contracts under 12 U.S.C. § 1821(e) were subject to the payment priorities established by 12 U.S.C. § 1821(d). *See id.* at 1116. Battista argued that in FIRREA, Congress established two types of claims: (1) claims approved by the FDIC pursuant to § 1821(d) that are satisfied by the remittance of receiver's certificates from the assets of the failed financial institution, and (2) claims for damages due to repudiation under § 1821(e) that are payable solely in cash. *See id.* at 1117. We disagreed, holding that "§ 1821(e) is better interpreted as being subject to the various provisions of § 1821(d)." *Id.* We observed that "little in § 1821 indicates that Congress intended to establish two distinct types of non-depositor claims, beyond the fact that Congress provided for damages for repudiation in subsection (e), while discussing the claims payment process in subsection (d)." *Id.* "[I]f Congress had wished to depart from the § 1821(d) regime for claims for damages under § 1821(e), presumably it would have said so. . . ." *Id.* "[T]he distribution priority in § 1821(d)(11)(A), which was added to § 1821 in 1993, makes little sense if parties injured by repudiations under § 1821(e) are treated separately from parties with claims under § 1821(d). . . ." *Id.* at 1118. We pointed out that in its regulations, "the FDIC interpreted

§ 1821(d)(11)'s priority scheme as including claims for damages arising from contract repudiation under § 1821(e), but not entitled to the same priority as administrative claims." *Id.* at 1119; *see also* 12 C.F.R. § 360.4 (defining administrative expenses); 58 Fed. Reg. 43,069, 43,070 (1993) (clarifying that administrative expenses generally do not include claims arising from contract repudiation).

We also distinguished *Sharpe*, expressly clarifying that *Sharpe* did not exempt claimants whose contracts had been repudiated from the claims administration process set forth in § 1821(d). *See Battista*, 195 F.3d at 1119.

### 3.   *McCarthy v. FDIC*

In *McCarthy*, we considered the dismissal of an action challenging the way the FDIC handled a loan the plaintiff was negotiating with a bank after the bank failed and the FDIC was appointed as receiver. *See McCarthy*, 348 F.3d at 1076. The plaintiff alleged that he was forced to accept a new loan on a "take-it-or-leave-basis and that he would not have executed this loan had he known of [the bank's] closure and the FDIC's receivership. . . ." *Id.* at 1077 (internal quotation marks omitted).  The district court held that it lacked subject matter jurisdiction because the plaintiff failed to satisfy FIRREA's exhaustion requirements.  *See id.*  Relying on *Sharpe*, the plaintiff asserted that FIRREA's exhaustion requirements were inapplicable because he was a debtor, not a creditor, of the insolvent bank and because his claims were premised on the FDIC's post-receivership conduct. *See id.* at 1076–77.

We rejected the plaintiff's argument premised on *Sharpe*, explaining that *Sharpe* was not controlling because that case

was decided in a different context, where the Sharpes were neither creditors nor debtors of the failed institution.  *See id.* at 1077.  We noted that "[t]he text of § 1821(d)(13)(D) plainly states that *any* claim or action that asserts a right to assets of a failed institution is subject to exhaustion.  There is no limitation to creditors, or exclusion of debtors, and that *is* controlling."  *Id.* at 1077 (emphases in the original).  We emphasized that "*Sharpe* was an unusual case," and that in *Sharpe* "we had no occasion to decide whether a debtor's claim or action, like a creditor's, must be exhausted, for the Sharpes were not debtors and our decision turned on the claimants' being aggrieved parties to a contract that the FDIC had not repudiated."  *Id.* at 1078.

We concluded:

> [W]e see no reason why the plain meaning of the statute should not govern this case. . . . And, regardless of whether he is a creditor or a debtor making claim to the bank's assets, requiring exhaustion furthers the purpose of FIRREA to ensure that the assets of a failed institution are distributed fairly and promptly among those with valid claims against the institution and promptly to wind up the affairs of failed banks.

*Id.* at 1079 (citation and internal quotation marks omitted).

### C. The District Court's Application of *Sharpe* To The FDIC's Motion To Dismiss Deutsche Bank's Claims

In its initial order, the district court denied in part and granted in part the FDIC's motion to dismiss Deutsche Bank's claims. The district court held that, because the FDIC exceeded its statutory authority in splitting the Pooling and Servicing Agreements without Deutsche Bank's consent, our discussion in *Sharpe* mandated rejection of the FDIC's arguments that prudential mootness precluded Deutsche Bank's claims and that Deutsche Bank's claims were subject to the priority scheme set forth in 12 U.S.C. § 1821(d)(11). *See Deutsche Bank Nat'l Trust Co. v. FDIC*, 784 F. Supp. 2d 1142, 1159–60, 1170 (C.D. Cal. 2011) (*Deutsche Bank I*).

The district court determined that, because Deutsche Bank alleged that the FDIC breached the contracts, rather than repudiating them, *Sharpe* "makes clear that damages resulting from the FDIC's breach of a contract are not subject to the § 1821(d)(11) distribution priority scheme. . . ." *Id.* at 1159. Applying *Sharpe*, the district court opined that § 1821(d)(11)'s priority scheme was inapplicable because "a claim against the FDIC for post-seizure breach of contract does not constitute a claim under FIRREA . . ." *Id.* at 1159–60. The district court delineated that, at this stage in the litigation, it was unnecessary to discern "whether damages will ultimately be payable from the receivership or from FDIC-C's own funds. Even if the damages will come from the receivership, Deutsche Bank's claim will take priority over the categories identified in § 1821(d)(11), and there is accordingly a possibility of recovery. . . ." *Id.* at 1160. The district court denied the FDIC's motion to dismiss Deutsche Bank's claim and held that "Deutsche Bank may

18      Deutsche Bank Nat'l Trust Co. v. FDIC

proceed with its breach of contract claim arising out of the sale of assets to OneWest Bank." *Id.*[3]

### D. The District Court's Order Granting Reconsideration

The district court subsequently granted the FDIC's motion for reconsideration of the prudential mootness issue. *See Deutsche Bank Nat'l Trust Co. v. FDIC*, 854 F. Supp. 2d 756, 759 (C.D. Cal. 2011) (*Deutsche Bank II*). Reconsidering its prior ruling, the district court analyzed whether *Battista* and *McCarthy* undermined its holding based on *Sharpe*, "that if a claim for post-receivership breach of a pre-receivership contract does not qualify as a claim within the meaning of FIRREA's exhaustion requirement, it likewise did not qualify as a claim subject to the § 1821(d)(11) distribution priority."

---

[3] The district court dismissed Deutsche Bank's breach of contract claims premised on the FDIC's splitting of the benefits and burdens of the PSAs. The district court reasoned that, because portions of the agreements constituted qualified financial contracts, the FDIC was entitled to split the servicing functions from the liabilities. *See Deutsche Bank I*, 784 F. Supp. 2d at 1153–55. However, the district court allowed breach of contract claims to proceed that were based on the FDIC's failure to obtain Deutsche Bank's consent before transferring the servicing functions. *See id.* at 1155. This claim was allowed to proceed against the FDIC in its capacity as a receiver, with leave to amend to state a claim against the FDIC in its corporate capacity. *See id.* at 1162, 1170. This claim also encompassed the constructive trust claim. *See id.* at 1163, 1170. The district court granted the FDIC's motion to dismiss Deutsche Bank's breach of fiduciary duty, takings, and due process claims. *See id.* at 1169–70. The district court denied the FDIC's motion to dismiss Deutsche Bank's claims based on breach of the implied covenant of good faith and fair dealing. *See id.* at 1162–63. As discussed below, we only address in this opinion the sole claim certified for interlocutory appeal – whether Deutsche Bank's claims are subject to the statutory priority payment scheme.

*Id.* at 761 (citation and internal quotation marks omitted). Although the district court concluded that *Battista* did not impact its prior ruling, *see id.* at 761–62, the district court held that *McCarthy* compelled dismissal of Deutsche Bank's claims as prudentially moot. *See id.* at 764–67.

The district court observed that "[t]he decision in *Sharpe* did not squarely address the issue presented here:  whether a claim for post-receivership breach of a pre-receivership contract qualifies as a general unsecured liability under the § 1821(d)(11) distribution priority, or whether it falls outside of that scheme altogether. . . ." *Id.* at 764.  According to the district court, *McCarthy* "undercuts *Sharpe's* reasoning" because "[b]y holding that a debtor can have a claim subject to exhaustion, *McCarthy* eliminates that key step in *Sharpe's* logic." *Id.* (internal quotation marks omitted).  "*McCarthy*, however, did not – and could not – overrule *Sharpe*." *Id.*  As a result, the district court interpreted *McCarthy* as "distinguish[ing] *Sharpe* and limit[ing] its holding that a claimant need not exhaust administrative remedies to claims arising out of a breach of contract in the circumstances present in *Sharpe*. . . ." *Id.* at 765 (citation and internal quotation marks omitted).  The district court determined that Deutsche Bank's claims were not covered by *Sharpe's* exception because "Deutsche Bank had not fully performed its obligations, but rather had continuing obligations to pay servicing fees over time.    Thus, its claims for post-receivership breach of pre-receivership contracts are subject to the § 1821(d)(11) distribution priority." *Id.* at 766. The district court held that, because Deutsche Bank's breach of contract claims were "third-tier general unsecured claims [,] Deutsche Bank . . . cannot recover anything on those claims given IndyMac's deep insolvency. . . ." *Id.* at 767.   Finding prudential mootness, the district court

dismissed Deutsche Bank's claims with prejudice "except for
the second cause of action . . . for post-failure breach of
contract to the extent that it is based on the alleged breach of
contracts that [FDIC as Receiver] executed or approved,
which would be entitled to a priority right of payment under
12 U.S.C. § 1821(d)(20) . . ." *Id.* (internal quotation marks
omitted).

The district court also *sua sponte* certified "the prudential
mootness issue for interlocutory appeal by Deutsche Bank."
*Id.* at 768 (citation omitted).  The district court "conclude[d]
that the question whether claims for post-receivership breach
of a pre-receivership contract are subject to the § 1821(d)(11)
distribution priority constitute[d] a controlling question of
law worthy of certification." *Id.*  The district court certified
for interlocutory appeal "the following controlling question
of law:  whether Deutsche Bank's claims for postfailure
breach by [FDIC as Receiver] of contracts executed by a
failed bank are payable only as third-tier general unsecured
claims under the § 1821(d)(11) distribution priority. . . ." *Id.*
at 770.

We granted "[t]he petition for permission to appeal
pursuant to 28 U.S.C. § 1292(b)," and limited the appeal "to
the specific question of law certified by the district court . . ."

## II.  STANDARDS OF REVIEW

We review de novo whether Deutsche Bank's claims are
prudentially moot.  *See Hunt v. Imperial Merch. Servs.*,
560 F.3d 1137, 1141 (9th Cir. 2009).  "We also review de
novo a district court's interpretation and construction of a
federal statute." *Holmes v. Merck & Co., Inc.*, 697 F.3d
1080, 1082 (9th Cir. 2012) (citation omitted).

## III.   DISCUSSION

### A. Permissible Scope of the Appeal

In addition to challenging the district court's holding concerning prudential mootness, Deutsche Bank contends that the district court erred in holding that the PSAs constituted qualified financial contracts that could be severed pursuant to 12 U.S.C. § 1821(e)(9), thereby negating Deutsche Bank's related breach of contract and constructive trust claims.  The FDIC counters that this issue was not included in the question of law certified by the district court.

"[A]n appellate court's interlocutory jurisdiction under 28 U.S.C. § 1292(b) permits it to address any issue fairly included within the certified order because it is the *order* that is appealable, and not the controlling question identified by the district court. . . ."  *Nevada v. Bank of Am. Corp.*, 672 F.3d 661, 673 (9th Cir. 2012) (citation and internal quotation marks omitted) (emphasis in the original).

In this appeal, the dispositive issue, and the only issue certified in the district court's order, concerns prudential mootness.  Encapsulated within that issue is whether Deutsche Bank's claims constitute third-tier general unsecured claims under 12 U.S.C. § 1821(d)(11).  Although we have authority to review issues fairly included within the certified order, review of issues not included in the certified order would obliterate the distinction between interlocutory appeals and appeals after final judgment and would encourage circumvention of the conventional appeals process.  Perhaps in recognition of that risk, "[c]ommentators and courts have consistently observed that the scope of the issues open to the court of appeals [under § 1292(b)] is closely

limited to the order appealed from and the court of appeals will not consider matters that were ruled upon in other orders." *United States v. Stanley*, 483 U.S. 669, 677 (1987) (citations, alterations, and internal quotation marks omitted); *see also Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 46, 50 (1995) (noting that the authority to review interlocutory appeals is "circumscribed" and that the rule should not be interpreted to "parlay" interlocutory orders into "multi-issue interlocutory appeal tickets"); *Durkin v. Shea & Gould*, 92 F.3d 1510, 1514 (9th Cir. 1996) ("[A]ppellate review is limited to the certified order; issues presented by other, noncertified orders could not be considered simultaneously[.]") (citation, alteration, and footnote reference omitted).  In keeping with the letter and spirit of 1292(b), our precedent, and Supreme Court guidance, we limit the scope of this appeal to the certified order and decline to reach any issues that are not encompassed within the certified order issued by the district court.  *See Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 689 (9th Cir. 2011) (similarly declining to review uncertified issues). Accordingly, we review only the district court's determination of prudential mootness.  Appeal of the balance of the district court's rulings must await final judgment.

## B. Prudential Mootness Based On FIRREA's Distribution Priorities

The doctrine of prudential mootness permits a court to "dismiss an appeal not technically moot if circumstances have changed since the beginning of litigation that forestall any occasion for meaningful relief. . . ."  *Hunt*, 560 F.3d at 1142 (citations, alteration, and internal quotation marks omitted).  Although we have not extensively applied the prudential mootness doctrine *per se*, we have concluded that

claims against a receiver are moot if those claims cannot be satisfied due to a  lack of post-receivership assets.  For example, in *Henrichs v. Valley View Dev.*, 474 F.3d 609, 615 (9th Cir. 2007), we determined that "a claim for damages against the FDIC stemming from the FDIC's alleged breach of the FDIC Settlement Agreement" was moot because "[t]he receivership distributed all of the failed bank's assets" and no assets remained to satisfy the alleged breach of contract claims.

The district court's dismissal of Deutsche Bank's third-tier general unsecured claims as prudentially moot is legally sound.  Pursuant to 12 U.S.C. § 1821(d)(11)(A)(iii), claims that are "general or senior liabilit[ies] of the institution" constitute third-tier claims that do not receive payment until claims for administrative expenses and claims from the institution's depositors have been satisfied.   Notably, 12 U.S.C. § 1821(d)(11) does not contain statutory exceptions for a particular species of general liability.   Rather, § 1821(d)(11)(A)(iii) provides that "[a]ny other general or senior liability" constitutes a third-tier priority claim. 12 U.S.C. § 1821(d)(11)(A)(iii) (emphasis added). This plain language in the statute reflects clear Congressional intent to not carve out an exception for general unsecured claims based on breaches of non-repudiated contracts.  *See United States v. Havelock*, 664 F.3d 1284, 1292 (9th Cir. 2012) (en banc) ("[W]e are not in the business of rewriting the law, but that of interpreting Congress's words when it enacted the statute. . . .") (citation omitted).

Relying on *Sharpe*, Deutsche Bank posits that FIRREA does not protect the FDIC when it exceeds its statutory authority by breaching pre-receivership contracts. The import of Deutsche Bank's argument is that if FIRREA does not

apply to protect the FDIC from breach of contract claims, FIRREA similarly cannot cabin Deutsche Bank's claims through application of § 1821(d)(11). However, this rationale derived from *Sharpe* does not apply to the facts of this case. As we recognized in *McCarthy*, "*Sharpe* was an unusual case. . . ." *McCarthy*, 348 F.3d at 1078. Given that we have limited *Sharpe's* reach even in the administrative exhaustion context, *see id.*, it would be illogical for us to expand *Sharpe* to more substantive provisions, such as 12 U.S.C. § 1821(d)(11), that were not at issue or addressed in *Sharpe*. *See Sharpe*, 126 F.3d at 1152 (describing the case as involving 12 U.S.C. § 1821(i) and administrative exhaustion). Although the panel in *Sharpe* wrote that "FIRREA does not permit the FDIC to breach contracts at will," it did not hold or even imply that breach of contract claims are categorically exempt from the distribution priorities set forth in 12 U.S.C. § 1821(d)(11). *Id.* at 1155. Rather, the panel simply concluded that, because the plaintiffs were not creditors or depositors, their claims were not subject to FIRREA's administrative exhaustion requirements. *See id.* at 1156–57. Given *Sharpe's* notable limitations, we are not swayed by Deutsche Bank's overly expansive interpretation of *Sharpe*.[4]

---

[4] Deutsche Bank's reliance on *County of Sonoma v. Federal Housing Finance Agency*, 710 F.3d 987 (9th Cir. 2013) is misplaced. In that case, we considered whether the Federal Housing Finance Agency acted within its authority when it precluded Freddie Mac and Fannie Mae from purchasing mortgages for properties that were encumbered by property-assessed clean energy liens. *See id.* at 988–89. Although we cited *Sharpe* for the proposition that judicial review is not barred when an agency acts beyond its statutory powers, we did not address FIRREA's provisions or the issue raised in this appeal concerning application of the priority scheme delineated in 12 U.S.C. § 1821(d)(11). *See id.* at 992.

Even if applicable to Deutsche Bank's claims, *Sharpe* militates against Deutsche Bank's assertion of a superpriority claim.  In *Sharpe*, we determined that the FDIC could have invoked FIRREA's administrative exhaustion requirements if the plaintiffs had been creditors.  *See id.* at 1156 ("Section 1821(d) sets forth an administrative claims process, which requires that creditors submit claims to the FDIC for administrative resolution.  If the Sharpes [were] considered creditors, they [would be] subject to that claims process.") (footnote reference and internal quotation marks omitted). We reasoned that the plaintiffs were not creditors because "[b]ut for the FDIC's breach, the full cash amount specified in the settlement agreement would have been wired to the Sharpes.  It is only as a consequence of the FDIC's breach that the FDIC can construe the Sharpes as creditors of the FDIC. . . ." *Id.*

In *McCarthy*, we recognized the dichotomy between creditor and non-creditor claimants and opined that *Sharpe* was of limited utility in deciding whether a debtor's claim must be exhausted, because the facts in *Sharpe* did not include either classification of claimant.  *See McCarthy*, 348 F.3d at 1078 (observing that in *Sharpe* "we had no occasion to decide whether a debtor's claim or action, like a creditor's, must be exhausted, for the Sharpes were not debtors and our decision turned on the claimants' being aggrieved parties to a contract that the FDIC had not repudiated").  Unlike in *Sharpe*, Deutsche Bank's agreements with IndyMac established a creditor relationship between Deutsche Bank and the FDIC as IndyMac's successor, prior to the FDIC's alleged post-receivership breach of contract. Indeed, the allegations of the complaint reflect the extensive nature of Deutsche Bank's creditor status.  Deutsche Bank's *Sharpe*-inspired argument that the FDIC cannot utilize

FIRREA's priority framework due to FDIC's breach is thus undermined by Deutsche Bank's status as a creditor. *See Sharpe*, 126 F.3d at 1156 ("If the Sharpes [were] considered creditors, they [would be] subject to that claims process [under § 1821(d).")**[5]** Therefore, *Sharpe's* limited exception for non-creditor claims premised on the FDIC's breach of contract does not alter the classification of Deutsche Bank's claims as general liabilities under the priority framework set forth in 12 U.S.C. § 1821(d)(11).**[6]**

---

**[5]** It is also arguable that *Sharpe* is distinguishable because the plaintiffs in *Sharpe*, unlike Deutsche Bank, fully performed the underlying contract. *See Sharpe*, 126 F.3d at 1153 ("As such, the settlement agreement governs, and the Sharpes are neither creditors nor depositors under the agreement. They are parties to a contract they fully performed.").

**[6]** In concluding that 12 U.S.C. § 1821(d) applies to Deutsche Bank's claims, we are also persuaded by the D.C. Circuit's recent decision in *MBIA Ins. Corp.*, addressing a somewhat analogous situation. In that case, MBIA Insurance Corp. (MBIA) entered into similar PSAs with IndyMac prior to its insolvency. *See MBIA Ins. Corp.*, 708 F.3d at 235–36. MBIA argued that "the FDIC Conservator of IndyMac Federal breached its seller-and-servicer obligations under the PSAs, causing damages to MBIA. . . ." *Id.* at 236. MBIA asserted that its claims constituted administrative expenses under 12 U.S.C. § 1821(d)(11)(A) "because the FDIC had approved the PSAs . . ." *Id.* (internal quotation marks omitted). In rejecting MBIA's administrative priorities contention, the D.C. Circuit observed:

> Section 1821(d)(11) establishes an order of priority among claimants of the failed bank, placing recovery of administrative expenses first, followed by depositors' claims, and only thereafter general creditors' claims. MBIA's interpretation would put general creditors before depositors simply by virtue of the fact that the contracts to which they were a party or beneficiary were liabilities transferred to the FDIC Conservator by the commonly-used mechanism of a purchase and

We, therefore, hold that *Sharpe* was limited to its particular facts and does not bar application of the statutory priority distribution framework to Deutsche Bank's general unsecured claims.[7]

---

assumption agreement, and were not repudiated. Specifically, MBIA's broad interpretation of 'approved' would place general creditor claims related to the *failed bank's pre-failure misrepresentations* above depositors, which are hardly the types of claims that could ever be classified as administrative expenses.   The FDIC regulation on administrative expenses tracks Congress's purpose that administrative expenses be a narrowly drawn category, limited to ordinary and necessary expenses of the failed institution but only those that the receiver determines are necessary to maintain services and facilities to effect an orderly resolution of the institution. . . .

*Id.* at 243–44 (citations, alterations, footnote references, and internal quotation marks omitted) (emphasis in the original).   The D.C. Circuit held that "[t]he district court therefore properly rejected MBIA's broad interpretation of 'approved' in § 1821(d)(20) and dismissed MBIA's damages claims . . . as prudentially moot in light of the FDIC's No Value Determination."   *Id.* at 245 (citation omitted).   "Where it is so unlikely that the court's grant of remedy will actually relieve the injury, the doctrine of prudential mootness permits the court in its discretion to stay its hand, and to withhold relief it has the power to grant by dismissing the claim for lack of subject matter jurisdiction . . ."   *Id.* (citation and internal quotation marks omitted).

[7] Deutsche Bank's argument premised on a constructive trust theory does not warrant reversal of the district court's dismissal for prudential mootness. Deutsche Bank's constructive trust argument relies on *Sharpe's* observation that 12 U.S.C. § 1821(j) does not bar equitable relief when the FDIC has exceeded its statutory authority.  *See Sharpe*, 126 F.3d at 1155. However, *Sharpe* does not establish Deutsche Bank's entitlement to a constructive trust or other equitable relief.  Under the facts as pled by Deutsche Bank, it is a creditor seeking payment of sums due under a

28      DEUTSCHE BANK NAT'L TRUST CO. V. FDIC

In sum, *Sharpe* and *Battista* do not support Deutsche Bank's attempt to avoid the priority distribution scheme of 12 U.S.C. § 1821(d), as neither case addressed application of the priority distribution scheme delineated in 12 U.S.C. § 1821(d) to a creditor like Deutsche Bank. Because Deutsche Bank's overly broad assertion of a superpriority claim is not supported by any controlling precedent, Deutsche Bank's claims must be evaluated under the statutory priority framework. Applying the provisions of 12 U.S.C. § 1821(d), we agree with the district court that Deutsche Bank's third-tier unsecured claims are prudentially moot because Deutsche Bank cannot recoup any sums owed from an insolvent IndyMac.

## IV.   CONCLUSION

Although the FDIC arguably breached the contracts at issue rather than repudiating them, *Sharpe* does not support Deutsche Bank's broad assertion that it is entitled to a superpriority claim in contravention of the explicit hierarchy of payment set forth in 12 U.S.C. § 1821(d)(11). Adopting Deutsche Bank's interpretation of 12 U.S.C. § 1821(d)(11) would disadvantage other equally deserving creditors who are constrained by the statutory payment priority framework. Because Deutsche Bank is a quintessential creditor, its claims are third-tier general unsecured liabilities under 12 U.S.C. § 1821(d)(11)(A)(iii), and the district court properly held that Deutsche Bank's claims were prudentially moot, as there were insufficient funds to satisfy general unsecured liabilities.

---

contract. As a creditor, Deutsche Bank is subject to the statutory priority distribution scheme and administrative exhaustion requirements contained in 12 U.S.C. §§ 1821(d)(11) and 1821(j) respectively. *See MBIA Ins. Corp.*, 708 F.3d at 243–45; *see also McCarthy*, 348 F.3d at 1076.

*See Henrichs*, 474 F.3d at 615; *see also Deutsche Bank II*, 854 F. Supp. 2d at 760 ("The FDIC has made a determination that the assets of IndyMac and IndyMac Federal are insufficient to make any distribution on general unsecured claims and therefore, such claims, asserted or unasserted, will recover nothing and have no value. . . .") (citation, footnote reference, and internal quotation marks omitted).

**AFFIRMED.**